**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| TIFD III-E INC., the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case Nos.:  3:01-CV-01839 (SRU) (lead case) 3:01-CV-01840 (SRU) |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | July 8, 2004 |
| Defendant. | ) ) ) | |

**JOINT TRIAL MEMORANDUM**

In accordance with the Court's March 22, 2004 Order and the Standing Order of the

United States District Court for the District of Connecticut, Plaintiff, TIFD III-E INC.

("Plaintiff") and Defendant the United States of America ("Defendant"), submit the following

Joint Trial Memorandum.

      1.      TRIAL COUNSEL

For Plaintiff:

      William F. Nelson (ct22883)
      David J. Curtin (ct22881)
      Michael J. Desmond (ct23186)
      John A. Galotto (ct22882)

For Defendant:

      Robert J. Higgins (ct23378)
      Barry E. Reiferson (ct24580)

      2.      JURISDICTION

This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C.

§ 1346(e) and 26 U.S.C. § 6226(a).

3.      JURY/NON-JURY

Trial of this case will be to the bench, without a jury.

4.      NATURE OF THE CASE

These consolidated cases are an action brought by Plaintiff, the tax matters partner of

Castle Harbour-I Limited Liability Company ("Castle Harbour"), seeking a refund of deposits

made with the Internal Revenue Service ("IRS") in the amount of $62,212,010, plus interest, and

seeking a decision from the Court readjusting administrative adjustments made by the Internal

Revenue Service ("IRS") in two Notices of Final Partnership Administrative Adjustments

("FPAAs") mailed to Plaintiff on June 29, 2001.  The FPAAs adjusted partnership items reported

on federal income tax returns (IRS Forms 1065) filed by Castle Harbour for the 1993 though

1998 tax years.

The first FPAA (the "1993-1996 FPAA") covered Castle Harbour's 1993 through 1996

tax years and, for informational purposes only, stated that accuracy-related penalties under 26

U.S.C. § 6662 would apply for these tax years.  The 1993-1996 FPAA is the subject of the

Complaint filed in Case No. 3:01-CV-01839 (SRU).  The second FPAA (the "1997-1998

FPAA") covered Castle Harbour's 1997 and 1998 tax years and determined that accuracy-related

penalties under 26 U.S.C. § 6662 apply.  The 1997-1998 FPAA is the subject of the Complaint

filed in Case No. 3:01-CV-01840 (SRU).  By Order dated March 19, 2002, the Court

consolidated Case No. 3:01-CV-01839 (SRU) with Case No. 3:01-CV-01840 (SRU) for all

purposes, including trial.

5.    <u>STIPULATIONS OF FACT AND LAW</u>

The parties have agreed and stipulated to the following issues of fact and/or law:

1. Plaintiff is a Delaware corporation headquartered at 201 High Ridge Road, Stamford, Connecticut 06927.

2. GE Capital Summer Street-I LLC was organized on July 26, 1993 as a state law limited liability company ("LLC") under Nevada law.

3. On October 6, 1993, GE Capital Summer Street-I LLC changed its name to Castle Harbour-I Limited-Liability Company ("Castle Harbour").

4. Castle Harbour timely filed its U.S. Returns of Partnership Income (Form 1065) with the IRS for the 1993 through 1998 tax years (the "Partnership Returns").

5. Plaintiff is the Tax Matters Partner ("TMP") of Castle Harbour for each of the 1993 through 1998 tax years, within the meaning of 26 U.S.C. § 6231(a)(7).

6. In its capacity as the TMP of Castle Harbour, Plaintiff is the authorized and proper party to bring these consolidated actions under 26 U.S.C. § 6226(a).

7. The IRS mailed two Notices of Final Partnership Administrative Adjustments ("FPAAs") to Plaintiff on June 29, 2001, adjusting partnership items reported on the Partnership Returns.

8. Plaintiff timely filed separate Complaints in these consolidated actions pursuant to 26 U.S.C. § 6226(a), challenging the FPAAs.

