APPENDIX E

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TIFD III-E INC., the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case Nos.: 3:01-CV-01839 (SRU) (lead) <br> 3:01-CV-01840 (SRU) (member) |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.     FINDINGS OF FACT**

   **A.     Jurisdictional Facts**

1.  Plaintiff is a Delaware corporation headquartered at 201 High Ridge Road, Stamford, Connecticut 06927.

2.  GE Capital Summer Street-I LLC was organized on July 26, 1993, as a state law limited liability company ("LLC") under Nevada law.

3.  On October 6, 1993, GE Capital Summer Street-I LLC changed its name to Castle Harbour-I Limited-Liability Company ("Castle Harbour").

4.  Castle Harbour timely filed its U.S. Returns of Partnership Income (Form 1065) with the IRS for the 1993 through 1998 tax years (the "Partnership Returns").

5.  Plaintiff is the Tax Matters Partner ("TMP") of Castle Harbour for each of the 1993 through 1998 tax years, within the meaning of I.R.C. ("I.R.C.") § 6231(a)(7).

6.  In its capacity as the TMP of Castle Harbour, Plaintiff is the authorized and proper party to bring these consolidated actions under I.R.C. § 6226(a).

1

7. The IRS mailed two Notices of Final Partnership Administrative Adjustments ("FPAAs") to Plaintiff on June 29, 2001, adjusting partnership items reported on the Partnership Returns.

8. Plaintiff timely filed separate Complaints in these consolidated actions pursuant to I.R.C. § 6226(a).

9. Prior to filing these consolidated actions, Plaintiff made jurisdictional deposits of tax in the total amount of $62,212,010, as required by I.R.C. § 6226(e), for each of the 1993 through 1998 tax years.

10. During the 1993 through 1998 tax years, Plaintiff and TIFD III-M INC., a Delaware corporation ("TIFD III-M"), were members of Castle Harbour.

11. Plaintiff and TIFD III-M are both indirect subsidiaries of General Electric Capital Corporation ("GECC"), which is a wholly owned indirect subsidiary of The General Electric Company ("GE").

12. During the 1993 through 1998 tax years, Plaintiff and TIFD III-M were part of an "affiliated group" pursuant to I.R.C. § 1504, of which GE was the "common parent" responsible for filing a consolidated federal income tax return.

13. For the 1993 through 1998 tax years, Castle Harbour was classified as a partnership under the Internal Revenue Code.

14. Because Plaintiff and TIFD III-M (as well as GECC) were both members of GE's consolidated group (the "GE Group") for tax purposes during the 1993 through 1998 taxable years, their tax liabilities were reported as part of the GE Group's consolidated federal tax returns.

### B.  GECC's Background in the Aircraft Leasing Business

15. GECC entered into the commercial aircraft financing business, which included aircraft leasing, in the 1960s.

16. In the early 1990s, GECC's aircraft leasing business was operated primarily through an operating division called Transportation & Industrial Funding Corporation ("T&I") and through an indirect subsidiary called Polaris Holding Company ("Polaris").

17. From the 1960s through the early 1990s, GECC's aircraft leasing business focused on long-term finance leases (including leveraged leases), rather than shorter-term operating leases.

18. Finance leases are longer in duration than operating leases and therefore require the lessor to take a less active role in managing and remarketing its aircraft than do operating leases.

19. In the late 1980s, GECC expanded its commercial aircraft leasing business by acquiring an interest in Polaris, a California-based company that specialized in commercial aircraft operating leases.

20. In 1992, GECC had approximately 350 leased airplanes in its portfolio, including both T&I (primarily finance leases) and Polaris (primarily operating leases) aircraft.

21. In 1992, approximately 40% of the airplanes in GECC's portfolio were older "Stage II" aircraft manufactured in the 1970s and early 1980s.

22. Stage II aircraft were significantly less valuable than newer, Stage III aircraft because they were not compliant with "Stage III" noise regulations, they were less fuel efficient, and they were more expensive to operate.

### C. GECC's Acquisition of Guinness Peat Aviation Assets

23. Guinness Peat Aviation Group, Plc ("GPA") is a Shannon, Ireland-based company that specialized in commercial aircraft operating leases.

24. In May 1992, an attempted initial public offering of stock by GPA failed.

25. The cancellation of GPA's IPO provided an opportunity for GECC to acquire additional knowledge and capacity in the aircraft leasing business, particularly with respect to operating leases.

26. On October 30, 1993, GECC closed a transaction in which it acquired assets from GPA, including 45 aircraft subject to short-term operating leases, aircraft management systems, and a personnel structure.

27. Following the acquisition of assets from GPA, GECC consolidated its aircraft leasing business into a new business group known as General Electric Capital Aviation Services or "GECAS."

28. The purchase of GPA's assets gave GECC a significant world-wide presence in the aircraft leasing business and enhanced GECC's capabilities, particularly with respect to the management, operation and remarketing of leased aircraft.

