APPENDIX F

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIFD III-E INC., THE TAX MATTERS PARTNER OF CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NOS. 3:01CV01839(SRU) 3.01CV01840(SRU) |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT
AND CONCLUSIONS OF LAW**

A.    Introduction

1.    The plaintiff, TIFD III-E, Inc., is the Tax Matters Partner for Castle Harbour-I, LLC, a limited liability company, which elected to be taxed as a partnership.

2.    In July 1993, the General Electric Capital Corporation (GECC) contributed all the assets to Castle Harbour through subsidiaries.

3.    GECC is a controlled subsidiary of the General Electric Company (GE).

4.    Castle Harbour was originally named GE Capital Summer Street-I Limited Liability Company.

5.    The GECC subsidiaries originally participating in Castle Harbour were TIFD III-E, Inc., TIFD III-M, Inc., and General Electric Capital AG.

6.    The original assets included the beneficial interests in 63 aircraft and engines with a claimed fair market value of $550 million.

7.    The 63 aircraft and engines were subject to leveraged leases and $251 million of non-

recourse debt.

8.    The GECC subsidiaries also contributed $296 million in cash.

9.    The total net asset value of Castle Harbour at formation in July 1993 was $595 million.

10.   The 63 aircraft and engines were leased primarily to major United States registered airlines in 1993.

11.   The leases generated rental income according to their terms.

12.   The primary purpose of Castle Harbour was to shelter from the federal income tax the income stream from these leases.

13.   In July 1993, the income stream from the aircraft/engine leases over ten years was projected to exceed one-half billion dollars, i.e., $509 million.

14.   In July 1993, GECC knew that it had already claimed all allowable depreciation on prior tax returns with respect to the 63 aircraft and engines contributed to Castle Harbour.

15.   In July 1993, the 63 aircraft and engines contributed to Castle Harbour each had a "zero tax basis."

16.   Shortly after the formation of Castle Harbour in July 1993, GECC and its investment banking firm, Babcock & Brown, solicited foreign banks to participate in Castle Harbour.

17.   Foreign bank participation was necessary to effect the tax shelter purpose of Castle Harbour.

18.   The tax shelter purpose of Castle Harbour was attempted through the allocation of 98% of the operating income (lease income from the 63 aircraft and engines contributed by GECC with zero tax basis) to foreign, tax-indifferent, banks.

19.   Domestic (United States based) participants were not solicited for Castle Harbour.

20.   Babcock & Brown prepared an "investment memorandum" to provide interested foreign

banks.

21.     The Babcock & Brown memorandum described the transaction, the existing operating agreement, and the expected range of return for a participant.

22.     ING Bank, N.V. and Rabo Merchant Bank, N.V., (the "Dutch banks") expressed interest in joining Castle Harbour.

23.     ING Bank, N.V. was then named Internationale Nederlanded Bank, N.V.

24.     Babcock & Brown determined that ING Bank and Rabo Merchant Bank would not be subject to United States taxation on any income from Castle Harbour due to tax treaties between the United States and the Netherlands.

25.     For ING Bank and Rabo Merchant Bank to avoid United States taxation on income from Castle Harbour, the transaction and its subsequent operations had to be conducted outside the United States.

26.     Negotiations between GECC and the Dutch banks concerning their joining Castle Harbour, took place in Bermuda, outside the United States, during September and October, 1993.

27.     On October 6, 1993, the Dutch banks agreed to join Castle Harbour.

28.     The Dutch banks contributed a total of $117,287,156 to Castle Harbour.

29.     GECC and the Dutch banks entered into numerous agreements in connection with the Dutch banks joining Castle Harbour.

30.     The principal document governing Castle Harbour's operation and finances signed on October 6, 1993, is the "Amended and Restated Operating Agreement ("operating agreement").

31.    On October 6, 1993, the GECC subsidiary General Electric General Electric Capital AG withdrew from Castle Harbour.

32.    The members of Castle Harbour-I Limited Liability Company (Castle Harbour) during the years in suit, 1993 through 1998, were two GE entities (TIFD III-E, TIFD III-M), and the Dutch banks.

33.    The operating agreement signed by the GE entities and the Dutch banks on October 6, 1993, allocated 98% of Castle Harbour's taxable income to the tax-indifferent Dutch banks.

