IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIFD III-E INC.,THE TAX MATTERS PARTNER OF CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NOS. 3:01CV01839(SRU) |
| | ) | 3.01CV01840(SRU) |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**UNITED STATES' TRIAL BRIEF**

STATEMENT

A.    Introduction

This is a TEFRA proceeding[1] in which the Tax Matters Partner, TIFD-III E, Inc.

contests, on behalf of Castle Harbour-I, LLC, a limited liability company which elected to

be taxed as a partnership, adjustments to its federal income tax returns for its taxable

years 1993 through 1998, determined by the IRS in Notices of Final Partnership

Administrative Adjustment on June 29, 2001.   The IRS proposed adjustments to the

Castle Harbour partnership tax return, which will flow through to the partners and

increase the tax liability of the partners which are United States taxpayers (TIFD III-E,

_____

[1] A "TEFRA Proceeding" is one commenced pursuant to §§ 6221 through 6234 of the Internal Revenue Code (IRC), enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat.324, 648.  Under TEFRA, the parties in a partnership may file an action to resolve various tax issues associated with the partnership. IRC § 6226(a).  These issues, known as "partnership items," include the total amount of taxable income earned by the partnership, and the fraction of the partnership's taxable income that should be included in each partner's taxable income.  Treas. Reg. § 301.6231(a)(3)-1.

Inc., and TIFD III-M, Inc., wholly owned subsidiaries of the General Electric Capital

Corporation (GECC), and referred to here as the "GE entities").[2] GECC is a subsidiary

of the General Electric Company.[3] The IRS also determined that any underpayments of

tax for these years resulting from the determined adjustments are subject to either the

20% penalty for negligence or disregard of rules or regulations (IRC § 6662(b)(1)), or

the 20% penalty for a substantial understatement of income tax (IRC § 6662(b)(2)). [4]

The government defends this action on several alternative theories. The

government first will demonstrate at trial that no valid partnership existed for tax

purposes among the participants in Castle Harbour, as the GE entities and two Dutch

banks, ING Bank, N.V. and Rabo Merchant Bank, N.V., did not join together with a

---

[2] To satisfy the jurisdictional requirements of IRC § 6226(e)(1), the plaintiff deposited $62,212,010 with the IRS. This amount closely corresponds to the increased income tax liability of GE resulting from the IRS' proposed adjustments, exclusive of interest and penalties.

[3] GECC went through a reorganization and name change in 2001 but was known as GECC during the years at issue here.

[4] Pursuant to IRC § 6226(f), as amended effective for partnership tax years ending after August 5, 1997, the applicability of penalties that relate to partnership items are within the scope of a court's jurisdiction in a partnership-level proceeding under § 6226(a) or (b). Accordingly, with respect to the years 1997 and 1998, this Court has jurisdiction to decide what penalties are applicable with respect to any adjustments to partnership items. (In subsequent refund litigation, a partner could raise partner-level defenses to the applicability of the penalties, but could not challenge partnership-level judicial determinations with respect to partnership items or the applicability of penalties.) With respect to the years 1993-1996, the applicability of penalties that relate to adjustments to the partnership items at issue in this case must be determined in separate partner-level proceedings. This Court's factual findings, however, will be binding on all partners who are treated as parties to this litigation pursuant to § 6226(c) and (d).

non-tax business purpose, *i.e.,* the intent to join together for the conduct of a business enterprise. ASA Investerings Partnership v. Commissioner, 201 F.3d 505, 511 (2000), *cert. denied*, 581 U.S. 871 (2000). "[E]scaping taxation is not a 'business' in the ordinary meaning." National Investors Corp. v. Hoey, 144 F.2d 466, 468 (2d Cir. 1944) (Hand, J.). An arrangement, be it a transaction or the formation of an entity, which lacks a non-tax business purpose is "sham" and is disregarded for tax purposes. ASA Investerings Partnership, 201 F.3d at 512. A transaction is a sham, and therefore without effect for Federal income tax purposes, "if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions." Nicole Rose v. Commissioner, 320 F.3d 282 (2d Cir. 2003), citing DeMartino v. Commissioner, 862 F.2d 400, 406 (2d Cir. 1988).

Second, in addition to demonstrating that the arrangement between the GE entities and the Dutch banks was a sham, the government also will demonstrate at trial that even if Castle Harbour had a non-tax business purpose, the Dutch banks' participation was, in substance, in the nature of a lender rather than a partner. Castle Harbour, therefore, could not allocate any of its income to the Dutch banks, and all the income is properly allocated to the GE entities which, in substance, were the only equity investors in Castle Harbour.

Third, the government will demonstrate at trial that even if the partnership is not disregarded as a sham, and even if the Dutch banks' participation was that of an equity investor and not merely a lender, the "special allocation" by Castle Harbour of 98% of Castle Harbour's taxable income to the Dutch banks violates IRC § 704(b)(2) as lacking "substantial economic effect," as defined by Treas. Reg. § 1.704-1(b)(2), and should be

disregarded.   As a result, without the 98% allocation of income to the Dutch banks, the

allocation of income would reflect the ownership interests of the banks during the 1993

through 1998 period which declined from 8.57% at the end of 1993 to 2.45%  prior to a

buyout in December 1998.  Absent this "special allocation" the tax liability of the GE

entities increases by approximately $56 million.

B.     The Castle Harbour Arrangement

        1.     GECC created Castle Harbour

        In July 1993, GECC contributed all of the original assets to Castle Harbour through

its subsidiaries.  These subsidiaries were TIFD III-E, Inc., TIFD III-M, Inc., and General

Electric Capital AG.   These assets consisted of beneficial interests in 63 aircraft with a

claimed fair market value of $550 million, subject to leveraged leases with $251 million

of non-recourse debt, and $296 million in cash, for total net asset value of $595 million.[5]

---

        [5]   A leveraged lease is a way of making sure that the depreciation deductions
from an asset are enjoyed by a taxpayer who can use the deduction.  Suppose that L is
a company that requires the use of an asset, but that L is unprofitable, and so it does
not have taxable income it can reduce with a depreciation deduction. A profitable
company, P, buys the asset and leases the asset to L.  P borrows money to come up
with the purchase price.  P is thus required to make interest payments to the lender.
These interest payments are roughly equal to the rental payments that L is required to
pay P.  Over time, P takes the depreciation deductions.   See Marvin A. Ehirelstein,
Federal Income Taxation, 142-45 (1988).  Here, GECC appears to have used leverage
leases to acquire the rights to use the depreciation deductions associated with aircraft.
If one commentator is right, then most aircraft in the country are subject to leveraged
leases.  Here, we are not challenging GECC's use of a leveraged lease to acquire
depreciation deductions.  What is at issue here is GECC's attempt to eliminate the tax it
should pay on the rents it received from the users of the aircraft.  Lee A. Shepard,
Goodbye Mr. Chips: Lease Stripping on Trial Again, With Add-Ons, 100 Tax Notes 453
(July 28, 2003).

The cash investment was later reduced to $240 million.[6]  When contributed to Castle Harbour, the aircraft were leased primarily to United States registered airlines of relative strength, and all the leases were performing.

The 63 aircraft were fully depreciated on the books of GECC.  That is, all 63 aircraft had a tax basis of zero at the time of their contribution to Castle Harbour.  They remained under long-term leases and, therefore, would continue to generate significant lease income for the remainder of their leases.[7]

2. Tax Indifferent Foreign Banks

Shortly after the formation of Castle Harbour in July, 1993, an effort began to solicit participation by a foreign bank (which would be indifferent to the tax consequences of allocating to it 98% of the taxable income).  Personnel from GECC and its investment firm, Babcock & Brown, traveled to Europe to obtain foreign participants.  Babcock & Brown authored an "investment memorandum" to provide potential participants.  The memorandum described the transaction and the existing operating agreement, and the expected range of return for the banks.  The plaintiff does not contend that domestic participants were considered seriously.

---

[6] At trial the government will demonstrate the cash contribution was contributed to a subsidiary (Castle Harbour Leasing, Inc. (CHLI)) and used to purchase commercial paper, principally that of GECC, effecting a circular flow of the cash contribution.

[7] The aircraft were depreciated for tax purposes under the allowable accelerated depreciation methods. Consequently, depreciation deductions were allowable in excess of actual depreciation in value and the aircraft had remaining useful lives long after they were fully depreciated for tax purposes.  In general, during the years when the accelerated depreciation deductions were allowable, the depreciation deductions would exceed the lease income and could actually shelter other income from tax.  Conversely, however, once fully depreciated for tax purposes, the continuing lease income would be fully taxable if it remained on the books of GE.

ING and Rabo were separately solicited and expressed interest in the investment. Babcock & Brown determined that these Dutch banks would not be subject to United States taxation on any income from Castle Harbour due to tax treaties between the United States and the Netherlands. Negotiations took place in Bermuda, lasting about 3 weeks, concluding on October 6, 1993. On that date the GE entities, TIFD III-E and TIFD III-M, and the Dutch banks signed the "Amended and Restated Operating Agreement" ("operating agreement"), the principal document for the operation of Castle Harbour.

The Dutch banks contributed $117 million in cash to Castle Harbour. The operating agreement provided that the Dutch banks would receive periodic payments over eight (8) years, which in substance reflected a return of the $117 million, plus an additional amount which was a rate of return of approximately 9.03587%. The operating agreement also memorialized the 98% income allocation to the Dutch banks for both taxable income and capital account purposes. The anticipated income allocation was reflected in the schedule of periodic payments, which amounted to a return of the $117 million, plus 9.03587%.

Return of the $117 million was assured by terms in the operating agreement. The operating agreement required that Castle Harbour hold liquid assets like GECC commercial paper in an amount at least equal to 110% of the remaining balance in the Dutch banks' "investment accounts." These accounts formed part of the financial statements prepared each year for Castle Harbour in accordance with the operating agreement. The investment accounts detailed the balances remaining to be repaid the Dutch banks. The account balances were reduced by the annual distributions pursuant

-6-

to Exhibit E of the operating agreement and increased by interest earned at the rate of 9.03587%.    If Castle Harbour did not maintain such a balance, the Dutch banks had the right to demand a liquidation of Castle Harbour.    The operating agreement also provided that if any of the periodic payments were missed, the Dutch banks had the right to immediate liquidation of Castle Harbour, resulting in the immediate repayment of the $117 million, assured by the 110% liquid asset requirement.[8]  Indeed, under these provisions of the operating agreement, Castle Harbour could not use the $117 million contributed by the Dutch banks, except to purchase commercial paper paying a lower rate of return (3.22 to 5.93%) than that owed to the Dutch banks.

GECC also provided a separate performance guarantee to the Dutch banks. Direct assurances from GECC with respect to the operation of Castle Harbour, in addition to the liquidation rights and 110% liquid asset requirements, were necessary ("deal breakers") for the Dutch banks to join Castle Harbour.  The Dutch banks would not have agreed to an arrangement by which return of their $117 million depended solely on the success of Castle Harbour. [9]

---

[8]  The 110% requirement was effected through a subsidiary of Castle Harbour, Castle Harbor Leasing, Inc. (CHLI), which held GE commercial paper in an amount necessary to satisfy the 110% requirement.  While Castle Harbour had to pay the Dutch banks a return of 9.03587%, the commercial paper it held earned only 3.22 to 5.93%.

[9]  And as demonstrated in Part C.3 below, the Dutch banks' risk of loss was substantially diminished after the first two and one-half years, as they had already received a return of more than half their "investment" by then.

