# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TIFD III-E INC, the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY,     ) <br> ) <br> ) <br> ) <br> ) <br> Plaintiff,     ) <br> ) <br> v.     ) <br> ) <br> UNITED STATES OF AMERICA,     ) <br> ) <br> Defendant.     ) <br> ) | Case Nos.:  3:01-CV-01839 (SRU) (lead case) <br>               3:01-CV-01840 (SRU) <br><br> July 8, 2004 |

## PLAINTIFF'S TRIAL BRIEF

MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C.  20036
Telephone:  (202) 775-1880

CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, CT  06509-1950
Telephone:  (203) 777-5501

Attorneys for Plaintiff, TIFD III-E INC.

## TABLE OF CONTENTS

I.      STATEMENT AND SUMMARY OF THE CASE ................................................. 1

II.     SUMMARY OF THE CASTLE HARBOUR TRANSACTION ........................... 4

  A. GECC's Background in Aircraft Leasing .............................................................. 4

  B. The Origin and Formation of Castle Harbour ....................................................... 6

  C. The Investments by ING and Rabo ...................................................................... 13

  D. The Interests Acquired by ING and Rabo ........................................................... 16
      1.  Contributions, Profits, Losses, and Residual Gains and Losses. ................... 16
      2.  Exhibit E Distributions. ................................................................................. 19
      3.  Capital Accounts and Liquidation Rights. .................................................... 19
      4.  Guaranteed Payments. ................................................................................... 20
      5.  ING's and Rabo's Rights to Participate in Management. .............................. 22
      6.  ING's and Rabo's Exposure to Catastrophic Losses. ................................... 23

  E. Castle Harbour Leasing Inc. ("CHLI") and the Reasons It Held Liquid Assets... 24

  F. Castle Harbour Operations ................................................................................... 26

  G. Disposition of Interests in Castle Harbour by ING and Rabo ............................. 27

  H. Tax Consequences of the Transaction .................................................................. 28

III.    THE IRS'S AUDIT DETERMINATIONS ....................................................... 33

IV.     DISCUSSION ....................................................................................................... 35

  A. Castle Harbour Had Economic Substance .......................................................... 35
      1.  The Economic Substance Requirement. ........................................................ 36
          a.  Gregory v. Helvering. ............................................................................. 36
          b.  Chisholm. ................................................................................................ 38
          c.  Subsequent Decisions. ............................................................................ 39
          d.  Business Purpose. ................................................................................... 43
      2.  Castle Harbour Had Objective Economic Substance for All of Its Partners. . 44
      3.  The Partnership Had Substantial Non-Tax Business Purposes ...................... 48
      4.  ING and Rabo Cannot Be Disregarded as Partners. ..................................... 51
      5.  Conclusion. ................................................................................................... 58

  B. ING and Rabo Were Partners in Castle Harbour ................................................ 58
      1.  Classification of Investments. ....................................................................... 59
      2.  The Interests Held by ING and Rabo Had All of the Characteristics of Equity
          and None of the Essential Features of Debt. ................................................. 61
          a.  The Class A interests lacked the essential characteristic of debt:  an
              unconditional promise to a sum certain on demand or at a fixed maturity
              date. ........................................................................................................ 61
          b.  ING and Rabo did not possess the right to enforce the payment of
              principal and interest. ............................................................................. 64

c.  ING's and Rabo's interests were subordinate to those of general creditors of Castle Harbour.................................................................................... 65

d.  ING and Rabo were entitled to participate in the management of Castle Harbour and in fact participated actively in significant management decisions.......................................................................................................... 66

e.  The Class A interests were consistently identified and "labeled" as equity........................................................................................................... 67

f.  ING's and Rabo's interests were treated as equity for regulatory, rating agency and financial accounting purposes.............................................. 68

g.  Summary. ................................................................................................... 69

3.  ING's and Rabo's Interests Possessed the Economic Attributes of Equity From a Corporate Finance Perspective. ........................................................ 70

4.  The Class A Investors Are Properly Characterized As Partners.................... 71

C.  The Income From The Partnership Was Properly Allocated................................ 71

1.  The Government's Own Adjustment Respects the Allocation of Castle Harbour's Book Income Under Section 704(b)............................................... 71

2.  Once the Allocation of Book Income With Respect to Contributed Property is Fixed Under Section 704(b), the Allocation of Taxable Income in Excess of Book Income Under Section 704(c) is Mandatory. ....................................... 76

