### D. The Interests Acquired by ING and Rabo

#### 1. Contributions, Profits, Losses, and Residual Gains and Losses.

In return for their combined investment of $117.5 million, ING and Rabo received Class A interests in Castle Harbour. The Class A interests entitled ING and Rabo to an unrestricted 98% of Castle Harbour's operating profits. Operating Agreement § 3.1 (allocating "Profits"). Under the Operating Agreement, operating profits consisted generally of rent from the aircraft portfolio, less (1) expenses related to the operation of that portfolio, (2) interest on debt encumbering the aircraft in the portfolio, and (3) depreciation of the aircraft. Although the parties expected Castle Harbour to generate operating profits, those profits depended on whether it continued to receive rent from its airline lessees and succeeded in controlling its operating expenses, many of which (such as insurance costs) were variable.

Operating profits did not include gains and losses from disposition of capital assets. Section 3.3(h) of the Operating Agreement allocated 90% of the first $3.2 million of such gains and 1% of all other disposition gains (without limitation) to ING and Rabo.

On the loss side, section 3.2 of the Operating Agreement allocated to ING and Rabo 98% of the first $3.9 million of operating losses (less disposition losses allocated under the 90% tier described below). Operating losses did not include residual gains and losses on aircraft or other asset dispositions; ING and Rabo were allocated 90% of the first $ 3.2 million of such disposition losses (less operating losses allocated under the 98% tier described above). Thereafter, ING and Rabo were allocated 1% of all operating losses until after III-E and III-M had been allocated total cumulative operating losses and

16

disposition losses approximately equal to their total contributions, ING and Rabo would bear all losses to the extent of their remaining positive capital accounts. While this allocation of risk of loss is complex, it is similar to the way that corporate losses are borne by preferred and common stockholders, in that common stockholders bear the entire risk of loss until their capital has been depleted, at which point the risk shifts to preferred stockholders. However, unlike typical preferred stockholders, ING and Rabo had a material exposure to the first, and therefore most likely, tier of losses and shared in each dollar of loss.[11] A summary of the interests of ING and Rabo in the profits and loses of Castle Harbour is set forth in Figure 2.

---

[11] A one percent interest in real economic losses on a $531 million aircraft portfolio is not insignificant, especially when compared to ING and Rabo's relative investment of 17%.

17

## FIGURE 2: ALLOCATION OF OPERATING PROFITS/LOSSES
## AND DISPOSITION GAINS/LOSSES
## TO ING AND RABO

\*   Operating Profits:

      98% with no limit

\*   Operating Losses:

      98% until ING/Rabo receive $3.8 million (less disposition losses allocated under the 90% tier); then

      1% of next $541.5 million (less disposition losses allocated under the 1% tier); then

      100% until ING/Rabo capital is $0

\*   Disposition Gains:

      90% until ING/Rabo receive $2.8 million; then

      1% of remainder with no limit

\*   Disposition Losses:

      90% until ING/Rabo receive $2.8 million (less operating losses allocated under the 98% tier); then

      1% of next $541.5 million (less operating losses allocated under the 1% tier); then

      100% until ING/Rabo capital is $0

2. <u>Exhibit E Distributions</u>.

ING and Rabo were scheduled to receive annual distributions from Castle Harbour in amounts specified in Exhibit E to the Operating Agreement. Any Exhibit E distributions received by ING or Rabo would reduce its capital account. Moreover, the Exhibit E distributions were payable only in the discretion of Castle Harbour's general manager. ING and Rabo did not have the contractual or legal right to demand Exhibit E distributions or to claim a default if distributions were not made; rather, they had the equity-like right to cause Castle Harbour to be liquidated if Exhibit E distributions were not made. Upon a liquidation of Castle Harbour, ING and Rabo also would not have the right to receive the Exhibit E scheduled amounts. Instead, they would be entitled to receive their capital account balances, which as described below could be more or less than the Exhibit E amounts, depending on the amount of income, gains and losses allocated to ING and Rabo.

3. <u>Capital Accounts and Liquidation Rights</u>.

