shares of Castle Harbour's taxable income only to the extent permitted under the U.S.-Netherlands tax treaty. Castle Harbour's business operations were located outside the United States (in Ireland, Bermuda and Hong Kong), and it was not engaged in a trade or business within the U.S.;[17] therefore, the shares of income allocable to ING and Rabo were exempt from federal income tax. See Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Dec. 18, 1992, U.S.–Neth., art. 7, 3 Tax Treaties (CCH) ¶ 6103; I.R.C. § 882.

When ING and Rabo became members of Castle Harbour, the 63 aircraft that Plaintiff had contributed had an aggregate fair market value of $531,252,403, which (as required by the applicable IRS regulations) became the book value of the aircraft in the hands of Castle Harbour. For tax purposes, however, the aircraft had been fully depreciated by the time they were contributed to Castle Harbour and thus had a tax basis of zero. As a result, while Castle Harbour had substantial annual depreciation expense for book purposes, it had no tax deductions for depreciation in respect of the contributed aircraft. Thus, Castle Harbour's taxable income[18] generally exceeded its book income by the amount of Castle Harbour's book depreciation deduction. ING and Rabo were allocated 98% of Castle Harbour's operating income, and the ceiling rule prohibited Castle Harbour from creating tax depreciation deductions to match the book depreciation deductions allocated to ING and Rabo. Therefore, 98 % of the excess of Castle Harbour's taxable income from operations over its book operating income was required

---

[17] GECC's aircraft leasing business, GE Capital Aviation Services, continues to have substantial operations in Ireland.

[18] Castle Harbour's "operating income" for book purposes consisted generally of its rental income and associated expenses, but excluded gains and losses from sales and other dispositions of aircraft.

by the ceiling rule to be allocated to ING and Rabo, rather than to GECC or its affiliates.[19]

While Castle Harbour was intended to obtain favorable tax results, it was not intended or designed to maximize the amount of tax benefits to GECC, III-E and III-M at the expense of the business plan or the overall objectives of the sell-down initiative. The favorable tax treatment produced by the ceiling rule would apply only so long as Castle Harbour continued to own the aircraft. Sales of aircraft would produce significant taxable gain (because of their zero tax basis) that would be allocated to III-E, other than ING or Rabo, under section 704(c), and distributions of aircraft to III-E would shift to III-E the future tax burden of owning a fully depreciated aircraft. Despite the tax disadvantages to III-E of aircraft dispositions, from the beginning GECC anticipated that Castle Harbour would dispose of a significant portion of its aircraft while ING and Rabo were partners.[20]

In summary, the tax consequences of the Castle Harbour transaction resulted from the application of longstanding, well-accepted rules governing the allocation of partnership income, including the ceiling rule. GECC was aware of these tax rules and took them into account in connection with the formation of Castle Harbour and in negotiating the terms of the Castle Harbour Operating Agreement with ING and Rabo. These rules not only permitted, but <u>required</u>, that 98% of Castle Harbour's taxable income from operations be allocated to ING and Rabo. This case results from the IRS's

---

[19] If ING and Rabo had been U.S. taxpayers, the additional taxable income allocated to them under the ceiling rule would have increased their bases in their partnership interests, resulting in a taxable loss (or reduced taxable gain) on the eventual sale or liquidation of those interests.

[20] The investment memorandum provided to ING and Rabo projected that Castle Harbour would dispose of over $163 million between 1993 and 2000. See Exhibit J-017, at 0017666. In fact, Castle Harbour sold 16 aircraft and distributed another 15 aircraft to III-E from 1994 through 1996.

efforts to prevent the ceiling rule's mandatory allocation of taxable income to ING and Rabo.[21]

### III. THE IRS'S AUDIT DETERMINATIONS

The IRS examined Castle Harbour's tax returns for its 1993-1998 taxable years. On June 29, 2001, the IRS issued the two FPAAs, one for the 1993-96 taxable years and the second for the 1997-98 taxable years. The FPAAs do not discuss the context of the Castle Harbour transaction; they ignore GECC's extensive background in the aircraft leasing industry and the economic conditions in that industry in 1993; and they disregard Castle Harbour's extensive operations in Bermuda. Despite the clear requirements of the ceiling rule, the FPAAs summarily conclude that a substantial portion of Castle Harbour's taxable income should be reallocated from the Class A investors (ING and Rabo) to Plaintiff (III-E) and III-M. Specifically, the FPAAs conclude:

1. The formation of Castle Harbour as a partnership lacked economic substance and was without legitimate business purpose and therefore no valid partnership existed among Plaintiff, III-M, ING, and Rabo.

