and that the parties conducted extensive negotiations over the allocation and management of those risks.

Furthermore, the evidence will demonstrate that each partner of Castle Harbour had a reasonable expectation of making an economic profit from the transaction apart from any tax benefits. Indeed, the evidence will also show that each partner actually made a pre-tax return on its investment in Castle Harbour that differed from the projected returns. Thus, not only did all four partners, including III-E and III-M, expect to earn a pre-tax profit of an uncertain amount – subsequent experience demonstrates that their expectations were reasonable. Moreover, because GECC obtained the use of CHLI's cash through intercompany borrowings, it had the opportunity to profit from the use of such funds.

In asserting that Castle Harbour did not have economic substance, the IRS relied heavily on the Second Circuit's decision in Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966). The transaction addressed in Goldstein is not even remotely comparable to the Castle Harbour transaction. In Goldstein, the taxpayer was a housewife who won the Irish Sweepstakes. To reduce the high taxes that would result from receiving the winnings in a single taxable year, she attempted to manufacture a debt on which she could prepay deductible interest. To that end, she borrowed money from a bank, using the loan proceeds to purchase Treasury securities that she immediately deposited with the bank as security for the loan. The bank retained all payments of principal and interest on the securities and applied them to amounts due under the loan. The interest rate payable on the loan (4.5%) exceeded the interest rate earned on the securities (less than 2%). This "negative spread," plus costs and fees, ensured that, taxes aside, Mrs. Goldstein would

lose money. Moreover, because she never received, or had useful access to, the loan proceeds or the securities, the transaction did not change her economic circumstances in any cognizable way, except to deplete her net worth in hopes of achieving a tax benefit. Under these circumstances, the Second Circuit concluded that the statute was not intended to permit interest deductions for transactions "without <u>any</u> expectation of profit <u>and</u> without <u>any</u> other purpose except to obtain an interest deduction." 364 F.2d at 742 (emphasis added).

In contrast, the investments by ING and Rabo provided Castle Harbour (and indirectly, GECC) with minority equity financing that added over $100 million in cash to the asset side of GECC's consolidated balance sheet.[25] These funds were used to further the interests of Castle Harbour, the partners of Castle Harbour and GECC.

In addition, III-E and III-M each had a bona fide expectation of an economic profit, the reasonableness of which is demonstrated by the fact that each of them actually realized a profit (without regard to tax benefits) of between five and six percent. Furthermore, as the evidence will demonstrate, ING and Rabo not only had the potential for realizing a profit over and above their preferred return, but each of them actually achieved a total return in excess of its preferred return. Each had a material risk of loss on its investment. The transfer of the aircraft to Castle Harbour and the admission of ING and Rabo as partners of Castle Harbour materially altered GECC's legal relationship to the commercial aircraft portfolio by eliminating its direct control. The transaction reduced GECC's interest in the future growth of the aircraft portfolio and decreased its

---

[25] Because GECC's wholly owned subsidiaries had voting control over Castle Harbour, financial accounting rules required Castle Harbour's results to be presented on a consolidated group basis together with GECC. <u>See</u> Consolidation, General Accounting Standards, sections C51.101-C51.401 (Fin. Accounting Standards Bd., 1998).

loss exposure. Thus, the transaction objectively affected each partner's economic positions, legal relations, and non-tax business interests for an indefinite period of time that ultimately exceeded five years.

Finally, the evidence will demonstrate that the economic substance and reported tax consequences of the Castle Harbour transaction are completely consistent with the purposes of the applicable partnership tax rules – to paraphrase Judge Hand's opinion in Gregory, the transaction is the thing that the statute and regulations intended. See Helvering v. Gregory, 69 F.2d at 810; see also Rosenfeld, 706 F.2d at 1281-82 (rejecting IRS argument that a gift-lease back transaction impermissibly shifted income from taxpayer to a trust, relying in part on the fact that the "Clifford trust" rules explicitly contemplated such income shifting).

        3.     The Partnership Had Substantial Non-Tax Business Purposes.

Because economically substantial transactions must be respected for tax purposes, even if they are tax motivated, the Castle Harbour transaction simply cannot be disregarded. In theory, therefore, it is not even necessary to engage in a separate inquiry into the subjective business purposes of the parties. Nevertheless, the evidence at trial will demonstrate that GECC, III-E and III-M had substantial business purposes for creating and continuing Castle Harbour and for admitting ING and Rabo as partners. The evidence will show that Castle Harbour resulted from exigent business purposes that led to an economically real business relationship that also achieved tax benefits.

