Congress a general purpose underlying the entire Code to deprive the taxpayer in each case of freedom to choose between legal forms similar in a broad economic sense but having disparate tax consequences." 308 F.2d at 44-45. Rather, the court held that the Code "affords significance to the type of investment chosen . . . so long as that investment has substantial economic reality in terms of the objective factors which normally surround the type chosen." Id. at 46. More recently, the Eleventh Circuit Court of Appeals articulated the same principle using somewhat different language. Noting that the Code "treats lots of economically similar behavior differently," the court observed that debt and equity financing have different tax consequences: "There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business, but it does not mean that the taxpayer lacks a 'business purpose.'" UPS, 254 F.3d at 1019.

In IRS Notice 94-47, 1994-1 C.B. 357, which was issued shortly after the issuance of the Class A interests in Castle Harbour to ING and Rabo, the IRS identified eight factors as relevant in determining whether an instrument is debt or equity for federal income tax purposes:

> The characterization of an instrument for federal income tax purposes depends on the terms of the instrument and all surrounding facts and circumstances. Among the factors that may be considered in making this determination are (a) whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future; (b) whether holders of the instruments possess the right to enforce the payment of principal and interest; (c) whether the rights of the holders of the instruments are subordinate to rights of general creditors; (d) whether the instruments give the holders the right to participate in the management of the issuer; (e) whether the issuer is thinly capitalized; (f) whether there is identity between holders of the instruments and stockholders of the issuer; (g) the label placed upon the instruments by the parties; and (h) whether the instruments are intended to be treated as debt or equity for non-tax

purposes, including regulatory, rating agency, or financial accounting purposes. No particular factor is conclusive in making the determination of whether an instrument constitutes debt or equity. The weight given to any factor depends upon all the facts and circumstances and the overall effect of an instrument's debt and equity features must be taken into account.

> 2.  The Interests Held by ING and Rabo Had All of the Characteristics of Equity and None of the Essential Features of Debt.

Applying the debt / equity characteristics identified by the IRS in Notice 94-47 to the evidence that will be presented at trial demonstrates that the Class A interests held by ING and Rabo possessed none of the essential features of debt.

> a.  The Class A interests lacked the essential characteristic of debt: an unconditional promise to a sum certain on demand or at a fixed maturity date.

While the courts have made it clear that the totality of the facts must be considered in determining whether to recast the legal form (as debt or equity) of an instrument, the essential feature of debt is an unconditional, legally enforceable right to be paid a fixed amount upon demand or a specified date. Although surrounding circumstances, rather than the terms of the instrument, may establish that a fixed maturity date exists, a mere expectation of repayment is not enough. As noted by the Second Circuit in an early decision:

> The shareholder is an adventurer in the corporate business; he takes the risk, and profits from success. The creditor, in compensation for not sharing the profits, is to be paid independently of the risk of success, and gets a right to dip into the capital when the payment date arrives.

Commissioner v. O.P.P. Holding Corp., 76 F.2d 11 (2d Cir. 1935) (emphasis added).

Two years later, the Second Circuit reiterated the importance of the unconditional right to payment. Noting that "there may be preferred shares going by the name of bonds, and bonds going by the name of preferred shares," the court identified the crucial factor:

61

"[W]e may say that at least those are not creditors, who cannot withdraw from the venture without the consent of the rest, demanding a fixed sum at some period set in advance." Jewel Tea Co. v. Commissioner, 90 F.2d 451, 453 (2d Cir. 1937); see also Commissioner v. Schmoll Fils Associated, Inc., 110 F.2d 611, 613 (2d Cir. 1940) ("The fact that payment of interest may only be required out of profits and that payment of principal may not be required, except in the remote and contingent event of a liquidation of the company, has been held to remove obligations from the class of debts." (citing Jewel Tea)); Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957) ("The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof."); Stahl v. United States, 441 F.2d 999, 1002 (D.C. Cir. 1970) (An "absolute liability to pay" is the "sine qua non of the debtor-creditor relationship.").[30]

As the evidence presented at trial will show, ING and Rabo were not entitled to be repaid principal or to receive interest at any time or on demand. Upon the liquidation of Castle Harbour, they would be entitled to receive only the balance, if any, in their capital accounts, which would be determined by reference to allocations of profits and losses to them over the life of the partnership (as well as their contributions to the partnership and prior distributions received from the partnership). Moreover, ING and Rabo, like III-E and III-M, were unconditionally obligated to repay to Castle Harbour any deficit balance in their capital accounts on liquidation of Castle Harbour or on liquidation of their interests in Castle Harbour. The evidence will further show that there was a material risk

---

[30] While a fixed and unconditional right to repayment is traditionally viewed as the *sine qua non* of debt, the converse is not true: an instrument may be treated as equity for tax purposes even though it has a due date on which a fixed amount must be paid. See, e.g., I.R.C. § 351(g)(2); Treas. Reg. § 1.305-5(d), Example (7); Rev. Rul. 94-28, 1994-1 C.B. 86.

