2. <u>Once the Allocation of Book Income With Respect to Contributed Property is Fixed Under Section 704(b), the Allocation of Taxable Income in Excess of Book Income Under Section 704(c) is Mandatory.</u>

The IRS has conceded that 98% of Castle Harbour's book operating income was properly allocated to ING and Rabo. Castle Harbour's taxable operating income exceeded its section 704(b) book income each year by an amount equal to its book depreciation deductions with respect to contributed aircraft, which had an initial book value of $531 million, but no depreciable tax basis. Section 704(c) provides specific rules for dealing with this shortfall in tax depreciation.

When Congress enacted the Internal Revenue Code of 1954 (the "1954 Code"), it recognized that differences between the book value and the tax basis of property contributed to a partnership could result in differences between its book income or loss and its taxable income or loss. Congress addressed the obvious question of how to allocate these book/ tax differences among the partners by enacting sections 704(c)(1) and (2) of the 1954 Code.

Section 704(c)(1) established the general rule, which <u>required</u> partnerships to allocate the tax consequences of built-in gain or built-in loss on contributed property in the same ratio in which they allocate their book or economic income. In other words, section 704(c)(1) required the partnership to compute its taxable income as a separate entity and to allocate that taxable income in the same manner as its book income. Thus, if one partner contributed property with a built-in gain to a partnership, the general rule shifted a proportionate amount of the partnership's taxable income to the non-contributing partners, even if the taxable income resulted from the built-in gain existing

on the date of the contribution. The Senate Committee Report explained the decision to make section 704(c)(1) the general rule as a trade-off between fairness and complexity:

> This treatment was adopted as the general rule in the interest of simplification. While the rule may result in possible detriment (or gain) to noncontributing partners, it should be noted that there will, in general, be a corresponding loss (or gain) to such partners upon sale or disposition of their interest in the partnership.

S. Rep. No. 83-1622 (1954), reprinted in 1954 U.S.C.C.A.N. at 5022-23.

While adopting the simple approach of section 704(c)(1) as the general rule, Congress added an elective provision, section 704(c)(2) of the 1954 Code, permitting partners to allocate built-in gain or loss to reflect book-tax differences in contributed property. While the 1954 Code permitted partners to allocate the tax burden of a built-in gain (or the tax benefit of a built-in loss) to the contributing partner, the Senate Finance Committee Report imposed a limitation on section 704(c)(2) allocations, which became known as the "ceiling rule":

> In any case, however, the total . . . depreciation allocated to the partners may not differ from the amount of . . . depreciation or depletion allowable to [the partnership].

Id. at 5023. The Senate Committee Report for the 1954 Code includes an example of the operation of the ceiling rule in which A and B form an equal partnership. A contributes property worth $1,000 with a basis of $400, while B contributes $1,000 cash. The property contributed by A was eligible for depreciation at an annual rate of 10%. The Committee Report states:

> Since B, who contributed $1,000 in cash, has, in effect, purchased an undivided half interest in the property for $500, and since the property depreciates at an annual rate of 10 percent, B should be entitled to a deduction of $50 per year. But since the partnership is allowed only $40 per year (10 percent of $400), no more than this amount may be allocated

77

>to B. Therefore the partners agree that the $40 deduction for depreciation is to be allocated $40 to B and $0 to A, the contributor.

Id. at 5023.

The clear and well-understood effect of the ceiling rule is to overstate the taxable income of B, the noncontributing partner, compared to B's book income, and to understate the taxable income of A, the contributing partner, compared to A's book income. To illustrate, assume in the example that the partnership earns $100 of gross income each year. Economically, this income is offset by $100 of book depreciation ($1,000 contributed value depreciated at ten percent a year), so that the partnership has no book income. B (the noncontributing partner) nevertheless has $10 of taxable income per year ($50 share of book gross income, less $0 tax depreciation). Over ten years, B's taxable income exceeds its book or economic income by $100 ($10 times ten). A (the contributing partner) enjoys an equal offsetting benefit. Each year A has $50 of taxable income ($50 book gross income less $0 tax depreciation). Thus, over ten years A has $500 of taxable income and no net book or economic income. Moreover, at the end of ten years, the contributed property is fully depreciated for book purposes and has no remaining unrecovered book cost. At the outset, the contributed property had a built-in tax gain of $600, but because of the ceiling rule A is taxed on only $500 of this income. The ceiling rule "shifts" the incidence of tax on $100 of taxable income to B.

