## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| TIFD III-E INC., the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) ) | Case Nos.: 3:01-CV-01839 (SRU) (lead case) 3:01-CV-01840 (SRU) |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | August 4, 2004 |
| Defendant. | ) ) ) | |

### PLAINTIFF'S POST-TRIAL BRIEF

## I.    INTRODUCTION

The evidence in this case closed on July 28, 2004, after approximately six days of trial. At the conclusion of the trial, the Court set closing arguments for August 5 and granted both parties the right to file post-trial briefs on or before August 4.

The principal theory set forth in the IRS's FPAAs (PX 377; PX 378)[1] was that the Castle Harbour transaction did not have economic substance or any non-tax business purpose. The strong evidence presented by Plaintiff at trial refutes both assertions. Because Plaintiff's Trial Brief (filed on July 8, 2004) adequately addresses the legal standards that apply to this theory, they need not be restated here.

This brief focuses primarily on the government's third—and lowest ranking— theory, under section 704 of the Internal Revenue Code ("I.R.C." or the "Code"). The government's retreat to this theory started in the month before trial with the expansion of

---

[1] "PX" refers to Plaintiff's Exhibits admitted into evidence at trial; "JX" refers to the Joint Exhibits.

the scope of Mr. Lacey's expert opinion points. The government's attempt to support this theory at trial through Mr. Lacey failed.

We briefly supplement Plaintiff's Trial Brief with respect to the government's debt-equity position.

## II.    ING AND RABO WERE EQUITY INVESTORS

The IRS's secondary argument was that ING and Rabo were not equity investors in Castle Harbour, but lenders. The evidence at trial makes clear that the partnership interests acquired by ING and Rabo easily satisfy the requirements for classification as equity for federal income tax purposes. While Plaintiff's Trial Brief adequately discusses the applicable legal standards, two additional points raised at trial warrant discussion.

First, the IRS has respected numerous instruments as equity that are substantially more debt-like than the interests held by ING and Rabo. For example, in Revenue Ruling 90-27, 1990-1 C.B. 50, the IRS addressed the tax consequences of "dutch-auction rate preferred stock." The terms of such stock provide for a fixed liquidation preference and a dividend rate that fluctuates based on a "dutch auction" process designed to ensure that the stock always trades at its liquidation preference. The stock is generally rated by credit rating agencies. In Revenue Ruling 90-27, the IRS specifically states that, "[f]rom the perspective of the holders, dutch-auction rate preferred stock is an investment alternative to commercial paper or other short-term debt." Nevertheless, the IRS concludes that such an "investment alternative to commercial paper or other short-term debt" is an equity interest in the issuer that entitles a corporate holder to a dividends-received deduction. Dutch-auction preferred stock is more debt-like than ING's and Rabo's Class A interests in every respect, but dutch-auction preferred stock undeniably is

equity. There is no principled basis for characterizing the Class A interests as debt without also changing the tax treatment for dutch-auction preferred stock.[2]

Second, the government has asserted that the ability of ING and Rabo to liquidate Castle Harbour in certain instances gave them the right of creditors (see Gov't Trial Brief at 42-43); however, the right to dissolve a partnership has long been recognized as an attribute of partner status. See, e.g., Unif. P'ship Act (1997) § 801(1) (requiring dissolution of "partnership at will" upon notice from a partner of partner's "express will to withdraw as a partner"). The Nevada limited-liability company statute under which Castle Harbour was formed contained a similar provision. See Nev. Rev. Stat. Ann. § 86.491.1(c) (1993) (requiring dissolution of Nevada limited-liability company upon, inter alia, the resignation of a member, unless remaining members unanimously consent to continuation of its business). In fact, at the time of the Castle Harbour transaction, the regulations under section 7701 of the Code included the ability of a member to trigger the dissolution of an entity by resigning as an indication that the entity lacked "continuity of life," a factor used to distinguish partnerships from corporations. Treas. Reg. § 301.7701-2(b)(2) (1993) ("[T]he resignation of a partner dissolves the partnership.").[3]

---

[2] In Revenue Procedure 2002-16, 2002-1 C.B. 572, the IRS addressed certain tax reporting issues arising from the creation of a partnership instrument that, in the IRS's own words, "might be described as a synthetic tax-exempt variable-rate bond." The interests held by ING and Rabo were substantially more equity-like than the preferred partnership interests that the IRS recognized as equity in Revenue Procedure 2002-16.

[3] Even if the liquidation right were viewed as a creditor-type remedy, it would not support reclassification of the interests held by ING and Rabo as debt. In Revenue Ruling 94-28, 1994-1 C.B. 86, the IRS respected a class of preferred stock as equity even though its holders had creditors' rights under applicable state law.

