entitlement.[15] The approach used by the government would be unrecognizable to the drafters of the section 704(b) regulations.

Examples in the section 704(b) regulations demonstrate this point. See Treas. Reg. § 1.704-1(b)(5), Ex. 1(iv), (v), (vi). In Example 1(iv), A and B have positive capital account balances of $20,000 and $40,000, respectively, at the beginning of the year, meaning that if the partnership sold its assets at book value and liquidated, there would be $60,000 of assets to be distributed $20,000 to A and $40,000 to B. The partnership's operating income equals its operating expenses, with the exception of a $25,000 cost recovery deduction (i.e., the partnership has a net loss of $25,000), which the partnership agreement allocates entirely to A. The example notes that only $20,000 has economic effect, because it reduces A's capital account to zero and A has no deficit restoration obligation. The example allocates this $20,000 to A. The remaining $5,000 is reallocated according to the partners' interests in the partnership.

The example reasons that upon a hypothetical sale of assets at book value, the partnership would have only $35,000 to distribute ($60,000 at the beginning of the year, reduced by the net loss of $25,000). A's capital account is zero and B's capital account is $40,000. The $5,000 loss has no impact on the hypothetical liquidating distribution to A (who would be entitled to zero regardless of whether the partnership had incurred the $5,000 loss), but the $5,000 loss reduces the book value of partnership assets available for distribution to B from $40,000 ($60,000 less the first $20,000) to $35,000. Thus,

---

[15] As noted above, the government's accounting expert used the partners' capital account balances to determine their interests in Castle Harbour's economic profits. This reliance is ironic, to say the least, since those capital account balances reflect the allocation of 98% of Castle Harbour's operating income to ING and Rabo.

26

under the example, the comparative liquidation method allocates the remaining $5,000 to B.

The example's methodology differs substantially from the government's description of its latest approach. Based on the government's trial brief and the testimony of its accounting expert, Mr. Lacey, one would expect the special allocation to be disregarded and the $25,000 deduction allocated 1/3 to A and 2/3 to B, based on their respective capital accounts prior to the allocation. The example does not do that. Instead, the example identifies which partner incurs the economic detriment of each dollar of deduction and allocates the deduction accordingly. The approach taken by the government in its regulations could not be more different from the position taken by the government in this case.

Example 1(vi) of section 1.704-1(b)(5) further illustrates this point. That example addresses how to allocate a $20,000 deduction at a time when the adjusted capital account balances of A and B are $15,000 and $35,000, respectively. The example addresses the issue by analyzing how the $20,000 item affects the economic entitlements of the partners and allocates the item $15,000 to A and $5,000 to B. In contrast, the government's trial brief apparently would allocate 15/50 of the deduction to A and 35/50 of the deduction to B, based on their relative capital accounts. See Gov't Trial Brief at 46 n. 20 ("[T]heir economic profits [are] determined by their interest in the book capital accounts...."); id. at 50 n. 23 (describing government's method as allocating income "according to the parties' respective interests in the book capital accounts at the end of each year"). Again, the government's regulations contradict the litigating position it has devised in this case.

Applying the teachings of these examples to the economic arrangement among the Castle Harbour partners, the fact is that out of every dollar of book operating income realized by Castle Harbour, 49 cents went to ING and 49 cents went to Rabo. The government's trial brief acknowledges that these allocations increased the amount to which ING and Rabo would have been entitled in the event of a liquidation of Castle Harbour. Far from supporting the government's new theory, the comparative liquidation method set forth in the regulations validates the allocations contained in the Castle Harbour operating agreement.

Third, the government abdicates its responsibility to rationalize its desired reallocation of book income with the economics of the partnership agreement. As discussed above, according to the regulations the term "partner's interest in the partnership" refers to the manner in which the partners have agreed to share the economic benefit of the particular item. The undisputed evidence in this case—including the testimony of the government's expert witness—makes clear that the allocation of 98% of Castle Harbour's book operating income to ING and Rabo was an integral part of the partners' economic arrangement. See Proposed F&C, ¶¶ 131, 132, 133, 134.

