IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TIFD III-E INC., the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Case Nos.:  3:01-CV-01839 (SRU) (lead case)<br>3:01-CV-01840 (SRU)<br><br>August 4, 2004 |

PLAINTIFF'S REVISED AND ANNOTATED PROPOSED FINDINGS OF FACT

AND CONCLUSIONS OF LAW

I.    FINDINGS OF FACT

    A.    **Jurisdictional Facts**

1.    Plaintiff is a Delaware corporation headquartered at 201 High Ridge Road, Stamford, Connecticut 06927. **Stipulation No. 1.**[1]

2.    GE Capital Summer Street-I LLC was organized on July 26, 1993, as a state law limited liability company ("LLC") under Nevada law. **Stipulation No. 2.**

3.    On October 6, 1993, GE Capital Summer Street-I LLC changed its name to Castle Harbour-I Limited-Liability Company ("Castle Harbour"). **Stipulation No. 3.**

4.    Castle Harbour timely filed its U.S. Returns of Partnership Income (Form 1065) with the IRS for the 1993 through 1998 tax years (the "Partnership Returns").

---

[1]    The parties' stipulations are included in the Joint Trial Memorandum filed with the Court on July 8, 2004.

**Stipulation No. 4; JX 22;[2] JX 40; JX 50; JX 56; JX 59; JX 70; Hyde Tr. (7/26/04) at 540:23 to 542:1.[3]**

5.     Plaintiff is the Tax Matters Partner ("TMP") of Castle Harbour for each of the 1993 through 1998 tax years, within the meaning of 26 U.S.C. ("I.R.C.") § 6231(a)(7). **Stipulation No. 5.**

6.     In its capacity as the TMP of Castle Harbour, Plaintiff is the authorized and proper party to bring these consolidated actions under I.R.C. § 6226(a). **Stipulation No. 6.**

7.     The IRS mailed two Notices of Final Partnership Administrative Adjustments ("FPAAs") to Plaintiff on June 29, 2001, adjusting partnership items reported on the Partnership Returns. **Stipulation No. 7.**

8.     Plaintiff timely filed separate Complaints in these consolidated actions pursuant to I.R.C. § 6226(a). **Stipulation No. 8.**

9.     Prior to filing these consolidated actions, Plaintiff made jurisdictional deposits of tax in the total amount of $62,212,010, as required by I.R.C. § 6226(e), for the 1993 through 1998 tax years. **Stipulation No. 9.**

10.     During the 1993 through 1998 tax years, Plaintiff and TIFD III-M INC., a Delaware corporation ("TIFD III-M"), were members of Castle Harbour. **Stipulation No. 11.**

---

[2]  "JX" refers to the Joint Exhibits admitted into evidence at trial; PX refers to Plaintiff's Exhibits and DX refers to Defendant's Exhibits.

[3]  Trial testimony is cited by each witness' last name, the date the trial testimony was given, and page and line references to the trial transcript.

11.     Plaintiff and TIFD III-M are both indirect subsidiaries of General Electric Capital

Corporation ("GECC"), which is a wholly owned indirect subsidiary of The

General Electric Company ("GE").  **Stipulation No. 12.**

12.     During the 1993 through 1998 tax years, Plaintiff and TIFD III-M were part of an

"affiliated group" pursuant to I.R.C. § 1504, of which GE was the "common

parent" responsible for filing a consolidated federal income tax return.

**Stipulation No. 13.**

13.     For the 1993 through 1998 tax years, Castle Harbour was classified as a

partnership under the Internal Revenue Code.  **Stipulation No. 14.**

**B.     GECC's Background in the Aircraft Leasing Business**

14.     In the early 1990s, GECC's aircraft leasing business was operated primarily

through an operating division known as Transportation & Industrial Funding

Corporation ("T&I") and through an indirect subsidiary called Polaris Holding

Company ("Polaris").  **O'Reilly Tr. (7/21/04) at 45:18 to 46:3; Parke Tr.**

**(7/22/04) at 375:5 to 376:2; Lewis Tr. (7/21/04) at 131:17 to 132:7; PX 197 at**

**0100872**.

15.     Prior to 1992, GECC's aircraft leasing business included operating leases, but

focused on long-term finance leases (including leveraged leases).  **O'Reilly Tr.**

**(7/21/04) at 48:8 to 48:18**.

16.     Finance leases are longer in duration than operating leases and therefore require

the lessor to take a less active role in managing and remarketing its aircraft than

do operating leases.  **O'Reilly Tr. (7/21/04) at 47:14 to 48:7.**

17.     In the late 1980s, GECC expanded its commercial aircraft leasing business by acquiring an interest in Polaris, a California-based company that specialized in commercial aircraft operating leases.  **O'Reilly Tr. (7/21/04) at 48:8 to 48:18.**

18.     In the 1992-1993 time period, GECC had approximately 350 leased airplanes in its portfolio, including both T&I (primarily finance leases) and Polaris (primarily operating leases) aircraft.  **PX 140 at 0100468; PX 181 at 0100484; O'Reilly Tr. (7/21/04) at 50:23 to 51:3.**

19.     In 1992, approximately 40% of the airplanes in GECC's portfolio were older "Stage II" aircraft manufactured in the 1970s and early 1980s.  **PX 140 at 0100468; O'Reilly Tr. (7/21/04) at 50:23 to 51:3.**

