144.  Castle Harbour had two primary sources of profits: (i) operating profits, generated from lease payments; and (ii) disposition profits (gains) realized when airplanes came off lease and were sold to third parties or distributed to Plaintiff at fair market value. **Hyde Tr. (7/26/04) at 532:22 to 533:3**.

145.  Under the Amended and Restated Operating Agreement, operating profits consisted primarily of rent from Castle Harbour's aircraft portfolio, less (1) expenses related to the operation of that portfolio and Castle Harbour generally, (2) interest on debt encumbering the aircraft in the portfolio, and (3) depreciation of the aircraft. **JX 1 at 0101425-426**.

146.  The Amended and Restated Operating Agreement provided for the allocation of an uncapped 98% of Castle Harbour's operating profits to ING and Rabo. **PDX D; JX 1, § 3.1 at 0101435; Dull Tr. (7/22/04) at 350:24 to 351:12 and 356:19 to 357:13**.

147.  Because ING and Rabo were allocated an uncapped 98% of Castle Harbour's operating profits, if, at the end of the day, the company had been very profitable, ING and Rabo would have had larger capital accounts and would have earned a higher return on their investments. **Dull Tr. (7/22/04) at 350:24 to 351:12 and 356:19 to 357:13**.

148.  The Amended and Restated Operating Agreement allocated 90% of the first approximately $2.85 million of disposition profits (gains) and 1% of all additional disposition gains to ING and Rabo. **PDX E; JX 1, § 3.3(h) at 0101438-439; Dull Tr. (7/22/04) at 351:13 to 354:5**.

149.    The Amended and Restated Operating Agreement allocated to ING and Rabo 98% of the first approximately $3.85 million of operating losses, and a minimum of 1% (and as much as 100%) of all incremental losses. **PDX E; JX 1, § 3.2 at 0101435-436.**

150.    Under the Amended and Restated Operating Agreement, operating losses did not include residual losses on aircraft or other asset dispositions. ING and Rabo were allocated 90% of the first approximately $2.85 million of such disposition losses, and a minimum of 1% (and as much as 100%) of all excess disposition losses. **PDX E; JX 1, § 3.3(j) at 0101439-441.**

151.    After Plaintiff and TIFD III-M had been allocated total operating losses and disposition losses approximately equal to their total contributions to Castle Harbour, ING and Rabo would bear all losses of Castle Harbour to the extent of their remaining positive capital accounts. **PDX E; JX 1, § 3.3(j) at 0101440-441.**

152.    The Amended and Restated Operating Agreement provided for guaranteed payments to ING and Rabo as holders of the Class A interests (the "Class A Guaranteed Payment"). **JX 1 at 0101405 and § 12.2 at 0101491-492.**

153.    The Class A Guaranteed Payment was payable, if at all, only upon liquidation of Castle Harbour or upon the redemption of ING's and Rabo's interests in Castle Harbour, and then only if ING and Rabo had not previously received aggregate net allocations of operating income and gain sufficient to give them a minimum specified yield on their unrecovered investments. **Dull Tr. (7/22/04) at 346:12 to 346:20.**

154.   The Class A Guaranteed Payment was payable, if at all, under two potential rates, approximately 8.5% and approximately 9%, depending on the circumstances under which the interests of ING and Rabo in Castle Harbour were being bought out or liquidated.  **Dull Tr. (7/22/04) at 365:22 to 366:4; Myers Tr. (7/27/04) at 833:10 to 835:19.**

155.   The Class A Guaranteed Payment, if due, was subordinate to the claims of Castle Harbour's creditors.  **JX 1, § 12.2 at 0101491-492.**

156.   The Class A Guaranteed Payment provision was never triggered.  **Dull Tr. (7/22/04) at 346:18 to 346:20 and 365:18 to 365:21.**

157.   The Amended and Restated Operating Agreement provided that Class B guaranteed payments would be paid to Plaintiff and TIFD III-M on the last day of each year.  **JX 1, § 4.1 at 0101446.**

158.   The Class B guaranteed payments were an expense of Castle Harbour and were paid before any distributions were made to ING and Rabo.  **Dull Tr. (7/22/04) at 344:14 to 344:25; Myers Tr. (7/27/04) at 859:11 to 860:20.**

159.   The Class B guaranteed payments were not charged against the capital accounts of Plaintiff or TIFD III-M.  **Myers Tr. (7/27/04) at 859:11 to 860:20; JX 24 at 0008809 and 0008812; JX37 at 0016341 and 0016344, JX 49 at 0008963 and 0008966; JX 53 at 0009076 and 0009079; JX 61 at 0018000 and 0018002; JX 68 at 0027168 and 0027170.**

160.   The Class B guaranteed payment ensured that Plaintiff and TIFD III-M would receive some return on the assets they contributed to Castle Harbour.  **Dull Tr. (7/22/04) at 344:14 to 344:25.**

