3:01CV01839(SRU)
3:01CV01840(SRU)
(JUDGE UNDERHILL)

FILED

2004 AUG -4 P 3: 10

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

---

TIFD III-E INC.,THE TAX MATTERS PARTNER OF
CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY,

Plaintiff

v.

THE UNITED STATES,

Defendant

---

UNITED STATES' POST-TRIAL BRIEF

---

KEVIN J. O'CONNOR
United States Attorney
JOHN B. HUGHES
Chief, Civil Division
ROBERT J. HIGGINS
BARRY E. REIFERSON
Trial Attorneys
Department of Justice
Washington, D.C. 20044

TABLE OF CONTENTS

Page:

United States' Post-Trial Brief ................................................ 1
    A.    The Plaintiff Has Failed to Meet Its Burden of Proof ...................... 1
    B.    The Evidence Demonstrates That Castle Harbour Was Not a Valid
          Partnership for Federal Income Tax Purposes ........................... 2
          1.    Dutch Banks as Passive Investors, Not Managers ................... 5
          2.    GECC's Guarantees to Dutch Banks ............................ 7
          3.    The 110% Investment Account Balance Assured the
                Dutch Banks That the Exhibit E Payments Would Be Made ......... 8
          4.    The Difference Between the Rights of the Dutch Banks and the GE Entities
                Demonstrates That the Parties Did Not Join to Share Profits and
                Losses ................................................... 9
          5.    Castle Harbour Was a Finely Tuned Financial Arrangement Designed to
                Provide the Dutch Banks a 9% Return and Shelter $310 Million in Airplane
                Rental Income for GECC ..................................... 10
    C.    The October 6, 1993 Castle Harbour Transaction Was a "Sham" and Should Be
          Disregarded for Federal Income Tax Purposes ......................... 14
          1.    The Sham Transaction Doctrine Disregards Transactions That Are Motivated
                by Tax Consequences and Not by Business or Economic
                Consequence ............................................. 14
          2.    Plaintiff Relies on GECC Business Objectives to Justify the Castle Harbour
                Transaction .............................................. 15
          3.    Contributing $240 Million to Raise $117 Million .................. 17
          4.    Sheltering Income from Fully-Leased Stage II Aircraft .............. 18
          5.    There Was No Economic Substance to the October 6, 1993 Transaction,
                Which Brought the Dutch Banks Into an Existing Structure For the Purpose of
                Sheltering Income ......................................... 18
          6.    Castle Harbour Was Economically Empty ...................... 20
    D.    The Evidence Demonstrates That the Allocation of 98% of Taxable
          Income to the Dutch Banks Lacked Substantial Economic Effect under Treas. Reg. §
          1.704-1(b) and Should Be Disregarded in Favor of Allocation by Ownership
          Interests .......................................................... 21
          1.    The 98% Income Allocation Violated the "Overall-tax-effect" Rule ... 21
          2.    Plaintiff's Reliance on IRC § 704(c) is Misplaced; the
                Allocations of Income at Issue are Not Gains or Losses
                from Dispositions But the 98% of Income to the Dutch
                banks .................................................. 26
    E.    The Dutch Banks Were Creditors Not Equity Owners .................... 27
          1.    The Return of the Dutch Banks' Investment Was Virtually

           Guaranteed (# 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.    Defined Principal (# 7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.    Fixed Maturity Date (# 6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.    Intent of the Parties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

5.    The Covenants of the Operating Agreement Indicate Debt (# 4)  . . . . . . 32

6.    Repayment Enforcement Rights (# 3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

7.    Lack of Management Role for Dutch Banks (# 2)  . . . . . . . . . . . . . . . . . 34

8.    The Dutch Banks Had a Primary Claim Upon the Assets of Castle Harbour and Its Subsidiary (# 1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

9.    The Dutch Banks' Potential Upside Was Minimal, Effectively Limited, and Indicative of a Debt Instrument (# 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

F.    The GECC Entities are Liable for Penalties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## INDEX

Page:

Cases:

ACM Partnership v. Commissioner, 157 F.3d 231 (3d Cir. 1998) . . . . . . . . . . . . . . . . 19

ASA Investerings Partnership, 201 F.3d 505 (2000),
    *cert. denied*, 581 U.S. 871 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 16

Boca Investerings Partnership vs. United States, 314 F.3d 625 (D.C. Cir. 2003) . . . . 3, 14

Boeing v. United States, 537 U.S. 437 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . 14

Commissioner v. Culbertson, 337 U.S. 733 (1949) . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 7

Cottage Savings Association v. Commissioner, 499 U.S. 554 (1991) . . . . . . . . . . . . 21

Dow Chemical Co. v. United States, 250 F.Supp.2d 748 (E.D. Mich. 2003) . . . . . . . . 19

Dunn v. Commissioner, 615 F.2d 578 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . 27, 28

Estate of Kahn v. Commissioner, 499 F.2d 1186 (2d Cir. 1974) . . . . . . . . . . . . . . . . . 3

Estate of Mixon v. United States, 464 F.2d 394 (5th Cir. 1972) . . . . . . . 27, 30, 31, 33, 35

Fin Hay Realty Co v. United States, 398 F.2d 694 (3d Cir. 1968) . . . . . 27, 30, 31, 33, 35

Gilman v. Commissioner, 933 F.2d 143 (2d. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 14

Gregg Co. of Delaware v. Commissioner, 239 F.2d 498 (2d Cir. 1956) . . . . . . . . . 27, 28

Gregory v. Helvering, 293 U.S. 465 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 25

