> [T]he economic effect of an allocation (or allocations) is not substantial if, at the time the
> allocation becomes part of the partnership agreement, (1) the after-tax economic
> consequences of at least one partner may, in present value terms, be enhanced
> compared to such consequences if the allocation (or allocations) were not contained in
> the partnership agreement, and (2) there is a strong likelihood that the after-tax
> economic consequences of no partner will, in present value terms, be substantially
> diminished compared to such consequences if the allocation (or allocations) were not
> contained in the partnership agreement. In determining the after-tax economic benefit
> or detriment to a partner, tax consequences that result from the interaction of the
> allocation with such partner's tax attributes that are unrelated to the partnership will be
> taken into account.

Thus, under the overall-tax-effect rule, a special allocation scheme does not have substantial economic

effect, regardless of its effect on capital accounts, if, after taxes, at least one partner is better off and no

partner is worse off than it would be if the allocation were not in the partnership agreement.

Here, the after-tax-rule is violated satisfied on several levels of analysis. The 98/2% allocation

scheme enhanced the after-tax economic consequences of all of the partners of Castle Harbour. The

economic situation of the Dutch banks was enhanced by increasing by approximately $25,172,443 the

amount allocated to their capital accounts, without changing their tax liability. The Dutch banks were

not harmed on an after-tax basis since they were tax indifferent parties and could have absorbed a 99%

allocation of income without suffering any United States taxation. Here, the capital accounts were part

of the operating agreement's mechanism along with the Class A Guaranteed Payment and the

Indemnification premium for determining the return to Dutch banks.

At the same time, the 98/2 special allocation enhanced the after-tax economic situation of the

GE entities by $31,641,345 (the difference between their tax savings of $56,814,788 and the decrease

of $25,173,443 to their capital accounts).

22

Defendant's Exhibit 62 provides a comparison of the 98% allocation to the Dutch banks and allocations by the Dutch banks' declining ownership interests over the 1993 through 1998 period at issue.[4] Defendant's Exhibit 62 demonstrates several key points, all of which are derived from Castle Harbour's capital accounts and tax returns, for 1993 through 1998, which are in evidence as joint exhibits. The plaintiff challenged none of the facts set forth in Defendant's Exhibit 62 at trial. Under th special allocation, approximately $284,073,937 of taxable income was allocated to the Dutch banks away from GECC. The Dutch banks could absorb any allocation of operating income and not be subject to United States taxation. GECC avoided federal income tax at the marginal rate of 20% for every dollar of income allocated to the Dutch banks. Defendant's Exhibit 62 demonstrated that the federal income tax which plaintiffs sought to avoid during the period 1993 through 1998 by allocating the Dutch banks 98% of operating income rather than amounts proportional to their declining ownership interests was

$56, 814,788. In addition, because the tax book 98/2 allocation offset income with expenses, including book depreciation (depreciation based on fair market value at the time the planes were contributed to Castle Harbour), the net amounts allocated to the capital accounts of the Dutch banks increased their capital accounts by only (approximately) $25 million, not (approximately) $284 million. Thus, everyone won. The Dutch banks obtained $25 million and GE obtained the difference between the tax savings of $56 million and the $25 million it gave to the Dutch banks, approximately $30 millior

---

[4]  Joint Exhibit 1, the operating agreement, identifies the percentage interests in Castle Harbour as TIFD III-E (81.1964%), TIFD III-M (1%), ING Bank (8.9018%), and Rabo Merchant Bank (8.9018%) as of October 6, 1993.

As demonstrated in Def. Ex. 62, the 98/2 special allocation enhanced the after-tax economic consequences of all of the partners of Castle Harbour.[5] The 98/2 special allocation enhanced the economic situation of the Dutch banks by increasing by approximately $25,172,443 the amount allocated to their capital accounts, without changing their tax liability. At the same time, the 98/2 special allocation enhanced the after-tax economic situation of the GE entities by $31,641,345 (the difference between their tax savings of $56,814,788 and the decrease of $25,173,443 to their capital accounts). Under the partnership special allocation, both the GE entities and the Dutch banks obtain after-tax economic benefits. No partner bears any after-tax economic burden. The after-tax economic burden falls solely and squarely upon the U.S. Treasury. The Treasury Regulations (Treas. Reg. § 1.704-1(b)(2)(iii)(a)) clearly prohibit special allocations like the one here in which partners reap economic benefits while shifting the economic loss to United States taxpayers. This special allocation, therefore, cannot be respected. The tax liability of the GE partners, absent the special allocation during the years in suit, is increased by more than $56 million.

