## IN THE UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF CONNECTICUT

TIFD III-E INC., THE TAX MATTERS )
PARTNER OF CASTLE HARBOUR-I )
LIMITED-LIABILITY COMPANY, )
                              )
            Plaintiff, )
                              )
         v. )      CASE NOS. 3:01CV1839(SRU)
                              )                 3.01CV1840(SRU)
UNITED STATES OF AMERICA, )
                              )
            Defendant. )

## NOTICE OF APPEAL

Pursuant to F.R.A.P. 4(a)(1), the United States of America hereby gives notice

and appeals to the United States Court of Appeals for the Second Circuit from the

following: Memorandum of Decision, entered November 1, 2004, and Judgment in

Favor of Plaintiff Against Defendant, entered November 3, 2004. Copies of the

Memorandum and Judgment are attached hereto.

                       KEVIN J. O'CONNOR
                       United States Attorney
                       JOHN B. HUGHES
                       Chief, Civil Division

                       ROBERT J. HIGGINS (ct23378)
                       BARRY E. REIFERSON (ct24580)
                       Trial Attorney, Tax Division
                       U.S. Department of Justice
                       Post Office Box 55
                       Washington, D.C. 20044
                       Telephone: (202) 307-6580
                       Facsimile: (202) 514-5440

December 28, 2004

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TIFD III-E INC., the Tax Matters Partner of : 
CASTLE HARBOUR-I LIMITED- : 
LIABILITY COMPANY, :          CIVIL ACTION NOS.
     Plaintiff, :          3:01cv1839 (SRU) (lead)
     :          3:01cv1840 (SRU)
    v. :
     :
UNITED STATES OF AMERICA, :
    Defendant. :

### MEMORANDUM OF DECISION

TIFD III-E Inc. ("TIFD III-E") has sued the United States of America to recover

approximately $62 million that TIFD III-E deposited with the Internal Revenue Service ("I.R.S.")

in satisfaction of an alleged tax liability. That tax liability arose from the I.R.S.'s determination

that TIFD III-E had incorrectly calculated and reported the amount of income TIFD III-E earned

as a partner in Castle Harbour-I Limited-Liability Company ("Castle Harbour"). The case was

tried to the court over eight days. The court's findings of fact and conclusions of law are set

forth below.

### I.      Procedural History

Castle Harbour was a Nevada limited liability company. In every year from 1993 to

1998, it filed a partnership tax return, also known as a Form 1065. (J. Exs. 22, 40, 50, 56, 59, 70)

TIFD III-E, a Delaware corporation, was one of the owners of Castle Harbour. Because Castle

Harbour was treated as a partnership for tax purposes, TIFD III-E paid United States tax on the

income attributed to it on Castle Harbour's Form 1065.

In 2001, the I.R.S. issued two notices of Final Partnership Administrative Adjustments

("FPAAs") concerning Castle Harbour. (Pl.'s Exs. 377, 378) The FPAAs attributed

approximately $310 million of additional income to TIFD-III E, resulting in an additional tax liability of $62,212,010.

Pursuant to section 6226(a) of the Internal Revenue Code ("I.R.C."), TIFD III-E filed a complaint against the United States challenging the FPAAs. Before filing, TIFD III-E deposited the disputed sum of $62,212,010 with the I.R.S. as required by I.R.C. section 6226(e). Because it is the tax matters partner of Castle Harbour, TIFD III-E is authorized to bring this suit. I.R.C. § 6226(a)

## II.    Findings of Fact

On the basis of the testimony, exhibits, and designated depositions, I make the following findings of fact.

### A.    Background

TIFD III-E is a wholly owned subsidiary of the General Electric Capital Corporation ("GECC"), a subsidiary of the General Electric Company ("GE"). Among other things, GECC[1] is in the business of commercial aircraft leasing. (July 21, O'Reilly, 48; July 21, Lewis, 134)[2] Typically, airlines do not own aircraft, principally because airlines do not ordinarily produce sufficient income to take advantage of the tax depreciation deductions generated by commercial aircraft. (July 21, Brickman, 204-05) Instead, a company with greater taxable income, such as GECC, will buy the planes and lease them to airlines, thereby giving the airlines the use of the

---

[1] GECC is the true party in interest and ultimate taxpayer in this case, though many of the actions relevant to this case were taken by GECC's wholly owned subsidiaries. I will frequently use the name "GECC" to refer interchangeably to both GECC itself and to its wholly owned subsidiaries.

[2] Citations to trial testimony are given as follows: (month and day, last name of witness, page number). All of the trial took place in 2004.

aircraft and the lessor company the tax deductions. (July 21, Brickman, 204-05)

In the early 1990s, the airline industry experienced a number of setbacks, including several bankruptcies. (July 21, O'Reilly, 49; July 21, Lewis, 137; July 22, Dull, 299; July 22, Parke, 385-86; July 23, Nayden, 451) These events caused GECC concern for its own prospects in the aircraft leasing business. (July 21, O'Reilly, 66-72; July 21, Lewis, 141-42; July 22, Parke, 386) In 1992, at least partially in response to this concern, GECC executives began looking for ways to reduce GECC's risk in the aircraft leasing business. (July 21, Lewis, 155-56) To do this, GECC initiated what it referred to as a "sell-down" effort – an attempt, among other things, to raise immediate cash against GECC's aircraft assets. (July 21, O'Reilly, 77-78; July 21, Lewis, 158-59; July 26, Nayden, 455-56) In other words, rather then simply awaiting return in the form of the – now less certain – rental income, GECC wanted to lower its risk by raising immediate cash against that future stream of income.

