usefully, they received an internal rate of return of approximately 9.1%.  (July 27, Myers, 817)

The GECC entities were allocated approximately $600,000 of the $28.6 million of Operating Income, and approximately $133 million of the $137 million Disposition Gains.  (J. Exs. 20, 24, 37, 49, 53, 61, 68)  Over the period of Castle Harbour's operation, GECC received $6 million in Class B payments, approximately $20 million in distributions from its capital accounts, and distributions of aircraft worth about $41 million.  Id.  In 1998, after GECC bought out the Dutch Banks for approximately $31 million, it became the sole owner of the assets of Castle Harbour, worth approximately $692 million.  In total, GECC received nearly $728 million ($6 million Class B payments, plus $20 million distributions, plus $41 million aircraft, plus $692 assets, minus $31 million buyout) over five years for its initial investment of around $591 million.  These payments gave GECC a pre-tax internal rate of return of approximately 5.5%. (July 27, Myers, 762)

For the reasons given above, the Dutch Banks were allocated much more taxable income than book income.  Specifically, the Dutch Banks were allocated approximately $310 million in taxable income.  Had this income been allocated to GECC, GECC would have been required to pay approximately $62 million in taxes on that income.

## III.    Conclusions of Law

The government argues three alternative theories in defense of its reallocation of Castle Harbour's income.  First, the government argues that Castle Harbour was formed with no non-tax purpose, making its formation a "sham" transaction to be disregarded when calculating taxes. Second, the government argues that, even if the arrangement had a business purpose, the Dutch Banks were, for tax purposes, only lenders to Castle Harbour, not partners, and could not,

therefore, be allocated any partnership income.  Third, the government argues that, even if Castle

Harbour should be treated as a partnership for tax purposes, the way it allocated income violated

the "overall tax effect" rule of section 704(b) of the Internal Revenue Code.

A.    Standard of Review

The parties do not dispute that I am to review TIFD III-E's tax liability *de novo*, ignoring

the factual findings and legal analysis of the Commissioner of Internal Revenue ("the

Commissioner").  R.E. Dietz Corp. v. United States, 939 F.2d 1, 4 (2d Cir. 2001).  The ultimate

determination of the Commissioner, however, is presumptively correct.  Therefore the taxpayer,

TIFD III-E, bears the burden of persuading me that the determination is incorrect.  Id.

B.    Was Castle Harbour's Formation a "Sham" Transaction?

Regardless of its literal compliance with the tax code, a transaction will be deemed a

"sham" and disregarded when calculating taxes if it has no business purpose or economic effect

other than the creation of tax benefits.  Jacobson v. Commissioner, 915 F.2d 832, 837 (2d Cir.

1990).  There is no dispute that the Castle Harbour transaction created significant tax savings for

GECC.  The critical question, however, is whether the transaction had sufficient economic

substance to justify recognizing it for tax purposes.  Newman v. Commissioner, 902 F.2d 159,

163 (2d Cir. 1990).

To determine whether a transaction has economic substance or is, instead, a "sham," a

court must examine both the subjective business purpose of the taxpayer for engaging in the

transaction and the objective economic effect of the transaction.  Gilman v. Commissioner, 933

F.2d 143, 148 (2d Cir. 1991).  TIFD III-E takes this to mean that if I find *either* a subjective

business purpose *or* objective economic effect, the transaction is not a sham.  The government

adopts another reading of the law, arguing that I should apply a more flexible standard that considers both factors but makes neither dispositive.

The decisions in this circuit are not perfectly explicit on the subject. Recently, for example, Judge Arterton adopted the more flexible standard, but acknowledged some potentially contrary, or at least ambiguous, language in <u>Gilman</u>. <u>Long Term Capital Holdings v. United States</u>, 2004 WL 1924931, *39 n.68 (D. Conn. Aug. 27, 2004). That ambiguity, however, does not affect the decision of this case. As I will explain, under either reading I would conclude that the Castle Harbour transaction was not a "sham." The transaction had both a non-tax economic effect and a non-tax business motivation, satisfying both tests and requiring that it be given effect under any reading of the law.

1.    *Economic Effect*

In light of my findings of fact, I have little trouble concluding that the Castle Harbour transaction had a real, non-tax economic effect. In return for a significant portion of Castle Harbour's Operating Income,[32] the Dutch Banks contributed approximately $117 million dollars, which was used by Castle Harbour's subsidiary CHLI either to purchase aircraft or to retire GECC debt.[33] The economic reality of such a transaction is hard to dispute. The Dutch Banks gave up $117 million and received part of Castle Harbour's Operating Income in return. Castle Harbour received the Dutch Banks' $117 million, assigned part of its Operating Income in return, and put the $117 million to use in an ongoing, substantial business.

---

[32] This portion was significant even if, as I discussed above, one considers the GECC entities' allocation of Operating Income to include the amount of the Class B payments.

[33] Because GECC invested $240 million in cash as well, and money is fungible, it is not possible to say what part of the $117 million was used for which activity.

The government does not dispute that, if this is what occurred, the transaction would have economic effect.  Instead, the government argues that various provisions of the Operating Agreement stripped these apparent realities of any substance.  Specifically, the government argues that: (1) the Dutch Banks did not really give up their $117 million, because the combination of Investment Accounts and Exhibit E payments guaranteed return of that money; and (2) Castle Harbour did not really gain the use of the $117 million because the "Core Financial Assets" provision of the Operating Agreement essentially "froze" that money.

