3:01CV01839(SRU)
3:01CV01840(SRU)
(Judge Underhill)

*IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT*

TIFD III-E INC., THE TAX MATTERS PARTNER OF
CASTLE HARBOUR-1 LIMITED-LIABILITY COMPANY,

Plaintiff

v.

THE UNITED STATES OF AMERICA,

Defendant

APPENDIX B TO THE UNITED STATES
INITIAL BRIEF ON REMAND

KEVIN J.O'CONNOR
    United States Attorney
JOHN B. HUGHES
    Chief, Civil Division
ROBERT J. HIGGINS
    Trial Attorney
    United States Department of Justice (Tax)
    Washington, D.C. 20044

## TABLE OF CONTENTS

**Page**

Exhibit    Description

1.  Notice of Final Partnership Administrative Adjustment
    For Tax Years Ending 1999 and 1998 ................................ B1

2.  Joint Exhibit Sixteen ........................................... B17

3.  Excerpts from Trial Transcript of July 21, 2004, pp. 107-111 ............ B21

4.  Plaintiff's Privilege Log, February 6, 2007, Nos. 906 and 907 ............ B26

5.  Proposed Judgment ............................................ B27

6.  Excerpts from Trial Testimony of Dennis Nayden, Diarmud Hyde,
    Chris Tewell, Eric Dull, and Robert O'Reilly ........................ B29

**Internal Revenue Service**
111 West Huron Street, Buffalo, NY 14202

**Department of the Treasury**

Refer To:
 S:C:CP:S:TT:E:2:5:DG
Taxpayer Identifying Number:
 06-1222214
Name of Partnership:
 Castle Harbour - I Limited Liability Company
Partnership Identifying Number:
 98-0140866
Tax Year Ended:
 199712, 199812
Person to Contact:
 Don Glover 16-00705



Date: JUN 2 9 2001

TIFD III-E, Inc.
TAX MATTERS PARTNER
Castle Harbour - I Limited Liability Company
201 High Ridge Road
Stamford, Connecticut 06927

Contact Hours:
 8am - 4:30pm
Contact Telephone Number:
 (716) 961-5271

## NOTICE OF FINAL PARTNERSHIP ADMINISTRATIVE ADJUSTMENT

The law requires us to send a Notice of Final Partnership Administrative Adjustment (FPAA) to the partnership named above, for the tax year shown above, and to each partner who is entitled to receive this notice.

We are proposing adjustments to the partnership items of the partnership and tax year shown above. We will send the examination report outlining these adjustments to the Tax Matters Partner (TMP) of the partnership. (The TMP is the partner designated by the partnership to deal with the IRS.) He/she is also authorized to act for the partners who are not entitled to receive this notice. Any partner who wants a copy of the examination report should request it from the TMP. If the TMP is unable to provide you with a copy of the examination report, please contact the person named in the heading of this letter.

Taxable Years Ending Before August 6, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease to the tax liability on your individual return. Form 870-P, *Agreement to Assessment and Collection of Deficiency in Tax for Partnership Adjustments*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.

Taxable Years Ending After August 5, 1997:

The adjustments to the partnership items reported on the partnership tax return may cause an increase or decrease in the tax liability on your individual return. The adjustments may include partnership level determinations regarding penalties and additions to tax that relate to adjustments to partnership items. Form 870-PT, *Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts*, is a summary of the proposed adjustments to the partnership return. You can compute your share of the proposed adjustments by multiplying each adjusted partnership item by your percentage interest for that partnership item.



**EXHIBIT**

1

Letter 1830 (DO) (Rev. 3-2001)
Catalog Number 61242U

B1

IRSB1064

You have three options available to you:

## 1. If you agree with the adjustments:

Sign and return the enclosed Form 870-P/Form 870-PT. When you sign Form 870-P/Form 870-PT, you are agreeing to pay any additional tax and interest resulting from the adjustments to the partnership return. For tax years ending after August 5, 1997, you are also agreeing to any partnership level determination as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items, if any. In addition, you are waiving your rights to participate in any administrative or judicial proceeding affecting partnership items and in partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items for the tax year in question. This is a binding settlement only if you sign and return Form 870-P/Form 870-PT and we sign on behalf of the Commissioner of Internal Revenue Service. When we sign the agreement form, the one-year extension of the period of limitations on assessments will begin under Internal revenue Code section 6229(f). Once the agreement is signed by both parties, you may not file a claim to change the items in question or claim a refund/credit based on a readjustment.

Note: If you are the TMP of the partnership, see the section of this letter entitled, *"For the Tax Matters Partner of the Partnership"*.

## 2. If you do not agree with the adjustments:

If you are the TMP of the partnership and want to contest the adjustments in court, you must file a petition within 90 days from the date of this letter. During this 90-day period, no other partner may file a petition for judicial review. You can file your petition for readjustment of partnership items with:

1. the United States Tax Court;
2. the United States Court of Federal Claims; or
3. the District Court of the United States, in the district of the partnership's principal place of business.

A petition filed by the TMP precludes all other actions. If the TMP doesn't file a petition by the 90th day from the date the FPAA was mailed, any partner or any 5 percent group entitled to receive this notice may petition one of these courts. A "5 percent group" includes any group of partners who together have an interest of five percent or more in profits of the partnership. The petition must be files after the 90th day, but on or before the 150th day from the date the FPAA was mailed to the TMP. If more than one petition is filed in Tax Court, the first petition filed will go forward. All other petitions (even those filed earlier in one of the other courts) will be dismissed. If no one files a petition in Tax Court, the first petition filed in one of the other courts will go forward and subsequent petitions will be dismissed.

Petitions filed with the United States Tax Court must be mailed to:

**United States Tax Court**
**400 Second Street, NW**
**Washington, DC 20217**

Attach a copy of this letter to the petition. The time in which you must file a petition with the court is fixed by law and the court cannot consider your case if your petition is filed late. If this letter is addressed to both a husband and wife and both want to petition the Tax Court, both must sign the petition or each must file a separate signed petition.

