**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

TIFD III-E INC., the Tax Matters Partner of
CASTLE HARBOUR-I LIMITED-LIABILITY
COMPANY,

               Plaintiff,

       v.

UNITED STATES OF AMERICA,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case Nos.:  3:01-CV-01839 (SRU) (lead case)
              3:01-CV-01840 (SRU)

**PLAINTIFF'S BRIEF ON REMAND REGARDING**
**SECTION 704(e) OF INTERNAL REVENUE CODE**

MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C.  20036
Telephone:  (202) 775-1880

KING & SPALDING
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone:  (404) 572-3566

CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, Connecticut 06509-1950
Telephone:  (203) 777-5501

Attorneys for Plaintiff, TIFD III-E INC.

## TABLE OF CONTENTS

Introduction .................................................................................................................. 1

Summary of Argument ................................................................................................. 5

Argument ..................................................................................................................... 6

    I.    The Banks' Interests Satisfy All Requirements of Section 704(e)(1) .......... 6
        A.    Capital was a material income-producing factor
               in Castle Harbour ..................................................................... 7
        B.    The Banks' interests were "capital interests" ................................. 8
        C.    The Banks were the "real owners" of their interests .................... 14
        D.    Section 704(e)(1) is not limited to "family partnerships" ............. 16
        E.    Conclusion ................................................................................ 18

    II.    The Banks' Interests Fall Squarely Within the Purpose and Intent of
        Section 704(e)(1) ..................................................................................... 18
        A.    Congress enacted section 704(e)(1) to establish an objective
               standard for determining partner status .......................................... 18
        B.    Castle Harbour is a partnership for purposes of
               section 704(e)(1) ...................................................................... 27

    III.    The Second Circuit's Decision Does Not Preclude Application of
        Section 704(e)(1) ..................................................................................... 30
        A.    The Second Circuit's *Culbertson* holding is irrelevant to the
               application of section 704(e)(1) ...................................................... 30
        B.    The Second Circuit did not hold that the Banks'
               interests were debt ................................................................... 33
        C.    The Second Circuit's characterization of the Banks'
               interests as debt-like does not preclude application of
               section 704(e)(1) ...................................................................... 38

    IV.    Treating the Banks as Partners Under Section 704(e)(1) is Consistent
        with Established Tax Principles .............................................................. 39
        A.    Established precedent recognizes preferred equity ..................... 39
        B.    Section 704(e)(1) requires rejection of the Government's
               effort to create a "twilight zone" ................................................. 43

    V.    Conclusion .............................................................................................. 46

# TABLE OF AUTHORITIES

## CASES

*Bateman v. United States*, 490 F.2d 549 (9th Cir. 1973) ................................................. 32

*Carriage Square, Inc. v. Commissioner*, 69 T.C. 119 (1977) ........................................ 17

*Collazos v. United States*, 368 F.3d 190 (2d Cir. 2004) ................................................ 16

*Commissioner v. O.P.P. Holding Corp.*, 76 F.2d 11 (2d Cir. 1935) ........................... 34, 39

*Commissioner v. Tower*, 327 U.S. 280 (1946) .......................................................... 19, 20

*Conn. National Bank v. Germain*, 503 U.S. 249 (1992) ................................................ 18

*Culbertson v. Commissioner*, 337 U.S. 733 (1949) ............................................... *passim*

*Culbertson v. Commissioner*, 194 F.2d 581 (5th Cir. 1952), *rev'g*, 9 T.C.M.
    (CCH) 647 (1950) ....................................................................................................... 21

*Evans v. Commissioner*, 447 F.2d 547 (7th Cir. 1971), *aff'g*, 54 T.C. 40 (1970),
    *acq.*, 1978-2 C.B. 1 ................................................................................................... 17

*Forman v. Commissioner*, 199 F.2d 881 (9th Cir. 1952) ............................................... 32

*Gottlieb v. Carnival Corp.*, 436 F.3d 335 (2d Cir. 2006) ............................................. 18

*Grapevine Imports Ltd. v. United States*, 71 Fed. Cl. 324 (Fed. Cl. 2006) ................... 16

*Greene v. United States*, 79 F.3d 1348 (2d Cir. 1996) ................................................. 18

*Helvering v. Clifford*, 309 U.S. 331 (1940) ................................................................. 21

*Jewel Tea Co. Inc. v. United States*, 90 F.2d 451 (2d Cir. 1937) ............................... 33, 39

*Johnston v. Commissioner*, 69 T.C.M. (CCH) 2283 (1995) ............................................ 8

*Lucas v. Earl*, 281 U.S. 111 (1930) ............................................................................. 21

*Lusthaus v. Commissioner*, 327 U.S. 293 (1946) .......................................................... 20

*Madorin v. Commissioner*, 84 T.C. 667 (1985) ............................................................. 17

*Mark IV Pictures, Inc. v. Commissioner*, 60 T.C.M. (CCH) 1171 (1990), *aff'd*,
    969 F.2d 669 (8th Cir. 1992) ....................................................................................... 8

iii

*Morton v. Commissioner*, 46 T.C. 723 (1966)............................................................................32

*Pa. Department of Corrections v. Yeskey*, 524 U.S. 206 (1998) ..............................................16

*Pflugradt v. United States*, 310 F.2d 412 (7th Cir. 1962)...........................................................32

*Poggetto v. Commissioner*, 306 F.2d 76 (9th Cir. 1962) ............................................................32

*Smith v. Commissioner*, 32 T.C. 1261 (1959)......................................................................30, 31

*TIFD III-E INC. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004) ..............................*passim*

*TIFD III-E INC. v. United States*, 459 F.3d 220 (2d Cir. 2006) ...........................................*passim*

*Tiberti v. Commissioner*, 21 T.C.M. (CCH) 961 (1962)...........................................................29, 30

*Wind Energy Technology Associates III v. Commissioner*, 94 T.C. 787 (1990) ........................16

## STATUTES AND REGULATIONS

I.R.C. § 301  ................................................................................................................................46

I.R.C. § 351(g)(2), (3)................................................................................................................41

I.R.C. § 453 ................................................................................................................................46

I.R.C. § 701 ................................................................................................................................46

I.R.C. § 702 ................................................................................................................................46

I.R.C. § 704(e) .....................................................................................................................*passim*

I.R.C. § 704(e)(2)-(3) (1954) .....................................................................................................23

I.R.C. § 707(c) ..............................................................................................................................9