9. Prior to filing these consolidated actions, Plaintiff made jurisdictional deposits of tax in the total amount of $62,212,010, as required by 26 U.S.C. § 6226(e) for each of the 1993 through 1998 tax years.

10. This Court has subject matter jurisdiction over these consolidated cases pursuant to 26 U.S.C. § 6226(a) and 28 U.S.C. § 1346(e).

11. During the 1993 through 1998 tax years, Plaintiff and TIFD III-M INC., a Delaware corporation ("TIFD III-M"), were members of Castle Harbour.

12. Plaintiff and TIFD III-M are both indirect subsidiaries of General Electric Capital Corporation ("GECC"), which is a wholly owned indirect subsidiary of The General Electric Company ("GE").

13. During the 1993 through 1998 tax years, Plaintiff and TIFD III-M were part of an "affiliated group" pursuant to 26 U.S.C. § 1504, of which GE was the "common

3

parent" responsible for filing a consolidated federal income tax return.

14. For the 1993 through 1998 tax years, Castle Harbour was classified as a partnership under the Internal Revenue Code.

15. Plaintiff acquired its original membership interest in Castle Harbour through the contribution on July 26, 1993 of aircraft assets (including beneficial interests in certain trusts which owned commercial aircraft and engines), the stock of a subsidiary corporation, and cash.

6.    PLAINTIFF'S CONTENTIONS

Plaintiff contends that the adjustments to Castle Harbour's partnership items made by the FPAAs are erroneous, and that no ground set forth in the FPAAs for reallocating taxable income among the members of Castle Harbour has legal or factual merit. Specifically, Plaintiff contends (1) that Castle Harbour had economic substance and a legitimate business purpose, as those terms are defined under applicable law, (2) that Internationale Nederlanden Bank N.V. ("ING") and Rabo Merchant Bank N.V. ("Rabo") were members of and not lenders to Castle Harbour; and (3) that the allocations of taxable income set forth in the Amended and Restated Operating Agreement of Castle Harbour complied with the provisions of 26 U.S.C. § 704(b) and the regulations thereunder. Plaintiff understands that the Defendant has abandoned the fourth alternative argument set forth in the FPAAs, namely that 26 U.S.C. § 482 and the regulations thereunder permit a reallocation of Castle Harbour's items of income, deductions, credits or allowances. Therefore, section 482 has no application in this case. Plaintiff further contends that accuracy-related penalties under 26 U.S.C. § 6662 are erroneously asserted by the IRS.

As relief, Plaintiff seeks a determination that the adjustments set forth in the FPAAs are erroneous as a matter of fact and law, and that Castle Harbour properly reported all items of income, deduction and credit on its 1993 through 1998 income tax returns. Plaintiff further seeks a determination that accuracy-related penalties under 26 U.S.C. § 6662 do not apply, and seeks

an order and judgment directing Defendant to refund to Plaintiff the jurisdictional deposits made in connection with this case, together with interest thereon.

Concurrent with the filing of this Joint Trial Memorandum, Plaintiff will submit its Trial Brief, which provides a more detailed summary of the facts that Plaintiff will prove at trial, and a detailed analysis of applicable law.

7.    DEFENDANT'S CONTENTIONS

The defendant's position is that the Internal Revenue Service (IRS) correctly reallocated to the General Electric Capital Corporation (GECC) approximately $310 million of taxable income which Castle Harbour had allocated on its tax returns from 1993 through 1998 to the foreign, tax-indifferent Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.).  The income at issue was primarily lease income from the rental of 63 aircraft and engines contributed by GECC to Castle Harbour before the Dutch banks joined it on October 6, 1993.  GECC created Castle Harbour with the plan to bring in tax-indifferent foreign banks, to shelter this income which could no longer be offset by allowable depreciation deductions as the aircraft and engines had already been fully depreciated to a zero tax basis, yet remained under lease producing a predictable and significant income stream.