29. Following the acquisition of assets from GPA, and pursuant to a management services agreement, GECAS continued to manage a large portfolio of airplanes that GPA did not sell to GECC.

### D. GECC's "Sell-Down" Effort

30. From 1991 through 1993, the commercial airline industry was in a severe down cycle caused, in part, by the Persian Gulf War.

31. The problems facing the commercial airline industry in the early 1990s were reflected in bankruptcy filings by a number of major U.S. airlines, including Continental Airlines in

      December 1990, Pan American in January 1991, Midway in March 1991, America West in June 1991, and TransWorld Airlines in January 1992.

32. The down cycle in the commercial airline industry created excess capacity, which limited airlines' ability to pass costs on to their customers.

33. In 1991, the total number of passenger airline miles flown declined on a year-over-year basis for the first time since World War II.

34. The recession in the airline industry had a direct impact on GECC, which had hundreds of millions of dollars invested in commercial airplanes and commercial airplane leases.

35. In 1991, during the course of its bankruptcy proceedings, Eastern Airlines transferred 26 airplanes to GECC.

36. The 26 airplanes transferred by Eastern became "non-performing" assets on GECC's balance sheet, leading to write-downs on the book value of the airplanes, creating a drain on GECC's earnings, and affecting the profitability of the company's aircraft financing business.

37. The 26 airplanes transferred by Eastern were part of a significant increase in the number of non-performing aircraft in GECC's portfolio in the early 1990s.

38. GECC's non-performing aircraft assets (and assets that were at risk of non-performing) created an external perception among some market analysts and investors of an issue that could undermine the performance of GE's stock.

39. GECC's non-performing aircraft assets also made it difficult for the company to attract third-party capital to the aircraft financing business.

40. GECC's ability to attract third-party capital to its aircraft financing business was important because it demonstrated vitality in the market, provided independent validation of the company's investment decisions, and provided independent validation for the residual value of the company's airplanes.

41. In 1991, GECC's ability to reduce its non-earning assets (including aircraft) was identified as a significant factor in the market's assessment of the value of GE stock.

42. In the early 1990s, many of the Stage II airplanes in GECC's portfolio were at risk of becoming non-performing assets because they were on lease to airlines that were in or on the verge of bankruptcy.

43. When Stage II airplanes were returned to GECC before the end of their lease terms, it was difficult for GECC to find new homes for them in the depressed market that existed in the early 1990s.

44. In 1993, credit rating agencies were concerned about GECC's exposure to the airline industry.

4

45. In 1993, credit rating agencies were particularly concerned with GECC's exposure to older Stage II airplanes.

46. GECC's exposure to non-performing aircraft assets led to a directive from senior management that there would be no new investment in the company's aircraft financing business until its exposure to non-earning assets, in particular Stage II aircraft, was reduced.

47. Notwithstanding the recession in the airline industry in the early 1990s, GECC saw strong potential for long-term growth in the aircraft financing business.

48. In order to address short-term business constraints and to position GECC for long-term growth, in 1992 the company began to develop a plan to manage or "sell-down" non-performing assets (and assets at risk of not performing), including aircraft.

49. The "sell-down" effort was not limited to selling assets, but included a full range of measures to reduce exposure to or "monetize" assets without actually selling them.

50. GECC's efforts to manage non-performing assets were constrained by its historical focus on long-term finance leases, which did not provide the company with a high level of experience in areas like aircraft remarketing.

51. In connection with the sell-down effort, beginning in May 1992, GECC's corporate finance department submitted requests for proposal (collectively, the "Sell-Down RFP") to seven investment banks, seeking ideas that would help the company achieve three primary objectives.

52. The seven investment banks that initially received the Sell-Down RFP in May 1992 were Citicorp, Goldman Sachs, Bankers Trust, McManus & Miles, Kidder Peabody & Company, Babcock & Brown, Inc. ("Babcock & Brown"), and Morgan Stanley & Co., Inc.

53. The primary objectives of the Sell-Down RFP were: (i) accessing liquidity in order to meet the industry's future demands; (ii) tapping into a wider pool of investor capital; and (iii) achieving off-balance financing for a portion of GECC's current asset portfolio.

54. One of the investment banks to whom the Sell-Down RFP was submitted was Babcock & Brown, Inc. ("Babcock & Brown"), an investment banking firm that specialized in asset leasing transactions.

55. GECC had worked with Babcock & Brown previously on asset leasing transactions.

56. The seven investment banks that originally received the Sell-Down RFP responded to it by providing GECC with proposed transactions designed to meet the identified objectives.

57. GECC reviewed the proposed transactions and determined that it would proceed with consideration of three proposals submitted by four of the seven investment banks.

58. The steps GECC could take to implement the sell-down effort were limited by overall capital structure restrictions, including a target 8:1 debt to common equity ratio which limited the amount of money GECC could raise through debt offerings, and by a "negative pledge" covenant in some if its public debt that limited GECC's ability to borrow funds against its assets.