34.    The total amount of Castle Harbour's taxable income allocated to the Dutch banks from 1993 through 1998 was $310,138,800, as follows:

<u>Taxable Income Allocated to Dutch Banks, 1993-1998</u>

| | |
|---|---|
| 1993 | $16,073,453 |
| 1994 | $75,061,872 |
| 1995 | $62,406,532 |
| 1996 | $49,874,972 |
| 1997 | $50,776,164 |
| 1998 | $55,945,807 |
| Total: | $310,138,800 |

35.    The Internal Revenue Service (IRS) routinely audits the federal income tax returns of the General Electric Company and its subsidiaries. These audits include examinations of entities formed or joined by General Electric subsidiaries, such as Castle Harbour.

36.    Following an audit, the IRS, on June 29, 2001, issued two Notices of Final Partnership Administrative Adjustments to TI FD III-E, as tax matters partner for Castle Harbour-I Limited Liability Company, for taxable years 1993 through 1998.

37.    The IRS adjustment reallocated the $310,138,800 in taxable income from the Dutch

banks to the GE entities, TIFD III-E and TIFD III-M.

38.    To satisfy jurisdictional requirements for this action, TIFD III-E deposited $62,212,010 with the IRS.

39.    The $62,212,010 deposit by TI FD III-E represented the federal income tax on $310,138,800 of income reallocated by the IRS from the Dutch banks to the GE entities.

40.    The IRS also determined that penalties should apply to the understatement of taxes by GECC as a result of the Castle Harbour transaction.

41.    The plaintiff, TIFD III-E, as the tax matters partner for Castle Harbour, filed these consolidated actions to challenge the reallocation of Castle Harbour's taxable income in the amount of $310,138,800 from the Dutch banks to the GE entities.

B.    Allocated Taxable Income Not Distributed to Dutch Banks

42.    The operating agreement mandated the allocation of 98% of Castle Harbour's income to the Dutch banks.

43.    The allocation of 98% of income to the Dutch banks is not consistent with their contribution of $117 million compared to GECC's contribution of $595 million in assets.

44.    Castle Harbour did not, however, distribute the 98% of Castle Harbour's taxable income allocation totaling $310,138,800 to the Dutch banks.

45.    The operating agreement provided for the maintenance of capital accounts for each member, including the Dutch banks.

46.    The capital accounts were calculated using "704(b) book accounting," which is required by ' 704(b) of the Internal Revenue Code and the regulations thereunder.

47.    Under 704(b) book accounting procedures, income was reduced by depreciation

expenses, calculations based on the fair market value of the airplanes at the time of

their contribution to Castle Harbour in 1993 over the anticipated remaining useful life of

the airplanes.

48.    The 704(b) book income allocated 98% to the Dutch banks during 1993 through 1998

was as follows:

Book Income Allocations to Dutch Banks, 1993-98

| 1993 | $332,000 |
|------|----------|
| 1994 | $9,660,000 |
| 1995 | $6,548,000 |
| 1996 | $1,340,000 |
| 1997 | $2,258,000 |
| 1998 | $7,560,000 |
| Total: | $27,698,000 |

49.    Accordingly, the Dutch banks' claim on the income of Castle Harbour was not the

$310,138,000 of taxable income allocated but the $27,698,000 of book income

allocated.

50.    By agreeing to share $27,698,000 of book income with the Dutch banks, GECC

believed it would save federal income taxes on $310,138,000, or approximately

$62,212,010.

51.    The potential tax savings benefit to GECC in forming Castle Harbour was

partially offset by substantial initial transaction costs.

52.    Through 1994, the initial transactions costs of Castle Harbour totaled $13,751,486.

53.    The initial transactions costs included the $9 million fee to the investment banking firm,

Babcock & Brown.

C.     Dutch Banks:  Necessary Tax-Indifferent Parties

54.     ING Bank and Rabo Merchant Bank's roles in Castle Harbour were as the foreign, tax-indifferent parties, not as partners of the GE entities.

55.     The operating agreement prevented ING Bank and Rabo Merchant Bank from selling their purported interests in the United States or to a United States person as such action would frustrate the tax shelter plan of Castle Harbour.

56.     Castle Harbour entered into Tax Indemnity Agreements with each Dutch bank.

57.     The purpose of the Tax Indemnity Agreements was to guarantee that the Dutch banks would be indemnified by Castle Harbour if any of the income allocated to them would become subject to taxation by the United States or other governments in a manner not anticipated when they joined Castle Harbour.