3.    Why GE Would Agree to Allocate 98% of the Income to the Dutch Banks

A 98% allocation of Castle Harbour's income to the Dutch banks did not mean the Dutch banks would receive a 98% distribution of the lease payments.  That would not have made economic sense in view of the contributions of each of the participants. The operating agreement and the accounting system adopted in it were carefully crafted to ensure a predictable return for the Dutch banks of their $117 million plus 9.03587%; a return far less than the $310,138,800 of taxable income allocated on paper to the Dutch banks. During 1993 through 1998, income from the leases, which would have been taxable to GE but for the Castle Harbour arrangement, was allocated to the Dutch as follows:

Taxable Income Allocated to Dutch Banks, 1993-1998

| | |
|---|---|
| 1993 | $16,073,453 |
| 1994 | $75,061,872 |
| 1995 | $62,406,532 |
| 1996 | $49,874,972 |
| 1997 | $50,776,164 |
| 1998 | $55,945,807 |
| Total: | $310,138,800 |

Castle Harbour did not have to distribute the $310,138,800 in taxable income to the Dutch banks (even though that income was no longer subject to tax on GE's returns) per the operating agreement.  The operating agreement also incorporated 704(b) book accounting  procedures.  Although the airplane assets had zero tax basis, 704(b) book accounting permitted depreciation based on fair market value on the date of contribution to Castle Harbour of the fully tax depreciated airplanes.  Thus, the 98% income allocation was decreased by 98% of the depreciation.  Each year's depreciation

was calculated by dividing the fair market value of the planes by the remaining useful life of the planes.  The "capital accounts" (which are the accounts upon which final distributions to the Dutch banks are based, in part, in the event of liquidation) were thus increased each year by the income from the leases, and reduced by depreciation and actual distributions.  The § 704(b) book income allocated to the Dutch banks, as adjusted, results in actual cash payments upon liquidation, assuming a positive balance in the capital accounts.  Yet, even when added to the operating distributions, this is far less than the taxable income allocated to the Dutch banks. The actual § 704(b) book income allocations, after § 704(b) book depreciation, to the Dutch banks during 1993 through 1998 are as follows:

Book Income Allocations to Dutch Banks, 1993-98

| | |
|---|---|
| 1993 | $    332,000 |
| 1994 | $ 9,660,000 |
| 1995 | $ 6,548,000 |
| 1996 | $ 1,340,000 |
| 1997 | $ 2,258,000 |
| 1998 | $ 7,560,000 |
| Total: | $27,698,000 |

This sum, $27,698,000, pales in comparison to the $310,138,798 that GECC sought to shelter through the Castle Harbour arrangement.  The $27,698,000 is part of the price GECC apparently decided it was willing to pay to avoid the federal income tax on the $310,138,798 of sheltered income, which approximates the deposit at issue here, $62,212,010.

Without these accounting protocols for Castle Harbour income, the transaction would not have made any economic sense for GE.   It is difficult to imagine GE entering

a transaction that carried costs equal to or greater than a tax savings of $62,212,010.[10] In addition to allocating § 704(b) book income to the Dutch banks in the amount of $27,698,000, there were other, very substantial, initial transaction costs.  Through 1994, these costs totaled $13,751,486.  This amount included the $9,000,000 fee to the investment firm, Babcock & Brown.   Such a cost could not be justified even to obtain use of the Dutch banks' $117 million, since GE could borrow that money at much lower rates from other sources, including issuing GECC commercial paper which paid between 3.22 and 5.93% during this period.

The Castle Harbour arrangement could only be economically justifiable to GE when seen (as it was) as a device to obtain the $62,212,010 tax savings, less its out-of-pocket expenses.[11]

### 4.  GECC Maintained Control Over Castle Harbour's Assets

At formation in July 1993, Castle Harbour was entirely a GECC operation.[12]  In addition to the operating agreement, there were several agreements between GECC, its subsidiaries, and Castle Harbour but none changed the fact that GECC kept the assets entirely within its control.

---

[10]   This is the amount of the deposit at issue.  The amount of tax adjustment varies slightly under the alternative theories utilized by the government to defend the IRS determination, ranging from approximately $56 million to $62 million.

[11]   While the motivation of the Dutch banks may not be relevant (see ASA Investerings Partnership, 201 F.3d at 515), we note that pursuant to the operating agreement and the GECC Guaranty, the banks made a good return on their $117 million, approximately 9.03587%, with more than a fair amount of security to protect themselves from loss.

[12]   At its inception, Castle Harbour was called GE Capital Summer Street-I, LLC.

The management of the airplane leases remained in GECC control through the appointment of GECC employed individuals as general manager and managers. The original general manager (located in Hong Kong) and managers (residing in Mexico and Switzerland) apparently were selected for their non-US locations rather than their airplane management experience. Only the general manager had an aviation background, but he was no longer working in the field. Castle Harbour began with $595 million in assets, but the general manager's compensation from Castle Harbour was limited by the operating agreement to $12,000 per year. The individuals selected as general manager and managers at the formation of Castle Harbour were all GECC employees, with compensation packages independent of Castle Harbour.

The general manager and managers did not need particular expertise as Castle Harbour entered into a management (administrative services) agreement with a GECC subsidiary based in London, GE Capital Advisory Services, Ltd., on the date of its formation. This entity was engaged to provide finance, accounting, aircraft lease portfolio activities, and general administrative services to Castle Harbour. Subsequently, another GECC entity, GE Aviation Services, Ltd. (GECAS), based in Shannon, Ireland, took over the administrative services for Castle Harbour.

5.    The $240 Million GECC Cash Contribution Was Also Tax Motivated

An important element of the Castle Harbour structure is the cash contribution from GECC. Castle Harbour did not have a non-tax need for this cash. The cash was moved to a Castle Harbour subsidiary (CHLI), and invested in GECC commercial paper, *i.e.*, recirculated back to the contributor. The $240 million cash contribution from GECC to Castle Harbour was tax motivated. With a tax basis of zero in the contributed

-11-

airplanes, and the non-recourse liabilities associated with the airplanes allocated to the

Dutch banks, the $240 million cash contribution was needed to increase the basis of

TIFD III-E's partnership interest.  Otherwise, distributions to TIFD III-E would have

brought the basis below zero and required a recognition of income by TIFD III-E, and

ultimately GECC.   Income recognition would have collapsed the tax shelter plan as

planes and cash were distributed to TIFD III-E –to GECC–during the life of Castle

Harbour.

      6.    <u>Castle Harbour Lacked a Non-tax Purpose</u>

The Castle Harbour transaction lacked any credible non-tax business purpose.

Plaintiff's effort to connect this 1993 transaction to a 1991 effort to stimulate a troubled

sector of GECC's operations falls short.  While it is true that the Gulf War in 1991 led to

difficult times in the airline business, this business is cyclical and apparently the industry

has run a net loss over the past century, even though GECC claims it has never had a

losing year in the airplane business.  It is clear that by 1993, GECC resolved most if not

all of the difficulties faced in 1991 and was concluding a significant expansion of its

airplane leasing sector through a major acquisition.  GECC had begun a major

expansion of its commercial airline business in 1986 through the acquisition of a West

Coast based airline leasing business, Polaris.   In 1993, GECC had approximately 200-

250 airplanes in its portfolio and Polaris had a similar number, approximately 200-250.

GECC also expanded its portfolio in the fall of 1993 by effectively purchasing an

Ireland-based commercial leasing business, at the same time frame as the Dutch banks

joined Castle Harbour.  This added another 400-500 planes to the GECC portfolio.  This

scenario does not provide support for the Castle Harbour transaction beyond the need to find shelter for the income stream from 63 fully depreciated airplanes.

Further undermining plaintiff's purported business purpose are inconsistencies in the chronology of events plaintiff is using in an attempt to link Castle Harbour to the 1991 downturn in the airline business.   GECC issued a request for proposals to various investment banks in May 1992 to assist its aviation sector.  None of the responses proposed the Castle Harbour transaction.  Though Babcock & Brown received the 1992 request and responded then, Castle Harbour did not emerge as a possible transaction until a year later.  Meanwhile the business sector, particularly GECC's, had improved substantially.

Rather, the motivation for the Castle Harbour arrangement was the existence of 63 fully depreciated planes in its portfolio with a predictable and reliable income stream that no longer could be reduced for tax purposes by depreciation deductions.

C.     The Dutch Banks Were Creditors Not Equity Owners

1.  The Investments Have More Characteristics of Debt Than Equity

The Dutch banks each transferred to Castle Harbour $58,643,578, for a total of $117,287,156, to become members of Castle Harbour, LLC.  These transfers should be characterized as debt (and the Dutch banks as lenders/creditors) rather than equity. The risks assumed by the Dutch banks and the potential for loss was not unusual for creditors.   The debt instrument is not analogous to preferred stock, as the plaintiff contends.

The Dutch banks were to receive a return "range" between 8% and 9.5% for the use of their $117 million.  There was a target return rate (9.03587%) and a regular

payment schedule from Castle Harbour to the Dutch banks, set forth on Exhibit E to the operating agreement.  The payment schedule was strictly followed; any failure to make the agreed upon payments timely permitted the Dutch banks to demand the liquidation of Castle Harbour.  The final payment to the Dutch banks upon their early buyout by GECC on December 31, 1998, varied the overall return approximately $80,000 from the target return (9.03587%) with respect to overall payments of $143,516,000.

The Dutch banks did face the risk of a return lower than 9.03587%, but it was not likely to fall outside the range of 8% to 9.5%  due to the income stream associated with the airplanes contributed by GECC.  Declines in the residual values of the aircraft after the leases expired were the most significant risk faced by the Dutch banks. Although the Dutch banks considered the annual payments pursuant to Exhibit E as advances with repayment characteristics, the risk of repayment to Castle Harbour was minimal.  This aspect of the arrangement did not change the Dutch banks' own characterization of the transaction as debt for financial and Dutch tax purposes.

The Dutch banks $117 million was highly collateralized, particularly through the requirement that Castle Harbour maintain liquid assets equal to 110% of the remaining, unpaid investment.  The Dutch banks participation in management was de minimus, at best.   There was a prepayment penalty and the Dutch banks could force liquidation if they were not repaid periodically, as scheduled.    The scheduled payments were always made in a timely fashion.

Contrary to plaintiff's expectations at the beginning of the transaction, the Dutch banks themselves treated the transaction with Castle Harbour as debt for Dutch tax

purposes and their own financial accounting purposes.  The banks recognized that the

transaction had elements of equity as well as debt, but treated the investments as debt.

The plaintiff contends that the Dutch banks' characterization of debt or equity for their

own reporting purposes or Dutch tax reporting purposes is not relevant to this inquiry.

To the contrary, GECC was careful to insist that the Dutch banks characterize their

investment as equity and instructed the independent accounting firm preparing Castle

Harbour's financial statements that the Dutch banks' characterization would be that of

equity.  Apparently, however, the characterization was debt.

      2.    <u>The Investment Accounts Tracked the Dutch Banks' Return</u>

      The mechanism used by Castle Harbour to compensate the Dutch banks for

their contribution of $117 million can be understood and considered by examining the

"investment accounts" maintained for the Dutch banks as part of the annual financial

statements of Castle Harbour.[13]   No such accounts were prepared for the GECC

entities, TIFD III-E and TIFD III-M.  These statements monitored the Dutch banks' initial

payment of $117 million, the annual adjustments at the "applicable rate" of 9.03587%

as defined in the operating agreement, and the annual cash distributions set forth in

Exhibit E to the operating agreement.   Each year, 1993 through 1998, the annual

adjustments increased the investment account by the amount determined by multiplying

the applicable rate times the average daily balance in the investment account.

Similarly, every year from 1993 through 1997, the cash distributions provided for by

Exhibit E to the operating agreement reduced the investment account.  The buyout on

---

    [13]  These "investment accounts" were maintained separately from the the "capital
accounts" required by the Treasury Regulations (discussed above, and further below).