3.  Conclusion. ..................................................................................................... 82

V.    PENALTIES ................................................................................................................. 82

VI.   CONCLUSION............................................................................................................. 84

TABLE OF AUTHORITIES

CASES

ASA Investerings P'ship v. Commissioner, 201 F.3d 505 (D.C. Cir. 2000) ................... 56
Beaver Pipe Tools, Inc. v. Carey, 139 F. Supp. 470 (N.D. Ohio 1955), aff'd per curiam,
    240 F.2d 843 (6th Cir. 1957) ....................................................................... 64
Boca Investerings P'ship v. United States, 314 F.3d 625 (D.C. Cir. 2003) ..................... 57
Bolinger-Franklin Lumber Co. v. Commissioner, 7 B.T.A. 402 (1927) ......................... 67
Chisholm v. Commissioner, 79 F.2d 14 (2d Cir. 1935)........................................ 38, 39, 53
Commissioner v. Culbertson, 337 U.S. 733 (1949)................................................... 53
Commissioner v. J.N. Bray Co., 126 F.2d 612 (5th Cir. 1942) ..................................... 67
Commissioner v. Meridian & Thirteenth Realty Co., 132 F.2d 182 (7th Cir. 1942)........ 65
Commissioner v. O.P.P. Holding Corp., 76 F.2d 11 (2d Cir. 1935)............................... 61
Commissioner v. Proctor Shop, Inc., 82 F.2d 792 (9th Cir. 1936) ................................. 67
Commissioner v. Schmoll Fils Associated, Inc., 110 F.2d 611 (2d Cir. 1940) ............... 62
Commissioner v. Tower, 327 U.S. 280 (1946) ....................................................... 54
Compaq Computer Corp. v. Commissioner, 277 F.3d 778 (5th Cir. 2001)....................... 40
DeMartino v. Commissioner, 862 F.2d 400 (2d Cir. 1988)........................................ 35, 43
Forman v. Commissioner, 199 F.2d 881 (9th Cir. 1952)............................................... 56
Frank Lyon Co. v. United States, 435 U.S. 561 (1978).......................................... 4, 41, 42
Full Serv. Beverage Co. v. Commissioner, 69 T.C.M. (CCH) 2221 (1995) ................... 67
Gilbert v. Commissioner, 248 F.2d 399 (2d Cir. 1957)............................................... 62
Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991) ......................................... 35, 40, 43
Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966)........................................ 46, 47
Gregory v. Helvering, 293 U.S. 465 (1935) .................................................... 36, 37, 38
Hambuechen v. Commissioner, 43 T.C. 90 (1964) ................................................... 59
Hartman v. Commissioner, 17 T.C.M. (CCH) 1020 (1958)........................................ 59
Helvering v. Richmond, F. & P.R. Co., 90 F.2d 971 (4th Cir. 1937)............................ 65
Hunt v. Commissioner, 59 T.C.M. (CCH) 635 (1990)............................................... 63
IES Industries, Inc. v. Commissioner, 253 F.3d 350 (8th Cir. 2001) ............................. 40
Jacobson v. Commissioner, 915 F.2d 832 (2d Cir. 1990)........................................ 35, 40
Jewel Tea Co. v. Commissioner, 90 F.2d 451 (2d Cir. 1937) ....................................... 62
John Wanamaker Philadelphia v. Commissioner, 139 F.2d 644 (3d Cir. 1943) .............. 65
Keefe v. Cote, 213 F.2d 651 (1st Cir. 1954)............................................................. 50
Kingsmill Corp. v. Commissioner, 28 T.C. 330 (1957) ............................................. 64
Kraft Foods Co. v. Commissioner, 232 F.2d 118 (2d Cir. 1956) ................................. 40
Lee Telephone Co. v. Commissioner, 260 F.2d 114 (4th Cir. 1958).............................. 68
Miele v. Commissioner, 56 T.C. 556 (1971), aff'd without opinion, 474 F.2d 1338 (3d
    Cir. 1973) ................................................................................................ 64, 67
Milwaukee & Suburban Transport Corp. v. Commissioner, 283 F.2d 279 (7th Cir.
    1960) ......................................................................................................... 68
Mullin Bldg. Corp. v. Commissioner, 9 T.C. 350 (1947), aff'd, 167 F.2d 1001 (3rd Cir.
    1948) ......................................................................................................... 64
Nassau Lens Co., Inc. v. Commissioner, 308 F.2d 39 (2d Cir. 1962) ........................ 59, 60
Newman v. Commissioner, 902 F.2d 159 (2d Cir. 1990)........................................ 42, 43, 51