The Operating Agreement pursuant to which the interests were issued required that a capital account be maintained for each partner. In general, a partner's capital account was the sum of its contributions to Castle Harbour and its cumulative allocations of Castle Harbour's profits and gains, reduced by its cumulative allocations of Castle Harbour's losses and by distributions received from Castle Harbour. The capital accounts were not merely notional, economically irrelevant accounting entries. To the contrary, they defined each partner's net unrecovered economic investment in Castle Harbour and defined the amount each partner would be entitled to receive on liquidation after satisfaction of the claims of creditors and certain guaranteed payment obligations of

19

Castle Harbour. ING's and Rabo's claims for their unrecovered capital accounts were pari passu with the capital account claims of III-E and III-M.

Significantly, the Operating Agreement imposed a deficit capital account restoration obligation (commonly referred to as a "DRO") on all of its partners. Operating Agreement § 12.3. Under the DRO, upon liquidation, a partner was obligated to pay into Castle Harbour an amount equal to any deficit balance then in its capital account. In the case of ING and Rabo, the aggregate Exhibit E distributions, if made, would have exceeded their aggregate contributions of $117.5 million by $37.5 million. Thus, if Castle Harbour had made all Exhibit E distributions to ING and Rabo, they would have had deficit capital accounts (and DROs on liquidation) unless the cumulative allocations of profit and gain to them were at least $37.5 million.[12]

### 4. Guaranteed Payments.

The term "guaranteed payment" is a term of art in partnership finance and tax law. See I.R.C. § 707(c). A guaranteed payment is an amount payable to a partner for services or for the use of capital that is determined without regard to the partnership's income. The practical economic distinctions between a guaranteed payment and a regular distribution to a partner are that (1) a guaranteed payment must generally be paid even if the partnership does not have income, and (2) unlike a regular distribution (such as the Exhibit E distributions to ING and Rabo), a guaranteed payment is treated as a partnership expense and is not charged directly to the payee partner's capital account. Thus, a guaranteed payment affects the capital accounts of all partners by reducing

---

[12] The Class A Guaranteed Payments described below would have mitigated these DROs, but the capital account deficits and DROs would nevertheless have existed at liquidation.

20

income or increasing losses that are shared or borne by the members according to their general income and loss sharing arrangements.

The Operating Agreement provided for two kinds of guaranteed payments, one to the Class B partners (III-E and III-M) and the other to the Class A partners (ING and Rabo). The guaranteed payments to III-E and III-M (referred to as the "Class B Guaranteed Payments" in section 4.1 of the Operating Agreement) were treated as expenses and reduced operating income. Because ING and Rabo were allocated 98% of all of Castle Harbour's operating income, they bore 98% of the economic burden of the Class B Guaranteed Payments (which totaled $6 million over the 1993-98 period).

The Operating Agreement also provided for guaranteed payments to ING and Rabo as holders of the Class A interests (the "Class A Guaranteed Payment"). Operating Agreement §§ 10.8(b), 12.2. The Class A Guaranteed Payment was unusual in that it would accrue and be payable, if at all, only upon liquidation of Castle Harbour or the redemption of the Class A interests by Castle Harbour, and then only if ING and Rabo had not previously received aggregate net allocations of operating income and gain sufficient to give them a minimum specified yield on their unrecovered investments. In other words, ING and Rabo were generally entitled to receive a return _on_ their unrecovered investment of the greater of a minimum specified return (represented by the Class A Guaranteed Payment) or the yield actually produced by their allocable aggregate shares of operating profits and losses and gains and losses from capital asset dispositions. While the Class A Guaranteed Payment assured ING and Rabo of a minimum yield or return on their unrecovered investment, it did not assure them a return _of_ their investment; thus, it would not offset or otherwise make ING and Rabo whole for

21

operating and disposition losses allocated to them under the 1% and 100% loss tiers described above and shown on Figure 2. Losses allocable under these tiers, if sufficiently large, could completely wipe out the unrecovered capital investments of ING and Rabo.

Not only was the right of ING and Rabo to receive any Class A Guaranteed Payment a contingent right that would not accrue until liquidation (if at all), but the Class A Guaranteed Payment was subordinate to the claims of Castle Harbour's creditors. The Class A Guaranteed Payment would be funded only on liquidation and only after all creditors had been satisfied. In many respects, therefore, the Class A Guaranteed Payment provided ING and Rabo with a yield similar to that of a participating preferred stock, which has a right to receive cumulative dividends that is senior to the rights of common stockholders, but was subordinate to the rights of creditors.[13]

Ultimately, III-E and III-M received all Class B Guaranteed Payments that they were owed. No Class A Guaranteed Payment was ever due to ING or Rabo; instead, their yield was determined entirely by reference to their interests in the actual operating profits and disposition gains and losses of Castle Harbour.