2. Alternatively, ING and Rabo were lenders to Castle Harbour rather than partners in Castle Harbour.

3. Alternatively, the allocations contained in the Castle Harbour partnership agreement lacked "substantial economic effect."

4. Alternatively, income of Castle Harbour should be reallocated among the partners pursuant to I.R.C. § 482.[22]

The IRS has resorted to these arguments out of necessity. To the extent the transactions had substance, the plain language of the IRS's own regulations compels the

---

[21] Although the IRS subsequently changed the rules to repeal the mandatory application of the ceiling rule, it did not do so until December 1993, after the formation of Castle Harbour and the admission of ING and Rabo as partners. Thus, the mandatory application of the ceiling rule applies to all of the taxable years at issue in this case.

[22] The government has since conceded that there was no basis for the IRS's section 482 argument.

33

treatment reported by Castle Harbour on its U.S. federal partnership tax returns. Moreover, the history of those regulations makes clear that they were intended to produce the very tax consequences that the IRS now finds unpalatable. Because it could not disavow its own regulations, which require the application of the ceiling rule to assets contributed to a partnership prior to December 21, 1993, the IRS concocted the arguments reflected in the FPAAs.

The facts presented at trial, however, will demonstrate that Castle Harbour was a valid partnership that conducted an enormous and enduring commercial aircraft leasing business. The investments in the partnership made by ING and Rabo had objective economic substance and satisfied significant non-tax business purposes of III-E, III-M, and their corporate parent, GECC. Moreover, under well-established case law – and the IRS's own published rulings – the interests acquired by ING and Rabo clearly constituted equity, rather than debt. Finally, the allocations of Castle Harbour's operating income had substantial economic effect and therefore must be respected.

Ultimately, the IRS's complaints are that the Castle Harbour transaction provided III-E and III-M with tax results more favorable than they might have received if they had engaged in alternative transactions as if Castle Harbour had been formed after the repeal of the ceiling rule. Under the established law of the Second Circuit, however, the IRS cannot dictate the manner in which GECC conducts its affairs and the existence of favorable tax consequences is irrelevant, because Plaintiff will show that the transaction had economic substance, that ING and Rabo were equity investors and not lenders, and that the allocations to ING and Rabo had substantial economic effect under the law applied to the taxable year at issue.

IV. **DISCUSSION**

This brief addresses each of the three remaining IRS theories that were asserted in the FPAAs and have not yet been abandoned by the government. This discussion makes it clear that the IRS's remaining theories are inconsistent with 70 years of case law in the Second Circuit and with published administrative positions of the IRS.

A. **Castle Harbour Had Economic Substance**

The principal theory of the FPAAs is that "the arrangement by which TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank purported to form a partnership lacked economic substance and was without legitimate business purpose," and as a result, "no valid partnership existed." The cases relied upon by the IRS in support of the FPAAs fall into two categories – those that disregard or recast a transaction and those that disregard a partnership. Sometimes, when a court determines to disregard a transaction or an entity (including a partnership), it speaks in terms of "sham," although the Second Circuit has historically spoken in terms of "economic substance." Semantics aside, the effect of a decision to disregard a transaction or entity is to suspend the normal operation of the tax law as if the transaction or other event had never occurred. Conversely, if a transaction is not disregarded under the economic substance or "sham" transaction doctrine, the tax laws will apply to the transaction in accordance with its substance.