Like the transaction at issue in UPS, Castle Harbour arose out of the conduct of a substantial, on-going business that constituted a core business activity of GECC.[26] Indeed, the facts that will be shown at trial are substantially more favorable to the taxpayer than those of UPS.

The transaction at issue in UPS was initiated and consummated for the sole purpose of reducing taxes; in contrast, Castle Harbour arose out of exigent business circumstances, was initiated to achieve three specific "sell-down" business objectives (accessing liquidity; tapping into a wider pool of investor capital; and achieving off-balance sheet financing for a portion of its current asset portfolio), and was structured to further GECC's non-tax business interests. In UPS, the transaction "simply altered the form of an existing, bona fide business"; Castle Harbour accomplished much more than merely altering the "form" of GECC's existing aircraft leasing business.

The evidence will demonstrate that Castle Harbour provided III-E, III-M and their parent, GECC, with economic benefits that were independent of any federal income tax consequences. (Indeed, GECC articulated each of these non-tax business purposes in the RFP it issued to seven investment banks well before the tax benefit of the ceiling rule was identified.) First, the transaction provided Castle Harbour and, ultimately, GECC with $117.5 million in equity financing.

Second, because the investment was structured as equity, it reduced GECC's debt/equity ratio, resulting in a material non-tax financial benefit. In particular, a key factor in GECC's debt rating was its maintenance of a ratio of debt to common equity that did not exceed 8:1. Because GECC's debt to common equity ratio at the end of 1993

---

[26] The IRS's explanation of its FPAA adjustments cited the Tax Court's decision in favor of the IRS in UPS, asserting that "Castle Harbour possesses similarities to the UPS case." Subsequent to the issuance of the FPAAs, the Eleventh Circuit reversed the Tax Court.

was 7.96:1, the classification of the investment as minority equity for financial accounting purposes provided GECC with material non-tax benefits. Not only did the issuance of equity avoid an increase in GECC's debt to common equity ratio, but the use of a portion of the proceeds to purchase GECC commercial paper actually reduced GECC's debt to common equity ratio. See, e.g., Keefe v. Cote, 213 F.2d 651 (1st Cir. 1954) (improvement to credit position is a legitimate business purpose).

Third, the infusion of funds enabled GECC to finance purchases of additional aircraft, thereby diversifying its portfolio and reducing the concentration in Stage II aircraft.

Fourth, the equity investments by ING and Rabo enabled GECC to demonstrate liquidity in its aircraft leasing portfolio and thereby address concerns of its rating agencies. GECC is a finance company and, like many finance companies, funded itself through the issuance of debt securities registered with the Securities and Exchange Commission (i.e., public debt). This debt consisted primarily of short-term commercial paper and medium-term notes. The indenture provisions related to the medium-term notes contained a negative pledge covenant that prohibited GECC and its domestic affiliates from issuing secured debt (with minor exceptions) whether or not the debt was issued subject to the indenture. Thus, in order for GECC to comply with the negative pledge, GECC could not issue debt secured by the aircraft. Non-compliance with the covenants of the indenture, including the negative pledge, would cause a default under the indenture. Because the interests acquired by ING and Rabo were not debt, their acquisition enabled GECC to achieve the partial monetization of the aircraft without violating the negative pledge.

Not only was Castle Harbour formed to achieve significant non-tax business purposes, but it was actively managed to achieve a pre-tax economic profit. For example, as discussed above, the tax benefits resulting from application of the ceiling rule were available only as long as Castle Harbour continued to own the contributed aircraft. Despite that fact, by December 31, 1996, Castle Harbour had sold or distributed 31 aircraft. Those dispositions would not have occurred if Castle Harbour had been operated to maximize the tax benefits resulting from use of the ceiling rule.

In summary, Castle Harbour arose in the context of an ongoing, bona fide business and originated in response to specific problems faced by that business. The evidence will prove that the stated business purposes were not "merely window dressing," as the IRS alleged in the FPAAs. Castle Harbour complies fully with the Second Circuit's standard, because it was clearly "motivated <u>at least in part</u> by reasons unrelated to taxes." <u>Newman</u> 902 F.2d at 163 (emphasis added). Therefore, the transaction had sufficient non-tax business purpose to satisfy any interpretation of the economic substance doctrine.