62

of a deficit capital account existing and that ING and Rabo each recognized that it might have a deficit capital account at the time of its withdrawal from Castle Harbour and thus might be required to return a portion of its prior distribution. Therefore, while ING and Rabo expected to receive regular distributions as specified in Exhibit E of the Operating Agreement, they had absolutely no right to receive a "sum certain."

As explained above, ING and Rabo had a contingent right to receive Class A Guaranteed Payments on liquidation of Castle Harbour out of capital remaining after payment of all of Castle Harbour's substantial debt. This guaranteed payment was intended to provide ING and Rabo with a return <u>on</u> – but not a return <u>of</u> – their investments equal to a minimum yield if they had not achieved that minimum yield from prior allocations of income and gain. The courts have respected similar arrangements as equity interests in a partnership. See <u>S&M Plumbing Co. v. Commissioner</u>, 55 T.C. 702 (1971) (investment providing a minimum guaranteed profit respected as an equity interest in a joint venture); <u>Hunt v. Commissioner</u>, 59 T.C.M. (CCH) 635 (1990) (respecting partnership interest as equity even though the holder's right to 18% return and to the repayment of 98% of investment were guaranteed by other partners). The Class A Guaranteed Payment was more comparable to participating preferred stock that accrues a minimum dividend that will be paid out of corporate capital on liquidation.

Finally, on liquidation, after payment of all creditors and the Class A Guaranteed Payment, if any, ING and Rabo were entitled to share with III-E and III-M, pari passu, in Castle Harbour's remaining capital in satisfaction of their remaining positive capital accounts. And, like III-E and III-M, ING and Rabo were obligated to restore to Castle Harbour any deficit balances in their capital accounts.

In short, ING and Rabo had no right to be repaid "principal," even on liquidation; in fact, their rights on liquidation were less than those typically provided to holders of garden-variety preferred stock.[31]

Moreover, the Class A interests did not have a due date. Courts have held that an instrument that "matures" only upon liquidation of the issuer does not possess a fixed maturity date for purposes of classification as debt. See, e.g., Beaver Pipe Tools, Inc. v. Carey, 139 F. Supp. 470 (N.D. Ohio 1955), aff'd per curiam, 240 F.2d 843 (6th Cir. 1957) (liquidation not a fixed maturity date because time of liquidation uncertain); Mullin Bldg. Corp. v. Commissioner, 9 T.C. 350, 353-54 (1947), aff'd, 167 F.2d 1001 (3rd Cir. 1948) ("debenture preferred stock" that was redeemable only upon liquidation of the issuer did not have a fixed maturity date).

      b.      ING and Rabo did not possess the right to enforce the payment of principal and interest.

An instrument that is debt in form conveys substantive creditor's rights that holders of equity do not possess. In the absence of substantive creditor's rights, a key indicium of debt does not exist. Miele v. Commissioner, 56 T.C. 556, 565 (1971), aff'd without opinion, 474 F.2d 1338 (3d Cir. 1973) (instrument held to be stock where holders could not file claims as creditors if the corporation went into receivership); Kingsmill Corp. v. Commissioner, 28 T.C. 330, 337 (1957) (instrument was stock where remedies on default were those of a stockholder and not a creditor; right to take over operations through the election of directors is a common remedy of preferred stockholders).

---

[31] For example, holders of preferred stock generally are entitled to receive the full amount of their liquidation preference before any distribution can be made to holders of common stock. In contrast, ING and Rabo would have received their capital accounts pari passu with III-E and III-M.

Because the Class A interests were equity interests in Castle Harbour, ING and Rabo did not have creditor's rights to enforce payment. While they could require Castle Harbour to liquidate, the right to compel liquidation is an owner's right, not a creditor's right. A creditor may have the right to reduce a claim to judgment or to institute foreclosure or bankruptcy proceedings (which may eventually result in liquidation), but a creditor does not have the right to require a debtor to liquidate.

        c.      ING's and Rabo's interests were subordinate to those of general creditors of Castle Harbour.