Consistent with the legislative history, the regulations under section 704(c) of the 1954 Code include the ceiling rule as a requirement for <u>all</u> section 704(c)(2) allocations and contain an example similar to that contained in the Senate Committee Report. Example (1) of Treas. Reg. § 1.704-1(c)(2)(i) (1956) illustrates the mandatory shift

78

created by the ceiling rule. The example from the 1956 regulations survives, in modified form, as Example (1)(ii) of section 1.704-3(b)(2) of the existing regulations.

In 1984, Congress amended section 704(c) of the 1954 Code by repealing section 704(c)(1) and making the previously elective regime of section 704(c)(2) mandatory. For the years at issue in this case, the governing provision is section 704(c)(1) of the Internal Revenue Code of 1986, the relevant portion of which reads as follows:

Under regulations prescribed by the Secretary –

(A) income, gain, loss, and deduction with respect to property contributed to the partnership by a partner shall be shared among the partners so as to take account of the variation between the basis of the property to the partnership and its fair market value at the time of contribution . . . .

In the 1984 amendments, Congress retained the ceiling rule. However, the Senate Finance Committee suggested that "it may be appropriate" for the Treasury Department to revise the section 704(c) regulations to eliminate or modify the ceiling rule. S. Rep. No. 98-169, vol. 1, at 215 n.2 (1984). The Committee made clear, however, that any such amendments to the regulations should be prospective: "The committee expects that regulations . . . will provide that, with respect to contributions made before the regulations are issued, the partnership has complied with the requirements of [section 704(c)] if allocations with respect to contributed property have been made in accordance with the existing regulations under section 704(c)(2). . . .") Id. at 215.

On December 24, 1992, the IRS issued proposed regulations under section 704(c), but did not propose to completely repeal the ceiling rule. Instead, they retained the ceiling rule, but permitted taxpayers to avoid the ceiling rule and permitted the IRS to prevent the application of the ceiling rule in certain cases. The notice of proposed

79

rulemaking, reflecting the relevant legislative history, provided that the regulations would apply only to contributions of property occurring after the date of publication of final regulations.

On December 21, 1993, almost six months after the formation of Castle Harbour and more than two months after the investments by ING and Rabo, the government promulgated final regulations. Consistent with the legislative history of the 1984 amendments and the 1992 proposed regulations, the December 1993 regulations apply only to property contributed to a partnership on or after December 21, 1993. Because the aircraft were contributed to Castle Harbour on July 26, 1993, and were marked to market on October 6, 1993 (when ING and Rabo were admitted as partners), the December 1993 regulations do <u>not</u> apply to the allocation of income at issue in this case. Therefore, the ceiling rule as set forth in the original regulations applies to the allocations of taxable income or loss in respect of the aircraft contributed to Castle Harbour.

The inconsistency between the IRS position and the applicable regulations becomes even more apparent when one examines the changes made by the December 1993 regulations. Those regulations permit partnerships to avoid the ceiling rule by using the "traditional method" and making "curative allocations" of taxable items that are independent of the allocation of book items. <u>See</u> Treas. Reg. § 1.704-3(c). The curative allocation method is identical to the method used by the IRS in the FPAAs; however, the December 1993 regulations – as intended by Congress – do <u>not</u> apply to property

contributed before December 21, 1993 and therefore do not apply to Castle Harbour.[34]
See Treas. Reg. § 1.704-3(f). The 1956 regulations make it clear that curative allocations were <u>not</u> permitted prior to the December 1993 regulations.[35]

Finally, it remains to be explained how section 704(c) in general and the ceiling rule in particular integrate with the allocation of partnership book income under section 704(b). The regulations applicable to the contributed aircraft provided for the coordination of section 704(b) and section 704(c), as follows:

> Section 704(c) . . . generally require[s] that if property is contributed by a partner to a partnership, the partners' distributive shares of income, gain, loss, and deduction, as computed for tax purposes, with respect to such property are determined so as to take account of the variation between the adjusted tax basis and fair market value of the property. Although section 704(b) does not directly determine the partners' distributive shares of tax items governed by section 704(c), <u>the partners' distributive shares of tax items may be determined under section 704(c) . . . with reference to the partners' distributive shares of the corresponding book items, as determined under section 704(b) and this paragraph.</u>

Treas. Reg. § 1.704-1(b)(1)(vi) (emphasis added). As illustrated by Treas. Reg. §§ 1.704-1(b)(5) Example (14) (iii), and Example (18) (iv), the application of the ceiling rule does not affect the allocation of section 704(b) book income. Instead, the ceiling rule acts as a limit on the amount of tax loss that can be allocated to match a noncontributing partner's book loss. That limit or ceiling is the amount of taxable loss that correlates to the book loss at issue. Both examples state that the fact that the noncontributing partner "bears an economic loss ... without a corresponding taxable loss is attributable entirely to the 'ceiling rule.'" Id. These examples are completely

---

[34] The December 1993 regulations make clear that the ability to make curative allocations to avoid the ceiling rule is a creature of the regulations: "in the absence of specific published guidance, it is not reasonable to use an allocation method . . . under which the partnership creates tax allocations of income, gain, loss, or deduction independent of allocations affecting book capital accounts." Treas. Reg. § 1.704-3(a)(1).

[35] Treas. Reg. § 1.704-1(c)(2)(i) Example (1) (1956) ("[T]he partnership cannot . . . thereby treat [the contributing partner] as if [it] had received . . . additional . . . income.").

consistent with Example (1) of Treas. Reg. § 1.704-1(c)(2)(i) (1956). The IRS's regulations thus make clear that the tax benefit sought by Plaintiff in connection with the formation of Castle Harbour was expressly intended by the IRS and the Congress to apply to any contributions of property that are not subject to the December 1993 regulations.

    3.    <u>Conclusion.</u>

The FPAAs do not adjust ING's and Rabo's 98% aggregate share of section 704(b) book operating income. As a result, ING and Rabo were allocated 98% of Castle Harbour's rental income, operating expenses, and book depreciation. The regulations explicitly required that their distributive shares of tax items under section 704(c) be determined with reference to their distributive shares of the corresponding book items as determined under section 704(b). Treas. Reg. § 1.704-1(b)(1)(vi). Because of the ceiling rule, there was no tax depreciation to match ING's and Rabo's aggregate 98% share of book depreciation. Hence, their taxable operating income clearly exceeded their book operating income by 98% of Castle Harbour's book depreciation on the contributed aircraft. Not only does this result follow from the plain meaning of the applicable regulations, as described above, but the legislative history of the 1954 Code demonstrates that Congress specifically intended for the partnership tax rules to work in the very way in which they were applied by Castle Harbour.

## V.    PENALTIES

The FPAA issued by the IRS for the 1997 and 1998 tax years asserts that accuracy-related penalties apply to the underpayment of tax that results from the FPAA

adjustments. See I.R.C. §§ 6662(a), (b)(1) and (b)(2).[36] The accuracy-related penalty, where it applies, is equal to 20 percent of the underpayment of tax that results from the FPAA adjustments, and can be based on a "substantial understatement" of tax or a negligent return reporting position. Id. For the reasons described above, the FPAA adjustments have no basis in law or fact. Accordingly, no underpayment of tax arises from those adjustments and the accuracy-related penalty for 1997 and 1998 does not apply.

Even in the unlikely event that the Court were to sustain some aspect of the FPAA adjustments, the accuracy-related penalty based on negligence would not apply. For the reasons set forth above, Castle Harbour (i) had a clear basis under the tax law for its positions, (ii) made every attempt to comply with the provisions of the internal revenue laws, and (iii) exercised ordinary and reasonable care in the preparation of its 1997 and 1998 partnership tax returns. Moreover, the accuracy-related penalty based on a substantial understatement of income tax would not apply because, as demonstrated above, Castle Harbour had substantial authority for the positions taken on its 1997 and 1998 tax returns. See I.R.C. § 6662(d)(2)(B)(i); Treas. Reg. § 1.6662-4(d). Specifically, at the time Castle Harbour filed its 1997 and 1998 returns, the overwhelming weight of legal authority supported its reporting positions and no contrary legal authorities existed.