## III.  SECTION 704(b) AND THE SUBSTANTIAL ECONOMIC EFFECT STANDARD

### A.     The Government's Remaining Theory.

Only the IRS's third argument remains, namely, that the allocations of income by Castle Harbour lacked "substantial economic effect" within the meaning of section 704(b) of the Code.[4]  The government's latest, unsupported interpretation of sections 704(b) and (c) is driven by the strong evidence presented against the IRS's primary and secondary arguments and the government's need to find an alternative theory, even a bad one.  In reality, the government's principal complaint is that it does not like the results of the mandatory application of its own longstanding regulations, which were amended only after Castle Harbour had been formed and begun operations.

Plaintiff contends the allocation of 98% of book operating income to ING and Rabo (approximately $28 million)—and the resulting mandatory allocation of 98% of taxable operating income—was proper because the book operating income allocation affected dollar for dollar the economic results to ING and Rabo, and any other allocation would have substantially altered these economic results.

The IRS originally accepted the allocation of $28 million (98%) of book operating income to ING and Rabo, but argued that only $28 million of taxable operating income (an amount significantly less than 98% of Castle Harbour's taxable operating income) could be allocated to the Dutch investors.  This position is flatly contrary to the mandatory rules of section 704(c) then in effect, as explained in Plaintiff's Trial Brief at 71-82.

---

[4] Before trial, the government abandoned its challenge based on section 482 of the Code.

The government has now switched its position and agrees with Plaintiff that the percentage of taxable operating income allocated to the Dutch investors should equal the percentage of book operating income allocated to these investors; however, the government now attempts to reduce the allocation of book operating income to ING and Rabo by more than $25 million (from almost $28 million to less than $3 million), creating a disparity of more than $25 million between the book operating income allocated to ING and Rabo and the cash that they were entitled to—and actually did— receive under their contractual agreement with GECC (the Operating Agreement).  This discrepancy between the book income allocation and the resulting economic impact on ING and Rabo is contrary to the most fundamental tenet of section 704(b)—a book income allocation <u>must</u> affect, dollar for dollar, the economic results of the partners. Matching book income allocations with the economic result to the partner is the <u>sine qua non</u> of section 704(b), as explained below.  The allocation of taxable income follows automatically from the allocation of book operating income.

As set forth below, the allocations of 98% of Castle Harbour's book operating income to ING and Rabo complied with the requirements of section 704(b).  Moreover, despite the government's shifting contentions, section 704(c) and its "ceiling rule" (as in effect for the taxable years at issue) govern the allocation of tax depreciation—not just disposition gains—when property whose tax basis is less than its value is contributed to a partnership.  The legislative history of section 704(c), the government's own regulations under section 704(b) and section 704(c), and repeated statements by the IRS and commentators confirm that this is "hornbook law."  The government's attempt to read section 704(c) out of this case is incomprehensible.

B.    Section 704(b).

Sections 704(a) and 704(b) of the Code provide:

(a)  Effect of partnership agreement

A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement.

(b)  Determination of distributive share

A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership … if –

(1) the partnership agreement does not provide as to the partner's distributive share of income, gain, loss, deduction, or credit (or item thereof), or

(2) the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect.

I.R.C. § 704.  Thus, under section 704(b), the Operating Agreement's allocation of 98% of Castle Harbour's book operating income to ING and Rabo must be respected if the allocation has "substantial economic effect."  If that allocation lacked substantial economic effect, the interests of ING and Rabo in Castle Harbour's book operating income would be determined in accordance with the "partner's interest in the partnership" (sometimes referred to as "PIIP").

The substantial economic effect standard requires that a partnership's book income be allocated among the members of the partnership in a manner that is consistent with the members' economic arrangement for sharing that income.  This standard has two components.  First, an allocation must have "economic effect" (a term that is precisely defined by the regulations); second, the economic effect of the allocation must be "substantial."

6

1.     <u>The Economic Effect Test.</u>

In general, the economic effect test applies a capital account analysis to determine how, in the long run, the partners will actually share items of book income and gain that must be allocated on a year-to-year basis.  In general, an allocation has economic effect if it is credited or debited to the partners' capital accounts and if the partners' capital accounts determine how much money they will eventually receive from the partnership.

More specifically, the economic effect test has three parts: (1) capital accounts must be determined and maintained for the partners in accordance with the section 704(b) regulations, (2) the partners' capital accounts must determine the amounts they are entitled to receive upon final liquidation of the partnership or redemption of a partner's interest, and (3) each partner must be obligated to restore any deficit balance in its capital account upon liquidation or redemption of its interest in the partnership.  <u>See</u> Treas. Reg. § 1.704-1(b)(2)(ii)(b).  In general terms, a partner's capital account is the arithmetic sum of (1) the fair market value of contributions by the partner to the partnership, <u>plus</u> (2) book income and gain allocated to the partner, <u>minus</u> (3) the fair market value of distributions by the partnership to the partner, and <u>minus</u> (4) book losses allocated to the partner.  <u>See</u> Treas. Reg. § 1.704-1(b)(2)(iv)(b); JX001 at 0101403 - 405 (definition of "capital account").  If allocations of book income and loss under the partnership agreement are credited or debited to the partners' capital accounts and if, at the end of the day, the partners settle their economic rights and obligations to each other by transferring money or property to or from the partnership to "zero out" their capital accounts, the allocations will have determined each partner's net economic return, dollar for dollar.  Thus, the allocations will have had economic effect.