To achieve its desired results, the government would reduce the amount of book income allocated to ING and Rabo by a total of $25,172,443, even though ING and Rabo realized the full economic benefit of that income. See Gov't Trial Brief at 50-52; Lacey Tr. (7/28/04) at 1063:13-18. Under this approach, the capital account balances of ING and Rabo would have been $25,172,443 less than the amount they were entitled to receive (and ultimately did receive). The government has acknowledged, however, that the economic entitlements of ING and Rabo were based on their capital account balances

28

as maintained pursuant to the Operating Agreement, including the allocation of 98% of book operating income. See Gov't Trial Brief at 17-18. Thus, the capital account balances resulting from the government's proposed reallocation of income would have had no effect on the amounts that ING and Rabo were entitled to receive upon liquidation; indeed, the government's accounting expert readily admitted that under the government's approach "[l]ess income is allocated to the Dutch banks than cash they received." Lacey Tr. (7/28/04) at 1063: 16-18.

Put simply, the government has ignored the logical consequence of its latest position, which would reallocate book income actually received by ING and Rabo to Plaintiff and TIFD III-M. Allocating book income to one partner's capital account when another partner is the real economic beneficiary of that book income is antithetical to section 704(b), yet that is precisely what the government is advocating in this case.

## V. THE SECTION 704(c) REGULATIONS PROHIBIT ANY REALLOCATION OF TAXABLE INCOME TO PLAINTIFF

Once it is determined that the allocations of Castle Harbour's book operating income were valid under section 704(b), section 704(c) and the ceiling rule dictate the allocation of Castle Harbour's taxable income among its partners.

Plaintiff's trial brief explained the ceiling rule as in effect prior to December 21, 1993. In contrast, the government's trial brief ignored it, and in his opening statement counsel for the government asserted that "[t]his is not a 704(c) case. That applies to how you treat gains and losses from disposition of aircraft." Gov't Opening Statement, Tr. (7/21/04) at 36:17-19. It is hard to imagine a statement that could be more completely wrong.

29

As explained in Plaintiff's Trial Brief, the legislative history of the Internal Revenue Code of 1954 specifically describes the application of section 704(c) and the ceiling rule to the allocation of depreciation deductions. See Plaintiff's Trial Brief at 77-78 (citing S. Rep. No. 83-1622 (1954)). The first section 704(c) regulations, which were promulgated in 1956 and which apply to Plaintiff's contribution of aircraft to Castle Harbour, included an example specifically illustrating the application of section 704(c) and the ceiling rule to depreciation deductions. See Treas. Reg. § 1.704-1(c)(2)(i)(1956), Example (1); Plaintiff's Trial Brief at 78-79. Similarly, the section 704(b) regulations themselves illustrate that section 704(c) applies after allocations of section 704(b) book income have been determined. See Treas. Reg. § 1.704-1(b)(5), Example (17). This is true even when the section 704(c) item is depreciation that is limited by the ceiling rule. See Treas. Reg. § 1.704-1(b)(5), Example 18 (ix) (valid allocation of $80,000 book depreciation matched by only $60,000 of tax depreciation under section 704(c) principles).

Finally, although they do not apply to this case, the current section 704(c) regulations, which were promulgated in December 1993, refute the government's litigating position that section 704(c) applies only to gains and losses from dispositions of contributed property. See Treas. Reg. § 1.704-3(b)(1) ("For section 704(c) property subject to amortization, depletion, depreciation, or other cost recovery, the allocation of deductions attributable to these items takes into account built-in gain or loss on the property."). Indeed, significant portions of the government's current section 704(c) regulations would be rendered superfluous if, as the government has asserted, section 704(c) and the ceiling rule are irrelevant to book-tax differences in depreciation. See,

30

e.g., Treas. Reg. § 1.704-1(c)(1) (describing the potential use of "curative allocations" to avoid the impact of the ceiling rule on allocations of depreciation deductions in respect of property contributed to a partnership on or after December 21, 1993).

In summary, the legislative history of section 704(c) and longstanding regulations under sections 704(b) and 704(c) refute the government's assertion that "[t]his is not a 704(c) case." Because of the government's failure to follow its own regulations and its explicit disavowal of section 704(c) at trial, Plaintiff believes it appropriate to make the following additional points.