20.     Stage II aircraft were significantly less valuable than newer, Stage III aircraft because they were not compliant with "Stage III" noise regulations.  **PX 159 at 0100355-357; O'Reilly Tr. (7/21/04) at 50:9 to 50:22.**

**C.      GECC's Acquisition of Guinness Peat Aviation Assets**

21.     Guinness Peat Aviation Group, Plc ("GPA") is a Shannon, Ireland-based company that specialized in commercial aircraft operating leases and was a competitor of GECC in the early 1990s.  **O'Reilly Tr. (7/21/04) at 48:11 to 48:25.**

22.     In the spring of 1992, an attempted initial public offering of stock by GPA failed.  **O'Reilly Tr. (7/21/04) at 91:7 to 92:10; Hyde Tr. (7/26/04) at 483:7 to 483:16; PX 159 at 0100354.**

23.     On October 30, 1993, GECC closed a transaction in which it acquired assets from GPA, including aircraft subject to short-term operating leases, aircraft management systems, and 85% to 90% of GPA's employees.  **O'Reilly Tr.**

**(7/21/04) at 97:11 to 99:19; Hyde Tr. (7/26/04) at 483:7 to 483:16; JX 26 at 0022062.**

24.    Following the acquisition of assets from GPA, GECC consolidated its aircraft leasing business into a new business group known as General Electric Capital Aviation Services or "GECAS." **PX 197 at 0100872; Parke Tr. (7/22/04) at 375:8 to 376:2.**

25.    Following the acquisition of assets from GPA, and pursuant to a management services agreement, GECAS continued to manage a large portfolio of airplanes that GPA did not sell to GECC. **Hyde Tr. (7/26/04) at 484:13 to 484:22**.

**D.    GECC's "Sell-Down" Effort**

26.    From 1991 through 1993, the commercial airline industry was in a severe down cycle caused, in part, by the Persian Gulf War. **O'Reilly Tr. (7/21/04) at 49:6 to 50:4; Parke Tr. (7/22/04) at 385:17 to 386:14; Nayden Tr. (7/23/04) at 451:7 to 452:10; Lewis Tr. (7/21/04) at 137:15 to 138:5; Brickman Tr. (7/21/04) at 205:10 to 206:3; PX 162; Dull Tr. (7/22/04) at 298:24 to 299:2.**

27.    The problems facing the commercial airline industry in the early 1990s were reflected in bankruptcy filings by a number of major U.S. airlines, including Continental Airlines in December 1990, Pan American in January 1991, Midway in March 1991, America West in June 1991, and TransWorld Airlines in January 1992. **PDX F[4]; Lewis Tr. (7/21/04) at 137:20 to 138:5.**

28.    The recession in the airline industry had a direct impact on GECC, which had hundreds of millions of dollars invested in commercial airplanes and commercial

---

[4]    "PDX" refers to Plaintiff's Demonstrative Exhibits admitted into evidence at trial.

airplane leases. **Lewis Tr. (7/21/04) at 153:16 to 155:12; Nayden Tr. (7/23/04) at 451:7 to 452:10; Brickman Tr. (7/21/04) at 206:4 to 206:20**.

29.   In 1991, during the course of its bankruptcy proceedings, Eastern Airlines transferred 26 airplanes to GECC. **O'Reilly Tr. (7/21/04) at 66:25 to 69:5; Dull Tr. (7/22/04) at 296:5 to 296:14**; JX 12 at 0097335.

30.   The 26 airplanes transferred by Eastern initially became "non-performing" or "non-earning" assets on GECC's balance sheet, creating a drain on GECC's earnings, and affecting the profitability of the company's aircraft financing business. **O'Reilly Tr. (7/21/04) at 66:25 to 69:5; JX 12 at 0097335-336; Lewis Tr. (7/21/04) at 140:5 to 140:23**.

31.   The 26 airplanes transferred by Eastern were part of a significant increase in the number of non-performing aircraft on GECC's balance sheet in the early 1990s. **O'Reilly Tr. (7/21/04) at 72:20 to 73:9; Lewis Tr. (7/21/04) at 138:6 to 139:2 and 140:24 to 141:12; Dull Tr. (7/22/04) at 299:3 to 299:14; PX 181 at 0100484.**

32.   Non-performing aircraft assets continued to be a significant problem for GECC into 1993. **PX 197 at 0100891; Parke Tr. (7/22/04) at 387:19 to 389:1.**

33.   GECC's non-performing aircraft assets (and assets that were at risk of non-performing) created an external perception among market analysts and investors of an issue that could undermine the performance of GE's stock. **O'Reilly Tr. (7/21/04) at 60:16 to 61:9; Parke Tr. (7/22/04) at 387:19 to 388:19; Lewis Tr. (7/21/04) at 147:6 to 148:15**.