161.   Between October 6, 1993 and December 31, 1998, Castle Harbour made Class B guaranteed payments to Plaintiff and TIFD III-M totaling approximately $5,776,000. **JX 24 at 0008809, JX37 at 0016341, JX 49 at 0008963; JX 53 at 0009076; JX 61 at 0018000; JX 68 at 0027168.**

162.   Under the Amended and Restated Operating Agreement, at the option of its General Manager, Castle Harbour could make annual cash distributions to ING and Rabo. **JX 1, § 4.2 at 0101447; Tewell Tr. (7/26/04) at 648:7 to 649:13.**

163.   Castle Harbour was not required to make the annual cash distributions, even if adequate funds were available. **JX 1, § 4.2 at 0101447; Tewell Tr. (7/26/04) at 648:7 to 649:13.**

164.   If Castle Harbour failed to make an annual cash distribution, ING and Rabo had the right under the Amended and Restated Operating Agreement to cause Castle Harbour to be liquidated. **JX 1, § 14.1(d) at 0101499-500; Dull Tr. (7/22/04) at 345:8 to 345:22.**

**G.    Castle Harbour's Operations**

165.   Castle Harbour was actively engaged in the business of leasing commercial jet airplanes to major airlines including American Airlines, Delta Airlines, US Airways, Continental and SwissAir. **Hyde Tr. (7/26/04) at 484:23 to 485:2; PX 383; Tewell Tr. (7/26/04) at 640:4 to 641:19; PDX C.**

166.   From October 6, 1993 through December 31, 1998, Castle Harbour had a stream of variable operating income that was derived primarily from lease payments made by the lessees of its owned aircraft. **Dull Tr. (7/22/04) at 343:2 to 343:25.**

167.  On October 6, 1993, Castle Harbour was registered with the Registrar of Companies of Bermuda.  **PX 193; Hyde Tr. (7/26/04) at 498:7 to 498:17.**

168.  On October 6, 1993, Castle Harbour was issued a permit by the Bermuda Minister of Finance, granting it permission to carry on a trade or business in Bermuda.  **PX 90; Hyde Tr. (7/26/04) at 498:7 to 498:17.**

169.  From 1994 through 1998, Castle Harbour's principal place of business was located in Bermuda.  **Dull Tr. (7/22/04) at 371:9 to 371:12, 413:6 to 413:8; Hyde Tr. (7/26/04) at 497:17 to 498:6.**

170.  Castle Harbour rented office space in Bermuda.  **Hyde Tr. (7/26/04) at 497:17 to 498:6.**

171.  Ninety-eight percent of the expense incurred by Castle Harbour to rent office space in Bermuda was allocated to ING and Rabo.  **Hyde Tr. (7/26/04) at 625:14 to 626:23; DX 6.**

172.  Other commercial aircraft leasing companies, including Sarer and Rybeck, are located in low-tax jurisdictions like Bermuda.  **Hyde Tr. (7/26/04) at 489:9 to 489:16.**

173.  From 1994 through 1998, Castle Harbour held annual member meetings in Bermuda.  **Hyde Tr. (7/26/04) at 500:21 to 501:16; PX 252; PX 288; Tewell Tr. (7/26/04) at 643:14 to 643:22.**

174.  Representatives of ING and Rabo, including Elena Nassopoulou and Hem Mulders participated in person in the annual member meetings.  **Hyde Tr. (7/26/04) at 500:21 to 501:20.**

175.    Management of Castle Harbour was vested in a group of managers elected by
        Plaintiff and TIFD III-M. **JX 1, § 5.1 at 0101451-452; Hyde Tr. (7/26/04) at
        502:2 to 502:8; Dull Tr. (7/22/04) at 359:8 to 359:18; Tewell Tr. (7/26/04) at
        641:10 to 642:4 and 644:25 to 645:17.**

176.    In 1997, the compensation arrangement for Castle Harbour's general manager was
        amended to require Castle Harbour to incur the majority of the expenses
        associated with the general manager. **JX 64; Hyde Tr. (7/26/04) at 527:20 to
        529:1**.

177.    In addition to the annual meeting, Castle Harbour's managers met at least
        quarterly by telephone to discuss the company's operations and activities. **Hyde
        Tr. (7/26/04) at 502:18 to 502:22 and 503:3 to 503:20; Tewell Tr. (7/26/04) at
        641:20 to 642:4.**

178.    The topics covered in the manager's meetings included the status of the aircraft
        leases, the status of efforts to find new homes for aircraft coming off lease, Castle
        Harbour finances, and tax compliance. **JX 25; JX 28; JX 29; JX 34; JX 51; JX
        57; JX 65; PX 213; PX 230; PX 249;PX 252; PX 257; PX 285; PX 288; PX
        300; PX 311; PX 315; PX 330; PX 336; PX 337; PX 352; PX 355; PX 358; PX
        274; PX 281; PX 286; PX 289; PX 297; PX 299; PX 302; PX 305; PX 306; PX
        309; PX 314; PX 323; PX 324; PX 328; PX 329; PX 331; PX 346; PX 349; PX
        353; PX 356; PX 363; PX 373**.