Haas v. Commissioner, 248 F.2d 487 (2d Cir. 1957) . . . . . . . . . . . . . . . . . . . 4, 5, 7, 13

In Re CM Holdings, Inc., 301 F.3d 96 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 14

John Kelley Co. v. Commissioner, 326 U.S. 521 (1946) . . . . . . . . . . . . . . . . . . . . . . 27

Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . 14

Knetsch v. United States, 364 U.S. 361 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Laidlaw v. Commissioner, T.C. Memo 1998-232, 1998 WL 345528, June 30, 1998 . . . 27

Lee v. Commissioner, 155 F3d. 584 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 14, 20

Lewis v. Reynolds, 284 U.S. 281 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

National Muffler Dealers Assoc. v. United States, 440 U.S. 472 (1979) . . . . . . . . . 21, 22

Nicole Rose v. Commissioner, 320 F.3d 282 (2d. Cir. 2003) . . . . . . . . . . . . . . . . 14, 20

R.E Dietz Corp. V. United States, 939 F.2d 1 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . 1

Rosenberg v. Commissioner, T.C. Memo 2000-108, 2000 WL 326198, March 29, 2000 27

Scriptomatic, Inc. v. United States, 555 F.2d 364 (3d Cir. 1977) . . . . . . . . . . . . . . . . 27

Sochin v. Commissioner, 843 F.2d 351 (9th Cir.),
    *cert. denied*, 488 U.S. 824 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . 14

Statutes:

Internal Revenue Code (26 U.S.C.):
    § 704(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    § 704(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 40

-iii-

§ 704(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27
§ 6226(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
§ 6226(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2
§ 6662(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 6662(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 6662(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 6662(d)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 6662(d)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
§ 7430(c)(4)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
§ 7491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
§ 7491(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
§ 7491(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Regulations:
Treas. Reg. § 1.704-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Treas. Reg. § 1.704-1(b)(2)(iii)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24
Treas. Reg. § 1.6662-3(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Treas. Reg. § 1.6662-3(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Miscellaneous:
Defendant's Exhibits:
1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 9, 10, 30
2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 30
3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8
4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8
6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 10, 11, 12, 19
16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 10
30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11
34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 32, 33
43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21
54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 20
61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5
62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 11, 21, 23, 24
64 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
67 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
76 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
85 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18
86 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
87 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
88 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18
89 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5
91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5
95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6
97 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6
99 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5
100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6
103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9-10
107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 11
112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20
114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 32, 37
115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 29
124 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976,
    1976-3 C.B. (Vol. 2) 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Joint Exhibits:
    1 . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 9, 10, 11, 12, 13, 23, 32, 34, 35, 36, 37
    3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 18
    17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11
    22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Plaintiff's Exhibits:
181 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
377 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
378 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
380 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 38
Demonstrative W . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 35

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIFD III-E INC., THE TAX MATTERS PARTNER OF CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NOS. 3:01CV01839(SRU) |
| | ) | 3.01CV01840(SRU) |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

**UNITED STATES' POST-TRIAL BRIEF**

A.    <u>The Plaintiff Has Failed to Meet Its Burden of Proof</u>

This is a tax suit in which the plaintiff, TIFD III-E, as the Tax Matters Partner of Castle

Harbour, seeks a readjustment of partnership items and the repayment of $62 million deposited with th

Internal Revenue Service, pursuant to Internal Revenue Code (IRC, 26 U.S.C.) § 6226(a), (e).   The

well-settled principles of tax litigation apply here: The burden of proof rests with the plaintiff, the

Court's review of the facts and law is *de novo* (not simply a review of the Internal Revenue Services'

(IRS) actions), and the administrative determination of the IRS is presumptively correct but otherwise

not relevant.  <u>Lewis v. Reynolds</u>, 284 U.S. 281, 283 (1932); <u>R.E Dietz Corp. v. United States</u>, 939

F.2d 1, 4 (2d Cir. 1991).[1]

The plaintiff has failed to meet its burden for the reasons set forth in the discussion below.

---

[1]Plaintiff does not qualify for the burden shifting of IRC § 7491 as it is described in
§ 7430(c)(4)(A)(ii) and,  with respect to penalties, because the plaintiff is not an individual.  IRC §
7491(a)(2)(C) and 7491(c).

Furthermore, the plaintiff is mistaken in its apparent position that the issues to be decided by the Court

are defined by the Final Notices of Administrative Adjustment issued to the plaintiff in this case and the

Explanation of Items (Form 886A) prepared during the administrative proceedings.  Pl. Exs.[2] 376-378.

These materials are not relevant to this proceeding.  The Court has jurisdiction to review all the

"partnership items" of the partnership and "the proper allocation of such items among the partners" for

the years at issue.  IRC § 6226(e).

B.    The Evidence Demonstrates That Castle Harbour Was Not a Valid Partnership for
      Federal Income Tax Purposes

The evidence at trial demonstrated that Castle Harbour was formed to execute a tax shelter

which utilized the Dutch banks as tax indifferent parties to shelter from U.S. federal income tax, income

produced by aircraft leases.  Joint Exs. 1, 16; Def. Exs. 42, 43, 44, 45, 80, 88, 103.  Because GECC

had already taken the full amount of depreciation for tax purposes with respect to these aircraft, all

income would be subject to tax had the Dutch banks not joined the transaction.

Castle Harbour was a GECC operation from start to finish and the Dutch banks joined to earn

a 9% return on their "investment."  Def. Exs. 15, 27, 45, 54, 61, 62, 89, 91, 96, 97, 99, 100, 107.