Plaintiff's position, as can be gathered from its pre-trial brief, is based on a flawed premise, i.e., that tax allocations must follow book allocations even if the book allocations cannot survive the "substantial economic effect" analysis required by § 704(b) and the regulations. This approach further exalts "form over substance," the marker for abusive tax shelters. Gregory v. Helvering, 293 U.S. at

---

[5]Plaintiff did not challenge the accuracy of the amounts set forth in Defendant's Exhibit 62, nor offer any alternative analysis. Plaintiff did not offer a rebuttal witness to Defendant's expert witness, Dr. John Lacey, who testified with respect to Defendant's Exhibit 62. Plaintiff alleged that Defendant's Exhibit 62 was not simply calculations but performed its own calculations to explain the contents of the exhibit. Plaintiff questioned the choice of calculation method, the comparative liquidation method ("CLM"), but did not offer evidence demonstrating that this method is inappropriate or that Dr. Lacey's arithmetic was incorrect.

24

465-67.  Plaintiff's reasoning appears to be that by actually preparing financial statements and maintaining them, the book income requirements are satisfied and therefore unassailable by the government.  The position ignores the regulation.

Moreover, the record is quite clear that the "deal" between the Dutch banks and GECC was finely tuned, first by the investment bankers, Babcock & Brown, and later by the contracting parties, GECC and the two Dutch banks, ING and Rabo Merchant Bank.  The deal's target yield for the Dutch banks return of capital was 9%.   The financial elements of the deal are contained in the operating agreement but demonstrated in the annual financial statements, particularly the Class A investment accounts (with the annual increases at the applicable rate of 9.03587%), the Exhibit E distributions to the Dutch banks, the income statements (which reduced income from airplane lease rentals by a depreciation deduction even though the planes were fully depreciated by GECC before their contribution) and the capital accounts (which along with the investment accounts, the Class A guaranteed payment, and indemnification premium was necessary to determine the "bottom line" for the Dutch banks return).

This arrangement between GECC and the Dutch banks was a private contract.  The government was not asked beforehand for an advance ruling on the possible federal income tax results Hence it makes no sense–and there is no legal authority–for one of the parties (GECC) to now claim that since they entered into such an arrangement, the government must accept the book income allocations agreed to privately.  The book income allocations must first pass IRC § 704(b) muster and here they do not.

25

2.    Plaintiff's Reliance on IRC § 704(c) is Misplaced; the Allocations of
Income at Issue are Not Gains or Losses from Dispositions But the
98% of Income to the Dutch banks

Plaintiff argued in its pretrial brief that IRC § 704(c) was at issue but failed to adduce any

evidence to support its apparent position. Plaintiff's reliance on IRC § 704(c) is misplaced. Plaintiff

apparent position is in fact a smoke screen to divert the Court's attention from the lack of

"substantiality" with respect to Castle Harbour's allocation of 98% of the operating income (not

dispositions of gains or losses) to the Dutch banks.

The plaintiff confuses the role of IRC § 704(c). It does govern the allocation of disposition

gains and losses–to make sure that "built-in gain" from contributed property is not shifted to another

partner. The case, however, is not about allocation of built-in gain on the disposition of contributed

aircraft. This case is about the allocation of 98% of the income, tax and tax book, to the Dutch banks

– an issue addressed by IRC § 704(b), not IRC § 704(c).

The record (for example, tax returns and capital accounts) makes clear that the 98% allocation

of income did not include gains and losses from dispositions, which were governed by a different

allocation scheme which was fully aired during the trial. Section 704(c) applies to those dispositions.

Since the allocations of those dispositions is not at issue , plaintiff's reliance on IRC § 704(c) is

misplaced. And, even if IRC § 704(c) did require the special allocation of income used here, which it

does not, that does not mean the transaction is beyond challenge. There is no rational reading of IRC

§704 which would give a preferred position to subsection (c) over subsection (b). App. A.[6]  A

---

[6]References to "App. A." are to Appendix A to this brief which sets forth the text of IRC §§
704 (a), 704(b), and 704(c) (26 U.S.C.).