Selling the aircraft or borrowing money against them, two straightforward ways of raising capital, were not options. Sale was not a realistic option because, in general, the secondary market for aircraft was weak. (July 21, O'Reilly, 70) This was particularly true with respect to GECC's older aircraft – known as "Stage II" aircraft – which did not meet certain regulatory standards, including those for noise. (July 21, O'Reilly, 50; July 22, Dull, 308) Non-recourse debt was not an option for two reasons. First, in order to maintain its AAA credit rating, GECC had an agreement with credit rating agencies that prohibited GECC from borrowing more than eight times its common equity. (July 21, O'Reilly, 95-96; July 22, Parke, 379) In 1993, GECC's debt-to-common-equity ratio was 7.96 to 1, giving it little room to borrow. (July 22, Parke, 381) Second, a number of GECC's medium-term and long-term debt instruments contained a

-3-

"negative pledge" – a covenant prohibiting GECC from using its assets to secure debt other than purchase money debt. (July 21, O'Reilly, 96; July 22, Parke, 384)

With the two most obvious options for raising money off the table, GECC sought outside advice concerning other possibilities.  In May 1992, GECC submitted Requests for Proposal ("RFPs") to seven investment banks.  (Pl.'s Exs. 141, 142, 143, 146; J. Exs. 8, 10)  The RFPs sought proposals that would, in essence, allow GECC to solicit outside investment in at least part of its aircraft leasing business. All of the investment banks submitted proposals; none of them met all of GECC's objectives.  (July 21, O'Reilly, 88-89)  Nevertheless, in March 1993, after some back and forth, the investment bank Babcock & Brown submitted a revised proposal that GECC found acceptable. (July 21, O'Reilly, 90)  Babcock & Brown eventually received a $9 million fee for its work.  (July 21, Brickman, 225)

Babcock & Brown's final[3] proposal called for the creation of a separate entity to which GECC would contribute a number of aircraft.  (D.'s Ex. 22)  Investors would then be solicited to purchase ownership shares in the new entity.  (J. Ex. 17)  The result would be that GECC would trade some of the risks and returns of those aircraft to the outside investors in exchange for a cash contribution to the newly created entity.  The proposal also called for the investors to be foreign tax-neutral entities, an arrangement that would offer lucrative tax savings to GECC.

After GECC senior management approved the proposal, it was implemented in two stages.

First, on July 26, 1993, GECC formed a Nevada limited liability company known as GE

---

[3] Before submitting the proposal ultimately adopted, Babcock & Brown submitted at least two other proposals to GECC, which were rejected.  (July 21, Brickman, 212-15)

Capital Summer Street-I Limited Liability Company ("Summer Street"), which was owned by three GECC subsidiaries: TIFD III-E, TIFD III-M, and General Electric Capital AG. (Pl.'s Ex. 118; July 22, Dull, 315)  Through these subsidiaries, GECC contributed to Summer Street: (a) 63 "Stage II" aircraft worth $530 million, but subject to $258 million of non-recourse debt (a net value of $272 million);[4] (b) $22 million of rents receivable on the aircraft; (c) $296 million in cash; and (d) all the stock of GECC subsidiary TIFD VI, which had a value of $0.  (July 22, Dull, 314-15, 331)

Second, on October 6, 1993, the GECC subsidiaries sold $50 million of their interest in Summer Street, which included all of GE Capital AG's interest, to two Dutch banks, ING Bank N.V. and Rabo Merchant Bank N.V. (collectively, the "Dutch Banks"). (July 22, Dull, 322-23) The Dutch Banks also contributed an additional $67.5 million, bringing their total investment to $117.5 million.  (July 22, Dull, 322-23)  Summer Street then changed its name to Castle Harbour-I Limited Liability Company ("Castle Harbour") (Pl.'s Exs. 118, 119), and TIFD VI changed its name to Castle Harbour Leasing, Inc. ("CHLI") (July 22, Dull, 331)

B.    Structure of Castle Harbour

When the final stage of the Castle Harbour transaction was completed on October 6, 1993, the parties entered into an Amended and Restated Operating Agreement ("the Operating Agreement").  (J. Ex. 1)  The Operating Agreement dictated the way gains and losses were allocated between TIFD III-E, TIFD III-M (collectively the "GECC entities"), and the Dutch Banks.  Consequently, understanding the terms of the Operating Agreement is essential to

---

[4] Legal title to the aircraft in question was held in trust.  Consequently, it was the beneficial ownership in the aircraft that GECC transferred to Summer Street.  (July 22, Dull, 302)

understanding the tax consequences at issue in this litigation.