As explained in my findings, the Investment Accounts and Exhibit E payments served different purposes.  The Exhibit E payments provided the Dutch Banks with a guarantee that they would receive fixed payments over eight years, resulting in the ultimate buyout of most of their ownership interest.  The net result of the Investment Accounts, on the other hand, was to provide the Dutch Banks with some amount of security for their investment, namely, that they would almost certainly receive no less than an 8.5% return.   In other words, Exhibit E payments guaranteed the *manner* of payment, whereas the Investment Accounts guaranteed the *amount*.

It is hard to see how an assurance about the manner in which returns would be paid could undercut the economic reality of an initial investment.  In year one, Castle Harbour received, and used, $117 million from the Dutch Banks.  Over subsequent years, that amount was paid back in installments out of the gross rental proceeds of the aircraft leasing business.  The latter fact does not change the former – Castle Harbour received an economically real, up-front payment of $117 million.  In truth, I am not sure that the government takes issue with this point.  Rather, the government appears to believe that Exhibit E payments somehow guaranteed the Dutch Banks an *amount* of return.  They did not.  The Exhibit E payments reduced the banks' capital accounts,

-27-

while Operating Income increased them.  If, when the Dutch Banks were bought out, the Exhibit

E payments had "overpaid" the banks' accounts they would owe money (and conversely, if the

banks were underpaid they would be owed money).  In other words, it was quite possible for the

Dutch Banks' allocation to fall short of the sum of Exhibit E payments and, in that case, the

banks would be required to make a payment to Castle Harbour.

The Investment Accounts, by contrast, did provide the Dutch Banks with some guarantee

of return.  As explained earlier, the Dutch Banks were almost entirely certain of at least an 8.5%

internal rate of return on their investment.  Latching on to this fact, the government asserts that,

because of this guarantee, there was no risk to the Dutch Banks and, therefore, no economic

reality to their investment.  I do not agree.

First, a lack of risk is not enough to make a transaction economically meaningless.  Even

with an 8.5% guaranteed return, the Dutch Banks still participated in the – economically real –

upside of the leasing business.  The better the leasing business did, the more money the Dutch

Banks made.  In fact, they made a return of approximately 9.1% on their investment (i.e., an

amount greater than 8.5%), and, had things gone better, they would have made even more.

Participating in upside potential, even with some guarantee against loss, is economically

substantial.[34]  Second, the government's premise, that a guarantee of a positive return indicates

no risk, is simplistic.  Whether an investment is "risky" to the investor depends on a number of

factors, including the investor's cost of capital and opportunity costs.  Had the Dutch Banks, for

---

[34] The government also appears to argue that the Dutch Banks did not really participate in
the upside of the business because "[t]he rental income, particularly in 1993, 1994, and 1995 was
very predictable."  Govt. Post-Trial Brief at 10.  This argument is hardly worth addressing.  An
investor does not participate any less in an investment, and an investment is not any less real,
because there is some element of predictability to the return.

example, borrowed the $117 million at 8.6% or foregone an opportunity to lend that money at 8.6%, the chance that they would only earn an 8.5% internal rate of return would have unquestionably represented a real risk. In short, entirely open-ended risk is not the only economically real risk.

The government also argues that Castle Harbour did not really raise any money, because the Operating Agreement required CHLI to maintain 110% of the Dutch Banks' Investment Accounts in "Core Financial Assets," i.e., high-grade commercial paper or cash. Thus, says the government, the $117 million was effectively "frozen," not available for use. This argument is missing a step. It is true that the Operating Agreement contained the provision in question, but that provision only restricted the money's use; it did not forbid it. At the very least, CHLI was permitted to invest in GECC commercial paper, which it did. That investment was not meaningless, because it allowed GECC to retire that amount of commercial paper, thereby improving its debt-to-equity ratio and creating borrowing capacity under GECC's agreement with the credit rating agencies.

2.   *Business Purpose*

TIFD III-E contends that GECC's non-tax purpose in entering into the Castle Harbour transaction was to raise capital and, more importantly, to demonstrate to investors, rating agencies, and GECC senior management, that it *could* raise capital on its fleet of aging Stage II aircraft. The most direct evidence in support of this contention was the testimony of five GECC executives, who all swore that "demonstrating liquidity" and "monetizing" Stage II aircraft were important motivations.

In evaluating the economic substance of a transaction, courts are cautioned to give more

weight to objective facts than self-serving testimony.  Lee v. Commissioner, 155 F.3d 584, 586 (2d Cir. 1998).  Were the executives' testimony the only evidence before me, I am not sure how persuaded I would be of GECC's motives.  As things stand, however, against the backdrop of the objective economic reality of the Castle Harbour transaction – i.e, that GECC *did* raise $117 million and increase its liquidity by retiring debt – I find the testimony of GECC's executives persuasive.

Consequently, I find that GECC was subjectively motivated to enter into the Castle Harbour transaction, at least in part, by a desire to raise capital and a desire to demonstrate its ability to do so.