**Letter 1830 (DO) (Rev. 3-2001)**
Catalog Number 61242U

IRS81065

When a partner (including each member of a 5 percent group that files a petition) files a petition in either the appropriate District Court or the Court of Federal Claims, the partner filing the petition must deposit the amount that the partner's tax liability would be increased if the treatment of the partnership items on the partner's return were made consistent with the treatment of partnership items under the FPAA. If you reported the partnership items the way the partnership reported them on its return, you can generally determine the amount to deposit by taking your pro rata share of the partnership adjustments into account in recomputing your tax. You must deposit the appropriate amount with the IRS on or before the day you file your petition.

## 3. If you do nothing:

If a petition for readjustment is not filed in any of the courts listed in this letter, the FPAA becomes final, and we will bill you for any additional tax plus interest that you may owe under the FPAA. You will not be permitted to contest the treatment of the partnership items of the partnership under the FPAA in any refund claim or suit. The law allows the Service to bill you after 150 days from the mailing date of the FPAA to the TMP.

However, if a petition is filed in the Tax Court, and the Tax Court upholds the adjustments in whole or in part, we will not bill you until the Tax Court decision is final.

You may wish to contact the TMP of the partnership or your tax advisor to discuss this matter.

If you have any questions please write to the person whose name and address are shown in the heading of this letter. If you write, attach a copy of this letter to help identify your account. Also, include your telephone number and the most convenient time for us to call you in case we need additional information.

If you prefer, you may call the IRS contact person at the telephone number shown in the heading of this letter. If this number is outside your local calling area, there will be a long distance charge to you.

Thank you for your cooperation.

Sincerely,

Karen J. Ammons
Director of Field Operations

Enclosures:
Form 870-P/Form 870-PT
Copy of this letter

Letter 1830 (DO) (Rev. 3-2001)
Catalog Number 61242U

B3

IRS81066

## FOR THE TAX MATTERS PARTNER OF THE PARTNERSHIP

If you are the Tax Matters Partner (TMP), you are entitled to make an agreement to bind non-notice partners to the treatment of the partnership items as shown on the enclosed schedule of adjustments. You must add the following statement above the signature blocks on the Form 870-P or Form 870-PT:

"The undersigned Tax Matters Partner is signing this offer on behalf of himself (herself) and all other partners whom he (she) has the authority to bind; a final agreement resulting from the co-signature of the Commissioner of Internal Revenue will be binding on all such other partners."

As the TMP, you may submit a petition, as described above for the partnership on behalf of all partners.

If you have any questions, you can call the IRS contact person at the telephone number shown in the heading of this letter. Thank you for your cooperation.

Letter 1830 (DO) (Rev. 3-2001)
Catalog Number 61242U

B4

IRS81067

| Form **870-PT** (03/2001) | **Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts** | Page 7 of 44 IN REPLY REFER TO: S:C:CP:S:TT:E:2:5:DG |
|---|---|---|

| Taxpayer(s) name(s), address and ZIP code:<br><br>Castle Harbour - I Limited Liability Company<br>201 High Ridge Road<br>Stamford, Connecticut 06927 | Name of Partnership:<br>Castle Harbour - I Limited Liability Company<br><br>Taxpayer Identifying Number: 98-0140866 | Tax Year(s) Ended:<br><br>199712, 199812 |
|---|---|---|
| Taxpayer Identifying Number: 98-0140866 | Name of Tax Matters Partner: | |

Offer of Agreement to Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts
&
Waiver of Restrictions on Assessment for Partnership Items, Penalties, Additions to Tax, and Additional Amounts

Under sections 6224(c) and 7121 of the Internal Revenue Code of 1986, the Commissioner of the Internal Revenue Service and the undersigned taxpayer(s) agree to the determination of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items as shown on the attached schedule of adjustments.

The undersigned taxpayer(s), in accordance with section 6224(b) and 6213(d), also waives the restrictions provided by sections 6225(a) and 6213(a) and consents to the assessment and collection of any deficiency attributable to partnership items, penalties, additions to tax and additional amounts that relate to adjustments to partnership items, as set forth in the attached schedule of adjustments; plus any interest provided by law.

This agreement is conditional and will not become effective or final until this agreement form is returned to the Commissioner and is signed on his or her behalf. The one-year extension of the period of limitations on assessment under section 6229(f) will not begin to run until the date the Commissioner's representative signs this form on the Commissioner's behalf.

If this agreement form is signed for the Commissioner, the treatment of partnership items and partnership level determinations as to penalties, additions to tax and additional amounts that relate to adjustments to partnership items under this agreement will not be reopened in absence of fraud, malfeasance, or misrepresentation of fact. In addition, no claim for an adjustment of partnership items, refund or credit based on any change in the treatment of partnership items or partnership level determinations as to penalties, additions to tax and additional amounts may be filed or prosecuted.

| Signature of taxpayer | Date Signed |
|---|---|
| Signature of taxpayer | Date Signed |
| By (Signature and *title*) | Date Signed |

| FOR INTERNAL REVENUE USE ONLY | Date accepted for Commissioner | Signature |
|---|---|---|
| | Office | Title |

*(See Instructions for Signing Agreement)*   Form 870-PT (03/2001)

IRS81068

## SCHEDULE OF ADJUSTMENTS

| NAME OF PARTNERSHIP | TAX YEAR(S) ENDED | | |
|---|---|---|---|
| Castle Harbour -I Limited Liability Company | 199712 | 199812 | |
| TAXPAYER IDENTIFYING NUMBER   98-0140866 | | | |
| DETAIL OF ADJUSTMENTS TO ORDINARY INCOME | | | |
| | | | |
| TOTAL ADJUSTMENTS TO ORDINARY INCOME | | | |
| OTHER ADJUSTMENTS | | | |
| A. **REALLOCATION AMONG MEMBERS** | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) CORRECTED | | | |
| B. **ACCURACY PENALTY - IRC 6662(a)** | | | |
| (1) ADJUSTMENT | | | |
| (2) AS REPORTED | | | |
| (3) AS CORRECTED | | | |

REMARKS

Reallocation Among Members - All income has been reallocated to TIFD III-E, Inc. and TIFD III-M, Inc. as explained in the attached explanation of adjustments.