I.R.C. § 1271 ..............................................................................................................................46

I.R.C. § 1288 ..............................................................................................................................46

I.R.C. § 1446  .............................................................................................................................46

I.R.C. § 3797(a)(2) (1939) ...................................................................................................23, 25

I.R.C. § 7701(a)(1)......................................................................................................................16

I.R.C. § 7801(b)(2) .................................................................................................5

I.R.C. § 7806(b) ...................................................................................................17

Treas. Reg. § 1.305-5(d) .......................................................................................41

Treas. Reg. § 1.704-1(b)(2)(iv)(g)(1)-(3) .........................................................35, 36

Treas. Reg. § 1.704-1(e)(1)(i)(iii)(iv)(v), (2)(v)(x) .......................................... *passim*

Treas. Reg. § 1.707-1(c) ..........................................................................................9

Treas. Reg. § 25.2701-3(d) ...................................................................................42

Treas. Reg. § 301.7701-2 .......................................................................................45

Treas. Reg. § 301.7701-3(a)(g)(1)(i)(ii) ............................................................40, 45

Treas. Reg. § 301.7701-4(c)(1), (2) ...................................................................36, 44

## LEGISLATIVE MATERIALS

97 Cong. Rec. 12,146 (1951) ................................................................................24

97 Cong. Rec. 12,147 (1951) ................................................................................19

H.R. Rep. No. 72-708, at 53 (1932) ...................................................................43, 44

H.R. Rep. No. 82-586, at 32 (1951) ...................................................................22-26

H.R. Rep. No. 105-148, at 471, 473-474 (1997) .....................................................41

H.R. Rep. No. 105-220, at 543-44 (1997) ..............................................................41

Revenue Act of 1951, Pub. L. No. 82-183, § 340(a)(c), 65 Stat. 452, 511 (1951) .................23, 31

S. Rep. No. 82-781, at 39 (1951) .....................................................................22, 25, 26

## ADMINISTRATIVE MATERIALS

Market Segment Specialization Program Guideline, 2002 WL 32770029 (I.R.S.) ......................17

F.S.A. 829, 1992 FSA LEXIS 284 (May 22, 1992) .......................................................40

G.C.M. 36,960 (Dec. 20, 1976) ...........................................................................17

T.A.M. 200418008 (Dec. 29, 2003)..................................................................................37

T.A.M. 200512020 (Aug. 20, 2004) ...............................................................................37

T.A.M. 200650017 (Dec. 15, 2006)................................................................................45

Rev. Proc. 93-27, 1993-2 C.B. 343 ..................................................................................8

Rev. Proc. 2003-84, 2003-2 C.B. 1159 ..........................................................................42

Rev. Rul. 78-142, 1978-1 C.B. 112 ................................................................................40

Rev. Rul. 90-27, 1990-1 C.B. 50 ..............................................................................34, 40

T.D. 8080 (March 21, 1986) ...........................................................................................44

## MISCELLANEOUS

Donald Korb, Remarks at the 2007 University of Southern California Tax
    Institute: What a Difference Two Years Makes (Jan. 23, 2007), *in* Tax Notes
    Today, Jan. 24, 2007, LEXIS 2007 TNT 16-65 ........................................................5

Israel Packel, *The Next Inning of Family Partnerships,* 100 U. Pa. L. Rev. 153
    (1951)......................................................................................................................25

Michael I. Saltzman, *IRS Practice and Procedure*, ¶ 3.04[5][a] (Rev. 2d Ed.
    2006) ......................................................................................................................17

Robert K. Lifton, *The Family Partnership: Here We Go Again,* 7 Tax L. Rev. 461
    (1952)..........................................................................................................16, 22, 26

Pursuant to this Court's order at the hearing on this matter on November 15, 2006, Plaintiff hereby submits its opening brief regarding the application of section 704(e) of the Internal Revenue Code (the "Code" or "I.R.C."). Proposed findings of fact and conclusions of law are submitted herewith.

### Introduction

This case is before this Court on remand from the United States Court of Appeals for the Second Circuit. *TIFD III-E INC. v. United States*, 459 F.3d 220 (2d Cir. 2006). Plaintiff brought this case under section 6226 of the Code to challenge Final Partnership Administrative Adjustments ("FPAAs") issued by the Internal Revenue Service to Castle Harbour-I Limited-Liability Company ("Castle Harbour" or the "Partnership") for the 1993-1998 tax years.

In 1993, TIFD III-E INC. and TIFD III-M INC., both subsidiaries of the General Electric Capital Corporation ("GECC"), and ING Bank N.V. and Rabo Merchant Bank N.V. (collectively, the "Banks") entered into the Partnership. Under the terms of the Partnership's Operating Agreement, 98% of the Partnership's profits ("Operating Income") was allocated to the Banks. Under section 704(c) of the Code and the regulations thereunder, the allocation of Operating Income to the Banks resulted in the allocation of a larger amount of taxable income to the Banks. Because the Banks were not subject to U.S. federal income taxes on this income, the IRS challenged the tax returns filed by the Partnership and sought to reallocate taxable income from the Banks to TIFD III-E and TIFD III-M.

After an eight-day bench trial, this Court upheld the validity of the allocations to the Banks. *TIFD III-E INC. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004). This

1

Court's opinion summarizes the trial evidence concerning how the Castle Harbour transaction evolved, why it was done, how the decision was made to do it, and how the Partnership actually operated.

Plaintiff's evidence at trial was presented primarily through eight fact witnesses.[1] The Court was introduced to the Castle Harbour facts by the testimony of Bob O'Reilly. Mr. O'Reilly explained in detail the adverse business environment that prevailed in the airline and aircraft leasing businesses in the early 1990s, how GECC reacted internally to the adverse business developments, and how the Castle Harbour transaction resulted from management's decision to implement a business strategy of attracting outside investors to raise equity capital and to show liquidity in the aircraft leasing business without violating the company's negative pledge or debt-to-equity ratio requirement. Mr. O'Reilly explained how GECC sought external advice through eight requests for proposals and how GECC eventually chose to work with Babcock & Brown to address its business problems. He explained the business reasons for his recommendation that his superiors approve the transaction. Mr. O'Reilly's testimony was squarely supported and corroborated by many exhibits and by the testimony of the other GECC witnesses who testified after him, including Denis Nayden. Mr. Nayden, the President and Chief Operating Officer of GECC at the time, was the senior GECC official responsible for reviewing and approving the transaction. He explained the business reasons for his

---

[1]  Plaintiff's fact witnesses were:  Robert O'Reilly, Robert Lewis, Eric Dull, James Parke, Diarmuid Hyde, Chris Tewell, Daniel Brickman, and Denis Nayden.

decision. The Government did not ask Mr. Nayden a single question on cross-examination.[2] *See* Tr. at 459:8 (7/23/04, Nayden).