The tax shelter required foreign participants which would be protected by tax treaties from United States taxation on the 98% of the lease income to be allocated away from GECC. The Dutch banks qualified under the tax treaties between the United States and the Netherlands, generally speaking, as long as the activities of Castle Harbour took place outside the United States.

The tax shelter would not have made economic sense to GECC if the Dutch banks actually received distributions in the amount of sheltered income, $310 million.  The Dutch

banks did not receive distributions in this amount. The Dutch banks joined Castle Harbour by

making a contribution of approximately $117 million and expected a return of this capital plus

interest at the "applicable rate" of 9.03587%. Through book accounting procedures which

permitted depreciation based on the fair market value of the contributed aircraft (even though the

contributor, GECC had no further depreciation to claim for tax purposes), the 98% of lease

income actually distributed to the Dutch banks amounted to approximately $27.7 million.

The Dutch banks had no management role in Castle Harbour and were not free to sell

their alleged interests. Their targeted return rate, 9.03587%, was carefully calculated and

zealously protected. They required a direct and unconditional performance guaranty from GECC

with respect to the operations of Castle Harbour and the making of payments to it. GECC agreed

to make additional contributions to Castle Harbour if they were necessary to meet the repayment,

with interest, obligations to the Dutch banks. Castle Harbour had to hold, at all times, in liquid

assets an amount equal to 110% of the balance in the Dutch banks' "investment accounts" with

Castle Harbour. The Dutch banks were indemnified against any non-Dutch taxes which might

arise from Castle Harbour operations.

The Dutch banks' repayment rights differed from the GECC entities. They received

annual distributions set forth on Exhibit E to the operating agreement signed on October 6, 1993.

Failure to make such payments allowed the Dutch banks to demand a liquidation of Castle

Harbour. The Exhibit E payments were part of the mechanism to return the Dutch banks

contribution with an interest rate of 9.03587%. The Exhibit E payments totaled over $118

million between 1993 and 1997. The Dutch banks were also provided guaranteed payments and

indemnification premiums in the event of their premature removal by GECC, which were

actually paid when they exited Castle Harbour in December 1998.  The GECC entities were only

guaranteed annual payment of $500,000.

The allocation of 98% of income to the Dutch banks played an important role in the tax

shelter and in compensating the Dutch banks at the target rate of 9.03587%.  Allocating the

income by the Dutch banks alleged ownership interest in Castle Harbour—which declined over

the years with the Exhibit E payments—would have reduced the allocation of income to

approximately $2.5 million rather than the approximately $27.7 million capital account

allocation of income.  The 98% allocation of income would also benefit GECC on an after-tax

basis if the tax shelter is permitted.  By avoiding taxation on approximately $310 million, GECC

would save approximately $62 million in taxes.  Allocating $27.7 million to the Dutch banks

reduces this sought after savings (as does transaction costs, which exceeded $13 million through

1994).  GECC also received an immediate income boost in 1993 after contributing the aircraft

by reducing its deferred income tax liability account—and thus increasing income—by $71.3

million.

The Castle Harbour tax shelter changed the form but not the substance of GECC's

aircraft leasing operations with respect to the 63 fully tax depreciated aircraft and engines

contributed.  GECC employees were appointed managers and general mangers of Castle

Harbour.  The Dutch banks had no role in such selections.  The GECC employee appointed

general manager in 1993 was paid only $12,000 per year by Castle Harbour, which began with

$595 million in assets.  GECC first placed a manager in Bermuda, the supposed operations

center for Castle Harbour in 1995.  He was an employee of a GECC subsidiary and his salary

and expenses were not paid for by Castle Harbour but by TIFD III-E.  The management of

Castle Harbour's aircraft portfolio essentially was performed by GECC employees based in

Shannon, Ireland, just like the rest of GECC's aircraft portfolio. Castle Harbour only had one, part-time employee in Bermuda.