59. The 8:1 debt to common equity benchmark was established through an agreement with Moody's Investor Services and other credit rating agencies as to the steps GECC would take to maintain its AAA credit rating.

60. At the end of 1993, GECC's debt to common equity ratio was 7.96:1.

61. The negative pledge was a financing covenant included in many of GECC's existing medium and long-term debt offerings that precluded the company from pledging assets to secure debt except in limited circumstances such as purchase money debt.

62. From May 1992 through early 1993, GECC considered various proposals offered in response to the Sell-Down RFP, but was not able to find one that satisfied its goals while complying with the company's capital structure restrictions.

E. **Origin and Formation of Castle Harbour**

63. In March 1993, Babcock & Brown submitted a new proposal to GECC's aircraft finance group for a partnership transaction that would monetize aircraft assets.

64. Babcock & Brown's March 1993 proposal originated from the Sell-Down RFP and was designed to achieve many of the same objectives described in the Sell-Down RFP.

65. The March 1993 proposal called for GECC to partner with an equity investor in a transaction that would involve the contribution by GECC of a portfolio of leased aircraft and the contribution of cash by the equity investor.

66. Although the March 1993 proposal did not respond to all of the sell-down objectives, GECC concluded that it was the best transaction that could be done in light of the current market conditions, and that doing nothing with its aircraft portfolio was not an option.

67. The March 1993 proposal lead to the formation of GE Capital Summer Street-I Limited Liability Company, a Nevada limited liability company that would later change its name to Castle Harbour-I Limited Liability Company.

68. In July 1993, the Castle Harbour transaction was presented to senior GECC management.

69. The benefits GECC expected to derive from Castle Harbour included (i) raising $120 million of minority equity financing; (ii) demonstrating liquidity in the aircraft leasing market; (iii) producing a significant pre-tax profit; and (iv) shifting some rent collection and residual value risk.

70. GECC believed that, by bringing in new equity investors, Castle Harbour would demonstrate liquidity in the aircraft leasing marketplace.

71. GECC believed that, by bringing in new equity investors, Castle Harbour would support the book valuations of GECC's aircraft portfolio and thereby help to avoid a write-down of aircraft asset values.

72. The anticipated cost to GECC for obtaining minority equity financing through Castle Harbour was higher than the cost of the company's debt financing, but substantially lower than the cost of common equity financing.

73. GECC believed that the incrementally higher cost of the Castle Harbour transaction (over debt financing) was outweighed by the benefits that would come from structuring the transaction as equity.

74. GECC expected to realize significant current and future federal income tax savings from the Castle Harbour transaction.

75. GECC management approved the Castle Harbour transaction shortly it closed with ING and Rabo in early October.

76. On July 26, 1993, Castle Harbour (then known as GE Capital Summer Street-I Limited Liability Company), was organized as a Nevada limited liability company ("LLC").

77. Castle Harbour was formed between subsidiaries of GECC prior to the identification of third-party equity investors in order to provide prospective investors with an existing transaction structure to consider and to minimize the risk that the tax benefit provided to contributing partners would be withdrawn by new regulations before the transaction was fully established.

78. The Nevada LLC structure allowed for member management rights that were compatible with Federal Aviation Administration ("FAA") limitations on aircraft ownership by non-U.S. owners.

79. The original member investors in Castle Harbour were (i) Plaintiff; (ii) General Electric Capital AG ("SwissCo"), a wholly-owned affiliate of GECC organized under the laws of Switzerland; and (iii) TIFD III-M.

80. Plaintiff acquired its initial member interest in Castle Harbour through the contribution of aircraft assets (with a net value of $294,903,437), 100% of the stock in TIFD-VI INC. (with a value of zero), an option agreement (with a value of zero), a cash flow participation agreement (with a value of zero), and $240,000,000 in cash.

81. TIFD VI INC. changed its name to Castle Harbour Leasing, Inc. ("CHLI") on September 28, 1993.

82. SwissCo acquired an initial member interest in Castle Harbour through the contribution of $6 million in cash.

83. TIFD III-M acquired an initial member interest in Castle Harbour through the contribution of $50,000,000 in cash.

84. Substantially all of the cash contributed to Castle Harbour by Plaintiff, SwissCo and TIFD III-M on July 26, 1993 was subsequently contributed by Castle Harbour to CHLI, its subsidiary corporation.

85. The aircraft assets Plaintiff contributed to Castle Harbour included all beneficial interests in a portfolio of 63 commercial aircraft (and associated aircraft engines) subject to 45 leveraged leases and are collectively referred to as the "Aircraft Assets."

86. The 63 aircraft contributed to Castle Harbour included 32 Boeing 727s, 25 Boeing 737s, one Boeing 747, three McDonnell Douglas DC-9s and two McDonnell Douglas DC-10s.