58.     GECC ended Castle Harbour's relationship with the Dutch banks in 1998 as the result of a change in law which might have increased the obligation of GECC to indemnify the Dutch banks for Netherlands taxes.

59.     The Dutch banks demanded and received a separate Guaranty from GECC with respect to the performance of its subsidiaries, TIFD III-E and TIFD III-M, in fulfilling the obligations of Castle Harbour to the banks.

60.     The Guaranty from GECC recognized that the Dutch banks had no management role in Castle Harbour.

61.     The Guaranty obligated GECC to contribute additional capital to Castle Harbour to safeguard the Dutch banks' interests.

62.     Castle Harbour had no need for the Dutch banks' $117 million contribution to operate.

63. The operating agreement required Castle Harbour to hold liquid assets in an amount at least equal to 110% of the remaining balance of the investment accounts for the Dutch banks.

64. This 110% liquid asset requirement effectively blocked the use by Castle Harbour of the Dutch banks' contribution.

65. Castle Harbour used its subsidiary, Castle Harbour Leasing, Inc. (CHILI), to purchase commercial paper, primarily that of GECC, to effect the 110% liquid asset requirement.

66. The Dutch banks could demand liquidation of Castle Harbour if liquid asset holdings of Castle Harbour did not equal or exceed 110% of the investment account balances.

67. The GECC commercial paper earned Castle Harbour between 3.22% and 5.93% during the period 1993 through 1998 while the applicable rate for the Dutch banks remained 9.03587% during this period.

D.  Dutch Banks: Lenders Not Equity Investors

68. The Dutch banks had virtually no management role in Castle Harbour.

69. GECC employees were appointed Castle Harbour general manager and managers.

70. The Dutch banks' repayment rights differed from the GECC entities' rights.

71. The Dutch banks received annual payments as set forth in Exhibit E to the operating agreement signed in October, 1993, as follows:

Exhibit E Payments to Dutch Banks

| | |
|---|---|
| 1993 | $5,856,789 |
| 1994 | $39,127,597 |
| 1995 | $42,846,678 |
| 1996 | $19,620,374 |
| 1997 | $10,991,784 |
| Total: | $118,443,222 |

72.    A failure to make Exhibit E payments to the Dutch banks would have permitted the
       banks to demand a liquidation of Castle Harbour.

73.    The Exhibit E payments were part of the mechanism to repay the Dutch banks their
       initial investment with a target yield of 9.03587%.

74.    Upon liquidation or GECC's buyout, the Dutch banks were entitled to payments based
       on their capital accounts, Class A Guaranteed Payments, or Indemnification Premiums,
       all designed to achieve the target return of 9.03587% on their initial investments.

75.    The GECC entities were only guaranteed a Class B Guaranteed payment, not to
       exceed $500,000 per year.

Sharing Risk of Profits and Losses

76.    The Dutch banks joined Castle Harbour to earn a target return of 9.03587% on their
       investment.

77.    The operating agreement established the target rate of return, the "applicable rate," of
       9.03587%.

78.    After five years of operation, the return to the Dutch banks varied only $80,000 from a
       precise 9.03587% return on their initial investment.

79.    The "investment accounts" measured the balance of the Dutch banks' contributions to
       Castle Harbour.

80.    The investment accounts were increased each year by 9.03587% of the year-end
       balance.

81.    The "applicable rate" of 9.03587% never varied during the Dutch banks participation in
       Castle Harbour.

82.    The investment account balances for the Dutch banks were as follows:

### Dutch Banks' Investment Account Balances

| Year | Adjustments at 9.03587% | Cash Distribution | Balance |
|---|---|---|---|
| Opening | - | - | $117,286,000 |
| 1993 | $3,494,000 | $5,856,000 | $114,924,000 |
| 1994 | $10,374,000 | $39,128,000 | $ 86,170,000 |
| 1995 | $7,776,000 | $42,846,000 | $51,100,000 |
| 1996 | $4,518,000 | $19,620,000 | $36,098,000 |
| 1997 | $3,260,000 | $10,992,000 | $28,366,000 |
| 1998 | $2,654,000 | $30,930,000 0 | 0 |

E.    Allocating 98% of Income to Dutch Banks Benefitted the Banks and GECC

83.    After October 6, 1993, when the Dutch banks joined Castle Harbour, the putative

ownership interests were TIFD III-E, 81.1964%, TIFD III-M, 1 %, ING, 8.9018%, and

Rabo, 8.9018 %.