December 31, 1998, reduced the investment account for each Dutch bank to zero.  A summary of the investment account balances is as follows:

<u>Dutch Banks' Investment Account Balances</u>

| Year | Adjustments at 9.03587% | Cash Distribution | Balance |
|------|-------------------------|-------------------|---------|
| Opening | - | - | $117,286,000 |
| 1993 | $  3,494,000 | $  5,856,000 | $114,924,000 |
| 1994 | $10,374,000 | $39,128,000 | $  86,170,000 |
| 1995 | $  7,776,000 | $42,846,000 | $  51,100,000 |
| 1996 | $  4,518,000 | $19,620,000 | $  36,098,000 |
| 1997 | $  3,260,000 | $10,992,000 | $  28,366,000 |
| 1998 | $  2,654,000 | $30,930,000 | 0 |

3.      <u>Repayment Schedule for the Dutch Banks-Exhibit E</u>

The annual Exhibit E cash distributions were sizable and mandatory.  These distributions played an integral role in the financial relationship between GECC and the Dutch banks.  These payments reduced the Dutch banks' investment accounts and capital accounts.  As explained above, the capital account § 704(b) book income allocated to the Dutch banks was far less than taxable income, as § 704(b) book income was reduced by depreciation.  These payments were the vehicle for the repayment to the Dutch banks of their $117 million contribution and interest at the applicable rate, 9.03587%.   The Dutch banks demanded, and received, a Guaranty Agreement, between GECC and the Dutch banks–not with Castle Harbour–that the terms of the operating agreement would be executed faithfully.  The Exhibit E distributions were among the most important terms in that agreement.  Failure of Castle Harbour to pay the amounts entitled each Dutch bank to demand liquidation of the enterprise.   Castle Harbour made the Exhibit E payments as required from 1993

-16-

through 1997.  The buyout of the Dutch banks on December 31, 1998, relieved the

obligation to make an Exhibit E payment on that date. The total Exhibit E payments

made to the Dutch banks during 1993 through 1997 were as follows:

Exhibit E Payments to Dutch Banks

| | |
|---|---|
| 1993 | $  5,856,789 |
| 1994 | $39,127,597 |
| 1995 | $42,846,678 |
| 1996 | $19,620,374 |
| 1997 | $10,991,784 |
| Total: | $118,443,222 |

Exhibit E set forth additional payments to the Dutch banks for 1998, 1999 and

2000.  These were not made since GECC decided to end the relationship on

December 31, 1998.  The scheduled 1998 payment was included in the final payments

to the Dutch banks.  The additional payments were $6,770,862 for 1999 and

$26,032,067 for 2000.   These would have brought the total Exhibit E cash distributions

to $154,053,947 which would have been a return of their capital plus interest at the

applicable rate of 9.03587%.

4.     Dutch Banks' Return--Capital Accounts with 98% Income Allocation

Castle Harbour maintained capital accounts for all participants. The key

components of the capital accounts, as far as the Dutch banks were concerned, were

the 98% income allocations and the Exhibit E cash distributions, discussed above.

Like the investment accounts, the capital accounts measured the return of the Dutch

banks on their contributions.  Both had a targeted return rate of 9.03587%, per the

operating agreement.  The opening balances were the combined investment of $117

million.  Allocations of income (98%) and gains/losses (which were allocated under

-17-

another formula not challenged here) increased or decreased the account balances. The Exhibit E cash distributions decreased the account balances. A summary of the capital account balances for the Dutch banks is set forth below

<u>Dutch Banks' Capital Account Balances-98% Income Allocation</u>

| | |
|---|---|
| Opening Balance | $117,556,000 |
| 1993 | $112,032,000 |
| 1994 | $ 85,432,000 |
| 1995 | $43,224,000 |
| 1996 | $24,920,000 |
| 1997 | $16,186,000 |
| 1998 | $23,746,000 (before buyout) |
| | 0        (after buyout) |

Not surprisingly, the buyout of the Dutch banks on December 31, 1993, with the final payment made in early 1999, produced a return on investment of approximately 9.03587%, the applicable rate identified in the operating agreement signed in October, 1993.

D.    <u>The Special Allocations to the Dutch Banks Fail the Statutory Requirement of "Substantial Economic Effect"</u>

After October 6, 1993, when the Dutch banks joined Castle Harbour, the putative ownership interests were TIFD III-E, 81.1964%, TIFD III-M, 1%, ING, 8.9018%, and Rabo, 8.9018 %. The operating agreement did not follow ownership interests in allocating each partner's distributive share of income, gain, loss, deduction or credit. Instead, the Dutch banks were each allocated 49% of profit and loss, for a total of 98%. TIFD III-E and TIFD III-M were each allocated 1%. There were different allocations for capital gains and losses.

The 98% income allocation to the Dutch banks is a key component to GECC and the Dutch banks achieving the target 9.03587% applicable rate return for the Dutch

banks.  This can be demonstrated by considering hypothetical capital accounts based

on an ownership percentage allocation of income, rather than the 98% income

allocation set forth in the operating agreement.  Using the comparative liquidation

method (CLM) (which recognizes that Dutch banks' "ownership" percentages declines

each year as their initial investments were repaid), it is evident that the 98% income

allocation increases the payments to the Dutch banks by over $25 million.

<u>Impact of 98/2 Allocation on Dutch Banks' Capital Accounts</u>

| Year/Period | Castle Harbour's Book Income | Allocation to Banks Under 98/2 | CLM | Increase Under 98/2 |
|---|---|---|---|---|
| 10/6/93 – 12/31/93 | $      339,000 | $      332,000 | $      58,113 | $      273,887 |
| 1994 | 9,857,000 | 9,660,000 | 1,371,560 | 8,288,440 |
| 1995 | 6,682,000 | 6,548,000 | 566,299 | 5,981,701 |
| 1996 | 1,368,000 | 1,340,000 | 70,488 | 1,269,512 |
| 1997 | 2,304,000 | 2,258,000 | 78,519 | 2,179,481 |
| 1998 | 7,736,000 | 7,560,000 | 380,578 | 7,179,422 |
| Totals | $28,286,000 | $27,698,000 | $2,525,557 | $25,172,443 |

The distortion of income resulting from the 98% allocation of income to the Dutch

banks is enormous.  Considering the income tax consequences of the 98% income

allocation, the Dutch banks suffered no increased tax liability as a tax indifferent party.

GECC, however, avoided taxation on approximately $284,073,938 through this

allocation.  The tax liability on this amount would have been $56,814,788, as set forth

below:[14]

---

[14]    This amount, $56,814,788, is less than the deposit at issue, $62,212,010.
As explained in footnote 10, the tax liability of GECC at issue here varies slightly under
the alternative theories advocated by the government here.  Here, the reallocation of
income to the GECC entities is not 100% of the income previously allocated to the
Dutch banks.  The allocation is by ownership percentages, which decrease over time,
as the Dutch banks transfer to Castle Harbour is repaid with interest.

Impact of 98/2 Special Allocation of Income on GE Entities Tax Liabilities

| Year/Period | Castle Harbour's Taxable Income | Allocation to GE Entities 98/2 | CLM | Increase Under CLM | Tax on Increase at 20% Rate[15] |
|---|---|---|---|---|---|
| 10/6/93–12/31/93 | $ 16,401,481 | $      328,028 | $13,589,867 | $ 13,261,839 | $  2,652,368 |
| 1994 | 76,593,747 | 1,531,875 | 65,936,055 | 64,404,180 | 12,880.836 |
| 1995 | 63,680,135 | 1,273,603 | 58,283,247 | 57,009,644 | 11,401,929 |
| 1996 | 50,892,829 | 1,017,857 | 48,270,512 | 47,252,655 | 9,450,531 |
| 1997 | 51,812,412 | 1,036,248 | 50,046,674 | 49,010,426 | 9,802,085 |
| 1998 | 57,244,395 | 1,298.588 | 54,433,782 | 53,135,194 | 10,627,039 |
| Totals | $316,624,999 | $  6,486,199 | $260,264,106 | $284,073,937 | $56,814,788 |

Thus, both parties benefitted from the 98% income allocation, at the expense of only the U.S. Treasury.  Although the 98% income allocation produced a pre-tax detriment to GECC by reducing the amount of income to which it would have been entitled if the capital accounts had been calculated on the basis of ownership, this reduction ($25,173,443) was less than the tax savings ($56,814,788) producing an after-tax economic benefit of $31,641,345.   This after-tax benefit is further reduced by the costs of the transactions, particularly the start-up costs described above (p. 15) which totaled $13,751,486 by the end of 1994.  The banks of course benefitted by receiving an almost guaranteed return in excess of 9% on the use of there funds, which were securely held in GE paper (earning between 3.22 and 5.93%).

---

[15] The 20% rate is used because the GE consolidated group was subject to the alternative tax during the years at issue, and thus subject to a 20% tax rate.

ARGUMENT

A.    Castle Harbour Was Not a Valid Partnership for Tax Purposes

In order to enjoy federal income tax treatment as a partnership, parties must join together in good faith to conduct an enterprise and to share profits and losses. Commissioner v. Culbertson, 337 U.S. 733, 744-45 (1949).   This is a question of federal law determined by examining all the facts and circumstances of the enterprise. Ibid.; Estate of Kahn v. Commissioner, 499 F.2d 1186 (2d Cir. 1974).   The intent of the parties controls, and that intent is ascertained by considering all the facts and circumstances of the enterprise.  Culbertson, 337 U.S. at 742; Burde v. Commissioner, 352 F.2d 995, 1002 (2d Cir. 1965);  ASA Investerings Partnership, 201 F.3d at 511; Boca Investerings Partnership vs. United States, 314 F.3d 625, 631 (D.C. Cir. 2003).

All the facts and circumstances surrounding the participation in Castle Harbour by two Dutch banks supports a conclusion that GECC did not have the requisite intent to join together with the Dutch banks for the purposes of carrying on a partnership for non-tax business reasons.  GECC did not need the money sent to Castle Harbour by the Dutch Banks, nor did the operating agreement allow Castle Harbour to use the money–it became simply collateral for the Dutch banks' loans to Castle Harbour.  The Dutch banks brought no management expertise to Castle Harbour; management was entirely a GECC operation.  The Dutch banks' management participation was virtually nil.  The purpose of Castle Harbour was to provide shelter for a large stream of income from leased aircraft owned by GECC for which depreciation deductions had been exhausted.  The Dutch bank's role was as the "tax-indifferent party" willing to accept, for a fee, any allocation of taxable income since its tax burden would always be zero.

-21-

GECC initially formed Castle Harbour, contributing cash and airplanes under lease, using solely GECC entities as members.  This arrangement could not accomplish the purpose of sheltering taxable income from the lease rents.   To shelter the income, GECC needed the Dutch banks.  Accepting the role of tax-indifferent party is not the same as joining together in good faith to conduct an enterprise and to share profits and losses.  Culbertson, 337 U.S. at 742, 744-45; ASA Investerings Partnership, 201 F.3d at 513; National Investors Corp., 144 F.2d at 468.

The plaintiffs' tax shelter scheme fails *ab initio* for want of a partnership between GECC and the Dutch banks.  ASA Investerings Partnership; Boca Investerings, supra. Partnership.   Adherence to the formalities of a partnership are not enough to establish a partnership for federal income tax purposes.  Estate of Kahn, 499 F.2d at 1189 (state court determination of partnership under state law not controlling).  Many factors can be considered in evaluating an arrangement for federal income tax purposes.  Estate of Kahn, Ibid., citing Luna v. Commissioner, 42 T.C.1067, 1077-78 (1964).

1.    Agreements Between the Parties and Their Conduct

a.  The Operating Agreement's Legend

The agreement between the members and their conduct in executing its terms is an important factor.   Luna, 42 T.C. at 1077.  Here there are several agreements which detail the relationship between GECC and the Dutch banks within Castle Harbour.  The structure, formation, and operation of Castle Harbour are governed primarily by the Amended and Restated Operating Agreement of October 6, 1993, which was adopted by the GECC members and the Dutch banks following a few weeks of negotiations in Bermuda–the offshore location necessary to avoid United States taxation on the

taxable income allocated to the Dutch banks.   The tax sheltering purpose is clear in the "Legends for All Investors" set forth on the second page of the agreement.   It provides that::

> NO INVESTOR MAY DIRECTLY OR INDIRECTLY, OFFER
> SELL, RESELL, OR DELIVER LLC INTERESTS IN THE
> UNITED STATES OR TO OR FOR A U.S. PERSON.