Pflugradt v. United States, 310 F.2d 412 (7th Cir. 1962) ................................................ 56

Ragland Investment Co. v. Commissioner, 52 T.C. 867 (1969), aff'd, 435 F.2d 118 (6th Cir. 1970) ...................................................................................................................... 67

Rice's Toyota World v. Commissioner, 752 F.2d 89 (4th Cir. 1985) ............................ 36

Rosenfeld v. Commissioner, 706 F.2d 1277 (2d Cir. 1983) ...................................... 40, 48

S&M Plumbing Co. v. Commissioner, 55 T.C. 702 (1971) ............................................ 63

Saba P'ship v. Commissioner, 273 F.3d 1135 (D.C. Cir. 2001) ...................................... 57

Stahl v. United States, 441 F.2d 999 (D.C. Cir. 1970) ................................................... 62

Stanchfield v. Commissioner, 24 T.C.M. (CCH) 1681 (1965) ........................................ 59

Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984) .............. 66

Third Scottish American Trust Co., Ltd. v. United States, 37 F. Supp. 279 (Ct. Cl. 1941) ............................................................................................................................. 68

United Parcel Service v. Commissioner, 254 F.3d 1014 (11th Cir. 2001) ........... 43, 44, 60

United States v. Ingredient Technology Corp., 698 F.2d 88 (2d Cir. 1983) .................... 40

Zilkha & Sons Inc. v. Commissioner, 52 T.C. 607 (1969), acq., 1970-2 C.B. xxi ........... 67

## INTERNAL REVENUE CODE PROVISIONS

I.R.C. § 6226 ..................................................................................................................... 1

I.R.C. § 1346(e) ................................................................................................................ 1

I.R.C. § 482 ................................................................................................................ 2, 33

I.R.C. § 6662(d)(2)(B)(i) ................................................................................................. 83

I.R.C. § 707(c) ................................................................................................................ 20

I.R.C. § 882 ..................................................................................................................... 31

I.R.C. § 6662(a) .............................................................................................................. 83

I.R.C. § 6662(b) .............................................................................................................. 83

I.R.C. § 701 ..................................................................................................................... 29

I.R.C. § 702(a) ................................................................................................................ 29

I.R.C. § 761(b) ................................................................................................................ 71

I.R.C. § 7701(a)(2) .......................................................................................................... 71

## TREASURY REGULATIONS

Treas. Reg. § 1.704-1(b)(1)(vi) .................................................................................. 81, 82

Treas. Reg. § 1.704-1(b)(2)(iv) ...................................................................................... 72

Treas. Reg. § 1.704-1(b)(5) ............................................................................................ 81

Treas. Reg. § 1.704-1(c)(2) (1956) ................................................................................ 73

Treas. Reg. § 1.704-1(c)(2)(i) (1956) ........................................................................ 78, 82

Treas. Reg. § 1.704-3(c) ................................................................................................ 80

Treas. Reg. § 1.704-3(f) ................................................................................................. 81

Treas. Reg. § 1.6662-4(d) .............................................................................................. 83

Treas. Reg. § 1.6662-4(d)(3)(i) ...................................................................................... 84

## OTHER AUTHORITIES

Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Dec. 18, 1992, U.S.–Neth., art. 7, 3 Tax Treaties (CCH) ¶ 6103 ................................................................................................................. 31

IRS Notice 94-47, 1994-1 C.B. 357 ......................................................................... 60, 68

S. Rep. No. 83-1622 (1954) ........................................................................... 77, 78

S. Rep. No. 98-169, vol. 1, at 215 (1984) .................................................... 73, 79

Tech. Adv. Mem. 84-14-001 (Dec. 1983) ....................................................... 66

Uniform Limited Partnership Act. .................................................................. 66

## I.    STATEMENT AND SUMMARY OF THE CASE

These consolidated cases are actions brought by TIFD III-E INC. (hereinafter referred to as "Plaintiff" or "III-E"[1]) pursuant to 26 U.S.C. (I.R.C.) § 6226 and 28 U.S.C. § 1346(e), to challenge the Internal Revenue Service's ("IRS") adjustment of tax returns filed by Castle Harbour-I Limited-Liability Company ("Castle Harbour") for the 1993 through 1998 tax years.[2] The IRS's adjustments are set forth in two notices of Final Partnership Administrative Adjustment (the "FPAAs") mailed on June 29, 2001. Plaintiff calculated the taxes allegedly due by reason of such adjustments, approximately $62 million, and made good faith deposits of those amounts with the IRS. Plaintiff filed this action to obtain a refund of the deposits.