     5.    <u>ING's and Rabo's Rights to Participate in Management</u>.

Among the issues negotiated among the parties was the manner by which ING and Rabo would participate in the management of Castle Harbour. Because ING and Rabo were not U.S. companies, Federal Aviation Administration ("FAA") regulations limited their ability to have direct voting rights in Castle Harbour. On the other hand, because their return would depend on Castle Harbour's operating income and the residual value of its aircraft, ING and Rabo were unwilling to give GECC, as the controlling

---

[13] As stated above, if on liquidation, ING and Rabo had deficit capital account balances, the Class A Guaranteed Payment would mitigate but not eliminate their DROs.

22

partner, the unilateral authority to make business and investment decisions that would affect them.[14] Accordingly, the parties negotiated an intricate set of controls (which was reviewed and approved by the FAA) that granted ING and Rabo the de facto right to approve or disapprove any material (and many immaterial) deviations from the mutually agreed-upon business plan. These rights were augmented by the right of ING and Rabo to participate as non-voting members in Castle Harbour manager meetings that were the functional equivalent of directors' meetings.

The evidence presented at trial will demonstrate that, having negotiated for these rights, ING and Rabo exercised them actively and continuously throughout the term of their investment in Castle Harbour. As the evidence also will show, because Castle Harbour operated a real business during difficult times, ING and Rabo were required to analyze and to decide whether to consent to numerous material business decisions.

6. ING's and Rabo's Exposure to Catastrophic Losses.

Because, as described above, ING and Rabo bore almost all residual losses after III-E and III-M had been allocated losses approximately equal to their original contributions, ING and Rabo were very concerned about catastrophic losses. The issue was the subject of intense negotiations in Bermuda because GECC was unwilling to accept a "special allocation" of either catastrophic losses or the cost of excessive insurance. In the end, ING and Rabo agreed to accept a minimum of 1% of the catastrophic risk (other than uninsured losses resulting from the failure to maintain agreed-upon minimum insurance coverage) and to bear 98% of the cost of liability insurance (as an expense that reduced their 98% share of operating profits).

---

[14] Decisions affecting residual value were significant because, of Castle Harbour's 63 aircraft, 60 were expected to come "off lease" prior to the end of 1999, which was within the period during which ING and Rabo were expected to own their interests in Castle Harbour.

### E. Castle Harbour Leasing Inc. ("CHLI") and the Reasons It Held Liquid Assets

ING and Rabo invested $117.5 million in cash in Castle Harbour, and III-E and III-M invested total net cash of $245 million. In addition, Castle Harbour generated cash flow that was neither distributed currently to its partners nor used to service the debt encumbering its aircraft portfolio. Most of these funds (in excess of working capital requirements) were contributed to Castle Harbour's wholly owned U.S. corporate subsidiary, Castle Harbour Leasing, Inc. ("CHLI"). CHLI was permitted to invest its funds either in new aircraft or liquid, highly rated securities, including (importantly) GECC commercial paper.

The funds in CHLI served a number of purposes. First, they provided Castle Harbour a source of liquidity. This liquidity was important to ING and Rabo as equity investors, because it provided assurance that in the event of liquidation they could promptly receive the positive balances, if any, in their ending capital accounts without having to force a "fire sale" of Castle Harbour's assets. Significantly, however, the liquidity was not "collateral" in a legal or economic sense: it could not be directly accessed by ING or Rabo and it was not "walled off" from the creditors of Castle Harbour and CHLI. Moreover, as explained above, ING and Rabo were entitled to 98% of Castle Harbour's operating profits, which included net income from aircraft leasing operations, but did not include CHLI's income. Rather, ING and Rabo shared in CHLI's income through their interests in capital gains and losses of Castle Harbour, which were allocated as "Disposition Gains" (see Figure 2 above), rather than as a component of operating income. Thus, the earnings on CHLI's liquid assets did not materially mitigate ING's and Rabo's interests in, or exposure to, fluctuations in the aircraft leasing income.

24

Despite the liquidity provided by CHLI, ING and Rabo looked primarily to income from aircraft operations and residual values of the aircraft for their return, which was consistent with GECC's business purposes in the sell-down initiative.

A second reason for holding funds in CHLI was that CHLI could invest some of the funds in new aircraft, thereby responding to the business's desire to acquire new planes.