The Second Circuit has well articulated the standard for applying the sham transaction doctrine: "A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions." DeMartino v. Commissioner, 862 F.2d 400, 406 (2d Cir. 1988). See also Gilman v. Commissioner, 933 F.2d 143, 147 (2d Cir. 1991); Jacobson v. Commissioner, 915 F.2d 832, 837 (2d Cir. 1990). Accord Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir.

35

1985), ("To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists.") Thus, unless a transaction is "fictitious," it cannot be disregarded as a sham unless (1) the transaction had no non-tax "economic effect" (an objective test) and (2) the taxpayer had no non-tax business purpose for entering into the transaction (a subjective test).

The evidence will establish that Castle Harbour was real and cannot be dismissed as "fictitious." Furthermore, the evidence presented at trial will demonstrate that the Castle Harbour transaction had objective economic substance and that the parties had non-tax business purposes for engaging in the transaction.

          1.     The Economic Substance Requirement.

The economic substance doctrine means simply that the tax law must regard and apply to a transaction that changes the economic or non-tax interests of taxpayers, but cannot apply when a transaction is meaningless except for tax. The economic substance doctrine is generally accepted and applied throughout the United States, but traces its origins to the Second Circuit.

          a.     Gregory v. Helvering.

The seminal case in the area of economic substance and sham transactions is Gregory v. Helvering, 293 U.S. 465 (1935), aff'g 69 F.2d 809 (2d Cir. 1934). The taxpayer in Gregory owned 100% of the stock of United Mortgage Corporation ("United"), which in turn owned 1,000 shares of the Monitor Securities Corporation ("Monitor"). Mrs. Gregory wanted to sell the Monitor shares, but wished to avoid the double taxation that would result if United sold the Monitor shares and then distributed

36

the sale proceeds to her as a taxable dividend. To reduce her taxes, Mrs. Gregory caused United to organize a new subsidiary, Averill Corporation ("Averill"), and caused United to transfer its 1,000 shares of Monitor stock to Averill in exchange for all of Averill's stock. Pursuant to the plan, United then distributed the Averill stock to Mrs. Gregory, Averill liquidated and distributed the 1,000 shares of Monitor stock to Mrs. Gregory, and Mrs. Gregory proceeded to sell the Monitor shares. Taking the position that United's distribution of the Averill shares was a tax-free reorganization (rather than a dividend), Mrs. Gregory reported no taxable income on the receipt of the Averill shares, treated Averill's liquidation as a taxable transaction resulting in capital gain, and reported no gain on the sale of the Monitor stock on the grounds that she had just received those shares in a taxable liquidation of Averill. Had the plan worked, she would have been taxed once (on the liquidation of Averill) at lower capital gain rates.

The Second Circuit and the Supreme Court held that the distribution of Averill shares constituted a dividend taxable at ordinary income rates because the purported reorganization lacked economic substance. The flaw in Mrs. Gregory's plan was not that the transaction was undertaken to avoid tax, but that the transaction was not substantively what the statute contemplated as a "reorganization."

Gregory established several core principles in the law of economic substance. First, a taxpayer has the <u>right</u> to structure a transaction to minimize or avoid taxation: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." <u>Gregory v. Helvering</u>, 293 U.S. at 469. In the Second Circuit's opinion, Judge Learned Hand had stated the same principle slightly differently: "Any one may so arrange his

37

affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." Helvering v. Gregory, 69 F.2d at 810.

Second, a taxpayer's motive to avoid taxation is not a basis to disallow an otherwise valid transaction.[23] Responding to the taxpayer's argument that a motive to escape taxation cannot "alter the result or make unlawful what the statute allows," the Supreme Court agreed that "[i]t is quite true that if a reorganization in reality was effected within the meaning of subdivision (B), the ulterior [tax avoidance] purpose mentioned will be disregarded." Gregory v. Helvering, 293 U.S. at 469. This statement echoed the Second Circuit's opinion, in which Judge Hand had stated that "a transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation." Helvering v. Gregory, 69 F.2d at 810.