4.   <u>ING and Rabo Cannot Be Disregarded as Partners.</u>

The preceding section explains how the evidence will demonstrate that nothing about Castle Harbour was fictitious; it was replete with economic substance and actuated by material non-tax business purposes. In short, the Castle Harbour transaction cannot be disregarded under general sham and economic substance principles.

As a variant of its economic substance argument, in the FPAAs, the IRS concedes that Castle Harbour was a partnership and that III-E and III-M were partners, but asserts that ING and Rabo were not valid partners and that any income allocated to them should be reallocated to III-E and III-M. There is a subset of authority regarding economic

51

substance that applies directly to the question whether an arrangement constitutes a partnership for tax purposes and whether investors in such an arrangement are partners. While consistent with generally applicable sham and economic substance cases, this line of authority is informed by specific statutory provisions that, in many respects, make it even clearer that Castle Harbour was a partnership and that *all* of its members – including ING and Rabo – were partners.

Despite the IRS concession that Castle Harbour was a partnership, it is helpful to understand why it was a partnership in order to appreciate why ING and Rabo must be respected as partners.

Section 7701(a)(2) of the Code provides, in part:

> For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, join venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation . . . .[27]

This definition, which has been in the Internal Revenue Code in substantially similar form since 1932, applies literally and substantially to Castle Harbour. Castle Harbour was an unincorporated organization (a Nevada limited liability company) that carried on a real business or venture (aircraft leasing). It had assets with a gross fair market value of almost $1 billion and a net fair market value of over $600 million. Castle Harbour actually conducted its business directly with its customers and others through its own employees as well as its agents. It cannot be classified as a trust or estate or as a

---

[27] Section 761(a) contains a virtually identical definition of the term "partnership."

52

corporation.[28] Therefore, Castle Harbour falls squarely within the statutory definition of a partnership.

The fact that the partnership form produced tax benefits is irrelevant. As the Second Circuit made clear in Chisholm, supra, the test for recognition of an entity as a partnership is not whether the use of the partnership form provided tax advantages for the partners, but whether the partners actually created an "enduring firm which should continue to hold the joint principal and to invest and reinvest it." 79 F.2d at 15. Thus, in Chisholm, the Second Circuit predicated its decision on the fact that the Chisholm brothers engaged in continuing investment activity through the partnership. Because the partnership rules were intended to apply to ongoing, unincorporated investment or business ventures, the fact that the animating purpose for forming the partnership was avoidance of imminent taxable gain did not prevent recognition of the partnership.

The leading case on the issue of what constitutes a partnership for federal income tax purposes is Commissioner v. Culbertson, 337 U.S. 733 (1949). While Congress later acted to limit expansive interpretations of Culbertson, no discussion of the tax definition of a partnership would be complete without considering it. The federal income tax system of the 1940's and early 1950's was characterized by steeply progressive marginal rates, ranging from under 20 percent to over 90 percent; throughout much of this period, married couples could not mitigate the effect of these progressive rates by filing joint

---

[28] Under the regulations, an entity that is not required to be classified as a corporation is an "eligible entity." Treas. Reg. § 301.7701-3(a). An eligible entity in existence prior to January 1, 1997 will have the same classification as it claimed under the regulations in effect prior to that date. Treas. Reg. § 301.7701-3(b)(3)(i), (h). Castle Harbour was formed in 1993 and consistently filed all federal income tax returns as a partnership. As will be demonstrated, Castle Harbour had at least two members (equity owners) at all times throughout each year at issue in this case. Therefore, at all relevant times Castle Harbour was a partnership within the meaning of the Code and regulations.

53

returns. So-called "family partnerships" became the tax shelter of this era.[29] The idea was simple: transfer a profitable business to a partnership and give or sell interests in the partnership to relatives or close associates, thereby spreading the income among multiple lower-rate taxpayers and cutting the effective rate of tax on partnership income by as much as 70%. Although some of these partnerships served valid non-tax purposes (such as bringing a child into the business), many were purely tax motivated. Copious litigation ensued in which the IRS sought to deny the tax benefits of partnership status.