The courts have consistently recognized that subordination to general creditors strongly supports characterization of an instrument as equity. See John Wanamaker Philadelphia v. Commissioner, 139 F.2d 644, 647 (3d Cir. 1943) ("It is beyond doubt that the most significant characteristic of a creditor-debtor relationship - the right to share with general creditors in the assets in the event of dissolution or liquidation – is absent. . . . The reasonable conclusion to be drawn from the fact that the holder of preferred stock is subordinated to creditors is that he is a stockholder rather than a creditor."); Commissioner v. Meridian & Thirteenth Realty Co., 132 F.2d 182 (7th Cir. 1942); Helvering v. Richmond, F. & P.R. Co., 90 F.2d 971, 974 (4th Cir. 1937) ("[O]ne of the most important considerations is whether the right to share in the assets . . . in case of dissolution is subject to the right of creditors.")

Upon liquidation of Castle Harbour, all creditors' claims, whether arising out of contract or tort, would be paid prior to any distribution to ING and Rabo as Class A interest holders. While conceding that the Class A interests held by Rabo and ING were "subordinated to all other claims including guaranteed payments required to be made to the GECC partners," in its explanation of the FPAAs the IRS summarily concluded that

65

"[t]his factor appears neutral." The IRS position ignores the case law and contradicts the IRS's published position in Notice 94-47, as well as the position the IRS has taken in auditing other taxpayers. See Tech. Adv. Mem. 84-14-001 (Dec. 1983) (subordination to general creditors "has long been a hallmark of equity status"). That the IRS is apparently willing to refute its own longstanding position for purposes of this case underscores the strength of Plaintiff's evidence.

> d.   ING and Rabo were entitled to participate in the management of Castle Harbour and in fact participated actively in significant management decisions.

If ownership of an instrument provides the holder with the right to participate in management, that fact is evidence of equity. Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984). On the other hand, there is no requirement that equity interests convey voting or management rights. For example, limited partners traditionally were not accorded voting or control rights because such rights would strip them of their limited liability under earlier versions of the Uniform Limited Partnership Act. Unif. Ltd. P'ship Act § 7 (superseded 1976). Similarly, preferred stock holders often cannot vote.

Because of FAA restrictions, ING and Rabo did not have formal voting rights in Castle Harbour. Nevertheless, ING and Rabo negotiated for and received the right to participate in management deliberations, and the agreement imposed broad constraints on Castle Harbour's activities that gave ING and Rabo the practical right to approve a wide variety of strategic and operational decisions. Thus, their consent was required in order for Castle Harbour to engage in a wide variety of transactions. For example, Castle Harbour could not extend any aircraft lease without obtaining the consent of ING and Rabo, as Class A investors. The evidence presented at trial will show that, when asked

for their consent, ING and Rabo typically conducted an inquiry into the implications of any extension because of the potential impact such an extension would have on their investments. The evidence will also show that representatives of ING and Rabo regularly and actively participated in the manager meetings of Castle Harbour as well as the member meetings.

    e. <u>The Class A interests were consistently identified and "labeled" as equity</u>.

The form of an instrument conveys substantive rights and limitations and is evidence of whether the issuer and investor intended to create a debtor-creditor relationship. <u>See, e.g.</u>, <u>Ragland Inv. Co. v. Commissioner</u>, 52 T.C. 867, 876 (1969), <u>aff'd</u>, 435 F.2d 118 (6th Cir. 1970) ("[L]acking sorcery powers to divine the parties' subjective intent, courts must always rely on the overt manifestations thereof . . . ."). For these reasons, the courts traditionally have given great weight to the labeling of an instrument as equity. When it has sought to recharacterize an instrument that was unambiguously labeled as stock as debt for tax purposes, the IRS has been almost invariably unsuccessful. <u>See, e.g.</u>, <u>Zilkha & Sons Inc. v. Commissioner</u>, 52 T.C. 607 (1969), <u>acq.</u>, 1970-2 C.B. xxi; <u>Miele v. Commissioner</u>, 56 T.C. 556 (1971), <u>aff'd without published opinion</u>, 474 F.2d 1338 (3d Cir. 1973); <u>Full Serv. Beverage Co. v. Commissioner</u>, 69 T.C.M. (CCH) 2221 (1995). But see <u>Bolinger-Franklin Lumber Co. v. Commissioner</u>, 7 B.T.A. 402 (1927). Although courts have sometimes characterized some "preferred" instruments as debt, those instances have involved instruments whose labeling as equity was ambiguous. <u>See, e.g.</u>, <u>Commissioner v. J.N. Bray Co.</u>, 126 F.2d 612 (5th Cir. 1942) ("debenture preference stock" paying fixed "interest"); <u>Commissioner v. Proctor Shop, Inc.</u>, 82 F.2d 792 (9th Cir. 1936) (same); <u>Third Scottish</u>

American Trust Co., Ltd. v. United States, 37 F. Supp. 279 (Ct. Cl. 1941) ("debenture stock" paying "interest").