---

[36] A separate FPAA was issued for 1997 and 1998 because of a change in law with respect to penalties in partnership cases. For partnership tax years ending after August 5, 1997, Section 1238(a) of the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, 111 Stat. 994, amended I.R.C. § 6221 to require that penalties be determined in the partnership proceeding even though they are imposed on the individual partners.

Treas. Reg. § 1.6662-4(d)(3)(i). Castle Harbour's partners have additional defenses to penalties that cannot be raised in this partnership proceeding.[37]

## VI. CONCLUSION

The evidence produced at trial will establish that the investments in Castle Harbour by ING and Rabo had substantive, non-tax economic effects. The evidence will further show that, even though the partners understood and anticipated that the ceiling rule would provide a clear tax benefit to the partner contributing fully depreciated aircraft to the partnership, the formation of Castle Harbour responded to business exigencies and furthered the non-tax business purposes of III-E, III-M and their corporate parent, GECC. The IRS's argument that the transaction lacked economic substance is based on significant mistakes of facts and is, therefore, fundamentally flawed.

The IRS's alternative argument – that ING and Rabo were creditors rather than partners – suffers from equally serious flaws. Not only did the investments by ING and Rabo have economic substance, but the substance of those investments was equity. Characterization of their investments as equity is consistent with the facts of the transaction and the overwhelming weight of judicial and administrative authority.

The other surviving argument from the FPAA – that the section 704(c) allocations by Castle Harbour lack "substantial economic effect" – is based on a misunderstanding of the basic application of section 704(b) and section 704(c), and is nothing more than an attempt to repeal the ceiling rule by applying the December 1993 regulations retroactively, in violation of their explicit effective date provisions.

---

[37] Partner-level defenses to penalties (i.e., defenses that are unique to an individual partner) are not part of the partnership proceeding and can be raised only in a refund suit brought after the court finds in favor of the IRS in the partnership proceeding. I.R.C. §§ 6230(c)(1)(C), (c)(2) and (c)(3); Treas. Reg. §§ 301.6221-1(c), (d).

84

The tax consequences of the investments by ING and Rabo flow directly from the application of the Code and regulations in effect at the time of transaction. The ceiling rule resulted from deliberate policy choices made by Congress in 1954 and by the executive branch when it promulgated the first regulations under section 704(c) in 1956 and the most recent regulations in December 1993. Moreover, the history of the ceiling rule makes it clear that in adopting the rule Congress and the executive branch intended to produce the very tax consequences that the IRS now seeks to avoid.

Dated this 8th day of July, 2004.

Respectfully submitted,

/s/ William F. Nelson

William F. Nelson, ct22883
David J. Curtin, ct22881
Michael J. Desmond, ct23186
John A. Galotto, ct22882
MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
wnelson@mckeenelson.com
dcurtin@mckeenelson.com
mdesmond@mckeenelson.com
jgalotto@mckeenelson.com

Anthony M. Fitzgerald, ct04167
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, CT 06509-1950
Telephone: (203) 777-5501
Facsimile: (203) 784-3199
e-mail: afitzgerald@carmodylaw.com

**CERTIFICATE OF SERVICE**

It is hereby certified that service of the foregoing Plaintiff's Trial Brief has been made today, July 8, 2004, by sending true and correct copies thereof via overnight mail, postage pre-paid, to the following:

>Robert J. Higgins
>Barry E. Reiferson
>Trial Attorney, Tax Division
>U.S. Department of Justice
>555 4th Street, N.W., Rm. 8816
>Ben Franklin Station
>Washington, D.C.  20001

and by regular mail, postage prepaid to:

>John B. Hughes
>Assistant U.S. Attorney
>Chief, Civil Division
>157 Church Street
>New Haven, CT  06508

_____
Anthony M. Fitzgerald, (ct04167)
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, Connecticut  06509-1950
Telephone:  (203) 777-5501
Facsimile:  (203) 784-3199
e-mail:  afitzgerald@carmodylaw.com