At trial, Eric Dull testified that the capital accounts were "score cards" of the partners' economic interests. Dull Tr. (7/22/04) at 333:17 to 334:17. Castle Harbour's financial statements confirm that the 98% allocation of book operating income was credited, dollar for dollar, to ING's and Rabo's capital accounts. See Plaintiff's Proposed Findings and Conclusions ("Proposed F&C"), ¶¶ 131, 132.[5] Furthermore, the uncontroverted evidence at trial showed that the Exhibit E distributions received by ING and Rabo were debited to their capital accounts, and that these investors were paid the remaining balance in their capital accounts when their interests were purchased at the end of 1998. Thus, ING and Rabo received, dollar for dollar, cash payments that reflected the allocation of 98% of book operating income. See Proposed F&C, ¶¶ 131, 132. The evidence also is clear that all members of Castle Harbour were obligated to restore any deficit balance in their capital accounts on liquidation. See Proposed F&C, ¶ 134. Accordingly, the allocation of 98% of book operating income to ING and Rabo had economic effect.

### 2.    The Substantiality Test.

The second component of the substantial economic effect standard requires that the economic effect of the allocation be "substantial." Under the section 704(b) regulations, the economic effect of an allocation is substantial "if there is a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." Treas. Reg. § 1.704-1(b)(2)(iii).

---

[5] An annotated and revised version of Plaintiff's Proposed Findings of Fact and Conclusions of Law is being filed simultaneously with this brief.

The classic example of an allocation that has economic effect but lacks substantiality is a partnership between two 50/50 partners, one of which is taxable and the other of which is tax-exempt. The partnership holds two assets, a taxable bond and a tax-exempt bond, that produce the same amount of interest income. The partnership agreement allocates the taxable interest to the tax-exempt partner and the tax-exempt interest to the taxable partner. The allocation of all of the tax-exempt interest to the taxable partner does not increase the amount that partner would have received on liquidation when compared to an allocation to her of 50% of the tax-exempt and 50% of the taxable interest—thus, the economic effect of the allocation is not substantial, and each class of income will be reallocated equally between the taxable and tax-exempt partners. In contrast, Castle Harbour's allocation of book operating income affected how much cash each partner would receive. For example, if Castle Harbour's book operating income had doubled, the Dutch investors would have received 98% of the additional income; such amounts would have been credited to their capital accounts and distributed to them on the sale or liquidation of their interests, and thus would have affected substantially their economic return from Castle Harbour.

  3.  <u>The Partner's Interest in the Partnership Standard</u>.

If an allocation of an item of income, gain, loss, deduction or credit contained in an agreement does not have substantial economic effect (or if the agreement does not provide for an allocation of the item), a partner's share of the item is determined "in accordance with the partner's interest in the partnership." Section 1.704-1(b)(3)(i) of the regulations provides:

> References in section 704(b) and this paragraph to a partner's interest in the partnership, or to the partners' interests in the partnership, signify the manner in which the partners have agreed to share the

economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated. . . . [T]his sharing arrangement may or may not correspond to the overall economic arrangement of the partners. Thus, a partner who has a 50 percent overall interest in the partnership may have a 90 percent interest in a particular item of income or deduction. . . . The determination of a partner's interest in a partnership shall be made by taking into account all facts and circumstances relating to the economic arrangement of the partners. All partners' interests in the partnership are presumed to be equal (determined on a per capita basis). However, this presumption may be rebutted by the taxpayer or the Internal Revenue Service by establishing facts and circumstances that show that the partners' interests in the partnership are otherwise.

Treas. Reg. § 1.704-1(b)(3)(i). The regulations identify four nonexclusive factors that may be used in making this determination: (a) relative contributions to the partnership; (b) interests in economic profits and losses (if different from the partners' interests in taxable income or loss); (c) interests in cash flow and other non-liquidating distributions; and (d) rights to distributions upon liquidation. Treas. Reg. § 1.704-1(b)(3)(ii).

The regulatory definition of what constitutes a "partner's interest in the partnership" establishes two crucial points. First, the determination of a partner's interest in the partnership is based on the <u>economic</u> agreement among the partners, specifically, how "the partners have agreed to share the economic benefit or burden" of a "particular item." That analysis cannot be performed in isolation from the economic provisions of the partnership agreement, and it is clear that the Castle Harbour allocations reflected PIIP because the Castle Harbour members were entitled to money based upon these allocations.

Second, the partner's interest in the partnership standard is based on how the partners have agreed to share the economic benefit, on an item-by-item basis, of book income or gain or the burden, on an item-by-item basis, of a book loss or deduction. The regulations explicitly provide that a partner's interest in one item may differ greatly from

that partner's interest in another item or from the partner's "overall interest" in the partnership. This item-by-item approach is inherent in the principle that the partner's interest in the partnership standard is applied by examining how the partners have agreed to share the economic benefit or burden of the "particular item" being allocated.