First, the application of section 704(c) and the ceiling rule to contributions of depreciable property to a partnership is hornbook law and had been hornbook law for decades prior to 1993. See, e.g., Arthur B. Willis, Willis on Partnership Taxation § 11.05 (1st ed. 1971); 2 Stanley S. Surrey, William C. Warren, Paul R. McDaniel & Hugh J. Ault, Federal Income Taxation, 36-38 (1973); 1 William S. McKee, William F. Nelson & Robert L. Whitmire, Federal Taxation of Partnerships and Partners, ¶ 10.08 (1st ed. 1977); Gregory J. Marich & William S. McKee, Sections 704(c) and 743(b): The Shortcomings of Existing Regulations and the Problems of Publicly Traded Partnerships, 41 Tax L. Rev. 627 (1986); John P. Steines, Jr., Partnership Allocations of Built-in Gain or Loss, 45 Tax L. Rev. 615, 641-47 (1990).[16]

---

[16] Commentators have ascribed various reasons for the adoption of the ceiling rule. Like the general rule contained in section 704(c)(1) of the 1954 Code, the ceiling rule's effects could be viewed as temporary, in that they eventually reverse on liquidation of the partnership or sale of a partner's interest. See, e.g., Surrey et al., supra, at 37-38. Some commentators have suggested that the ceiling rule resulted from the view that a partnership should compute its income as an entity. See Marich & McKee, supra, at 635 ("The ceiling rule and its distortions are a product of the entity-aggregate conflict that is deeply embedded within subchapter K."). Others have suggested that the ceiling rule reflected a concern that, in the absence of such a rule, partners could have the incentive to inflate the value of contributed property in order to create taxable income or taxable loss items to allocate among the partners. See Mark P. Gergen, Colloquium on Partnership Taxation: Reforming Subchapter K: Contributions and Distributions, 47 Tax L. Rev. 173,

Second, prior to the December 1993 regulations, the ceiling rule was <u>mandatory</u>. Depending on the particular facts and circumstances (such as the partners' relative tax brackets and whether the property was built-in gain or built-in loss property), the ceiling rule could benefit taxpayers or the government. <u>See</u> L. Sheppard, "News Analysis: The Proposed Section 704(c) Regulations Promote Adverse Selection," 58 Tax Notes, 260, Jan. 18, 1993 ("The ceiling rule has been a source of practitioner complaints for years. But it will not go away . . . .").

Third, the ceiling rule was <u>pervasive</u>. It was a planning consideration whenever a partner contributed built-in gain or built-in loss property to a partnership. In the words of one commentator: "[T]he ceiling rule is ubiquitous. One can only speculate about this, but it is not extreme to think that the ceiling is hit in over half of the contributions to and purchases of interests in partnerships." Steines, <u>supra</u>, at 647. The ceiling rule was not obscure or esoteric; it was a routine part of any planning for contributions of property to partnerships.

Finally, the fact that the ceiling rule "shifted" the tax burden associated with built-in gain property from the contributing partner to the non-contributing partner or partners is irrelevant. This is not merely <u>a</u> potential result of the ceiling rule—it is the <u>only</u> result. The ceiling rule has no effect on the partners' interests in the partnership's economic or book income; its only impact is on the allocation of taxable income.

For this reason, the government's complaint that neither ING nor Rabo received any benefit from the allocation of taxable income in excess of its 49% share of book operating income simply misses the point. Not only do the applicable section 704(c)

---

183-84 (1991). While the underlying reasons that led to the adoption of the ceiling rule may be unclear, the fact that the ceiling rule was the law is unquestionable.

32

regulations mandate the use of the ceiling rule, but the section 704(b) regulations explicitly state that the differences between the amount of book income and the amount of taxable income allocated to a noncontributing partner do not cause the partnership's book allocations to lack substantial economic effect. See Treas. Reg. § 1.704-1(b)(5), Example 14 (iii) (book allocations had substantial economic effect even though one partner suffers an economic loss but is allocated no tax loss because of the ceiling rule); id., Example 18 (v), (vi), (ix), (xi), (xii)(book allocations have substantial economic effect even though they differ from the allocations of taxable items where the disparity "is attributable entirely to the 'ceiling rule.'").

VI. THE GOVERNMENT SHOULD NOT BE PERMITTED TO IGNORE ITS OWN REGULATIONS

As set forth in the preceding section, it is undeniable that section 704(c) and the ceiling rule apply to the facts of this case and provide a tax benefit to Plaintiff. In similar contexts, the courts have refused to permit the government to ignore the explicit provisions of its own regulations. For example, in Woods Investment Co. v. Commissioner, 85 T.C. 274 (1985), the Tax Court held that the IRS was bound by its regulations even though the regulations provided the taxpayer with a tax benefit. In the Tax Court's view, the IRS's remedy was to amend its regulations rather than ignore them. 85 T.C. at 282 ("Since respondent has not taken steps to amend his regulations, we believe his apparent reluctance to use his broad power in this area does not justify judicial interference in what is essentially a legislative and administrative matter." (citation omitted)). See Plymouth Savings Bank v. Internal Revenue Service, 187 F.3d 203, 209 (1st Cir. 1999) (holding for taxpayer based "on a plain reading of the regulations," stating, "[t]he IRS, which promulgates these regulations, has had ample opportunity to