34.     The recession in the airline industry in the early 1990s made it difficult for GECC to attract third-party capital to the aircraft financing business. **Lewis Tr. (7/21/04) at 163:22 to 164:17.**

35.     GECC's ability to attract third-party capital to its aircraft financing business was important because it demonstrated vitality in the market, provided independent validation of the company's investment decisions, and provided independent validation for the residual values of the company's airplanes. **PX 139; Lewis Tr. (7/21/04) at 191:9 to 191:22 and 193:13 to 193:16.**

36.     GECC's non-earning assets were at an historical high in the fall of 1991. **JX 7; Lewis Tr. (7/21/04) at 138:16 to 139:2.**

37.     In 1991, GECC's ability to reduce its non-earning assets (including aircraft) was identified as a significant factor in the market's assessment of the value of GE stock. **JX 7 at 0097222; Lewis Tr. (7/21/04) at 138:6 to 139:2, 147:6 to 148:15, 155:17 to 157:10 and 190:4 to 191:8; JX 12 at 0097334-336.**

38.     In the early 1990s, many of the Stage II airplanes in GECC's portfolio were at risk of becoming non-performing assets because they were on lease to airlines that were in or on the verge of bankruptcy. **Lewis Tr. (7/21/04) at 191:23 to 192:25; Nayden Tr. (7/23/04) at 451:7 to 452:10; PDX F.**

39.     In 1993, credit rating agencies were concerned about GECC's exposure to the airline industry. **PX 155 at 0097445; O'Reilly Tr. (7/21/04) at 58:23 to 59:17; Lewis Tr. (7/21/04) at 144:4 to 144:16.**

40.    In 1993, credit rating agencies were particularly concerned with GECC's exposure to older Stage II airplanes. **PX 155 at 0097445; Lewis Tr. (7/21/04) at 139:8 to 140:4 and 144:4 to 144:16.**

41.    GECC's exposure to non-performing aircraft assets led to a directive from senior management to step up efforts to deal with the issue though the commitment of significant time and resources. **Lewis Tr. (7/21/04) 141:13 to 142:2.**

42.    Notwithstanding the recession in the airline industry in the early 1990s, GECC saw strong potential for long-term growth in the aircraft financing business, and was looking for opportunities to grow its aircraft financing business. **O'Reilly Tr. (7/21/04) at 69:22 to 72:19; Lewis Tr. (7/21/04) at 149:6 to 149:24 and 193:22 to 194:8.**

43.    In order to address short-term business constraints and to position GECC for long-term growth, in 1992 the company began to develop a plan to manage or "sell-down" non-performing assets (and assets at risk of not performing), including aircraft. **PX 146 at 0097301-302; Nayden Tr. (7/23/04) at 452:17 to 453:16; Lewis Tr. (7/21/04) at 159:22 to 160:15.**

44.    The "sell-down" effort was not limited to selling assets, but included a full range of measures to reduce exposure to or "monetize" assets without actually selling them. **O'Reilly Tr. (7/21/04) at 77:4 to 78:2 and 99:21 to 101:8; Nayden Tr. (7/23/04) at 452:17 to 453:16.**

45.    In connection with the sell-down effort, beginning in May 1992, GECC submitted requests for proposal (collectively, the "Sell-Down RFP") to seven investment banks, seeking ideas that would help the company achieve three primary

objectives. **JX 8 at 0097297; PX 141 at 0097235; PX 142 at 0097279; P143 at 0097253; PX 146 at 0097302; O'Reilly Tr. (7/21/04) at 76:14 to 76:24 and 78:16 to 81:21; Lewis Tr. (7/21/04) at 158:8 to 159:2; Brickman Tr. (7/21/04) at 206:21 to 207:20.**

46.    The seven investment banks that initially received the Sell-Down RFP in May 1992 were Citicorp, Goldman Sachs, Bankers Trust, McManus & Miles, Kidder Peabody & Company, Babcock & Brown, Inc. ("Babcock & Brown"), and Morgan Stanley & Co., Inc. **JX 10 at 0097472.**

47.    In June 1993, the Sell-Down RFP continued to fairly represent GECC's goals and a copy of the RFP was sent to Merrill Lynch. **PX 160.**

48.    The three primary objectives identified in the Sell-Down RFP were: (i) accessing liquidity in order to meet the industry's future demands; (ii) tapping into a wider pool of investor capital; and (iii) achieving off-balance financing for a portion of GECC's current asset portfolio. **JX 8 at 0097297; PX 141 at 0097235; PX 142 at 0097299; PX 143 at 0097253; Dull Tr. (7/22/04) at 302:13 to 302:20; Lewis Tr. (7/21/04) at 162:14 to 163:7; JX 10.**

49.    One of the investment banks to whom the Sell-Down RFP was submitted was Babcock & Brown, an investment banking firm that specialized in asset leasing transactions. **JX 8; Brickman Tr. (7/21/04) at 206:21 to 207:20.**

50.    GECC had worked with Babcock & Brown previously on asset leasing transactions. **Brickman Tr. (7/21/04) at 202:3 to 203:12.**

51.    The seven investment banks that originally received the Sell-Down RFP responded to it by providing GECC with proposed transactions designed to meet the identified objectives.  **JX 10 at 0097472; JX 11 at 0097323.**

52.    GECC reviewed the proposed transactions and determined that it would proceed with consideration of three proposals submitted by four of the seven investment banks.  **JX 10 at 0097473; O'Reilly Tr. (7/21/04) at 85:18 to 86:14.**

53.    The steps GECC could take to implement the sell-down effort were limited by overall capital structure restrictions, including a target 8:1 debt-to-equity ratio which limited the amount of money GECC could raise through debt offerings, and by a "negative pledge" covenant in some if its public debt that limited GECC's ability to borrow funds against its assets.  **Parke Tr. (7/22/04) at 379:4 to 379:15 and 383:18 to 385:16; Lewis Tr. (7/21/04) at 163:8 to 163:21 and 166:23 to 167:17; PX 129, § 4.03 at 0100550-552.**

54.    The 8:1 debt-to-equity benchmark was established through an agreement with Moody's Investor Services and other credit rating agencies as to the steps GECC would take to maintain its AAA credit rating.  **Parke Tr. (7/22/04) at 379:16 to 380:20; PX 132 at 0100463; PX 287 at 0100510.**

55.    At the end of 1993, GECC's debt-to-equity ratio was 7.96:1.  **Parke Tr. (7/22/04) at 380:21 to 381:9; PX 287 at 015510.**

56.    The negative pledge was a financing covenant included in many of GECC's existing medium and long-term debt offerings that precluded the company from pledging assets to secure debt except in limited circumstances such as purchase

money debt. **Parke Tr. (7/22/04) at 383:24 to 385:16; PX 129, § 4.03 at 0100550-552**.