179.    Although they had no direct voting rights, ING and Rabo were permitted to, and
        did, participate in the Castle Harbour manager's meetings, either in person or by
        telephone, to weigh in on issues affecting the partnership. **JX 1, § 9.2(e) at**

**0101481-482; Dull Tr. (7/22/04) at 362:5 to 363:7; Hyde Tr. (7/26/04) at 503:21 to 504:5; Mulders Tr. (12/9/03) at 75:21 to 78:5; Tewell Tr. (7/26/04) at 643:14 to 644:24, 645:15 to 645:25, 680:12 to 681:19 and 697:3 to 698:1.**

180.     From 1995 through 1998, Castle Harbour had a Resident Manager in Bermuda who handled the day-to-day operation of the partnership's business. **Hyde Tr. (7/26/04) at 485:3 to 486:10; Tewell Tr. (7/26/04) at 642:24 to 643:6.**

181.     Castle Harbour's resident manager dealt directly with the partnership's creditors, its airline lessees, potential lessees, and other third parties. **Hyde Tr. (7/26/04) at 520:22 to 521:7 and 525:13 to 525:18.**

182.     From July 1993 through July 1994 the day-to-day financing and accounting activities of Castle Harbour were handled by London-based GE Capital Advisory Services Ltd. ("Advisory, Ltd.") under the terms of an Administrative Services Agreement. **PX 57; JX 6; PX 36; Tewell Tr. (7/26/04) at 646:15 to 647:8; Dull Tr. (7/22/04) at 412:16 to 412:25.**

183.     Beginning in February 1994, Shannon, Ireland-based General Electric Capital Aviation Services, Ltd. ("GECAS, Ltd.") assumed responsibility for some of the day-to-day financing and accounting activities of Castle Harbour. **JX 26; JX 31; Dull Tr. (7/22/04) at 413:1 to 413:5; Tewell Tr. (7/26/04) at 646:15 to 647:8.**

184.     In March 1994, the Office of Revenue Commissioners for the Republic of Ireland ruled that by GECAS, Ltd. performing services for Castle Harbour, neither Castle Harbour nor CHLI would be regarded as a resident of Ireland carrying on a trade in Ireland. **Hyde Tr. (7/26/04) at 566:11 to 566:21; DX 70.**

185.   In July 1994, GECAS, Ltd. assumed full responsibility for Castle Harbour' day-to-day financing and accounting activities under an Administrative Services Agreement.  **JX 32**.

186.   The administrative services agreement covered Castle Harbour's operations, finance and accounting functions, its lease portfolio management functions, and its bookkeeping functions.  **JX 32 at 095822, 095823; Hyde Tr. (7/26/04) at 534:23 to 535:21**.

187.   GECAS, Ltd. performed similar administrative services functions for third party aircraft lessors as it performed for Castle Harbour.  **Hyde Tr. (7/26/04) 535:22 to 536:15, 545:2 to 546:8 and 624:14 to 625:1; PX 214 at 000918-919**.

188.   Castle Harbour paid GECAS, Ltd. for the services provided under the Administrative Services Agreement.  **JX 32 at 095813; JX 37 at 0016341; JX 49 at 0008963; JX 53 at 0009076; JX 61 at 0018000; JX 68 at 0027168**.

189.   Ninety-eight percent of the expenses incurred by Castle Harbour under the Administrative Services Agreement were allocated to ING and Rabo.  **PDX D**.

190.   To assist Castle Harbour in placing airplanes coming off lease, a Remarketing Agreement was entered into between Castle Harbour and GECAS, Ltd. on August 1, 1994.  **PX 217; Hyde Tr. (7/26/04) at 495:10 to 495:20 and 554:4 to 555:19; Tewell Tr. (7/26/04) at 646:15 to 647:1**.

191.   Castle Harbour paid GECAS, Ltd. for the work that was performed under the Remarketing Agreement.  **Hyde Tr. (7/26/04) at 625:2 to 625:13**.

192.    The expenses incurred by Castle Harbour under the Remarketing Agreement were allocated to Plaintiff, TIFD III-M, ING and Rabo.  **Hyde Tr. (7/26/04) at 625:7 to 625:13**.

193.    From July 1993 through August 1996, Chris Tewell served as Castle Harbour's General Manager, working for the company from an office in Hong Kong.  **PX 23 at 0098063; JX 1 at 0101661; PX 308; Tewell Tr. (7/26/04) at 639:10 to 639:16; Hyde Tr. (7/26/04) at 502:2 to 502:8.**

194.    Mr. Tewell held a work permit relating to his work as the general manger of Castle Harbour.  **Tewell Tr. (7/26/04) at 639:24 to 640:3**.