The "investment" was not used to fund operations or buy equipment.  Rather, it was held in GECC

commercial paper which paid a lower rate of interest than was payable to the Dutch banks.  What

GECC obtained from the Dutch banks was their status as a "tax indifferent party" to which it could, on

paper, shift 98% of the taxable income from fully depreciated (for tax purposes) aircraft.  In return, the

---

[2]References to "Pl. Ex." are to the Plaintiff's admitted Trial Exhibits.  References to "Joint Ex."
are to the admitted Joint Exhibits. References to "Def. Ex." are to the Defendant's admitted Trial
Exhibits. References to "Tr." are to the transcript of testimony at the trial of this matter.

Dutch banks received a high rate of return on the time value of parking $117 million in GECC commercial paper. The difference between the interest rate the Dutch banks could have earned if they had simply purchased $117 million of GECC commercial paper on the open market, 3.5 - 5.9%, and the 8.38 - 9.035% they could earn through participation in Castle Harbour was the premium paid for their willingness to act as the tax indifferent party, an accommodation fee of sorts.

Prof. Meyers acknowledged that GECC stayed in the Castle Harbour arrangement because of its "tax efficient" arrangement. Tr. 912. He also acknowledged that when the tax law changed, GECC pulled out. Ibid.

GECC and the Dutch banks did not join together in good faith to conduct an enterprise and to share profits and losses. Therefore, Castle Harbour is not entitled to treatment as a partnership for federal tax purposes. Commissioner v. Culbertson, 337 U.S. 733, 744-45 (1949); Estate of Kahn v. Commissioner, 499 F.2d 1186 (2d Cir. 1974)(examining all the facts and circumstances, court concluded that what purported to be a partnership in form was actually a sole proprietorship, even though the minority partner was entitled to a share of the profits, with an unlimited upside). The intent of the participants is key to determining whether the form of the transaction, as a partnership will be respected for federal tax purposes. ASA Investerings Partnership, 201 F.3d 505, 511 (2000), cert. denied, 581 U.S. 871 (2000); Boca Investerings Partnership vs. United States, 314 F.3d 625, 631 (D.C. Cir. 2003). In Culbertson, 337 U.S. at 742, the Supreme Court explained that the relevant inquiry is:

> whether, considering all the facts--the agreement, the conduct of the parties in
> execution of its provisions, their statements, the testimony of disinterested persons, the
> relationship of the parties, their respective abilities and capital contributions, the actual
> control of income and the purposes for which it is used, and any other facts throwing

3

light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

The lack of participation in management by the Dutch banks, along with covenants of the Operating Agreement which required that Castle Harbour maintain liquid assets equal to 110% of the amount owed to the Dutch, "has the effect of placing a heavy burden on the taxpayer to show the bona fide intent of the parties to join together as partners." Id. at 744.

A significant fact which indicates that a partnership should not be recognized for tax purposes is the absence of a change of control of the business enterprise after the formation of the partnership. Haas v. Commissioner, 248 F.2d 487, 489 (2d Cir. 1957). In Haas, the Second Circuit described agreements which purported to form a joint venture, but nevertheless concluded that there had not been a change of control of the business after the joint venture formation:

> The agreements entered into in 1948 and 1949 may have indeed created rights and duties between the parties to those agreements; and also may have created rights and duties between the contracting parties, on the one hand, and third persons dealing with the contracting parties on the other. Nevertheless these agreements in no way affected the control of Oxford or the operation of the business carried on by Oxford.

The facts of the instant case are indistinguishable from Haas. The operating agreement clearly affected the rights of the GE entities and the Dutch banks vis-a-vis each other. But the Operating Agreement did not "affect control" of Castle Harbour, which was always controlled by GE and its hand picked employees. The only control the Dutch banks obtained through the Operating Agreement was to demand a liquidation if one of the loan repayments were missed or if its security fell below 110%.

The intent of the parties here is virtually transparent. Beyond the form of the transaction and the labels assigned by its designers (Dutch banks as "members"), the intent of GECC was to maintain control of the enterprise established in July 1993 and originally named GE Capital Summer Street-I,

4

LLC. The intent of GECC in recruiting only foreign investors was to facilitate a sheltering of aircraft lease rental income. Def. Exs. 15, 18, 27. The details of the October 6, 1993, entry of the Dutch banks demonstrate that GECC did not need the infusion of cash from the Dutch to operate Castle Harbour and the very terms of the arrangement required GECC to effectively "freeze" 110% of the Dutch banks' investment. Joint Ex. 1; Def. Exs. 1, 2, 3, 4. The intent of the Dutch banks was to receive a 9% target return but no less than an 8.5% return. Def. Ex. 15, 61, 62, 114-117, 119. These facts do not demonstrate an intent to form a partnership. Rather, these facts expose an abusive tax shelter in which the Dutch banks played a passive "straw man's" role in exchange for highly secured return.

1. <u>Dutch Banks as Passive Investors, Not Managers</u>

Plaintiff's attempt to cast the Dutch banks as active participants in Castle Harbour failed at trial and is not credible. The testimony of Babcock & Brown investment banker Daniel Brickman made clear that GECC was not looking for management assistance from the foreign investors and none was expected. Tr. 246-47; 255; 283; Joint Ex. 17

GECC maintained control of Castle Harbour through employees like Mr. Tewell (who worked full time for GE in Hong Kong while collecting his $1,000 per month from Castle Harbour). Def. Exs. 54, 89, 91, 96, 97, 99, 100, 107. An example of the scope of GECC's continual involvement in Castle Harbour is demonstrated in Def. Ex. 54, a memorandum describing a meeting in Bermuda of GECC employees and outside counsel regarding Castle Harbour. GECC employees from Stamford, Connecticut and Shannon, Ireland attended this meeting in Bermuda. Def. Ex. 54.