26

transaction, including all the special allocations, must satisfy all requirements of IRC § 704 and the

regulations. Thus, a failure to satisfy the "substantial economic effect" requirements of subsection (b

fatal, even if the failure is a result of studiously applying subsection (c) (which is not the case here in

event). When GECC, with the help of Babcock & Brown, designed the Castle Harbour arrangement,

it had to be sure it complied with both IRC § 704(b) and IRC § 704(c).

E.    The Dutch Banks Were Creditors Not Equity Owners

It is well recognized that various factors can be considered to determine whether an investmer

is debt or equity, though not all are of equal weight and no single one is controlling. John Kelley Co.

Commissioner, 326 U.S. 521, 530 (1946); Dunn v. Commissioner, 615 F.2d 578, 584 (2d Cir.

1980); Scriptomatic, Inc. v. United States, 555 F.2d 364, 372-73 (3d Cir. 1977); Estate of Mixon v.

United States, 464 F.2d 394, 402-03 (5th Cir. 1972)(identifying 13 factors, but noting 38 factors have

been used by various courts); Fin Hay Realty Co v. United States, 398 F.2d 694 (3d Cir. 1968)

(identifying 16 factors); Rosenberg v. Commissioner, T.C. Memo 2000-108, 2000 WL 326198,

March 29, 2000; Laidlaw v. Commissioner, T.C. Memo 1998-232, 1998 WL 345528, June 30,

1998.

No one factor is determinative, rather the Court should examine all the facts and circumstance

Gregg Co. of Delaware v. Commissioner, 239 F.2d 498, 501-502 (2d Cir. 1956). When evaluating

"hybrid" instruments, "it is necessary to consider the individual provisions of the [Operating Agreeme

and the history of their issuance and subsequent treatment" in order to determine whether the Dutch

bank's were lenders or equity investors. Id. The evidence adduced at trial demonstrates that the

Dutch banks' transfer of $117 million was a loan rather than an equity investment. A review of the

27

"total facts surrounding the creation and use of the [Dutch banks' funds,]" <u>Dunn</u>, 615 F.2d at 584,

demonstrates that behind the form-over-substance facade created by a few sections of a carefully

crafted operating agreement lies the obligation of Castle Harbour to repay the Dutch banks' investme

at regular intervals, with a substantial interest payment. The Dutch banks secured their investment w

provisions in the operating agreement that required Castle Harbour to maintain, in a wholly owned

subsidiary, an amount of liquid assets equal to 110% of the amount owed to the Dutch banks. The

Operating Agreement gave the Dutch banks the right to liquidate Castle Harbour should one of the

required periodic payments be missed or should the liquid assets held as security fall below 110%.

As shown in Plaintiff's Demonstrative Exhibit W, plaintiff contends, through Professor Myers

that only seven factors are potentially relevant to the debt versus equity analysis. Even if plaintiff wer

correct in the contention that only seven factors are potentially relevant, which, as discussed below,

they are not, the seven factors point to the Dutch banks' investment as being nothing more than a loan

The seven factors are: (1) existence of residual claim with a potential upside, (2) ownership and contr

(3) rights in distress, (4) terms and covenants, (5) existence of downside risk, (6) fixed maturity date,

and (7) defined principal. The plaintiff also makes the puzzling assertion that three of those seven

· factors, labeled as "other" on Plaintiff's Demonstrative Exhibit W, including downside risk, fixed

maturity and defined principal, are irrelevant here. Pl.'s Dem. Ex. W; Tr. 855. As discussed below,

the "other" factors, as well as the parties' intent, omitted from the plaintiff's list, are not only relevant

they are highly indicative of the existence of debt. We discuss these factors below, although not

necessarily in the order presented by Plaintiff's Demonstrative Exhibit W, with a cross-reference to th

factor as identified by Plaintiff's Demonstrative Exhibit W.