    1.    *Overview*

Castle Harbour was a self-liquidating partnership. Through two entities,[5] GECC

contributed to Castle Harbour a net $246 million in cash[6] and, more importantly, approximately

$294 million worth of leased aircraft.[7] The Dutch Banks contributed approximately $117.5

million in cash. Each partner received an allocation of the net income of the partnership. The

Dutch Banks were referred to as Class A partners, the GECC entities as Class B partners. (J. Ex.

1 at Bates 101430-31) Over eight years, the Dutch Banks' ownership interest was to be almost

entirely bought out with the income of the partnership. This self-liquidation mechanism can best

be understood by considering an actual year in the partnership.

Castle Harbour's first full year of operation was 1994. At the beginning of 1994, each

partner's ownership interest – recorded in a "capital account" entry on Castle Harbour's financial

statements (J. Ex. 1 at Bates 101403-31) – was approximately the same as at the start of the

partnership. GECC's capital account was approximately $540 million.[8] (J. Ex. 24 at Bates 8812)

The Dutch Banks' combined capital accounts were approximately $112 million.[9] (J. Ex. 24 at

---

    [5] These entities' compliance with the terms of the Operating Agreement was guaranteed by GECC. (J. Ex. 3)

    [6] $296 million initial contribution, minus $50 million interest sold to the Dutch Banks.

    [7] $530 million in aircraft, minus $258 million non-recourse debt, plus $22 million in rent receivable.

    [8] $294 million net aircraft value, plus $246 cash investment, minus $12,000 income allocation.

    [9] $117.5 million cash investment, plus $600,000 income allocation, minus $6 million distribution.

Bates 8812)

In 1994, Castle Harbour received approximately $100 million in gross income – mostly rent from aircraft leases.[10] In accordance with the Operating Agreement, the net income for 1994, approximately $9.8 million, was distributed $9.6 million to the Dutch Banks and $0.2 million to GECC. (J. Ex. 37 at Bates 16344)  (The mechanics of net income calculation and allocation are discussed below.)  Accordingly, the Dutch Banks' combined capital accounts increased to approximately $122 million, and the GECC entities' accounts increased negligibly, remaining at around $540 million.

The Dutch Banks' capital accounts, however, did not actually increase because part of the gross rent of $100 million was used to "buy-out" approximately $40 million of the banks' combined ownership interest.  (J. Ex. 37 at Bates 16344)  Thus, at the end of 1994, the Dutch Banks' capital accounts, originally at $112 million, had increased by $10 million (allocation) but decreased by $40 million (buy-out), resulting in final combined capital accounts of approximately $82 million.[11]

This general pattern was to be repeated for eight years.  Each year the Dutch Banks were to have their capital accounts debited or credited, depending on whether the partnership had received a gain or suffered a loss, and each year the Dutch Banks were to have a significant portion of their ownership interest bought out by the partnership.  The amount of the annual buy-out payment was set forth in the Operating Agreement at Exhibit E, giving rise to the name

---

[10] Additionally one aircraft was distributed back to GECC, an event that was treated essentially as a sale.  For simplicity, I ignore that transaction in this illustration.

[11] Principally because of the airplane distribution gain that this example ignores, the actual number was higher by about $3 million.  (J. Ex. 37 at Bates 16344)

"Exhibit E payments."[12] (J. Ex. 1 at Bates 101662)  The Exhibit E payments were scheduled to pay cash annually in amounts that would provide the Dutch Banks with an internal rate of return[13] of 9.03587% over eight years.  At the end of eight years, if the Dutch Banks' capital accounts had actually earned a rate of return 9.03587%, the Dutch Banks' capital accounts, i.e., ownership interests, would be decreased to near zero – in other words, Exhibit E payments would have cancelled out the Dutch Banks' capital account increases and returned the Dutch Banks' initial investment.  Similarly, if the Dutch Banks' capital accounts were credited with partnership income at a rate less than 9.03587%, the capital accounts would be negative after eight years; if the capital accounts were credited at a rate greater than 9.03587%, the capital accounts would be positive.  Positive capital accounts would result in payments to the banks when the partnership wound up; negative accounts would mean the banks owed money to the partnership. (Op. Agmt. § 12.2-12.3, J. Ex. 1 at Bates 101492-93).  If the banks' interests were not liquidated after eight years, the banks would still have their capital accounts credited or debited by allocations of income or loss in successive years.

This arrangement provided the Dutch Banks, in return for their initial cash investment, with (a) an ownership interest in Castle Harbour that was increased or diminished by allocations of income or loss and (b) a stream of payments over eight years that would repay the Dutch Banks' initial investment at an internal rate of return of 9.03587%.  Any discrepancies between

---

[12] Technically, Exhibit E payments were discretionary on the part of GECC. Nevertheless, because failure to make a scheduled Exhibit E payment gave the Dutch Banks the right to force a liquidation of Castle Harbour, it was unlikely the payments would not be made. (Op. Agmt. § 14.1(d), J. Ex. 1 at Bates 101499)

[13] Internal rate of return is defined as the discount rate necessary to make the net present value of a stream of future payments equal to zero.

these two items – the Dutch Banks' ownership shares and the total payments made to the banks over the eight years – would be reconciled upon liquidation of the banks' partnership interests.