C.    Were the Dutch Banks Partners in Castle Harbour?

The government takes the alternative position that, even if the Castle Harbour transaction as a whole had economic substance, for tax purposes the Dutch Banks were not partners of the GECC entities but rather were their creditors.  Though neither party has put it exactly this way, there are two circumstances under which the Dutch Banks would not be considered partners: (1) if there was no economic reality to the label "partner;" and (2) if, regardless of the economics of the situation, the tax code simply classifies them as something else.  In either case, the practical effect of declaring that the Dutch Banks were not partners would be to reassign all of Castle Harbour's income to GECC.

In the first circumstance, the analysis is essentially the same as the "economic substance" analysis just undertaken, but, rather than examining the substance of the entire transaction, I would only address the narrow question whether there was any economic reality to the choice of the partnership form.  Indeed, there is a narrow subset of case law, derived in part from the

general economic substance doctrines and in part from the Supreme Court's more specific

partnership analysis in <u>Commissioner v. Culbertson</u>, 337 U.S. 733, 742 (1949), that address just

this point.

In the second circumstance, the question is not whether the form chosen has economic

reality, but whether tax law requires a different choice of form, i.e., a different classification.  I

have not seen a case in which a court has undertaken this type of "classification" analysis of a

partnership, and I am skeptical that under the current tax code there is much chance that an

economically substantial partnership would ever be classified as something else.  Nevertheless,

the government urges me to examine the Dutch Banks' partnership interest using the same

standard used in determining whether a commercial instrument is classified as "debt" or "equity"

for the purpose of taxing distributions.  For reasons I will explain below, I do not think the

debt/equity test is relevant to classifying a partnership – the Tax Code's definition of a

partnership is extremely broad and easily met in this case.  Moreover, even applying the test

urged by the government, there is no question in my mind that the Dutch Banks, for tax purposes,

held equity in Castle Harbour.

1.    *Economic Substance of the Dutch Banks' Partnership Interest*

The decision to form a partnership may be economically insubstantial, even though the

partnership undertakes a legitimate business.  In other words, a transaction may have economic

effect, yet there may be no non-tax reason to join together with a third party to engage in that

transaction.

This situation has received particular attention in a recent line of D.C. Circuit decisions

starting with <u>ASA Investerings Partnership v. Commissioner</u>, 201 F.3d 505 (D.C. Cir. 2000).  In

ASA Investerings, the D.C. Circuit examined a complex partnership and concluded that, even if the taxpayer had a legitimate non-tax business purpose for engaging in the transaction in question, the formation of a partnership with various foreign entities to accomplish that goal served no non-tax purpose. Specifically the court asked the question (derived from the Supreme Court's analysis in Culbertson[35]), "whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." ASA Investerings, 201 F.3d at 513. The D.C. Circuit answered the question in the negative, noting that "[t]here is no reason to believe that AlliedSignal[, the taxpayer,] could not have realized Matthews's interest rate play[, one of the transaction's benefits,] without the partnership at far, far lower transaction costs." Id. at 516. The court also concluded that the foreign investor's interest did not look much like a partner's interest because the investor was guaranteed an exact return – "A partner whose risks are all insured at the expense of another partner hardly fits within the traditional notion of partnership." Id. at 515.

       In a subsequent case, involving a nearly identical transaction, the D.C. Circuit was even more explicit that a partnership would not be recognized if its formation served no business purpose. "The only logical explanation then, for the partnership's formation was the exploitation of Temp. Treas. Reg. § 15A.453-1(c)(3)(1) . . . . The absence of a non-tax business purpose is fatal to the recognition of the entity for tax purposes." Boca Investerings Partnership v. United States, 314 F.3d 625, 632 (D.C. Cir. 2003).

---

       [35] The Supreme Court in Culbertson held that the determination whether a partnership "is real for income-tax purposes depends upon whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both." Culbertson, 337 U.S. at 741.

-32-

Neither <u>ASA Investerings</u> nor <u>Boca Investerings</u> enunciate a new standard of review. Both cases are only applications of the general economic substance or "sham transaction" doctrine. The <u>ASA Investerings</u> court said as much, noting, "[courts] treat 'sham entity' cases the same way the law treats 'sham transaction' cases." <u>ASA Investerings</u>, 201 F.3d at 512. In fact, the D.C. Circuit directly rejected the argument that different standards might apply: "Although the Tax Court said it would not consider whether the *transactions* at issue lacked 'economic substance,' its decision rejecting the bona fides of the *partnership* was the equivalent of a finding that it was, for tax purposes, a 'sham.'" <u>Id.</u> (emphasis in original).

I have already explained why the Castle Harbour transaction did not lack economic substance. Nevertheless, <u>ASA Investerings</u> raises the possibility that, though the transaction as a whole has economic substance, the formation of a partnership to accomplish the transaction might, absent tax considerations, be economically meaningless. On the facts of this case, however, such a holding is not possible.

If I had concluded, for example, that Castle Harbour was not a sham because it was engaged in the business activity of leasing aircraft,[36] or if I concluded that it was not a sham because it earned GECC a pre-tax profit,[37] then I might very well need to consider separately the question whether the use of a partnership with foreign banks to conduct such activity was a sham,

---

[36] TIFD III-E presented a good deal of evidence on this point, evidence regarding the day-to-day operation of Castle Harbour's leasing business.