The accuracy penalty has been determined to be applicable under IRC 6662(a) as explained in the attached explanation of adjustments.

| (03/2001) Form **870-PT** | Cat No. 57315A | Department of the Treasury-Internal Revenue Service |
|---|---|---|

IRS81069

# INSTRUCTIONS FOR SIGNING THIS AGREEMENT

1. If a JOINT RETURN OF A HUSBAND AND WIFE was filed, and both spouses intend to agree, both spouses must sign Form 870-PT, unless one spouse, acting under a power of attorney, signs as agent for the other.

2. If the taxpayer is a corporation, the agreement must be signed with the corporate name followed by the signature and title of the officer authorized to sign Form 870-PT.

3. Your attorney or agent may sign for you if this action is specifically authorized by a power of attorney, which if not previously filed, must accompany this form.

4. If this offer is signed by a Tax Matters Partner, please include title with the signature.

B7

IRS81070

CASTLE HARBOUR I LIMITED LIABILITY COMPANY
98-0140866

EXPLANATION OF ADJUSTMENTS

It is determined that the arrangement by which TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank purported to form a partnership lacked economic substance and was without legitimate business purpose, and that no valid partnership existed among TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank. As a result, it is determined that the income reported by Castle Harbour I Limited Liability Company is properly allocated among TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank as follows:

REALLOCATIONS OF ORDINARY INCOME

|  | TIFD III-E, Inc. | TIFD III-M, Inc. | ING Bank | Rabo Bank |
|---|---|---|---|---|
| 1997 | $50,053,347 | $722,817 | (25,388,082) | (25,388,082) |
| 1998 | $55,146,673 | $799,133 | (27,972,903) | (27,972,903) |

**1997:**

|  | TIFD III-E | TIFD III-M | ING Bank | Rabo Bank |
|---|---|---|---|---|
| Rent Income per Return | 513,818 | 513,819 | 25,177,115 | 25,177,115 |
| Rent Income Reallocation | 49,637,420 | 716,810 | (25,177,115) | (25,177,115) |
| Corrected Rent Income | 50,151,238 | 1,230,629 | 0 | 0 |
| Interest Income per Return | 4,561 | 4,561 | 223,490 | 223,490 |
| Interest Income Reallocation | 440,617 | 6,363 | (223,490) | (223,490) |
| Corrected Interest Income | 445,178 | 10,924 | 0 | 0 |
| Investment Expense per Return | 255 | 256 | 12,523 | 12,523 |
| Investment Expense Reallocation | 24,689 | 357 | (12,523) | (12,523) |
| Corrected Investment Expense | 24,944 | 613 | 0 | 0 |
| Total Ordinary Income Reallocations | 50,053,347 | 722,817 | (25,388,082) | (25,388,082) |

IRSB1071

| | TIFD III-E | TIFD III-M | ING Bank | Rabo Bank |
|---|---|---|---|---|
| **1998:** | | | | |
| Rent Income per Return | 570,280 | 570,280 | 27,867,160 | 27,867,160 |
| Rent Income Reallocation | 54,938,207 | 796,113 | (27,867,160) | (27,867,160) |
| Corrected Rent Income | 55,508,487 | 1,366,393 | 0 | 0 |
| | | | | |
| Interest Income per Return | 2,337 | 2,336 | 114,163 | 114,163 |
| Interest Income Reallocation | 225,065 | 3,261 | (114,163) | (114,163) |
| Corrected Interest Income | 227,402 | 5,597 | 0 | 0 |
| | | | | |
| Investment Expense per Return | 173 | 172 | 8,420 | 8,420 |
| Investment Expense Reallocation | 16,599 | 241 | (8,420) | (8,420) |
| Corrected Investment Expense | 16,772 | 413 | 0 | 0 |
| | | | | |
| Total Ordinary Income Reallocations | 55,146,673 | 799,133 | (27,972,903) | (27,972,903) |

**B9**

[2]

IRS81072

Alternatively, it is determined that ING Bank and Rabo Bank were in substance lenders to, rather than partners of, Castle Harbour I Limited Liability Company.   As a result, it is determined that the income reported by Castle Harbour I Limited Liability Company is properly allocated among TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank as follows:

## REALLOCATIONS OF ORDINARY INCOME
## LENDER TREATMENT

|  | TIFD III-E, Inc. | TIFD III-M, Inc. | ING Bank | Rabo Bank |
|---|---|---|---|---|
| 1997 | $48,667,867 | $702,809 | $(24,685,338) | $(24,685,338) |
| 1998 | $54,325,000 | $787,227 | $(27,556,114) | $(27,556,114) |

**1997 (Using 5.64%):**

| | | | | |
|---|---|---|---|---|
| Rent Income per Return | 513,818 | 513,819 | 25,177,115 | 25,177,115 |
| Rent Income Reallocation | 48,263,452 | 696,969 | (24,480,211) | (24,480,211) |
| Corrected Rent Income | 48,777,270 | 1,210,788 | 696,904 | 696,904 |
| Interest Income per Return | 4,561 | 4,561 | 223,490 | 223,490 |
| Interest Income Reallocation | 428,421 | 6,187 | (217,304) | (217,304) |
| Corrected Interest Income | 432,982 | 10,748 | 6,186 | 6,186 |
| Investment Expense per Return | 255 | 256 | 12,523 | 12,523 |
| Investment Expense Reallocation | 24,006 | 347 | (12,176) | (12,176) |
| Corrected Investment Expense | 24,261 | 603 | 347 | 347 |
| Total Ordinary Income Reallocations | 48,667,867 | 702,809 | (24,685,338) | (24,685,338) |

B10

[3]

IRSB1073

| 1998 (Using 5.15%): | TIFD III-E | TIFD III-M | ING Bank | Rabo Bank |
|---|---|---|---|---|
| Rent Income per Return | 570,280 | 570,280 | 27,867,160 | 27,867,160 |
| Rent Income Reallocation | 54,119,641 | 784,251 | (27,451,946) | (27,451,946) |
| Corrected Rent Income | 54,689,921 | 1,354,531 | 415,214 | 415,214 |
| Interest Income per Return | 2,337 | 2,336 | 114,163 | 114,163 |
| Interest Income Reallocation | 221,711 | 3,213 | (112,462) | (112,462) |
| Corrected Interest Income | 224,048 | 5,549 | 1,701 | 1,701 |
| Investment Expense per Return | 173 | 172 | 8,420 | 8,420 |
| Investment Expense Reallocation | 16,352 | 237 | (8,295) | (8,295) |
| Corrected Investment Expense | 16,525 | 409 | 125 | 125 |
| Total Ordinary Income Reallocations | 54,325,000 | 787,227 | (27,556,114) | (27,556,114) |