The Government's case consisted of one fact witness, one accounting expert and excerpts of three depositions. The Government's fact witness (John Fahy) and the deposition testimony supported Plaintiff's case more than they did the Government's case. The Government's accounting expert, John Lacey, despite last minute additions and changes to his opinions, added nothing to its case.

Based on the evidence presented, this Court held that the formation of Castle Harbour was not a sham, finding that the formation of the Partnership had economic substance and was motivated by substantial non-tax business purposes. *Id.* at 111. This Court also found that the Banks held equity interests in Castle Harbour and concluded that they were partners for federal income tax purposes. *Id.* at 117. Finally, this Court held that the allocation of Operating Income to the Banks had "substantial economic effect" within the meaning of section 704(b) of the Code. *Id.* at 120-21.

On appeal, the Government did not challenge this Court's finding that the formation of Castle Harbour was not a sham. *See* Brief for Defendant-Appellant ("Appellant Br.") at 35 n.14, *TIFD III-E INC. v. United States*, 459 F.3d 220 (2d Cir. 2006) (No. 05-0064). Instead, the Government made only two principal arguments: that (1) regardless of whether the Banks were lenders, they were not "partners" for federal income tax purposes, and (2) the allocations of income to the Banks did not have substantial economic effect within the meaning of section 704(b) of the Code. *See*

---

2   The Second Circuit did not question this Court's determination that Plaintiff's fact witnesses were credible.

Appellant Br. at 30-32. While emphasizing what it viewed as the "debt-like" characteristics of the Banks' interests, the Government did not challenge this Court's conclusion that the Banks' interests were equity rather than debt for federal income tax purposes. *See, e.g., id.* at 31 (Banks' interests "operated in many respects like debt"); *id.* at 49 (Banks' interests "worked like debt"); *id.* at 53 (Banks "may or may not" have been lenders).

Consistent with the Government's argument on appeal, the Second Circuit reversed this Court's decision based on a novel interpretation of *Culbertson v. Commissioner*, 337 U.S. 733 (1949). Specifically, the Second Circuit held that the Banks were not properly classified as "partners" under *Culbertson* because their interests were too much "in the nature of a secured loan," *TIFD III-E*, 459 F.3d at 241, for them to be recognized as "bona fide equity participants" in the Partnership, *id.* at 225.[3] It remanded this case for this Court to consider the Plaintiff's alternative argument that section 704(e)(1) of the Code requires recognition of the Banks as partners. *Id.* at 241 n.19; *see* Brief for Plaintiff-Appellee ("Appellee Br.") at 63-65, *TIFD III-E INC. v. United States*, 459 F.3d 220 (2d Cir. 2006) (No. 05-0064); Appellant Reply Br. at 14-15.

Although the Second Circuit discussed debt/equity factors in its *Culbertson* analysis, it did not hold that the Banks' interests were debt for federal income tax

---

[3]   Plaintiff filed a petition for rehearing identifying certain factual misunderstandings contained in the Second Circuit's opinion. The petition for rehearing was denied on October 6, 2006.

purposes.[4]  Apparently the Government agrees.  Describing the Second Circuit decision, the Chief Counsel of the IRS has stated:

> Although some have asserted that the Castle Harbour decision was a statement on the long standing debt/equity issue, the court was very careful in its statements.  The court did not state that the interest is debt, but rather that the banks were more like secured creditors than equity partners.  The difference is subtle but important, as it does not stand for any position on the debt/equity issue.

Donald Korb, What a Difference Two Years Makes, Remarks at the 2007 University of Southern California Tax Institute (Jan. 23, 2007), *in* Tax Notes Today, Jan. 24, 2007, LEXIS, 2007 TNT 16-65.[5]  Indeed, had the Second Circuit held that the Banks were lenders, *Culbertson* would have been irrelevant and the remand under section 704(e) would have been pointless.

In its pre-trial brief to this Court, Plaintiff explained its position that section 704(e)(1) applies and that it requires that the Banks be respected as partners.  Plaintiff's Trial Brief at 55-56, 71.  The parties have agreed that there is no need for this Court to take further testimony or otherwise reopen the record to address the section 704(e)(1) issue.

<u>**Summary of Argument**</u>

Section 704(e)(1) is unambiguous.  It mandates that the owner of a capital interest in a partnership be recognized as a partner if capital is a material income-producing factor in the partnership's business.  The Banks' interests in Castle Harbour satisfy all the

---

[4]  In addition, the Court of Appeals did not address whether the allocation of income to the Banks was valid under section 704(b).  *See TIFD III-E*, 459 F.3d at 224 n.1.

[5]  The Chief Counsel is the "chief law officer" of the IRS.  I.R.C. § 7801(b)(2).

5

requirements for application of section 704(e)(1) set forth in the Code and the regulations thereunder.

Congress enacted the predecessor to section 704(e)(1) in 1951 in response to the considerable confusion that had arisen because of the Supreme Court's intent-based approach to determining partnership status in *Culbertson* and other cases. In enacting the statute, Congress sought to provide an objective, administrable standard for determining partner status. Although Congress enacted the predecessor to section 704(e)(1) in response to *Culbertson*, which was a "family partnership" case, the provision applies to all capital-intensive partnerships, including Castle Harbour. Thus, for partnerships in which capital is a material income-producing factor, section 704(e)(1) provides a stand-alone alternative to the *Culbertson* intent test and any judicial interpretation that might seek to limit the type of capital interests that are respected as partnership interests.

Application of section 704(e)(1) establishes that the Banks were partners in Castle Harbour.

## Argument

### I.    The Banks' Interests Satisfy All Requirements of Section 704(e)(1)

The language of section 704(e)(1) is clear and unambiguous: "A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person."[6] Each Bank was a partner under section 704(e)(1), because (1) capital was a "material income-producing factor" in the Partnership; (2) each Bank owned a "capital interest"; and (3) each Bank

---

[6]    As used in section 704(e)(1), "this subtitle" refers to subtitle A of the Code (I.R.C. §§ 1-1563), which contains the income tax provisions of the Code.

was the "real owner" of its capital interest. *See* Treas. Reg. § 1.704-1(e)(1)-(2).