GECC had no purpose in creating and operating Castle Harbour other than to shelter income from the federal income tax. The $240 million cash contribution was both necessary to create a positive tax basis for TIFD III-E in Castle Harbour and quickly circulated back to GECC through the purchase of commercial paper. Castle Harbour was not proposed as the result of relatively minor business difficulties in 1991 but in the spring/summer of 1993. GECC's aircraft portfolio had no non-performing aircraft in 1993. GECC, in fact, was expanding its aircraft holdings at the time Castle Harbour was created, from 400-500 planes to almost 1000 in 1994. The contribution by the Dutch banks to Castle Harbour —$117 million —was not needed and could not be used by Castle Harbour due to the obligation to maintain liquid assets in an amount equal to 110% of the Dutch banks contributions that were not yet repaid.

The tax treatment of the arrangement was the result of negligence and/or a disregard of rules and regulations. Further, the tax treatment resulted in a substantial understatement of tax by Castle Harbour and the GE consolidated group. Therefore, a 20% penalty pursuant to IRC § 6662 is appropriate.

8.    LEGAL ISSUES

**Plaintiff's Statement**:

    a.  Whether Castle Harbour lacked economic substance and had a legitimate business purpose.

    b.  Whether ING and Rabo made equity investments in Castle Harbour or whether they made loans.

 c. Whether the allocations contained in Castle Harbour's Amended and Restated Operating Agreement complied with 26 U.S.C. § 704(b) and the regulations thereunder.

 d. Whether, for the 1997 and 1998 tax years, accuracy-related penalties under 26 U.S.C. § 6662 apply.

**Defendant's Statement:**

 a) Whether a valid partnership existed for tax purposes among the GE entities (TIFD, III-E, Inc. and TIFD, III-M, Inc.) and the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.);

 b) Whether the October 6, 1993, transaction by which GE entities (TIFD, III-E, Inc. and TIFD, III-M, Inc.) and the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.) purported to form a partnership for tax purposes was a "sham transaction" which lacked a non-tax business purpose and economic substance;

 c) Whether the participation of the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.) was in substance in the nature of a lender rather than a partner;

 d) Whether the special allocation by Castle Harbour of 98% of its taxable income violated the provisions of IRC § 704(b)(2) as lacking "substantial economic effect," as defined by Treas. Reg. § 1.704-1(b)(2), and should be disregarded;

e) Whether the GE entities (TIFD, III-E, Inc. and TIFD, III-M, Inc.) are liable for

the accuracy related penalties under IRC § 6662, due to either negligence or

disregard of rules or regulations or due to a substantial understatement of tax.

9.    VOIR DIRE QUESTIONS

Not applicable.

10.    LIST OF WITNESSES

Plaintiff reserves the right to call the following individuals as witnesses at trial:

| Witness | Brief Statement of Anticipated Testimony |
| --- | --- |
| Daniel Brickman | Mr. Brickman is affiliated with the investment banking firm of Babcock & Brown, Inc. ("Babcock & Brown"), and will testify regarding GECC's solicitation of investment ideas from Babcock & Brown in 1992 and 1993 to address problems in its aircraft leasing business. Mr. Brickman will also testify regarding the origin and structuring of the Castle Harbour transaction and will testify about steps taken by Babcock & Brown to locate equity investors for Castle Harbour. |
| Eric Dull | Mr. Dull was the lead negotiator for GECC in its negotiations with ING and Rabo over their investments in Castle Harbour and will testify about those negotiations. Mr. Dull will also testify regarding the origin and structure of Castle Harbour and GECC's reasons for entering into the transaction. Mr. Dull was also an officer and director of TIFD III-M and will testify regarding the involvement and participation of TIFD III-M as an owner of Castle Harbour. |
| Niall Greene | Mr. Greene held a senior position with General Electric Capital Aviation Services, Ltd. ("GECAS, Ltd.") in the mid-1990s and will testify regarding aircraft remarketing generally, the state of the aircraft market in the 1990s, and remarketing work done by GECAS, Ltd. under contractual arrangements with Castle Harbour and other entities. |
| Dermot Hanly | Mr. Hanly worked for GECAS, Ltd. in the mid-1990s and performed financial, accounting and other administrative services for GECAS and for other third parties, including Castle Harbour, under contractual arrangements. Mr. Hanly will testify regarding administrative services he performed for with Castle Harbour, including processing expenses and distributions, preparation of financial statements and preparation of tax returns. |