87. Of the 63 aircraft contributed to Castle Harbour, 60 were expected to come "off lease" prior to the end of 1999.

88. On July 21, 1993 and October 6, 1993, the FAA issued opinions stating that the aircraft contributed to Castle Harbour that were registered with the FAA would continue to be duly registered in the names of the trustees that held legal title to the aircraft.

89. The trustees holding legal title to the 63 contributed aircraft were notified of the transfer of beneficial ownership to Castle Harbour.

90. The airlines leasing the 63 contributed aircraft were notified of the transfer of beneficial ownership to Castle Harbour.

91. Other third parties, including insurers, were notified of the transfer of beneficial ownership to Castle Harbour.

92. On July 26, 1993, the gross fair market value of the Aircraft Assets contributed to Castle Harbour by Plaintiff was $531,252,403, plus an accrued rent receivable of $21,638,634.

93. On July 26, 1993, the Aircraft Assets were subject to non-recourse debt of $257,987,600.

94. On July 26, 1993, the net value of the Aircraft Assets contributed to Castle Harbour was $294,903,437.

95. The U.S. tax basis of the Aircraft Assets on July 26, 1993 was $0.

96. After Castle Harbour was formed on July 26, 1993, Babcock & Brown began taking steps to find third-party investors.

97. To facilitate the solicitation of third-party equity investors, Babcock & Brown prepared an "Investment Memorandum" that outlined the proposed terms for an investment in Castle Harbour.

### F. Investments in Castle Harbour Made by ING and Rabo

98. In August 1993, Babcock & Brown identified two Dutch financial institutions, Internationale Nederlanden Bank N.V. (subsequently renamed ING Bank N.V.) ("ING") and Rabo Merchant Bank N.V. ("Rabo") as potential third-party equity investors in Castle Harbour.

99. Castle Harbour was presented to ING and Rabo as a partnership interest in an LLC.

100. In September 1993 and October 1993, representatives of ING, Rabo and GECC negotiated over the terms of ING's and Rabo's investment in Castle Harbour.

101. In the negotiations, ING and Rabo recognized that they would have equity interests in Castle Harbour that were subordinate to all creditors of Castle Harbour.

102. In negotiating their participation in Castle Harbour, ING and Rabo were concerned with the downside potential of their investments.

103. In negotiating their participation in Castle Harbour, ING and Rabo expressed concern over the legal and economic consequences (and potential liability) that could arise from a catastrophic accident involving Castle Harbour's airplanes.

104. Because of the liability concerns expressed by ING and Rabo, the level of insurance coverage that Castle Harbour would be required to carry was the subject of extensive negotiations.

105. FAA regulations limited ING's and Rabo's ability to participate directly in the operation, management, and control of Castle Harbour.

106. In negotiating the terms of their investment in Castle Harbour, ING and Rabo demanded a detailed set of negative controls that would require their consent in order for the partnership to make any significant (and many insignificant) business decisions.

107. After three weeks of arm's-length negotiations between representatives of ING, Rabo, and GECC, the parties reached an agreement on the terms of the equity investment in Castle Harbour that would be made by ING and Rabo.

108. The Castle Harbour transaction closed with ING and Rabo on October 6, 1993.

109. On October 6, 1993, ING and Rabo each acquired Class A member interests in Castle Harbour.

110. ING's Class A member interest in Castle Harbour was acquired by:

   a. Payment of $25,424,649.50 to acquire part of the member interest in Castle Harbour that had been held by TIFD III-M; and

   b. A cash contribution of $33,712,079.50 to Castle Harbour.

9

111. Rabo's Class A member interest in Castle Harbour was acquired by:

   a. Payment of $25,424,649.50 to acquire part of the member interest in Castle Harbour that had been held by TIFD III-M; and

   b. A cash contribution of $33,712,079.50 to Castle Harbour.

112. TIFD III-M made an additional capital contribution to Castle Harbour on October 6, 1993.

113. With the admission of ING and Rabo as members of Castle Harbour, SwissCo was retired as a partner and TIFD III-M's member interest, after its additional capital contribution, was reduced to 1%.

114. The $117,424,159 invested in Castle Harbour by ING and Rabo was reported by GECC on its audited financial statements as minority equity.

115. From a corporate finance perspective, the investments ING and Rabo made in Castle Harbour were equity investments.

116. From a corporate finance perspective, ING and Rabo did not extend loans to Castle Harbour.

117. Plaintiff, TIFD III-M, ING and Rabo each provided substantial capital to Castle Harbour, assumed real economic risk, and shared in the potential for real economic profit and loss from the operations of Castle Harbour.

118. ING's and Rabo's participation as members of Castle Harbour had no fixed termination date.

119. It was expected that ING and Rabo would remain as equity investors in Castle Harbour through at least the end of 2000.