84.    The operating agreement did not follow ownership interests in allocating each partner's

distributive share of income, gain, loss, deduction or credit.

85.    The operating agreement allocated each Dutch bank 49% of income from Castle

Harbour, for a total of 98%. TI FD III-E and TI FD III-M were each allocated 1% of

income.

86.    The operating agreement allocated gains and losses from dispositions differently than

income.

87.    The 98% income allocation to the Dutch banks is a key component to GECC and the

Dutch banks achieving the target 9.03587% applicable rate return for the Dutch banks.

88.    The 98% income allocation increase the payments to the Dutch banks by over $25

million, as demonstrated by the following schedule ("CLM" refers to "comparative

liquidation method" which takes into account the declining putative ownership interests

of the Dutch banks as they were repaid):

**Impact of 98/2 Allocation on Dutch Banks' Capital Accounts**

| Year/Period | Castle Harbour's Book Income | Allocation to Banks Under | | Increase Under 98/2 |
| --- | --- | --- | --- | --- |
| | | 98/2 | CLM | |
| 10/6/93 в 12/31/93 | $    339,000 | $    332,000 | $    58,113 | $    273,887 |
| 1994 | 9,857,000 | 9,660,000 | 1,371,560 | 8,288,440 |
| 1995 | 6,682,000 | 6,548,000 | 566,299 | 5,981,701 |
| 1996 | 1,368,000 | 1,340,000 | 70,488 | 1,269,512 |
| 1997 | 2,304,000 | 2,258,000 | 78,519 | 2,179,481 |
| 1998 | 7,736,000 | 7,560,000 | 380,578 | 7,179,422 |
| Totals | $28,286,000 | $27,698,000 | $2,525,557 | $25,172,443 |

89.    The distortion of income resulting from the 98% allocation of income to the Dutch

banks is enormous.

90.    By allocating 98% of taxable income to the Dutch banks, GE attempted to avoid

taxation on approximately $284,073,938, as set forth below:

**Impact of 98/2 Special Allocation of Income on GE Entities Tax Liabilities**

| Year/Period | Castle Harbour's Taxable Income | Allocation to GE Entities | | Increase Under CLM | Tax on Increase at 20% Rate[1] |
| --- | --- | --- | --- | --- | --- |
| | | 98/2 | CLM | | |
| 10/6/93в12/31/93 | $ 16,401,481 | $    328,028 | $13,589,867 | $ 13,261,839 | $  2,652,368 |
| 1994 | 76,593,747 | 1,531,875 | 65,936,055 | 64,404,180 | 12,880.836 |
| 1995 | 63,680,135 | 1,273,603 | 58,283,247 | 57,009,644 | 11,401,929 |
| 1996 | 50,892,829 | 1,017,857 | 48,270,512 | 47,252,655 | 9,450,531 |
| 1997 | 51,812,412 | 1,036,248 | 50,046,674 | 49,010,426 | 9,802,085 |
| 1998 | 57,244,395 | 1,298.588 | 54,433,782 | 53,135,194 | 10,627,039 |
| Totals | $316,624,999 | $ 6,486,199 | $260,264,106 | $284,073,937 | $56,814,788 |

---

[1] The 20% rate is used because the GE consolidated group was subject to the
alternative tax during the years at issue, and thus subject to a 20% tax rate.

91.    Considering the income tax consequences of the 98% income allocation, the
Dutch banks suffered no increased tax liability as a tax-indifferent party.

92.    GECC avoided taxation on approximately $284,073,938 through this allocation.
The tax liability on this amount would have been $56,814,788.

93.    Both parties benefitted from the 98% income allocation. The Dutch banks' capital
accounts increased with the 98% income allocations and this helped produce the
9.03587% return on their capital.  Although the 98% income allocation produced a
pre-tax detriment to GECC by reducing the amount of income it would have been
entitled if the capital accounts had been calculated on the basis of ownership, this
reduction ($25,173,443) was less than the tax savings ($56,814,788).

F.    <u>Castle Harbour-Form Over Substance</u>

94.    The original Castle Harbour general manager and managers were selected in
1993 on the basis of their non-US locations, not for experience in the aircraft
leasing business.

95.    The Dutch banks had no right to appoint managers of Castle Harbour.

96.    The GECC employee appointed as general manager in 1993 received only
$12,000 per year from Castle Harbour. The original assets were valued at $595
million.