Sale of a Castle Harbour interest to a United States person could have the effect, *inter alia*, of subjecting income of that new owner to United States taxation and GECC to indemnify that owner for such United States taxes.

### b.  Tax Indemnification Agreement

Participation of the Dutch banks was sought, and the banks' compensation was dependent on their role as a tax indifferent party, rather than the good faith conduct of an enterprise and to share profits and losses.  The Tax Indemnification Agreement executed by the Dutch banks and TIFD III-E (a GECC subsidiary) on October 6, 1993, emphasizes this purpose.  This agreement provides that the Dutch banks would be indemnified for covered taxes imposed with respect to income or distributions from Castle Harbour.  Its terms sought to assure that the Dutch banks continued to qualify for the tax benefits of the treaty between the Netherlands and the United States without which they never would have agreed to join Castle Harbour.  The agreement also shows that if the Dutch banks had to pay taxes, they would have demanded greater compensation for their participation, which in turn would have raised the cost of the tax savings to GECC.

In fact, a change in the possible tax liabilities of the Dutch banks in the Netherlands with respect to Castle Harbour income and distributions led to the early

buyout of the Dutch banks on December 31, 1998.  The Tax Indemnification Agreement was amended in late 1998 in an attempt to resolve this possibility–and to limit costs to GECC– but, to the Dutch banks' surprise, GECC decided to end the Dutch Banks' relationship with Castle Harbour rather than face a possible increase in cost.  This conduct demonstrated the tax-driven nature of Castle Harbour for GECC.

GECC could unilaterally decide to close down Castle Harbour because it preserved that right for itself when the Dutch banks became members.  ¶ 14.3 Operating Agreement.   The Dutch banks did not have a corresponding right to buyout the GECC entities.

c.  GECC's Guaranty

GECC's purpose in forming Castle Harbour is obvious–to shelter the income stream from the leased airplanes with respect to which depreciation deductions were exhausted.   Despite all the formalities of the Operating Agreement, Contribution Agreement, Tax Indemnification Agreement, and Services Agreements, the Dutch banks would not join Castle Harbour until GECC in its own capacity rather than through its subsidiaries agreed to "absolutely, unconditionally and irrevocably" guarantee the performance–including making scheduled payments--by the GECC entities and the individual managers appointed by such subsidiaries.  Guaranty, ¶ 2.  Negotiated in Bermuda, the Guaranty recites the activities of the various GECC entities in forming Castle Harbour and operating its business.  The Guaranty recognizes that the Dutch banks have no role in appointing the managers for Castle Harbour. The Guaranty looks to GECC entities, not the Dutch banks, to contribute additional capital if necessary. This document hardly suggests that the Dutch banks joined the members of Castle Harbour

-24-

to conduct an enterprise and to share profits and losses.  Rather it reveals the limited

but critical role of the Dutch banks–to facilitate the sheltering of income from United

States taxation.

2.     Capital and Service Contributions

a. $117 Million Cash Contribution

The Dutch banks' contributions to Castle Harbour, $117 million, pale in

comparison to GECC's contribution of cash and airplanes totaling $595 million.

Nonetheless, the operating agreement allocates 98% of the income to the Dutch banks

and caps their capital gains and losses.

Castle Harbour had more than sufficient cash to operate before the Dutch banks'

infusion.   All the airplanes contributed by GECC were under lease and producing

income.  This income was sufficient to cover all costs and generate substantial cash

holdings.   GECC contributed $296 million in cash at formation.  This money was

moved to Castle Harbour's subsidiary (CHLI) and used to purchase commercial paper.

This cash contribution had two discernible purposes: (1) create a tax basis in the

partnership for GECC sufficient to allow it to receive distributions without recognizing

taxable income and (2) provided liquidity to comfort the Dutch banks.

The operating agreement required Castle Harbour to maintain, at all times, a

balance of high grade commercial paper equal to 110% of the remaining balance in the

Dutch banks' investment accounts.  ¶ 5.8(b), Operating Agreement.  This effectively

limited the use of the Dutch banks' investments to provide security for their own

investments.  From 1994 onward, the commercial paper held by CHLI consisted solely

of GECC commercial paper.  Thus, there was a circulation of the Dutch money from

-25-

Castle Harbour to the subsidiary back to GECC through the purchase of commercial paper.

The Dutch funds were effectively blocked for all purposes except the purchase of GECC commercial paper. This arrangement makes no sense other than to encourage the Dutch banks to join Castle Harbour and provide the foreign, tax neutral partner that GECC desired. The Dutch banks could have purchased GECC commercial paper directly, without going through Castle Harbour. The return rate targeted for the Dutch banks by Castle Harbour (9.03587%) significantly exceeded the cost of GECC commercial paper. The only rationale for such activity by GECC was the tax shelter. The Dutch banks' participation made the shelter work; the Dutch wanted Castle Harbour to hold liquid assets ready to buy them out, rather than rely on the sale of airplanes to raise cash. The security provided the Dutch banks is inconsistent with a conclusion that the Dutch banks joined Castle Harbour to conduct an enterprise and to share profits and losses. Culbertson, 337 U.S. at 744-45.

b. De Minimus Management Role for Dutch Banks

The Guaranty issued by GECC to the Dutch banks and the operating agreement make clear that the Dutch banks had virtually no role in the management of Castle Harbour. In addition to appointing GECC (or other General Electric subsidiary) employees to serve as managers of Castle Harbour (many of whom did not have aircraft leasing experience), Castle Harbour contracted with GECC entities to manage the aircraft portfolios. The Dutch banks were allowed to attend manager's meetings but it is clear that they did not seek nor were they awarded any management role in Castle Harbour. The managers themselves were also mere figureheads. Castle Harbour was

run by GECC headquarters in Stamford, Connecticut, and from GECAS headquarters in Shannon, Ireland.  Indeed, no one at Castle Harbour has offered an explanation for the $12,000 annual payment to the General Manager from a business with initial capitalization of $595 million.  ¶ 5.7(b), Operating Agreement.  And, the managers all received much more significant compensation packages from other GE subsidiaries for whom they worked.

      3.   <u>Dutch Banks' Payment Rights</u>

The Dutch banks received annual payments pursuant to Exhibit E of the Operating Agreement.  These were substantial payments, ranging from approximately $39 million in 1994 to approximately $10 million in 1997.  Failure to make these payments entitled the Dutch banks to demand liquidation of Castle Harbour.  ¶ 14.1(d), Operating Agreement.   Upon liquidation or purchase of the Dutch banks' interests, additional cash payments would be made.  The amounts paid depended on the balance of the Dutch banks' capital accounts, and any Class A Guaranteed Payment or Indemnification Premium due the Dutch banks.  ¶ 1.10, Operating Agreement.  These mechanisms were in place to repay the Dutch banks their contributions plus interest at the target yield of 9.03587%.

In contrast, the GECC entities were only guaranteed a Class B Guaranteed Payment, which when paid, did not exceed $500,000, even though their investment was $595 million.  ¶ 4.1, Operating Agreement.  The nature of the relationship to Castle Harbour of the GECC entities was very different than the nature of the Dutch banks' relationship to Castle Harbour.  The payment schedule on Exhibit E and the payment

guarantees available to them indicate relative control over cash distributions also differed substantially from the GECC entities.

4.     Sharing Risk of Profits and Losses

The Dutch banks and GECC did not join together to share in profits and losses. Culbertson, 337 U.S. at 744-45; Estate of Kahn, 499 F.2d at 1189;  Luna, 43 T.C. at 1078.  In reality, the Dutch banks joined Castle Harbour to obtain essentially a fixed return on their money of 9.03587%.   This rate is set forth in the operating agreement within the definition of "applicable rate."  ¶ 1.10, Operating Agreement.   The allocation of 98% of income to the Dutch banks and the annual cash distributions to the Dutch banks according to Exhibit E were finely tuned by GECC's investment bankers, Babcock & Brown, to realize a 9.03587% return to the Dutch banks upon their exit from Castle Harbour.  Despite the early exit of the Dutch banks and over five years of existence, the return of the Dutch banks varied by only approximately $80,000 from a 9.03587% return on their contributions to Castle Harbour.   The security provisions, described above, further insulated the Dutch banks from risk of loss.  The structure of the agreements also precluded any appreciable ability to share in profit beyond that scripted by the agreements through the payment schedule.  Indeed, the 98% allocation to the Dutch banks was only with respect to the lease income, and did not include capital gains or losses on the sale or disposition of the planes.

a.  Class A Investment Accounts

The clearest picture of the importance of the 9.03587% return rate is the Class A Investment Accounts prepared each year as part of Castle Harbour's Financial Statements.  ¶ 1.10 ("Class A Investment Account; Class A Investment Account

-28-

Adjustment"); 8.2(b), Operating Agreement.  These investment accounts measured the balance of the Dutch banks contributions to Castle Harbour.  No such report was prepared for the GECC entities.  The account was decreased by the distributions set forth in Exhibit E to the operating agreement and increased by an annual adjustment, i.e., the balance in the account multiplied by the applicable rate, 9.03587%.  ¶ 1.10, Operating Agreement.  Though by definition the applicable rate could vary during the Dutch banks participation in Castle Harbour, it never did and for each year, 1994 through 1998, the applicable rate was 9.03587%.

The investment accounts for the Dutch banks demonstrate that the banks did not join Castle Harbour to share the risks of profit or loss but rather to derive a 9.03587% gain on their contribution.  Despite the fact that the Dutch banks remained participants in Castle Harbour for five years, during which hundreds of millions of dollars of lease rents were collected, leases were extended, some airplanes were distributed to GECC, and other airplanes were acquired, the overall return to the Dutch banks deviated approximately only $80,000 from the 9.03587% target or "applicable rate."

Clearly the intent, and reality, of Castle Harbour's structure was to "collar" the potential upside and downside to the Dutch bank's risk.  Limiting the ultimate risk of the Dutch banks is antithetical to the existence of a true partnership for federal income tax purposes.

                    b.   Capital Accounts and Federal Income Tax Returns

The lack of sharing the risk of profit or loss by the Dutch banks can also be demonstrated by comparing the Capital Accounts and the federal income tax returns filed by Castle Harbour.   The vast allocation of taxable income to the Dutch banks on

the tax returns suggests that they shared in the profits of Castle Harbour.  In fact, however, the Dutch banks' return on their contribution had little to do with the amounts of income allocated to them on federal income tax returns of Castle Harbour.

The difference between the federal income tax returns and the Capital Accounts is not the amount of revenue received by Castle Harbor, the amount of distributions to the Dutch banks, nor the role of the Applicable Rate (9.03587%).  The key is depreciation.

Castle Harbour's taxable income was computed without taking depreciation (a deduction allowed for "wear and tear") since GECC had fully depreciated the airplanes prior to contributing them to Castle Harbour in 1993.  The tax returns demonstrate the full measure of taxable income sheltered by GECC by allocating 98% of Castle Harbour's taxable income to the Dutch banks.  Of course, this allocation was of no consequence or concern to the Dutch banks.  As tax indifferent parties, allocating some or all of Castle Harbour's income on the tax returns to the Dutch banks would not have mattered since their tax bill would remain the same: zero.  Nor did the tax return allocations of income determine the actual return received by the Dutch banks on their contributions to Castle Harbour.  The applicable rate of 9.03587% was not a tax return component.

The situation was quite different with respect to the capital accounts prepared for Castle Harbour.  Required by the operating agreement (and in an attempt to comply with certain Treasury Regulations), the income component of the capital accounts was calculated by taking into account deductions for depreciation based on the fair market value of the airplanes when contributed.  This resulted in a much lower "income"

-30-

amount for capital account purposes than for federal income tax purposes.  The capital account income was easily calculable also.  Income consisted primarily of rental income from leases; the deductions were almost entirely composed of interest and depreciation.   From these highly predictable amounts, GECC's objective of "collaring" the return of the Dutch banks at 9.03587% became highly manageable since the cash distributions to the Dutch banks were determined solely through the agreement between GECC and the Dutch banks, i.e., the operating agreement's Exhibit E.  Plaintiff's contention that the Dutch banks simply joined Castle Harbour to share the risk of obtaining profits or suffering losses is without merit.