Castle Harbour was formed in 1993 to operate a commercial aircraft leasing business with offices in Hong Kong and Bermuda. Castle Harbour's principal place of business is currently located in Stamford, Connecticut.

Castle Harbour was classified as a partnership for United States income tax purposes.[3] Partnerships are "flow-through" entities for United States federal income tax purposes and are not subject to an entity-level tax. Tax liability, if any, on a partnership's income is determined at the partner level. Accordingly, Castle Harbour did not pay United States federal income tax on its income; instead, for the 1993 through 1998 tax years, Castle Harbour allocated its taxable income among its four partners (Plaintiff and

---

[1] "TIFD" stands for Transportation and Industrial Funding Division, an operating division of General Electric Capital Corporation ("GECC"). It is an acronym that GECC uses, along with sequential Roman numerals and letters, to name and identify numerous subsidiary corporations through which it holds assets and conducts business operations.

[2] Plaintiff, as the tax matters partner of Castle Harbour, is the proper party to contest the IRS's adjustment of Castle Harbour's tax returns. See, e.g., 26 U.S.C. § 6226(a).

[3] Castle Harbour was organized as a Nevada limited liability company. Because it is a partnership for federal income tax purposes, Castle Harbour is sometimes referred to herein as a partnership and its members are sometimes referred to herein as partners.

TIFD III-M INC. ("III-M"), both wholly owned subsidiaries of GECC, and two large multinational financial institutions, Internationale Nederlanden Bank N.V. ("ING") and Rabo Merchant Bank N.V. ("Rabo")).  As Dutch corporations, ING and Rabo were exempt from U.S. income tax on their shares of the income of Castle Harbour under the tax treaty between the United States and the Netherlands.  Plaintiff and III-M paid tax on their shares of Castle Harbour's taxable income.

This case resulted from the efforts of the IRS to take the income that was allocated to ING and Rabo under the partnership tax rules and shift it to Plaintiff and III-M.  The FPAAs issued by the IRS relied on four alternative arguments. [4]  The IRS's first – and principal – argument was that the equity investments by ING and Rabo in Castle Harbour should be disregarded for tax purposes because Castle Harbour lacked "economic substance and was without legitimate business purpose."  The IRS's second argument was that, even if their investments had substance, ING and Rabo "were lenders to Castle Harbour rather than partners in Castle Harbour."  The IRS's third argument was that, even if ING and Rabo are respected as partners in Castle Harbour, most of the taxable income allocated to them should be reallocated to Plaintiff and III-M.  The government has abandoned a fourth argument under I.R.C. § 482.

None of the IRS's three remaining arguments have any basis in law or in fact.  First, a transaction is respected for federal income tax purposes, if it has either a valid business purpose or economic effects apart from tax consequences, even if the taxpayer anticipates significant tax benefits.  The evidence at trial will show that Castle Harbour was formed to achieve valid business purposes, including enabling GECC to respond to

---

[4]  In a separate FPAA issued with respect to the 1997 and 1998 tax years, the IRS determined that accuracy-related penalties under I.R.C. § 6662 apply.  Otherwise, the IRS's theories for adjusting Castle Harbour's tax returns are the same for each tax year at issue in this case.

adverse market conditions in the aircraft leasing industry by using 63 aircraft to raise almost $120 million of equity. The evidence also will show that Castle Harbour had significant non-tax economic effects: in addition to the fact that GECC obtained nearly $120 million in minority equity financing, ING and Rabo participated in the success of, and were exposed to the operating risks of, Castle Harbour's aircraft leasing business. Thus, the facts will show that the investments by ING and Rabo in Castle Harbour had economic effects apart from tax consequences, that GECC had non-tax business purposes for obtaining those investments, and that, as a result, the Castle Harbour transaction cannot be disregarded.