Third, CHLI could loan the funds to GECC, thereby providing GECC with access to the funds for general purposes, including investments in new, wholly owned aircraft or other assets.

GECC's ability to borrow funds from CHLI was very important. The interests of ING and Rabo were recorded on Castle Harbour's books as an equity investment. Furthermore, pursuant to applicable accounting rules, Castle Harbour and CHLI were included on GECC's consolidated financial statements; they were not "off-balance sheet" entities. The membership interests of ING and Rabo in Castle Harbour were recorded on GECC's financial statements as minority equity interests in a consolidated affiliate. Thus, cash held by Castle Harbour and CHLI was shown as cash on GECC's consolidated GAAP balance sheet. Conversely, any intra-group debt owed by GECC to Castle Harbour or CHLI (including GECC commercial paper purchased by CHLI) was eliminated, pursuant to applicable accounting rules, on GECC's consolidated GAAP balance sheet. The net effect was that Castle Harbour's cash, including the capital contributions received from ING and Rabo, could be loaned to GECC without creating additional balance sheet or rating agency debt on the books of GECC. This result furthered the overall objectives of the sell-down initiative by demonstrating GECC's

25

ability to raise funds against the aircraft portfolio without creating additional debt on its balance sheet and without violating its negative pledge covenants.

### F.     Castle Harbour Operations

The evidence presented at trial will demonstrate that, for over five years – from July 1993 through December 1998 – Castle Harbour aggressively managed its aircraft portfolio and other assets to maximize the economic return to its partners. Its General Managers, working with Resident Managers in Bermuda, managed the day-to-day activities of Castle Harbour, with the assistance of many contract employees working in Ireland. These activities included (i) collecting and monitoring lease payments and insurance on the 63 aircraft owned by Castle Harbour, (ii) negotiating directly with airlines on material business issues, such as the extension of lease terms and the sale of aircraft, (iii) "hushkitting" Stage II aircraft in order to bring them into compliance with Stage III noise regulations, and (iv) locating new lessees or purchasers for aircraft at the end of their lease terms. These activities entailed substantial and direct negotiations between Castle Harbour and third parties, including various airlines, an international freight delivery company, and prospective purchasers. The evidence presented at trial will show clearly that these third parties recognized Castle Harbour as a business entity and dealt with Castle Harbour in its capacity as owner of its airplanes.

From year to year, as will be shown clearly at trial, the financial results of Castle Harbour's actual operations varied significantly from the original projections included in the Investment Memorandum that had been provided to ING and Rabo. In addition, the actual residual value of the aircraft that came off lease varied substantially from the original projections.

26

Because of the management controls negotiated by the parties, on numerous occasions from 1994 through 1998, Castle Harbour's managers asked ING and Rabo to consider and to consent to amendments and waivers of various provisions of the Amended and Restated Operating Agreement to allow Castle Harbour to take steps such as re-leasing or selling aircraft.

### G. Disposition of Interests in Castle Harbour by ING and Rabo

In 1997, an arcane change in U.S. tax law prompted GECC to enter into negotiations with ING and Rabo over altering the terms of their participation in Castle Harbour.[15] Those negotiations were not fruitful, however, and effective December 31, 1998, ING and Rabo sold their interests to subsidiaries of GECC. ING and Rabo received $15,579,980 each in exchange for their interests, which price equaled their respective capital account balances as of the end of 1998, as adjusted to reflect their allocable shares of any gain or loss in Castle Harbour's aircraft portfolio and CHLI shares as of the end of 1998 and certain minor adjustments.

At the end of their investments in Castle Harbour, ING and Rabo had received material positive returns on their investments. These returns varied significantly from year to year, and the total returns exceeded the projections originally contemplated in the Investment Memorandum. Consistent with the sell-down initiative, GECC obtained material non-tax benefits from the Castle Harbour transaction, including an infusion of $117.5 million in equity financing and other benefits resulting from the willingness of ING and Rabo to make an equity investment in Castle Harbour's leased aircraft portfolio. In addition, III-E and III-M each received a pre-tax economic profit (i.e., a profit

---

[15] The change in tax law pertained to the tax treatment of partnerships such as Castle Harbour under tax treaties, including the treaty between the U.S. and the Netherlands. Thus, the change was unrelated to the ceiling rule.

27

independent of any federal income tax benefit) and an after-tax economic profit from their investment in Castle Harbour.