Third, the tax laws will apply according to their terms to any transaction or set of facts that is, in substance, what the law contemplates or "intends," but the laws will not apply to transactions or facts that lack the substance or content to which the statute was directed. Gregory v. Helvering, 293 U.S. at 469.

      b.  Chisholm.

Shortly after the Supreme Court's decision in Gregory, the Second Circuit, again speaking through Judge Hand, applied the Gregory principles in the context of a partnership. In Chisholm v. Commissioner, 79 F.2d 14 (2d Cir. 1935), the Second Circuit held that the taxpayer and his brother were entitled to the tax savings that resulted from

---

[23] A few provisions of the Internal Revenue Code expressly require consideration of tax avoidance motive. See, e.g., I.R.C. §§ 183, 269. Where a provision like section 183 or section 269 applies, the explicit terms of the statute reflect the intention that motive be considered. No such provision applies here.

the contribution of stock to a partnership, even though their primary purpose in forming the partnership and contributing the stock to the partnership was to defer and possibly eliminate their tax liability on a pending sale of the stock. The IRS asserted tax deficiencies against the brothers, seeking to disregard their transfers of shares to the partnership. The Board of Tax Appeals ("BTA") sustained the IRS's position, reasoning that because the partnership admittedly was formed to escape taxation, the transaction was not bona fide.

On appeal, the Second Circuit reversed the BTA, noting that in Gregory the Supreme Court had been "solicitous to reaffirm the doctrine that a man's motive to avoid taxation will not establish his liability if the transaction does not do so without it." Chisholm, 79 F.2d at 15. According to Judge Hand, the appropriate inquiry was not whether the partnership was formed to achieve tax savings, but whether the Chisholm brothers meant to use the partnership form to jointly manage a pool of joint capital. The fact that the Chisholm brothers' partnership continued to exist and to operate long after the sale of the shares proved that the substance of the transaction was the establishment of an "enduring firm which should continue to hold the joint principal and to invest and reinvest it." Id. Therefore, notwithstanding the partnership's immediate sale of the contributed stock, it was respected as a partnership for tax purposes and the tax rules pertaining to the contribution of property to a partnership applied.

    c.  Subsequent Decisions.

Since deciding Gregory and Chisholm, the Second Circuit has consistently held that a transaction that changes the economic interests of the parties has objective economic effect and cannot be disregarded as a sham for tax purposes, regardless of the taxpayer's motive for engaging in the transaction. See Kraft Foods Co. v. Commissioner,

39

232 F.2d 118, 128 (2d Cir. 1956) ("Since the acts were real and the taxable entities cannot be characterized as sham entities, the transaction should not be disregarded merely because the transaction was entered into in response to a change in the governing tax law."); Rosenfeld v. Commissioner, 706 F.2d 1277, 1281 (2d Cir. 1983) ("[W]e believe our inquiry should focus on whether there has been a change in the economic interests of the parties. If their legal rights have changed, there is no basis for labeling a transaction a 'sham' and ignoring it for tax purposes. Indeed, our prior decisions have indicated that this is the relevant inquiry."); United States v. Ingredient Technology Corp., 698 F.2d 88, 94 (2d Cir. 1983) ("[T]he question is whether under the statute and regulations here involved the transaction affects a beneficial interest other than the reduction of taxes.").[24]

The Second Circuit, as well as other circuits, have recognized that a transaction has economic effect if there is a reasonable possibility of a profit (aside from taxes) from the transaction. See Gilman, 933 F.2d at 143; Jacobson, 915 F.2d at 232; Compaq Computer Corp. v. Commissioner, 277 F.3d 778 (5th Cir. 2001); IES Industries, Inc. v. Commissioner, 253 F.3d 350 (8th Cir. 2001). In general terms, a transaction or investment that has *any* reasonable prospect of turning an economic profit *must* be recognized as having economic substance; otherwise, no speculative, pure investment transaction would merit tax recognition unless the IRS and the court concurred in the taxpayer's investment analysis.