After years of litigation in the lower courts, the Supreme Court took up the issue in Commissioner v. Tower, 327 U.S. 280 (1946), which involved a partnership formed by a husband and wife. The Court focused on the intent of the parties:

> When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention is a question of fact . . . . We see no reason why this general rule should not apply in tax cases where the government challenges the existence of a partnership for tax purposes.

327 U.S. at 286-87. The Tower Court identified objective factors – such as whether all partners either invested capital that originated with them (as distinguished from obtaining capital by gift) or performed services – relevant to this inquiry into subjective intent. Tower's blending of the subjective intent inquiry with objective factors created more confusion than it resolved.

Three years after Tower, the Supreme Court addressed the issue again in Culbertson. Culbertson involved a family partnership between a father and four sons. The partnership owned and operated a ranch. Citing Tower, the Tax Court had held that

---

[29] One author estimated that as many 930,000 such partnerships existed. Note, Family Partnerships and the Revenue Act of 1951, 61 Yale L.J. 541 (1952).

54

the sons were not partners because they had not contributed capital that originated with them and had not performed vital services to the partnership during the years at issue. The Fifth Circuit reversed. The Supreme Court affirmed the Fifth Circuit and reiterated the primacy of the intent test:

> The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard . . . , but whether, considering all the facts . . . the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

337 U.S. at 742.

Although courts frequently cite <u>Culbertson</u> as establishing the standard for partnership status, litigation continued. In 1951, Congress finally responded by adding the following sentence to section 3797(a)(2) of the Internal Revenue Code of 1939, which contained the definition of "partnership" and "partner":

> A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

This sentence, in slightly modified form, now appears in section 704(e)(1) of the Code. By enacting this provision, Congress imposed a purely objective test for defining partners in partnerships: If capital is a material income-producing factor to the partnership, any person who owns a capital interest therein is a partner, regardless of intent.

The Seventh Circuit has explained the impact of current section 704(e)(1) as follows:

> The test is no longer whether the parties acted in good faith with a business purpose in joining together to conduct the partnership business. This was the test set forth in <u>Commissioner v. Culbertson</u> . . . , which was decided before present § 704(e)(1) was a part of the Code.

55

> The Committee report accompanying H.R. 4473 which became § 704(e)(1) states: "If the ownership is real, it does not matter what motivated the transfer [of the partnership interest] or whether the business benefited from the entrance of the new partner." The emphasis has shifted from "business purpose" to "ownership of a capital interest."

Pflugradt v. United States, 310 F.2d 412, 415 (7th Cir. 1962) (citation omitted). Other courts have reached the same conclusion regarding the impact of section 704(e)(1). See, e.g., Forman v. Commissioner, 199 F.2d 881 (9th Cir. 1952).

In this case, it is irrelevant whether Congress enacted section 704(e)(1) to overrule Culbertson, as implied by the Seventh Circuit, or merely to rein in radical interpretations of Culbertson's intent test. Consistent with Judge Hand's opinion in Chisholm and the Supreme Court's opinion in Culbertson, the fact that two taxpayers pool capital in an "enduring firm" is conclusive evidence that they intended to do so, regardless of whatever else motivated them. Conversely, if they do not jointly own capital or otherwise contribute something else (for example, services) to a joint enterprise, they likely fail the standard set forth in Chisholm as well as Culbertson's intent test.

In this case, the evidence will establish that Castle Harbour was formed to hold and manage business assets, that it endured for over five years with ING and Rabo as partners, that it conducted substantial business operations through its employees and agents, and that its members owned capital interests and intended to and did share the resulting benefits and burdens of ownership.

In support of its position that Castle Harbour was not a partnership, the IRS cited ASA Investerings P'ship v. Commissioner, 201 F.3d 505 (D.C. Cir. 2000). In that case, the District of Columbia Circuit held that a putative partnership would be disregarded as

56

a sham for federal income tax purposes because it did not have a non-tax business purpose. See id. at 512. The court rejected the taxpayer's argument that the partnership could not be disregarded as a sham because it had engaged in business activity, stating that the term "business activity" did not include "activity whose sole purpose is tax avoidance." Id. According to the court, "the absence of a nontax business purpose [was] fatal" to the recognition of the entity as a partnership. Id. The District of Columbia Circuit reached similar conclusions in two subsequent decisions involving tax-motivated transactions that were virtually identical to the transaction at issue in ASA. See Saba P'ship v. Commissioner, 273 F.3d 1135 (D.C. Cir. 2001), and Boca Investerings P'ship v. United States, 314 F.3d 625 (D.C. Cir. 2003).