The evidence will show that all of the documents governing the investments by ING and Rabo consistently identify the Class A interests as equity and ING and Rabo as members of Castle Harbour. Moreover, the form of the investment as equity had substantive significance: (1) it ensured that GECC could treat the Class A interests as minority equity for financial accounting and rating agency purposes, (2) it ensured that issuance of the interests to ING and Rabo would comply with GECC's negative pledge covenant, and (3) it prevented ING and Rabo from obtaining creditor's rights. The evidence at trial will establish that Castle Harbour was unanimously presented to ING and Rabo as an equity investment and that ING and Rabo recognized that they were making equity investments. Thus, the form of the Class A interests as equity was consistent with the intent and understanding of the parties.

> f. ING's and Rabo's interests were treated as equity for regulatory, rating agency and financial accounting purposes.

The treatment of an instrument for non-tax purposes – such as financial accounting, regulatory, and rating agency purposes – is relevant to its classification for tax purposes. See Notice 94-47, supra; see also Lee Telephone Co. v. Commissioner, 260 F.2d 114 (4th Cir. 1958) (cumulative sinking fund preferred stock issued for purpose of reducing ratio of debt to equity treated as stock); Milwaukee & Suburban Transport Corp. v. Commissioner, 283 F.2d 279 (7th Cir. 1960) ("preferred stock" with definite maturity date respected as equity); Miele, 56 T.C. at 566 (fact that taxpayer represented certificates to United States Maritime Commission as "preferred stock" was "indicative of an intention to create equity and not debt"); Ragland, 52 T.C. at 876 (characterization

68

of instrument as "preferred stock" in annual reports to stockholders and in filings with Securities and Exchange Commission was "highly significant evidence" supporting equity classification).

The interests in Castle Harbour held by ING and Rabo were consistently treated as equity on the financial statements of Castle Harbour. Furthermore, these interests were consistently treated as equity for purposes of Castle Harbour's dealings with the Federal Aviation Administration over the management rights it could provide to ING and Rabo, which would have been irrelevant if the interests were debt. Similarly, the audited consolidated financial statements of GECC and GE, which included Castle Harbour, consistently reflected the interests held by ING and Rabo as minority equity in a subsidiary. Indeed, one of GECC's principal business objectives for the Castle Harbour transaction was to obtain new capital that would qualify as minority equity for financial accounting purposes and rating agency purposes.

g. Summary.

In this case, six of the eight factors listed by the IRS in Notice 94-47 clearly support equity classification for the interests held by ING and Rabo in Castle Harbour. The remaining two factors – whether the issuer is thinly capitalized and whether the instrument is held by stockholders in proportion to their interests – are relevant to the characterization of instruments denominated as debt, but not to instruments that, like the

Class A interests, are denominated as equity.[32] Regardless of the relative weight applied to these factors, they overwhelmingly support equity treatment.

        3.      ING's and Rabo's Interests Possessed the Economic Attributes of Equity From a Corporate Finance Perspective.

At trial, plaintiff will introduce the expert testimony of Dr. Stewart Myers, a professor of corporate finance at the Massachusetts Institute of Technology. Dr. Myers' testimony will establish that, from an economic and corporate finance perspective, ING's and Rabo's Class A interests constitute equity. As an economic matter, equity represents a residual claim in the assets of the entity after the satisfaction of its creditors. The fact that the Class A interests were less risky than the Class B interests is consistent with classifying the Class A interests as equity, just as preferred stock constitutes equity even though less risky than common stock in the same issuer. In this case, the Class A interests represented a residual claim on the assets of Castle Harbour after the satisfaction of the substantial claims of creditors (principally, the holders of the non-recourse debt secured by the aircraft).