    4.    <u>Interaction of Section 704(b), Section 704(c) and the Ceiling Rule.</u>

As discussed in Plaintiff's Trial Brief, when property is contributed to a partnership, its tax basis carries over to the partnership under section 723 of the Code, while it must be entered on the partnership's books at its fair market value. <u>See</u> Treas. Reg. § 1.704-1(b)(2)(iv)(b). Section 704(b) governs the allocation of book gain, loss and depreciation from such property, while section 704(c) provides for the allocation of taxable gain, loss and depreciation attributable to any built-in gain or built-in loss in such property. <u>See</u> Treas. Reg. § 1.704-1(b)(2)(iv)(d)(3); <u>see also</u> Plaintiff's Trial Brief at 76-82.

For example, assume that A and B form an equal partnership.[6] A contributes cash of $1,000, which is deposited in a non-interest bearing account, and A's capital account is credited with $1,000. B contributes depreciable property with a value of $1,000 and a tax basis of zero. B's capital account is credited with $1,000. Under the section 704(b) regulations, the property, which has a remaining useful life of five years, is entered on the partnership's books at its $1,000 value. The partnership depreciates the book value of the property at the rate of $200 per year and receives annual rent from the property of $300. At the end of year 1, the partnership has $100 of section 704(b) book income ($300 rent,

---

[6] This example resembles the Castle Harbour partnership, with "A" representing ING and Rabo and "B" representing Plaintiff.

less $200 book depreciation), which is allocated equally to A and B, increasing their respective capital accounts by $50 and affecting dollar for dollar the amounts that each would receive upon liquidation of the partnership. Each partner's allocation of $50 of book income carries with it a pro rata share of the items making up that amount. See Treas. Reg. § 1.704-1(b)(1)(vii). Thus, A's $50 of book income consists of an allocation of $150 of rent and $100 of book depreciation.

The partnership has no tax depreciation to match its $200 book depreciation deduction because the property has a zero tax basis. For contributions of property occurring prior to December 21, 1993,[7] the only mechanism for addressing this shortfall was to allocate to A (the noncontributing partner) any available tax deductions for depreciation to the extent of A's $100 share of book depreciation, thereby leaving the tax burden of the built-in gain with B (the contributing partner). Under the ceiling rule, however, A's share of tax depreciation cannot exceed the actual tax depreciation available to the partnership. See Plaintiff's Trial Brief at 77-78. Since the partnership's total tax deduction for depreciation is zero, A receives no allocation of depreciation under section 704(c), and its $150 share of the partnership's rental income is not offset by any tax depreciation.[8] Thus, A is taxed on $150 of income, even though its capital account goes up by only its $50 share of the partnership's book income.

---

[7] This is the effective date of amended section 704(c) regulations that, in effect, eliminated the mandatory application of the ceiling rule.

[8] If the partnership had $100 of tax depreciation deductions, section 704(c) would allocate all $100 to B.

C.    Application of Sections 704(b) and (c) to Castle Harbour.

    1.    The Operating Agreement.

The uncontroverted trial evidence is that (a) ING and Rabo were allocated 98% of Castle Harbour's book operating income (approximately $28 million out of $28.6 million); (b) their $28 million share of book operating income was credited dollar for dollar to their capital accounts; (c) ING and Rabo received, dollar for dollar, the balances in their capital accounts through the combination of Exhibit E distributions in 1993-1997 and the amounts received on the sale of their Castle Harbour interests at the end of 1998; (d) a decrease in the percentage allocation of book operating income to ING and Rabo would have reduced their economic return from the transaction; and (e) ING and Rabo were required to contribute cash to restore any deficit balance in their capital accounts on liquidation of their Castle Harbour interests.  See Proposed F&C, ¶¶ 131, 132, 133, 134.

Under section 704(b), the allocation of 98% of Castle Harbour's book operating income in equal shares to ING and Rabo meant that each of them was allocated 49% of each component item of book operating income.  See Treas. Reg. § 1.704-1(b)(1)(vii).  In general, these components were rent, interest income, interest expense, operating expenses and book depreciation.[9]  See Proposed F&C, ¶ 145.  Accordingly, since ING and Rabo received 98% of book operating income, they also received 98% of each component item of book income and a corresponding allocation of 98% of the corresponding component of taxable income.