rewrite them to better suit its desired interpretation of the statute"); cf. Gitlitz v. Commissioner, 531 U.S. 206 (2001) (holding in favor of taxpayer based on plain meaning of statute, even though result was to provide a potential double benefit to the taxpayer). This point is particularly apt in this case, which involves a regulation that was in force for almost four decades and whose plain meaning is consistent with the stated intent of the drafters of the statute.

If the IRS does not like the impact of its regulations, the appropriate course is to amend the regulations, not ignore them.[17] In fact, the IRS did amend the section 704(c) regulations for contributions on or after December 21, 1993; had Plaintiff contributed the aircraft to Castle Harbour on or after that date, it would not have realized the tax benefits at issue in this case. Under these circumstances, it is wrong for the government to ignore its own regulations.

## VII. CONCLUSION

The IRS challenge to the Castle Harbour transaction originated with its claims that the transaction lacked both economic substance and business purpose and that the interests acquired by ING and Rabo were debt rather than equity. The evidence presented by Plaintiff at trial has established that neither of these arguments has any merit.

The only remaining argument was the IRS's third argument, that the allocations of operating income contained in the Castle Harbour Operating Agreement did not have substantial economic effect under section 704(b) of the Code. Beginning with the IRS

---

[17] Cf. Brown Group, Inc. v. Commissioner, 77 F.3d 217, 222 (8th Cir. 1996) ("Although our holding may result in a tax windfall . . . under the pre-1987 version of . . . of the Internal Revenue Code, such a tax loophole is not ours to close but must rather be closed or cured by Congress. Indeed, Congress has done just that. It closed this loophole the following year . . . ." (citation omitted)).

34

explanation of the FPAAs, continuing with the government's trial brief, and concluding with the testimony of the government's accounting expert at trial, the government has yet to offer a coherent explanation of its position. What is clear from the government's trial brief and the testimony of its expert is that the government's position would allocate more than $25,000,000 in book income to one set of partners, even though the government admits that another set of partners received the economic benefit of that

income, in clear violation of the section 704(b) regulations. The government's 704(b) argument remains nothing more than a mere assertion with no legal authority and or factual evidence to support it.

Respectfully submitted this 4th day of August 2004.

PLAINTIFF
TIFD III-E INC.

By: _____
Anthony M. Fitzgerald
One of the Attorneys for Plaintiff

Anthony M. Fitzgerald, ct04167
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, CT 06509-1950
Telephone: (203) 777-5501
Facsimile: (203) 784-3199
e-mail: afitzgerald@carmodylaw.com

William F. Nelson (ct22883)
David J. Curtin, ct22881
Michael J. Desmond, ct23186
John A. Galotto, ct22882
McKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, D.C. 20036
Telephone: (202) 775-1880
Facsimile: (202) 775-8586
wnelson@mckeenelson.com
dcurtin@mckeenelson.com
mdesmond@mckeenelson.com
jgalotto@mckeenelson.com

Suzanne C. Feese, ct 23162
KING & SPALDING
191 Peachtree Street
Atlanta, Georgia 30303-1763
Telephone: (404) 572-3566
Facsimile: (404) 572-5147
sfeese@kslaw.com

36

## CERTIFICATE OF SERVICE

This is to certify that the foregoing **PLAINTIFF'S POST-TRIAL BRIEF** has been served by facsimile and regular mail, postage prepaid, on August 4, 2004, to:

>Robert J. Higgins
>Barry E. Reiferson
>Trial Attorneys, Tax Division
>U.S. Department of Justice
>P.O. Box 26
>Ben Franklin Station
>Washington, D.C. 20044
>
>Facsimile: (202) 514-9440

and by regular mail, postage prepaid to:

>John B. Hughes
>Assistant U.S. Attorney
>Chief, Civil Division
>United States Attorney's Office
>District of Connecticut
>157 Church Street
>New Haven, CT 06508

_____
Anthony M. Fitzgerald, ct04167
One of the Attorneys for Plaintiff