57. From May 1992 through early 1993, GECC considered various proposals offered in response to the Sell-Down RFP, but was not able to find one that satisfied its goals while complying with the company's capital structure restrictions. **Brickman Tr. (7/21/04) at 210:11 to 216:23; JX 9 at CAS 00812; JX 13 at 0097489; DX 23; DX 26 at 0097385-386.**

**E.    Origin and Formation of Castle Harbour**

58. On April 1, 1993, Babcock & Brown submitted an additional proposal for a partnership transaction that would monetize aircraft assets. **DX 22; Brickman Tr. (7/21/04) at 216:24 to 219:16**.

59. Babcock & Brown's April 1993 proposal originated from the Sell-Down RFP and was designed to achieve many of the same objectives described in the Sell-Down RFP. **PX 161; O'Reilly Tr. (7/21/04) at 90:1 to 90:21; Lewis Tr. (7/21/04) at 165:11 to 166:1, 167:18 to 168:5 and 185:7 to 185:10; Brickman Tr. (7/21/04) at 210:11 to 211:19 and 212:10 to 219:16**.

60. The April 1993 proposal called for GECC to partner with an equity investor in a transaction that would involve the contribution by GECC of a portfolio of leased assets and the contribution of cash by the equity investor. **DX 22; Brickman Tr. (7/21/04) at 216:24 to 219:21**.

61. Although the April 1993 proposal did not respond to all of the sell-down objectives, GECC concluded that it was the best transaction that could be done in

light of the current market conditions, and that doing nothing with its aircraft portfolio was not an option. **Nayden Tr. (7/23/04) at 455:12 to 456:14.**

62.    The April 1993 proposal lead to the formation of GE Capital Summer Street-I Limited Liability Company, a Nevada limited liability company that would later change its name to Castle Harbour-I Limited Liability Company ("Castle Harbour"). **DX 22; PX 161; Brickman Tr. (7/21/04) at 217:20 to 218:14; Stipulation No. 3.**

63.    The Castle Harbour transaction came out of the sell-down effort. **Dull Tr. (7/22/04) at 297:12 to 297:20; Brickman Tr. (7/21/04) at 210:11 to 211:19 and 212:10 to 219:16.**

64.    The Castle Harbour transaction was presented to and formally approved by senior GECC management. **JX 16; O'Reilly Tr. (7/21/04) at 92:20 to 93:25; Parke Tr. (7/22/04) at 389:17 to 390:20; Lewis Tr. (7/21/04) at 166:18 to 166:22; Nayden Tr. (7/23/04) at 453:17 to 454:11.**

65.    The non-tax benefits GECC expected to derive from Castle Harbour included: (i) raising $120 million of minority equity financing; (ii) demonstrating liquidity in the aircraft leasing market; (iii) producing a significant pre-tax profit; and (iv) shifting some rent collection and residual value risk. **JX 16; Parke Tr. (7/22/04) at 390:1 to 390:20; Lewis Tr. (7/21/04) at 169:17 to 169:23; Nayden Tr. (7/23/04) at 455:12 to 456:14 and 457:6 to 457:20; O'Reilly Tr. (7/21/04) at 92:20 to 93:25.**

66.    GECC believed that, by bringing in new equity investors, Castle Harbour would demonstrate liquidity in the aircraft leasing marketplace. **Parke Tr. (7/22/04) at 390:1 to 390:13.**

67.    The Castle Harbour transaction kept GECC's debt-to-equity ratio at 7.96:1 at the end of 1993. Had the transaction not been entered into, the ratio would have been approximately 7.97:1 at the end of 1993. **Parke Tr. (7/22/04) at 395:7 to 395:12; O'Reilly Tr. (7/21/04) at 95:10 to 96:11.**

68.    Because it raised equity and did not require new debt to be issued, the Castle Harbour transaction did not violate GECC's negative pledge. **Parke Tr. (7/22/04) at 395:13 to 395:16; O'Reilly Tr. (7/21/04) at 97:4 to 97:10.**

69.    GECC expected to realize significant current and future federal income tax savings from the Castle Harbour structure. **Parke Tr. (7/22/04) at 390:21 to 390:24; O'Reilly Tr. 104:5 to 104:17; Dull Tr. (7/22/04) at 409:2 to 409:25; JX 16.**

70.    GECC management approved the Castle Harbour transaction shortly before it closed with ING and Rabo in early October. **Dull Tr. (7/22/04) at 304:4 to 304:24; JX 19.**

71.    On July 26, 1993, Castle Harbour (then known as GE Capital Summer Street-I Limited Liability Company), was organized as a Nevada limited liability company ("LLC"). **PX 22, PX 118, PX 119.**