195.    Employees of GECAS, Ltd. performed work for Castle Harbour under the terms of a seconding agreement entered into between Plaintiff and GECAS, Ltd.  **PX 277; Hyde Tr. (7/26/04) at 489:20 to 491:19; Tewell Tr. (7/26/04) at 659:6 to 659:10**.

196.    From August 1995 through May 1997, Diarmuid Hyde worked in Bermuda as Castle Harbour's resident manager.  **Hyde Tr. (7/26/04) at 485:3 to 486:10; PX 327[6]; JX 57 at 0024241; Tewell Tr. (7/26/04) at 660:22 to 661:6**.

197.    As resident manager, Mr. Hyde reported to Castle Harbour's general manager, Mr. Tewell.  **Hyde Tr. (7/26/04) at 502:9 to 502:17; Tewell Tr. (7/26/04) at 661:7 to 661:15**.

198.    Mr. Hyde's responsibilities as resident manager fell into five categories:  (i) aircraft remarketing; (ii) aircraft portfolio management; (iii) general business; (iv)

---

[6]   Plaintiff's Exhibit 327 was not offered at trial; Plaintiff anticipates that a stipulation will be agreed to between the parties as to its admission into evidence.

investor relations; and (v) management accounts; financial statements. **JX 45 at ING 02962; Hyde Tr. (7/26/04) at 493:3 to 494:22**.

199. Mr. Hyde was issued a work permit by the Government of Bermuda in connection with his work for Castle Harbour. **Hyde Tr. (7/26/04) at 496:3 to 496:7**.

200. From 1996 through 1998, Todd Freeman was the General Manager of Castle Harbour. **PX 311 at 0002619; PX 352 at 0027745**.

201. Charles Oleson was the resident manager of Castle Harbour beginning in May 1997. **JX 57 at 0024241**.

202. Mr.Oleson also served as the general manager of Castle Harbour beginning in February 1998. **PX 352 at 0027745**.

203. Castle Harbour held bank accounts in its name in Bermuda, Hong Kong and Switzerland. **Hyde Tr. (7/26/04) at 529:2 to 529:22**.

204. Between March 8, 1994 and January 1, 1998, the Amended and Restated Operating Agreement was amended seven times in order to accomplish business objectives of Castle Harbour that were otherwise limited by negative restrictions in the agreement. **JX 27, JX 30, JX 44, JX 46, JX 52, JX 63, JX 64; Dull Tr. (7/22/04) at 361:4 to 362:3; Hyde Tr. (7/26/04) at 500:1 to 500:13**.

205. Each of the amendments to the Amended and Restated Operating Agreement was considered and approved by ING and Rabo. **JX 27; JX 30; JX 44; JX 46; JX 52; JX 63; JX 64; Tewell Tr. (7/26/04) at 643:7 to 643:13 and 681:18 to 682:7**.

206. On six different occasions ING and Rabo agreed to waive certain provisions of the Amended and Restated Operating Agreement to allow the partnership to accomplish business objectives that were otherwise limited by the negative

restrictions in the Agreement. **Dull Tr. (7/22/04) at 361:4 to 362:3; Hyde Tr.**
**(7/26/04) at 500:14 to 500:20; PX 258; PX 260; PX 282; PX 350; PX 354; PX**
**357.**

207.    In 1994, Castle Harbour distributed three aircraft to Plaintiff in accordance with
the Amended and Restated Operating Agreement. **PX 215; PX 219; PX 220.**

208.    The distribution of three aircraft to Plaintiff in 1994 resulted in disposition gain
that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the
Amended and Restated Operating Agreement. **JX 37 at 0016347.**

209.    In 1995, Castle Harbour distributed 12 aircraft to Plaintiff in accordance with the
Amended and Restated Operating Agreement. **JX 35; JX 41; PX 224; PX 225;**
**PX 226; PX 231; PX 233; PX 236; PX 237; PX 244; PX 245; PX 250; PX 251;**
**PX 288 at 0000380.**

210.    The distribution of 12 aircraft to Plaintiff in 1995 resulted in a disposition loss to
Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in
accordance with the Amended and Restated Operating Agreement. **JX 49 at**
**0008970, 008972-8974.**

211.    In 1995 Castle Harbour sold eight aircraft to Federal Express Aviation Services,
International, Ltd. ("Federal Express"). **Hyde Tr. (7/26/04) at 511:25 to 517:17;**
**PX 252 at 000367; PX 288 at 000380; PX 253; PX 263; PX 264; PX 265; PX**
**266; PX 268; PX 269; PX 270; PX 271; PX 278.**

212.    The sale of eight aircraft to Federal Express in 1995 resulted in a disposition loss
to Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in

accordance with the Amended and Restated Operating Agreement. **JX 49 at 0008970 and 008972-8974**.

213. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's sale of eight aircraft to Federal Express in 1995. **PX 260**.

214. In 1995 Castle Harbour sold four aircraft to American Airlines, Inc. ("American Airlines"). **Hyde Tr. (7/26/04) at 517:19 to 521:14; PX 255; PX 283; PX 284; PX 286 at 095759; PX 288 at 0000380**.

215. The sale of four aircraft to American Airlines in 1995 resulted in a disposition loss to Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the Amended and Restated Operating Agreement. **JX 49 at 0008970 and 008972-8974**.

216. In 1996, Castle Harbour sold four additional aircraft to American Airlines. **PX 255; PX 283; PX 284; PX 286**.

217. The sale of four additional aircraft to American Airlines in 1996 resulted in a disposition loss to Castle Harbour that was allocated to Plaintiff, TIFD III-M, ING and Rabo in accordance with the Amended and Restated Operating Agreement. **JX 53 at 0009085-086**.

218. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's sale of eight aircraft to American Airlines in 1995 and 1996. **PX 282**.

219. In 1995, Castle Harbour negotiated and reached an agreement with Delta Air Lines, Inc. ("Delta") to extend the leases covering 21 aircraft owned by Castle Harbour. **Hyde Tr. (7/26/04) at 521:16 to 522:13; PX 252 at 0022814; PX 256, PX 257; PX 259**.

220. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's lease extension agreement with Delta in 1995. **PX 258**.

221. In 1996 and 1997, Castle Harbour negotiated and reached an agreement with U.S. Airways to extend the leases covering four aircraft owned by Castle Harbour. **Hyde Tr. (7/26/04) at 524:21 to 526:9; PX 302 at 095748; PX 313**.

222. ING and Rabo were consulted on, and agreed to consent to, Castle Harbour's lease extension agreement with U.S. Airways. **PX 350**.

223. In 1998, Castle Harbour negotiated with American Airlines over the disposition of airplanes and airplane engines that were scheduled to come off lease in 1999. **PX 354; PX 352 at 0027741; PX 353 at 0074884**.

224. Representatives of Castle Harbour conducted extensive remarketing negotiations that did not result in a final agreement, including negotiations with Federal Express, Viscount Air Service, Inc., the United States Marshall's Service and the Miami Heat professional basketball team. **Hyde Tr. (7/26/04) at 522:14 to 524:19**; **PX 221; PX 281 at 095755; PX 272; PX 358 at 0024167**.

225. In 1997, Castle Harbour and Continental Airlines disagreed on the interpretation of a leveraged lease contract owned by Castle Harbour. **Hyde Tr. (7/26/04) at 526:11 to 527:19; JX 58**.

226. The disagreement between Castle Harbour and Continental Airlines was resolved in Continental's favor, resulting in the loss to Castle Harbour (and its members) of $2.299 million in lease payments, thereby decreasing Castle Harbour's operating income. **JX 58 at 0024115; Hyde Tr. 527:6 to 527:19; Dull Tr. (7/22/04) at 429:1 to 429:12**.

227.   ING and Rabo were allocated 98% of the $2.299 million reduction in operating income that resulted from the disagreement with Continental Airlines. A portion of this allocation was mitigated by the buy out of ING and Rabo on December 31, 1998. **Hyde Tr. (7/26/04) at 527:13 to 527:19; Myers Tr. (7/27/04) at 831:13 to 833:1; JX 58 at 0024115.**

**H.     Castle Harbour Leasing, Inc.**

228.   CHLI was a Delaware corporation that, from 1994 through 1998, had its principal place of business in Bermuda. **PX 82; PX 186; Hyde Tr. (7/26/04) at 531:14 to 532:4.**

229.   CHLI was a U.S. corporation, filed federal income tax returns and paid tax on its income. **Dull Tr. (7/22/04) at 371:4 to 371:8; Hyde Tr. (7/26/04) at 542:3 to 542:23; JX 23; JX 39; JX 47; JX 54; JX 60; JX 67.**

230.   CHLI was structured to hold financial assets purchased with cash contributed by Castle Harbour so that in the event that the Castle Harbour business had to be liquidated, ING and Rabo's interests (as measured by their capital accounts) could be satisfied without an abrupt sale of the partnership's aircraft portfolio. **Dull Tr. (7/22/04) at 316:10 to 316:21; Mulders Tr. (12/9/03) at 25:7 to 26:23; Hyde Tr. (7/26/04) at 530:18 to 530:24; Lewis Tr. (7/21/04) at 182:9 to 182:16 and 183:5 to 183:14; Brickman Tr. (7/22/04) at 241:13 to 242:16.**

231.   The cash contributed by Castle Harbour to CHLI was also intended to be used to purchase airplanes and to address tax issues arising from the fact that the aircraft contributed to Castle Harbour had been fully depreciated for tax purposes. **Dull Tr. (7/22/04) at 316:22 to 317:6.**

232.    CHLI's purchase of GECC commercial paper allowed GECC to reduce the outstanding debt on its consolidated balance sheet in an amount equal to the $117.5 million that ING and Rabo invested in Castle Harbour. **Parke Tr. (7/22/04) at 391:21 to 392:4**.