The record is clear that GECC did not go outside its "family" to staff Castle Harbour. GECC

employees were selected to act as managers. The basic qualifications were US citizenship and an overseas location. Def. Exs. 96, 97, 100. Actual operational management was then sub-contracted to GE entities with airplane leasing experience. Jt. Exs. 6, 32. For example, the first "general manager" of Castle Harbour, Mr. Tewell, was an employee of GE based in Hong Kong. He was compensated $1,000 per month to oversee $700,000,000 to $800,000,000 of assets (value of airplanes at contribution plus cash contributions). Tr.668. He received a salary from his "other" GE position of approximately $160,000 per year. Mr. Tewell acknowledged that he sub-contracted the actual operations of Castle Harbour first to GE Capital Advisory Services, Ltd., based in London, and then to GECAS (GE Capital Aviation Services) based in Shannon, Ireland.

The Dutch banks did not have management voting rights, did not select managers, did not have an employee–or former employee–serving as a manager of Castle Harbour. Jt. Ex. 1. The refrain that this near invisibility of the Dutch banks in the management operations of Castle Harbour is due to United States legal requirements (FAA citizenship rules) falls short. There was no problem in amending the operating agreement to expand the number of managers to four thus allowing a non-United States citizen to serve as a manager (Diarmuid Hyde). Joint Ex. 44. In fact, the number of managers was eventually expanded to four, but still not person associated with the Dutch banks was appointed. There were no insurmountable legal barriers to the Dutch banks taking a role in management of Castle Harbour.

It was a matter of choice and agreement that the Dutch banks did not play a management role in Castle Harbour. The management of Castle Harbour and its major operations, the income producing leases, was handled by GECC controlled entities, in the same manner as the GECC airplane leases not

6

contributed to Castle Harbour. The lack of the any significant role for the Dutch banks in the management of Castle Harbour weighs heavily against the Plaintiff's claim that the partnership should respected for federal tax purposes. Culbertson, 337 U.S. at 744; Haas, 248 F.2d at 489.

    2.    GECC's Guarantees to Dutch Banks

GECC's intent in asking the Dutch banks to join Castle Harbour is obvious–to shelter the income stream from the leased airplanes with respect to which depreciation deductions were exhausted. The Dutch banks did not intend to put their funds at the risk of venture. Rather, the Dutch banks wanted guarantees that their funds would be returned, with interest. Further, the Dutch banks recognized the Castle Harbour itself could not provide the type of guarantees they wanted. Despite all the formalities of the Operating Agreement, Contribution Agreement, Tax Indemnification Agreement, and Services Agreements, the Dutch banks would not join Castle Harbour until GECC in its own capacity agreed to "absolutely, unconditionally and irrevocably" guarantee the performance–including making scheduled payments--by the GECC entities and the individual managers appointed by such subsidiaries who were to manage and operate Castle Harbour. Joint Ex. 3. The Guaranty recites the activities of the various GECC entities in forming Castle Harbour and operating its business. The Guaranty recognizes that the Dutch banks have no role in appointing the managers for Castle Harbour. The Guaranty looks to GECC entities, not the Dutch banks, to contribute additional capital if necessary. This document hardly suggests that the Dutch banks joined the members of Castle Harbour to conduct an enterprise and to share profits and losses. Rather it reveals the complete absence of the Dutch banks from management of Castle Harbour.

3.   The 110% Investment Account Balance Assured the Dutch Banks That
     the Exhibit E Payments Would Be Made

The plaintiff did not dispute at trial the 110% investment account balance requirement of the operating agreement. Def. Ex. 4. Its very existence is a rebuttal to the contention that the Dutch banks joined Castle Harbour to share in the risks of profit and losses. The 110% balance requirement provided a strong incentive for the GE entities to make the Exhibit E payments to the Dutch banks. Def. Ex. 1. Otherwise, they could demand a liquidation of Castle Harbour. Def. Ex. 3. The 110% requirement provided a ready source of cash to pay the Dutch banks the Exhibit E payments which were the mechanism for the Dutch banks to obtain their 9% return.

The 110% requirement was met by the commercial paper held by CHLI. By December 31, 1993, all of the commercial paper held by CHLI (Castle Harbour Leasing, Inc., a subsidiary of Castle Harbour) was issued by GECC. Def. Exs. 64-69, 95. The plaintiff described the role of CHLI as a potential investor in additional airplanes. Purchasing airplanes was a minor activity for CHLI. Def. Exs. 7, 8, 71, 76, 86, 87. In fact, only four planes were purchased by CHLI until the exit of the Dutch banks. Def. Ex. 83. These four planes were purchased from GECC and leased back to GECC. Moreover, one of the non-recourse lenders for two of the purchased planes required a direct payment guarantee from GECC. The Dutch banks were further protected from any profits or losses by this guarantee on behalf of CHLI. Def. Exs. 7, 8. More importantly, because of the requirement that 110% of the amount owed to the Dutch be held in liquid assets, it must be inferred that the money used to purchase these four planes did not come from the Dutch banks. It must have come from GECC.