1. <u>The Return of the Dutch Banks' Investment Was Virtually Guaranteed (# 5)</u>

While there may have existed a theoretical scenario under which the Dutch Banks would not have been repaid their entire investment of $117 million, such a result was almost impossible. While Professor Myers's report considered disposition losses of Castle Harbour up to a theoretical loss of approximately $100 million dollars, that theoretical loss would still have generated not only repaymer of the Dutch Banks' entire investment, but also a positive return of approximately 8.38%. Tr. 896. A: Professor Lacey testified, even if the Court were to consider Castle Harbour operating losses in the range of $300 million, in addition to the $100 million of disposition losses considered in Professor Myers's report, the Dutch Banks would still have received a substantial return on their investment, sir operating losses after the first $3.9 million were allocated 99% to the GE entities and only 1% to the Dutch Banks. Def. Ex. 119; Tr. 1050. Furthermore, Professor Myers testified that even if we were to assume that Castle Harbour's planes were worthless, the Dutch Banks would have received a positive return. Tr. 897. While Professor Myers purported to have a 90% confidence that the Dutch Banks would have a rate of return between 8.38% and 9.75% , and he did not determine the probability that the return might deviate from that range , he admitted that the Dutch Banks would likely have receive their investment back even in the case of an extreme catastrophe early in the life of Castle Harbour. Tr. 896, 918.

29

2.    <u>Defined Principal</u> (# 7)

Since there is no reasonable scenario under which the Dutch banks would receive anything les

than a return of their entire investment of $117 million, that amount can only be considered a defined

principal. Of course, the balance of the defined principal was paid down annually by the Exhibit E

payments. Tr. 405, 905, 648, 676. By the end of 1997, the Dutch banks had already received

payment of their entire principal. Def. Ex 1; Tr. 1009. The remaining balance paid to the Dutch bank

over their defined principal was an interest payment, variable only within a narrow range. Those

interest payments were also made, in part, annually by the Exhibit E payments, and then the remainde

upon settling the Dutch banks' account at dissolution of the partnership. Def. Ex. 1; Tr. 1010-1012.

3.    <u>Fixed Maturity Date</u> (# 6)

The presence of a fixed maturity date is a key indicator of a loan. <u>Estate of Mixon</u>, <u>Ibid.</u>; <u>Fin</u>

<u>Hay Realty Co., Ibid.</u>  Here, the operating agreement established a functional wrap-up date for Castle

Harbour of September 3, 2000. The last scheduled payment set forth on Exhibit E was set for the end

of the year 2000. Def. Ex. 1.  Indeed, under the terms of the Operating Agreement, the occurrence of

September 3, 2000, was deemed to be an "optional liquidation event." Def. Ex. 2.. Furthermore, the

balances in the Dutch banks' capital account and investment account, as well as their "minority

interest," were expected to be zero by the end of 2000. Def. Ex 34; Tr. 1075. Of course, one can

think of no reason for the GE entities to fail to liquidate Castle Harbour by September 3, 2000, as

failure to do so would constitute a gift to the Dutch banks of 98% of all Castle Harbour operating

income, and, in fact, Professor Myers deemed it a likely date for Castle Harbour to be wrapped up.

Tr. 902-903.  Indeed, as proposed by Babcock and Brown, the Dutch bank's interest was "self

liquidating" on or near that date.

>    4.    Intent of the Parties

The intent of the parties, as demonstrated by objective facts, is important in determining

whether this investment is debt or equity.  Fin Hay Realty Co., 398 F.2d at 696; Estate of Mixon, 464

F. 2d  at 402.  The Dutch banks treated their transfer of $117 million as debt.  Representatives of both

banks testified, that for internal book purposes and for Dutch tax purposes the transactions were

treated as loans, not equity. Nagel Tr.[7] 62-65, 71; Mulders Tr.[8] 42-44, 46-48.  Indeed, the ING

deposition witness indicated that his unit at ING only made loan investments. Nagel Tr. 64-65.

The testimony of the Dutch banks is clear that the economic realities of the investments and the

Dutch tax treatment desired by the Dutch banks are indistinguishable from economic principles

governing tax treatment of loan instruments in the United States.  Thus, the intent of the Dutch banks

relevant to the determination here, and is not, as plaintiff contends, an irrelevant question of foreign l

As the Dutch banks are "tax indifferent," their treatment of the transaction is for purposes other than

tax benefit and, accordingly, credible and deserving of considerable weight.  GE's characterization of

the transaction, on the other hand, appears to be highly influenced by the anticipated tax benefits.  As

evidenced in the correspondence between GECC and its accountant, KPMG, at the time of the

transaction, included among the assumptions underlying the Castle Harbour transaction was the

---

[7]References to "Nagel Tr." are to the deposition testimony of Wilfred Nagel, which was received into evidence at the trial of this matter.