The arrangement allowed GECC to reduce part of its interest in fixed assets to cash, i.e., it "monetized" or "securitized" part of the assets. Before the formation of Castle Harbour, GECC – through its wholly owned subsidiaries – owned 100% of its $272 million of aircraft (net), $22 million in associated rent receivables, and $240 million in cash. After the formation of Castle Harbour, GECC owned approximately 82% of a partnership that itself owned the aircraft, receivables, GECC's cash, and an additional $117.5 million in cash. In other words, pre-Castle Harbour, GECC owned 100% of $272 million in aircraft, 100% of $22 million in receivables, 100% of $240 million cash, and 0% of $117.5 million cash. Post-Castle Harbour, GECC owned 82% of each asset, i.e., $223 million of aircraft, $18 million of receivables, and $290 million in cash.[14] Over the first eight years, however, while the Dutch Banks' ownership interest was being bought out using Castle Harbour's income, GECC's interest was increasing inversely. Consequently, at the end of the eight years (had the partnership lasted that long), GECC would have regained almost complete ownership of the aircraft.

In sum, through Castle Harbour, GECC received $117.5 million in cash from the Dutch Banks, in return for which the banks received a self-liquidating (i.e., limited-term) ownership interest in aircraft and an allocation of the rental income from those aircraft. Put another way, GECC sold the Dutch Banks what amounted to an eight-year investment in a commercial leasing partnership.

---

[14] On its consolidated financial statements, GECC did not actually record the transaction in this manner. Instead, it simply kept the aircraft and $240 million on its books and recorded the Dutch investment as $117.5 million of "minority equity." (July 22, Dull, 357-58)

2.     *Allocations*

The general structure of Castle Harbour just described is fairly simple and perhaps not very different from that of a great many partnerships. The complexity of the transaction, and the source of this litigation, comes principally from the way in which the partnership's income was allocated between the GECC entities and the Dutch Banks.

Crucial to its allocation scheme, the Operating Agreement defined two categories of income (or loss): Operating Income[15] and Disposition Gains/Losses.

a.     Operating Income

Operating Income was comprised of income less expenses. Income was rent and interest on investments. Expenses consisted of normal administrative expenses, interest owed on aircraft debt, depreciation of the aircraft, and guaranteed payments to GECC entities, also known as Class B Guaranteed Payments. (J. Ex. 1 at Bates 101425-26) Depreciation was calculated on a straight-line basis, starting with the fair-market value of the aircraft at the time of Castle Harbour's formation and assuming a useful life for each aircraft of the greater of 7 years or 125% of the time remaining on the then outstanding lease of the aircraft. (J. Ex. 20 at Bates 8785) The Class B Guaranteed Payments were made annually to the GECC entities in the amount of either $500,000 or $2 million and did not reduce the capital account of the receiving GECC entity. (Op. Agmt. § 4.1, J. Ex. 1 at Bates 101447) Notably, expenses did not include payment of principal on the airplane debt or Exhibit E payments to the Dutch Banks.

Once Operating Income had been calculated, it was allocated to the capital accounts as

---

[15] The Operating Agreement simply refers to this as "Profit" and "Loss," but the parties adopted the more convenient designation of Operating Income.

-10-

follows. If Operating Income was positive, i.e., an Operating Gain, it was allocated 98% to the

Dutch Banks and 2% to the GECC entities. (Op. Agmt. § 3.1, J. Ex. 1 at Bates 101435) If

Operating Income was negative, i.e., an Operating Loss, then it was (a) first allocated in an

amount sufficient to offset the cumulative Disposition Gains allocated to any of the partners in

previous years, (b) the remainder was then allocated 98% to the Dutch Banks until they had been

allocated, cumulatively, $3,854,493 of Operating Losses, and (c) the remainder was allocated

99% to the GECC entities and 1% to the Dutch Banks.[16] (Op. Agmt. § 3.2, J. Ex. 1 at Bates

101435-36)

Operating Gain allocation was straightforward. For example, in 1997 Castle Harbour's

net Operating Income was $2,304,000, which was allocated $2,258,000 to the Dutch Banks and

$46,000 to the GECC entities – a simple 98/2 split. (J. Ex. 61 at Bates 18002)

Castle Harbour never experienced an Operating Loss, but a hypothetical situation will

illustrate how one would have been allocated. Assume that in 1994 Castle Harbour had an

Operating Gain of $10 million and a Disposition Gain (described below) of $10 million. The

Operating Gain would have been allocated $9.8 million to the Dutch Banks and $200,000 to the

GECC entities. The Disposition Gain, assuming it was Castle Harbour's first ever, would have

been allocated (for reasons explained later) approximately $3 million to the Dutch Banks and $7

million to GECC. If in 1995 Castle Harbour had a – very unlikely – Operating Loss of $15

million, it would have been allocated as follows. First, $3 million would be allocated to the

---

[16] The Operating Agreement specified further Operating Loss allocations in the event
losses exceeded $541 million. These allocations never came into play, were highly unlikely to
ever come into play, and, accordingly, are not relevant. (Op. Agmt. § 3.2(d)-(f), J. Ex. 1 at Bates
101436)