[37] This point also was argued by TIFD III-E, primarily through the testimony of its expert Professor Myers, who testified that Castle Harbour earned GECC a pre-tax internal rate of return of approximately 5.5%. I confess that I am not entirely sure of the significance of this number standing alone; internal rate of return would seem to me only to indicate profit when compared with a company's cost of capital.

serving no non-tax purpose.  In a transaction where a part of an ongoing business is spun off into

a separate partnership, the fact that the underlying business has economic substance does not

necessarily preclude a finding that the creation of the spin-off was a sham transaction.[38]  In other

words, when two parties form a new entity, the fact that the newly created entity has a business

purpose does not always mean that the act of creating the entity was not a sham.

Here, however, I did not conclude that the Castle Harbour transaction had economic

substance because Castle Harbour engaged in a legitimate business.  Rather, I concluded that *the*

*transaction that created Castle Harbour* was not a sham.  In other words, I concluded there was

valid business purpose and economic reality in the arrangement by which the GECC entities and

the Dutch Banks came together to form Castle Harbour, i.e., there was economic substance in not

only the actions, but also the formation, of the partnership.

In this respect, the Castle Harbour transaction differs significantly from the transaction at

issue in ASA Investerings.  In that case the court was principally concerned that (1) the outside

"investors" appeared to have absolutely no stake in the partnership and (2) there seemed to be no

reason to form a separate entity to engage in the underlying transactions, other than to avoid

taxes.  Neither situation is present here.

The Dutch Banks had a very real stake in the transaction because their return was tied

directly to the performance of the aircraft leasing business.  If the business did better, their return

---

[38] Though, in at least one case, a court found the underlying business purpose of a
reorganized entity to be sufficient to justify the reorganization transaction.  See United Parcel
Service of America v. Commissioner, 254 F.3d 1014, 1020 (11th Cir. 2001) ("The transaction
under challenge here simply altered the form of an existing, bona fide business, and this case
therefore falls in with those that find an adequate business purpose to neutralize any tax-
avoidance motive.").

-34-

was greater; if the business did worse, their return was less.  By contrast, the foreign banks in

ASA Investerings were guaranteed an *exact* amount of return regardless of the business's

performance.  It is true that the Dutch Banks' risk was mitigated by the existence of the

Investment Accounts, which guaranteed them a minimum return, but in ASA Investerings the

court was careful to distinguish the case where an investor's exact return is guaranteed, making

the investor entirely indifferent to the partnership's activities, from the case where downside is

limited but not upside, giving the investor an obvious interest in the performance of the

partnership.  The former situation indicates a sham, the latter – the situation present here – is not.

See ASA Investerings, 201 F.3d at 514; see also Hunt v. Commissioner, 59 T.C.M. (CCH) 635

(1990) (holding valid partnership existed even though one partner guaranteed a minimum return

of 18%).

　　　　With respect to the reason for forming a separate entity, not only was there a legitimate

non-tax reason to create a separate entity – so that the Dutch Banks and GECC could share an

investment in a specific business – but it is actually hard to imagine an alternative to creating a

separate entity.  As already discussed, a non-recourse loan on the aircraft was not possible

because of the "negative pledge" and eight-to-one debt/equity covenant.  Accordingly, given that

GECC wanted to raise money against its aircraft, and given that it could not borrow against them,

it is difficult to see what else it could have done other than create a separate entity and seek

investments in that entity.  Of course, even if there had been another way of achieving this

financing, it would not change my analysis; the creation of a partnership was one – even if not

the only – legitimate way of achieving the non-tax purpose of raising capital against some of

-35-

GECC's Stage II aircraft. That is all the economic substance test requires.[39]

2.    *Characterization of the Dutch Banks' Interest in Castle Harbour*

The government argues that, even if the Dutch Banks had an economically substantial interest in Castle Harbour, their interest should, as a matter of tax law, be characterized as a creditor's interest, not a partner's. In support of this argument, the government cites exclusively to the line of cases stemming from the Supreme Court's holding in John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). Those cases discuss whether various commercial instruments are considered debt or equity for tax purposes – usually in order to know whether to treat return on those instruments as deductible interest or non-deductible dividends.

Debt/equity analysis differs fundamentally from "sham" transaction analysis. John Kelley, 326 U.S. at 523 ("There is not present in either situation the wholly useless temporary compliance with statutory literalness which this Court condemned as futile, as a matter of law, in Gregory v. Helvering."). In fact, the two analyses are exclusive. "Classification" analysis asks the question what formal classification is appropriate for tax purposes, whereas "sham transaction" analysis asks whether an otherwise appropriate formal classification should be disregarded.

Accordingly, rather than asking me to apply the reasoning of ASA Investerings, as it did

---

[39] Some language in the Boca Investerings decision supports a reading that merely demonstrating a business *purpose* for forming a partnership is insufficient, and instead, a taxpayer must demonstrate a business *necessity*. Boca Investerings, 314 F.3d at 632 ("Because the district court did not find that a legitimate, non-tax *necessity* existed for the formation of the Boca partnership . . . .") (emphasis supplied). I think that other language, see, e.g., id. ("We do not of course suggest that in every transaction using a partnership a taxpayer must justify that to form"), as well as a reading of the case as whole, shows that the D.C. Circuit meant nothing more than that, when there appears to be no non-tax reason for creating a separate entity to effect a given transaction, the creation of the entity is likely a sham.

in its previous argument, the government here asks me to question what <u>ASA Investerings</u> presupposed, namely, that the entity in question was, as a *formal* matter, correctly classified as a partnership.  <u>See ASA Investerings</u>, 201 F.3d at 511 (noting that despite compliance with the tax code's formal definition of a partnership, the question was "whether the formal partnership had substance").