B11

[4]

IRS81074

Alternatively, it is determined that the special allocations contained in the Castle Harbour I Limited Liability Company partnership agreement lack substantial economic effect. As a result, it is determined that the income reported by Castle Harbour I Limited Liability Company is properly allocated among TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank in accordance with their interests in the partnership as follows:

### REALLOCATIONS OF ORDINARY INCOME

|      | TIFD III-E, Inc. | TIFD III-M, Inc. | ING Bank | Rabo Bank |
|------|------------------|------------------|----------|-----------|
| 1997 | $48,328,433 | $189,811 | $(25,368,763) | $(25,368,763) |
| 1998 | $48,373,053 | $145,176 | $(24,182,263) | $(24,182,263) |

|                                   | TIFD III-E | TIFD III-M | ING Bank | Rabo Bank |
|-----------------------------------|-----------:|-----------:|---------:|----------:|
| **1997:**                         |            |            |          |           |
| Rent Income per Return            | 513,818    | 513,819    | 25,177,115 | 25,177,115 |
| Rent Income Reallocation          | 47,926,839 | 188,233    | (25,167,177) | (25,167,177) |
| Corrected Rent Income             | 48,440,657 | 702,052    | 1,119,579 | 1,119,579 |
| Interest Income per Return        | 4,561      | 4,561      | 223,490  | 223,490   |
| Interest Income Reallocation      | 425,433    | 1,671      | (213,552) | (213,552) |
| Corrected Interest Income         | 429,994    | 6,232      | 9,938    | 9,938     |
| Investment Expense per Return     | 255        | 256        | 12,523   | 12,523    |
| Investment Expense Reallocation   | (23,839)   | (93)       | 11,966   | 11,966    |
| Corrected Investment Expense      | 24,094     | 349        | 557      | 557       |
| Total Ordinary Income Reallocations | 48,328,433 | 189,811  | (25,368,763) | (25,368,763) |

IRS81075

| | TIFD III-E | TIFD III-M | ING Bank | Rabo Bank |
|---|---|---|---|---|
| **1998:** | | | | |
| Rent Income per Return | 570,280 | 570,280 | 27,867,160 | 27,867,160 |
| Rent Income Reallocation | 48,190,192 | 144,627 | (24,090,849) | (24,090,849) |
| Corrected Rent Income | 48,760,472 | 714,907 | 3,776,311 | 3,776,311 |
| | | | | |
| Interest Income per Return | 2,337 | 2,336 | 114,163 | 114,163 |
| Interest Income Reallocation | 197,420 | 593 | (98,693) | (98,693) |
| Corrected Interest Income | 199,757 | 2,929 | 15,470 | 15,470 |
| | | | | |
| Investment Expense per Return | 173 | 172 | 8,420 | 8,420 |
| Investment Expense Reallocation | (14,559) | (44) | 7,279 | 7,279 |
| Corrected Investment Expense | 14,732 | 216 | 1,141 | 1,141 |
| | | | | |
| Total Ordinary Income Reallocations | 48,373,053 | 145,176 | (24,182,263) | (24,182,263) |

B13

[6]

IRS81076

Alternatively, I.R.C. section 482 and the regulations thereunder allow the Secretary to allocate income, deductions, credits, and allowances among controlled taxpayers to ensure that income and deductions are clearly reflected and to prevent the evasion of taxes. TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank acted in concert pursuant to a common design to shift income and deductions arbitrarily and may be treated as controlled by the same interests under section 482. Accordingly, to reflect income and deductions clearly and to prevent the evasion of taxes, it is determined that the income reported by Castle Harbour I Limited Liability Company is properly allocated among TIFD III-E, Inc., TIFD III-M, Inc., ING Bank, and Rabo Bank as follows:

## REALLOCATIONS OF ORDINARY INCOME
### (SECTION 482)

|      | TIFD III-E, Inc. | TIFD III-M, Inc. | ING Bank | Rabo Bank |
|------|------------------|------------------|----------|-----------|
| 1997 | $47,827,491 | $690,673 | $(24,259,082) | $(24,259,082) |
| 1998 | $47,694,660 | $691,146 | $(24,192,903) | $(24,192,903) |

|  | TIFD III-E | TIFD III-M | ING Bank | Rabo Bank |
|---|---|---|---|---|
| **1997:** | | | | |
| Rent Income per Return | 513,818 | 513,819 | 25,177,115 | 25,177,115 |
| Rent Income Reallocation | 47,430,059 | 684,934 | (24,057,497) | (24,057,497) |
| Corrected Rent Income | 47,943,877 | 1,198,753 | 1,119,618 | 1,119,618 |
| Interest Income per Return | 4,561 | 4,561 | 223,490 | 223,490 |
| Interest Income Reallocation | 421,023 | 6,080 | (213,551) | (213,551) |
| Corrected Interest Income | 425,584 | 10,641 | 9,939 | 9,939 |
| Investment Expense per Return | 255 | 256 | 12,523 | 12,523 |
| Investment Expense Reallocation | 23,591 | 341 | (11,996) | (11,996) |
| Corrected Investment Expense | 23,846 | 597 | 557 | 557 |
| Total Ordinary Income Reallocations | 47,827,491 | 690,673 | (24,259,082) | (24,259,082) |