Therefore, the plain language of section 704(e)(1) requires recognition of the Banks as

partners.

### A.     Capital was a material income-producing factor in Castle Harbour

The regulations establish the standard for determining whether capital is a

material income-producing factor in a partnership for purposes of section 704(e)(1):

> Capital is a material income-producing factor if a substantial portion of the
> gross income of the business is attributable to the employment of capital in
> the business conducted by the partnership.  In general, capital is not a
> material income-producing factor where the income of the business
> consists principally of fees, commissions, or other compensation for
> personal services performed by members or employees of the partnership.
> On the other hand, capital is ordinarily a material income-producing factor
> if the operation of the business requires substantial inventories or a
> substantial investment in plant, machinery, or other equipment.

Treas. Reg. § 1.704-1(e)(1)(iv).

Castle Harbour's income consisted of income generated from its investment of

capital, primarily rental income produced by its aircraft portfolio.  At its formation,

Castle Harbour owned 63 aircraft with a gross fair market value of over $531 million.

*See* JX[7] 1 § 2.1 at 0101430, Exhibit F at 0101664-67.  The Banks and the GECC

subsidiaries together contributed additional capital of approximately $364 million.  *See*

JX 1 §§ 2.1-2.3 at 0101430-32.  Castle Harbour did not generate any material fees,

commissions or other personal services income.  Capital was the only material income-

producing factor in Castle Harbour.

---

[7]     As used herein, "JX" refers to the Joint Exhibits admitted into evidence at trial, "PX"
refers to Plaintiff's Exhibits, and "PDX" refers to Plaintiff's Demonstrative Exhibits.

**B.**     **The Banks' interests were "capital interests"**

1.     The Banks' interests come within the established meaning of the term

"capital interest." The regulations under section 704(e)(1) define the term "capital

interest":

> [A] capital interest in a partnership means an interest in the assets of the
> partnership, which is distributable to the owner of the capital interest upon
> his withdrawal from the partnership or upon liquidation of the partnership.
> The mere right to participate in the earnings and profits of a partnership is
> not a capital interest in the partnership.

Treas. Reg. § 1.704-1(e)(1)(v). *See also Johnston v. Comm'r,* 69 T.C.M. (CCH) 2283,

2286 n.5 (1995) (describing a capital interest as one which "includes the right to share in

the capital of a partnership upon liquidation"); *Mark IV Pictures, Inc. v. Comm'r,* 60

T.C.M. (CCH) 1171, 1176 (1990), *aff'd,* 969 F.2d 669, 674 (8th Cir. 1992) (applying a

"hypothetical liquidation" test to determine whether an interest is a capital interest); Rev.

Proc. 93-27, 1993-2 C.B. 343 ("A capital interest is an interest that would give the holder

a share of the proceeds if the partnership's assets were sold at fair market value and then

the proceeds were distributed in a complete liquidation of the partnership.").[8]

---

[8]    In *Johnston,* the Tax Court explained the distinction between a capital interest and a
"profits interest":

> A capital interest is to be distinguished from a profits interest. A
> capital interest is an interest that includes the right to share in the capital of
> a partnership upon liquidation. A profits interest is a right to share in the
> profits and losses of a partnership, but not to share in its capital. . . .
> Although a capital interest *may* include a right to share in the profits and
> losses of a partnership, a profits interest does not include the right to share
> in the capital of a partnership.

69 T.C.M. (CCH) at 2286 n.5 (1995) (emphasis added); *see also* Rev. Proc. 93-27,
1993-2 C.B. 343 (distinguishing between capital interests and profits interests).

8

The Banks' interests in Castle Harbour were without doubt capital interests for purposes of section 704(e)(1). Upon withdrawal from or liquidation of the Partnership, the Banks were entitled to receive a distribution of the Partnership's assets based on the positive balances, if any, in their Capital Accounts. J. Ex. 1 § 12.2(d) at 0101491-92; *TIFD III-E*, 342 F. Supp. 2d at 99. Their right to receive any partnership assets was subordinate to the claims of creditors. *See* JX 1 § 12.2(a)-(d) at 0101491-92 (all Partnership assets must be used to satisfy creditors before any distributions to partners). Therefore, from the date of their initial investment in Castle Harbour, the Banks owned capital interests, and the return of their capital investment depended on the assets held by the Partnership.

2.    The Class A Guaranteed Payment and the GECC performance guaranty have no impact on the characterization of the Banks' interests as capital interests. Under certain circumstances the Banks would have been entitled to receive a Class A Guaranteed Payment. *See* JX 1 §§ 10.8 at 0101486-90, 12.7 at 0101494-95. The Class A Guaranteed Payment has no impact on the characterization of the Banks' interests as capital interests. The Class A Guaranteed Payment did not guarantee the Banks that they would receive repayment *of* their capital; it only promised them that they would receive a minimum return *on* the amount of capital they had invested in the Partnership. JX 1 §§ 1.10 at 0101405 (definition of "Class A Guaranteed Payment"), 10.8 at 0101486-90, 12.7 at 0101494-95.[9] The Banks would receive a Class A Guaranteed Payment only if their

---

[9]    The partnership rules expressly provide for guaranteed payments on a partner's capital; thus, such payments are entirely consistent with partner status. *See* I.R.C. § 707(c); Treas. Reg. § 1.707-1(c), Example 2 (guaranteed payment used to provide partner with a minimum return).

9

Investment Account *Adjustments* (in general, a notional 8.53587% return *on* their Investment Accounts)[10] exceeded the actual net Operating Income and Disposition Gain allocated to them under the Operating Agreement.  JX 1 §§ 1.10 at 0101400, 0101405 (definition of "Class A Guaranteed Payment"), 10.8 at 0101486-90, 12.7 at 0101494-95, 14.1 at 0101499-500, 14.3 at 0101501-505; *TIFD III-E*, 342 F. Supp. 2d at 104.[11]  As a result, the Class A Guaranteed Payment did *not* equal the difference between the Banks' Capital Account balances and their Investment Account balances.  Neither the Class A Guaranteed Payment nor the Investment Account Adjustment mechanism entitled the Banks to look beyond the assets of the Partnership for return of their capital investments.