10

| | |
|---|---|
| Diarmuid Hyde | Mr. Hyde was a manager of Castle Harbour resident in Bermuda from 1995 through 1997. Mr. Hyde will testify regarding his duties and responsibilities as a manager of Castle Harbour and will testify regarding the business and operations of Castle Harbour during this time period. |
| Richard Koffey (likely by deposition) | Mr. Koffey is affiliated with Babcock & Brown and will testify regarding GECC's solicitation of ideas from Babcock & Brown in 1992 and 1993 to address problems in its aircraft leasing business. Mr. Koffey will also testify regarding the origin and structuring of the Castle Harbour transaction and will testify about steps taken by Babcock & Brown to locate equity investors for Castle Harbour. Mr. Koffey will testify regarding tax aspects of the Castle Harbour transaction. |
| Robert Lewis | In 1993, Mr. Lewis was the head of Transportation & Industrial Funding Corporation (T&I), a wholly owned subsidiary of GECC that held, as one of its businesses, GECC's commercial aircraft financing business. Mr. Lewis will testify regarding market conditions for the commercial aircraft financing business in the 1990s, the challenges facing GECC in that business, the reasons the company entered into the Castle Harbour transaction, and the internal approval process for that transaction. |
| Hem Mulders (by deposition) | Mr. Mulders was the lead negotiator for Rabo on the Castle Harbour transaction and served as Rabo's representative for Castle Harbour during the five years in which Rabo was an investor. Mr. Mulders will testify by videotaped deposition regarding Rabo's reasons for investing in Castle Harbour, its negotiations with GECC over the transaction, the structure of Castle Harbour, Castle Harbour's operations, and Rabo's participation in the management of Castle Harbour. |
| Denis Nayden | Mr. Nayden was the Executive Vice President of GECC in 1993. Mr. Nayden will testify regarding market conditions for the commercial aircraft financing business in the 1990s, the challenges facing GECC in that business, the reasons the company entered into the Castle Harbour transaction, and the internal approval process for the transaction. Mr. Nayden will also testify about the capital structure of GECC and the process the company followed in the 1990s to raise funds for its operations. |
| Wilfred Nagel (by deposition) | Mr. Nagel was the lead negotiator for ING on the Castle Harbour transaction. Mr. Nagel will testify by videotaped deposition regarding ING's reasons for investing in Castle Harbour, its negotiations with GECC, the structure of Castle Harbour, Castle Harbour's operations, and Rabo's participation in the management of Castle Harbour. |

| | |
|---|---|
| Robert O'Reilly | In 1993, Mr. O'Reilly was the head of the Transportation Financing division of GECC's T&I subsidiary, which held, as one of its businesses, GECC's commercial aircraft financing business. Mr. O'Reilly will testify regarding market conditions for the commercial aircraft financing business in the 1990s, the challenges facing GECC in that business, the reasons the company entered into the Castle Harbour transaction, and the internal approval process for the transaction. |
| Charles Oleson | Mr. Oleson was the General Manager of Castle Harbour in 1998 and was also the manager resident in Bermuda in 1997 and 1998. Mr. Oleson will testify regarding the activities and operations of Castle Harbour and will testify regarding the 1998 buy-out by subsidiaries of GECC of Rabo and ING's interests in Castle Harbour. |
| James Parke | Mr. Parke is the Chief Financial Office of GECC, a position he held in 1993. Mr. Parke will testify regarding market conditions for the commercial aircraft financing business in the 1990s, the challenges facing GECC in that business, the reasons the company entered into the Castle Harbour transaction, and the approval process for that transaction. Mr. Parke will also testify about the capital structure of GECC, the process the company follows to raise funds for its operations, and the treatment and reporting of items on the company's financial statements. |
| Chris Tewell | Mr. Tewell was the General Manager of Castle Harbour from 1993 through 1997. Mr. Tewell will testify regarding the activities and operations of Castle Harbour during that time period. |
| Professor Stewart Myers | Professor Myers will be offered by Plaintiff as an expert witness in the area of financial economics and corporate finance. Professor Myers will opine that GECC made a material, positive return on its investment in Castle Harbour, and will opine that, from a corporate finance perspective, ING and Rabo were partners in, rather than lenders to, Castle Harbour. |