120. On October 6, 1993, an Amended and Restated Operating Agreement for Castle Harbour, together with the other closing documents, were executed by ING, Rabo, Plaintiff, TIFD III-M and SwissCo.

121. The final terms of ING's and Rabo's investments in Castle Harbour, as set forth in the Amended and Restated Operating Agreement, differed materially from the terms set forth in the Babcock & Brown Investment Memorandum.

122. The actual return to ING and Rabo on their investment in Castle Harbour depended on the return provided by Castle Harbour's assets, including its lease income and gain or loss on the disposition of its aircraft assets.

123. The Amended and Restated Operating Agreement required Castle Harbour to maintain capital accounts to track the investment of each member.

124. Under the Amended and Restated Operating Agreement, ING and Rabo would be entitled to receive their positive capital account balances upon the liquidation of their interests in Castle Harbour.

125. Under the Amended and Restated Operating Agreement, ING and Rabo would be required to contribute cash to restore any deficit capital account balances (a deficit restoration obligation or "DRO") upon the liquidation of their interests in Castle Harbour.

126. When the airplanes owned by Castle Harbour came off lease, the Amended and Restated Operating Agreement provided Castle Harbour with three options: (i) distribute the airplane to Plaintiff (with a mark-to-market valuation determination and adjustment of each members' capital account to reflect allocation of the resulting disposition gain or loss); (ii) sell the airplane to a third party at fair market value; or (iii) lease the aircraft pursuant to the terms of a master lease agreement with GECC.

127. Castle Harbour had two primary sources of profits: (i) operating profits, generated from lease payments; and (ii) disposition profits (gains) realized when airplanes came off lease and were sold to third parties or distributed to Plaintiff at fair market value.

128. Under the Amended and Restated Operating Agreement, operating profits consisted primarily of rent from Castle Harbour's aircraft portfolio, less (1) expenses related to the operation of that portfolio and Castle Harbour generally, (2) interest on debt encumbering the aircraft in the portfolio, and (3) depreciation of the aircraft.

129. The Amended and Restated Operating Agreement provided for the allocation of an uncapped 98% of Castle Harbour's operating profits to ING and Rabo.

130. The Amended and Restated Operating Agreement allocated 90% of the first approximately $3.2 million of disposition profits (gains) and 1% of all additional disposition gains to ING and Rabo.

131. The Amended and Restated Operating Agreement allocated to ING and Rabo 98% of the first approximately $4.0 million of operating losses, and a minimum of 1% (and as much as 100%) of all incremental losses.

132. Under the Amended and Restated Operating Agreement, operating losses did not include residual losses on aircraft or other asset dispositions. ING and Rabo were allocated 90% of the first approximately $ 3.2 million of such disposition losses, and a minimum of 1% (and as much as 100%) of all excess disposition losses.

133. After Plaintiff and TIFD III-M had been allocated total operating losses and disposition losses approximately equal to their total contributions to Castle Harbour, ING and Rabo would bear all losses of Castle Harbour to the extent of their remaining positive capital accounts.

134. The Amended and Restated Operating Agreement provided for guaranteed payments to ING and Rabo as holders of the Class A interests (the "Class A Guaranteed Payment").

11

135. The Class A Guaranteed Payment was payable, if at all, only upon liquidation of Castle Harbour or the redemption of ING's and Rabo's interests in Castle Harbour, and then only if ING and Rabo had not previously received aggregate net allocations of operating income and gain sufficient to give them a minimum specified yield on their unrecovered investments.

136. The Class A Guaranteed Payment did not assure ING and Rabo of a return of their investment and therefore it would not offset or otherwise make ING and Rabo whole for operating and disposition losses allocated to them under the 1% and 100% loss tiers set forth in the Amended and Restated Operating Agreement.

137. The Class A Guaranteed Payment was subordinate to the claims of Castle Harbour's creditors.

138. The Class A Guaranteed Payment provision was never triggered.

139. The Amended and Restated Operating Agreement provided that Class B guaranteed payments would be paid to Plaintiff and TIFD III-M on the last day of each year.

140. The Class B guaranteed payments were an expense of Castle Harbour and were paid before any distributions were made to ING and Rabo.

141. The Class B guaranteed payments were not charged against the capital account of Plaintiff or the capital account of TIFD III-M.

142. The Class B guaranteed payment ensured that Plaintiff and TIFD III-M would receive some return on the assets they contributed to Castle Harbour, irrespective of partnership profits.

143. All distributions by Castle Harbour to ING and Rabo were subordinate to the Class B Guaranteed Payments payable to Plaintiff and TIFD III-M.

144. Between October 6, 1993 and December 31, 1998, Castle Harbour made Class B guaranteed payments to Plaintiff and TIFD III-M totaling approximately $5,776,000.

145. The Class B guaranteed payments to Plaintiff and TIFD III-M were reported as income on the consolidated federal income tax returns of GE.

146. Under the Amended and Restated Operating Agreement, at the option of its General Manager, Castle Harbour could make annual cash distributions to ING and Rabo.