97.    Castle Harbour placed a manager in Bermuda in 1995. He was an employee of
GECAS, Ltd. His salary and expenses were while he was in Bermuda for two
years were paid by GECAS, Ltd., which was reimbursed by TIFD III-E for his
services. Castle Harbour did not pay his salary or expenses.

98.    The management of Castle Harbour's portfolio during 1994 through 1998 was

performed by the GECC employees based in Shannon, Ireland, just like the rest of GECC's airplane portfolio.

99.   Castle Harbour had one, part-time employee, located in Bermuda.

100.  GECC purchased and leased airplanes to domestic and foreign airlines prior to the Castle Harbour transaction.

101.  In 1991, the Gulf War and Eastern Airline's bankruptcy contributed to GECC having approximately 25 non-performing airplane leases in its portfolio.

102.  One of GECC's managements' responses to the downturn in the commercial airplane business in 1991 was the "Selldown" project.

103.  The 1991 Selldown project is too remote in time to the 1993 Castle Harbour transaction.

104.  Conditions in the commercial airplane leasing industry improved between the 1991 initiation of the Selldown project and the 1993 Castle Harbour transaction.

105.  GECC requested proposals from investment banks in May 1992 for the Selldown project but the Castle Harbour transaction was not proposed in response.

106.  The investment banking firm Babcock & Brown did not propose the Castle Harbour transaction in response to GECC's May 1992 request for proposals.

107.  By 1993, GECC did not have non-performing airplanes in its portfolio.

108.  By 1993, GECC was greatly expanding its commercial airplane leasing business through the acquisition of Guiness Peat Airways' (GPA) leasing business, which had a portfolio of between 400 and 500 planes.

109.  The Castle Harbour transaction was not proposed until the spring of 1993.

110.  GECC's airplane finance business was healthy and growing in July 1993 when the

Castle Harbour transaction occurred.

111.   The 63 airplanes involved in the Castle Harbour transaction continued to be managed by GECC after July 1993.

112.   From 1994, the 63 airplanes involved in the Castle Harbour transaction were managed pursuant to a contract with GECAS, Ltd. (GE Capital Aviation Services) based in Shannon, Ireland.

113.   From 1994, GECAS, Ltd. managed the bulk of GECC's 900 to 1000 airplanes in GECC's aviation portfolio.

114.   From July 1993, Castle Harbour received extensive administrative and legal support from GECC headquarters in Stamford, Connecticut.

115.   The "outside capital" ostensibly raised through the Castle Harbour transaction could not be used for Castle Harbour's operations.

## CONCLUSIONS OF LAW

116.   Castle Harbour should not be recognized as a partnership for federal income tax purposes.  The GE entities (TIFD III-E and TIFD III-M) and the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.) did not join together in Castle Harbour to share profits and losses but rather to shelter $310 million of income otherwise taxable to GE and for the Dutch banks to earn interest on highly secured loans.

117.   The October 6, 1993  transaction between the GE entities (TIFD III-E and TIFD III-M) and the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.) should be disregarded as a "sham transaction" which exalted form over substance due to the absence of a non-tax business purpose and a lack of economic substance beyond tax avoidance.

–14–

118.  The contributions of the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.) to Castle Harbour have more characteristics of debt than equity and should be considered debt instruments as a matter of law.   The loans were highly secured by the operating agreement's requirement that Castle Harbour hold in liquid assets amounts equal to 110% of the unpaid balance of the loans.

119.  The allocation of 98% of the taxable income of Castle Harbour to the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.) lacked substantial economic effect pursuant to IRC ' 704(b) and Treas. Reg. ' 1.704(b) and should be disregarded.  Taxable income should be reallocated according to ownership interests.

120.  The General Electric Company is liable for penalties for the 1997 and 1998 taxable years, the only years for which this Court presently has jurisdiction to consider penalties.  The allocation of 98% of the taxable income to the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V.) was the result of negligence or disregard of rules or regulations and/or resulted in a substantial understatement of income tax.

_John B Hughes_
KEVIN J. O'CONNOR
United States Attorney
JOHN B. HUGHES
Chief, Civil Division

July ___8___, 2004                    ROBERT J. HIGGINS (ct23378)
                                      Trial Attorney, Tax Division
                                      U.S. Department of Justice
                                      Post Office Box 55
                                      Washington, D.C. 20044
                                      Telephone: (202) 307-6580

–15–