The "collaring" of risk here is similar to the de minimis risks for another foreign bank (ABN–also Dutch) in <u>ASA Investerings Partnership</u>, 201 F.3d at 514.   The court of appeals there reasoned that accepting a de minimis risk of loss was not sufficient to recognize an arrangement as a partnership for federal income tax purposes.  The Dutch banks had a de minimis risk of not receiving their 9.03587% return.  Exhibit E to the operating agreement required annual payments which were predetermined to deliver the target return; if the payments were not made timely or the required 110% of the remaining balance in their investment accounts was not maintained, the Dutch banks could call for the liquidation of the partnership.  The GECC Guaranty made sure that these events did not happen through negligence or malfeasance on the part of GECC subsidiaries or employees.  The Class A Guaranteed Payment and Indemnification Premiums provided further guarantees that the target rate of 9.03587% would be achieved.  In fact it was.  The $80,000 variation from the 9.03587% return is

precisely the type of de minimis variation that the court in <u>ASA Investerings Partnership</u> found belied a partnership for tax purposes.  <u>Ibid.</u>

B.    <u>Castle Harbour is a "Sham"</u>

1.  <u>Substance Over Form</u>

The tax law is concerned with the economic substance of transactions, not the form or labels chosen by the taxpayer to describe those transactions.  Thus, it is a well-established principle that tax benefits claimed to arise out of a transaction that was contrived to create tax benefits, but that lacked independent economic substance, will not be allowed.  <u>Gregory v. Helvering</u>, 293 U.S. 465, 465-67 (1935).   Such transactions are referred to as "sham transactions."  <u>Knetsch v. United States</u>, 364 U.S. 361 (1960); <u>Nicole Rose v. Commissioner</u>, 320 F.3d 282 (2d. Cir. 2003); <u>Boca Investerings Partnership vs. United States</u>, 314 F.3d 625, 631 (D.C. Cir. 2003); <u>ASA Investerings Partnership</u>, 201 F.3d at 512;  <u>In Re CM Holdings, Inc.</u>, 301 F.3d 96, 102 (3rd Cir. 2002);  <u>Lee v. Commissioner</u>, 155 F3d. 584 (2d Cir. 1998);  <u>Kirchman v. Commissioner</u>, 862 F.2d 1486, 1490 (11th Cir. 1989).

The Second Circuit applies a flexible analysis to determine whether a transaction should be considered a sham and disregarded for federal income tax purposes.  <u>Gilman v. Commissioner</u>, 933 F.2d 143, 147-48 (2d. Cir. 1991).  While endorsing the "business purpose/economic effect analysis" of sham transactions, this Circuit has endorsed the "flexible nature of the analysis" demonstrated by the Ninth Circuit.  <u>Ibid</u>. at 148, <u>citing</u> <u>Casebeer v. Commissioner</u>, 909 F.2d 1360, 1363 (9th Cir. 1990); <u>Sochin v. Commissioner</u>, 843 F.2d 351, 354 (9th Cir.), <u>cert. denied</u>, 488 U.S. 824 (1988); <u>Zmuda v. Commissioner</u>, 731 F.2d 1417, 1420 (9th Cir. 1984).

In <u>Casebeer</u>, the Court rejected the notion that to determine that a transaction is a sham, "a court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits *and* that the transaction has no economic substance." <u>Ibid.</u> (emphasis in original).   The Ninth Circuit held that "[t]his argument has no merit." <u>Ibid.</u>

Thus it is clear that this Court can determine that a transaction is a sham even if the taxpayer can establish either a "business purpose" for the transaction or that the transaction had some "economic substance."   The question is whether "the transaction was motivated by tax consequences and not by business or economic consequences." <u>Gilman</u> at 148.   Determining business or economic consequences requires examining substance over form and avoiding exalting "artifice over reality."   <u>Gregory v. Helvering</u>, 293 U.S. at 469.

　　　2.　　Purpose of Castle Harbour was to Avoid Taxes

Considering all the facts and circumstances of this transaction, it is clear that Castle Harbour was formed to avoid federal income taxes.   It is true that GECC was in the airplane leasing business prior to forming Castle Harbour but only 63 planes were involved in this transaction.   A common characteristic of these 63 airplanes was certainly not a coincidence: all 63 airplanes had been fully depreciated for tax purposes and being under lease had healthy and predictable income streams for future years. The Castle Harbour planes formed a small part of the GECC portfolio.  By 1994, GECC had 400 to 500 planes in its portfolio.

Plaintiff's contention that weak conditions in the airline industry forced it to "take action" in the early 1990s collapses upon consideration of GECCs acquisition of

Guiness Peat Airways (GPA) in 1993, the improving conditions of the airline industry at that time, and the small number of planes involved in Castle Harbour.

Further, although the form of Castle Harbour suggests that these planes left the GECC umbrella, its substance indicates otherwise. The airplane leases were managed by a GECC entity based in Ireland, GECAS (General Electric Aviation Services), as was most, if not all, of GECC's other airplanes under lease. Castle Harbour was a GECC managed enterprise, from top to bottom. The Dutch banks' management role was de minimus, at best. There was little if any difference between the management of the Castle Harbour planes and the other 400 plus planes managed by GECC.

 GECC never lost control over the Castle Harbour planes, even though their management became more cumbersome, if only to keep the form of the transaction eligible for the tax shelter purpose. The managers of Castle Harbour were GECC employees, although for accounting and cost purposes they may have been "seconded" to Castle Harbour.   But for the tax avoidance purpose, Castle Harbour had no purpose; it increased costs across the board and only made sense because of the effort to shelter its income.

The plaintiffs further contend that the inclusion of outside, *i.e.*, non-GECC, investors in Castle Harbour had the business purpose of obtaining additional capital for GECC's airplane business.   That may have been the apparent form of the transaction, but its substance was much different.   The Dutch banks' contribution was $117 million. This would seem to satisfy the apparent goal of raising outside capital and there will likely be extensive trial testimony in an attempt to establish this point. The substance of the arrangement with the Dutch banks suggests otherwise. The operating agreement

required Castle Harbour to retain a balance equal to 110% of the unpaid balance of the Dutch banks investments in liquid assets, e.g. GECC commercial paper.   For example, on December 31, 1993, the Dutch banks "investment accounts" (representing the unpaid balances) totaled $114,924,000.   The operating agreement required Castle Harbour to maintain 110% of this amount (approximately $126,416,400) in liquid assets, as security for the Dutch banks.   Thus the "outside capital" supposedly raised by Castle Harbour was not available for use and of little value except for the Dutch banks' role in the tax shelter as tax-indifferent parties willing to receive a paper allocation of 98% allocation of taxable income.

   3.    GECC $240 Million Contribution Solely for Tax Purposes

   Another aspect of the Castle Harbour structure that demonstrates that it was a sham transaction designed to shelter income is GECC's contribution of $240 million in cash.   This cash contribution had the singular purpose of providing a tax basis for the plaintiff's interest in Castle Harbour.   The 63 airplanes contributed had been fully depreciated and had a zero tax basis.   A cash infusion of $240 million provided a tax basis equal to that amount which permitted tax-free distributions of airplanes or cash back to GECC through TIFD III-E, the plaintiff here.   Castle Harbour moved the cash to its subsidiary, Castle Harbour Leasing, Inc. (CHLI) which invested the money in commercial paper, primarily GECC's.   This circular movement of cash--unnecessary for the operations of Castle Harbour--clearly indicates the sham nature of this entity.

   4.    Castle Harbour Was Economically Empty

   Economic substance is a question of fact.   Nicole Rose, 320 F.3d at 284;   Lee, 155 F3d. at 586.   Determining economic effect requires examining substance over

form and avoiding exalting "artifice over reality."  Helvering, 293 U.S. at 469.  The

Castle Harbour transaction served no economic purpose beyond tax avoidance; as

such it was "economically empty" save for tax considerations. Nicole Rose, 320 F.3d at

284  Lee, 155 F.3d at 586.

An examination of the transaction which created Castle Harbour and Castle

Harbour's structure and very existence supports a conclusion that Castle Harbour is

nothing more than an artifice and it should be disregarded for federal income tax

purposes.  Nicole Rose, 320 F.3d at 284.  GECC created Castle Harbour in July 1993

by contributing cash and its interest in 63 commercial airplanes under lease to domestic

airlines.  The airplanes were under "leveraged leases," which generally means GECC

owned a small equity stake, perhaps 20%, and an institutional lender had financed the

remaining 80% of the airplane's cost.  Lease payments from the airlines usually were

committed to first payoff the institutional lender rather than being prorated between the

equity stakeholder and the lender.  The income stream from airplane assets was

predetermined by their pre-existing leases.  Transferring the leases to Castle Harbour

did not modify these economic arrangements.  Indeed, the planes were sub-leased

back to GECC.  Castle Harbour itself added nothing to these assets, and only

increased the costs of managing them.  For example, Babcock & Brown, the investment

banking firm, was paid a $9 million fee for its work in Castle Harbour.

GECC maintained control of the airplane leasing business ostensibly transferred

to Castle Harbour.   The managers were GECC employees who were compensated

primarily by GECC directly.  For example, the first general manager's salary was only

$12,000.  His compensation from GECC was many times that amount.  The aircraft

portfolio was primarily managed by a GECC entity based in Shannon, Ireland.  There is no legitimate claim that the management of Castle Harbour was independent of GECC.

The income generated by Castle Harbour was either lease income from the airplanes or from GECC commercial paper.  The commercial paper was purchased with funds contributed by GECC for the primary purpose of creating a tax basis in Castle Harbour for the plaintiff, TIFD III-E.  The commercial paper also provided liquidity which provided another level of security for the Dutch banks.  The Dutch banks did not participate in management but were earnest in their concern that they achieve the target return of 9.03587% return on their contribution.

GECC made sure through its employees managing Castle Harbour, its headquarters staff in Stamford, Connecticut providing support to Castle Harbour, and GECAS in Shannon, Ireland, that the assets of Castle Harbour were managed prudently.  In reality, GECC controlled Castle Harbour.   Creating Castle Harbour and establishing its operating base in Bermuda did nothing to advance the economic prospects of GECC other than the tax savings it claimed during 1993 through 1998.  Castle Harbour was designed to create wealth through tax savings.  It was nothing more than an artifice that should be disregarded for federal income tax purposes.

C.    The Dutch Banks Contributed Loans, Not Equity, to Castle Harbour

The Court of Appeals in ASA Investerings Partnership described the question of the proper characterization of the Dutch bank's contribution there as "peripheral" to the issue of whether a bona fide partnership existed for federal tax purposes.  Ibid. at 515.  Here, the Dutch banks' contributions were debt, not equity.  This conclusion buttresses the government's position that a partnership did not exist, as many of the factors

supporting this characterization of the Dutch banks' contributions are the same as those which demonstrate that a bona fide partnership did not exist between GECC and the Dutch banks for federal income tax purposes.

It is well recognized that various factors can be considered to determine whether an investment is debt or equity, though not all are of equal weight and no single one is controlling.  John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); Dunn v. Commissioner, 615 F.2d 578, 584 (2d Cir. 1980); Scriptomatic, Inc. v. United States, 555 F.2d 364, 372-73 (3d Cir. 1977);  Estate of Mixon v. United States, 464 F.2d 394, 402-03 (5th Cir. 1972)(identifying 13 factors, but noting 38 factors have been used by various courts);  Fin Hay Realty Co v. United States, 398 F.2d 694 (3d Cir. 1968) (identifying 16 factors); Rosenberg v. Commissioner, T.C. Memo 2000-108, 2000 WL 326198, March 29, 2000; Laidlaw v. Commissioner, T.C. Memo 1998-232, 1998 WL 345528, June 30, 1998.