The government's second theory – that ING and Rabo were "lenders" – is similarly unfounded. The evidence at trial will show that the interests acquired by ING and Rabo (1) were intended to be equity; (2) had no creditor rights, even in the event of a failure to make distributions; (3) participated in profits and losses; (4) were subject to operating risks; (5) allowed the holders to participate in management; (6) were subordinated in right of payment to all creditors, including unsecured trade creditors and tort claimants; (7) were in form equity; and (8) were treated as equity for financial reporting purposes and in filings with the Securities and Exchange Commission and the Federal Aviation Administration. These characteristics mandate treatment of the investments by ING and Rabo in Castle Harbour as equity for federal income tax purposes.

Finally, Plaintiff will show that the IRS's third alternative theory, seeking a reallocation of the taxable income of Castle Harbour, is incorrect. The allocations of taxable income by Castle Harbour were not only permitted, they were required, by the

Internal Revenue Code provisions and the regulations governing the allocation of partnership income. The proposed reallocation of taxable income cannot be squared with the statute or the IRS's own regulations.

In summary, Castle Harbour had real economic substance apart from tax savings, was formed for valid business purposes and engaged in a substantial and profitable business enterprise over a significant period of time. The transaction had significant non-tax purposes and significant economic effects for each separate participant. Finally, while Plaintiff acknowledges that the Castle Harbour transaction was structured to reduce federal income taxes, that fact is neither unusual nor legally relevant. See Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978) ("The fact that favorable tax consequences were taken into account . . . on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.").

## II.    SUMMARY OF THE CASTLE HARBOUR TRANSACTION[5]

### A.    GECC's Background in Aircraft Leasing

Leasing is one means by which businesses and consumers finance property for business or personal use. In 1993 (and continuing to the present), almost all commercial airlines financed a significant portion of their aircraft through leases, often because they did not have sufficient taxable income to effectively utilize depreciation deductions generated by expensive aircraft.[6]

---

[5]    Concurrent with the submission of this Trial Brief, Plaintiff is filing, as part of the Joint Trial Memorandum, proposed Findings of Fact and Conclusions of Law that parallel the discussion in this brief.

[6] When an airline finances an aircraft through a lease, the lessor is entitled to claim the tax depreciation on the plane and the airline receives rent deductions. From the lessor's economic perspective, the lease performs like nonrecourse debt during the lease term, during which gross rent typically exceeds the cost of

4

As one of the biggest non-bank finance companies in the world, GECC is engaged broadly in the business of financing and is one of the largest lessors of property, including commercial aircraft, in the United States. GECC first became involved in the commercial aircraft financing business (including aircraft leasing) in the mid-1960's. By the early 1990's, GECC had invested heavily in aircraft leasing and had significant interests in, and exposure to, the commercial airline industry.

The early 1990's were difficult times for commercial airlines and, therefore, for companies that financed their aircraft. In 1991, for the first time since World War II, the total number of miles flown on commercial airlines declined from the prior year. These difficulties were, in part, created by the Persian Gulf War, which drove down demand and created excess capacity in the airline industry. This excess capacity constricted the airlines' pricing flexibility, leaving them unable to pass all costs on to their customers and putting many of them at risk of defaulting on the terms of their aircraft financing arrangements. The depressed market created two challenges for GECC and other aircraft lessors: the enhanced risk of airline-lessee default, and the lack of any viable secondary market for planes that came "off lease" due to lease expirations or lessee defaults.

The Eastern Airlines bankruptcy dramatically illustrated to GECC the impact that the airline recession could have on its financial fortunes.[7] In 1991, in the course of the airline's bankruptcy, GECC received 26 airplanes from Eastern. The delivery of the Eastern airplanes, which represented 8.6% of GECC's total aircraft portfolio,

---

the aircraft and fully amortizes the lessor's purchase money debt, but the lessor's overall return depends to some extent on the residual value of the aircraft at the end of the lease.

[7] Eastern Airlines had filed for bankruptcy in March 1989. Continental Airlines filed for bankruptcy in December 1990; Pan American in January 1991; Midway in March 1991; America West in June 1991; and TransWorld Airlines in January 1992.

significantly increased GECC's non-earning assets, illustrating that aircraft could quickly become non-earning, problem assets. Stock analysts and credit rating agencies devoted attention to these risks and scrutinized GECC's potential exposure to non-earning assets.