### H. Tax Consequences of the Transaction

This is, of course, a tax case that would not exist if Castle Harbour had not produced tax results under the ceiling rule that the IRS now seeks to reverse. The evidence in this case will show that, while these tax benefits were substantial and the partnership was structured to obtain them, they were not the source of the sell-down initiative, and Castle Harbour clearly would not have been formed if it had not satisfied the substantive, non-tax business purposes of the sell-down initiative. Specifically, as explained above, the evidence will show that (1) GECC's aircraft leasing business was seeking ideas to further its sell-down objectives by, among other things, raising equity or otherwise monetizing portions of its existing portfolio of leased aircraft; (2) raising funds through the issuance of general credit debt or equity of GECC or GE would not satisfy the sell-down objectives; (3) raising nonrecourse debt against the portfolio was not a feasible option; and (4) an outright sale of whole planes or undivided interests therein was not economically viable. Only an equity investment in the aircraft portfolio could realistically achieve GECC's non-tax objectives. A legal entity was necessary to achieve GECC's desired objective of raising capital that would qualify as equity for rating agency and GAAP purposes.

Raising equity involving specific assets effectively requires the creation of an entity to which assets are contributed and in which investors invest. Whatever the state law characterization of such an equity-raising entity (corporation, trust, partnership, limited liability company), for tax purposes the choices generally boil down to two: entities that are taxed as corporations and entities that are treated as partnerships.

28

Regardless of the form of entity, GECC and any potential investors would necessarily take into account the tax characteristics of the aircraft portfolio and the tax costs or benefits resulting from an equity investment in that portfolio. Castle Harbour's portfolio had been fully depreciated for tax purposes, but it was still producing substantial taxable rental income. Moreover, because the planes in the portfolio were still leveraged (i.e., subject to unamortized, nonrecourse purchase money debt), they were producing taxable income in excess of cash flow.[16]

Under these circumstances, if GECC contributed the portfolio in a nontaxable transaction to a corporation as the equity monetization entity, the adverse tax characteristics of the portfolio would "carry over" to the corporation. The corporation would pay tax as a separate entity and, because of its "carryover basis" in the aircraft, would have taxable income in excess of its net cash flow. Any investor in the stock of that corporation would have to take into account the impact of this incremental tax burden on the value of the stock.

If, on the other hand, the equity vehicle were a partnership, a different tax regime would apply. The Internal Revenue Code does not impose a separate, entity-level tax on the income of partnerships; rather, the partners include their shares of the partnership's income, gains, losses, deductions and credits on their separate federal income tax returns. I.R.C. §§ 701, 702(a). The adverse tax characteristics of the portfolio would increase the amount of taxable income allocated to the partners. Because of the "ceiling rule," which is discussed in detail below, some of this additional, non-economic taxable income would be allocated to the new investors.

---

[16] The portfolio was producing taxable income in excess of cash flow because rental income, which was taxable, was being used to make nondeductible payments of principal on the purchase money debt.

Under the ceiling rule, a domestic equity investor would be <u>required</u> to absorb and pay tax on a portion of the partnership's taxable income in excess of its economic income and would consider this issue in its investment decision. If the investor were a non-U.S. taxpayer entitled to the benefits of an income tax treaty, the mandatory allocation to it of this non-economic taxable income would not be a significant factor. Whether the investor were domestic or foreign, however, the partnership tax rules then in existence would <u>prohibit</u> Castle Harbour from allocating this noneconomic taxable income to GECC or its subsidiaries, the partners contributing the aircraft.

In short, accomplishing GECC's business goals required an entity that would be characterized as a corporation or a partnership for tax purposes. In either case, the structure had to account for the noneconomic taxable income that the portfolio would continue to produce. In two of the obvious options – a partnership with a domestic investor or a corporation – the noneconomic taxable income would impose a transaction cost to the investor that would make the cost of the investor's equity substantially more expensive. The third option – a partnership with a non-U.S. investor – did not create this transaction cost. Moreover, because the U.S. market for equity investments in leased aircraft was already heavily saturated, foreign investors were a more likely source of equity capital without regard to these transaction costs. GECC's selection of the third option is hardly surprising.

As U.S. corporations, III-E and III-M were subject to U.S. federal income tax on their worldwide income and therefore were subject to federal income tax on their distributive shares of Castle Harbour's income. Because ING and Rabo were incorporated and headquartered in the Netherlands, they were subject to U.S. tax on their

30