---

[24] The Second Circuit's interpretation is consistent with decisions of other circuits. See, e.g., ACM P'ship v. Commissioner, 157 F.3d 231, 248 n.31 (3d Cir. 1998) ("[I]t is also well established that where a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations."); Peter Pan Seafoods, Inc. v. United States, 417 F.2d 670, 673 (9th Cir. 1969) ("Where a transaction has economic substance and is economically realistic, it should be recognized for tax purposes. Tax motive alone is not the criterion for determining its legitimacy.").

40

In addition to profit potential, financial risk is a fundamental indicium of economic substance. If the taxpayer takes real financial risk in a transaction, even if the risk is relatively small, the transaction has economic substance and must be respected for tax purposes. See Frank Lyon v. United States, 435 U.S. 561 (1978).

In Lyon, the taxpayer entered into a sale-leaseback transaction. The rent payments under the lease exactly equaled the taxpayer's payments under the mortgage loan, and because the lease was a "net" lease, the lessee was responsible for all maintenance on the building. As a result, during the lease term, the taxpayer could neither make nor lose a dime (unless the lessee defaulted on the rent payments), but the taxpayer did expect to derive substantial tax benefits during the lease term from tax depreciation on the building and interest deductions on the mortgage. The lease also provided the lessee with a fixed price purchase option; if, as expected, the lessee exercised the option at the end of the lease term, the taxpayer would realize a six percent return. Because the option price was fixed, the taxpayer could not benefit from any appreciation in the value of the building. Although the taxpayer had mixed motives for entering into the transaction, the taxpayer's expected tax benefits objectively dominated its non-tax benefits.

The IRS argued that the transaction was a sham and that the taxpayer therefore was not entitled to depreciation deductions on the building or interest deductions on its mortgage payments. The Eighth Circuit Court of Appeals agreed with the IRS, but the Supreme Court reversed, holding that the taxpayer's presence as a third party in the transaction and its personal liability on the financing demonstrated that the transaction was not a sham. Id. at 581. The Court noted that because the taxpayer had disclosed the

41

liability on its corporate balance sheet, the transaction had actually affected its financial position, including its ability to incur more debt. While acknowledging that financial accounting treatment does not "lend substance to that which has no substance," the Court concluded that "in this case accepted accounting methods, as understood by the several parties to the respective agreements and as applied to the transaction by others, gave the transaction a meaningful character consonant with the form it was given." Id. at 577. "The fact that favorable tax consequences were taken into account by [the taxpayer] on entering into the transaction is no reason for disallowing those consequences." Id. at 580. The Court stated that "where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." Id. at 583-84 (emphasis added). The Court's use of the word "solely" is important, because it negates any balancing of motives. A transaction that is solely tax motivated has no non-tax purpose.

The Second Circuit's decision in Newman v. Commissioner, 902 F.2d 159 (2d Cir. 1990), is consistent with Lyon. Newman involved an arrangement in which the taxpayer purchased a truck and entered into an agreement with a trucking company (Schultz Transit) for the operation of the truck. The taxpayer claimed that the contractual relationship with Schultz Transit was that of an owner and independent contractor which entitled the taxpayer to an investment tax credit. The IRS contended that the form of the agreement should be disregarded and the agreement recharacterized as a lease. In

reversing the Tax Court's finding that the agreement lacked economic substance the Second Circuit stated:

> We have construed [the economic substance] factor to require a "change in the economic interests of the relevant parties." . . . For [the taxpayer], the primary substance was his liability for operating costs and his burden of the risk of operating losses—features absent in leases. Schultz Transit, in turn, was assured of at least recovering costs as a result of the agreement; the absence of a lease guaranteed that it would not lose money.

Id. at 163 (citing Rosenfeld v. Commissioner, 706 F.2d at 1282).

### d. Business Purpose.

Although most of the Second Circuit decisions on the economic substance doctrine have focused on the objective economic effect of the transactions, there is also authority that a transaction that lacks objective economic effects cannot be disregarded unless it also lacks any subjective non-tax business purpose. See DeMartino, 862 F.2d at 406; Gilman, 933 F.2d at 147. In evaluating the business purpose factor, the Second Circuit in Newman posed the question as follows: "Were the parties motivated at least in part by reasons unrelated to taxes?" Newman, 902 F.2d at 163 (emphasis added).