The standard articulated by the D.C. Circuit arguably is inconsistent with Chisholm, Culbertson and section 704(e)(1). In any event, the facts that Plaintiff will establish at trial are readily distinguishable from the facts addressed in ASA, Saba and Boca. In each of the three cases considered by the D.C. Circuit, there was no evidence of any non-tax business purpose. See, e.g., Boca, 314 F.3d at 632 ("[T]he record would not support a finding that the partnership form served any non-tax business purpose."); Saba, 273 F.3d at 1141 ("Here, the Tax Court specifically found 'overwhelming evidence in the record that [the partnerships] were organized solely to generate tax benefits . . . .'"(citation omitted)). In contrast, the evidence at trial will show that Castle Harbour was structured to facilitate significant non-tax business purposes, including raising equity capital against a portion of GECC's portfolio of leased aircraft, and that the creation of a separate legal entity was essential for GECC to achieve its non-tax business purposes.

In summary, ING and Rabo satisfied the statutory requirement of section 704(e)(1). Castle Harbour derived its income exclusively from owning and managing capital. Its partners acquired and owned equity capital interests in Castle Harbour and they shared the benefits and burdens of those interests. In addition, the investments by ING and Rabo satisfied the common-law standards for partner status arising from Culbertson. Moreover, the evidence will establish that Castle Harbour enabled GECC, III-E and III-M to achieve non-tax business objectives that they could not have achieved without the creation of a separate entity. The evidence will therefore establish that the FPAAs' assertion that "no valid partnership existed" among all the members of Castle Harbour is erroneous.

     5.    Conclusion.

Castle Harbour had demonstrable, objective economic effects, independent of federal income tax consequences. Furthermore, it was initiated to address non-tax business objectives in connection with GECC's aircraft leasing business. It had economic substance and cannot be disregarded for federal income tax purposes.

    **B.**    **ING and Rabo Were Partners in Castle Harbour**

As an alternative to its economic substance argument, the IRS contends in the FPAA that the Class A investors, ING and Rabo, were lenders to rather than equity investors in Castle Harbour. Unlike the IRS's first argument, this alternative argument recognizes that the investments in Castle Harbour by ING and Rabo had substance and cannot be disregarded. Instead, this alternative argument asserts that the substance of their investment was an investment in debt and not an investment in equity.

The evidence presented at trial will demonstrate that the government's attempt to recharacterize ING's and Rabo's Class A interests as debt is based on fundamental mistakes of fact and law.

1.   Classification of Investments.

Most of the cases addressing whether an instrument constitutes debt or equity for federal income tax purposes involve instruments issued by corporations, rather than partnerships; however, the same standards apply to distinguish partnership equity from partnership debt. See, e.g., Stanchfield v. Commissioner, 24 T.C.M. (CCH) 1681, 1692 (1965); Hambuechen v. Commissioner, 43 T.C. 90, 101-102 (1964); Hartman v. Commissioner, 17 T.C.M. (CCH) 1020 (1958).

A review of the case law establishes that in determining whether an instrument is debt or equity for tax purposes, tax motivation is irrelevant: a taxpayer may decide whether to issue debt or equity based solely on tax considerations. As discussed above, in Kraft Foods, the Second Circuit upheld the taxpayer's characterization as indebtedness of debentures issued by a subsidiary to its parent corporation, even though the subsidiary distributed the debentures as a dividend solely to circumvent a change in the tax law.

The Second Circuit reiterated this position in Nassau Lens Co., Inc. v. Commissioner, 308 F.2d 39 (2d Cir. 1962). In Nassau, the IRS sought to recharacterize debt held by the sole stockholder of the issuing corporation as equity. The Tax Court sustained the IRS, holding that the debt would not be recognized unless the taxpayer could establish a non-tax business purpose for the allocation of the shareholder's investment between debt and equity. The Second Circuit reversed the Tax Court.

While acknowledging that the issuance of debt to the sole shareholder had limited non-tax consequences, the Second Circuit observed that "the courts have not attributed to

59