Dr. Myers will also testify that a distinguishing feature of equity from a corporate finance perspective is that an equity security usually has "upside" potential if the underlying business is more profitable than anticipated. The Class A interests were entitled to 98% of all operating income. They also were entitled to 90% of all gains from

---

[32] Inadequate capitalization (factor (e) in Notice 94-47) may be evidence that the holders of an instrument that is nominally debt may not have the right to be repaid without regard to the success of the venture and thus may support reclassification of the instrument as equity. The converse is not true - adequate capitalization does not change the legal rights of the holder of an equity investment to those of a creditor. See Estate of Mixon v. U.S., 464 F.2d 394, 408 (5th Cir. 1972) (referring to the "insignificance of this factor" absent facts showing that the issuer was thinly capitalized). Similarly, if shareholders hold debt in the same proportion in which they hold stock (factor (f) in Notice 94-47), labeling a portion of their investment as debt has no substantive impact on their relative priorities, which may indicate that the form should not be respected. Again, the converse is not true - the fact that the owners of the one class of equity do not own the other class of equity does not support reclassification of either class as debt.

the disposition of the aircraft, up to a limit of $2.9 million, and 1% of all disposition gains thereafter. Dr. Myers' testimony will establish that the returns to which ING and Rabo were entitled would vary depending on the success of Castle Harbour in a manner that is consistent with ownership of an equity interest and inconsistent with ownership of debt.

        4.      <u>The Class A Investors Are Properly Characterized As Partners</u>.

The conclusion that ING and Rabo were partners of Castle Harbour for federal income tax purposes follows from the conclusion that the Class A interests were equity. The Code defines the term "partner" as "a member of a partnership." I.R.C. §§ 761(b), 7701(a)(2). As discussed above, section 704(e)(1) mandates that the owner of a capital interest in a partnership in which capital is a material income-producing factor is a partner for federal income tax purposes. Accordingly, ING and Rabo were partners in Castle Harbour for federal income tax purposes.

    C.    **The Income From The Partnership Was Properly Allocated**

        1.      <u>The Government's Own Adjustment Respects the Allocation of Castle Harbour's Book Income Under Section 704(b)</u>.

The FPAA asserts, as its third alternative theory, that the allocations of income contained in the Operating Agreement did not have "substantial economic effect" under section 704(b) of the Internal Revenue Code and, therefore, that most of Castle Harbour's taxable income should be reallocated from ING and Rabo to III-E and III-M. The conclusive response to this argument is that the FPAA accepts, and indeed bases its adjustment on, Castle Harbour's allocation of its income, as computed for section 704(b) purposes.

71

While the rules governing the allocation of partnership income can be complex, the inconsistency in the IRS's argument requires an understanding of only a few basic legal principles and a brief review of the explanation that the IRS gave of its methodology for computing its section 704(b) adjustments. The first principle is that section 704(b), as interpreted by applicable regulations, governs the allocation of a partnership's economic or "book" income, <u>not its taxable income.</u> See Treas. Reg. §§ 1.704-1(b)(2)(iv)(*b*),(*d*) and (*g*). An item of "book" income or deduction may or may not have a taxable "twin." (For example, a partnership may have tax-exempt income that is included in its book income, but is excluded from its taxable income.) To the extent that an economic item has a corollary tax item, the tax item must be allocated in a manner prescribed by the regulations.

As relevant to this case, section 704(b) <u>mandates</u> that a partnership compute its book gain, loss and depreciation with respect to contributed property by reference to the property's fair market value on the date of contribution. For purposes of computing its taxable gain, loss or depreciation with respect to contributed property, however, the partnership's tax cost (or "basis") "carries over" from the contributing partner. Thus, whenever a partnership's book value in contributed property differs from its tax basis in the property, its book or economic income will almost invariably differ from its taxable income.

The second basic principle is that if a contribution of property to a partnership results in a difference between the partnership's book income and its taxable income, the difference is <u>not</u> allocated under section 704(b). Instead, section 704(c) governs the allocation of the <u>taxable</u> gain, loss and depreciation with respect to the contributed

72

property. The regulations under section 704(c) provide very specific rules for correlating the allocation of taxable gain, loss and depreciation with respect to the contributed property with the allocation of book gain, loss and depreciation with respect to that property. The specific section 704(c) rule that applied to Castle Harbour is Treas. Reg. § 1.704-1(c)(2) (1956) (last sentence); see S. Rep. No. 98-169, vol. 1, at 215 (1984).[33]

In this case, it is not disputed that, in July 1993, TIFD III-M contributed aircraft with a value of $531 million and a tax basis of zero. Further, it is not disputed that, for section 704(b) purposes, Castle Harbour was <u>required</u> to enter the aircraft on its books at $531 million and to compute its operating income by depreciating that $531 million book value, even though there was no tax depreciation to match such book depreciation. Therefore, Castle Harbour's <u>taxable</u> operating income exceeded its <u>book</u> or economic operating income under section 704(b) each year by the full amount of its book deprecation deduction with respect to the contributed aircraft. Section 704(b) governs the allocation of Castle Harbour's book income; section 704(c) governs the allocation of the additional taxable income.