The exception was that the book depreciation allocation could not be matched by an allocation of tax depreciation, since Castle Harbour did not have any tax depreciation

---

[9] Book depreciation was based on the fair market value of the 63 aircraft when contributed on July 26, 1993, depreciated straightline over the period set forth in Exhibit F to the Operating Agreement.  See JX001, at 0101408, 0101664 – 667 (definition of "Depreciation").

deductions. Although section 704(c) required that any tax depreciation deductions be allocated first to ING, Rabo and TIFD III-M (the three partners that had not contributed any built-in gain property) to match their shares of 704(b) book depreciation, the aircraft contributed by Plaintiff had a tax basis of zero. The zero tax basis meant that Castle Harbour had no tax depreciation to allocate to ING, Rabo or TIFD III-M under section 704(c). Like A in the example above, the ceiling rule expressly prohibited Castle Harbour from creating tax depreciation deductions for ING and Rabo (or from reallocating other taxable income to Plaintiff) to make up for the shortfall in tax depreciation. As a result, the amount of Castle Harbour's book depreciation allocated to ING and Rabo under section 704(b) exceeded the amount of tax depreciation ($0) allocated to them under section 704(c). The other items taken into account in computing taxable operating income, however, were identical in amount to the items of book operating income; thus, the allocation to ING and Rabo of 98 % of each item of taxable income to match their 98% share of each item of book operating income resulted in a taxable operating income allocation significantly higher than book operating income due to the difference between book and tax depreciation—a difference mandated by section 704(c) and not permitted to be offset or mitigated due to the ceiling rule.

D.   The Government's Position.

1.   The IRS Audit Position.

As discussed in Plaintiff's Trial Brief, in its explanation of its FPAA adjustments the IRS did not adjust Castle Harbour's allocations of book operating income under section 704(b). See PX 376 at 0102266; Plaintiff's Trial Brief at 71-75. According to the trial evidence, the IRS stated that its method "respects the book capital accounts of each partner" and "reflects the actual value of partnership assets each partner would be entitled

to receive on liquidation." PX 376 at 0102266. For each year the IRS allocated taxable income to ING and Rabo "in amounts equal to the book income which they had the right to receive under the terms of the partnership agreement." Id. Thus, notwithstanding the government's denials and protests, the evidence demonstrates that the IRS agreed that the allocations of Castle Harbour's book income were valid.

Contrary to the explicit requirements of the ceiling rule, which applied to all contributions of property to Castle Harbour prior to December 21, 1993, the IRS compensated for the partnership's shortfall in tax depreciation by allocating Castle Harbour's remaining taxable income to Plaintiff and TIFD III-M. Id.; see also Plaintiff's Trial Brief at 74-75. In other words, to avoid a result it did not like, the IRS simply ignored the ceiling rule.

### 2.    The Government's Litigating Position.

In its trial brief and in the testimony of its accounting expert, John Lacey, the government revised its position. Apparently, the government realized that the IRS's approach, which sought to allocate taxable income independently from the allocation of book income, was untenable. The government's trial position avoided this flaw by acknowledging that the percentage of taxable operating income allocated to ING and Rabo should, under the facts of this case, correspond to the percentage of book operating income allocated to them. See Gov't Trial Brief at 52-53.

Correcting this problem required the government to reallocate Castle Harbour's book operating income to Plaintiff and TIFD III-M in order to attract more taxable income to them. Thus, in contrast to the FPAAs, which explicitly respected Castle Harbour's allocations of book operating income, the government's trial brief sought to reallocate most of Castle Harbour's book operating income from ING and Rabo to

Plaintiff and TIFD III-M.  See Gov't Trial Brief at 51.  It then reallocated taxable income in the same proportions.  Id. at 52-53.

Like the IRS administrative position, the government's litigating position recognizes that the allocations of book operating income set forth in Castle Harbour's Operating Agreement had "economic effect," under the section 704(b) regulations.  The government contends, however, that the economic effect of these allocations is not "substantial."  See Gov't Trial Brief at 49.  Based on its conclusion that the allocation did not have "substantial economic effect," the government seeks to reallocate Castle Harbour's book operating income based on the "partner's interest in the partnership" standard.  See Gov't Trial Brief at 46 n. 20.

There does not seem to be any dispute that the allocations contained in Castle Harbour's Operating Agreement satisfied the economic effect test of Treas. Reg. § 1.704-1(b)(2)(ii).  Under the agreement, Castle Harbour correctly computed its book income.  It properly established and maintained capital accounts.  Those capital accounts governed liquidating distributions.  Any partner with a deficit in its capital account on liquidation was required to refund the partnership the amount of such deficit.  See Proposed F&C, ¶ 134.  Moreover, the government has acknowledged the economic reality of those allocations.  See, e.g., Gov't Trial Brief at 9 ("The § 704(b) book income allocated to the Dutch banks . . . results in actual cash payments upon liquidation . . . ."); Lacey Tr. (7/28/04) at 1033:12 - 21 (using capital accounts maintained pursuant to Operating Agreement to determine each partner's "ownership interest").

Not only do these admissions demonstrate that the allocations in the Operating Agreement had economic effect—they also demonstrate that their economic effect was

"substantial." In an apparent effort to finesse this point, the government has raised the "overall-tax-effect" test of the section 704(b) regulations. The government's application of the overall-tax-effect test is based on a fundamental flaw that is fatal to its position. As demonstrated below, the allocations contained in the Castle Harbour Operating Agreement satisfy the overall-tax-effect test and, accordingly, have substantial economic effect under section 704(b). Furthermore, since these allocations reflect the partners' economic arrangement, they are identical to the allocations that would be mandated under the partners' interests in the partnership standard.