72.    In order to achieve the benefits described in paragraph 65, above, it was necessary for GECC, through its wholly owned subsidiaries, to establish an entity such as

Castle Harbour; those benefits could not have been achieved by issuing equity directly from GECC. **Myers Tr. (7/27/04) at 769:19 to 771:12.**

73.    Castle Harbour was formed between subsidiaries of GECC prior to the identification of third-party equity investors in order to provide prospective investors with an existing transaction structure to consider. **Dull Tr. (7/22/04) at 315:13 to 315:19; Brickman Tr. (7/21/04) at 219:25 to 221:2.**

74.    The Nevada LLC structure allowed for member management rights that were compatible with Federal Aviation Administration ("FAA") limitations on management and ownership of aircraft by non-U.S. members. **PX 121; PX 122; PX 123.**

75.    The original member investors in Castle Harbour were (i) Plaintiff; (ii) General Electric Capital AG ("SwissCo"), a wholly owned affiliate of GECC organized under the laws of Switzerland; and (iii) TIFD III-M. **PDX A; PX 23 at 0097903.**

76.    Because Plaintiff and TIFD III-M are wholly owned indirect subsidiaries of GECC, and because GECC guaranteed the performance of Plaintiff and TIFD III-M in connection with the Castle Harbour transaction, from an economic perspective, GECC can be viewed as a partner in Castle Harbour. **Myers Tr. (7/27/04) at 769:4 to 769:18; JX 3; Mulders Tr. (12/9/03) at 50:3 to 50:15; Nagel Tr. (12/4/03) at 46:22 to 47:15.**

77.    Viewing GECC as a partner in Castle Harbour does not change the economics of the transaction. **Myers Tr. (7/27/04) at 769:4 to 769:18.**

78.    Plaintiff acquired its initial member interest in Castle Harbour through the contribution of aircraft assets (with a net value of $294,903,437), 100% of the

stock in TIFD-VI INC. (with a value of zero), an option agreement (with a value of zero), a cash flow participation agreement (with a value of zero), and $240,000,000 in cash. **PDX A; PDX C; PX 23 at 0097926; Dull Tr. (7/22/04) at 314:9 to 315:8.**

79.    TIFD VI INC. changed its name to Castle Harbour Leasing, Inc. ("CHLI") on September 28, 1993. **PX 78 at 0099736.**

80.    SwissCo acquired an initial member interest in Castle Harbour through the contribution of $6 million in cash. **PDX A; PX 23 at 0097926.**

81.    TIFD III-M acquired an initial member interest in Castle Harbour through the contribution of $50,000,000 in cash. **PDX A; PDX C; PX 23 at 0097926.**

82.    Substantially all of the cash contributed to Castle Harbour by Plaintiff, SwissCo and TIFD III-M on July 26, 1993 was subsequently contributed by Castle Harbour to CHLI, its subsidiary corporation. **Dull Tr. (7/22/04) at 317:19 to 318:5; JX 17 at RABO 0242.**

83.    The aircraft assets Plaintiff contributed to Castle Harbour included all beneficial interests in a portfolio of 63 commercial aircraft (and associated aircraft engines) subject to 45 leveraged leases (and are collectively referred to as the "Aircraft Assets"). **Dull Tr. (7/22/04) at 308:16 to 309:1; PX 383.**

84.    The Aircraft Assets contributed to Castle Harbour included 32 Boeing 727s, 25 Boeing 737s, one Boeing 747, three McDonnell Douglas DC-9s and two McDonnell Douglas DC-10s. **PX 383.**

85.    Of the Aircraft Assets contributed to Castle Harbour, 60 airplanes were expected to come off lease prior to the end of 1999. **PX 383.**

86.   The Aircraft Assts contributed to Castle Harbour included 60 "Stage II" airplanes. **Dull Tr. (7/22/04) at 305:21 to 305:25**.

87.   The Aircraft Assets contributed to Castle Harbour were selected to be appealing to likely investors and, to the extent possible, to allow GECC to raise money against Stage II airplanes. **Dull Tr. (7/22/04) at 306:16 to 307:3 and 317:7 to 317:18**.

88.   On July 21, 1993 and October 6, 1993, the FAA issued opinions stating that the aircraft contributed to Castle Harbour that were registered with the FAA would continue to be duly registered in the names of the trustees that held legal title to the aircraft. **PX 43 at 0046799; PX 104 at 0099938**.

89.   The trustees holding legal title to the contributed Aircraft Assets were notified of the transfer of beneficial ownership to Castle Harbour. **PX 192**.

90.   The airlines leasing the 63 contributed aircraft were notified of the transfer of beneficial ownership to Castle Harbour. **PX 191; Dull Tr. (7/22/04) at 311:3 to 311:10**.

91.   Other third parties, including insurers, were notified of the transfer of beneficial ownership to Castle Harbour. **PX 178**.

92.   On July 26, 1993, the gross fair market value of the Aircraft Assets contributed to Castle Harbour by Plaintiff was at least $531,252,403, plus an accrued rent receivable of $21,638,634. **JX 17 at RABO 0242; Dull Tr. (7/22/04) at 309:13 to 311:2; PX 381 at 0101326-327**.

93.   On July 26, 1993, the Aircraft Assets were subject to non-recourse debt of $257,987,600. **JX 1, § 2.1 at 0101430**.