233.    The cash Castle Harbour contributed to CHILI was invested in liquid financial and aircraft assets, including GE commercial paper and publicly traded preferred stock in unrelated corporations, and was invested in aircraft assets. **Dull Tr. (7/22/04) at 324:9 to 325:6; Hyde Tr. (7/26/04) at 530:25 to 531:13; Tewell Tr. (7/26/04) at 661:16 to 663:7**.

234.    GECC had access to and use of the $117.5 million that ING and Rabo invested in Castle Harbour. **Dull Tr. (7/22/04) at 324:17 to 325:6**.

235.    On August 1, 1994, an Administrative Services Agreement was entered into between CHLI and GECAS, Ltd., covering the day-to-day finance and accounting activities of CHLI. **PX 216**.

236.    The activities performed by GECAS, Ltd. for CHILI under the Administrative Services Agreement were similar to those that GECAS, Ltd. performed for Castle Harbour, described in paragraph 186, above. **PX 216 at 095870-871**.

237.    CHLI paid GECAS, Ltd. for the services provided under the Administrative Services Agreement. **PX 216 at 095860; JX 48 at 0008919; JX 55 at 0009040; JX 62 at ING03684; JX 69 at ING 03600**.

238.    In December 1994, CHLI purchased an interest in two 737-500 aircraft that were on lease to Continental Airlines. **JX 38 at 0008851; Hyde Tr. (7/26/04) at 530:25 to 531:13; Dull Tr. (7/22/04) at 325:11 to 325:21**.

239.   In December 1995, CHLI purchased an interest in two additional 737-500 aircraft that were on lease to Continental Airlines. **JX 48 at 0008922; Hyde Tr. (7/26/04) at 530:25 to 531:13**.

240.   The four aircraft purchased by CHLI were Stage III airplanes that were close to new, and were purchased for a total amount of approximately $100 million. **Hyde Tr. (7/26/04) at 530:25 to 531:13; Dull Tr. (7/22/04) at 370:13 to 371:1**.

241.   CHLI held its own bank accounts, one of which was used to acquire and hold GECC commercial paper. **Hyde Tr. (7/26/04) at 532:6 to 532:21 and 557:10 to 557:18**.

**I.     Castle Harbour's Operating Results**

242.   In accordance with the Amended and Restated Operating Agreement, quarterly financial statements were prepared for Castle Harbour and annual statements of account were audited by KPMG. **JX 1, § 8.2(b) at 0101477-478; JX 20, JX 24, JX 37, JX 49, JX 53, JX 61; JX 68; Tewell Tr. (7/26/04) at 659:22 to 660:7; Hyde Tr. (7/26/04) at 537:5 to 538:18**.

243.   Castle Harbour's financial statements were prepared in accordance with the determination of partnership profit, gain and loss set forth in the Amended and Restated Operating Agreement. **Hyde Tr. (7/26/04) at 540:3 to 540:7; JX 20 at 0008766; JX 24 at 0008806; JX 37 at 0016337; JX 49 at 0008959; JX 53 at 0009072; JX 61 at 0017996; JX 68 at 0027164**.

244.   Financial statements were also prepared for and maintained by CHLI. **JX 21; JX 38; JX 48; JX 55; JX 62; JX 69; PX 190; Hyde Tr. (7/26/04) at 540:8 to 540:21**.

245.   Castle Harbour's airplane leasing business generated material positive cash flow and pre-tax income for each of its member investors. **PDX M; PDX N; PDX Q; PDX T; Myers Tr. (7/27/04) at 762:11 to 762:17 and 863:9 to 863:17; PX 380 at 0101230 and 0101233; Tewell Tr. (7/26/04) at 659:13 to 659:19.**

246.   Castle Harbour accomplished its stated goal of raising approximately $120 million in third-party equity for GECC. **Nayden Tr. (7/23/04) at 457:6 to 457:20.**

247.   Castle Harbour accomplished its stated goal of attracting new equity investors to GECC's aircraft financing business. **Nayden Tr. (7/23/04) at 457:6 to 457:20.**

248.   The income generated by Castle Harbour was shared by its members in accordance with the allocation provisions of the Amended and Restated Operating Agreement. **PDX D; PDX E; JX 24 at 0008812; JX 37 at 0016344; JX 49 at 0008966; JX 53 at 0009079; JX 61 at 0018002; JX 68 at 0027170.**