8

4.    The Difference Between the Rights of the Dutch Banks and the GE Entities
Demonstrates That the Parties Did Not Join to Share Profits and Losses

The nature of the relationship to Castle Harbour of the GECC entities was very different than the nature of the Dutch banks' relationship to Castle Harbour. The payment schedule on Exhibit E, the payment guarantees to the Dutch banks, the 110% requirement, and the terms of the liquidation rights demonstrate that the parties had different claims with respect to the assets of Castle Harbour, and not just with respect to the difference in dollar values of their investments. Jt. Ex. 1.

The Dutch banks received annual payments pursuant to Exhibit E of the Operating Agreement. Def. Ex. 1. These were substantial payments, ranging from approximately $39 million in 1994 to approximately $10 million in 1997. Failure to make these payments entitled the Dutch banks to demand liquidation of Castle Harbour. Def. Ex. 2. Upon liquidation or purchase of the Dutch banks' interests, additional cash payments would be made. The amounts paid depended on the balance of the Dutch banks' capital accounts, the balance in the Class A Investment Accounts and Class A Guaranteed Payment or Indemnification Premium due the Dutch banks. Joint Ex. 1. These mechanisms were in place to repay the Dutch banks their contributions plus interest at the target yield o 9.03587%. In addition, the Dutch banks interest was secured by the requirement that 110% of the amounts owed to them would be held in liquid assets. The Dutch banks had the right to demand liquidation only if Schedule E payments were missed or the 110% liquid asset requirement was not met Otherwise, the interest of the Dutch banks would "self-liquidate" after it received a return of its princip: plus the bargained for 9.035% interest.

In contrast, the GECC entities were only guaranteed a Class B Guaranteed Payment, which when paid, did not exceed $500,000, even though their investment was $595 million. Joint Ex. 1; Def.

9

Ex. 103. The GECC entities, however, had the right to liquidate the Dutch banks' interests at any time, for any reason. This gave the GECC entities control over the Dutch banks' ability to share in any upside. Through the operational control given to the GECC entities, GECC could further control the ability of Castle Harbour to experience disposition gains, thus further collaring the Dutch banks' upside potential. Ibid.

5.   Castle Harbour Was a Finely Tuned Financial Arrangement Designed to Provide the Dutch Banks a 9% Return and Shelter $310 Million in Airplane Rental Income for GECC

The Dutch banks and GECC did not join together to share in profits and losses. The objective facts establish that the Dutch banks joined Castle Harbour to obtain a fixed return on their money of 9.03587%. Despite the early exit of the Dutch banks and over five years of existence, the return of the Dutch banks varied by only approximately $80,000 from a 9.03587% return on their contributions to Castle Harbour. Tr. 835. Plaintiff does not dispute this result. This was a remarkable outcome and plaintiff's expert witnesses explicitly agreed that this was the actual outcome. Ibid.

The allocation of 98% of Castle Harbour's operating income to the Dutch banks and the annual cash distributions to the Dutch banks according to Exhibit E were finely tuned by GECC's investment bankers, Babcock & Brown, to realize a 9.03587% return to the Dutch banks upon their exit from Castle Harbour. Def. Ex. 1, 15; Tr. 243. It is clear from the evidence that the October 5, 1993, financial model/projections for Castle Harbour prepared by Babcock & Brown were very, very accurate. Def. Ex. 15, 27. There is no reason they should not have been. The rental income, particularly in 1993, 1994, and 1995 was very predictable as the contributed planes were under lease. Def. Ex. 15, 30; Jt. Ex. 1. The book depreciation was very predictable as the starting point was the

10

fair market value assigned the contributed planes at the time of their contribution in July 1993. Def. Ex
30. This left very few possible variations to contend with. The expenses of Castle Harbour were
susceptible to tight controls by GECC. Def. Ex. 6, 107, 112, 124, 125. The use of "secondments" of
GECC employees to Castle Harbour, rather than direct payments by Castle Harbour, is one example
of tight control.. When Mr. Hyde went to Bermuda, he was not paid by Castle Harbour. Rather, he
was seconded by his GE subsidiary employer (GECAS) to the plaintiff, TIFD III-E, who provided his
services to Castle Harbour without direct cost. Def. Ex. 107. The direct overhead of Castle Harbour
was minimal. For example, the office space in Bermuda, for both Castle Harbour and CHLI was only
174 square feet. Def. Ex. 6.

    The structure of the agreements also precluded any appreciable ability to share in profit beyond
that scripted by the agreements through the payment schedule. Jt. Ex. 1. Indeed, the 98% allocation
to the Dutch banks was only with respect to the lease income, and did not include capital gains or
losses on the sale or disposition of the planes. Ibid.; Jt. Ex. 17, Def. Ex. 15. The Dutch banks' role in
Castle Harbour's tax shelter scheme concerned the highly predictable lease rental income. The only
variation on the prediction cited by the plaintiff involved Continental Airlines but the amount in
controversy was only approximately $1.5 million during the 1993 through 1998. Def. Ex. 16. This
amount pales in comparison with the $310 million of rental income that GECC attempted to shelter
through Castle Harbour. Def. Ex. 62; Jt. Exs. 22, 40, 50, 59, 70.

    Plaintiff's focus on disposition gains or losses is an attempt to divert attention from the tax
shelter motivations of Castle Harbour. The evidence demonstrates that gains and losses from
dispositions were overwhelmingly assigned to the GE entities. Def. Ex. 15; Jt. Exs. 1, 17, 24, 37, 48,

11

53, 61, 68. The chances of the Dutch banks sharing more than $2.8 million in disposition gains or losses or $3.5 million in operating losses was very remote. These "Tier 1" allocations were part of the reasonable expectations of the Dutch banks and fully taken into account when they agreed to join Castle Harbour. Beyond these amounts, the Dutch banks share was 1% for the next $541 million dollars in possible losses or gains, a highly unrealistic outcome. Thus, the compensation formula for th Dutch banks provided a "collar" for the return on their contributions, particularly a floor of 8.5%. Def. Ex. 15, 119.