[8]References to "Mulders Tr." are to the deposition testimony of Hem Mulders, which was received into evidence at the trial of this matter.

assumption that the Dutch banks would "treat their interests in [Castle Harbour] as equity interests"

rather than debt. Def. Ex. 42 at ¶ 10. Since the characterization of the transaction did not alter the

contractual relationship between the parties as set forth in the Operating Agreement, GE was free to

label the transaction to suit its needs: maintaining an apparent debt to equity ratio of 1 to 8 to satisfy

credit rating agencies and to minimize taxes. Neither of these reasons, however, is subject to the

checks and balances that would exist if a U.S. bank, which had to contend with tax consequences of

the transaction and its own regulators and rating agencies, were involved. GE's characterization,

serving only to benefit GE and without consequence to any other party, therefore, is entitled to little, i

any, weight.

### 5.    The Covenants of the Operating Agreement Indicate Debt (# 4)

Examination of the Covenants of the Operating Agreement are strong evidence that the true

nature of the relationship between the GE and the Dutch banks is that of lender and creditor. Of

course, these covenants are typical of debt covenants demanded by creditors because they do not have

control of management. As discussed below, the Dutch banks had no control of management. Thus,

they would have insisted on these covenants to protect their ability to be repaid the loan principal, plu

interest.

The Operating Agreement contained an "Indemnification Premium" to be paid to the Dutch

banks as compensation for an early buyout–an event which actually occurred on December 31, 1998

(because, according to Prof. Myers, a change in the tax law which, apparently, removed GE's incentiv

to allocate 98% of the income to the Dutch banks). Jt. Ex. 1 at § 1.10; Def. Ex. 114 at 14; Tr. 367,

32

915. Provisions such as this "Indemnification Premium" are typically seen in debt instruments in ord

to compensate the creditor for lost interest on a loan that is paid off early. Tr. 915, 854- 855, 1011.

The Operating Agreement also contained a prohibition of any modification of any lease

agreement that might have had a material adverse effect on the ability of the Dutch banks to get repaid

This, again, is a covenant seen in loan agreements. Tr. 908. Similarly, the Operating Agreement

contained a covenant prohibiting Castle Harbour from incurring additional debt or liens without the

consent of the Dutch banks. Tr. 907. One expects to find this covenant in a loan agreement. Ibid.

6.    Repayment Enforcement Rights (# 3)

Another strong indicator of debt is the presence of provisions which enforce repayment rights.

The Dutch banks had repayment enforcement rights akin to those of a creditor-- the right to force

liquidation, a strong indicator of a creditor-debtor relationship. Def. Ex. 42; Estate of Mixon, Ibid.; F

Hay Realty Co., Ibid. As Professor Myers testified in response to inquiries by the Court, an equity-

holder would typically have to obtain seats on the board of directors in order to force a liquidation, bu

only a debt-holder could otherwise do so. Tr. 848. As discussed below, the Dutch banks were

contractually prohibited from obtaining management control, so their liquidation rights were detailed

the Operating Agreement. Unlike the enforcement rights of an equity holder, the Dutch banks could

force liquidation, and, if the Dutch chose to do so, management could do nothing to prevent liquidatic

This contractual right to force liquidation over any objection of management is akin to the rights of a

creditor, not a partner.

33

7.    Lack of Management Role for Dutch Banks (# 2)

The Dutch banks were contractually prohibited from being involved in the election of Castle

Harbour's managers, as that right was reserved exclusively for the GE entities.  Joint. Ex. 1 at 59).

Despite the Federal Aviation Administration ("FAA") rules allowing 25% of managers to be foreign

citizens, Joint Ex. 1 at 59; Tr. 500, the Dutch banks never had a single representative act as a manager

Tr. 685, 910.  GE's contention that FAA rules prohibited foreign managers completely is incorrect

(and it is not credible that GE was not aware of the correct rules).  In fact, when the operating

agreement was amended to allow for a fourth manager, that manager was Mr. Hyde, not a U.S. citizen

but a GECAS employee, and thereby under the control of GE.  Tr. 500.  Thus the plaintiff's argument

that FAA rules required that all managers be U.S. citizens is both incorrect and beside the point; the

Dutch banks simply had no role in the management of Castle Harbour and this fact is highly indicative

of debt, not equity.