-11-

Dutch Banks and $7 million to the GECC entities to offset their prior Disposition Gains. Second, the remaining $5 million would be allocated 90% to the Dutch Banks and 10% to the GECC entities until the Dutch Banks had been allocated $3,854,493 of cumulative Operating Income losses.  Assuming the Dutch Banks in previous years had never been allocated an Operating Loss, this second step would mean that $4,282,770 would be allocated 90/10, resulting in $3,854,493 going to the Dutch Banks and $428,277 going to the GECC entities.  Third, the remaining approximately $717,000 would be allocated 99% to the GECC entities and 1% to the Dutch Banks.

b.    Disposition Gain/Loss

A Disposition Gain or Loss was the result of the difference between the sale price of an asset, usually an aircraft, and its book value.  (Op. Agmt. § 3.3(h),(j), J. Ex. 1 at Bates 101438-39)  Alternatively, if an aircraft was distributed back to one of the GECC entities, the fair market value was deducted from the receiver's capital account and the difference between the aircraft's fair market value at the time of distribution and its book value was treated as a Disposition Gain or Loss.  (Op. Agmt. § 10.8(a)(i)(B), J. Ex. 1 at Bates 101488)  Similarly, if the GECC entities were to buy out entirely the Dutch Banks' interest in the partnership, the difference between the fair market value of all held assets and their book value was to be treated as a Disposition Gain or Loss.  (Op. Agmt. § 10.8(b)(i)(B), J. Ex. 1 at Bates 101488)

Disposition Gains and Losses were allocated much like Operating Losses:  (a) first, Disposition Gains were allocated to offset prior Disposition Losses and prior *Operating* Losses;

-12-

Disposition Losses offset prior Disposition Gains,[17] (b) the remainder was then allocated 90% to the Dutch Banks until they had been allocated, $2,854,493 of either Disposition Gains or Losses, (c) the remainder was allocated 99% to the GECC entities and 1% to the Dutch Banks.[18] (Op. Agmt. § 3.3(h),(j), J. Ex. 1 at Bates 101438-41)

For example, in 1995 Castle Harbour disposed of a number of aircraft, some to TIFD III-E and some to third parties. The aircraft distributed to TIFD III-E had a fair market value of approximately $27 million, and consequently TIFD III-E's capital account was reduced by that amount. (J. Ex. 49 at Bates 8969) The aircraft sold to third parties were sold for approximately $21 million. (J. Ex. 49 at Bates 8969) The book value of all these aircraft was approximately $74 million, causing Castle Harbour a Disposition Loss of approximately $26 million.[19] (J. Ex. 49 at Bates 8969) That loss was distributed as follows. First, because in prior years cumulative Disposition Gains of approximately $3 million had been allocated to the Dutch Banks, and cumulative Disposition Gains of approximately $1.5 million had been allocated to the GECC

---

[17] The fact that Disposition Gains and Losses were allocated to first offset prior years' Disposition Gains or Losses meant that Disposition Gains and Losses were allocated cumulatively. That is, if net Disposition Gains had been distributed only once, at the end of the partnership, the result would have been the same as if – as it was actually done – gains and losses were allocated annually in amounts sufficient to offset prior years' gains and losses. The situation was not the same with Operating Gains and Losses because Operating Gains were not allocated to offset prior Operating Losses and vice versa.

[18] As with Operating Loss, there were different allocations that would take place should Disposition Losses exceed $541 million. (Op. Agmt. § 3.3(j)(iv)-(vi), J. Ex. 1 at Bates 101440-41) Those allocations are not relevant to this case.

[19] $21 million, plus $27 million, minus $74 million.

-13-

entities (J. Ex. 37 at Bates 16347), those amounts of loss were allocated to each respectively.[20]

Second, the Dutch Banks were allocated 90% of the remaining losses and GECC, 10%, until the

Dutch Banks had been allocated $2,854,493 in losses, and GECC had been allocated about $0.3

million. Third, the remainder was allocated 99% to GECC (approximately $18 million) and 1%

to the Dutch Banks (approximately $0.1 million). In total, therefore, the Dutch Banks were

allocated approximately $6 million in Disposition Losses,[21] and the GECC entities,

approximately $20 million.[22] (J. Ex. 49 at Bates 8970)

c.    Operating Income vs. Actual Income

Operating Income, as defined by the Operating Agreement, might at first glance look like

a simple measure of the net cash received by Castle Harbour in its normal operations, i.e., gross

non-disposition income less expenses. That was not the case. Operating Income in fact defines a

non-obvious category of income, primarily because it includes as expenses items not clearly

considered expenses, e.g., Class B Guaranteed Payments, and excludes items that appear to be

expenses, e.g., debt payments and Exhibit E payments. It is worth pointing out some of the

effects of this definition.

As noted above, the Class B Payments guaranteed to the GECC entities were treated as

expenses and did not reduce the receiver's capital account. Consequently if one were to consider

---

[20] Note that prior years' *Operating* Gains were not offset, though if there had been a
Disposition *Gain* that would have offset prior years *Operating Losses.*

[21] This $6 million in Disposition Losses is the sum of the $3 million Disposition Gain
offset, plus $2.9 million allocated at 90%, plus $100,000 allocated at 1%.