Given that the question is how to classify the Dutch Banks' interest in Castle Harbour, I am more than a little puzzled by the cases cited.  If the question is whether Castle Harbour was formally a partnership, it makes sense to look not to the case law distinguishing between debt and equity for the purpose of determining appropriate deductions but to the tax code's definition of a "partnership."  Section 761 of the Internal Revenue Code states that "the term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on."  26 U.S.C. § 761. The section further provides, "[f]or purposes of this subtitle, the term 'partner' means a member of a partnership."  <u>Id.</u>

There can be little dispute that Castle Harbour meets the section 761 definition of a partnership.  It was an unincorporated organization (a limited liability company) that carried on an aircraft leasing business.  There is even less doubt that the Dutch Banks were partners, namely, members of the partnership.

The fact that section 761 provides the formal definition of a partnership might explain the government's inability to cite a single case in which the debt/equity line of cases is used to reclassify a partner's interest.  Of course, a partnership interest is generally thought to be an equity interest, and should the question how to classify such an interest in the hands of the holder

-37-

arise in a context in which the traditional debt/equity question arises, the distinctions drawn in debt/equity cases might be useful. Here, however, the question is the taxation of a partnership, and that question is governed by chapter K of the Internal Revenue Code, which provides the definition of partnership cited above.

Section 761's formal definition is very broad and will often easily be met. But that only means that the "sham transaction" doctrine – and not the debt/equity distinction – is the test by which a court is to scrutinize the partnership structure.

I do acknowledge that, if despite meeting the formal definition of partnership, a partner's interest had all the characteristics of debt, that would strongly indicate that the partner's participation in the partnership was a sham. That has nothing to do with the "classification" of the interest, but is merely the result of the principle that, when performing a sham transaction analysis, a court looks to substance, not form. In other words, the only possible relevance of the debt/equity analysis is as an aid to performing "sham transaction" analysis.

I believe my analysis in the previous sections already explains why the Dutch Banks' participation as a partner in Castle Harbour was not a sham. I do not read any of the cases on "sham transactions," including those that specifically deal with the question of sham partnerships, to require me to undertake a further analysis – using steps borrowed from a separate area of tax law – to assure myself that, not only were the parties economically real partners, they were also *not debtors*. Nevertheless, even an application of this borrowed test, leads, unsurprisingly, to the same result.[40]

---

[40] This is not some happy coincidence, but rather follows from my previous conclusion, which implicitly addressed the issue of the propriety of characterizing the Dutch Banks' interest as equity. I concluded above that the Castle Harbour transaction had economic substance, in

Courts have applied varying factors to determine whether an instrument is debt or equity, always holding that no one factor is determinative. The I.R.S., though declining to issue explicit regulations on the subject, has highlighted eight factors worthy of consideration:

> (a) whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future; (b) whether holders of the instruments possess the right to enforce the payment of principal and interest; (c) whether the rights of the holders of the instruments are subordinate to rights of general creditors; (d) whether the instruments give the holders the right to participate in the management of the issuer; (e) whether the issuer is thinly capitalized; (f) whether there is identity between holders of the instruments and stockholders of the issuer; (g) the label placed upon the instruments by the parties; and (h) whether the instruments are intended to be treated as debt or equity for non-tax purposes, including regulatory, rating agency, or financial accounting purposes.

I.R.S. Notice 94-47.

These factors are intended to aid the determination whether an instrument characterized as debt should actually be characterized as equity. In trying to make the reverse determination, as I must do here, it is apparent that several of those factors deserve little weight. Possession of management rights by an alleged creditor – factor (d) – indicates the creditor may really be an owner, but the reverse is not true. The average stockholder of a publically traded corporation has no management rights, but there is little doubt he holds equity. Similarly, a loan to a thinly capitalized entity  – factor (e) – might raise the suspicion that the loan is actually equity, but the purchase of equity in a well capitalized entity is entirely ordinary and does not indicate the

---

part, because the Dutch Banks really invested $117 million in return for a significant portion of any of the returns of the aircraft leasing business. For the purpose of "sham transaction" analysis, that conclusion is, I believe, sufficient to establish that the banks had an economically real *equity* interest in the partnership. Accordingly, it is not surprising that a more mechanical application of the debt/equity test yields the same result.

existence of a debt.  Finally, though a creditor with no right to enforce the payment of principal

or interest – factor (b) – looks suspiciously like an equity holder, an equity holder with a right to

force a buyout of his share is perfectly normal.  In the partnership context, the default rule is that

any partner can force a liquidation of the partnership, i.e., force her investment to be returned to

her (plus her gains or minus her losses).  See Revised Uniform Partnership Act § 801(1)

(dissolution required upon notice of a "partner's express will to withdraw as a partner").

     The other factors all indicate that the Dutch Banks held equity.