IRS81077

| | TIFD III-E | TIFD III-M | ING Bank | Rabo Bank |
|---|---|---|---|---|
| **1998:** | | | | |
| Rent Income per Return | 570,280 | 570,280 | 27,867,160 | 27,867,160 |
| Rent Income Reallocation | 47,514,365 | 688,533 | (24,101,449) | (24,101,449) |
| Corrected Rent Income | 48,084,645 | 1,258,813 | 3,765,711 | 3,765,711 |
| | | | | |
| Interest Income per Return | 2,337 | 2,336 | 114,163 | 114,163 |
| Interest Income Reallocation | 194,652 | 2,821 | (98,736) | (98,736) |
| Corrected Interest Income | 196,989 | 5,157 | 15,427 | 15,427 |
| | | | | |
| Investment Expense per Return | 173 | 172 | 8,420 | 8,420 |
| Investment Expense Reallocation | 14,356 | 208 | (7,282) | (7,282) |
| Corrected Investment Expense | 14,529 | 380 | 1,138 | 1,138 |
| | | | | |
| Total Ordinary Income Reallocations | 47,694,660 | 691,146 | (24,192,903) | (24,192,903) |

B15

[8]

IRS81078

CASTLE HARBOUR I LIMITED LIABILITY COMPANY
98-0140866

It is further determined that any underpayments of tax resulting from the adjustments contained herein are subject to the following penalties imposed by I.R.C. Section 6662 - Imposition of Accuracy-Related Penalties.

I.R.C. Sections 6662(a) and (b)(1) provide a 20% penalty on the portion of the underpayment of tax resulting from negligence or disregard of rules or regulations. The failure to report the income that has been reallocated herein constitutes negligence or disregard of rules or regulations and is subject to a 20% penalty on any resulting underpayment of tax. The amount of the penalty may be computed by applying the penalty percentage against any resulting underpayment of tax.

Alternatively, I.R.C. Sections 6662(a) and (b)(2) provide a 20% penalty on the portion of the underpayment of tax resulting from a substantial understatement of income tax. The underpayments of tax resulting from the failure to report the income that has been reallocated herein constitute substantial understatements of income tax and are subject to a 20% penalty on any resulting underpayment of tax. The amount of the penalty may be computed by applying the penalty percentage against any resulting underpayment of tax.

B16
[9]

IRS81079

# PROJECT AIRLEASE

## TRANSPORTATION & INDUSTRIAL FUNDING

- Raise $120MM of Capital (Off-Balance Sheet Financing for Rating Agency Purposes and Equity Capital for GAAP Purposes)

- Reduce Deferred Tax Liabilities, Creating Significant Current Year Net Book Income ($50-55MM)

- Enhanced Cash Economic Benefit ($65.0MM NPV)

- REDACTED

- Foreign Investors Increase Tax Risks And Significantly Limit Operational Flexibility

| | Book Income |
|---|---|
| 1993 | $50-55MM |
| 1994-2000 | $20-22MM |
| Cumulative Total | $70-77MM |

CONFIDENTIAL
ATTORNEY/CLIENT
PRIVILEGED INFORMATION
STRICTLY PRIVATE

**TAX EFFICIENT STRUCTURE RAISES SIGNIFICANT CAPITAL AND PRODUCES ATTRACTIVE BOOK INCOME PROFILE**

0076301

EXHIBIT 2

MN 054694

JOINT EXHIBIT 16

B17

CONFIDENTIAL
ATTORNEY/CLIENT
PRIVILEGED
INFORMATION
STRICTLY PRIVATE

*TRANSPORTATION & INDUSTRIAL FUNDING*     *PROJECT AIRLEASE*

| | Aircraft | Lessee |
|---|---|---|
| 26 | 727-200 | American |
| 21 | 737-200 | Delta |
| 8 | 737-200 | U.S. Air |
| 3 | DC 9-30 | U.S. Air |
| 2 | DC 10-30 | Continental |
| 2 | 727-200 | Continental |
| 1 | 747-300 | Swissair |
| 63 | Aircraft ($555MM FMV subject to $258MM debt) | |

- **Participation In Partnership With Foreign Investors Requires GE Capital To Severely Limit Involvement With Aircraft**

  **All Operations, Accounting and Decision-Making Activities Involving Aircraft Must be Undertaken Outside the United States**

  - Accounting/Operations -- U.K./Ireland

  - Decision-Making -- Hong Kong

- **Participation In Partnership Eliminates Ability to Actively Manage Aircraft . . . Even Outside the U.S.**

  **No Significant Changes Can Be Made To Aircraft or Leases (*e.g.* Re-engining or Lease Workouts) Prior To Partnership Unwind In 2000 or Removal of Aircraft from Partnership**

**STRUCTURE SIGNIFICANTLY LIMITS OPERATIONAL FLEXIBILITY**

0076302

MN 054695

B18

CH242035



TRANSPORTATION & INDUSTRIAL FUNDING

PROJECT AIRLEASE

CONFIDENTIAL ATTORNEY/CLIENT PRIVILEGED INFORMATION STRICTLY PRIVATE

0076303

MN 054696

**B19**

CH242036

PROJECT AIRLEASE

TRANSPORTATION & INDUSTRIAL FUNDING

APPROVED BY:

D. J. NAYDEN

J. A. PARKE

R. DAVINO

0076304

B20

MN 054697

Trial Transcript, July 21, 2004, pp. 107-111

8    CROSS EXAMINATION

9    BY MR. HIGGINS:

10    Q.  Mr. O'Reilly, do you recall your deposition?

11    A.  I'm sorry?

12    Q.  You recall your deposition last year?

13    A.  Yes.

14    Q.  All right.  When you, this is the, my understanding

15    is that Joint Exhibit 16 is the pitch document, is that

16    correct?

17    A.  I believe so, yes.

18    Q.  And I don't know if we discussed the term pitch

19    before; that is the term for describing a deal and how

20    it's presented?

21    A.  Yes, on all transactions we put together, in the GE

22    way we put things sideways on a page summarizing the

23    transaction and we refer to this as pitch.

24    Q.  And in the pitch, looking at a pitch, you would have

25    considered all the information on the pitch deal document,

**EXHIBIT**

**3**

2176474.1

108

1    is that correct?

2    A.  Yes.

3    Q.  And we have, we just went through, Mr. Curtin, the

4    first bullet raising 120 million; you relied on that in

5    signing the pitch document, is that correct?

6    A.  Uh huh.  (Affirmative.)

7    Q.  And you relied on the second one which is reduced

8    deferred tax liabilities?