GECC's performance guaranty did not protect the Banks against loss of their capital investment.  GECC merely guaranteed that its corporate subsidiaries (TIFD III-E and TIFD III-M) and the Managers of Castle Harbour would perform their independent obligations.  *See* JX 3 §2 at 0099405 (guaranteeing "the due and punctual performance and payment by the GECC Subsidiaries (in their respective individual corporate capacities) and the Managers of all covenants, obligations and indemnities . . . to be performed or observed or paid by them" under the transaction documents).  The

---

[10]  In some cases this return could increase to 9.03587%.  *See* JX. 1 §§ 1.10 at 0101400, 0101405 (definition of "Class A Guaranteed Payment"), 10.8 at 0101486-90, 12.7 at 0101494-95.

[11]  The computation of the Class A Guaranteed Payment excluded allocations to the Banks' capital accounts of Operating Losses in excess of $3.85 million (net of previously allocated Disposition Losses under the corresponding Disposition Loss allocation tier) or Disposition Losses in excess of $2.85 million (net of previously allocated Operating Losses under the corresponding Operating Loss allocation tier).  *See TIFD III-E*, 342 F. Supp. 2d at 105-06; JX 1 §§ 1.10 at 0101405-07 (definitions of Class A Guaranteed Payment and Class A Investment Account Adjustment), 3.2 at 0101435-36.  Thus, the Class A Guaranteed Payment did not protect the Banks against the allocation of losses in excess of these amounts.

performance guaranty did not alter the fact that the Banks' underlying rights to the return of their capital on liquidation or withdrawal were limited to their positive Capital Account balances. *Cf. id.* § 3(a) at 0099405-06 (limiting indemnification of Banks to their claims under the Operating Agreement and related agreements).

The impact of the Class A Guaranteed Payment and the GECC performance guaranty on the Banks' interest in the Partnership's assets can be illustrated by considering what would have happened if, immediately after the Banks' acquisition of their interests, the value of the Partnership's assets had declined to the balance of its outstanding debt and the Partnership had liquidated, incurring $1 million of expenses in the process.[12] Under this scenario, the Partnership would have had a $1 million Operating Loss and a $659 million Disposition Loss. The Operating Loss would have been allocated 98% to the Banks and 2% to the GECC partners, and the Disposition Loss would have been allocated (i) 90% to the Banks and 10% to the GECC partners until the Banks had been allocated $2.85 million total losses (taking into account their $980,000 allocation of Operating Loss); (ii) 99% to the GECC partners and 1% to the Banks until the losses allocated to the GECC partners equaled their $541.5 million contribution; (iii) 100% to the Banks to the extent of their remaining capital account balances; and (iv) thereafter to TIFD III-E. *See TIFD III-E*, 342 F. Supp. 2d at 101-02; JX 1 §§ 3.2(c) at 0101436, 3.3(j) at 0101439. On liquidation, the Partnership would have had no assets,[13] and, after adjustment for allocations of the losses, the Banks' capital accounts would have been zero. The GECC partners would have been required to contribute a net of

---

[12]  At this value, the Partnership's assets would have gone to its creditors.

[13]  *See* JX 1 § 12.2(a) at 0101492 (all Partnership assets must be used to satisfy creditors before any distributions to partners).

11

$1,000,000 to restore their aggregate capital account deficit, which would have been used to pay the Partnership's liquidation expenses.[14]  The Banks' Investment Account balances would have been approximately $118 million (because the loss allocations would not have affected their Investment Account balances);[15] however, because of the reduction of their capital account balances to zero, the Banks would not have been entitled to any liquidating distribution from the Partnership.[16]

Thus, the Banks would have lost their capital investment of $117.5 million.  They would have been entitled to an aggregate Class A Guaranteed Payment of approximately $3.85 million, but that payment would not have come close to making them whole.  They would have suffered an overall economic loss of almost $114 million and would have had no claim for reimbursement of that loss against Castle Harbour, the GECC partners, or any other person.  The GECC partners would have been obligated to contribute funds so the Partnership could make the Class A Guaranteed Payment; had they failed to do so, the

---

[14]  *See* JX 1 § 12.3 at 0101493 (in the event of liquidation, each Interest Holder is required to restore any deficit capital account balance to zero in accordance with Treasury Regulations).

[15]  *See* JX 1 at § 1.10 at 0101406 (definition of Class A Investment Account).  Thus, contrary to the Second Circuit's understanding, *TIFD III-E*, 459 F.3d at 227, the Investment Account balances did not keep track of the minimum balance the Banks would receive on liquidation.  *See TIFD III-E*, 342 F. Supp. 2d at 105 (Banks were not assured of receiving their Investment Accounts).

[16]  This analysis is inconsistent with this Court's prior observation that the Banks' investments in Castle Harbour would have been wiped out only if the Partnership recognized losses of at least $2.8 billion.  *See TIFD III-E*, 342 F. Supp. 2d at 106. That observation did not take account of the fact that, as the Court noted elsewhere in its opinion, *id*. at 102 n.18, once TIFD III-E and TIFD III-M had been allocated $541.5 million in losses, sections 3.2(e) and 3.3(j)(v) of the Operating Agreement allocated to the Banks 100% of all losses until the Banks' capital accounts were reduced to zero.

Banks would have had a claim against GECC under the GECC performance guaranty. But their claim would have been limited to $3.85 million. *See* JX 3 §2 at 0099405 (limiting GECC's guarantee to the "performance and payment by the GECC Subsidiaries").

There are statements in the Second Circuit's opinion that, while ambiguous, could be read as inconsistent with the foregoing analysis of the GECC performance guaranty. *See, e.g., TIFD III-E*, 459 F.3d at 237 ("The banks did not need to rely on assets of Castle Harbour or the taxpayer for reimbursement. They had the guaranty of the taxpayer's far more solvent parent GECC."); *id.* (performance guaranty assured the banks they "would be repaid in full . . . from a source to which the general creditors had no access"); *id.* at 240 ("repayment of the banks was assured even in the event the partnership suffered catastrophic loss"); and *id.* ("the banks had effective priority over the general creditors of the partnership"). The Second Circuit's statements apparently resulted from a misunderstanding of some findings made by this Court.[17]

The facts are clear that if the Partnership had incurred a loss in excess of the capital invested by TIFD III-E and TIFD III-M, the Banks would have lost some or all of their capital investment and would have had no claim against either the Partnership or GECC.[18] And it is clear that the creditors of the Partnership had actual and legal priority

---

[17] For example, the Second Circuit may have interpreted this Court's statement that the Banks "were guaranteed a minimum return," *see TIFD III-E*, 342 F. Supp. 2d at 117, to mean that the Banks were guaranteed the return of their investment.