Plaintiff reserves the right to call any witness listed by Defendant and reserves the right to call other witnesses for purposes of rebuttal and impeachment, including but not limited to its designated rebuttal expert, Professor Norman Strauss.

Defendant reserves the right to call the following witnesses at trial:

1) Daniel Brickman:                    2 Soundview Drive, Greenwich, CT 06830

    Anticipated Testimony:       Mr. Brickman will testify regarding his work with Babcock & Brown regarding the formation of Castle Harbour, its structure, and predicted financial operations.

2) John B. Fahy:                    32 Twin Pond Road Lane, New Canaan, CT 06840

    Anticipated Testimony:       Mr. Fahy will testify regarding the formation of Castle
                                    Harbour, particularly the various financial information
                                    schedules prepared for potential foreign investors and for
                                    the GE entities and the Dutch banks during the negotiations
                                    leading to the Castle Harbour agreement on October 6,
                                    1993.

3) GECC/TIFD III-E:                 201 High Ridge Road, Stamford, CT 06927

    Anticipated Testimony:       The corporate plaintiff will designate a knowledgeable
                                    person to testify regarding the preparation of all financial
                                    records produced by it during discovery, including but not
                                    limited to the federal income tax returns of Castle Harbour-
                                    I Limited Liability Company, Castle Harbour Leasing, Inc.,
                                    and the Financial Statements prepared for these same
                                    entities, for the years 1993 through 1998.

                                    The corporate plaintiff will designate a person
                                    knowledgeable to testify regarding all aspects of the
                                    Amended and Restated Operating Agreement signed on
                                    October 6, 1993 and the Operating Manual for Castle
                                    Harbour.

4) Dr. John Lacey                   7 Poppy Trail, Rolling Hills, CA 90274
                                    310-541-5913

    Anticipated Testimony:       Dr. Lacey is an expert in the fields of accounting,
                                    economics, and quantitative business analysis.
                                    His review of Castle Harbour's financial and operational
                                    records support his conclusions that 1) the money
                                    contributed by the Dutch banks to Castle Harbour was not
                                    used or needed by Castle Harbour; 2) the use of the Dutch
                                    banks' contributions was restricted by the agreement
                                    among the GE entities and the Dutch banks; 3) GECC's
                                    contribution of $296 million to Castle Harbour was used to
                                    offset a negative capital account and circulated back to
                                    GECC through the purchase of GECC commercial paper;
                                    4) the Dutch banks did not obtain the risks and rewards of
                                    ownership through their contribution to Castle Harbour; 5)
                                    the Dutch banks' cash contributions to Castle Harbour had
                                    characteristics of debt; 6) the only business purpose for
                                    including the Dutch banks in Castle Harbour was the
                                    avoidance of paying federal income taxes by GE; 7) Castle

Harbour allocated 98% of its taxable income to the Dutch banks to avoid GE having to pay $62 million in federal income taxes; 8) the cash paid to the Dutch banks was a small percentage of the taxable income allocated to them by Castle Harbour; 9) the allocation of 98% of Castle Harbour's taxable income to the Dutch banks benefited the Dutch banks and GE, which would not have been the result if the allocations followed ownership interests.

5) Dr. Herbert T. Spiro          17516 Lemarsh, Northridge, CA 91325
                                 818-349-9458

Anticipated Testimony:          Dr. Spiro is a financial economist specializing in economic feasibility assessments and financial analysis. His review of Castle Harbour's financial and operational records, and the initial report prepared by Stewart Myers, support his conclusions that the nature of the Dutch banks' transaction with Castle Harbour was that of a term loan.