147. Castle Harbour was not required to make the annual cash distributions, even if adequate funds were available.

148. If Castle Harbour failed to make an annual distribution, ING and Rabo had the right under the Amended and Restated Operating Agreement to cause Castle Harbour to be liquidated.

### G. Castle Harbour's Operations

149. Castle Harbour was actively engaged in the business of leasing commercial jet airplanes to major airlines including American Airlines, Delta Airlines, US Airways, Continental and SwissAir.

150. From October 6, 1993 through December 31, 1998, Castle Harbour had a stream of variable and unpredictable operating income that was derived primarily from lease payments made by the lessees of its owned aircraft.

151. On October 6, 1993, Castle Harbour was registered with the Registrar of Companies of Bermuda.

152. On October 6, 1993, Castle Harbour was issued a permit by the Bermuda Minister of Finance, granting it permission to carry on a trade or business in Bermuda.

153. From 1994 through 1998, Castle Harbour's principal place of business was located in Hamilton, Bermuda.

154. Management of Castle Harbour was vested in a group of managers elected by Plaintiff and TIFD III-M.

155. From 1994 through 1998, Castle Harbour held annual meetings in Bermuda.

156. In addition to the annual meeting, Castle Harbour's managers met at least quarterly by telephone to discuss the company's operations and activities.

157. The topics covered in the manager's meetings included the status of the aircraft leases, the status of efforts to find new homes for aircraft coming off lease, Castle Harbour finances, and tax compliance.

158. Although they had no direct management voting rights, ING and Rabo were permitted to, and frequently did, participate in Castle Harbour's manager's meetings, either in person or by telephone, to weigh in on issues affecting the partnership.

159. From 1995 through 1998, Castle Harbour had a Resident Manager in Bermuda who handled the day-to-day operation of the partnership's business.

160. Castle Harbour's resident manager dealt directly with the partnership's creditors, its airline lessees, potential lessees, and other third parties.

161. From July 1993 through July 1994 the day-to-day financing and accounting activities of Castle Harbour were handled by GE Capital Advisory Services Ltd. ("Advisory, Ltd.") under the terms of an Administrative Services Agreement.

162. Beginning in February 1994, General Electric Capital Advisory Services, Ltd. ("GECAS, Ltd.") assumed responsibility for some of the day-to-day financing and accounting activities of Castle Harbour.

163. In March 1994, the Office of Revenue Commissioners for the Republic of Ireland ruled that by performing services for Castle Harbour, GECAS, Ltd. would not be regarded as a resident of Ireland carrying on a trade in Ireland.

164. In July 1994, GECAS, Ltd. assumed full responsibility for Castle Harbour's day-to-day financing and accounting activities under an Administrative Services Agreement.

165. The administrative services agreements covered Castle Harbour's operations, finance and accounting functions, its lease portfolio management functions, and its bookkeeping functions.

166. Advisory, Ltd. and GECAS, Ltd. performed similar administrative services functions for third party aircraft lessors as they performed for Castle Harbour.

167. To assist Castle Harbour in placing airplanes coming off lease, a Remarketing Agreement was entered into between Castle Harbour and GECAS, Ltd. on August 1, 1994.

168. From July 1993 through August 1996, Chris Tewell served as Castle Harbour's General Manager, working for the company from an office in Hong Kong.

169. Mr. Tewell held a Periodic Work Permit from Bermuda that allowed him, as a non-resident, to visit Bermuda in connection with his work for Castle Harbour.

170. While employed as Castle Harbour's General Manager, Mr. Tewell visited Bermuda in person at least twice annually.

171. Employees of GECAS, Ltd. performed work for Castle Harbour under the terms of a seconding agreement entered into between Plaintiff and GECAS, Ltd.

172. From August 1995 through April 1997, Diarmuid Hyde worked in Bermuda as Castle Harbour's resident manager.

173. Mr. Hyde was issued a work permit by the Government of Bermuda in connection with his work for Castle Harbour.

174. From August 1996 through February 1998, Todd Freeman was the General Manager of Castle Harbour.

175. Charles Oleson was the resident manager of Castle Harbour from May 1997 through early 1999.

176. Mr. Oleson also served as the general manager of Castle Harbour from February 1998 through early 1999.

177. Mr. Oleson was issued a work permit by the Government of Bermuda in connection with his work for Castle Harbour.

178. Castle Harbour held bank accounts in its name in Bermuda, Hong Kong and Switzerland.

179. Between March 8, 1994 and January 1, 1998, the Amended and Restated Operating Agreement was amended seven times in order to accomplish business objectives of Castle Harbour that were otherwise limited by negative restrictions in the agreement.

180. Each of the amendments to the Amended and Restated Operating Agreement was considered and approved by ING and Rabo.

181. On six different occasions ING and Rabo agreed to waive certain provisions of the Amended and Restated Operating Agreement to allow the partnership to accomplish business objectives that were otherwise limited by the negative restrictions in the Agreement.