1.    Dutch Banks Treated Investments as Debt

The intent of the parties is a logical place to begin this analysis and it is striking here that the Dutch banks treated their investments as debt.  Fin Hay Realty Co., 398 F.2d at 696; Estate of Mixon, 464 F. 2d  at 402.  Representatives of both banks testified at their depositions that for internal book purposes and for Dutch tax purposes the investments were treated as loans, not equity.  Indeed, the ING deposition witness indicated that his unit at ING only made loan  investments.

These facts are obviously inconsistent with plaintiff's argument that Dutch banks were equity stakeholders in Castle Harbour.  Plaintiff may contend that the Dutch banks treatment was a question of foreign law and has no bearing on the Court's

-38-

determination.  That is not quite accurate.  The deposition testimony of the Dutch banks is clear that the economic realities of the investments and the Dutch tax treatment desired by the Dutch banks are indistinguishable from economic principles governing tax treatment of loan instruments in the United States.   An exchange of correspondence between GECC and its accountants, KPMG, included among the assumptions underlying the Castle Harbour transaction that the Dutch banks would treat "their interests as equity interests rather than debt."   There was no foreign law exception asserted in the correspondence with KPMG.

      2.   <u>Lack of Management Role for Dutch Banks</u>

      The Dutch banks had no right to select any of the managers for Castle Harbour. The role of general manager was key to the operation of Castle Harbour, but the Dutch banks played no role in his selection.  The extent of GECC's control over the general manager is highlighted by the fact that he was paid only $12,000 per year to manage an enterprise with initial capitalization of $595 million.  The managers were uniformly GE or GECC employees or former employees whose compensation and loyalty rested with GECC.  The Dutch banks' attendance at the annual manager's meeting and telephonic participation at quarterly management meetings did not evidence management activities but rather lenders monitoring the activities of the entity to which loans were made.   The de minimus management participation by the Dutch banks here is a strong indicator that their investments were loans.  <u>Estate of Mixon</u>, <u>Ibid</u>.; <u>Fin Hay Realty Co.</u>, <u>Ibid.</u>

3.    <u>Fully Capitalized and No Need for Dutch Funds</u>

A lack of adequate capitalization usually suggests that an investment is a loan. Use of investor's funds to purchase capital equipment supports a conclusion that the investment is an equity stake. <u>Estate of Mixon</u>, <u>Ibid</u>.; <u>Fin Hay Realty Co.</u>, <u>Ibid.</u>  Here, excessive capitalization and a lack of need for the Dutch funds bolster the government's position that the Dutch investments were loans.  GECC set up Castle Harbour by contributing airplanes under lease and cash in the amount of $296 million. No additional capital was needed to purchase assets for Castle Harbour.  The airplanes supplied a steady stream of income through lease rents.  Indeed, the $117 million contributed by the Dutch banks was effectively frozen by the operating agreement's requirement that 110% of the balance of the Dutch investments must be held in liquid assets.  Almost half of the $117 million was transferred directly to GECC through the buyout of most of TIFD III-M's interest in Castle Harbour.   It is clear that the Dutch banks investment in Castle Harbour differed sharply from a capital investment.

4.    <u>Fixed Maturity Date</u>

The presence of a fixed maturity date is a key indicator of a loan.  <u>Estate of Mixon</u>, <u>Ibid</u>.; <u>Fin Hay Realty Co.</u>, <u>Ibid.</u>   Here, the operating agreement established a target date for the wrap-up of Castle Harbour.  The operating agreement established a functional repayment date for the Dutch banks' investments of September 3, 2000. The last scheduled payment set forth on Exhibit E was set for the end of the year 2000. Section 14.2 of the operating agreement established a mechanism for liquidating Castle Harbour by the end of 2000 or the purchase of the Dutch bank's interests by the plaintiff, TIFD III-E.  Prior to September 3, 2000, the operating agreement provided for

an Indemnification Premium to be paid the Dutch banks for an early buyout–an event which actually occurred on December 31, 1998. ¶ 1.10 ("Indemnification Premium"); ¶ ¶ 10.8, 12.7, Operating Agreement.

     5.    <u>Repayment Schedule and Rate of Interest</u>

A "plain vanilla" loan is easily identifiable by a fixed repayment schedule and fixed rate of interest. A consumer car loan is a common example. These factors are important in classifying a loan for federal income tax purposes. <u>Mixon</u>, <u>Ibid</u>.; <u>Fin Hay</u>, <u>Ibid.</u> Exhibit E to the operating agreement is clearly a repayment schedule. It is no more complicated than a consumer car loan. A payment is listed for each year, 1993 through 2000. The distributions were made as scheduled from 1993 through 1997. GECC chose to buyout the Dutch banks on December 31, 1998. If the payments were not made, the Dutch banks had the right to demand liquidation of Castle Harbour within 10 days. ¶ 14.1(d), Operating Agreement. The Exhibit E payments played a vital role in calculating the capital accounts and the investment accounts of the Dutch banks prepared for the annual financial statements of Castle Harbour.

The Castle Harbour agreement established a target interest rate of 9.03587%. There was a possibility of the rate fluctuating within a fixed range, but it did not. The range of fluctuation was quite small, much less than the fluctuations possible in popular home equity loans or consumer credit cards, which might vary with the prime rate. The "collar" on the earnings rate available to the Dutch banks was quite narrow and pales in comparison to the risk of total loss of investment usually associated with equity investments. The operating agreement had significant safeguards for the Dutch banks, <u>e.g.</u>, a balance of liquid investments equal to 110% of the outstanding balance of the

Dutch investments and the annually scheduled Exhibit E payments, as well as a guaranty by GECC.

      6.    <u>Relative Status of Dutch Investment to Other Creditors</u>

The only other creditors of Castle Harbour were the nonrecourse lenders on the original purchase of the aircraft that GECC contributed. The Dutch banks were in effect the only lender to Castle Harbour and their investment was protected separately, i.e., not by the value of the aircraft or the lease rents but by the operating agreement's requirement that 110% of the value of the remaining balance of the Dutch banks' investments be held in cash equivalents. The commercial paper holdings of Castle Harbour's subsidiary and the fully performing leases provided substantial security for the Dutch banks' investments. This factor supports a finding that the investments were debt, not equity. <u>Estate of Mixon</u>, <u>Ibid</u>.; <u>Fin Hay Realty Co.</u>, <u>Ibid</u>.

The deposition testimony of the Dutch banks refers, at times, to their "equity" investment even though they treated the investment as debt. This reference refers to the fact that the aircraft contributed by GECC before the Dutch banks joined Castle Harbour were subject to "leveraged leases," i.e., the nonrecourse lenders financed approximately 80% of the purchase price and GECC financed the remainder. The Dutch banks' investments pertained to the GECC share which can be described as "equity." This arrangement does not diminish the fact that the Dutch banks' investments were highly secured loans.

      7.    <u>Repayment Enforcement Rights</u>

The Dutch banks did not have security interests in the airplanes (the nonrecourse lenders did), but they did have the right to force liquidation upon non-

payment of the Exhibit E annual payments.  This is an enforcement right similar to that

of a creditor and a strong indicator of debt. ¶ 14.2(d), Operating Agreement.  Similarly,

failure by Castle Harbour to maintain in cash equivalents 110% of the balance of the

Dutch banks investment balances also permitted the Dutch banks to demand the

liquidation of Castle Harbour. ¶¶ 5.8, 14.2(e), Operating Agreement.  Estate of Mixon,

Ibid.; Fin Hay Realty Co., Ibid.

8.    Source of Payments to Dutch Banks

Repayment of the Dutch banks' investments did not depend on Castle Harbour

making a profit, thus indicating a debt instrument.   Estate of Mixon, Ibid.; Fin Hay

Realty Co., Ibid.  Castle Harbour had substantial cash assets and a steady stream of

income from lease rents. Castle Harbour had no need for the infusion of cash from the

Dutch banks.  The 110% cash equivalent requirement was held in commercial paper

yielding approximately 4.99%.   The target rate return for the Dutch banks was

9.03587%.  The difference was easily obtained from Castle Harbour's cash flows.

9.    Ability of Castle Harbour to Borrow from Lending Institutions

The inability to borrow from outside lending institutions is an indicia that a

contribution is equity.  Estate of Mixon, Ibid.; Fin Hay Realty Co., Ibid.   Here, GECC did

not need any additional investments, either by loan or equity, to operate Castle

Harbour.  The only purpose of the Dutch banks' participation was to be the tax

indifferent party for the purpose of sheltering income from federal taxation.  GECC's

capacity to borrow as well as to lend is well-known.  It is a commercial finance center

itself.  Castle Harbour's holding of millions of dollars of GECC commercial paper

demonstrates that Castle Harbour was essentially loaning money back to GECC.

-43-

Considering all these factors, it is clear that the Dutch banks' investment should be treated as debt for federal income tax purposes. The Dutch banks joined Castle Harbour to gain a virtually fixed return on their $117 million investment. Their participation was needed by GECC to make the tax shelter scheme work but otherwise their $117 million was unnecessary and unutilized. GECC provided extraordinary security for the loan, first by contributing $296 million in cash and then by agreeing to a fixed repayment schedule, a 110% cash equivalent for the unpaid investment balances, and rights to force liquidation if repayment or the 110% security arrangement lapsed. These are characteristics of debt, not equity, for federal income tax purposes.

D.    The Allocation of 98% of Income to the Dutch Banks Lacked Substantial Economic Effect under Treas. Reg. § 1.704-1(b)

As in the case of Castle Harbour, a partnership's income, gain, or loss may be allocated to the respective partners in an amount that differs from the partners' ownership  interests in partnership capital.[16]  Such an allocation is known as a "special allocation."  The majority of special allocation provisions are not driven by tax considerations.  For example, in a simple two-party partnership, one partner may contribute money while the other contributes skill.  The skilled partner will likely demand an allocation of income different from its respective interest in the partnership capital. While the majority of special allocations are respected for tax purposes, they are regulated by IRC § 704(b), to prevent certain tax-driven special allocation schemes such as the Castle Harbour scheme.  As indicated by the legislative history of § 704(b),

---

[16]  Here, the operating agreement identified the percentage interests in Castle Harbour as TIFD III-E (81.1964%), TIFD III-M (1%), ING Bank (8.9018%), and Rabo Merchant Bank (8.9018%) as of October 6, 1993.

the purpose of § 704(b) was to prevent federal tax avoidance through special allocations.[17]  Congress, in furtherance of that purpose, codified portions of the relevant Treasury Regulations,[18]enacting the Tax Reform Act of 1976, Section 213(d), under Title II entitled "Amendments Related To Tax Shelters[,]" which is now § 704(b).[19] Without regulation, special allocations would allow taxpayers to shelter income and avoid tax liabilities by shifting income among partners based on their respective tax attributes.

To the extent that Castle Harbour is deemed to be a valid partnership and all parties to the partnership agreement are deemed to be partners, the special allocation of 98% of leasing income to the Dutch banks and 2% to the GE entities must be reallocated in accordance with the partners' respective interests in Castle Harbour, in order to determine each partners' tax liability, in accordance with Section 704(b), because the special allocation lacks substantial economic effect.

Section 704(b) provides, in relevant part, that when "the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect[,]" that "partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and

---

[17]  See Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 106 (Before amendment of 704(b)(2) in 1976, by which Congress codified a portion of the Treasury Regulations supporting 704(b), a special allocation was not recognized if its principal purpose was to avoid or evade a federal tax).

[18]  Id.

[19]  Tax Reform Act of 1976, 1976-3 C.B. (Vol. 1) 24.

circumstances)."[20]  Accordingly, for purposes of determining the partners' respective tax liability, a special allocation must have economic effect, and that economic effect must be substantial.