This exposure was exacerbated for GECC because at the time a disproportionately high percentage of its aircraft portfolio consisted of older, "Stage II" aircraft. Stage II aircraft were less marketable than newer, "Stage III" aircraft. Stage II aircraft were older and more expensive to operate than Stage III aircraft and did not comply with increasingly strict noise abatement regulations in the United States and Europe. These regulations made continued, long-term use of Stage II aircraft in the United States and Europe problematic, absent expensive retrofitting (called "hush kitting").

### B.    The Origin and Formation of Castle Harbour

In the early 1990's, GECC's exposure to non-earning assets was not limited to its aircraft portfolio, but extended to commercial real estate and corporate loans. The evidence presented at trial will demonstrate that to address this exposure, senior management at The General Electric Company ("GE"), GECC's ultimate parent, asked GECC management to address directly the non-earning asset issue. In response, GECC management began an initiative to "sell down" assets, including aircraft. Despite its label, the sell-down initiative was not limited to selling assets, because for many asset classes (including commercial aircraft), there was no viable secondary market at the time. Rather, the sell-down program embraced a range of means to "monetize" (i.e., convert some or all of GECC's investment into cash) certain assets or otherwise reduce the risk of owning such assets without actually selling them.

Although the managers of GECC's aircraft leasing business believed that the depressed market created favorable opportunities to invest in new aircraft and that the

industry had the potential for substantial long-term growth, the GECC Board of Directors (consisting primarily of GE senior management) stopped new aircraft investments until the business had made progress in the sell-down initiative and in managing the aircraft portfolio. Thus, for the aircraft leasing business, the objective was to generate funds from existing assets in order to make new investments and allow the business unit to grow.

In furtherance of its aircraft sell-down effort, GECC submitted a request for proposal (the "RFP") to seven investment banks.[8] Thus, GECC sought assistance to supplement the ideas it had generated internally. The RFP originated with the managers of GECC's aircraft leasing business, who prepared the RFP in response to directives from senior management at GECC and GE. The RFP identified three primary objectives that the proposals should address: (1) accessing liquidity; (2) tapping into a wider pool of investor capital; and (3) achieving off-balance sheet financing for a portion of GECC's aircraft portfolio. The RFP expressly suggested that the recipients consider partnership structures as vehicles to achieve some of the sell-down goals. Based on initial responses received from the seven investment banks, GECC decided to continue discussions with four banks: Citicorp; Kidder Peabody (which at the time was wholly owned by GE); Babcock & Brown, Inc., which specialized in asset leasing transactions; and McManus & Miles, which specialized in aircraft finance.

GECC made clear that, in addition to responding to the economic challenges presented by the markets generally, sell-down solutions had to address important company-specific objectives and limitations. First, while GECC's general credit debt

---

[8] The seven investment banks receiving RFPs in May 1992 were Citicorp, Goldman Sachs, Bankers Trust, McManus & Miles, Kidder Peabody & Company, Babcock & Brown, Inc., and Morgan Stanley & Co., Inc.

was (and is) rated "triple-A," issuing full recourse debt would not reduce GECC's

ownership risk in, or monetize the equity value of, the aircraft portfolio and thus would

not achieve its sell-down objectives. Moreover, GECC's capacity to issue triple-A debt

was not unlimited. To maintain its credit rating, GECC had committed to its rating

agencies that it and its subsidiaries would maintain a combined ratio of debt to common

equity of no greater than 8:1. Maintaining the 8:1 ratio was a particular concern in 1993,

when GECC's debt to common equity ratio rose to 7.96:1 by the end of the year.

Second, while nonrecourse debt secured by its equity interest in the aircraft

portfolio could achieve some of its objectives in the sell-down initiative, issuing

nonrecourse debt against the aircraft was not a viable option for GECC. A significant

source of GECC's debt capital was (and is) general credit debt. A substantial portion of

GECC's unsecured debt was supported by a covenant – the so-called "negative pledge" –

that generally prohibited GECC and its domestic finance subsidiaries from incurring

secured debt, with the principal exception of certain types of purchase-money debt.[9]

Because of the negative pledge, GECC could not incur debt secured by its existing equity

interest in its aircraft portfolio. Even in the absence of the negative pledge, as an

economic matter, it would have been difficult for GECC to raise nonrecourse debt against

the aircraft portfolio because those assets were already encumbered by substantial

amounts of purchase-money nonrecourse debt.