When discussing business purpose, the courts have distinguished between tax planning that occurs within the context of an ongoing business and tax-motivated transactions that occur outside of any business context. See Newman, 902 F.2d at 162 ("We have held in a tax-related context that 'when a taxpayer chooses to conduct his business in a certain form, 'the tax collector may not deprive him of the incidental tax benefits flowing therefrom, unless it first be found to be but a fiction or a sham.'"") (citations omitted)).

A recent case illustrating this point is United Parcel Service v. Commissioner, 254 F.3d 1014 (11th Cir. 2001) (hereinafter referred to as "UPS"), which involved a program

43

whereby UPS offered its customers the opportunity to purchase "excess value" insurance on the parcels they shipped. UPS's insurance broker recommended a tax-saving plan under which UPS could reduce its taxes by transferring the insurance operation to a Bermuda affiliate. The IRS challenged the restructuring, seeking to tax UPS on the premium payments received by the Bermuda affiliate. The Tax Court sustained the IRS position, concluding, inter alia, that the plan did not have a business purpose, that UPS's sole motivation was tax avoidance, and that the transaction was a sham.

On appeal, the Eleventh Circuit reversed the Tax Court. Citing Gregory, the court placed particular emphasis on its conclusion that the Tax Court had applied an overly narrow interpretation of the term "business purpose":

> A "business purpose" does not mean a reason for a transaction that is free of tax considerations. Rather, a transaction has a "business purpose," when we are talking about a going concern like UPS, as long as it figures in a bona fide, profit-seeking business. See ACM P'ship v. Comm'r, 157 F.3d 231, 251 (3d Cir. 1998). This concept of "business purpose" is a necessary corollary to the venerable axiom that tax-planning is permissible. See Gregory v. Helvering . . . .

254 F.3d at 1019. The transaction engaged in by UPS "simply altered the form of an existing, bona fide business, and this case therefore falls in with those that find an adequate business purpose." Id. at 1020. In other words, a business taxpayer has the right to move its business assets and operations around to minimize taxes. UPS is entirely consistent with such Second Circuit cases as Chisholm, Kraft Foods, and Newman.

        2.    <u>Castle Harbour Had Objective Economic Substance for All of Its Partners</u>.

The evidence will show that Castle Harbour had significant economic substance: (i) it was properly organized and complied with applicable FAA and other governmental

44

regulations; (ii) that its partners contributed 63 aircraft and stock in a subsidiary corporation, plus $357 million in cash; (iii) its partners shared the benefits and burdens of the ownership of those assets for over five years; (iv) during that time, Castle Harbour had employees and, as owner of the aircraft, dealt with many material business issues, including negotiations with lessees of the aircraft, potential buyers of the aircraft, and other third parties; and (v) Castle Harbour's partners, including ING and Rabo, participated indirectly in its business operations. Thus, Castle Harbour affected the economic and non-tax interests of all of its partners, as well as those of unrelated third parties, such as airlines and employees.

Despite these facts, the FPAAs assert that the formation of Castle Harbour and the investments by ING and Rabo had no economic substance. In support of its positions, the IRS alleged:

> [1] Castle Harbour was also predetermined and designed. [2] While it would not yield a completely specific result, parameters were quantifiable using reasonable probabilities. [3] Little or no risk was involved. [4] There was no indication of pre-tax profit apart from the tax benefits.

All four statements are incorrect, and even their relevance is highly questionable. For example, the first three sentences of this allegation could have been said of the transaction at issue in Frank Lyon (and most leasing investments), but those facts did not prevent the Supreme Court from recognizing the transaction for tax purposes.

At trial, Plaintiff will establish that the actual results of Castle Harbour's operations and the actual results to its partners were not pre-arranged or pre-determined, but fluctuated significantly from the projections prepared at the outset due to unknown and unforeseeable economic and business factors. In addition, the evidence will establish that ING and Rabo each bore a risk of loss from its equity investment in Castle Harbour

45