There are two issues relating to the allocation of Castle Harbour's book and taxable income that the IRS has erroneously combined. The first is whether, under section 704(b), Castle Harbour properly allocated 98% of its economic or book operating income to ING and Rabo. The second is whether, under section 704(c), Castle Harbour properly allocated its taxable income in excess of its book income. According to the FPAAs, Castle Harbour's allocations fail the substantial economic effect test of section

---

[33] As noted above and as described further below, this rule was superseded by Treas. Reg. § 1.704-3, which repealed the mandatory application of the ceiling rule and which governs the application of section 704(c) to book/tax disparities with respect to property contributed after December 21, 1993. Treas. Reg. § 1.704-3(f).

704(b); the FPAAs make no mention of the second issue, which is governed by section 704(c).

While the FPAAs state that Castle Harbour's allocations of income lacked substantial economic effect under section 704(b), the IRS's explanation of the FPAAs makes clear that it agrees that Castle Harbour's allocations of 98% of its <u>book</u> operating income must be respected under section 704(b). Although the FPAAs do not mention section 704(c), the reallocation of taxable income included in the FPAAs relates <u>only</u> to Castle Harbour's <u>taxable</u> income in excess of its book income, which is the province of section 704(c).

Specifically, in its audit of Castle Harbour, the IRS explained its FPAA methodology as follows:

> [T]he method used to allocate taxable income among the partners is the comparative liquidation method. <u>The comparative liquidation method is used to distribute taxable income to each of the partners in a manner which respects the book capital accounts of each partner, and which reflects the actual value of partnership assets each partner would be entitled to receive on liquidation of the partnership as of the end of each taxable year considered in this examination. Under this method, each year taxable income was allocated to ING and Rabo in amounts equal to the book income which they had the right to receive under the terms of the partnership agreement.</u> The remaining taxable income was divided between TIFD-III-E and TIFD-III-M based upon the relative value of their book capital accounts.

IRS Explanation of Items (Form 826-A) at Bates page 0102266 (marked as Plaintiff's Exhibit 376) (emphasis added).

Plaintiff agrees with the IRS that ING and Rabo actually had the right to receive "amounts equal to the book income" that was allocated to them "under the terms of the partnership agreement." Plaintiff and the IRS also agree that the "book capital accounts of each partner [as adjusted by such book income allocations] ... reflect[ed] the actual

74

value of partnership assets each partner would be entitled to receive on liquidation of the partnership as of the end of each taxable year considered in this examination." Thus, while the FPAAs assert that Castle Harbour's allocations of income lacked substantial economic effect under section 704(b), it is clear that the IRS allocated <u>book</u> operating income in the same way that Castle Harbour did, <u>i.e.</u>, 98% to ING and Rabo and 2% to III-E and III-M.

As the IRS further explained its FPAA adjustment, "[t]he remaining taxable income was divided between TIFD-III-E and TIFD-III-M based upon the relative value of their book capital accounts." The "remaining taxable income" is the sum of the 2% share of the TIFD III-E and TIFD III-M in Castle Harbour's book operating income under section 704(b), and the excess of Castle Harbour's total taxable income over its book income. Thus, the FPAAs –

    (1)    respect Castle Harbour's allocation of its book operating income, <u>as computed for section 704(b) purposes</u>,

    (2)    allocate <u>taxable</u> operating income to all of the partners in amounts equal to their respective shares of such section <u>704(b) book</u> income, and then

    (3)    allocate 100% of Castle Harbour's taxable operating income in excess of its book operating income solely to III-E and III-M.

The fact that the FPAAs expressly respect Castle Harbour's allocations of section 704(b) book operating income conclusively rebuts any argument that those book allocations lacked "substantial economic effect" under section 704(b). As described below, the allocation of 100% of Castle Harbour's taxable income in excess of its book operating income solely to III-E and III-M, is absolutely improper.

75