## IV.   THE ALLOCATION OF CASTLE HARBOUR'S BOOK OPERATING INCOME SATISFIES THE REQUIREMENTS OF SECTION 704(b)

### A.     Castle Harbour's Allocations Had Substantial Economic Effect.

The so-called overall-tax-effect test provides:

> [T]he economic effect of an allocation (or allocations) is not substantial if, at the time the allocation becomes part of the partnership agreement: (1) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement, and (2) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement.

Treas. Reg. § 1.704-1(b)(2)(iii)(a) (second sentence). Thus, the overall-tax-effect test requires a comparison between (1) the anticipated after-tax consequences of the specific allocation that is being challenged, and (2) the hypothetical after-tax consequences that would have ensued if the challenged allocation not been included in the partnership agreement (the "baseline allocation"). This comparison depends on the use of the appropriate baseline allocation.

The question, therefore, is what is the appropriate baseline allocation for purposes of the overall-tax-effect test. Section 704(b) provides the answer—if the partnership agreement contains no allocation, the item is allocated in accordance with the partner's interest in the partnership. See I.R.C. § 704(b)(1). In other words, because PIIP determines the allocation if the partnership agreement contains no allocation, it is by definition the only appropriate baseline allocation.[10]

As explained above, the partner's interest in the partnership standard refers to how the parties have agreed to share the "economic benefit or burden (if any) corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated." Treas. Reg. § 1.704-1(b)(3). Indeed, the government itself has recognized that the Castle Harbour partners agreed that ING and Rabo would receive 98% of the book operating income:

1) "The 'capital accounts' (which are the accounts upon which final distributions to the Dutch banks are based, in part, in the event of liquidation) were thus increased each year by the income from the leases. . . . The § 704(b) book income allocated to the Dutch banks . . . results in actual cash payments upon liquidation . . . ." (Gov't Trial Brief at 9) (emphasis added).

2) "The key components of the capital accounts, as far as the Dutch banks were concerned, were the 98% income allocations and the Exhibit E cash distributions . . . . Like the investment accounts, the capital accounts measured the return of the Dutch banks on their contributions. . . . Allocations of income (98%) and gains/losses . . . increased or decreased the account balances." Gov't Trial Brief at 17-18 (emphasis added).

3) "The 98% income allocation to the Dutch banks is a key component to GECC and the Dutch banks achieving the target 9.03587% applicable rate return for the Dutch banks." Id. at 19 (emphasis added).

---

[10] In contrast, the government uses the partners' relative capital accounts as its baseline allocation. See Gov't Trial Brief at 50 n.23 (adopting "CLM" as baseline); Lacey Tr. (7/28/04) at 1033:12-21. As demonstrated during the cross-examination of Mr. Lacey, the government's baseline allocation is totally inconsistent with the partners' underlying economic arrangement. See Lacey Tr. (7/28/04) at 1063:13-18.

4) "The capital accounts were calculated using '704(b) book accounting,' which is required by § 704(b) of the Internal Revenue Code and the regulations thereunder." Defendant's Proposed Findings of Uncontroverted Fact and Conclusions of Law ¶ 46.

In short, according to the government, (i) ING and Rabo invested in Castle Harbour to achieve a significant economic profit; (ii) the allocation of 98% of Castle Harbour's book income was a "key component" to their ability to achieve this desired profit; (iii) each dollar of book income allocated to ING or Rabo increased its capital account by the same amount; and (iv) ING and Rabo were entitled to receive each dollar of book income allocated to their capital accounts upon liquidation of Castle Harbour, to the extent not previously distributed. On the undisputed facts of this case, therefore, the correct baseline allocation for applying the overall-tax-effect test is 49% to ING, 49% to Rabo, 1% to Plaintiff, and 1% to TIFD III-M, because (1) that allocation reflects the partners' economic arrangement, and (2) there is no other allocation that would produce the appropriate economic result. Because the actual allocation and the baseline allocation are identical, the allocations contained in the Operating Agreement necessarily satisfy the overall-tax-effect rule.

Obviously, using an allocation contained in a partnership agreement as the baseline allocation ensures that the allocation will satisfy the overall tax effect test; therefore, at first blush it may appear that Plaintiff's position would read the overall-tax-effect rule out of the regulations. Any such concern is unwarranted. A review of the examples illustrating the application of the overall-tax-effect rule in the government's regulations demonstrates that the principal purpose of the overall-tax-effect test is to address character issues (such as those arising from the difference between capital gain

and ordinary income) while ensuring that the allocations are consistent with the economic arrangement set forth in the contract among the partners (the partnership agreement).