94.    On July 26, 1993, the net value of the Aircraft Assets contributed to Castle Harbour was $294,903,437. **JX 1, § 2.1 at 0101430; PDX A**.

95.    By July 26, 1993, the Aircraft Assets had been fully depreciated for U.S. tax purposes and therefore had a tax basis of $0. **Dull Tr. (7/22/04) at 317:3 to 317:6**.

96.    After Castle Harbour was formed on July 26, 1993, Babcock & Brown began taking steps to find third-party investors. **Brickman Tr. (7/21/04) at 221:23 to 223:6**.

97.    To facilitate the solicitation of third-party equity investors, Babcock & Brown prepared an "Investment Memorandum" that outlined the proposed terms for an investment in Castle Harbour. **JX 17; Dull Tr. (7/22/04) at 319:10 to 320:4; Brickman Tr. (7/21/04) at 221:03 to 221:22**.

**F.    Investments in Castle Harbour Made by ING and Rabo.**

98.    In August 1993, Babcock & Brown identified two Dutch financial institutions, Internationale Nederlanden Bank N.V. (subsequently renamed ING Bank N.V.) ("ING") and Rabo Merchant Bank N.V. ("Rabo") as potential third-party equity investors in Castle Harbour. **Brickman Tr. (7/21/04) at 224:9 to 225:1**.

99.    The investments in Castle Harbour were presented to ING and Rabo as equity interests in an LLC. **JX 17 at RABO 0241-242; Mulders Tr. (12/9/03) at 15:25 to 16:7; Nagel Tr. (12/4/03) at 85:10 to 85:19**.[5]

100.   In September 1993 and October 1993, representatives of ING, Rabo and GECC negotiated over the terms of ING's and Rabo's investment in Castle Harbour.

---

[5]   The record citations for Messrs. Mulders, Nagel and Koffey refer to their deposition transcripts, portions of which were designated for trial and submitted to the Court on July 20, 2004.

Dull Tr. (7/22/04) at 318:21 to 319:9 and 327:13 to 328:5; Brickman Tr. (7/21/04) at 225:19 to 227:16; Koffey Tr. (5/14/03) at 41:8 to 42:3.

101.    In the negotiations, ING and Rabo recognized that they would have equity interests in Castle Harbour that were subordinate to all creditors of Castle Harbour. **Mulders Tr. (12/9/03) at 16:11 to 16:18; Nagel Tr. (12/4/03) at 85:10 to 85:19; Myers Tr. (7/27/04) at 857:12 to 858:11.**

102.    In negotiating their participation in Castle Harbour, ING and Rabo were concerned with the downside potential of their investments. **Mulders Tr. (12/9/03) at 34:21 to 35:13; Brickman Tr. (7/21/04) at 264:8 to 264:23.**

103.    In negotiating their participation in Castle Harbour, ING and Rabo expressed concern over the legal and economic consequences (and potential liability) that could arise from a catastrophic accident involving Castle Harbour's airplanes. **Dull Tr. (7/22/04) at 354:6 to 355:14; Mulders Tr. (12/9/03) at 31:8 to 31:22 and 35:14 to 37:6; Nagel Tr. (12/4/03) at 77:2 to 78:10; Brickman Tr. (7/21/04) at 225:24 to 226:20 and (7/22/04) 257:1 to 258:11; Koffey Tr. (5/14/03) at 44:14 to 44:23.**

104.    Because of the liability concerns expressed by ING and Rabo, the level of insurance coverage that Castle Harbour would be required to carry was the subject of extensive negotiations. **Dull Tr. (7/22/04) at 354:6 to 355:14; Mulders Tr. (12/9/03) at 37:4 to 38:21; Brickman Tr. (7/21/04) at 226:1 to 226:20 and (7/22/04) 257:1 to 258:11.**

105.    FAA regulations limited the ability to structure Castle Harbour in a manner that would allow ING and Rabo to participate directly in the operation, management,

and control of Castle Harbour. **PX 43 at 0046793-801; PX 104 at 0099934-939; Dull Tr. (7/22/04) at 359:8 to 360:7; Myers Tr. (7/27/04) at 775:4 to 776:3**.

106.    In negotiating the terms of their investments in Castle Harbour, ING and Rabo demanded a detailed set of negative controls that would require their consent in order for the company to make any significant (and many insignificant) business decisions. **JX 1, § 5.4 at 0101455-459 and § 6.3 at 0101475; Dull Tr. (7/22/04) at 359:8 to 361:3; Hyde Tr. (7/26/04) at 502:23 to 503:2**.

107.    After three weeks of arm's-length negotiations between representatives of ING, Rabo, and GECC, the parties reached an agreement on the terms of the equity investments in Castle Harbour that would be made by ING and Rabo. **Dull Tr. (7/22/04) at 321:4 to 321:12, 327:13 to 328:5 and 330:18 to 330:22; Brickman (7/21/04) at 225:24 to 227:16; JX 1 at 0101393-394; JX 18**.

108.    The Castle Harbour transaction closed with ING and Rabo on October 6, 1993. **JX 1 at 0101393**.

109.    On October 6, 1993, ING and Rabo each acquired a Class A member interest in Castle Harbour. **PDX B; JX 1, § 2.2 at 0101431; Dull Tr. (7/22/04) at 322:6 to 323:5**.