249.   From 1993 through 1998, the average annual internal rate of return ("IRR") to GECC (through its indirect subsidiaries, Plaintiff and TIFD III-M) on its investment in Castle Harbour was between 5.5% and 5.6%, without taking into consideration any federal income tax benefits. **PDX M, PDX N; PX 380 at 0101233, 0101290 and 0101297; Myers Tr. (7/27/04) at 762:12 to 762:17, 784:4 to 784:14, 790:3 to 793:12 and 863:9 to 863:17.**

250.   The 5.5% to 5.6% IRR to GECC does not take into account intangible non-tax benefits GECC received from entering into the Castle Harbour transaction such as demonstrating liquidity for Stage II airplanes, attracting new investors and managing GECC's balance sheet, each of which has economic value. **Myers Tr. (7/28/04) at 967:15 to 968:16.**

251.    The return received by each of Castle Harbour's members was determined by the performance of Castle Harbour's assets and was not fixed or pre-determined. **PDX Q; PDX T; Myers Tr. (7/27/04) at 817:9 to 820:25 and 822:25 to 823:19; Mulders Tr. (12/9/03) at 32:3 to 33:5; Nagel Tr. (12/4/03) at 49:23 to 51:12.**

252.    Castle Harbour's income varied significantly from year to year, varied significantly from projections made prior to the admission of ING and Rabo as members on October 6, 1993, and varied from annual budgets. **Dull Tr. (7/22/04) at 328:6 to 329:1, 343:2 to 343:25; Hyde Tr. (7/26/04) at 538:20 to 540:2; PDX U-1, U-2, U-3 and U-4; Myers Tr. (7/27/04) at 827:24 to 831:1; DX 15; JX 20, JX 24, JX 37, JX 49, JX 53, JX 61, JX 68; Mulders Tr. (12/9/03) at 34:9 to 34:20; Nagel Tr. (12/4/03) at 17:20 to 18:11.**

**J.    Buy-Out of ING and Rabo**

253.    Under the Amended and Restated Operating Agreement, ING and Rabo had the right at certain times and in certain circumstances to liquidate their interests in Castle Harbour. **JX 1, § 14.1 at 01011499-500.**

254.    Under the Amended and Restated Operating Agreement, Plaintiff had the right to buy-out at any time the interests in Castle Harbour that were held by ING and Rabo. **JX 1, § 14.3(a) at 0101501; Dull Tr. (7/22/04) at 364:2 to 364:9.**

255.    In 1997, a change in U.S. tax law led to uncertainty over whether U.S. tax would have to be withheld from the distributions Castle Harbour made to ING and Rabo. **Dull Tr. (7/22/04) at 364:10 to 365:1; Mulders Tr. (12/9/03) at 57:10 to 64:19.**

256.    As a result of the uncertainty over U.S. tax law, on November 30, 1998, Plaintiff notified ING and Rabo that it intended to exercise its option under the Amended

and Restated Operating Agreement to purchase the interests of ING and Rabo in Castle Harbour, effective December 31, 1998. **PX 359; PX 360[7]; Dull Tr. (7/22/04) at 365:2 to 365:17; JX 71; JX 72.**

257. On December 31, 1998, ING's and Rabo's interests in Castle Harbour were bought out for $15,579,880 each. **JX 71, JX 72.**

258. The buy-out amount for ING's and Rabo's interests in Castle Harbour included an "indemnification premium" of $77,880 each. **JX 71 at 0024683; JX 72 at 0024677; Dull Tr. (7/22/04) at 366:20 to 367:14.**

259. The indemnification premium is similar to a call premium on preferred stock. **Dull Tr. (7/22/04) at 367:2 to 367:8.**

260. In connection with the buy-out, Castle Harbour obtained valuations of its assets. **JX 66.**

261. ING and Rabo reviewed and consented to the final valuation determinations with respect to Castle Harbour's assets. **JX 66.**

262. Plaintiff designated Hudson River Aircraft Holdings 1, Inc. ("Hudson River 1"), a wholly owned indirect subsidiary of GECC, as the entity that would purchase Rabo's interest in Castle Harbour. **PX 368.**

263. On December 31, 1998, Hudson River 1 purchased the entire interest of Rabo in Castle Harbour. **JX 68 at 0027172.**

264. Plaintiff designated Hudson River Aircraft Holdings 2, Inc. ("Hudson River 2"), a wholly owned indirect subsidiary of GECC, as the entity that would purchase ING's interest in Castle Harbour. **PX 367.**

---

[7] Plaintiff's Exhibits 359 and 360 were not offered at trial; Plaintiff anticipates that a stipulation will be agreed to between the parties as to their admission into evidence.