GECC did not have such a restriction on its return from the Castle Harbour venture. The very fact that such a floor existed is strong evidence that Castle Harbour should not be treated as a partnership for tax purposes. There cannot be a sharing of profits and losses if two parties, the Dutch banks, have a floor established for the yield on their contribution, while the other parties did not. Plaintiff's expert witness attempted to exaggerate the potential risks of this venture by using a chart witl a distorted scale. Defendant's expert witness provided analysis which demonstrated the virtual floor for the Dutch banks' return with an appropriately scaled model. Def. Ex. 119. Plaintiff did not attempt to rebut or challenge defendant's expert witness testimony on this matter.

From the outset of Castle Harbour, the "end of the day" results for the Dutch banks were highly secured and inconsistent with the notion that they joined Castle Harbour to share in profits and losses. The Class A Investment Accounts measured the unpaid balance of their contributions, increased every year by 9.03587% interest, the "applicable rate," and reduced by the Exhibit E payments. Jt. Ex. 1. Contrary to plaintiff's apparent contention, the Class A Investment Accounts are very relevant to the calculation of the Dutch banks' final return. Should the Class A Investment Accounts balance exceed

12

the Dutch bank's capital accounts at the "end of the day," the Dutch banks become entitled to the Class A Guaranteed Payment. Joint Ex. 1. This mechanism establishes a steady floor for the Dutch banks return. But under any reasonable scenario, plaintiff's expert witness agreed, the Class A Guaranteed Payment would produce a yield for the Dutch banks of approximately 8.5%. Tr. 868-69.

If the Class A Guaranteed Payment is not implicated, as was the case for the buyout of the Dutch banks in 1998, the Dutch banks return is further secured by the Indemnification Premium, which functions like a call premium for a bond. The final payment to the Dutch banks in this case included an Indemnification Premium. Jt. Ex. 71, 72. With these protections, it is not surprising that the Dutch banks' return at the end of 1998 differed only $80,000 form the return predicted five years earlier, in 1993.

The agreements strongly support a conclusion that Castle Harbour is not entitled to taxation as a partnership as the participants did not join together in an enterprise to share profits and losses, but rather joined together to shelter income from federal taxes. Control over the airplane leasing operation never changed hands, and was always controlled by GECC. Haas, 248 F.2d 489. The only joint enterprise was to lower GECC's tax bill. "[E]scaping taxation is not a 'business' in the ordinary meaning." 144 F.2d 466, 468 (2d Cir. 1944). The Dutch banks received a share of that lower bill as the cost of their participation as the tax indifferent party. GECC received a lower tax bill and thereby "earned" $62 million. The Dutch banks received a premium interest rate, over and above what they would have received had they simply purchased GECC commercial paper, as compensation for standing in the role of the "tax indifferent" party. Indeed, the terms of the various agreements ensured

13

that the Dutch would receive a return of their money, but would not interfere with GECC's business operations.

C.   The October 6, 1993 Castle Harbour Transaction Was a "Sham" and Should Be Disregarded for Federal Income Tax Purposes

1.   The Sham Transaction Doctrine Disregards Transactions That Are Motivated by Tax Consequences and Not by Business or Economic Consequence

It is a well-established principle that tax benefits claimed to arise out of a transaction that was contrived to create tax benefits, but that lacked independent economic substance, will not be respected. Gregory v. Helvering, 293 U.S. 465, 465-67 (1935).  Knetsch v. United States, 364 U.S. 361 (1960);  Nicole Rose v. Commissioner, 320 F.3d 282 (2d. Cir. 2003); Boca Investerings Partnership vs. United States, 314 F.3d 625, 631 (D.C. Cir. 2003); ASA Investerings Partnership, 201 F.3d at 512;  In Re CM Holdings, Inc., 301 F.3d 96, 102 (3rd Cir. 2002);  Lee v. Commissioner, 155 F3d. 584 (2d Cir. 1998);  Kirchman v. Commissioner, 862 F.2d 1486, 1490 (11th Cir. 1989).

The Second Circuit considers the two-prong test (business purpose/economic substance) to determine whether a transaction is a "sham" but applies a flexible analysis.  Gilman v. Commissioner, 933 F.2d 143, 147-48 (2d. Cir. 1991).  The ultimate legal question is whether "the transaction was motivated by tax consequences and not by business or economic consequences."  Gilman, 933 F.2d at 148, citing Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990); Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir.), cert. denied, 488 U.S. 824 (1988); Zmuda v. Commissioner, 731 F.2d 1417, 1420 (9th Cir. 1984).

Thus it is clear that this Court can determine that a transaction is a sham even if the taxpayer can establish either a "business purpose" for the transaction or that the transaction had some "economic

14

substance." Determining business or economic consequences requires examining substance over form and avoiding exalting "artifice over reality." Gregory v. Helvering, 293 U.S. at 469. Here it is evident that the form of the October 6, 1993 transaction had the purpose of bringing the Dutch banks into Castle Harbour. The substance of that transaction was to execute the tax shelter purpose of the structure.