According to the Operating Agreement, the manager resident to Hong Kong was named as

Castle Harbour's general manager.  Joint Ex. 1 at § 5.1(c).  While playing no role in the election of the

managers, including the general manager, the Dutch banks' ceding of control to GECC is highlighted

the general manager's own testimony in which he admitted that he was paid only $12,000 per year to

manage an enterprise with initial capitalization of approximately $700 million, he maintained a job wi

GECC in an unrelated field that paid him more than $160,000 per year , he worked in GECC's Asia

headquarters, and he outsourced his "part-time" duties with respect to Castle Harbour to GE

subsidiaries.  Tr. 666-99.

34

The Dutch banks' failed to attend all telephonic quarterly management meetings and had no

voting rights even when they did attend.  Joint Ex. 1 at 82; Tr. 680-81.  These sporadic telephonic

appearances by the Dutch banks did not evidence management activities but rather the typical

monitoring by lenders of the activities of the entity to which loans are made.  Tr. 910-911.  The lack of

management participation by the Dutch banks here is a strong indicator that their investments were

loans.  Estate of Mixon, Ibid.; Fin Hay Realty Co., Ibid.

> 8.    The Dutch Banks Had a Primary Claim Upon the Assets
>        of Castle Harbour and Its Subsidiary    (# 1)

The argument put forth by the plaintiff in plaintiff's Demonstrative Exhibit W, that the Dutch

banks had a residual claim to the assets of Castle Harbour, thereby evidencing an equity claim, gives

undue weight to a single factor when compared to all the other indicia of debt here, and ignores the

reality of the entire contract.  The facts establish that the Dutch banks had a subordinated claim on

operating income of Castle Harbour.  That is, they had a claim subordinate to that of the nonrecourse

lenders on the original purchase of the aircraft that GECC contributed.  Of course, Professor Myers

testified, in response to the Court's inquiry, that such subordination is in no way determinative of the

debt versus equity issue, as the Dutch banks would be subordinated either way.  Tr. 858.  Meanwhile,

the Dutch banks did not rely on any residual funds to obtain a return of their principal, with interest, a

they were separately secured by cash and high-grade liquid securities parked in CHLI, in part as a

result of the 110% Core Financial Assets requirement.

When one considers the result in the event of a catastrophic loss of the airplanes early in Castle

Harbor's life, it is clear that the position of the Dutch banks was superior to that of the nonrecourse

lenders, and such superiority is another indicium of debt.  In the event of a catastrophic loss of the

35

airplanes, the nonrecourse lenders would have been wiped out, while the Dutch banks would have

been repaid. Tr. 917-918. While Professor Myers states in his graduate level textbook that equity is

riskier than debt, the Dutch banks bore far less risk than did the nonrecourse creditors. Tr. 916.

> 9.    The Dutch Banks' Potential Upside Was Minimal,
>        Effectively Limited, and Indicative of a Debt Instrument (# 1)

The Dutch banks' potential upside was minimal and this limited upside was not indicative of a

equity investment, but rather it was indicative of a limited "sweetener" added to a debt contract. The

target return rate for the Dutch Banks was either 8.54% or 9.03587%, depending on the reason for the

ending of the relationship between the Dutch Banks and Castle Harbour. Tr. 437; Joint Ex. 1 at 7.)

The Applicable Rate here, as defined in the Operating Agreement , was 9.03587%. While the Dutch

banks had upside potential, most of that upside was effectively a guaranteed return on a loan– i.e.

interest.

The potential upside for the Dutch banks was to receive interest over and above 9.03587%.

That upside was determined by the availability of allocations of 98% of Castle Harbour's operating

income net of operating losses, Joint. Ex. 1 at §§ 3.1, 3.2, and by 1% of any disposition gains (90% of

disposition gains up to $2.9 million, net of disposition losses, and then 1% thereafter). Joint. Ex. 1 at

3.3(h).

The upside to the Dutch banks was capped by three realities: (1) the improbability of a return

substantially greater than the target return of 9.03587%, (2) the existence of a call provision in the

operating agreement whereby the GE entities could buy out the Dutch banks' interest at any time, and

(3) GE's control of Castle Harbour which allowed it to distribute assets to GECC to shift income from

profitable assets away from Castle Harbour and to control the timing of any dispositions (which could

be delayed until after the Dutch banks had left Castle Harbour). The range of "extreme" outcomes of operating income would yield no more than a 9.99% return to the Dutch banks, an upside limited to less than 1% above the target return rate. Pl. Ex. 380 at Fig. 6; Tr. 911.