[22] This $18 million in Disposition Losses is the sum of the $1.5 million Disposition Gain
offset, plus $300,000 allocated at 10%, plus $18 million allocated at 99%.

-14-

such payments as allocations – which would make sense given that they represented income going directly to GECC entities[23] – the income allocated to GECC would then be significantly more than 2%. For example, in 1997, as discussed above, Operating Income was approximately $2.3 million, and was allocated 98% to the Dutch Banks and 2% to GECC. If one considers that GECC also received a Class B distribution of $2,000,000 prior to any allocation and not deducted from its capital account, it might make sense to consider its allocation to be $2,046,000, making the actual split closer to 50/50.

The treatment of aircraft depreciation as an expense, and its consequent deduction from Operating Income, also had some interesting effects. The depreciation schedule for the aircraft was fairly aggressive, usually coming out to between 60 to 70 percent of the rental income for a given year. The effect of this depreciation was that a large portion of the cash that came into Castle Harbour was not reflected in Operating Income.[24] Of course, aggressive depreciations meant Castle Harbour would be more likely to realize a gain when the assets were sold (or the Dutch Banks were bought out), but this gain would be a *Disposition* Gain and therefore allocated more favorably to GECC.

### 3.    *Other Provisions*

The principal features of the Castle Harbour transaction have been described: it was a self-liquidating partnership with a complex scheme for allocating gains and losses. There are

---

[23] Put another way, had the Class B payments been treated as allocations followed by distributions the effect on the capital account would have been the same. The capital account would have been increased by the allocation, but then decreased by the distribution.

[24] The amount of cash offset by depreciation did not actually sit in Castle Harbour, but ended up being used to pay off the two significant expenses not included as Operating Income expenses – debt principal and Exhibit E payments.

-15-

three other features of the partnership relevant to this case.

> a.    CHLI

Most of the cash invested in Castle Harbour was not held by Castle Harbour. Instead it was transferred to Castle Harbour Leasing Inc. ("CHLI"), a domestic corporation and wholly owned subsidiary of Castle Harbour. (July 22, Dull, 322-23, 358; July 22, Parke, 394) This arrangement allowed income from any asset (cash or aircraft) to be recognized only as a Disposition Gain rather than as Operating Income, simply by moving that asset to CHLI. For example, interest earned on the re-investment of the approximately $360 million cash initially invested by the partners would have counted as Operating Income had the cash been held in Castle Harbour. Because the cash was moved to CHLI, interest accumulated there and was allocated to the partners as a *Disposition* Gain when the Dutch Banks were ultimately bought out. Similarly, CHLI purchased several aircraft during Castle Harbour's existence. (July 22, Dull, 325) Rental income generated by those aircraft did not count towards Operating Income, as it would have if the aircraft were owned by Castle Harbour, and that income was not allocated to the partners until the buyout of the Dutch Banks, when it was allocated as a *Disposition* Gain. (July 22, Dull, 370)

> b.    Investment Accounts

Under the Operating Agreement, Castle Harbour was required to maintain "Investment Accounts" for the Dutch Banks. (J. Ex. 1 at Bates 101405-06) No cash was actually paid into these accounts; they merely kept track of a hypothetical balance. Id. The opening balance of these accounts was the initial investment made by the Dutch Banks. Id. That balance was to be recalculated at the time the Dutch Banks exited the partnership as if every year the balance had

-16-

been increased by a defined Applicable Rate but also reduced by the Exhibit E payments. Id. The Applicable Rate was either 9.03587%[25] or 8.53587%, depending on the reason for the Dutch Banks' exit. Id.

If at the time of the Dutch Banks' exit from Castle Harbour the Investment Account balance exceeded the algebraic sum of the Dutch Banks' allocation of (a) Operating Gains, (b) Operating Losses that had been allocated at the 98% rate, which could not exceed approximately $4 million, (c) Disposition Gains, and (d) Disposition Losses that had been allocated at the 90% rate, which could not exceed approximately $3 million, that amount would be paid to the Dutch Banks, instead of the amount in their capital accounts. That payment, if made, was labeled a Class A Guaranteed Payment. Id.

c.     Core Financial Assets

As discussed above, Castle Harbour put most of its cash in its subsidiary, CHLI. CHLI was not free to dispose of that cash as it chose. Under the Operating Agreement, CHLI was required to keep high-grade commercial paper or cash, referred to as "Core Financial Assets," in an amount equal to 110% of the current value of the Investment Accounts. (J. Ex. 1 at Bates 101408; Op. Agmt. § 5.8(b), J. Ex. 1 at Bates 101471-72)

As it turns out, CHLI ended up investing most of its $360 million in GECC commercial paper. (July 22, Dull, 324) This benefitted GECC because, by having a GECC subsidiary – Castle Harbour – purchasing GECC commercial paper, GECC was buying back or "retiring" its debt, thereby decreasing its debt-to-equity ratio and freeing GECC to borrow more money. (July

---

[25] In the event that the Applicable Rate was 9.03587% the Investment Accounts would be close to zero at the end of the eight-year period, because, as noted before, the Exhibit E payments provided an internal rate of return of 9.03587%.