     Sum Certain: The Dutch Banks were not owed a sum certain.  They were to receive 98%

of the net Operating Income, whatever that might be.  It is true that their potential downside was

limited, but their upside was not.  Thus, although they were guaranteed a minimum return, they

were not guaranteed a maximum – or, more to the point, a *certain* – return.   The difference is

significant.  An interest holder guaranteed a fixed return resembles a debtor because he has no

interest in anything other than solvency of the entity obligated to pay him.  By contrast, even with

security against downside risk, an investor with unlimited upside potential has a significant

interest in the performance of the entity in question, because performance directly affects the

amount of her return.  Moreover, this type of arrangement has previously been found consistent

with a partnership interest.  See Hunt, 59 T.C.M. (CCH) at 635.

     Creditors' Rights: The Dutch Banks' interest was subordinate to that of general creditors.

     Identity of Debtors and Creditors: The Dutch Banks did not have any other relationship

with Castle Harbour, so this factor is immaterial.

     Label Used: Although there was some evidence that the Dutch Banks at times referred to

their investments as debt, in general it appears that all the parties primarily considered the banks'

interest to be that of partners.

Treatment for Non-Tax Purposes: The Dutch Banks' interest was treated as a partnership interest for two important non-tax purposes. It was recorded as "minority equity" on GECC's financial statements. It was not considered a violation of GECC's "negative pledge," which it would have been were it debt.

In short, there is nothing about the Dutch Banks' participation in Castle Harbour that leads me to conclude that labeling them "partners" was inaccurate, much less a sham.

D.     Did Allocations of Castle Harbour's Income Violate the "Overall Tax Effect" Rule?

The government's final argument is that the allocation of Castle Harbour's income violated the "overall-tax-effect" rule set forth in Treasury Regulations § 1.704-1(b)(2), and the income should, therefore, be reallocated according to each partner's ownership interest in Castle Harbour.

"A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement." I.R.C. § 704(a). "A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if – (1) the partnership agreement does not provide as to the partner's distributive share . . . or (2) the allocation to a partner under the agreement . . . does not have substantial economic effect. I.R.C. § 704(b).

A "partner's interest in the partnership" signifies "the manner in which the partners have agreed to share the economic benefit or burden (if any) corresponding to the income, gain, loss,

-41-

deduction, or credit (or item thereof) that is allocated." Treas. Reg. § 1.704-1(b)(3). "In determining a partner's interest in the partnership, the following factors are among those that will be considered: (a) the partners' relative contributions to the partnership, (b) the interest of the partners in economic profits and losses . . . (c) the interest of the partners in cash flow and other non-liquidating distributions, and (d) the rights of the partners to distributions of capital upon liquidation." Id.

An allocation lacks "substantial economic effect" if it either (a) does not have "economic effect" or (b) is not "substantial." Treas. Regs. § 1.704-1(b)(2).

Whether an allocation has "economic effect" depends on a complicated analysis, principally of how the capital accounts of the partners were maintained. It is not disputed that Castle Harbour's allocations had "economic effect."

An allocation is not substantial if, among other things, it fails the so-called "overall tax-effect" rule, that is:

> if, at the time the allocation becomes part of the partnership agreement, (1) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement, and (2) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement.

Treas. Reg. § 1.704-1(b)(2)(iii)(a).

The government argues as follows:

> (1) The Castle Harbour partners' interests in the partnership are their respective
>
> percentages of ownership, for example, at the start of the partnership,

-42-

approximately 82% for the GECC entities and 18% for the Dutch Banks.

(2)  Were income allocated according to those percentages, the GECC entities would

incur a $56 million tax liability, and the Dutch Banks would receive a small

portion of income.

(3)  By allocating income 98% to the Dutch Banks and 2% to the GECC entities, the

Dutch Banks received $30 million in income, while the GECC entities saved $56

million in taxes.

(4)  Thus, the Dutch Banks were better off by $30 million and GECC by $26 million

($56 million in saved taxes less $30 million to the Dutch Banks).  Because, after

taxes, everyone was better off, and no one worse off, the overall tax effect rule

was violated.

The problem with the government's argument is that its premise, that the partners'

interests in the partnership are their respective percentages of ownership, appears to be made out

of whole cloth.  A partner's interest in the partnership signifies "the manner in which the partners

have agreed to share the economic benefit or burden (if any) corresponding to the income, gain,

loss, deduction, or credit (or item thereof) that is allocated."  Treas. Reg. § 1.704-1(b)(3).

Contribution of capital to the partnership is one factor that may be considered, but it has little

weight in this case when balanced against the other factors.  The Operating Agreement explicitly

allocates the Dutch Banks 98% of all the partnership's Operating Income.  Throughout the

existence of the partnership the Dutch Banks always received 98% of the partnership's Operating

Income.  When the partnership was liquidated, the Dutch Banks were paid the amounts

remaining in their capital accounts, which reflected an increase based on allocations of 98% of

-43-

the partnership's Operating Income.  It is therefore crystal clear that the Dutch Banks agreed to receive – and actually did receive – the economic benefit of 98% of all the Operating Income of Castle Harbour, making their "partner's interest in the partnership," with respect to Operating Income, 98%.