9    A.  Yes.

10   Q.  All right.  And you would have relied on the enhanced

11   cash economic benefit item, whatever that is?

12   A.  Uh huh.  (Affirmative.)

13   Q.  And the fourth -- the last one, not the fourth one,

14   the foreign investors increased tax risks, you relied on

15   that bullet, you would, whatever it meant to you?

16   A.  Significantly it limits operational flexibility, yes.

17   Q.  So the redacted bullet, you would have relied on that

18   as well, isn't that correct?

19   A.  Sure.

20       MR. HIGGINS:  Your Honor, government renews its

2176474.1

B22

21    motion to remove this redaction. It's clear that the

22    witness has testified about why he approved the deal and

23    he's just testified about that he relied on this redacted

24    information and that the document in the government's

25    view, the redacted information has been put in issue by

109

1    the plaintiff and therefore should be revealed to the

2    defendant.

3        MR. CURTIN: Your Honor, if I may address that?

4    I think we've already argued this before and clearly, the

5    court has made a decision here. All this witness has said

6    is this is the document that he approved. It does contain

7    a piece that has legal advice. He obviously will answer

8    the questions truthfully in saying, sure, if it was on

9    there I would have taken that into consideration but that

10    doesn't mean he is waiving that at all. He's just

11    answering these questions. He's not in any way

12    communicating or responding to Mr. Higgins by disclosing

13    the communications from the lawyers. Indeed the court has

14    said that's privileged. He's just saying that he signed

15    this approval piece and he is not telling Mr. Higgins what

16    is in that, that communication. I think to say that now

2176474.1

B23

17    that I've asked him and he said he read this and relied on

18    it, is what he's already argued here about this piece.

19          MR. HIGGINS:  That's fine, thank you, Your

20    Honor.  And I refer to the substitute ruling by the court.

21    On page, page four of the, well, the paragraph begins on

22    page three of the substitute ruling dated July 16, says

23    TIFD has produced documents responsive to government's --

24    parts of the document reflect legal advice or the seeking

25    of legal advice.  There's a footnote, I don't think it

## 110

1     matters, deal with -- the next sentence reads it has not

2     argued that it acted on the advice of counsel, it meaning

3     TIFD.  I think that's now at issue.  The witness has

4     stated that, yes -- if this redacted portion is advice of

5     counsel, the witness clearly has stated, yes, I acted on

6     the advice of counsel.  So I think that's different.  We

7     moved beyond Friday.  We now have testimony and I

8     understand that the context of the original, of the

9     opinion but now we've moved on beyond that.  It's a joint

10    exhibit, it's in evidence and the government requests that

11    it be revealed to us.

12          THE COURT:  Well, I'm going to deny the motion.

2176474.1

13    I think you're reading that opinion too broadly.  It's not

14    enough simply to say I received advice from my lawyer and

15    I relied upon that advice.  There has to be some

16    unfairness and some indication, for example, my lawyer

17    advised me A B C and I relied upon that advice from my

18    lawyer.  That hasn't happened here.  The witness has not,

19    nor has the plaintiff, set forth in any way reliance on

20    any specific advice of counsel reliance or disclosure of

21    some but not all of the advice of counsel, and this is

22    simply at this point -- you haven't done anything by

23    eliciting the answer that you just elicited other than

24    having acknowledgement that lawyers were involved here and

25    that the clients listened to the lawyers.  That happens in

111

1    every single commercial transaction and many other

2    transactions, and you're not going to get a waiver simply

3    by acknowledging that a lawyer provided some advice

4    without disclosure of what that advice is.

5         So I understand your argument but I think you're

6    misreading the opinion on the privilege issues that were

7    issued earlier and I don't believe that there's been a

8    waiver here.

2176474.1

**B25**

# TIFD III-E INC. v. United States
## Documents on Plaintiff's Litigation Privilege Log Contested By the Government

| Priv. Log No. | Date | Author | Addressee | Persons Copied | Description from Privilege Log | Beginning Bates-number | Ending Bates-number | Basis for Withholding |
|---|---|---|---|---|---|---|---|---|
| 906 | 12/16/1994 | King & Spalding | GE Capital Corporation (Richard D'Avino, Esq.) TIFD III-E INC. (Brian A. Rogol) | James M. Kalashian, Esq (GECC) | Legal opinion of outside counsel concerning federal income tax | P000619 | P000710 | ACP |

| Date of Government's Letter | Government's Contention | Plaintiff's Response |
|---|---|---|
| 1/7/2003 | Category II: The document has been withheld in its entirety. While some redactions on grounds of privilege may be appropriate, underlying factual information or business advice is not within the scope of communications protected by the attorney-client privilege or the attorney work product doctrine. Plaintiff may produce the document with or without redaction. The government reserves the right to challenge any redaction. | This document was properly withheld as privileged in its entirety. |

*(handwritten: 9 1 PAGES)*

| Priv. Log No. | Date | Author | Addressee | Persons Copied | Description from Privilege Log | Beginning Bates-number | Ending Bates-number | Basis for Withholding |
|---|---|---|---|---|---|---|---|---|
| 907 | 12/16/1994 | King & Spalding | GE Capital Corporation (Richard D'Avino, Esq.) TIFD III-E INC. (Brian A. Rogol) | James M. Kalashian, Esq (GECC) | Legal opinion of outside counsel concerning federal income tax | P000711 | P000723 | ACP |

| Date of Government's Letter | Government's Contention | Plaintiff's Response |
|---|---|---|
| 1/7/2003 | Category II: The document has been withheld in its entirety. While some redactions on grounds of privilege may be appropriate, underlying factual information or business advice is not within the scope of communications protected by the attorney-client privilege or the attorney work product doctrine. Plaintiff may produce the document with or without redaction. The government reserves the right to challenge any redaction. | This document was properly withheld as privileged in its entirety. |

*(handwritten: 12 PAGES)*

EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TIFD III-E INC.,THE TAX MATTERS )
PARTNER OF CASTLE HARBOUR-I )
LIMITED-LIABILITY COMPANY, )
 )
　　　　　　Plaintiff, )
 )　　　　CIVIL ACTION NOS.
　　v. )　　　　3:01CV1839 (SRU) (lead)
 )　　　　3:01CV1840 (SRU)
UNITED STATES OF AMERICA, )
 )
　　　　　　Defendant. )