[18] The Banks understood that the GECC performance guaranty did not guarantee the repayment of their capital investment, as evidenced by the testimony of Hem Mulders, an executive of Rabo Merchant Bank who led the negotiations on behalf of Rabo. *See* Mulders Depo. at 50:15 (record citations for Messrs. Nagel and Mulders refer to their deposition transcripts, dated December 4, 2003 and December 9, 2003,

over the Banks. JX 1 § 12.2(a)-(d), 0101491-92. Under any reading of the operative

agreements, each Bank was entitled to a distribution of Partnership assets equal to its

capital account balance, which satisfies the definition of "capital interest." Thus, the

Second Circuit's statements do not affect the classification of the Banks' investments as

capital interests for purposes of section 704(e)(1).

   3.  <u>Conclusion</u>. The Banks' interests entitled them to a distribution of assets

upon their withdrawal from, or the liquidation of, the Partnership. The return of their

capital investment depended on the assets of the Partnership and was limited to their

capital account balances. Therefore, the Banks' interests were "capital interests" for

purposes of section 704(e)(1).

  **C.**  **The Banks were the "real owners" of their interests**

  The regulations under section 704(e)(1) establish the following standard for

recognition of a person as the owner of a capital interest:

> A donee or purchaser of a capital interest in a partnership is not
> recognized as a partner under the principles of section 704(e)(1) unless
> such interest is acquired in a bona fide transaction, not a mere sham for tax
> avoidance or evasion purposes, and the donee or purchaser is the real
> owner of such interest. To be recognized, a transfer must vest dominion
> and control of the partnership interest in the transferee.

Treas. Reg. § 1.704-1(e)(1)(iii).

  This Court found that the transaction by which the Banks acquired their interests

in the Partnership had non-tax business purpose and economic substance. *See TIFD III-*

*E*, 342 F. Supp. 2d at 109-13. The Second Circuit did not reverse this Court's finding on

---

respectively, portions of which were designated for trial and submitted to the court on
July 20, 2004) ("It's not a payment guarantee."); *id.* at 50:24-25 ("We didn't want to
take any risk on non-performance by any of the GE related bodies."); *id.* at 52:11-13
("Of course, we would have preferred the payment guarantee, but that was
inconceivable under this transaction structure.").

that point. *See TIFD III-E*, 459 F.3d at 231 n.11, 232. Thus, the Banks' investments in Castle Harbour occurred in a "bona fide transaction" that was "not a mere sham."

The trial evidence also establishes that the Banks possessed full dominion and control over their interests in the Partnership. The terms of the Banks' investments in the Partnership were hammered out in arm's-length negotiations over more than three weeks. Tr. at 225:24 - 226:20 (7/21/04, Brickman). They had the right to liquidate or sell their interests, subject to limited restrictions. *See* JX 1 §§ 10.2 at 0101482, 14.1 at 0101499-500, 14.3 at 0101501-505. They participated in person at annual member meetings and by telephone at quarterly manager meetings. *See, e.g.*, Tr. at 501:1 - 503:24 (7/26/04, Hyde); *see also* JX 1 § 9.2 at 0101480-82. The Partnership could not engage in many transactions without obtaining the Banks' consent, *see* JX 1 §§ 5.1(g) at 0101452, 5.4 at 0101455-59, and in fact was required to obtain their consent on numerous occasions, *see* Tr. at 287:7-14 (7/22/04, Dull cross-examination); PX 258 at 0002792-806; PX 282 at 0057159-76; PX 354 at 0024403-09; PX 357 at 0025335-39 (each PX, a waiver agreement signed by ING and Rabo).

The Partnership regularly distributed to the Banks their distributive shares of the Partnership's income. *See* Tr. at 342:2-16 (7/22/04, Dull). This fact supports the reality of the Banks' ownership of their interests. Referring to gifts of partnership interests, the section 704(e) regulations provide that "[t]he actual distribution to a donee partner of the entire amount or a major portion of his distributive share of the business income for the sole benefit and use of the donee is substantial evidence of the reality of the donee's interest." Treas. Reg. § 1.704-1(e)(2)(v).

15

In summary, the Banks acquired and exercised complete dominion and control over their interests. Therefore, they were the "real owners" of the interests for all tax purposes, including section 704(e)(1).

### D.    Section 704(e)(1) is not limited to "family partnerships"

By its terms, section 704(e)(1) applies to any "person" that owns a "capital interest" in any partnership in which capital is a "material income-producing factor." The term "person" includes a corporation or other entity. I.R.C. § 7701(a)(1). And section 704(e)(1) applies *"whether or not* such interest was derived by purchase or gift from any other person." I.R.C. § 704(e)(1) (emphasis added). Thus, neither the Code nor the regulations limits section 704(e)(1) to "family partnerships."[19]

The fact that section 704(e) appears under the "Family partnerships" heading is irrelevant to the scope of section 704(e)(1). The title or heading of a statute does not limit its plain meaning. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998); *Collazos v. United States*, 368 F.3d 190, 196-97 (2d Cir. 2004). This principle applies to the Internal Revenue Code. *See Grapevine Imps. Ltd. v. United States*, 71 Fed. Cl. 324, 331 (Fed. Cl. 2006) ("Section 7806(b) of the Code strictly instructs that the heading of a section is utterly without legal significance . . . . Case law makes amply clear that this provision prohibits courts from relying on the heading of a section in construing the language therein."); *Wind Energy Tech. Assocs. III v. Comm'r*, 94 T.C. 787, 791 (1990).

Similarly, while sections 704(e)(2) and (e)(3) refer, respectively, to gifts of partnership interests and other transfers of partnership interests between family members,

---

[19]  Contemporary commentators on the Revenue Act of 1951 understood this as well. *See* Robert K. Lifton, *The Family Partnership: Here We Go Again*, 7 Tax L. Rev. 461, 468 (1952) (attached hereto as Appendix 2A) ("This provision applies to non-family businesses as well as to family enterprises.").

16

that fact does not limit section 704(e)(1) to family partnerships.  The location of section

704(e)(1) is irrelevant to its interpretation.  *See* I.R.C. § 7806(b) ("No inference,

implication, or presumption of legislative construction shall be drawn or made by reason

of the location or grouping of any particular section or provision . . . .").  Moreover, of

the three separate provisions of section 704(e), only one — section 704(e)(3) — provides

a special rule whose application depends on a family relationship.