Defendant reserves the right to call any witness listed by plaintiff and reserves the right to call other witnesses for purposes of rebuttal and impeachment.

11.    EXHIBITS

Attached as Appendix A is a list of the parties' Joint Exhibits. Attached as Appendix B is a list of Plaintiff's exhibits, together with Defendant's objections thereto. Attached as Appendix C is a list of Defendant's Exhibits, together with Plaintiff's objections thereto. The parties have reserved all objections as to relevance for all exhibits other than Joint Exhibits.

12.    DEPOSITION TESTIMONY

The parties have designated and cross-designated deposition testimony from Richard Koffey, Hem Mulders and Wilfred Nagel. Although Plaintiff anticipates that they will testify at trial, in the event that they do not, Defendant has reserved the right to present at trial the disposition testimony of Diarmuid Hyde and Dermot Hanly. The parties' deposition designations and counter-designations are included on Appendix D. Plaintiff has objected to certain portions of Defendant's designations from the depositions of Messrs. Hanly, Mulders and Nagel, as noted

14

on Appendix D. Plaintiff also objects to the introduction into evidence of any exhibits referred to in Defendant's designations of deposition testimony unless they have otherwise been listed as exhibits on Defendant's exhibit list. To the extent such exhibits have been listed on Defendant's exhibit list, Plaintiff incorporates by reference its objections (if any) to those exhibits.

Defendant includes on its exhibit list all deposition exhibits introduced or referred to by the defendant within the designated deposition testimony of Richard Koffey, Diarmuid Hyde, Dermot Hanly, Hem Mulders and Wilfred Nagel.

13.    REQUESTS FOR JURY INSTRUCTIONS

Not applicable.

14.    ANTICIPATED EVIDENTIARY PROBLEMS

Evidentiary Problems Anticipated by Plaintiff

Plaintiff anticipates an evidentiary problem with respect to the testimony of one of Defendant's designated experts, Dr. John Lacey. On June 10, 2004, Defendant disclosed that Dr. Lacey had performed "additional analysis" and that testimony regarding this analysis would be offered at trial. Plaintiff has objected to Dr. Lacey's additional analysis, and will object to any proffered testimony regarding that analysis, on the grounds that it is an impermissible attempt to supplement an expert report after the August 15, 2003 date set forth in the Court's Scheduling Order. It is Plaintiff's position that Defendant should have filed a motion for relief from the Court's Scheduling Order with respect to Dr. Lacey's additional analysis. Plaintiff disputes that there is any basis for such relief. At trial, Plaintiff will object to any proffered testimony from Dr. Lacy regarding the additional analysis on the basis that it was not properly disclosed under the Court's Scheduling Order and Fed. R. Civ. P. 26(a)(2), and will object on other appropriate grounds.

Plaintiff also anticipates an evidentiary problem with respect to Defendant's listing of GECC and TIFD III-E as trial witnesses. Plaintiff will challenge any subpoena or other attempt to compel unnamed representatives of these entities to testify at trial, and will challenge any other effort by Defendant to designate trial witnesses under the pre-trial discovery procedures of Fed. R. Evid. 30(b)(6).

Evidentiary Problems Anticipated by Defendant

Pursuant to the Court's instruction on June 30, 2004, the defendant will request a telephone conference to raise any evidentiary problems in anticipation of trial rather than file any written motions, unless such are requested by the Court. A suggested date for such a conference is Monday, July 12, 2004.

The defendant's position with respect to the expert testimony of Dr. John Lacey is that by notifying the plaintiff of the "additional analysis" on June 10, 2004, the defendant acted with an abundance of caution to satisfy the duty to supplement set forth in Rule 26(e). The deadline for such supplementation in this case appears to be July 8, 2004, pursuant to Rule 26(e)(1) and Rule 26(a)(3). There may not have been a duty to inform the plaintiff at all about Dr. Lacey's supplemental analysis as it concerns plaintiff's own financial information and tax returns which are part of the record in this case and considered by Dr. Lacey before issuing his report on August 15, 2003. Nonetheless, the defendant advised the plaintiff of Dr. Lacey's additional analysis on June 10th, provided the schedules demonstrating the analysis on June 18th and offered a supplemental deposition of Dr. Lacey. The plaintiff has not responded to this offer.