182. In 1994, Castle Harbour distributed three aircraft to Plaintiff in accordance with the Amended and Restated Operating Agreement.

183. The distribution of three aircraft to Plaintiff in 1994 resulted in disposition gain that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the Amended and Restated Operating Agreement.

184. In 1995, Castle Harbour distributed 12 aircraft to Plaintiff in accordance with the Amended and Restated Operating Agreement.

185. The distribution of 12 aircraft to Plaintiff in 1995 resulted in a disposition loss to Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the Amended and Restated Operating Agreement.

186. In 1995 Castle Harbour sold eight aircraft to Federal Express Aviation Services, International, Ltd. ("Federal Express").

187. The sale of eight aircraft to Federal Express in 1995 resulted in a disposition loss to Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the Amended and Restated Operating Agreement.

188. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's sale of eight aircraft to Federal Express in 1995.

189. In 1995 Castle Harbour sold four aircraft to American Airlines, Inc. ("American Airlines").

190. The sale of four aircraft to American Airlines in 1995 resulted in a disposition loss to Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the Amended and Restated Operating Agreement.

191. In 1996 Castle Harbour sold four additional aircraft to American Airlines.

192. The sale of four additional aircraft to American Airlines in 1996 resulted in a disposition loss to Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the Amended and Restated Operating Agreement.

193. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's sale of eight aircraft to American Airlines in 1995 and 1996.

194. In 1995, Castle Harbour negotiated and reached an agreement with Delta Air Lines, Inc. ("Delta") to extend the leases covering 21 aircraft owned by Castle Harbour.

195. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's lease extension agreement with Delta in 1995.

196. In 1996 and 1997, Castle Harbour negotiated and reached an agreement with U.S. Airways to extend the leases covering four aircraft owned by Castle Harbour.

197. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's lease extension agreement with U.S. Airways.

198. In 1998, Castle Harbour negotiated with American Airlines over the disposition of airplanes and airplane engines that were scheduled to come off lease in 1999.

199. Representatives of Castle Harbour conducted extensive remarketing negotiations that did not result in a final agreement, including negotiations with Federal Express, American International Aviation, Viscount Air Service, Inc., CATO/Genesis Aviation, Ltd., the United States Marshall's Service and the Miami Heat professional basketball team.

200. In 1997, Castle Harbour and Continental Airlines disagreed on the interpretation of a leveraged lease contract owned by Castle Harbour.

201. The disagreement between Castle Harbour and Continental Airlines was resolved in Continental's favor, resulting in the loss to Castle Harbour (and its members) of $2.299 million in lease payments, thereby decreasing operating income.

202. ING and Rabo were allocated 98% of the $2.29 million reduction in operating income that resulted from the disagreement with Continental Airlines.

### H. Castle Harbour Leasing, Inc.

203. CHLI was a Delaware corporation that, from 1994 through 1998, had its principal place of business in Bermuda.

204. CHLI was a U.S. corporation, filed federal income tax returns and paid tax on its income.

205. CHLI was structured to hold financial assets purchased with cash contributed by Castle Harbour so that in the event the business had to be liquidated, ING and Rabo's interests (as measured by their capital accounts) could be satisfied without an abrupt sale of the partnership's aircraft portfolio.

206. The cash Castle Harbour contributed to CHILI was invested in liquid financial assets, including GE commercial paper and publicly traded preferred stock in unrelated corporations, and was invested in aircraft assets.

16

207. CHLI held liquid financial assets in order to provide liquidity to Castle Harbour.

208. On August 1, 1994, an administrative services agreement was entered into between CHLI and GECAS, Ltd., covering the day-to-day finance and accounting activities of CHLI.

209. The activities performed by GECAS, Ltd. under the administrative services agreement were similar to those that GECAS, Ltd. performed for Castle Harbour, described in paragraph 164, above.

210. In December 1994, CHLI purchased an interest in two 737-500 aircraft that were on lease to Continental Airlines.

211. In December 1995, CHLI purchased an interest in two additional 737-500 aircraft that were on lease to Continental Airlines.

I. **Castle Harbour Operating Results**

212. In accordance with the Amended and Restated Operating Agreement, financial statements were prepared for Castle Harbour.

213. Castle Harbour's financial statements were prepared in accordance with the determinations of partnership profit, gain and loss set forth in the Amended and Restated Operating Agreement.

214. Castle Harbour's airplane leasing business generated material positive cash flow and pre-tax income for each of its member investors.

215. Castle Harbour accomplished its stated goal of raising approximately $120 million in third-party equity for GECC.

216. Castle Harbour accomplished its stated goal of attracting new equity investors to GECC's aircraft financing business.

217. The income generated by Castle Harbour was shared by its members in accordance with the allocation provisions of the Amended and Restated Operating Agreement.