The first requirement under § 704(b), that a special allocation have economic effect, is a mechanical requirement focusing on whether the allocation of partnership tax items matches the corresponding economic allocations included in the capital accounts on the books and records maintained by the partnership.  "In order for an allocation to have economic effect, it must be consistent with the underlying economic arrangement of the partners. This means that in the event there is an economic benefit or economic burden that corresponds to an allocation, the partner to whom the allocation is made must receive such economic benefit or bear such economic burden." Treas. Reg. § 1.704-1(b)(2)(ii)(a).  Specifically, the partnership agreement must provide for the following:[21]

---

[20]    In determining a partner's interest in the partnership, the following factors are among those that will be considered:
(a) The partners' relative contributions to the partnership,
(b) The interests of the partners in economic profits and losses (if different than that in taxable income or loss),
(c) The interests of the partners in cash flow and other non-liquidating distributions, and
(d) The rights of the partners to distributions of capital upon liquidation.

Treas. Reg. § 1.704-1(b)(3)(ii). Here, the GE entities contributed 81.85% of the assets to the partnership, and their interest in economic profits, determined by their interest in the book capital accounts, ranged from 81.85% to 95.21%. (The interest in book capital accounts is determined using the comparative liquidation method discussed *infra*.)

[21]    Except as otherwise provided in paragraph (b)(2)(iv), a partner's capital account is properly determined and maintained if it is: (1) increased by the amount of money contributed by the partner to the partnership, (2) increased by the fair market value of property contributed by partner to the partnership (net of liabilities secured by such contributed property that the partnership is considered to assume or take subject to under I.R.C. section 752), (3) increased by the allocations to the partner of

(1) capital accounts must be determined and maintained in accordance with a precise set of rules found in paragraph (b)(2)(iv) of Treas. Reg. §1.704-1;

(2) upon liquidation of the partnership, liquidating distributions are required to be made in accordance with the positive capital account balances of the partners; and

(3) if a partner has a deficit balance in his capital account following the liquidation of his interest in the partnership, he is unconditionally obligated to restore the amount of such deficit balance to the partnership by the end of such taxable year.

Treas. Reg. 1-704.1(b)(2)(ii)(b).

The second requirement of § 704(b) is that the "economic effect" of the special allocation must be "substantial," (affect substantially the dollar amounts to be received by the putative partner), inclusive of tax consequences.  In particular, the allocation does not have a substantial economic effect if it results in an economic benefit to at least one partner and no partner is worse off economically.  This invalidation of the benefit is known as the "overall-tax-effect rule."  The Regulations provide the following in regard to the overall-tax-effect rule:

---

partnership income and gain (or items thereof), (4) decreased by the amount of money distributed to the partner by the partnership, (5) decreased by the fair market value of property distributed to the partner by the partnership (net of liabilities secured by such distributed property that such partner is considered to assume or take subject to under I.R.C. section 752), (6) decreased by allocations to the partner of expenditures of the partnership described in I.R.C. section 705 (a)(2)(B), and (7) decreased by allocations of partnership loss and deduction (or item thereof).  Treas. Reg. § 1.704-1(b)(2)(iv)(b).

> [T]he economic effect of an allocation (or allocations) is not substantial if, at the time the allocation becomes part of the partnership agreement, (1) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement, and (2) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement.  In determining the after-tax economic benefit or detriment to a partner, tax consequences that result from the interaction of the allocation with such partner's tax attributes that are unrelated to the partnership will be taken into account.

Treas. Reg. § 1.704-1(b)(2)(iii)(a).[22]  Thus, under the overall-tax-effect rule, a special

allocation scheme does not have substantial economic effect, regardless of its effect on

---

[22]  Treas. Reg. § 1.704-1 was issued pursuant to the authority of the Secretary of the Treasury under IRC § 7805.  Such an "interpretive" regulation is given deference by the courts.  Boeing v. United States, 537 U.S. 437, 448 (2003).  In giving this deference to interpretive regulations, the Supreme Court applies a reasonableness standard, noting that courts "must defer to [the Commissioner's] regulatory interpretations of the [Internal Revenue] Code so long as they are reasonable."  Cottage Savings Association v. Commissioner, 499 U.S. 554, 560-61 (1991).  In determining reasonableness, the Supreme Court looks to "whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose."  National Muffler Dealers Assoc. v. United States, 440 U.S. 472, 477 (1979).  As indicated by the legislative history of § 704(b), the purpose of § 704(b) was to prevent federal tax avoidance through special allocations.  See Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 106.  For more than twenty-five years, the Supreme Court and Congress have indicated their deference to and approval of the Secretary of the Treasury's regulations promulgated in furtherance of the statute's purpose.  The Court in National Muffler Dealers Association noted that "other considerations" such as the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation.  Congress has specifically approved the interpretive regulations here; an examination of the legislative history demonstrates that Congress in 1976 codified the substantiality requirement formerly found only in Treas. Reg. § 1.704-1, and while so doing, specifically referenced 26 C.F.R. § 1.704-1(b)(2), citing it as containing "other factors" relating to a determination of the validity or invalidity of an allocation.  Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 105.

capital accounts, if, after taxes, at least one partner is better off and no partner is worse off than it would be if the allocation were not in the partnership agreement.  That is the case here.  Because the overall-tax-effect rule is concerned with after-tax consequences, it is necessary to consider the impact of the special allocation on the partners' capital accounts and their tax liabilities.

The economic effect on the Castle Harbour partners of the 98/2 special allocation of income is not substantial.  All partners benefit from the allocation, at the expense of the public fisc. The information in the tables below demonstrates that (1) the 98/2 special allocation enhanced the economic consequences to the Dutch banks by increasing the amount allocated to their capital accounts without changing their tax liability (because the Dutch banks had no United States tax liability regardless of their allocation), and (2) the 98/2 special allocation enhanced the economic consequences to the GE entities on an after-tax basis.  As shown in the tables below, all Castle Harbour partners benefitted on an after-tax basis from the special allocation, and no partner bore any economic after-tax burden or cost.

As shown in the tables below, the 98/2 income allocation bestowed benefits upon all partners at the expense of the U.S. Treasury.  The special allocation shifted $25,172,443 from the GE entities to the Dutch banks in their respective capital accounts.  Were it not for the tax consequences, the Dutch banks would make $25 million more with this special allocation regime, while the GE entities would lose $25 million.  While one can understand why the Dutch banks would agree to the special allocation (there are 25 million reasons), there is no apparent economic justification,

apart from tax savings (discussed below), for the GE entities' agreement to a special allocation that costs them, pre-tax, $25 million upon liquidation.

The impact of the 98/2 special allocation of income on the partners' tax liabilities is determined by comparing the partners' tax liabilities using the 98/2 special allocation to the tax liabilities of the partners that would otherwise result if the allocations were made based upon the partners' respective capital ownership.[23]  As shown in the tables below, although the 98/2 special allocation had no impact on the tax liability of the Dutch banks, as they are tax-indifferent, it decreased the tax liability of the GE partners by approximately $56,814.788.[24]

_____

[23]  To determine the allocations that would have been made to the Dutch banks and to the GE entities in the absence of the 98/2 special allocation, the allocation was examined using the comparative liquidation method ("CLM"), by which the income was allocated according to the parties' respective interests in the book capital accounts at the end of each year.

[24]  It is remarkable that the partnership treated disposition gains (gains from the sale of aircraft contributed by the GE entities) quite differently.  Those gains were allocated 98/2 in the other direction– approximately 98% to the GE entities and 2% to the Dutch banks.  The disposition allocations were structured in this manner so that the GE entities could maintain their capital position with respect to the aircraft they "contributed" to the partnership.

The aircraft were contributed with a book value equal to their fair market value ("FMV").  At that time, the book value exceeded the zero tax basis, but equaled the FMV, so that all disposition proceeds (book value in excess of tax basis, known as tax gains) were required to go to the GE entities, in accordance with I.R.C. § 704(c). Thereafter, however, the aircraft were depreciated for book purposes at a faster rate than their FMV value decreased.  Because the FMV of the aircraft was increasingly greater than the book value, any disposition of the aircraft at FMV would result in a disposition gain (a gain in excess of the tax gain) subject to allocation among the partners.  If the disposition gains were subject to the same allocation scheme as the income gains, the Dutch banks would be allocated 98% of the disposition gains, thereby reducing the GE entities' capital ownership in their contributed property.  The GE entities certainly didn't enter this agreement to give away ownership in their own assets to their foreign "partners," and such a dilution– or contribution– was not necessary to carry out the income-sheltering scheme.

The economic effect of the 98/2 income allocation is demonstrated in the tables below:

1.      Effect of the 98/2 Allocation of Income on Capital Accounts

    a.      Impact of 98/2 Allocation on Dutch Banks' Capital Accounts

| Year/Period | Castle Harbour's Book Income | Allocation to Banks Under 98/2 | CLM [25] | Increase Under 98/2 |
|---|---|---|---|---|
| 10/6/93 – 12/31/93 | $    339,000 | $    332,000 | $    58,113 | $    273,887 |
| 1994 | 9,857,000 | 9,660,000 | 1,371,560 | 8,288,440 |
| 1995 | 6,682,000 | 6,548,000 | 566,299 | 5,981,701 |
| 1996 | 1,368,000 | 1,340,000 | 70,488 | 1,269,512 |
| 1997 | 2,304,000 | 2,258,000 | 78,519 | 2,179,481 |
| 1998 | 7,736,000 | 7,560,000 | 380,578 | 7,179,422 |
| Totals | $28,286,000 | $27,698,000 | $2,525,557 | $25,172,443 |

    b.  Impact of 98/2 Allocation on GE Entities' Capital Accounts

| Year/Period | Castle Harbour's Book Income[26] | Allocation to GE Entities 98/2[27] | Under CLM | Decrease Under 98/2 |
|---|---|---|---|---|
| 10/6/93 – 12/31/93 | $    339,000 | $    6,000 | $    280,887 | $    274,887 |
| 1994 | 9,857,000 | 197,000 | 8,485,440 | 8,288,440 |
| 1995 | 6,682,000 | 134,000 | 6,115,701 | 5,981,701 |
| 1996 | 1,368,000 | 28,000 | 1,297,512 | 1,269,512 |
| 1997 | 2,304,000 | 46,000 | 2,225,481 | 2,179,481 |
| 1998 | 7,736,000 | 176,000 | 7,355,422 | 7,179,422 |
| Totals | $28,286,000 | $    587,000 | $23,251,092 | $25,173,443 |

---

[25]   References to "CLM" are to the "comparative liquidation method" of determining ownership over a period of time.  It is appropriate to use here as repayment to the Dutch banks began almost immediately and their purported "ownership" stake in Castle Harbour continued to decline through 1998 when they exited Castle Harbour. See Treas. Reg. § 1.704-1(b)(3)(iii).

[26]  Book income is shown in the statements of capital accounts contained in the financial statements that KPMG prepared for Castle Harbour.

[27]   These amounts are shown in the statements of capital accounts contained in the financial statements that KPMG prepared for Castle Harbour.