In short, GECC needed to obtain new equity investments in the aircraft portfolio,

but raising equity against its aircraft portfolio was a challenge because (1) the airline

lessees were in questionable financial health, (2) many of the remaining lease terms were

---

[9] For example, most of GECC's portfolio of leased aircraft were encumbered by purchase money debt. GECC's equity interests in these aircraft were junior to this secured purchase money debt. Under the negative pledge, GECC could not pledge its lessor equity positions to secure other debt.

of relatively short duration, which made the residual value of the aircraft in the after-market an important component of their value, and (3) the after-market for aircraft in general and Stage II aircraft in particular was problematic. Merely selling whole or partial interests in more than several aircraft was not an option, because selling into such an unbalanced market would likely produce losses that GECC could avoid if it could find interim solutions. Thus, achieving GECC's various business objectives would require formation of a separate legal entity with other investors.

Because of these and other constraints, GECC's discussions with the four investment banks were not immediately fruitful. In April 1993, however, one of the four finalists, Babcock & Brown, submitted a new proposal to GECC that responded to many of the goals identified in the RFP and was consistent with GECC's capital structure limitations. This proposal contemplated the formation of a partnership to which GECC subsidiaries would contribute a portfolio of leased aircraft and cash and equity investors would contribute cash. The new proposal was designed to further the sell-down effort and to produce the following non-tax benefits:

> (1)     raise more than $100 million of capital that would be accounted for as minority equity on GECC's financial statements (and not count as debt for purposes of its commitment to maintain a debt to common equity ratio of not more than 8:1);
>
> (2)     demonstrate liquidity in the aircraft leasing market (by raising capital against a pool of assets without violating the negative pledge restriction on secured debt), which was important to rating agencies and financial markets concerned about the liquidity of GECC's portfolio;
>
> (3)     shift at least some of GECC's risks with respect to the residual value of its aircraft, default by its lessees, and catastrophic loss to the investors; and

(4)     minimize the adverse effects of any transaction on GECC's GAAP profits.

In addition, the partnership contemplated by Babcock & Brown would be subject to the U.S. partnership tax provision known as the "ceiling rule," described more fully below, which would provide a clear tax benefit to a partner, like Plaintiff, that contributed property with a low tax basis to a partnership. While there was some possibility at the time that the ceiling rule would be repealed by the IRS, the legislative history of the governing statute, which had been last amended in 1984, expressly contemplated that any such repeal would apply only prospectively to property contributions made after the issuance of regulations repealing the ceiling rule.

The partnership equity that Babcock & Brown proposed would not be "common" or "pure" equity, because the price of issuing common equity would be too high, but it would be equity for financial accounting, legal and negative pledge purposes. It would not count as debt for rating agency purposes and, indeed, would decrease GECC's all-important debt to common equity ratio. As equity, it would stand behind the substantial debt already encumbering the leased aircraft portfolio and upon liquidation would participate pari passu with GECC's equity. It would have a minimum yield, but would also share materially in the actual performance of the aircraft portfolio and would be exposed to the risk of loss even if GECC remained sound. By analogy, it would bear some resemblance to a preferred stock interest in a corporation that owned the partnership's assets and some resemblance to common stock in such a corporation.

In analyzing the Babcock & Brown proposal, GECC management recognized that the cost of raising capital through the proposal would exceed the company's normal cost of raising debt capital. Obviously, an investor acquiring illiquid, medium-to-long term

equity, whose yield depended in part on the performance of a troubled aircraft portfolio, would expect a higher return than it would if purchasing GECC's triple A-rated, liquid, short-term debt. As explained above, however, an issuance of debt would not have achieved the objectives of the sell-down initiative and, in any event, was not possible in light of GECC's negative pledge covenant and 8:1 debt/equity commitment.

The cost of the equity envisioned by the Babcock & Brown proposal was substantially lower than the implicit cost of capital raised by issuing GE "common" stock. In any event, however, issuing GE common stock would not have responded to any of the sell-down objectives and was not even a remote option for the managers of the aircraft division.