Example (5) of Treasury Regulation § 1.704-1(b)(5), illustrates the purpose and scope of the overall-tax-effect test. In Example (5), I (a 50% bracket taxpayer) and J (a 15% bracket taxpayer) are the only members of an investment partnership. I and J make equal contributions to the partnership, and they share equally in gains and losses from sales of partnership assets. They agree to allocate the tax-exempt income 80% to I and 20% to J, and to allocate 100% of the partnership's taxable dividends and interest to J. According to the facts, the amounts of income in each category are expected to be comparable. Example (5)(i) concludes that under the overall-tax-effect test the economic effect of the allocations is not substantial, because the allocations increase the after-tax returns of both partners.[11] Thus, Example (5)(i) states that partnership income must be reallocated in accordance with the partners' interests in the partnership.[12]

Moreover, Example 5(ii) illustrates what happens when income is reallocated in accordance with the partners' interests in the partnership because of the allocation's failure to satisfy the overall-tax-effect test. In its first taxable year, the partnership earns $450 of tax-exempt interest and $550 of taxable interest and dividends. If (as the

---

[11] The overall-tax-effect test is applied at the time the allocation becomes a part of the partnership agreement. See Treas. Reg. § 1.704-1(b)(2)(iii)(a). In Example (5)(i), the actual amount of tax-exempt interest and taxable interest and dividend income that the partnership will earn is uncertain, although the partners anticipate that the two categories will be roughly equivalent. Example 5(i) uses a 50/50 baseline allocation, which on the facts of the example is not unreasonable. In contrast, it was clear from the inception of the partnership that, regardless of the amount of any particular item, 98% of Castle Harbour's operating income would be allocated to ING and Rabo. Thus, the use of 98/2 as the baseline allocation is appropriate.

[12] Gains from the disposition of aircraft are allocated differently from operating income, but such gains cannot be taken into account in applying the overall-tax-effect rule. Treas. Reg. §§ 1.704-1(b)(2)(iii)( c) (final three sentences); -1(b)(5) Example (1)(vi) (partners "confident" that gain will offset prior allocation of deductions, deduction allocation nevertheless valid); - (b)(5)(xi) (offsetting gain allocation will not cause economic effect of deduction allocation to be insubstantial).

government contends) the partners' interests in the partnership were based on their proportionate capital accounts, I and J would each be allocated $225 of tax-exempt interest and $275 of taxable interest and dividends. According to Example 5(ii), that is not what happens. Instead, the first step is to determine how much income was credited to each partner's capital account under the partnership agreement. Under the agreement, I's capital account was credited with $360 (80% of the tax-exempt interest), and J's capital account was credited with $640 (20% of the tax-exempt interest and 100% of the taxable interest and dividends). The example uses these amounts to determine the partners' interests in the partnership for the year (36% for I and 64% for J). Thus, I receives 36% of the tax-exempt income and 36% of the taxable interest and dividends, and J receives 64% of the tax-exempt interest and 64% of the taxable interest and dividends.

In short, Example 5(ii) applies the partners' interests in the partnership standard by allocating the income so that the total amount of income allocated to each partner reflects the partners' economic entitlements to partnership income. See Treas. Reg. § 1.704-1(b)(5), Example (5)(ii). Example 5(ii) demonstrates that the reallocation must produce capital account balances that reflect the partners' entitlements. This last constraint is important: the mandate of the partners' interests in the partnership standard is to give effect to the partners' economic arrangement, not to change it.[13]

---

[13] The courts applying PIIP have adhered to this principle. See Vecchio v. Commissioner, 103 T.C. 170, 194-95 (1994) (entire taxable gain for year was allocated to one partner to eliminate partner's negative capital account and satisfy partner's liquidation preference); Interhotel Co., Ltd. v. Comm'r, T.C. Memo. 2001-15 (2001) (partner's interest in partnership standard requires that partnership allocations be analyzed on the basis of their actual economic impact); Estate of Tobias v. Comm'r, T.C. Memo. 2001-37 (2001) (allocating 100% of partnership income to one partner based on determination that he realized the "economic benefit" of 100% of such income).

In contrast to the facts of Example (5), the Castle Harbour Operating Agreement did not specially allocate different items of operating income in varying proportions among the partners. Instead, ING and Rabo received 98% of each and every item of income and deduction going into the computation of operating income. Mathematically, the only allocation of Castle Harbour's operating income that will produce the appropriate balances in the partners' capital accounts is the 98/2 allocation contained in the Operating Agreement.

Therefore, the undisputed facts of this case demonstrate that the allocation of Castle Harbour's book operating income reflects the partners' underlying economic arrangement and is thus consistent with the partner's interest in the partnership standard. Because this is the appropriate baseline allocation, it necessarily follows that the allocation satisfies the overall-tax-effect rule and therefore has substantial economic effect.

B.    Castle Harbour Allocated Its Operating Income in Accordance with the Partners' Interests in the Partnership.

Even if one concludes that the proper baseline allocation used in applying the overall-tax-effect test is something other than the partners' interests in the partnership, and that the allocation therefore does not have "substantial economic effect" within the meaning of the regulations, the allocation of 98% of Castle Harbour's operating income to ING and Rabo must still be respected. At most, the use of a different baseline allocation in applying the overall-tax-effect test would result in a determination that the allocation lacked "substantial economic effect" within the meaning of section 704(b) and the regulations. The only consequence of such a determination would be to require that

book income be allocated in accordance with the partners' interests in the partnership.
See Treas. Reg. §§ 1.704-1(b)(2)(iii)(a), -1(b)(3).