110.    ING's Class A member interest in Castle Harbour was acquired by:

   a.    Payment of $25,424,649.50 to acquire part of the member interest in Castle Harbour that had been held by TIFD III-M; and

   b.    A cash contribution of $33,712,079.50 to Castle Harbour.

**PDX C; JX 1, § 2.2 at 0101431-32; JX 2, § 2.1 at 0101699; Dull Tr. (7/22/04) at 322:6 to 323:5; PDX B**.

111. Rabo's Class A member interest in Castle Harbour was acquired by:

    a. Payment of $25,424,649.50 to acquire part of the member interest in Castle Harbour that had been held by TIFD III-M; and

    b. A cash contribution of $33,712,079.50 to Castle Harbour.

**PDX C; JX 1, § 2.2 at 0101431-32; JX 2, § 2.1 at 0101699; Dull Tr. (7/22/04) at 322:6 to 323:5; PDX B.**

112. TIFD III-M made an additional capital contribution to Castle Harbour on October 6, 1993. **PDX B; JX 1, § 2.3 at 0101431; PX 112.**

113. With the admission of ING and Rabo as members of Castle Harbour, SwissCo was retired as a partner and TIFD III-M's member interest, after an additional capital contribution, was reduced to 1%. **PDX B; Dull Tr. (7/22/04) at 318:6 to 318:20; JX 1, § 2.3 at 0101431.**

114. The total of $117,424,159 invested in Castle Harbour by ING and Rabo was reported by GECC on its audited financial statements as "minority interest in equity of consolidated affiliates." **PX 197 at 0100884; Parke Tr. (7/22/04) at 391:21 to 393:13; JX 19 at 0075868; Dull Tr. (7/22/04) at 304:25 to 305:7 and 357:14 to 357:24.**

115. The net $246 million in cash that was invested by GECC (through its wholly-owned, indirect subsidiaries) in Castle Harbour was then contributed to CHLI, which in turn invested it (by the end of 1993) in GECC commercial paper. **Parke Tr. (7/22/04) at 394:5 to 394:18; Myers Tr. (7/28/04) at 969:9 to 969:20.**

116. Because it was invested in GECC commercial paper and because Castle Harbour was consolidated with GECC for financial reporting purposes, GECC continued to

have full use of the net $246 million in cash that was invested in Castle Harbour. **Parke Tr. (7/22/04) at 394:19 to 394:23**.

117.   From a corporate finance perspective, the investments ING and Rabo made in Castle Harbour were equity investments. **Myers Tr. (7/27/04) at 762:18 to 762:19, 795:13 to 795:20 and 863:18 to 863:21**.

118.   From a corporate finance perspective, ING and Rabo did not extend loans to Castle Harbour. **Myers Tr. (7/27/04) at 762:18 to 762:19 and 795:13 to 795:20**.

119.   For U.S. federal tax purposes, ING and Rabo treated their investments in Castle Harbour as partnership interests. **JX 4, § 2 at 99436-437; Mulders Tr. (12/9/03) at 75:18 to 75:20**.

120.   For Dutch tax purposes, Dutch internal and external reporting purposes, and Dutch bank regulatory purposes, ING and Rabo inconsistently treated their interests in Castle Harbour as both debt and equity. **Mulders Tr. (12/9/03) at 43:3 to 44:22, 46:20 to 48:15, 94:13 to 96:20 and 108:6 to 110:15; Nagel Tr. (12/4/03) at 62:13 to 65:11 and 71:5 to 71:13**.

121.   The Dutch tax system is different in many respects from the U.S. tax system. **Mulders Tr. (12/9/03) at 96:15 to 96:20**.

122.   Plaintiff, TIFD III-M, ING and Rabo each provided substantial capital to Castle Harbour, assumed real economic risk, and shared in the potential for economic profit and loss from the operations of Castle Harbour. **JX 1, § 2.1 at 0101430-0101433; PDX M, PDX N; PDX Q; PDX T**.

123.   The right that ING and Rabo had to liquidate Castle Harbour in the event of the company's financial distress is similar to the liquidation right held by the owners

of preferred stock.  **JX 1, § 14.1 at 0101499-500 and § 12.1 at 0101490-491; Myers Tr. (7/27/04) at 844:14 to 851:11.**

124.   Castle Harbour's Amended and Restated Operating Agreement described the interests held by ING and Rabo in Castle Harbour as membership interests in a limited liability company.  The Operating Agreement does not otherwise have debt-like terms or covenants that override this equity characterization.  **JX 1, § 7.2 at 0101476; Myers Tr. (11/27/04) at 851:12 to 854:6.**

125.   The indemnification premium provision that is set forth in Castle Harbour's Amended and Restated Operating Agreement is similar to a call premium on preferred stock and does not make ING and Rabo lenders to, rather than equity members of Castle Harbour.  **JX 1 at 0101415; Myers Tr. (7/27/04) at 854:7 to 855:9 and (7/28/04) at 963:25 to 965:22.**

126.   ING's and Rabo's participation as members of Castle Harbour had no fixed maturity date.  **Myers Tr. (7/27/04) at 861:9 to 862:24 and (7/28/04) at 901:16 to 901:24.**

127.   It was expected that ING and Rabo would remain as equity investors in Castle Harbour through at least the end of 2000.  **Mulders Tr. (12/9/03) at 57:18 to 57:22 and 80:21 to 81:9.**

128.   On October 6, 1993, an Amended and Restated Operating Agreement for Castle Harbour, together with other closing documents, were executed by ING, Rabo, Plaintiff, TIFD III-M and SwissCo.  **JX 1.**

129.   The final terms of ING's and Rabo's investments in Castle Harbour, as set forth in the Amended and Restated Operating Agreement, differed materially from the

terms set forth in the Babcock & Brown Investment Memorandum.  **JX 1; JX 17; Dull Tr. (7/22/04) at 320:10 to 320:14 and 325:22 to 327:4; Brickman Tr. (7/22/04) at 286:3 to 287:16**.