265.    On December 31, 1998, Hudson River 2 purchased the entire interest of ING in Castle Harbour.  **JX 68 at 0027172.**

## II.    CONCLUSIONS OF LAW

1.    This Court has jurisdiction over these consolidated cases pursuant to I.R.C. § 6226(a) and 28 U.S.C. § 1346(e).  **Stipulation No. 10**.

2.    Plaintiff bears the burden of producing evidence, and persuading the Court by a preponderance of the evidence, that the determinations made by the IRS in its FPAAs are erroneous.

3.    The Castle Harbour transaction had economic substance.

4.    The Castle Harbour transaction changed the economic interests of Plaintiff, TIFD III-M, ING and Rabo.

5.    The investments in Castle Harbour made by Plaintiff, TIFD III-M, ING and Rabo each had independent economic substance.

6.    The investments in Castle Harbour made by Plaintiff, TIFD III-M, ING and Rabo were all materially profitable on a pre-tax basis.

7.    GECC and its indirect subsidiary corporations, Plaintiff and TIFD III-M, each had one or more valid, non-tax business purposes for entering into the Castle Harbour transaction.

8.    ING and Rabo each had one or more valid, non-tax business purposes for entering into the Castle Harbour transaction.

9.    For federal income tax purposes, Castle Harbour was properly characterized as a partnership.

10.    For federal income tax purposes, from October 6, 1993 through December 31, 1998, ING and Rabo were partners in Castle Harbour.

11.    For federal income tax purposes, ING and Rabo made equity investments in, not loans to, Castle Harbour.

12.    Castle Harbour's allocations of income, deduction and credit complied with the provisions of I.R.C. § 704(b) and the regulations thereunder.

13.    For the 1993 through 1998 tax years, Castle Harbour properly allocated all items of income, deduction and credit among its partners.

14.    No argument or evidence was presented at trial regarding I.R.C. § 482, and that statute has no application to this case or to the allocations of taxable income, deduction, credits and allowances of Castle Harbour.

15.    In reporting all items of income, deduction and credit on its 1997 and 1998 tax returns, Plaintiff, TIFD III-M and Castle Harbour did not engage in any conduct that would be subject to any accuracy-related penalties under I.R.C. § 6662.

16.    For the 1993 through 1998 taxable years, the partnership items of Castle Harbour were correctly reported on the Partnership's IRS Form 1065 tax returns.

17.    The FPAA mailed by the IRS with respect to Castle Harbour's 1993-1996 tax years is invalid and all of the adjustments set forth therein are erroneous.

18.    The FPAA mailed by the IRS with respect to Castle Harbour's 1997-1998 tax years is invalid and all of the adjustments set forth therein are erroneous.

19.    Plaintiff is entitled to a full refund of the jurisdictional deposits made to the

IRS in the total amount of $62,210,010, plus interest as provided in I.R.C.

§§ 6226(e)(3) and 6611.

Respectfully submitted this 4th day of August 2004.


PLAINTIFF
TIFD III-E INC.

By: _____
        Anthony M. Fitzgerald
        One of the Attorneys for Plaintiff

        Anthony M. Fitzgerald, ct04167
        CARMODY & TORRANCE LLP
        195 Church Street, P.O. Box 1950
        New Haven, CT  06509-1950
        Telephone:  (203) 777-5501
        Facsimile:  (203) 784-3199
        e-mail:  afitzgerald@carmodylaw.com

        William F. Nelson (ct22883)
        David J. Curtin, ct22881
        Michael J. Desmond, ct23186
        John A. Galotto, ct22882
        McKEE NELSON LLP
        1919 M Street, N.W., Suite 800
        Washington, D.C. 20036
        Telephone: (202) 775-1880
        Facsimile: (202) 775-8586
        wnelson@mckeenelson.com
        dcurtin@mckeenelson.com
        mdesmond@mckeenelson.com
        jgalotto@mckeenelson.com

        Suzanne C. Feese, ct 23162
        KING & SPALDING
        191 Peachtree Street
        Atlanta, GA  30303-1763
        Telephone:  (404) 572-3566
        Facsimile:  (404) 572-5147
        sfeese@kslaw.com

## CERTIFICATE OF SERVICE

This is to certify that the foregoing **PLAINTIFF'S REVISED AND ANNOTATED**

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** has been served by

facsimile and regular mail, postage prepaid, on August 4, 2004, to:

>
> Robert J. Higgins
> Barry E. Reiferson
> Trial Attorneys, Tax Division
> U.S. Department of Justice
> P.O. Box 26
> Ben Franklin Station
> Washington, D.C.  20044
>
> Facsimile:  (202) 514-9440

and by regular mail, postage prepaid to:

>
> John B. Hughes
> Assistant U.S. Attorney
> Chief, Civil Division
> United States Attorney's Office
> District of Connecticut
> 157 Church Street
> New Haven, CT  06508

_____
Anthony M. Fitzgerald ct 04167
One of the Attorneys for Plaintiff