### 2.    Plaintiff Relies on GECC Business Objectives to Justify the Castle Harbour Transaction

Plaintiff relies heavily upon the testimony of GECC business executives (O'Reilly, Lewis, and Nayden) to justify the Castle Harbour structure. This reliance is misplaced as the executives admittedly were not familiar with all the particulars of the structure they approved. Tr. 111-14; 181, 184. They generally were not familiar with the details of the operating agreement and the promised 9% return to the Dutch banks. They were not fully knowledgeable of the requirement that Castle Harbour maintain liquid assets equal to 110% of the balance of the Dutch banks investments. They were not aware of the role of the Class A Guaranteed Payment in assuring that the Dutch banks received a minimum return of 8.5%. They were not all aware of the federal income tax purpose of the $240 million cash contribution, i.e., to establish a positive tax basis for TIFD III-E. They could not testify about the recirculating back to GECC of much of the $240 million through the purchase of GECC commercial paper.

This lack of familiarity with the details may be understandable, given the hundreds of deals they may have been involved in during even one year. Tr. 456. Nonetheless, it is the details of the Castle Harbour structure that are at issue before the Court. The executives' testimony is essentially that "we are in business and this was one of our business deals." That testimony cannot provide a safe harbor from the sham transaction analysis, or the sham transaction rule would never have affect. As the Court

in <u>ASA Investerings Partnership</u>, 201 F.3d at 513, recognized, the sham transaction doctrine plays an important role in our system of taxation:

> We note that the "business purpose" doctrine is hazardous. It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way as to minimize tax. When the business purpose doctrine is violated, such structuring is deemed to have gotten out of hand, to have been carried to such extreme lengths that the business purpose is no more than a facade. But there is no absolutely clear line between the two. Yet the doctrine seems essential. A tax system of rather high rates gives a multitude of clever individuals in the private sector powerful incentives to game the system. Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device. The business purpose doctrine reduces the incentive to engage in such essentially wasteful activity, and in addition helps achieve reasonable equity among taxpayers who are similarly situated--in every respect except for differing investments in tax avoidance.

The October 6, 1993 transaction, when the Dutch banks joined Castle Harbour, is at issue and the Court must consider the details of that transaction and the purpose for bringing in the Dutch banks. The GECC executives' testimony did not provide salvation for GECC. The executives were well versed, on the other hand, in describing the economic woes facing the airlines during the early 1990s. They eventually acknowledged that because of a general recession in the United States at the time, other business sectors besides the airline industry were effected. Tr. 174-75. Moreover, despite the difficulties experienced by the airlines in the early 1990s, the GECC executives proudly noted that GECC was not losing money with its aircraft business in the early 1990s, nor had GECC ever lost money in its aircraft business. Pl. Ex. 181 (at bates 0100483). None of the executives could explain how bringing the Dutch banks into Castle Harbour would help GE make more money, except, of course, by not paying $62 million in tax and making GE's financial statements look better by calling the Dutch bank's interest a "minority interest" rather than debt.

    3.    <u>Contributing $240 Million to Raise $117 Million</u>

16

One of the alleged rationales for Castle Harbour was the need to raise liquidity for GECC. Joint Ex. 16. This is an inherently flawed justification for this transaction. First, GECC had to contribute $240 million of equity to Castle Harbour to make the tax shelter function. Koffey Tr.[3] 26-27. This contribution was necessary to provide a positive tax basis for the GE entities in Castle Harbour. Otherwise, GECC would have had to recognize income with every distribution from Castle Harbour, of which there were many. Def. Ex. 85. The plaintiff did not dispute this explanation for the $240 million contribution.

The Dutch banks contributed a total of $117 million to Castle Harbour but the operating agreement required Castle Harbour to maintain 110% of the unpaid balance in liquid assets. Therefore, the $117 million was not free for use by Castle Harbour and not really available for GECC to leverage. Since the GECC executives were not completely familiar with the structure of Castle Harbour, it is highly unlikely that any financial institutions had knowledge of the restrictions on the use of Castle Harbour's contribution from the Dutch banks.

As for GECC's financial accounting, it is clear from the testimony that the Dutch banks contribution was reported as a "minority interest," not as equity. Defendant's expert, Dr. John Lacey, testified that no banker would consider the relationship between the Dutch banks and Castle Harbour as true equity. Tr. 1029. The plaintiff offered no testimony to rebut Dr. Lacey's.

4.     <u>Sheltering Income from Fully-Leased Stage II Aircraft</u>

---

[3]The reference to "Koffey Tr." is to the deposition transcript for Richard Koffey. His testimony at the trial of this matter was by deposition.

Another focus of the GECC executives' testimony was the alleged problem with owning Stage II aircraft. It seems hardly unique to the aircraft leasing business that advances in technology (or governmental regulation) affects the value of older assets. In fact, the Stage II aircraft contributed to Castle Harbour were under lease and steadily producing income. After being contributed, these planes remained income producers. None of the airlines defaulted in the lease payments with respect to the contributed aircraft. The grave concerns expressed by the GECC executive witnesses with respect to these aircraft ring hollow when the economic productivity of these aircraft after contribution is considered. Moreover, GECC received Stage II aircraft back as distributions from Castle Harbour. Def. Ex. 85. If they were such a liability, it would have been expected that these Stage II aircraft would never return to GECC's inventory.

The real problem faced by GECC with respect to these aircraft was that they had been fully depreciated for federal income tax purposes before contribution and GECC would begin to pay more federal income taxes as the income continued and there were no longer depreciation deductions to offset the income. The GECC executives were well aware of this so-called "tax efficiency" as the tax motivations for the transaction are readily apparent from deal approval document. Joint Ex. 16; Def. Ex. 88. These tax savings had an immediate impact on GECC's bottom line. Def. Ex. 88.