Similarly, disposition gains were effectively capped by the range of possible outcomes upon sale. Professor Myers calculated, again without determining numerical probabilities, Tr. 896, an optimistic return to the Dutch banks at the high end of reasonable disposition gains; that optimistic upside was a return of 9.75%, Pl. Ex. 380 at Fig. 5, within 3/4 of one percent from the target return rate. Clearly, in order for the Dutch banks to receive a rate of return more than 1% above their expected 9.03587% target, gains would have to be extremely, and unforeseeably large.[9]

The Dutch banks' return was secondarily capped by the provision in the operating agreement allowing the GE entities to purchase the Dutch banks' interests at any time. Joint. Ex. 1 at § 14.3. Thus, if unforseen events produced allocations to the Dutch banks higher than the GE entities desired, the partnership could simply be terminated. Tr. 911-912; Def. Ex. 114 at 4.

The third cap on the Dutch banks' return was the complete control over Castle Harbour exerted by the GE entities. If any asset became particularly profitable, it could simply be transferred t GECC, removing it from the assets generating income allocated to the Dutch banks. Def. Ex. 114 at

---

[9]It is noteworthy that Messrs. O'Reilly, Lewis, and Nayden each testified that the majority of Castle Harbour's portfolio, despite having a fair market value at contribution of $531 million, was considered outdated. As such, it would be counterintuitive for the plaintiff to argue that those same aircraft were likely to generate higher-than-expected lease payments or sale prices.

Since the upside potential for the Dutch banks was limited to less than one percent above their target rate of return, and all other factors point to the existence of debt, this structure may best be termed debt with a "sweetener." Though the plaintiff claims that the existence of any upside potential or "upward slop[ing]" payoff diagram shows this to be equity, Pl. Ex. 380 at 13, their own expert witness agreed that upward sloping payoff diagrams exist in a number of debt instruments. Tr. 889-892. As Professor Myers stated, the option to convert a debt instrument into an equity instrument is often termed a "sweetener," and is so termed in his graduate-level textbook. Tr. 891. In this case, the "sweetener" existed without a conversion, as no additional risk was borne by the Dutch banks, and the debt-like structure never ceased to exist during the life of Castle Harbour. The "sweetener" here was the potential that the Dutch banks could earn slightly more than the 9.03587% target. The Dutch bank simply made a loan that was fully repaid on schedule, and then, only upon buyout, were the Dutch banks eligible to receive their "sweetener," which in this case amounted to approximately $136 thousand on a loan of $117 million– or one tenth of one percent.

Accordingly, when all the facts and circumstances are considered, without giving undue weight to any one factor, the evidence demonstrates that the relationship between GE and the Dutch banks was that of debtor-creditor.

F.    The GECC Entities are Liable for Penalties

As explained in the United States' pre-trial brief, the GE Entities are liable for penalties for the years 1997 and 1998. Trial Brief 54-59. The plaintiff did not offer any evidence at trial with respect to the tax advice upon which it relied in structuring the Castle Harbour transaction. The negligence penalty is therefore appropriate. Negligence "includes any failure to make a reasonable attempt to

38

comply with the provisions of [the Internal Revenue Code]." IRC § 6662(c).  Negligence is strongly

indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a

reported item, such as income, "which would seem to a reasonable and prudent person to be 'too good

to be true' under the circumstances[.]" Treas. Reg.  § 1.6662-3(b)(1).  Reasonableness here "is a

relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently

improper." Treas. Reg. § 1-6662-3(b)(3).  The term disregard "includes any careless, reckless, or

intentional disregard." 26 U.S.C. § 6662(c).

Alternatively, the GE entities are liable for 20% penalties for 1997 and 1998 for

substantial understatements of income tax under IRC 6662(b)(2) if the understatements that result from

the adjustments at issue for those years are substantial.  A substantial understatement of tax, as is

relevant here, is one that is the greater of 10% of the tax required to be shown on the returns of the GE

entities or $10,000.  IRC § 6662(d)(1).  Because, as was demonstrated at trial, the GE entities'

principal purpose for the entering into the Castle Harbour arrangement with the Dutch banks was to

avoid tax on the income produced by the fully depreciated airplanes, the amount of the understatement

is not reduced even if either (a) the taxpayer had substantial authority for its position, or (b) the

taxpayer fully disclosed the relevant fact on its returns and had a reasonable basis for the tax treatment

of the lease income on the returns.  IRC §§ 6662(d)(2)(B) and (C).