22, Parke, 393)

d.    Management Rights

Castle Harbour was managed primarily by the GECC entities who elected the

partnership's managers. The Dutch Banks' role was minimal. They did not vote for managers[26]

and none of their employees worked for Castle Harbour. They did participate in annual member

meetings (July 22, Dull, 362), but, for the most part, the only control they had was negative (July

22, Dull, 361).

The actual day-to-day operations of Castle Harbour, such as financing and accounting

activities, were outsourced to other GE entities – first, GE Capital Advisory Services Ltd., then,

General Electric Capital Aviation Services, Ltd. ("GECAS Ltd."). (July 22, Dull, 412-13; July

26, Tewell, 646-47)

4.    *Risks and Returns*

Having explained Castle Harbour's structure, it is worth summarizing how this complex

structure allocated the risks and returns of the Castle Harbour business.

The Dutch Banks received the lion's share of Operating Income, though this number was

greatly reduced from gross rental income because depreciation was treated as an expense. By

contrast, the Dutch Banks were not likely to receive much upside from the disposition of assets.

As a practical matter, their return on asset dispositions was capped at about $3 million. Although

they also received 1% of Disposition Gains above $3 million, that amount was insignificant

compared to their overall investment. For example, even if Castle Harbour had sold all its assets

---

[26] Apparently, because of Federal Aviation Administration ("FAA") restrictions, the
Dutch Banks could not have been given a right to elect the managers. (July 22, Dull, 359)

-18-

at approximately $303 million over book value, the Dutch Banks would only have recognized an additional $3 million of return. By comparison, Castle Harbour actually disposed of the assets at a cumulative gain of $137 million, which netted the Dutch Banks only $1.3 million above their initial $3 million allocation.

Similarly, under the Operating Agreement, the Dutch Banks were exposed to little more than a $3 million risk of Disposition Losses and a $4 million risk of Operating Losses, i.e., a total risk of little more than $7 million. Again, that risk was capped because, for amounts above that range, the Dutch Banks were exposed to only 1% of the risk for each type of loss (Disposition or Operating). For example, if the aircraft had simply been given away (i.e., a Disposition Loss of roughly $530 million) in 1994, the Dutch Banks would only have been exposed to approximately $5.27 million dollars of loss above their initial $3 million allocation of Disposition Losses.

Accordingly, under the Operating Agreement, the Dutch Banks were entitled to any Operating Income upside, but probably little more than approximately $3 million of any Disposition upside. On the other hand, they were not likely to be allocated much more than $7 million in losses, $4 million from Operating Losses and $3 million from Disposition Losses.

The Dutch Banks were actually protected against the possibility of even that $7 million in losses by their Investment Accounts. The Operating Agreement provided that, if the Dutch Banks' Investment Accounts exceeded the sum of their Operating Gains, Disposition Gains, Operating Losses up to $4 million, and Disposition Losses up to $3 million, the banks would be paid the difference. Thus, even if the Dutch Banks were allocated up to $4 million of Operating Losses and $3 million of Disposition Losses, they would still receive the full amount of their Investment Accounts. That is, the only negative effects of these losses would be to limit the

-19-

Dutch Banks' payout to the return rate of their Investment Account (either 9.03587% or 8.53587%).

That is not to say that the Dutch Banks were guaranteed to receive at least their Investment Account amounts. Those amounts could be reduced by the 1% allocation of Disposition Losses or Operating Losses, because such loss amounts were not included in the determination whether a Class A Guaranteed Payment was required.

To illustrate the risks to the Dutch Banks, it is useful to start with what actually happened. When the Dutch Banks were actually bought out, their capital accounts were worth $31.1 million (J. Exs. 71, 72) and their Investment Accounts were worth approximately $29 million (using the applicable interest rate of 8.53587%) (July 22, Dull, 366). Because their allocated gains, $31.1 million, exceeded their Investment Accounts, no Class A Guaranteed Payment was made; in other words, the Investment Accounts were irrelevant. (July 22, Dull, 365)

The situation would have been different if Castle Harbour had done worse. If, for example, Castle Harbour had a cumulative Operating Loss of $1 million and no Disposition Gain or loss, the Dutch Banks would have received a lower return. They would not, however, have received a negative return, that is, they would not have been required to pay more money into Castle Harbour. Castle Harbour would have suffered a loss, and that loss would have been allocated 98% to the Dutch Banks, bringing their capital account to negative $980,000. The result would have been that their Investment Accounts ($29 million) would have exceeded the sum of their Disposition Gains and Losses ($0) and their Operating Losses below $3 million ($980,000). Consequently, the Dutch Banks would have been bought out for only $29 million. Thus, though they would have received a lower return than if Castle Harbour had done better,

-20-

their return would still have been positive.