But, the government argues, allowing a partner's interest in a particular item of the partnership to be determined by looking at the way that item is allocated by the agreement makes the overall tax effect rule meaningless.  The overall tax effect rule requires a comparison of the partners' situation under the agreement's allocation with their situation under the default allocation, which, under section 704(b), is made according to each partner's interest in the partnership.  The government argues that if a partner's interest in the partnership is determined by reference to the agreement, then these two items are always the same, and it is logically impossible to violate the overall tax effect rule.  Therefore, the government contends, it cannot be that a partner's interest in the partnership is determined by reference to the partners' agreement.

The government is mistaken.  It is not true that if a partner's interest in the partnership is determined by reference to the partnership agreement it will always be the same as the specific allocations contained in the agreement.  To be sure, there are situations – and this case presents one of them – where a partner's interest in the partnership *is* the same as the agreement's allocation.  Those situations do not implicate the overall tax effect rule.  But there are other situations where the two items are different, and it is those situations that are governed by the overall tax effect rule.

Specifically, a partner's interest in the partnership is often not the same as the partnership agreement's allocations – even though that interest is determined by reference to the partnership

-44-

agreement – in cases where the agreement makes allocations based on the taxable characteristics of specific items.  In such cases, it is possible for the discrepancy between the agreement's allocation and a partner's interest in the partnership to violate the overall tax effect rule if the agreement's allocation makes one partner better off after-tax, and no partner substantially worse off.

An example, taken directly from the Treasury Regulations, makes this clear.

Individuals H[41] and J form a partnership.  H is in the 50% tax bracket, J, the 15% bracket. The partnership principally invests in taxable and tax-exempt debt instruments.  The partners each contribute equally to the partnership.  The partners agree to share equally gains and losses from the disposition of the debt securities, however, they also agree that tax-exempt interest will go 80% to H and 20% to J, and taxable interest 100% to J.

The partnership realizes $450 of tax-exempt interest and $550 of taxable interest.  Under the agreement H receives 80% of the $450 tax-exempt interest  – $360.  J receives  20% of the tax-exempt interest ($90) and all of the taxable interest ($550) – a total of $640.  For reasons I will explain in a moment, this allocation violates the overall tax effect rule, and the income must be reallocated according to each partner's interest in the partnership.  See I.R.C. § 704(b).  The regulations explain how this is to be done:  "Since under the partnership agreement [H] will receive 36 percent (360/1,000) and J will receive 64 percent (640/1,000) of the partnership's total investment income in such year, under paragraph (b)(3) of the section the partnership's tax-exempt interest and taxable interest and dividends each will be reallocated 36 percent to [H] and

_____

[41] The regulations use the letter "I" to designate the first partner.  To avoid confusion with the first person pronoun, I use "H."

64 percent to J." Treas. Reg. § 1.704-1 Example 5(ii).

In this example, the partners' interests in the partnership are not identical to the interests they are allocated under the partnership agreement. The partnership agreement allocates taxable interest 100% to J and 0% to H, and non-taxable interest 20% to J, 80% to H. By contrast, when allocation is done according to each partner's interest in the partnership, J is allocated 64% of each item, and H is allocated 34% of each item. This difference exists even though each partner's interest in the partnership is determined *exclusively by reference to the partnership agreement*. J is allocated 64% of interest income and H is allocated 34% because, in aggregate, that is how much the partnership agreement allocates them – the agreement allocates $640 of the $1000 of interest income to J ($90 tax-exempt income, plus $550 taxable income) and $360 of the $1000 to H ($360 tax-exempt income). Notably, the partner's interest is *not* determined by their ownership interest in the items in question (or in the partnership as a whole).[42]

With that in mind, it is easy to see why the above example fails the overall tax effect rule. Without the allocation, investment interest would be allocated according to each partner's interest in the partnership – H would receive 36% of the $450, tax free, i.e., $162 and 36% of $550 less 50% taxes, i.e., $99, for a total after-tax allocation of $261, and J would receive $288 of the tax-free interest, and $352 of the taxable interest, less $53 in taxes, for a total after-tax allocation of $587. With the challenged allocation, however, H receives $360 tax free, and J receives $90 tax free and $550 less $83 in taxes, i.e., $467, for a total after-tax allocation of $557. Thus H is better off after taxes with the challenged allocation – $360 versus $288 – and J

---

[42] Neither is the partners' interest determined by looking at the way they agreed to allocate proceeds from disposition of the debt instruments in question, i.e., equally.

is not substantially worse off – $587 vs. $557.  Put another way, H receives a greater amount with the items allocated according to their taxable characteristics than he would receive were the items allocated based simply on H's percentage interest in them, as inferred from the partnership agreement.  Accordingly, the overall tax effect rule is violated, and the amounts are reallocated according to each partner's interest in the partnership as described above.

This example makes clear that (a) when the partnership agreement contains explicit allocation provisions,[43] partner's interest in the partnership is determined by reference to the agreement, not by reference to ownership interest, and (b) this determination is not circular – it can lead to different allocations, particularly in cases where items are allocated based on their taxable characteristics.

In the case of Castle Harbour, the intent of the parties, and the economic reality of the situation, was the unambiguous assignment of a 98% interest in Operating Income to the Dutch Banks.  Operating Income was not further differentiated based on taxable characteristics, and there is simply no ground from which to argue that the partners had any other interest than the 98% and 2% assigned by the agreement.  Consequently, the overall tax effect rule is not applicable because there is no difference between the allocations made and each partner's actual interest in the partnership.  Morever, even if applicable, the overall tax effect rule would have no effect because reassignment of income based on the partners' interests in the partnership would result in the same allocation actually made.