## PROPOSED JUDGMENT

1.　　　For the reasons set forth in the Second Circuit's decision, *TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006), *rev'g and remanding*, 342 F. Supp. 2d. 94 (D. Conn. 2004), and the recent opinion of this Court regarding § 704(e), 26 U.S.C., with respect to the 1993 through 1998 tax years of Castle Harbour-I, Limited-Liability Company, the Court determines that--

　　　The reallocations of Castle Harbour's ordinary income for each year, 1993 through 1998, determined by the Internal Revenue Service for the reason that no valid partnership existed among TIFD III-E, Inc., TIFD III-M, Inc., ING Bank and Rabo Bank, as set forth in the Notices of Final Partnership Administrative Adjustment for these years, are sustained; and

2.　　　For the taxable years 1997 and 1998, the accuracy-related penalty is applicable to any underpayments of tax by the partners in Castle Harbour-I, Limited-Liability Company, attributable to the reallocations of Castle Harbour's ordinary income due to—

EXHIBIT

tabbies®

5
_____

**B27**

2179127.1

      a)      Negligence under Section 6662(b)(1), or

      b)      Substantial understatement of income tax under Section 6662(b)(2).

3.     Castle Harbour-I, Limited-Liability Company has not established reasonable cause or good faith under Section 6664(c) for any such underpayments of tax.

4.     Except as stated above, plaintiff's consolidated civil actions are dismissed with prejudice. Costs to the defendant.


Dated at Bridgeport, Connecticut, this _____ day of _____ 2007.


                         _____

                         Stefan R. Underhill
                         United States District Judge

Trial Transcript, July 23, 2004, pp. 454-55 (Dennis Nayden)

454

1    Q.  Just very quickly, I won't belabor this, would you

2    look in the binder in front of you?  There is an exhibit

3    that is J 16, and I would just ask if you could tell the

4    court in looking at that -- do you have that?

5    A.  A second --

6    Q.  Take a look at it and I'd ask you, Mr. Nayden, do you

7    see your signature on there?

8    A.  Yes, I do.

9    Q.  All right.  And is that the approval you signed on

10   this transaction?

11   A.  Yes, it is.

12   Q.  All right.  In approving this transaction, first of

13   all, as you got to the point of approving it, did you rely

14   on your deal team to provide you with information?

15   A.  Absolutely.  Whether it was this deal or the hundreds

16   of other deals that I would review on an annual basis, the

17   businesses themselves are charged with underwriting,

18   reviewing all of the issues and then presenting a summary,

19   if you will, of the proposed transaction, and also charged

20   with vetting all the issues relating to any given

EXHIBIT

6

2195500.1

B29

21    decision. So this, this transaction from a process point

22    of view would have been entirely comparable with the

23    processes of the average company which are quite rigorous

24    and detailed, and we would have reviewed and vetted all

25    dimensions of the business so the business proposition,

455

1    its rationale, what it was addressing, the financial

2    characteristics of it, the tax characteristics of it, the

3    legal charactertics of it, and that would be the principal

4    charge of the deal team and the business leader reporting

5    to me.

6        My job would be to, one, listen to the proposal. My

7    job together with my team, the corporate staff, would be

8    to ask appropriate questions to make sure I understood

9    what was being discussed, and then it was my job to sign

10    off on the transaction to give the business authority to

11    proceed.

2195500.1

Trial Transcript, July 26, 2004, pp. 540-41 (Diarmud Hyde)

22    BY MR. DESMOND:

23    Q.  Mr. Hyde, did Castle Harbour file its United States

24    income tax returns?

25    A.  I'm informed it did, 10-65.

541

1    Q.  What was your role, if any, in the preparation of

2    those returns?

3    A.  The returns were prepared by KPMG and the data for

4    the returns were provided by GECAS Limited and I would

5    review those returns.

6    Q.  Going back, we were talking moments ago about the

7    financial statements; did KPMG have any involvement in the

8    financial statements you discussed a moment ago?

9    A.  KPMG had involvement in the preparation of the

10    financial statements.

11    Q.  And they also prepared the tax returns you said?

12    A.  Yes.

13    Q.  And what about CHLI, did CHLI file financial

14    statements or -- I'm sorry, income tax returns, Mr. Hyde?

15    A.  It did, annual 1120, annual return.

16    Q.  Did Castle Harbour itself, the company, pay United

2195500.1

**B31**

17    States income tax?

18    A.  No.

19    Q.  Why is that?

20    A.  I'm not an expert in U. S. taxation but as I

21    understand it, each of the parties are responsible for

22    their own share of the partnership for U. S. tax returns.

**B32**

Trial Transcript, July 26, 2004, p. 660 (Chris Tewell)

660

1   Q.  All right.  Are you an accountant?

2   A.  No.

3   Q.  Were there others who reviewed these financial

4   statements -- in addition to you?

5   A.  Yes, people at GECAS as part of the advisory services

6   they would do the accounting, they would have some of the

7   back-up records.

8   Q.  All right, and in your position as general manager,

9   were you given the opportunity to review tax returns?

10  A.  Yes.

11  Q.  And did you do so?

12  A.  I did.

13  Q.  Are you a tax person?

14  A.  No.

2195500.1

Trial Transcript, July 22, 2004, pp. 407-08, 424 (Eric Dull)

8    BY MR. HIGGINS:

9    Q.  Mr. Dull, you didn't, I didn't hear testimony on

10   direct about federal income tax returns, did you have a

11   role in the reviewing of the income tax returns filed by

12   Castle Harbour, LLC?

13   A.  No, I did not.

14   Q.  Who reviewed those?

15   A.  I believe general manager would have.

16   Q.  Okay.  And the general manager, the first general

17   manager was Mr. Tewell?

18   A.  Actually, I'm sorry, for which entity?

19   Q.  The LLC, the ten 65s that were filed?

20   A.  I assume it would have been Mr. Tewell, if there were

21   forms to be filed.