All courts that have considered the issue have concluded that section 704(e)(1) is

not limited to "family" partnerships.  *See, e.g., Evans v. Comm'r*, 447 F.2d 547, 550 (7th

Cir. 1971) ("We cannot agree that . . . Congress intended to limit § 704(e)(1) to family

partnerships . . . ."), *aff'g* 54 T.C. 40, 51 (1970) ("section [704(e)] is broad in its scope

and covers a situation such as the instant case which does not involve a 'family

partnership' (there being involved no members of a family as defined in section 704(e)(3)

of the Code)"); *Madorin v. Comm'r*, 84 T.C. 667, 679 (1985); *Carriage Square, Inc. v.

Comm'r*, 69 T.C. 119, 126 n.4 (1977).  The IRS has long recognized that section

704(e)(1) is not limited to family partnerships.  *See* 1978-2 C.B. 1 (acquiescing in Tax

Court's decision in *Evans*)[20]; G.C.M. 36,960 (Dec. 20, 1976).[21]  Apparently the

Government agrees.  *See* Reply Brief for Defendant-Appellant ("Appellant Reply Br.") at

14 (acknowledging that section 704(e)(1) "has been applied outside the family context").

---

[20]  By formally acquiescing in the Tax Court's decision, the IRS agrees with its holding
even though it argued to the contrary before the Tax Court.  *See* Michael I. Saltzman,
*IRS Practice and Procedure*, ¶ 3.04[5][a] (Rev. 2d ed. 2006).

[21]  The IRS reiterated this view recently in a publicly available Market Segment
Specialization Program Guideline:  "IRC section 704(e) is titled 'Family
Partnerships' but only one subsection applies to family members. Subsection (e)(1)
provides that if any 'person' acquires an interest in a partnership from any other
'person' by purchase or gift, and if capital is a material income producing factor, then
the person will be considered a partner . . . ."  2002 WL 32770029 (I.R.S.).

17

In conclusion, it is undisputed that section 704(e)(1) is not limited to "family partnerships" but applies to all partnerships in which capital is a material income-producing factor. Thus, the fact that the Banks were not members of the same "family" as TIFD III-E and TIFD III-M is irrelevant to the application of section 704(e)(1).

### E.     Conclusion

Because the Banks were the real owners of capital interests in a partnership in which capital was a material income-producing factor, section 704(e)(1) requires that they be respected as "partners" in Castle Harbour.

## II.     The Banks' Interests Fall Squarely Within the Purpose and Intent of Section 704(e)(1)

The legislative history of section 704(e)(1) is entirely consistent with a straightforward interpretation of its language and supports the conclusion that the Banks were partners.[22]

### A.     Congress enacted section 704(e)(1) to establish an objective standard for determining partner status

1.     <u>Historical background</u>. The federal income tax system of the 1940s and early 1950s was characterized by steeply progressive marginal rates, ranging from under

---

[22] Since the Banks' interests satisfy the unambiguous requirements of section 704(e)(1), examination of the legislative history arguably is unnecessary. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *see also Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir. 2006). This principle applies to interpretations of the Internal Revenue Code. *See Greene v. United States*, 79 F.3d 1348, 1354 (2d Cir. 1996) ("While it cannot be disputed that construction of statutes requires 'some imagination of the purposes which lie behind them,' . . . the statutory language remains of paramount importance.") (quoting *Lehigh Valley Coal Co. v. Yensavage,* 218 F. 547, 553 (2d Cir. 1914) (L. Hand, J.)).

20% to over 90%. Throughout much of this period, married couples could not mitigate

the effect of this rate structure by filing joint returns. So-called "family partnerships"

became the tax shelter of this era.[23] In a typical transaction a taxpayer would transfer a

profitable business to a partnership and give or sell interests in the partnership to his

spouse or children, thereby spreading the income from the business among multiple

lower-rate taxpayers and cutting the effective rate of tax on the income by as much as

70%. Some of these partnerships were formed for valid non-tax purposes, such as

bringing a child into the business; however, many were purely tax motivated. Copious

litigation ensued in which the IRS challenged the intended tax benefits by seeking to

deny partnership status.

     After years of litigation in the lower courts, the Supreme Court took up the issue

in *Commissioner v. Tower*, 327 U.S. 280 (1946), which involved a partnership formed by

a husband and wife. The wife had acquired her partnership interest through a capital

contribution funded by a gift from the husband. The Court focused on the intent of the

parties:

> When the existence of an alleged partnership arrangement is challenged by
> outsiders, the question arises whether the partners really and truly intended
> to join together for the purpose of carrying on business and sharing in the
> profits or losses or both. And their intention is a question of fact . . . . We
> see no reason why this general rule should not apply in tax cases where the
> government challenges the existence of a partnership for tax purposes.

327 U.S. at 286-87. As this language suggests, the Court derived the intent test from the

non-tax law of partnership, under which a partnership was a mutual agency relationship

created by the reciprocal intent of the parties. *See id.*; *see also Culbertson*, 337 U.S. at

---

[23]  In floor debate, Senator Humphrey affirmed his understanding that between 1939 and
    1948 the number of family partnership returns increased from 290,000 to 930,000. 97
    Cong. Rec. 12,147 (1951) (attached hereto as Appendix 2B).

751-53 (Frankfurter, J., concurring). The *Tower* Court also emphasized two objective factors relevant to the inquiry into subjective intent — whether all partners invested capital that originated with them (in contrast to capital acquired by gift) or performed valuable services. *Tower*, 327 U.S. at 291-92. Since Mrs. Tower had neither contributed "original" capital to, nor performed "vital" services for, the venture, the Court held that she was not a partner. *Id.*; *see also Lusthaus v. Comm'r*, 327 U.S. 293 (1946) (same result on substantially similar facts).

  *Tower*'s blending of the subjective intent inquiry with objective factors confused the lower courts, many of which conditioned recognition of partner status on the contribution of original capital or performance of valuable services. As a result, three years after deciding *Tower* and *Lusthaus*, the Supreme Court addressed the definitional issue again in *Culbertson*. In that case, Mr. Culbertson and a Mr. Coons had operated a ranching partnership for many years. 337 U.S. at 735. Mr. Culbertson bought out Mr. Coons and shortly thereafter sold a portion of the ranch to his four sons for a note. *Id.* at 735-36. The sons paid the note partly by gifts from their father and partly from the proceeds of a loan procured by Culbertson & Sons, the partnership they had created with their father. *Id.* at 736-37. Thus, no son contributed "original" capital. One son served as the foreman of the ranch. Two worked during the summers, and a fourth was in the Army and performed no services. *Id.* at 737.