With respect to the defendant identifying the corporate plaintiff, TIFD III-E, and its corporate parent, General Electric Capital Corporation (GECC) on defendant's witness list, the defendant is protecting its interests by identifying these corporations as potential witnesses on

16

specific matters which the defendant is not certain the plaintiff will present in its case in chief.

Defendant assumes that the plaintiff can identify persons with such knowledge to testify on its

behalf at the trial, just as it will be able to designate representatives to attend the trial,

notwithstanding the provisions of Rule 615, Federal Rules of Evidence. The defendant is also

reserving its right to call any witness designated by the plaintiff as a witness for the defense in

this matter.

15.    PROPOSED FINDINGS AND CONCLUSIONS

Plaintiff's Proposed Findings of Fact and Conclusions of Law are attached as Appendix

E. Defendant's Proposed Findings of Fact and Conclusions of Law are attached as Appendix F.

The parties will each file trial briefs concurrent with the submission of this Joint Trial

Memorandum.

16    TRIAL TIME

The parties estimate that trial of this matter will take up to 13 court days, running from

July 21, 2004 through August 6, 2004.

An additional trial day may be necessary after the above-scheduled trial

dates to take testimony of one of defendant's experts, Dr. Herbert T. Spiro, who

will not be available to testify during defendant's case during the above scheduled

trial dates, as he will be out of the country. An additional trial day may also be

necessary for another witness under subpoena by the defense, John B. Fahy, an

employee of Babcock & Brown, the investment banking firm involved in the

Castle Harbour transaction. His current availability is limited to July 26 and 27.

He is scheduled to be out of the country after these dates during the above trial

dates.

17.    FURTHER PROCEEDINGS

The Defendant anticipates the Court considering evidentiary motions and motions to compel prior to the commencement of trial.

There remains pending the resolution of the Defendant's motion to compel production of documents withheld by Plaintiff on grounds of privilege. The Court is reviewing these documents <u>in camera</u> and a conference call was held on this matter on June 30, 2004. At that time, the Court requested additional information from the Plaintiff. Plaintiff will provide this information to the Court on or before the Pretrial Conference, scheduled for July 15, 2004 at 4:00 p.m.

18.    ELECTION FOR TRIAL BY MAGISTRATE

The parties both prefer to have this matter tried to the District Court, rather than to a United State Magistrate.

Respectfully submitted this 8th day of July 2004.


PLAINTIFF
TIFD III-E INC.

By: _Anthony M. Fitzgerald_ (signature)
    One of the Attorneys for Plaintiff

Anthony M. Fitzgerald, ct04167
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, CT  06509-1950
Telephone:  (203) 777-5501
Facsimile:  (203) 784-3199
e-mail:  afitzgerald@carmodylaw.com

William F. Nelson (ct22883)
David J. Curtin, ct22881
Michael J. Desmond, ct23186
John A. Galotto, ct22882
McKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
wnelson@mckeenelson.com
dcurtin@mckeenelson.com
mdesmond@mckeenelson.com
jgalotto@mckeenelson.com


DEFENDANT
UNITED STATES OF AMERICA

By: _Robert J. Higgins by John Hughes_ (signature)
    Robert J. Higgins (ct23378)
    Barry E. Reiferson (ct24580)
    Trial Attorneys, Tax Division
    U.S. Department of Justice
    Post Office Box 55
    Ben Franklin Station
    Washington, D.C.  20044
    Telephone:  (202) 307-6580
    Facsimile:  (202) 514-9440

Kevin J. O'Connor
United States Attorney

John B. Hughes
Chief, Civil Division