218. From 1993 through 1998, the average annual internal rate of return ("IRR") to Plaintiff and TIFD III-M on their investments in Castle Harbour was between 5.5% and 5.6%, without taking into consideration any federal income tax benefits.

219. The return received by each of Castle Harbour's members was determined by the performance of Castle Harbour's assets and was not fixed or pre-determined.

220. Castle Harbour's income varied significantly from year to year, and varied significantly from projections made prior to the admission of ING and Rabo as members on October 6, 1993.

### J. Buy-Out of ING and Rabo

221. In 1997, a change in U.S. tax law led to uncertainty over whether U.S. tax would have to be withheld from the distributions Castle Harbour made to ING and Rabo.

222. As a result of the uncertainty over U.S. tax law, on November 30, 1998, Plaintiff notified ING and Rabo that it intended to exercise its option under the Amended and Restated Operating Agreement to purchase the interests of ING and Rabo in Castle Harbour, effective December 31, 1998.

223. On December 31, 1998, ING's and Rabo's interests in Castle Harbour were bought out for $15,579,880 each.

224. In connection with the buy-out, Castle Harbour obtained valuations of its assets.

225. ING and Rabo reviewed and consented to the final valuation determinations with respect to Castle Harbour's assets.

226. Plaintiff designated Hudson River Aircraft Holdings 1, Inc. ("Hudson River 1"), a wholly owned indirect subsidiary of GECC, as the entity that would purchase Rabo's interest in Castle Harbour.

227. On December 31, 1998, Hudson River 1 purchased the entire interest of Rabo in Castle Harbour.

228. Plaintiff designated Hudson River Aircraft Holdings 2, Inc. ("Hudson River 2"), a wholly owned indirect subsidiary of GECC, as the entity that would purchase ING's interest in Castle Harbour.

229. On December 31, 1998, Hudson River 2 purchased the entire interest of ING in Castle Harbour.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over these consolidated cases pursuant to I.R.C. § 6226(a) and 28 U.S.C. § 1346(e).

2. Plaintiff bears the burden of producing evidence, and persuading the Court by a preponderance of the evidence, that the determinations made by the IRS in the FPAAs are erroneous.

3. The Castle Harbour transaction had economic substance.

4. The investments in Castle Harbour made by Plaintiff, TIFD III-M, ING and Rabo each had independent economic substance.

5. GECC and its indirect subsidiary corporations, Plaintiff and TIFD III-M each had one or more valid, non-tax business purposes for entering into the Castle Harbour transaction.

6. For federal income tax purposes, Castle Harbour was properly characterized as a partnership.

7. For federal income tax purposes, from October 6, 1993 through December 31, 1998, ING and Rabo were partners in Castle Harbour.

8. For federal income tax purposes, ING and Rabo made equity investments in, not loans to, Castle Harbour.

9. Castle Harbour's allocations of income, deduction and credit complied with the provisions of I.R.C. § 704(b) and the regulations thereunder.

10. For the 1993 through 1998 tax years, Castle Harbour properly allocated all items of income, deduction and credit among its partners.

11. Section 482 of the Internal Revenue Code and the regulations thereunder have no application to the allocations of income, deduction, credits and allowances of Castle Harbour.

12. In reporting all items of income, deduction and credit on its 1997 and 1998 tax returns, Plaintiff, TIFD III-M and Castle Harbour did not engage in any conduct that would be subject to any accuracy-related penalties under I.R.C. § 6662.

13. For the 1993 through 1998 taxable years, the partnership items of Castle Harbour were correctly reported on the Partnership's IRS Form 1065 tax returns.

14. The FPAA mailed by the IRS with respect to Castle Harbour's 1993-1996 tax years is invalid and all of the adjustments set forth therein are erroneous.

15. The FPAA mailed by the IRS with respect to Castle Harbour's 1993-1996 tax years is invalid and all of the adjustments set forth therein are erroneous.

16. Plaintiff is entitled to a refund of the jurisdictional deposits made to the IRS in the total amount of $62,212,010, plus interest as provided in I.R.C. §§ 6226(e)(3) and 6611.

Dated this 8 day of July, 2004.

        PLAINTIFF, TIFD III-E INC, the Tax Matters Partner of
        CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY

        _____
        Anthony M. Fitzgerald, (ct04167)
        CARMODY & TORRANCE LLP
        195 Church Street, P.O. Box 1950
        New Haven, Connecticut 06509-1950
        Telephone: (203) 777-5501
        Facsimile: (203) 784-3199
        e-mail: afitzgerald@carmodylaw.com

OF COUNSEL

William F. Nelson, ct22883
David J. Curtin, ct22881
Michael J. Desmond, ct23186
John A. Galotto, ct22882
MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
Email: wnelson@mckeenelson.com
       dcurtin@mckeenelson.com
       mdesmond@mckeenelson.com
       jgalotto@mckeenelson.com