2.     Impact of the 98/2 Allocation of Income on Tax Liabilities

a.  The Dutch Banks

| Year/Period | Castle Harbour's Taxable Income[28] | Allocation to Banks 98/2 | CLM | Increase Under 98/2 | Tax Increase at 0% Rate |
|---|---|---|---|---|---|
| 10/6/93–12/31/93 | $ 16,401,481 | $ 16,073,453 | $ 2,811,614 | $13,261,839 | $     0 |
| 1994 | 76,593,747 | 75,061,872 | 10,657,693 | 64,404,179 | 0 |
| 1995 | 63,680,135 | 62,406,532 | 5,396,888 | 57,009,644 | 0 |
| 1996 | 50,892,829 | 49,874,972 | 2,622,317 | 47,252,655 | 0 |
| 1997 | 51,812,412 | 50,776,164 | 1,765,738 | 49,010,426 | 0 |
| 1998 | 57,244,395 | 55,945,807 | 2,810,613 | 53,135,194 | 0 |
| Totals | $316,624,999 | $310,138,800 | $26,064,863 | $284,073,937 | $     0 |

b.  The GE Entities

| Year/Period | Castle Harbour's Taxable Income | Allocation to GE Entities 98/2 | CLM | Increase Under CLM | Tax on Increase at 20% Rate[29] |
|---|---|---|---|---|---|
| 10/6/93–12/31/93 | $ 16,401,481 | $     328,028 | $13,589,867 | $ 13,261,839 | $   2,652,368 |
| 1994 | 76,593,747 | 1,531,875 | 65,936,055 | 64,404,180 | 12,880.836 |
| 1995 | 63,680,135 | 1,273,603 | 58,283,247 | 57,009,644 | 11,401,929 |
| 1996 | 50,892,829 | 1,017,857 | 48,270,512 | 47,252,655 | 9,450,531 |
| 1997 | 51,812,412 | 1,036,248 | 50,046,674 | 49,010,426 | 9,802,085 |
| 1998 | 57,244,395 | 1,298.588 | 54,433,782 | 53,135,194 | 10,627,039 |
| Totals | $316,624,999 | $ 6,486,199 | $260,264,106 | $284,073,937 | $56,814,788 |

---

[28]  Castle Harbour's taxable income here is from its tax returns.  It differs from § 704(b) book income primarily due to depreciation. Depreciation was deducted as an expense from Castle Harbour's § 704(b) book income that was allocated to its partners' capital accounts, thereby reducing the income allocation to the Dutch banks and the GE entities for capital account purposes. The assets of Castle Harbour had been fully depreciated for tax purposes, however, so that no depreciation was allowable in computing the income that was allocated to the partners for tax purposes.

[29] The 20% rate is used because the GE consolidated group was subject to the alternative tax during the years at issue, and thus subject to a 20% tax rate.

As demonstrated by the foregoing tables, the 98/2 special allocation enhanced the after-tax economic consequences of all of the partners of Castle Harbour.  The 98/2 special allocation enhanced the economic situation of the Dutch banks by increasing by approximately $25,172,443 the amount allocated to their capital accounts, without changing their tax liability.  At the same time, the 98/2 special allocation enhanced the after-tax economic situation of the GE entities by $31,641,345 (the difference between their tax savings of $56,814,788 and the decrease of $25,173,443 to their capital accounts).  Under the partnership special allocation, both the GE entities and the Dutch banks obtain after-tax economic benefits.  No partner bears any after-tax economic burden.  The after-tax economic burden falls solely and squarely upon the U.S. Treasury.  The Treasury Regulations (Treas. Reg. § 1.704-1(b)(2)(iii)(a)) clearly prohibit special allocations like the one here in which partners reap economic benefits while shifting the economic loss to United States taxpayers.  This special allocation, therefore, cannot be respected.  The tax liability of the GE partners, absent the special allocation during the years in suit, is increased by more than $56 million.

E.    The GECC Entities Are Liable For Penalties

The GE entities are liable for a 20% penalty on the deficiencies that result from the adjustments determined for 1997 and 1998 for their failure to report $310,138,800 of taxable income, for which they failed to pay $62,212,010 in taxes.[30]  The GE entities

---

[30]  As noted in footnote 4, with respect to the years 1997 and 1998, this Court has jurisdiction to decide what penalties are applicable with respect to any adjustments to partnership items.  With respect to the years 1993-1996, the applicability of penalties that relate to adjustments to the partnership items at issue in this case must be determined in separate partner-level proceedings. This Court's factual findings, however, will be binding on all partners who are treated as parties to this litigation pursuant to § 6226(c) and (d).

are liable for a 20% accuracy-related penalty (IRC § 6662(a)), because the failure to report the lease income as attributable to the GE entities and pay tax on that income was due either to negligence or disregard of rules or regulations (§ 6662(b)(1)) and/or resulted in the substantial understatement of income tax (IRC § 6662(b)(2)).[31]  "[T]he term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard."  IRC § 6662(c).  A substantial understatement of tax, as is relevant here, is one that is the greater of 10% of the tax required to be shown on the returns of the GE entities or $10,000.  IRC § 6662(d)(1).

Importantly, because, as will be demonstrated at trial, the Castle Harbour arrangement had the principal purpose of tax avoidance,[32] the amount of the "understatement" upon which the penalty is calculated cannot be reduced even if the taxpayer can demonstrate that "there was or is substantial authority for such treatment," or there was adequate disclosure of the relevant facts with the return and "there is a reasonable basis for the tax treatment" by the taxpayer.  IRC § 6662(d)(2)(B)).[33]

These penalties provide an important disincentive to the use of tax shelters

---

[31]  A determination by the IRS that these penalties apply is presumed correct, and the taxpayer bears the burden of demonstrating otherwise. Addington v. Commissioner, 205 F.3d 54, 58 (2d Cir. 2000);  Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994).

[32]  In 1997, Congress amended § 6662(d)(2)(C), to provide that an arrangement was a tax shelter so long as a "significant purpose" of the arrangement was tax avoidance, effective for transactions entered into after August 5, 1997.  105 P.L. 34, 111 Stat. 788.

[33]  If the arrangement were not a tax shelter, then the amount of any understatement subject to penalty is reduced. If the taxpayer can demonstrate that "there was or is substantial authority for such treatment," or there was adequate disclosure of the relevant facts with the return and "there is a reasonable basis for the tax treatment" by the taxpayer. IRC § 6662(d)(2)(B).

because, absent the penalties, if the shelter is discovered and disallowed, the taxpayer would only be liable for the payment of taxes originally owed, with interest (representing the time value of money).  The IRC § 6662 penalties exist, in part, to deter taxpayers from playing the "audit lottery."  <u>Kluener v. Commissioner</u>, 154 F.3d 630, 637 (6th Cir. 1998), <u>citing</u> <u>Caulfield v. Commissioner</u>, 33 F.3d 991, 994 (8th Cir. 1994).

     1.  <u>Penalty Due to Negligence or Disregard of Rules and Regulations</u>

Negligence "includes any failure to make a reasonable attempt to comply with the provisions of [the Internal Revenue Code]." IRC § 6662(c).  Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a reported item, such as income, "which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances[.]" Treas. Reg. § 1.6662-3(b)(1).  Reasonableness here "is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper."  Treas. Reg. § 1-6662-3(b)(3).  The term disregard "includes any careless, reckless, or intentional disregard."  26 U.S.C. § 6662(c).

Representations that the Dutch banks were, in substance as well as form, members of Castle Harbour were not reasonable.  GECC "contributed" fully depreciated leased aircraft with a predictable and taxable income stream and maintained de facto ownership and control of those aircraft.  The Dutch banks played no role in the operation and management of Castle Harbour other than as a tax-indifferent party, which, for a fee, could absorb, for tax reporting purposes, all of the taxable income.

Even though, on the surface, the Castle Harbour arrangement may appear to meet mechanical accounting requirements, "[t]he reasonable basis standard is not

satisfied by a return position that is merely arguable or that is merely a colorable claim."
Treas. Reg. § 1-6662-3(b)(3).  As discussed above, in substance, the Dutch banks
were not members of Castle Harbour.  Even if the arrangement is not sham, the Dutch
banks were, in substance, lenders not equity investors.  Finally, even if the
arrangement is not a sham and the Dutch banks are recognized as equity investors and
not lenders, the "special allocation" of 98/2% to shift taxable income to the Dutch banks
does not meet the requirements of the Treasury Regulations that the allocation have
"substantial economic effect" because, under the 98/2% allocation, both the GE entities
and the Dutch banks gained after-tax and only the U.S. Treasury lost.  The return
position asserting that the 98/2% special allocation satisfied the regulations was either
careless, reckless or due to an intentional disregard of the regulations.  In sum, this
transaction was a tax avoidance scheme that was so blatant that it warrants the
imposition of the negligence penalty.  See Nicole Rose v. Commissioner, 320 F.3d at
284-85.  Consequently, under any of the government's theories, the negligence penalty
applies.

  2. <u>Penalty Due to Substantial Understatement</u>

   Alternatively, the GE entities are liable for 20% penalties for 1997 and 1998 for
substantial understatements of income tax under IRC 6662(b)(2) if the understatements
that result from the adjustments at issue for those years are substantial.  A substantial
understatement of tax, as is relevant here, is one that is the greater of 10% of the tax
required to be shown on the returns of the GE entities or $10,000.  IRC § 6662(d)(1).
Because, as will be demonstrated at trial, the GE entities' principal purpose for the
entering into the Castle Harbour arrangement with the Dutch banks was to avoid tax on

the income produced by the fully depreciated airplanes, the amount of the understatement is not reduced even if either (a) the taxpayer had substantial authority for its position, or (b) the taxpayer fully disclosed the relevant fact on its returns and had a reasonable basis for the tax treatment of the lease income on the returns. IRC §§ 6662(d)(2)(B) and (C).

Even if the principal purpose of the Castle Harbour arrangement was not tax avoidance, which it was, the 20% understatement penalty is still appropriate.  As explained above and as will be demonstrated at trial, the plaintiffs cannot demonstrate substantial authority for the treatment of the Dutch banks as members of Castle Harbour and for the 98/2% allocation of the lease income.  The GE entities must demonstrate that the "weight of the authorities supporting the treatment [of the Castle Harbour lease income] is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg.  § 1.6662-4(d)(3).  They must also demonstrate that they "reasonably believed that the tax treatment of [the Castle Harbour lease income] was more likely than not the proper treatment." 26 U.S.C. § 6662(d)(2)(C)(i).  The acceptable list of "authorities" includes Internal Revenue Code provisions, regulations, revenue rulings, tax treaties, court cases, congressional intent, private letter rulings and technical advice memoranda, among others.  Treas. Reg. §1.6662-4(d)(3)(iii).  While these authorities and the conclusions reached therein are accorded weight depending on their relevance, persuasiveness, and type, id., "[c]onclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority[,]" and are accorded no weight at all.  Id.

The plaintiffs also cannot demonstrate that all the relevant facts regarding the Castle Harbour arrangement were disclosed with its returns and that there was a reasonable basis  for the tax treatment of the Dutch banks as members of Castle Harbour or for the  98/2% allocation of taxable lease income to the Dutch banks.

Furthermore, because, as will be demonstrated at trial, the Castle Harbour transaction is a sham that lacks economic substance, it is disregarded for tax purposes, depriving the plaintiffs of any authority to exclude Castle Harbour's income from their own taxable income.  See Intertan, Inc. v. Comm'r, T.C. Memo 2004-1 (Jan. 5, 2004) (issuance and redemption of preferred stock was disregarded for tax purposes because it was a sham transaction entered into only to generate a tax deduction, thereby depriving the taxpayer of a substantial-authority defense to Section 6662 penalties based on the purported stock redemption).

CONCLUSION

Plaintiff's petitions should be dismissed and judgment entered for the United States on the grounds that (1) no partnership existed for federal income tax purposes between the GE entities and the Dutch banks (ING Bank, N.V. and Rabo Merchant Bank, N.V); (2) the formation of Castle Harbour on October 6, 1993, with the entry of the Dutch banks as putative members was a "sham transaction" that lacked a non-tax motivated business purposes and lacked economic substance; (3) the contributions to Castle Harbour by the Dutch banks were loans, not equity investments; or (4) the allocation of 98% of Castle Harbour's income to the Dutch banks lack "substantial economic effect," pursuant to IRC § 704(b) and the regulations issued thereunder.

These are alternative grounds and the United States prevails in this action on the basis of any of these four grounds.

KEVIN J. O'CONNOR
United States Attorney
JOHN B. HUGHES
Chief, Civil Division

_____
ROBERT J. HIGGINS (ct23378)
BARRY E. REIFERSON (ct24580)
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Washington, D.C. 20044
Telephone:  (202) 307-6580
Facsimile:  (202) 514-5440

July 8, 2004