In addition, the evidence presented at trial will show that GECC management believed that the proposal would demonstrate vitality in its portfolio of Stage II aircraft, even though the market was otherwise stagnant, which could have the indirect benefit of attracting new investors to the industry. Moreover, the proposal would mitigate the asset concentration in GECC's older Stage II aircraft portfolio by raising equity capital against those assets, thereby shifting some risk to the third-party investors and producing funds for new investments. By raising funds in this manner, GECC could reduce its investment in the existing aircraft assets and use the cash to invest in other assets, which would further diversify its aircraft portfolio and reduce the proportion of its portfolio represented by Stage II aircraft. The managers of GECC's aircraft leasing business wanted to use funds generated by the sell-down initiative for new investments that would diversify its aircraft portfolio. The proposed transaction would produce a significant amount of funds from the business's most problematic assets.

Finally, GECC understood that the tax benefits of the ceiling rule would be available with respect to any aircraft contributed to the partnership, unless regulations repealing the mandatory application of the ceiling rule were published beforehand.

Despite its clear benefits, the April 1993 proposal by Babcock & Brown did not fully satisfy all of GECC's objectives. Therefore, as late as June 1993, GECC provided a copy of the RFP to another investment bank, Merrill Lynch, stating that "[t]hese pages continue to fairly represent our goals in attempting to securitize lease assets."

Eventually, however, GECC concluded that Babcock & Brown's April 1993 proposal represented an acceptable opportunity to advance the goals of the sell-down initiative. GECC management approved the transaction and, on July 26, 1993, Castle Harbour was organized as a Nevada limited liability company under the name "GE Capital Summer Street-I Limited-Liability Company." Its original members were Plaintiff (III-E), III-M, and General Electric Capital AG, a Swiss corporation ("SwissCo"), each of whom contributed substantial assets and/or cash in exchange for their interests in Castle Harbour. Plaintiff's contribution included a portfolio of 63 aircraft, all of which were subject to existing leases with commercial airlines, and 60 of which were a Stage II-vintage airplanes. Plaintiff also contributed $240 million in cash and stock of a subsidiary corporation, III-M contributed $50 million in cash, and SwissCo contributed $6 million in cash.

Continuing the process begun by the RFP, the formation of Castle Harbour was a necessary component of GECC's efforts to raise equity capital that would participate in the aircraft leasing business. The purposes of establishing Castle Harbour in July 1993, prior to identification of the equity investors, were to limit the ability of prospective

12

investors to negotiate with GECC over the composition of the aircraft portfolio that
would be contributed to Castle Harbour and other structural aspects of the transaction and
to minimize the risk that the tax benefit provided to a contributing partner by the ceiling
rule would be repealed before Castle Harbour was fully established.

### C.    The Investments by ING and Rabo

After the initial formation of Castle Harbour, Babcock & Brown began the
process of identifying potential equity investors to purchase interests in Castle Harbour.
Like GECC, many traditional U.S. investors in leased aircraft were seeking to reduce,
rather than increase, their investment in commercial aircraft and were therefore not a
likely source of new investments.  European financial institutions, however, were a
logical source of investment.  Because ING and Rabo had previously invested in leased
aircraft, they were familiar with the aircraft leasing business, but unlike many U.S.
investors, they were not overly invested in aircraft leasing and were willing to consider
new investments.  ING and Rabo expressed interest in the transaction and were presented
with an Investment Memorandum outlining the general terms under which they might
invest in Castle Harbour.

The terms outlined in the Investment Memorandum were not final, "take it or
leave it" terms, but were subject to negotiation.  The Investment Memorandum included
detailed projections of rent, expenses, depreciation and residual values, inter alia, but
made clear that the actual results would depend on the performance of Castle Harbour's
business and that the investors would have material upside potential and downside risk.

In the fall of 1993, the discussions with ING and Rabo culminated in three weeks
of intense negotiations, with representatives of GECC, in Bermuda.  Those negotiations
resulted in an agreement, finalized on October 6, 1993, whereby ING and Rabo would

13

make a combined investment in Castle Harbour of approximately $117.5 million.[10]  The terms of their investments, which were set forth in an Amended and Restated Operating Agreement (the "Operating Agreement") and other closing documents, differed materially from those described in the Investment Memorandum.  Both ING and Rabo made it clear that they intended to participate in Castle Harbour as partners and equity investors.  The structure of Castle Harbour after the closing of the investments by ING and Rabo in October 1993, which remained in place until ING and Rabo sold their interests at the end of 1998, is depicted in Figure 1.

---

[10] ING and Rabo purchased III-M's original interest in Castle Harbour and made additional capital contributions to Castle Harbour.  On the same date, III-M bought the interest initially held by SwissCo.

14

**FIGURE 1**