The section 704(b) regulations require that the PIIP standard be applied in a
manner that ensures that the total amount of income allocated to each partner is consistent
with the amount the partner is entitled to receive under the partnership agreement. See
Treas. Reg. § 1.704-1(b)(5), Examples (5)(ii), (6) (last sentence) (reallocation reflects
economic sharing of item), (7)(i) (last sentence) (same), (7)(ii) (last sentence) (same).
The evidence in this case consistently establishes that ING and Rabo were entitled to
receive and did receive 98% of Castle Harbour's operating income. See PX 396; Dull Tr.
(7/22/04) at 350:24 to 351:12; see also Gov't Trial Brief at 9, 17-18. Thus, the partners'
interest in the partnership standard would allocate 98% of Castle Harbour's book
operating income to ING and Rabo.

C.    The Government's Application of the Partner's Interest in the Partnership
      Standard is Inconsistent with the Regulations.

Although the evidence demonstrates that, under the partner's interest in the
partnership standard, 98% of Castle Harbour's book operating income is properly
allocable to ING and Rabo, at trial the government offered a new and different allocation.
Specifically, through the testimony of its accounting expert, Mr. Lacey, the government
tried to argue that Castle Harbour's operating income should be allocated in proportion to
the partners' relative capital accounts.

The government's proposed "Lacey allocation" contains three significant errors.
First, the government apparently assumes that a partner's interest in the partnership
should be the same for every item. The government's proposed reallocation is based on
the partners' relative capital accounts. See Gov't Trial Brief at 50; Lacey Tr. (7/28/04) at

1068:6-8 ("It's the percentage of the capital account of party A divided by total capital account, multiplied times the income. Voila. That's the computation.") Since a partner has only one capital account, under the government's allocation method a partner's interest in the partnership would be the same for every partnership item—a result that the regulations flatly reject. See Treas. Reg. § 1.704-1(b)(3)(i). Thus, the government's method fails to examine how the partners have agreed to share the economic benefit or burden of the particular item being allocated, despite the regulations' requirement of such an examination. Id.

Second, the Lacey allocation incorrectly applies the "comparative liquidation method" for purposes of determining the partners' interests in economic profits. According to its trial brief, the government used the comparative liquidation method to allocate income "according to the parties' respective interests in the book capital accounts at the end of each year." Gov't Trial Brief at 50 n.23. While the government's trial brief cites the section 704(b) regulations as the source of its comparative liquidation method, the government's accounting expert, acting essentially as a conduit for the IRS's comparative liquidation method at trial, admitted that he had not referred to those regulations in preparing his comparative liquidation method computations. Lacey Tr. (7/28/04) at 1038:5-23; Gov't Trial Brief at 52 n.25 (citing Treas. Reg. § 1.704-1(b)(3)(iii)).[14]

---

[14] As a threshold matter, the regulation cited by the government applies only to allocations that do not have "economic effect" within the meaning of the section 704(b) regulations. Specifically, the provision applies only if the allocations under a partnership agreement satisfy two of the requirements for economic effect, but fail the third requirement (the obligation to restore capital account deficits). See Treas. Reg. § 1.704-1(b)(3)(iii). Castle Harbour's allocations satisfy all three requirements for economic effect, including the deficit restoration requirement. Indeed, the FPAAs and the government's trial brief acknowledge that Castle Harbour's allocations have economic effect.

The regulation cited (but not followed) by the government provides that the comparative liquidation method is applied by

> comparing the manner in which distributions . . . would be made if all partnership property were sold at book value and the partnership were liquidated immediately following the end of the taxable year to which the allocation relates with the manner in which distributions . . . would be made if all partnership property were sold at book value and the partnership were liquidated immediately following the end of the prior taxable year, and adjusting the result for the items described in (4), (5), and (6) of paragraph (b)(2)(ii)(d) of [section 1.704-1].

Treas. Reg. § 1.704-1(b)(3)(iii)(b).  In other words, the comparative liquidation method compares how partnership assets would have been distributed in the case of two hypothetical liquidations, one occurring at the close of the current taxable year and the other occurring at the close of the immediately preceding year.  The underlying principle is simple:  a partnership's book income (or loss) for a year will increase (or decrease) the net assets available for distribution to its partners, and the interest of a particular partner in an item of book income or loss for that year is determined by the impact of that item on the amount that partner would receive if the partnership were to liquidate at the end of that year.  Because the comparative liquidation method determines partnership allocations by examining partnership economics, it is not surprising that it produces allocations identical to the 98%/2% allocations employed by Castle Harbour.

The method described in the government's trial brief differs dramatically from that described in the regulation.  The regulation compares the year-to-year changes in a partner's interest in the partnership assets to determine how much income should be allocated to that partner.  In contrast, the government's approach compares the actual capital account balances of all the partners and apportions income ratably, paying no attention to the impact of the current year's income or loss on each partner's economic