130.  The actual return to ING and Rabo on their investments in Castle Harbour depended on the return provided by Castle Harbour's assets, including its aircraft lease income and the gain or loss on disposition of its aircraft assets.  **JX 1; PDX Q; PDX T; Myers Tr. (7/27/04) at 817:9 to 820:25 and 822:25 to 823:19**.

131.  The Amended and Restated Operating Agreement required Castle Harbour to maintain capital accounts to track the investment of each member and to serve as a "scorecard" of each member's interest.  **JX 1 at 0101403-404; Dull Tr. (7/22/04) at 332:13 to 333:6 and 333:17 to 334:17; Hyde Tr. (7/26/04) at 533:18 to 533:24 and 546:9 to 546:25; JX 20 at 0008772; JX 24 at 0008812; JX 37 at 0016344; JX 49 at 0008966; JX 53 at 0009079; JX 61 at 0018002; JX 68 at 0027170**.

132.  The capital accounts maintained by Castle Harbour started with each member's initial investment and were adjusted over time by allocations of book income, profit and loss, and by distributions made to each member.  **Myers Tr. (7/27/04) at 777:23 to 779:4**.

133.  Under the Amended and Restated Operating Agreement, ING and Rabo were entitled to receive their positive capital account balances on the buy-out or liquidation of their interests in Castle Harbour.  **JX 1, § 12.2(d) at 0101492; Dull Tr. (7/22/04) at 334:25 to 335:6 and 337:6 to 337:16**.

134. Under the Amended and Restated Operating Agreement, ING and Rabo were required to contribute cash to restore any deficit capital account balances (a deficit restoration obligation or "DRO") upon the liquidation of their interests in Castle Harbour. **JX 1, § 12.3 at 0101493; Dull Tr. (7/22/04) at 337:17 to 338:4; Myers Tr. (7/28/04) at 906:3 to 906:20; Mulders Tr. (12/9/03) at 99:5 to 99:15**.

135. The contractual requirement for an investor to return prior distributions in the event that a company's performance did not meet expectations is unheard of in the context of a debt instrument. **Myers Tr. (7/28/04) at 962:14 to 963:16**.

136. The scheduled distributions to ING and Rabo set forth in Exhibit E of the Amended and Restated Operating Agreement were merely a cash flow schedule that did not determine the ultimate return to ING or Rabo. **Mulders Tr. (12/9/03) at 42:7 to 42:17 and 54:6 to 54:16; Nagel Tr. (12/4/03) at 41:21 to 42:19**.

137. For Dutch book purposes, Rabo established a reserve for a portion of the Exhibit E distributions made by Castle Harbour in order to cover the potential DRO requirement. **Mulders Tr. (12/9/03) at 99:5 to 99:15**.

138. The capital accounts of ING and Rabo could become negative if ING or Rabo received more in scheduled "Exhibit E" payments from Castle Harbour than they had earned through allocations of operating and disposition income. **Dull Tr. (7/22/04) at 338:10 to 340:25; JX 1 at 0101663**.

139. Under the Operating Agreement, Castle Harbour was required to maintain a "Class A Investment Account" to track the theoretical amount that would have been due to ING and Rabo in the event that the Class A Guaranteed Payment

provision was triggered. **JX 1 at 0101406; Dull Tr. (7/22/04) at 403:25 to 405:14 and 436:13 to 436:22.**

140.    The Class A Investment Account was presented in Castle Harbour's financial statements using a higher 9.03587% Class A Guaranteed Payment rate in order to make a conservative presentation of the amount that could be due to ING and Rabo. **Dull Tr. (7/22/04) at 404:21 to 404:23 and 437:4 to 438:2; JX 24 at 0008813; JX 37 at 0016345; JX 49 at 0008967; JX 53 at 0009080; JX 61 at 0018003; JX 68 at 0027171; Myers Tr. (7/27/04) at 837:1 to 837:8.**

141.    When an airplane owned by Castle Harbour came off lease, the Amended and Restated Operating Agreement provided Castle Harbour with three options:  (i) distribute the airplane to Plaintiff (with a mark-to-market valuation determination and adjustment of each members' capital account to reflect allocation of the resulting disposition gain or loss); (ii) sell the airplane to a third party at fair market value; or (iii) lease the airplane pursuant to the terms of a master lease agreement with GECC. **JX 1, § 5.5(h) at 0101462-463; Hyde Tr. (7/26/04) at 510:15 to 511:6.**

142.    When an airplane owned by Castle Harbour came off lease, its members could (and did) agree to amend or waive the provisions of the Amended and Restated Operating Agreement to provide for any other form of disposition for the airplane. **PX 258, PX 260, PX 282, PX 350, PX 354; PX 357.**

143.    The managers of Castle Harbour decided what to do with Castle Harbour's airplanes when they came off lease. **Hyde Tr. (7/26/04) at 621:5 to 621:8.**