5.  There Was No Economic Substance to the October 6, 1993
    Transaction, Which Brought the Dutch Banks Into an Existing Structure
    For the Purpose of Sheltering Income

In July 1993, GECC created the Castle Harbour structure using solely GECC subsidiaries. This "special purpose entity" was known as GE Capital Summer Street LLC. The planes were contributed and $296 million was contributed. There is every reason to believe that this entity as

18

formed would make an economic profit as the planes were fully leased to healthy airlines. The Investment Memorandum prepared after the formation described a very healthy enterprise. Def. Ex. 15. There was sufficient "free cash" (rental payments in excess of the non-recourse debt requirements) to anticipate a profit. The plaintiff offered no evidence to suggest that GE Capital Summer Street would not make an economic profit.

The October 6, 1993 transaction which brought the Dutch banks into Castle Harbour added nothing of economic substance. It only added a tax shelter purpose to the transaction. The tax motivation for the October 6, 1993 transaction is very clear. Babcock & Brown only solicited foreign investors who would be protected from United States taxation of the operating income allocated to the foreign investor by tax treaty. The Dutch banks, ING and Rabo Merchant Bank, qualified under this criterion.

Plaintiff's expert witness testified that Castle Harbour earned a positive internal rate of return "absent taxes." That is hardly surprising as the same enterprise would have earned a profit absent taxes before the Dutch joined, as plaintiff's expert witness also confirmed. Tr. 923. Moreover, there is no significance in taking the measurement of the internal rate of return "absent taxes" of Castle Harbour. Though some courts have given weight to such an indicia, it is of no consequence here. See ACM Partnership v. Commissioner, 157 F.3d 231, 247-48 (3d Cir. 1998). The decision mentioned by plaintiff's expert witness in this regard, Dow Chemical Co. v. United States, 250 F.Supp. 2d 748 (E.D. Mich. 2003), appeal pending, is also inapposite as the transaction there did not involve foreign banks or partnership allocations. Tr. 864.

      6.     <u>Castle Harbour Was Economically Empty</u>

19

The Castle Harbour transaction served no economic purpose beyond tax avoidance; as such it was "economically empty" save for tax considerations. Nicole Rose, 320 F.3d at 284 Lee, 155 F.3d at 586. It was primarily a vehicle for sheltering lease payments on the 63 airplanes contributed by GECC. The income stream from airplane assets was predetermined by their existing leases. Transferring the leases to Castle Harbour did not modify these economic arrangements. Indeed, the planes were sub-leased back to GECC. Castle Harbour itself added nothing to these assets, and only increased the costs of managing them. For example, Babcock & Brown, the investment banking firm, was paid a $9 million fee for its work in Castle Harbour. Def. Ex. 112.

GECC maintained control of the airplane leasing business ostensibly transferred to Castle Harbour. The managers were GECC employees who were compensated primarily by GECC directly. The first general manager's salary was only $12,000. This minor payment demonstrated the "auto pilot" nature of the Castle Harbour operation. Mr. Tewell's compensation from GECC was many times that amount. Tr. 666. The aircraft portfolio was primarily managed by a GECC entity based in Shannon, Ireland. There is no legitimate claim that the management of Castle Harbour was independent of GECC. An example of the depth of GECC's continual involvement in the Castle Harbour transaction is Defendant's Exhibit 54, the minutes from a 1995 GECC meeting in Bermuda. Nearly a dozen GECC executives attended this meeting.

The income generated by Castle Harbour was either lease income from the airplanes or income from GECC commercial paper. The commercial paper was purchased with funds contributed by GECC for the primary purpose of creating a tax basis in Castle Harbour for the plaintiff, TIFD III-E. The commercial paper also provided liquidity which provided another level of security for the Dutch

20

banks. The Dutch banks were never intended to have more than a de minimus management role in Castle Harbour. Tr. 246-47; 255. When they did interact with Castle Harbour, it was primarily to protect their contribution and make sure that the expected 9% return was received. Def. Ex. 45 ("I believe that as long as CH is making the Dec 31 distributions and the return to the banks is circa 9% then the banks are more than happy with the outcome.")

GECC made sure through its employees managing Castle Harbour, its headquarters staff in Stamford, Connecticut providing support to Castle Harbour, and GECAS in Shannon, Ireland, that the assets of Castle Harbour were managed prudently. In reality, GECC controlled Castle Harbour. Creating Castle Harbour, bringing in the Dutch banks, and establishing its operating base in Bermuda did nothing to advance the economic prospects of GECC other than the tax savings it claimed during 1993 through 1998. Castle Harbour was designed to create wealth through tax savings. It was nothing more than an artifice that should be disregarded for federal income tax purposes.

D.    The Evidence Demonstrates That the Allocation of 98% of Taxable Income to the Dutch Banks Lacked Substantial Economic Effect under Treas. Reg. § 1.704-1(b) and Should Be Disregarded in Favor of Allocation by Ownership Interests

1. The 98% Income Allocation Violated the "Overall-tax-effect" Rule

The defendant introduced uncontroverted evidence regarding the comparative effect of the allocations of 98% of Castle Harbour's income to the Dutch banks for both the capital accounts set forth in Castle Harbour's financial statements and in the federal income tax returns. Defendant's Exhib 62 demonstrates simple facts based on mathematical comparisons of the taxable income allocations and the book income allocations. It is clear that these allocations violate the "overall-tax-effect" rule of Treas. Reg. § 1.704-1(b)(2)(iii)(a), which provides:

21