39

CONCLUSION

Plaintiff's petitions should be dismissed and judgment entered for the United States on the grounds that (1) no partnership existed for federal income tax purposes between the GE entities and the Dutch banks; (2) the formation of Castle Harbour on October 6, 1993, with the entry of the Dutch banks as putative members was a "sham transaction"; (3) the contributions to Castle Harbour by the Dutch banks were loans, not equity investments; or (4) the allocation of 98% of Castle Harbour's income to the Dutch banks lack "substantial economic effect," pursuant to IRC § 704(b) and the regulations issued thereunder. These are alternative grounds and the United States prevails in this action on the basis of any of these four grounds.  The Court should also find that the GE Entities are liable for the penalties asserted with respect to 1997 and 1998.  Under any of the alternative theories of liability, the transaction was the result of negligence or a disregard of rules and regulations or resulted in a substantial understatement of income tax.

KEVIN J. O'CONNOR
United States Attorney
JOHN B. HUGHES
Chief, Civil Division

ROBERT J. HIGGINS (ct23378)
BARRY E. REIFERSON (ct24580)
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Washington, D.C. 20044
Telephone:  (202) 307-6580
Facsimile:  (202) 514-5440

August 4, 2004

40

APPENDIX

**I.R.C. § 704:**

(a) EFFECT OF PARTNERSHIP AGREEMENT.– A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement.

(b) DETERMINATION OF DISTRIBUTIVE SHARE.– A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if–

(1) the partnership agreement does not provide as to the partner's distributive share of income, gain, loss, deduction, or credit (or item thereof), or

(2) the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect.

(c) CONTRIBUTED PROPERTY.–

(1) In general.– Under regulations prescribed by the Secretary–

(A) income, gain, loss, and deduction with respect to property contributed to the partnership by a partner shall be shared among the partners so as to take account of the variation between the basis of the property to the partnership and its fair market value at the time of contribution, and

(B) if any property so contributed is distributed (directly or indirectly) by the partnership (other than to the contributing partner) within 7 years of being contributed–

(i) the contributing partner shall be treated as recognizing gain or loss (as the case may be) from the sale of such property in an amount equal to the gain or loss which would have been allocated to such partner under subparagraph (A) by reason of the variation described in subparagraph (A) if the property had been sold at its fair market value at the time of the distribution,

(ii) the character of such gain or loss shall be determined by reference to the character of the gain or loss which would have resulted if such property had been sold by the partnership to the distributee, and

(iii) appropriate adjustments shall be made to the adjusted basis of the contributing partner's interest in the partnership and to the adjusted basis of the property distributed to reflect any gain or loss recognized under this subparagraph.

(2) Special rule for distributions where gain or loss would not be recognized outside partnerships.--Under regulations prescribed by the Secretary, if–

(A) property contributed by a partner (hereinafter referred to as the "contributing partner") is distributed by the partnership to another partner, and

(B) other property of a like kind (within the meaning of section 1031) is

distributed by the partnership to the contributing partner not later than the earlier of--

> (i) the 180th day after the date of the distribution described in subparagraph (A), or

> (ii) the due date (determined with regard to extensions) for the contributing partner's return of the tax imposed by this chapter for the taxable year in which the distribution described in subparagraph (A) occurs,

then to the extent of the value of the property described in subparagraph (B), paragraph (1)(B) shall be applied as if the contributing partner had contributed to the partnership the property described in subparagraph (B).

(3) Other rules.– Under regulations prescribed by the Secretary, rules similar to the rules of paragraph (1) shall apply to contributions by a partner (using the cash receipts and disbursements method of accounting) of accounts payable and other accrued but unpaid items. Any reference in paragraph (1) or (2) to the contributing partner shall be treated as including a reference to any successor of such partner.

## CERTIFICATE OF SERVICE

I certify that service of the foregoing United States' Trial Brief has, this 4th day of August 2004, been made on plaintiffs' counsel by facsimile and by mailing in a postage pre-paid envelope a copy thereof to the following addresses:

David J. Curtin, Esq.
MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, DC 20036

Anthony M. Fitzgerald
CARMODY & TORRANCE LLP
195 Church Street
P.O. Box 1950
New Haven, Connecticut 06509-1950

Suzanne C. Feese
KING & SPALDING
191 Peachtree Street
Atlanta, Georgia 30303-1763

_Rebecca Hines_
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6440