The Dutch Banks would only have received less than the amount in their Investment Accounts if Castle Harbour had done badly enough to cause losses to be distributed to the Dutch Banks at the 1% allocation rate, i.e., greater than approximately $4 million in Operating Losses or $3 million in Disposition Losses. Even then the effect in most scenarios would be minimal because the allocation would be only 1%. For example, the Dutch Banks would only have received a zero return, i.e., an allocation of $28.8 million in losses, if Castle Harbour experienced approximately $2.8 billion in Disposition or Operating Losses, an unlikely scenario given that the combined assets of Castle Harbour never exceeded a value of $700 million.[27]

In short, the Castle Harbour Operating Agreement shifted to the Dutch Banks principally the upside of the aircraft rentals and the risk that the upside would not exceed their Investment Accounts. The Dutch Banks also received a small portion of any upside from disposition of assets. Theoretically, the Dutch Banks also bore some risk from Disposition and Operating Losses, but, for the reasons just given, the risk was minimal.

     5.    *Tax Consequences*

The tax consequences of the Castle Harbour partnership allocations were significant. They are also relatively simple to understand. As described above, 98% of Operating Income was allocated to the Dutch Banks. Operating Income was reduced by expenses, including asset depreciation, which in most years equaled close to 70% of gross rental income. For tax purposes,

---

[27] This scenario might have occurred had there been some catastrophic accident that exceeded insurance coverage, and if that accident was treated as an Operating Loss. For that reason, the Dutch Banks, prior to entering Castle Harbour, bargained hard about the level of insurance coverage to be maintained by Castle Harbour and the degree to which such losses would come out of Operating Income. (July 22, Dull, 354-55)

the same allocation was made; Operating Income was allocated 98% to the Dutch Banks. Again, Operating Income was reduced by expenses, including depreciation, but all the aircraft in Castle Harbour had already been *fully depreciated* for tax purposes. Consequently, although nominally depreciation was an expense for tax purposes, it did not actually reduce taxable income. Accordingly, the taxable income allocated to the Dutch Banks was greater than their book allocation by the amount of book depreciation for that year. The Dutch Banks, however, did not pay United States income taxes.[28] Thus, by allocating 98% of the income from fully tax-depreciated aircraft to the Dutch Banks, GECC avoided an enormous tax burden, while shifting very little book income.

Put another way, by allocating income less depreciation to tax-neutral parties, GECC was able to "re-depreciate" the assets for tax purposes. The tax-neutrals absorbed the tax consequences of all the income allocated to them, but actually received only the income in excess of book depreciation. Thus, the full amount of book depreciation was available, pre-tax, to Castle Harbour to use.[29]

C.     Operation of Castle Harbour

Having explained the structure and mechanics of Castle Harbour, I will now summarize the actual results of its five years of operation.

_____

[28] Moreover, were any U.S. taxes to be assessed against the Dutch Banks, GECC agreed to indemnify them. (J. Exs. 4, 5) In addition, the Dutch Banks were prohibited, by the Operating Agreement, from selling their interest, thus ensuring that the interest would not be transferred to a taxable entity. (J. Ex. 1 at Bates 1482)

[29] Presumably GECC had to pay taxes on the amounts offset by depreciation when income was realized upon ultimate disposition of the assets. The record contains no evidence on what tax rate was applied at that point. At the very least, however, this arrangement allowed GECC to defer taxes on aircraft lease income.

Castle Harbour operated from its formation on October 6, 1993 until December 31, 1998 when GECC liquidated the Dutch Banks' interest.[30] Its principal place of business was in Bermuda. For most of its period of operation, Castle Harbour's lease portfolio was managed by GECAS under the terms of an administrative services agreement. (J. Exs. 26, 31, 32; July 22, Dull, 412-13; July 26, Tewell, 646-47) GECAS also helped Castle Harbour place aircraft when their existing leases expired. (J. Ex. 32; July 26, Hyde, 534-35)

From 1993 to 1998, Castle Harbour's cumulative Operating Income was approximately $28.6 million. (J. Exs. 20, 24, 37, 49, 53, 61, 68) Approximately $28 million of that income was allocated to the Dutch Banks. Id. During its period of operation, Castle Harbour disposed of a number of aircraft at a cumulative loss of about $24 million. Id. When the Dutch Banks were bought out, the value of all aircraft and of CHLI exceeded their respective book values by approximately $161 million. (J. Ex. 71 at Bates 24679) Consequently, Castle Harbour had a cumulative Disposition Gain of approximately $137 million. Approximately $4 million of that was allocated to the Dutch Banks. Exhibit E payments were made through 1997 in an amount totaling approximately $118.5 million. At the time of the buyout, the Dutch Banks had a positive balance in their capital accounts of approximately $31 million. They were bought out at that price.[31] In total, the Dutch received nearly $150 million ($118.5 million Exhibit E payments, plus $31 million buyout) over five years for their $117.5 million investment. Stated more

---

[30] The Dutch Banks were bought out after a change in U.S. tax law made it possible that Castle Harbour would no longer be treated as a partnership, potentially implicating GECC's liability under the parties' tax indemnification agreement. (July 22, Dull, 364-65)

[31] Actually, because of the circumstances of the buyout, the Dutch Banks received a slight premium of approximately $150,000 for having their interest bought out early. (July 22, Dull, 366-67). The details of that premium payment are not relevant to this case.