---

[43] There may be very good reasons for partners to allocate income in amounts higher or lower than each partner's capital contribution.  For example, allocations may reflect non-capital contributions such as expertise, time and energy devoted to the partnership, and whether the partner's interest is short-term or long-term.  A partnership, in other words, can reasonably establish classes of partners on grounds other than their capital contributions.

The government is attempting to use the overall tax effect rule to remedy its problem, not with the *manner* in which the Dutch Banks were allocated their interest in the partnership (something the overall tax effect rule might cover), but with the fact that the Dutch Banks were allocated such a huge interest in the first place. The tax benefits of the Castle Harbour transaction were the result of the allocation of large amounts of book income to a tax-neutral entity, offset by a large depreciation expense, with a corresponding allocation of a large amount of taxable income, but no corresponding allocation of depreciation deductions. This resulted in an enormous tax savings, but the simple allocation of a large percentage of income violates no rule. The government does not – and cannot – dispute that partners may allocate their partnership's income as they choose.[44] Neither does the government dispute that the taxable income allocated to the Dutch Banks could not be offset by the allocation of non-existent depreciation deductions to the banks.[45] And, as I have just explained, the bare allocation of a large interest in income does not violate the overall tax effect rule.

The truth is that the government's only real argument is its contention that the Castle Harbour transaction was done solely for the purpose of, and with the sole effect of, achieving the tax benefits consequent to the 98% income allocation to tax-neutral parties. In other words, the government is arguing – again – that the transaction was a "sham." That argument has already

---

[44] Here the large allocation provided a rational method of liquidating the Dutch Banks' partnership interests over a relatively short period of time.

[45] The rules governing the allocation of, among other things, depreciation deductions in situations where the book value of a contributed asset is greater than its tax basis are set forth in I.R.C. § 704(c) and its attendant regulations. In part, the application of that section's "ceiling rule" leads to the tax savings at issue here. The government, however, does not allege that the mechanics of section 704(c) allocation were improperly applied in this case, so there is no need to examine them.

-48-

been addressed.

**IV.    Conclusion**

The government is understandably concerned that the Castle Harbour transaction deprived the public fisc of some $62 million in tax revenue.  Moreover, it appears likely that one of GECC's principal motivations in entering into this transaction – though certainly not its only motivation – was to avoid that substantial tax burden.  Nevertheless, the Castle Harbour transaction was an economically real transaction, undertaken, at least in part, for a non-tax business purpose; the transaction resulted in the creation of a true partnership with all participants holding valid partnership interests; and the income was allocated among the partners in accordance with the Internal Revenue Code and Treasury Regulations.  In short, the transaction, though it sheltered a great deal of income from taxes, was legally permissible.  Under such circumstances, the I.R.S. should address its concerns to those who write the tax laws.

I conclude that from 1993 to 1998, Castle Harbour properly allocated income among its partners. The FPAAs issued by the I.R.S. were in error, and the I.R.S. must refund to TIFD III-E the total amount of TIFD III-E's jurisdictional deposit, plus any interest called for by 26 U.S.C. §§ 6226 and 6611.

The clerk will enter judgment for the plaintiff and close the file.


It is so ordered.

Dated at Bridgeport, Connecticut, this 1st day of November 2004.


   /s/ Stefan R. Underhill      
Stefan R. Underhill
United States District Judge

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2004 NOV -3 P 1: 48

U.S. DISTRICT COURT



TIFD III-E INC., the Tax Matters
Partner of CASTLE HARBOUR-I
LIMITED LIABILITY COMPANY

        v

UNITED STATES OF AMERICA

               3:01cv1839 (SRU)
               3:01cv1840 (SRU)


## JUDGMENT

This matter came on for trial before the Honorable Stefan R. Underhill, United States

District Judge.   On November 2, 2004, the court entered a Memorandum of Decision.

Therefore, it is hereby ORDERED and ADJUDGED that judgment is entered in favor of

the plaintiff, TIFD III-E INC., the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-

LIABILITY COMPANY.  The I.R.S. must refund to TIFD III-E the total amount of TIFD-III-E's

jurisdictional deposit, plus any interest called for by 26 U.S.C. Sections 6226 and 6611.

Dated at Bridgeport, Connecticut, this 3rd day of November,  2004.


                            KEVIN F. ROWE, Clerk

                            By _____
                               Deputy Clerk

Entered on Docket ___11-3-04___

TOTAL P.02

## CERTIFICATE OF SERVICE

I certify that service of the foregoing United States' Notice of Appeal, has, this 28th day of December 2004, been made on plaintiffs' counsel by mailing in a postage pre-paid envelope a copy thereof to the following addresses:

David J. Curtin, Esq.
MCKEE NELSON LLP
1919 M Street, N.W., Suite 800
Washington, DC 20036

Anthony M. Fitzgerald
CARMODY & TORRANCE LLP
195 Church Street
P.O. Box 1950
New Haven, Connecticut  06509-1950

Suzanne C. Feese
KING & SPALDING
191 Peachtree Street
Atlanta, Georgia  30303-1763


U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C.  20044
(202) 307-6440