22   Q.  Do you know how the income was allocated on the

23   federal income tax returns?

24   A.  My understanding is that the income would have

25   followed the allocation of both profits and losses.

**B34**                                              2195500.1

408

1    Q.  So 98/2 percent?

2    A.  Correct.

3    Q.  But your testimony is you didn't review them so you

4    don't have personal knowledge of the federal income tax

5    returns, is that correct?

6    A.  That is correct.

        *       *       *       *       *

424

4    Q.  Now, take a look, Mr. Dull, at Defendant's

5    Exhibit 103 which has already been admitted into evidence?

6    A.  I'm sorry, 103?

7    Q.  103, yes.  Have you seen this document before,

8    Mr. Dull?

9    A.  I don't think so.

10    Q.  Did you have contact with the KPMG in London that was

11    doing the financial statements?  Sorry?

12    A.  No, I didn't.

13    Q.  Communications, there was obviously this

14    communication from Mr. Kalashian; who's Mr. Kalashian?  In

15    1993 what was his role, do you recall?

16    A.   He's tax counsel.

17    Q.   Was he a tax counsel for Castle Harbour?  What was

18    his role in the closing?

19    A.   He was supporting the deal and providing advice to

20    the deal team.

2195500.1

**B36**

Trial Transcript, July 21, 2004, pp. 111-114 (Robert O'Reilly)

10    BY MR. HIGGINS:

   11    Q.   Mr. O'Reilly, did you -- you stated I believe in your

   12    testimony earlier that you weren't familiar with the

   13    details of the Castle Harbour deal?

   14    A.   Correct.

   15    Q.   So you were, you were not aware of the, of any

   16    requirement to retain in liquid assets the amount, certain

   17    of the amounts of the money that the Dutch banks

   18    contributed?

   19    A.   No, I don't -- that detail I was not, I don't

   20    remember.

   21    Q.   All right.  Do you remember the contribution by GECC

   22    of 240 million dollars to Castle Harbour?

   23    A.   I don't remember that but in reading these it says

   24    it.

   25    Q.   But you don't remember it?

                                    112

   1    A.   I don't remember it.  I don't remember the particular

   2    structure other than some of the requirements, the

   3    operational requirements that we talked about before.

   4    Q.   You don't remember the, anything about the

2195500.1

**B37**

5    liquidation rights of the Dutch banks within the operating

6    agreement?

7    A.  I do not.

8    Q.  You never read the operating agreement, did you?

9    A.  I don't believe I did.

10   Q.  And you never read the operating manual?

11   A.  I don't believe I would have, no.

12   Q.  You never reviewed, you weren't aware of the

13   repayment schedule to the Dutch banks as part of the deal?

14   A.  No.

15   Q.  You need to verbalize, that's no?

16   A.  No, I'm sorry.

17   Q.  Thank you.  Were you aware of the source of the

18   income to Castle Harbour?

19   A.  I'm not sure I know exactly what you're asking.

20   Q.  Okay.  Were you aware whether Castle Harbour had any

21   income during its existence?

22   A.  No, I would not, I would have been focused on the

23   income as outlined on this page.

24   Q.  On Joint Exhibit 10?

25   A.  To GE Capital --

2195500.1

**B38**

113

1   A.   The specific flows of cash within that transaction, I

2   would not have been, I would not have been --

3   Q.   So you wouldn't have been aware how predictable or

4   unpredictable the cashflows would have been?

5   A.   Not particularly.

6   Q.   Do you know what, you didn't know about the expense,

7   what expenses Castle Harbour had during its operation?

8   A.   I do not.

9   Q.   You didn't have any knowledge about the need for

10   Castle Harbour itself to have any liquidity?

11   A.   I did not.

12   Q.   You weren't aware of the expenses of Castle Harbour

13   beyond the -- at all or --

14   A.   Not in any specific -- not with any specificity, no.

15   Q.   Were you aware of the nine million dollar fee to

16   Babcock & Brown?

17   A.   In reading this, the numbers here, I knew that we

18   paid a fee to Babcock and I knew what it was at that point

19   in time.

20   Q.   You aren't aware of any accounting that went on

2195500.1

**B39**

21    within the Castle Harbour, the capital accounts and how

22    they were formulated?

23    A.  No, I was not.

24    Q.  And you weren't aware of their income tax returns,

25    preparations?

114

1    A.  No.

2    Q.  Castle Harbour?

3    A.  No.

4    Q.  You didn't participate in discussions with the Dutch

5    banks about in particular their involvement, did you?

6    A.  I did not.

7    Q.  And you haven't read the Dutch banks' depositions for

8    this case?

9    A.  I have not.

10    Q.  Let me go back to Plaintiff's Exhibit, Exhibit 138.

11    Could you -- okay.  Do you have that?

12    A.  Yes.

13    Q.  Okay.  Now, at the time you were appointed to the

14    position described in Exhibit 138, there was no details

15    about Castle Harbour at that point, the transaction

16    itself?

2195500.1

**B40**

17   A.  No.

18   Q.  Just turn to Exhibit 159, same book.  You have that?

19   A.  Yes.

20   Q.  In 159, just to make the record clear, you didn't,

21   you didn't speak with the analyst whose names are

22   identified on the first page?

23   A.  I did not, or have no recollection of speaking to

24   them.

2195500.1

Trial Transcript, July 21, 2004, p. 170-01 (Robert Lewis)

Q.  Now, in this Castle Harbour transaction, did you

15    participate in the negotiations across the table from any

16    potential investors?

17    A.  No, I did not.

18    Q.  All right.  Did you travel to any of the closings,

19    either of the two closings that occurred in this matter?

20    A.  No.

21    Q.  Now, when you -- did you in this particular

22    transaction, after it was agreed upon and agreements were

23    signed, did you go back and read those agreements?

24    A.  No, I did not.

25    Q.  All right, in transactions that you have in the past

171

1    and let's go back to this time, as a regular practice, do

2    you, did you go back and read the deal documents, if you

3    will, after you approved and recommended the transaction?

4    A.  No, I did, not as a leader of the business, I did

5    not -- in my earlier days, certainly, but it's been a long

6    time since I had done that kind of work.

2195500.1