  Citing *Tower*, the Tax Court held that the sons were not partners because they had neither contributed original capital nor provided vital services to the partnership during the years at issue. It made no findings regarding intent. The Fifth Circuit reversed the Tax Court, holding that the sons were partners for tax purposes. *Id.* at 738. The Supreme

20

Court reaffirmed the intent test that *Tower* had derived from non-tax law, but rejected

*Tower*'s focus on "original" capital or "vital" services as essential to partner status:

> The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard . . . , but whether, considering all the facts . . . the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Id.* at 742.  In addition to this intent-based standard, the *Culbertson* Court grounded its

decision on "the first principle of income taxation:  that income must be taxed to him who

earns it."  337 U.S. at 739-40.  That principle requires that income from the performance

of services or the use of capital be taxed to the service provider or capital owner.  *See,*

*e.g., Helvering v. Clifford*, 309 U.S. 331, 335-38 (1940); *Lucas v. Earl*, 281 U.S. 111,

114-15 (1930).  Applying that principle to the partnership context, the Court observed

that "[a] partnership is . . . an organization for the production of income to which each

partner contributes one or both of the ingredients of income – capital or services."  337

U.S. at 740.  The Court explained *Tower* and *Lusthaus* by stating that, in each case, the

wife had contributed neither services nor capital and, accordingly, the husband had been

"the true earner of the income."  *Id.* at 746.  In *Culbertson,* the Tax Court had made no

findings regarding the parties' intent; for this reason, the Supreme Court reversed the

Fifth Circuit's decision with instructions to remand the case so the Tax Court could

determine whether "there was a bona fide intent that [the sons] be partners, *either*

because of services to be performed during those years, or because of *contributions of*

*capital* of which they were the *true owners*."  *Id.* at 748 (emphasis added).[24]

---

[24]  On remand, the Tax Court held that the children were not partners, *Culbertson v. Comm'r*, 9 T.C.M. (CCH) 647 (1950), and the Fifth Circuit once again reversed the

21

2.    The Revenue Act of 1951.  *Culbertson* did not resolve the partnership

definition because of a conflict between its two elements — an intent test derived from

non-tax law and an affirmation that income from capital or services must be taxed to the

owner of the capital or the provider of the services.  Thus, although courts frequently cite

*Culbertson* as establishing the standard for partnership status, it was not the last word

and, in fact, engendered considerable confusion in the lower courts.[25]  One contemporary

author summarized the post-*Culbertson* situation as follows:

> The *Culbertson* opinion left uncertainty in its train.  Post-
> *Culbertson* decisions fall into three general categories.  Some few courts
> disjunctively applied the *Tower* criteria, but rationalized their decisions in
> terms of intent.  Most courts, however, felt that *Culbertson* meant more
> than a change in language.  Some probed for a subjective intent, returning
> to pre-*Tower* rules and completeness of gift tests.  Others added to the pre-
> *Tower* standards the requirement of a business purpose, which they found
> satisfied, generally, when the new partners were needed to permit
> extension of credit.  Courts pursuing either of these last two approaches
> embraced different criteria for determining whether a gift of partnership
> interest was complete.  Thus the Second Circuit Court of Appeals
> demanded some control commensurate with the new partner's interest.
> Other courts were satisfied if the new partner could withdraw his interest
> at will.

*See* Lifton, *supra* note 18, at 467 (attached hereto as Appendix 2A) (footnotes omitted).

In 1951, Congress acknowledged and expressed its dissatisfaction with this

confusion:  "Whether or not the opinion of the Supreme Court in *Commissioner v. Tower*

. . . and *Commissioner v. Culbertson* . . . , which attempted to explain the *Tower* decision,

afford any justification for the confusion is not material – the confusion exists."  H.R.

Rep. No. 82-586, at 32 (1951) (attached hereto as Appendix 2C); S. Rep. No. 82-781, at

---

Tax Court and held that the sons were partners, *Culbertson v. Comm'r*, 194 F.2d 581,
583 (5th Cir. 1952).

[25]  This confusion extended to the Culbertson family partnership.  *See supra* note 24.

39 (1951) (attached hereto as Appendix 2D). Congress was concerned that courts were

applying *Tower* and *Culbertson* to deny partner status to persons who, under general

principles of income taxation, should be treated as owners of property and taxable on the

income therefrom. Accordingly, Congress added the following sentence to section

3797(a)(2) of the Internal Revenue Code of 1939:

> A person shall be recognized as a partner for income tax purposes if he
> owns a capital interest in a partnership in which capital is a material
> income-producing factor, whether or not such interest was derived by
> purchase or gift from any other person.

Revenue Act of 1951, Pub. L. No. 82-183, § 340(a), 65 Stat. 452, 511 (1951) (82d Cong.,

1st Sess.) (attached hereto as Appendix 2E). In 1954, this sentence, in slightly modified

form, was reenacted as section 704(e)(1) of the Internal Revenue Code of 1954.[26]

The Ways and Means Committee Report to the 1951 Act explained the purpose of

the provision as follows:

> [The amendment] is intended to harmonize the rules governing interests in
> the so-called family partnership with those generally applicable to other
> forms of property or business. Two principles governing the attribution of
> income have long been accepted as basic: (1) income from property is
> attributable to the owner of the property; (2) income from personal
> services is attributable to the person rendering the services. There is no
> reason for applying different principles to partnership income. . . . Your
> committee's amendment makes it clear that, however the owner of a
> partnership interest may have acquired such interest, the income is taxable
> to the owner, if he is the real owner. If the ownership is real, it does not

---

[26] Section 3797(a)(2) of the 1939 Code contained generally applicable definitions of the
terms "partnership" and "partner," making no reference to family relationships.
I.R.C. § 3797(a)(2) (1939) (attached hereto as Appendix 2F). The 1951 Act also
added section 191 of the 1939 Code, which provided special rules for the allocation
of partnership income to persons who acquire their partnership interests by gift or by
purchase from family members; however, they do not affect the definition of the
terms "partnership" and "partner." The provisions of section 191 of the 1939 Code
were recodified in 1954 as sections 704(e)(2) and (3). I.R.C. § 704(e)(2)-(3) (1954)
(attached hereto as Appendix 2G).