matter what motivated the transfer to him or whether the business benefited from the entrance of the new partner.

Although there is no basis under existing statutes for any different treatment of partnership interests, some decisions in this field have ignored the principle that income from property is to be taxed to the owner of the property.

H.R. Rep. No. 82-586, at 32 (attached hereto as Appendix 2C).

The legislative history to the 1951 Act establishes four important points that are directly relevant to the application of section 704(e)(1) to the Banks' investments in Castle Harbour. First, Congress rejected any interpretation of *Culbertson* or *Tower* that would deny partner status to the true owner of a capital interest in a venture in which capital is a material income-producing factor.[27]

Second, Congress enacted an objective test focused solely on ownership of a capital interest even though it knew that many taxpayers were forming family partnerships for no purpose other than to shift income to lower bracket taxpayers.[28] In all

---

[27] As explained below, all courts that have directly considered the issue agree that section 704(e)(1) at least limits *Tower* and *Culbertson*.

[28] For example, Senator Humphrey, an opponent of the provision, said:

This is nothing more nor less than a shameful act of permitting tax avoidance. I submit that the record bears me out. What did the courts hold? The courts set up the test of good faith, and acting with a business purpose in the conduct of an enterprise, in order for a family partnership to be given tax recognition.

What does the Senate provision set up, and what does the House provision set up? *They replace the good faith and business purpose tests* with the mere test that a gift of a capital share is a real gift, and that ownership by the recipient is actual ownership.

97 Cong. Rec. 12,146 (1951) (attached hereto as Appendix 2B) (emphasis added). Senator Humphrey's description of the legislation is completely consistent with those of the Ways and Means and Finance Committee Reports.

24

cases governed by section 704(e)(1), Congress intended that the decisive factor would be the reality of the ownership, not the purpose of the transaction: "If the ownership is real, it does not matter what motivated the transfer . . . or whether the business benefited from the entrance of the new partner."[29]  H.R. Rep. No. 82-586 (attached hereto as Appendix 2C), at 32; S. Rep. No. 82-781, at 39 (attached hereto as Appendix 2D).

Third, while Congress enacted section 704(e)(1) in response to *Culbertson* and *Tower*, which were family partnership cases, Congress expressly disavowed any intent to create a special rule limited to family partnerships.[30]  Limiting section 704(e)(1) to family partnerships would have established a more liberal standard for determining partner status in a family partnership than in a partnership among unrelated parties, which would have been inconsistent with the legislative history of section 704(e)(1).  *See* H.R. Rep. No. 82-586, at 33 (attached hereto as Appendix 2C) ("Transactions between persons in a close family group, whether or not involving partnership interests, . . . should be subject to close scrutiny.").  Indeed, Congress made clear that the standard established by section 704(e)(1) — ownership of a capital interest — is consistent with general principles of income taxation, stating that "[t]here is no reason for applying different

---

[29] *See* Treas. Reg. § 1.704-1(e)(2)(x) ("If the reality of the transfer of interest is satisfactorily established, the motives for the transaction are generally immaterial.").  *Cf.* Israel Packel, *The Next Inning of Family Partnerships*, 100 U. Pa. L. Rev. 153, 158 (1951) (attached hereto as Appendix 2H) ("The concept that a special business purpose must be the motive for the creation of a partnership interest, [sic] should now be eliminated completely.").

[30] The predecessor to section 704(e)(1) (section 3797(a)(2) of the 1939 Code) was codified in the general definitions section of the 1939 Code.  I.R.C. § 3797(a)(2) (attached hereto as Appendix 2F).

25

principles to partnership income." H.R. Rep. No. 82-586, at 32 (attached hereto as Appendix 2C); S. Rep. No. 82-781, at 39 (attached hereto as Appendix 2D).[31]

Finally, Congress clearly distinguished the question of who should be recognized as a partner from the question of how income should be allocated among partners. In section 704(e)(1), Congress established a test for partner status based on a single objective criterion: ownership of a capital interest in a partnership in which capital is a material income-producing factor. Congress could have chosen to include the allocation of income or loss as an additional factor to be considered in determining the application of section 704(e)(1); instead, it chose to accord partner status to all capital interests described in section 704(e)(1) and to enact separate rules regulating the allocation of partnership income when a partner acquires a partnership interest by gift or purchases a partnership interest from a relative. These allocation rules are now codified as sections 704(e)(2) and 704(e)(3); they do not apply to the Banks. *See infra* pp. 38-39.

Characterization of the Banks as partners under section 704(e)(1) is compelled not only by the plain meaning of the statute but also by the unambiguous intent of Congress as reflected in the legislative history. The Banks made capital investments in Castle

---

[31] The regulations under section 704(e)(1) reiterate this fundamental concept:

> The production of income by a partnership is attributable to the capital or services, or both, contributed by the partners. The provisions of subchapter K, chapter 1 of the Code, are to be read in the light of their relationship to section 61, which requires, inter alia, that income be taxed to the person who earns it through his own labor and skill and the utilization of his own capital.

Treas. Reg. § 1.704-1(e)(1)(i); *see* Lifton, *supra* note 18, at 468 (attached hereto as Appendix 2A) (statute "is homage to the *Lucas v. Earl* doctrine that income must be taxed to the person who earns it, and to the *Blair* directive that a gift of income-producing property shifts the tax incidence on the income produced by that property").

Harbour.  Failure to recognize them as partners would thwart the stated legislative purpose of ensuring that income generated by capital-intensive partnerships is taxed to the real owners of that capital.

**B.      Castle Harbour is a partnership for purposes of section 704(e)(1)**

In its Reply Brief to the Second Circuit, the Government argued that section 704(e)(1) could not apply to the Banks' interests because the Banks did not own capital interests in a "partnership."  Specifically, the Government asserted that Castle Harbour was not a valid partnership for federal income tax purposes.  *See* Appellant Reply Br. at 14-15.  That erroneous argument appears to be based on the view that section 704(e)(1) merely determines whether a person is a "member" of a partnership, but not whether the arrangement in which the person owns a capital interest is a "partnership."  The Government's argument suffers from two flaws, either of which is fatal to its position.

1.      <u>Castle Harbour was a partnership</u>.  The Government's position in its reply brief is inconsistent with the FPAAs issued by the IRS, stipulations by the Government at trial, and the prior decision of this Court.  While the FPAAs concluded that the Banks were not partners, they respected Castle Harbour as a substantive partnership between TIFD III-E and TIFD III-M.  *See* PX 377 at 0101359.[32]  Consistent with the FPAAs, the Government stipulated before trial that "Castle Harbour was classified as a partnership under the Internal Revenue Code," *see* Joint Trial Memorandum 4, Stipulation No. 14, describing the issue as whether a partnership existed "among the GECC entities . . . and the Dutch banks," *id.* at 9.  This Court found that Castle Harbour was a partnership under

---

[32]  For example, the IRS reallocated rental income from ING and Rabo to TIFD III-E and TIFD III-M.  Since TIFD III-M contributed no aircraft to Castle Harbour, the only basis for allocating any rental income to it is the conclusion that it and TIFD III-E were members of a partnership.

27

section 761 and *Culbertson*. *TIFD III-E*, 342 F. Supp. 2d at 111-12, 115. As this Court found, not only was the formation of Castle Harbour motivated by non-tax business purposes, but there was no apparent alternative for GECC to achieve its business purposes other than through the formation of a new entity. *Id.* at 114. On the basis of these findings, this Court correctly held that Castle Harbour was a partnership. The Second Circuit's opinion does not undermine this prior determination. *Cf. TIFD III-E*, 459 F.3d at 231 n.11.

In short, the Government long ago acknowledged that for federal income tax purposes a partnership existed between TIFD III-E and TIFD III-M. Thus, without regard to the Banks' participation, Castle Harbour was a "partnership" for purposes of section 704(e)(1).

2.     The Government erroneously argues that section 704(e)(1) applies only when the existence of a partnership is established under other principles. Not only is the Government's argument wrong on the facts — it is also wrong on the law. Apparently, the Government believes that ownership of a capital interest does not make a person a partner under section 704(e)(1) unless the interest is issued by an entity that would qualify as a partnership without regard to section 704(e)(1). In other words, the Government appears to be arguing that *Tower* and *Culbertson* continue to mandate a "gating" test that an arrangement must satisfy before section 704(e)(1) can apply to a specific owner.

Any such argument is incorrect. Congress enacted section 704(e)(1) to provide an objective test that mandates recognition of persons as partners if they own real capital interests in capital-intensive partnerships, regardless of whether they would have been

partners under *Tower* and *Culbertson*. Significantly, in *Tower*, *Lusthaus* (its companion case), and *Culbertson* no partnership could have existed unless the persons whose interests were at issue were recognized as partners. *Tower* and *Lusthaus* both involved partnerships that existed, if at all, because of a transfer of an interest in a business to a spouse. Similarly, while Mr. Culbertson had operated a ranch in partnership with another person for some time, the partnership at issue was Culbertson & Sons, which was created *after* Mr. Culbertson had purchased his partner's entire interest and, two days later, formed a new venture with his sons. Thus, in *Culbertson,* as in *Tower* and *Lusthaus,* whether the transferees were partners determined whether any partnership existed. In none of these cases was there a preexisting partnership involving at least two persons whom the IRS recognized as partners.

Because a partnership can only exist when multiple taxpayers seek to derive income from pooled services and capital, whether specific persons are "partners" and whether the arrangement between them is a "partnership" necessarily are two sides of the same coin. In other words, the scope of the partnership is coextensive with the determination of who is a partner.[33] Thus, when section 704(e)(1) requires recognition of persons as partners, it likewise requires recognition of the existence of their partnership.

This common-sense interpretation is consistent with *Tiberti v. Commissioner*, 21 T.C.M. (CCH) 961 (1962), in which an individual engaged in the construction business as a sole proprietor transferred undivided one-fifth interests in the assets of the business

---

[33] This concept is hardly novel. For example, the existence of a debt presupposes the existence of a debtor and a creditor; conversely, the characterization of someone as a creditor presupposes the existence of a debt.

to four trusts, one for the benefit of each of his four children. 21 T.C.M. (CCH) at 962. The Tax Court held that the trusts were partners under section 704(e)(1) (and thus that the transfers created a partnership), even though there was no preexisting partnership prior to the taxpayer's transfer of assets to the trusts. *Id.* at 974. The Tax Court reached this conclusion without addressing whether any of the transferees would have been respected as "bona fide equity participants" under *Culbertson*.

### III.    The Second Circuit's Decision Does Not Preclude Application of Section 704(e)(1)

#### A.    The Second Circuit's *Culbertson* holding is irrelevant to the application of section 704(e)(1)

While the Second Circuit held that the Banks did not satisfy *Culbertson*'s test for partner status, the legislative history of section 704(e)(1) demonstrates that Congress intended to create an alternative objective standard to *Culbertson*'s intent-based standard and to reject criteria (such as the presence of "original capital") that limited the types of capital that are considered bona fide. It follows, therefore, that the Second Circuit's application of *Culbertson* does not control the application of section 704(e)(1). Indeed, that conclusion is implicit in the Second Circuit's decision to remand the section 704(e)(1) issue for consideration by this Court.

The courts have consistently recognized that a person who is not a partner under *Culbertson* may nevertheless qualify as a partner under section 704(e)(1). For example, in *Smith v. Commissioner*, 32 T.C. 1261 (1959), the taxpayers had given interests in a partnership to trusts for their children. *Id.* at 1262-63. For the years 1943 through 1948, the Commissioner had disregarded the trusts as partners, taxing all of the partnership's income to the taxpayers. *Id.* at 1263. The taxpayers challenged the Commissioner's

position but lost at trial and in the Ninth Circuit. *Id.* In auditing the taxpayers' 1952 and 1953 tax years, the Commissioner again disregarded the trusts as partners and sought to tax all of the partnership's income to the taxpayers. *Id.* at 1265. The taxpayers challenged the Commissioner's position in Tax Court. The Tax Court held that the trusts were partners for tax purposes, rejecting the Commissioner's effort to invoke the doctrine of collateral estoppel. *Id.* at 1265-66, 1270. According to the Tax Court, the 1951 enactment of the predecessor to section 704(e)(1) resulted in a sufficient change in the governing law to preclude application of the doctrine of collateral estoppel because Congress did not consider the 1951 amendments "to be a mere restatement or codification of existing law." *Id.* at 1267.[34]

The Tax Court's analysis of the collateral estoppel issue is completely consistent with other judicial interpretations of section 704(e)(1). The courts have consistently recognized that section 704(e)(1) provides a new substantive standard for determining partner status, although they have not been entirely consistent in explaining the relationship between section 704(e)(1) and *Culbertson*. The Seventh Circuit, for example, has characterized section 704(e)(1) as replacing the *Culbertson* test:

> The test is no longer whether the parties acted in good faith with a business purpose in joining together to conduct the partnership business.

---

[34] The Tax Court cited the statutory effective date in support of this conclusion. Section 340(c) of the Revenue Act of 1951 provided, in part: "The amendments made by this section shall be applicable with respect to taxable years beginning after December 31, 1950. The determination as to whether a person shall be recognized as a partner for income tax purposes for any taxable year beginning before January 1, 1951, shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning before January 1, 1951." Revenue Act of 1951, Pub. L. No. 82-183, § 340(c), 65 Stat. 452, 511 (1951) (attached hereto as Appendix 2E).

> This *was* the test set forth in *Commissioner v. Culbertson* . . . , which was
> decided before present § 704(e)(1) was a part of the Code.
>
> The Committee report accompanying H.R. 4473 which became
> § 704(e)(1) states: "If the ownership is real, it does not matter what
> motivated the transfer [of the partnership interest] or whether the business
> benefited from the entrance of the new partner. . . ." *The emphasis has
> shifted from "business purpose" to "ownership of a capital interest."*

*Pflugradt v. United States*, 310 F.2d 412, 415-16 (7th Cir. 1962) (citations omitted and

emphasis added); *see also Bateman v. United States*, 490 F.2d 549, 555 (9th Cir. 1973)

(Wright, J., dissenting) (drafters of section 704(e)(1) "intended to overrule *Tower* and

*Culbertson*"). Other cases have described section 704(e)(1) as limiting *Culbertson. See

Forman v. Comm'r*, 199 F.2d 881, 884 (9th Cir. 1952) ("The House and Senate Reports

concurred in finding such additional section was necessary to curb the Tax Court in its

erroneous interpretation, since the Culbertson decision, of 26 U.S.C.A. § 182."); *Morton

v. Comm'r*, 46 T.C. 723, 735 (1966) ("The applicable principles, at least as they affect the

partnership issue are set forth [in Supreme Court cases], *and limited by section 704(e) of

the 1954 Code.*" (emphasis added)).

Other decisions have construed section 704(e)(1) as an alternative to *Culbertson*,

so that a person who satisfies either *Culbertson* or section 704(e)(1) will qualify as a

partner. In *Poggetto v. Commissioner*, 306 F.2d 76 (9th Cir. 1962), the Ninth Circuit

addressed whether the taxpayers' daughter should be respected as a partner. The Ninth

Circuit concluded that the partnership interest did not satisfy the requirements of section

704(e)(1). According to the Ninth Circuit, the taxpayers' daughter

> cannot be ignored as a partner . . . simply because appellants have failed to
> satisfy the objective standards of § 704(e)(1). In order to disregard [her]
> as a partner for income tax purposes, it must also appear that the parties
> did not in good faith intend to join together as partners.

32

*Poggetto*, 306 F.2d at 79 (citations omitted).  Thus, under the Ninth Circuit's view, the daughter would have qualified as a partner as long as her interest satisfied either the objective standard of section 704(e)(1) or the good faith intent test of *Culbertson*.  The Second Circuit's remand is consistent with the approach taken by the Ninth Circuit in *Poggetto*.

It matters little in this case whether section 704(e)(1) is a limitation on, or an alternative to, *Culbertson*.  Section 704(e)(1) requires that a person who owns a capital interest in a partnership in which capital is a material income-producing factor be treated as a partner, regardless of whether that person would qualify as a partner under *Culbertson*.

Accordingly, the Second Circuit's decision, which relies on *Culbertson*, does not affect whether the Banks were partners under section 704(e)(1).  Since the Banks satisfy the criteria of section 704(e)(1), they must be respected as partners in Castle Harbour for federal income tax purposes.  Any other result would violate the express purpose of the statute and would be inconsistent with the cases.

**B.      The Second Circuit did not hold that the Banks' interests were debt**

As explained above, the Second Circuit did not hold that the Banks' interests in Castle Harbour were debt.  The Second Circuit did hold that the Banks' interests were too much "in the nature of secured debt" to be characterized as "bona fide equity participation[s]" under *Culbertson*.  *TIFD III-E*, 459 F.3d at 227, 240-41.  Describing an interest as "in the nature of debt" is fundamentally different from holding that the interest

33

*is* debt for tax purposes.[35]  For example, the Second Circuit has long recognized that preferred stock is highly debt-like but nevertheless is characterized as equity for federal income tax purposes.  *See Jewel Tea Co. Inc. v. United States*, 90 F.2d 451, 452-53 (2d Cir. 1937); *Comm'r v. O.P.P. Holding Corp.,* 76 F.2d 11, 13 (2d Cir. 1935); *see also* Rev. Rul. 90-27, 1990-1 C.B. 50 (respecting as equity preferred stock that is an "investment alternative" to short-term debt).  Similarly, as explained below, section 704(e)(1) applies to capital interests even if they are "debt-like."

In its *Culbertson* analysis, the Second Circuit emphasized the importance of assessing the "economic realities" of the Banks' interests in light of all the facts and circumstances.  *TIFD III-E*, 459 F.3d at 230-31.  In doing so, the court pointed to certain aspects of the Banks' interests that, in its view, made those interests highly debt-like. The Second Circuit's statements apparently resulted from a misunderstanding of certain findings of this Court.  An assessment of the features highlighted by the Second Circuit in light of the economic realities of the transaction and the totality of the record demonstrates that those features did not meaningfully limit the Banks' interest in Partnership income.  Furthermore, the Second Circuit's misapprehension of these facts does not affect the characterization of the Banks interests as capital interests within the meaning of section 704(e)(1).

First, the Second Circuit apparently interpreted this Court's prior opinion as supporting an assumption that GECC had the right to cause the Partnership to transfer aircraft to its corporate subsidiary, Castle Harbour Leasing Inc. ("CHLI"), thereby

---

[35]  As noted above, the Chief Counsel of the IRS has emphasized that the Second Circuit did not hold that the Banks' interests were debt.  *See supra* text accompanying note 5.

limiting the Banks' participation in the Partnership's Operating Income. *See TIFD III-E*,

459 F.3d at 234; *TIFD III-E*, 342 F. Supp. 2d at 103. Even if one assumes that GECC

had the economic incentive to do so — a debatable proposition — the record documents

that the Partnership was prohibited from transferring aircraft to CHLI and, in fact, never

did so. The Operating Agreement required Castle Harbour to "maintain *directly*" the 63

aircraft contributed by TIFD III-E (referred to as the "Original Leased Assets"). JX 1 §

5.8(b) at 0101471-72 (emphasis added). Moreover, those aircraft, the Original Leased

Assets, were encumbered by debt, the repayment of which was coterminous with the

original lease term. Tr. at 203:17 - 204:4 (7/21/04, Brickman). The by-laws of CHLI

prohibited it from incurring or assuming debt without the consent of its shareholder,

Castle Harbour, and Castle Harbour's Operating Agreement specifically prohibited the

Managers from consenting to CHLI incurring debt without the consent of the Banks. JX

2 Exhibit L at 0102135-36; JX 1 § 5.5(k) at 0101463. Nor could Castle Harbour amend

CHLI's bylaws without amending the Operating Agreement, which required the approval

of the Banks. JX 1 §§ 5.4(m) at 0101458, 9.1 at 0101480. If a lessee extended a lease,

Operating Income would increase; while the aircraft would no longer be encumbered by

debt, the Operating Agreement required Castle Harbour to continue to own the aircraft

directly. JX 1 §§ 5.5(h) at 0101462, 5.8(b) at 0101471-72. Thus, regardless of whether

GECC had an economic incentive to cause the Partnership to transfer aircraft to CHLI, it

could not do so without the Banks' consent. And even if the Banks had consented to a

contribution, that contribution would not have affected the Banks' entitlement to their

capital account balances on liquidation. Thus, this theoretical possibility is irrelevant to

whether the Banks owned capital interests.

35

Second, the Second Circuit may have believed that Castle Harbour could manipulate the amount of income received by the Banks by "redepreciating" the aircraft. *TIFD III-E*, 459 F.3d at 234-35. The section 704(b) regulations required that Operating Income be reduced by depreciation based on the fair market value (not tax basis) of the original aircraft. *See* Treas. Reg. § 1.704-1(b)(2)(iv)(g)(1). Those regulations authorized the Partnership to use "any reasonable method" to compute its depreciation. *Id.* § 1.704-1(b)(2)(iv)(g)(3). The method selected by the Partnership provided for straight-line depreciation over a period of not less than seven years, which was at least as long as the period that normally would apply to newly acquired aircraft.[36] The amount of depreciation was fixed at inception by Exhibit F to the Operating Agreement. *See* JX 1 §1.10 at 0101408 (definition of "Depreciation"), Exhibit F at 0101664-67. The Partnership could not have revised the depreciation schedule without obtaining the Banks' approval. JX 1 § 9.1 at 0101480; *see also id.* at § 5.4(q) at 0101458. Thus, GECC could not deprive the Banks of income by adjusting the computation of depreciation in its favor.[37]

Third, the court stated that GECC had the ability to terminate the Banks' interests in the Partnership and thereby prevent allocations of income to them. *TIFD III-E*, 459 F.3d at 235. Since the amount received by the Banks on any repurchase of their interests would have been based on their capital account balances, that possibility does not affect

---

[36] The IRS accepted, and the Government never challenged, the computation of Operating Income (including depreciation).

[37] The fact that a partnership complies with the IRS's requirement to determine book income by computing depreciation based on the fair market value of contributed property should have no adverse impact on whether members of that partnership own capital interests under section 704(e)(1).

36

the characterization of their interests as capital interests under section 704(e)(1).[38]  In any

case, the uncontradicted evidence in the record establishes that, in most likely scenarios,

it would not have been in GECC's economic self-interest to terminate the Banks'

interests in the Partnership.[39]  *See* Tr. at 914:23 - 915:5 (07/28/04, Myers).[40]  Thus, as a

matter of economic reality the Partnership's ability to redeem the Banks' interests did not

prevent the Banks from having a meaningful participation in its income.

     Fourth, in its *Culbertson* analysis the Second Circuit apparently relied on

assertions in the Government's appellate briefs that the Banks had consistently classified

their interests as debt for Dutch legal and accounting purposes.  *TIFD III-E*, 459 F.3d at

239; Appellant Br. at 52.  In fact, the record is to the contrary.  The Banks' treatment of

their interests was inconsistent.  For example, Rabo treated its interest as equity for Dutch

bank regulatory purposes, while for Dutch accounting purposes it placed its interest in the

same category as debt and illiquid preferred stock.  *See, e.g.*, Mulders Depo. at 94:25 -

96:2.[41]  In any case, while the accounting classification of an interest may be relevant to

---

[38]  *See, e.g.*, Treas. Reg. § 301.7701-4(c)(2), Example 1 (respecting as equity an interest in a pool of mortgages that is subject to premature termination due to mortgage prepayments).

[39]  GECC's self-interest is relevant.  *See TIFD III-E*, 459 F.3d at 229.

[40]  While GECC decided to repurchase the Banks' interests, it did so because of an unanticipated change in U.S. law regarding the application of tax treaties, and not to limit the Banks' upside.  Tr. at 364:10 - 365:1 (7/22/04, Dull); Mulders Depo. at 57:10 - 60:4.

[41]  While the Banks treated their interests as debt for Dutch tax purposes, the IRS maintains that foreign tax treatment is irrelevant to its U.S. tax classification.  *See* T.A.M. 200512020 (Aug. 20, 2004) (fixed return instrument was equity for U.S. tax purposes even though treated as debt under foreign tax law); T.A.M. 200418008 (Dec. 29, 2003) (same).

its treatment under the *Culbertson* intent-based standard, it has no relevance under section 704(e)(1).

### C. The Second Circuit's characterization of the Banks' interests as debt-like does not preclude application of section 704(e)(1)

In light of the Second Circuit's opinion, the question may arise whether the Second Circuit's characterization of the Banks' capital interests in Castle Harbour as "debt-like" is inconsistent with the characterization of the Banks as partners under section 704(e)(1). There is no basis for concluding that the term "capital interest" does not include preferred equity because it is "in the nature of" debt.

The language of section 704(e)(1) provides no basis for limiting the type or quality of "capital interest" to which it applies. To the contrary, Congress acted expressly to assure that capital ownership would be respected. There is not even a hint that Congress intended to exclude any type of equity capital from the purview of section 704(e)(1).

In fact, the relationship between section 704(e)(1) and sections 704(e)(2) and (e)(3) demonstrates that Congress intended section 704(e)(1) to apply to all capital interests. As discussed above, *supra* p. 26, while sections 704(e)(2) and 704(e)(3) distinguish between various types of capital interests, they do *not* limit the application of section 704(e)(1). Thus, an individual who acquires a partnership capital interest by gift is recognized as a partner under section 704(e)(1), even though section 704(e)(2) limits how much income may be allocated to her. Similarly, section 704(e)(3) treats a person who purchases a capital interest from a relative as having acquired the interest by gift for purposes of section 704(e)(2), but that does not change the fact that section 704(e)(1) requires recognition of the purchaser as a partner.

38

Congress could have taken another tack, such as limiting the application of section 704(e)(1) (and thereby denying partner status) to gifted or purchased interests if the partnership attempted to allocate too much or too little income or risk to such interests. It did not do so. Instead, Congress chose to adopt a blanket rule, based on basic principles of income taxation, that any person who owns a capital interest in a capital-intensive partnership will be respected as a partner.

In summary, there is no indication anywhere that the manner by which owners allocate income from and risks to capital limits the mandatory application of section 704(e)(1). Thus, section 704(e)(1) is equally applicable to preferred equity interests and "common" equity interests, as long as those interests are capital interests in a partnership in which capital is a material income-producing factor.

## IV.    Treating the Banks as Partners Under Section 704(e)(1) is Consistent with Established Tax Principles

### A.    Established precedent recognizes preferred equity

Any assertion that equity that is "in the nature of" debt cannot satisfy the "capital interest" requirement of section 704(e)(1) is irreconcilable with generally applicable precedent. The Second Circuit has long recognized that preferred stock is equity for federal income tax purposes, even though it is highly debt-like. In *Jewel Tea Co.*, Judge Learned Hand observed that since the common shareholders of a corporation generally are entitled to share all profits and to manage the business, it would have been "entirely logical" to treat preferred shares like debt, but that the tax law "has always distinguished between creditors and preferred shareholders." 90 F.2d at 452. Similarly, in *Commissioner v. O.P.P. Holding Corp.*, the Second Circuit noted that although preferred stock and debt instruments "both contain substantially similar provisions and are silent as

39

to the source of the return, . . . only in the case of certificates designated as bonds were the holders intended to be creditors of the corporation. . . . " 76 F.2d at 13.

The accepted tax classification of preferred stock is directly relevant for two reasons. First, the Second Circuit stated that the standards used to determine whether an investment in a corporation is debt or equity also apply to investments in partnerships. *TIFD III-E*, 459 F.3d at 233. Second, the "check the box" regulations permit an "eligible entity" (such as Castle Harbour) to elect whether to be taxed as a partnership or a corporation. *See* Treas. Reg. § 301.7701-3(a). As discussed below, these regulations presuppose that the same standards apply to characterize an interest as equity regardless of whether the issuer is classified as a corporation or a partnership.

The Banks' interests, while in some respects debt-like, are significantly more equity-like than garden variety preferred stock. For example, the IRS respects as equity adjustable rate preferred stock that "is an investment alternative to commercial paper or other short-term debt." Rev. Rul. 90-27, 1990-1 C.B. 50. The preferred stock in Revenue Ruling 90-27 is (1) non-voting; (2) provides no return other than a cumulative dividend that varies with an external interest-rate index; (3) provides for periodic adjustment to the index to ensure that the preferred stock will always sell at its issue price; (4) provides the holder with the right to elect members of the board if the corporation fails to pay dividends, virtually assuring timely payment; and (5) bears no loss until all equity attributable to junior classes of stock has been completely eliminated.[42]

---

[42] Consistent with Revenue Ruling 90-27, the IRS National Office has treated mandatorily redeemable preferred stock issued by a special purpose finance subsidiary as equity even though the issuer was required to invest its assets in high

40

Revenue Ruling 78-142, 1978-1 C.B. 112, recognizes as bona fide equity preferred stock that is subject to mandatory serial redemption after five years and whose covenants require, *inter alia*, that (1) the issuer maintain its shareholders' equity by keeping consolidated net current assets at specified levels; (2) that a corporate subsidiary of the issuer maintain bank deposits of a minimum specified amount; (3) that the issuer not incur any indebtedness or liens; and (4) that the issuer not enter into any transaction other than in the regular course of business without the consent of the preferred shareholders' representative. Noncompliance with these covenants entitles the holders to require immediate redemption of their preferred stock.

Numerous provisions of the Internal Revenue Code and Regulations recognize that an investment that provides little or no participation in profits and losses may be respected as "bona fide equity" for tax purposes. For example, section 351(g) of the Code respects as equity stock that "is limited and preferred as to dividends and does not participate in corporate growth to any significant extent" and is callable, redeemable, or has a dividend rate that is based on an external index.[43] I.R.C. § 351(g)(2), (3). Section 1504(a)(4) of the Code respects as equity nonvoting stock that is limited and preferred as to dividends and does not participate in corporate growth to any significant extent. The

quality assets and the holders were "virtually guaranteed" to receive dividends and the repayment of their investment. According to the IRS, "tens of billions of dollars of preferred stock" with similar terms had been issued. The National Office concluded that "the lack of risk of an investment will not support recharacterization of preferred stock as debt," and that the preferred stock at issue "should not be recharacterized as debt." F.S.A. 829, 1992 FSA Lexis 284 (May 22, 1992).

[43] The legislative history to section 351(g) observes that the issuers of some of this preferred stock are required to maintain large pools of liquid assets, but makes clear that this debt-like, low-risk, non-participating preferred stock is bona fide equity for tax purposes. H.R. Rep. No. 105-148, at 471, 473-474 (1997); H.R. Rep. No. 105-220, at 543-44 (1997).

41

Regulations under section 305, which apply only to dividends on corporate equity, contain an example describing fixed rate preferred stock that is callable, mandatorily redeemable at a fixed price in ten years, and is issued by a corporation that "is likely to have the legal and financial capacity . . . to redeem." Treas. Reg. § 1.305-5(d), Example 5. Regulations under section 2701 of the Code, which applies to transfers of equity interests, contain an example describing nonvoting preferred stock that carries a cumulative 8% dividend and provides the right to put the stock to the issuer for its par value. Treas. Reg. § 25.2701-3(d), Example 3.

The IRS has recognized holders of preferred partnership interests as partners for tax purposes even though their interests are so secure that, in the IRS's words, they are "the economic equivalent of a variable-rate tax-exempt bond." Rev. Proc. 2003-84, 2003-2 C.B. 1159. As described by the IRS:

> To create this instrument, a sponsor purchases a tax-exempt [self-liquidating] obligation and transfers the tax-exempt obligation to an entity that qualifies as a partnership for federal tax purposes (tax-exempt-bond partnership). The tax-exempt-bond partnership issues two classes of equity interests: interests that are entitled to a preferred variable return on its capital (variable-rate interests) and interests that are entitled to all of the remaining income of the partnership (inverse interest). The variable return on the variable-rate interests tracks current short-term exempt yields.

*Id.* at 1159. Thus, Revenue Procedure 2003-84 characterizes as equity an investment in a partnership that provides a variable-rate return based on an external interest index but provides no other participation in either income or losses of the partnership.

The Banks had substantially more participation in profits and losses than the preferred partnership interests described in Revenue Procedure 2003-84 and the preferred stock described above. The Banks' yield was more dependent on the Partnership's operations than that of most preferred shareholders. Unlike preferred shareholders, the

42

Banks could have been required to return some of their Exhibit E distributions had allocations of income to them produced a return of less than 9.03587%, and they were allocated at least one percent of all losses. JX 1 § 12.3 at 0101493. Like preferred stock, the Banks' capital bore all losses in excess of the contributions and retained earnings attributable to the "common" interests held by TIFD III-E and TIFD III-M. JX 1 § 3.2(e) at 0101436. The restrictions on Castle Harbour's operations were no more severe than those described in Revenue Ruling 78-142.

Regardless of the Second Circuit's conclusion that the Banks' interests were too debt-like to qualify them as "bona fide equity participant[s]" under *Culbertson*, established authorities show that the Banks' interests were consistent with equity classification for other tax purposes, including section 704(e)(1).

### B.  Section 704(e)(1) requires rejection of the Government's effort to create a "twilight zone"

In its appeal to the Second Circuit, the Government appeared to argue that it is possible for an investor in an unincorporated business entity to be neither a lender (because it does not hold debt) nor a partner (because its equity interest is too debt-like to be respected as a partnership interest). *See* Appellant Br. at 53 (arguing that, regardless of whether the Banks were "lenders" to the Partnership, they were not "partners"). The Second Circuit did not directly address the Government's assertion of the existence of this third, "twilight zone" category of partnership investment that is not debt, but is too debt-like to be treated as "bona fide" partnership equity. Section 704(e)(1) rejects such a possibility.

The Government's "twilight zone" position violates the broad statutory definition of "partnership" contained in sections 761 and 7701. Congress enacted the statutory

definition of "partnership" as part of the Internal Revenue Act of 1932 in response to confusion over the tax treatment of income from certain arrangements that were not partnerships under state law. Investors in a variety of unincorporated ventures were not including their shares of income on their individual returns based on the view that they were not "partners." *See* H.R. Rep. No. 72-708, at 53 (1932) (attached hereto as Appendix 2I). Congress sought to eliminate this problem "by placing *all* joint ventures, syndicates, pools, and similar organizations, which do not constitute [corporations] or trusts, in the category of partnerships, and the members of such syndicates, pools, etc., in the category of partners." *Id.* (emphasis added). Thus, Congress intended the partnership tax rules to apply broadly to all business and investment ventures not otherwise taxable as corporations or trusts. By providing an objective standard that taxes the owners of capital interests as partners, section 704(e)(1) supports the policies underlying these statutory definitions.[44]

Consistent with this statutory purpose, the IRS and the Treasury Department have long sought to ensure that the owner of a capital interest in an unincorporated business or investment venture will be taxed as a partner. For example, in 1986, the Treasury promulgated regulations mandating that investment trusts and similar arrangements that fragment ownership of a single asset (or asset pool) into multiple classes be treated as either partnerships or corporations. *See* Treas. Reg. § 301.7701-4(c)(1). The Treasury promulgated these multiple-class trust regulations in response to transactions structured

---

[44] Revenue Procedure 2003-84, discussed above, is another example of this anti-twilight zone policy. The IRS promulgated the Procedure in response to taxpayer arguments that the bond-like equity interests at issue were not subject to the partnership rules. The IRS rejected that position, based on its view that investors in multiple class ownership arrangements must be subject to either the partnership or corporate rules.

to avoid the corporate and partnership tax regimes. *See* T.D. 8080, 1986-1 C.B. 371. Thus, these regulations require that the owners of capital interests in an unincorporated multiple-class investment arrangement be taxed as partners, regardless of whether they intended to join a "partnership."[45]

The Government's "check the box" regulations are incompatible with the existence of a twilight zone category of investment. Promulgated in 1996, these regulations permit eligible entities (such as Castle Harbour) to elect whether to be taxed as a partnership or a corporation. *See* Treas. Reg. §§ 301.7701-2, -3. Under these regulations, if an entity taxable as a corporation validly elects to become taxable as a partnership, its shareholders automatically become partners, regardless of whether their interests would have satisfied any special requirements imposed by *Culbertson*'s subjective intent standard.[46] *See* Treas. Reg. § 301.7701-3(g)(1)(ii). Conversely, if a partnership elects to be taxed as a corporation, its partners automatically become shareholders. *Id.* § 301.7701-3(g)(1)(i). These rules simply do not accommodate the existence of a twilight zone category of partnership investment.

Finally, the Government's position that a person may make an investment in an unincorporated business in which capital is a material-income producing factor and not be treated as either a lender or a partner for tax purposes would create substantial uncertainty and confusion. The Internal Revenue Code prescribes highly detailed rules

---

[45] For example, the IRS recently relied on the multiple-class trust regulations in taking the position that a tax-motivated investment arrangement was a "partnership" for tax purposes, without once citing *Culbertson* or addressing whether the investors were "bona fide equity participants." *See* T.A.M. 200650017 (Dec. 15, 2006).

[46] As discussed above, the subjective test of *Culbertson* came from the common-law concepts of partnership; those concepts (such as mutual agency) have never been applied to determine shareholder status.

45

governing the taxation of partners, shareholders, and lenders, including rules relating to the timing and character of the income in the hands of the partner, shareholder or lender. For example, partners are subject to tax on their shares of partnership income, whether or not distributed, and that income has the same character in the partners' hands as in the hands of the partnership. I.R.C. §§ 701, 702. Partnerships with U.S.-source business income are required to withhold tax on income currently allocable to foreign partners. I.R.C. § 1446. By contrast, shareholders generally are taxed only on distributions of income, *see, e.g.*, I.R.C. § 301, and the Code contains specific rules governing the recognition of income by the holder of a debt instrument, *see, e.g.*, I.R.C. §§ 453, 1271-1288. None of these rules would apply to an investor that is neither a partner, a shareholder, nor a lender.

The Government's obvious failure even to consider the significant policy implications of its position suggests that the position is nothing more than a one-off rule concocted solely for purposes of the present litigation. Regardless of the Second Circuit's interpretation of *Culbertson*, the position is an untenable reading of section 704(e)(1).

### V.     Conclusion

The plain meaning of section 704(e)(1), which is completely consistent with the unambiguous Congressional intent, requires recognition of the Banks as partners in Castle Harbour. Because the Banks were partners in Castle Harbour, sections 704(b) and (c) apply to the allocations of income to them under the Operating Agreement, as provided in the prior opinion of this Court.

Respectfully submitted this 31st day of January 2007,

PLAINTIFF, TIFD III-E INC., the Tax Matters Partner of
CASTLE HARBOUR-I LIMITED-LIABILITY
COMPANY

_____

Ann H. Rubin, ct04486
Anthony M. Fitzgerald, ct04167
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, Connecticut  06509-1950
Telephone:    (203) 777-5501
Facsimile:    (203) 784-3199
Email:  arubin@carmodylaw.com
        afitzgerald@carmodylaw.com

OF COUNSEL

William F. Nelson, ct22883
David J. Curtin, ct22881
John A. Galotto, ct22882
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C.  20036
Telephone:    (202) 775-1880
Facsimile:    (202) 775-8586
Email: wnelson@mckeenelson.com
       dcurtin@mckeenelson.com
       jgalotto@mckeenelson.com

Suzanne Feese, ct23162
KING & SPALDING
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:    (404) 572-3566
Facsimile:    (404) 572-5100
Email: sfeese@kslaw.com

## CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing: (1) Plaintiff's Brief on Remand Regarding Section 704(e) of Internal Revenue Code (inclusive of all appendices); and (2) Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding Section 704(e) of Internal Revenue Code, has been made today, January 31, 2007, by sending true and correct copies thereof via overnight delivery to the following:

> Robert J. Higgins
> Trial Attorney, Tax Division
> U.S. Department of Justice
> 555 4th Street, N.W., Rm. 8816
> Ben Franklin Station
> Washington, D.C.  20001

and by regular mail, postage prepaid to:

> John B. Hughes
> Assistant U.S. Attorney
> Chief, Civil Division
> 157 Church Street
> New Haven, CT  06508

_Ann H. Rubin_

Ann H. Rubin, ct04486
Anthony M. Fitzgerald, ct04167
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, Connecticut  06509-1950
Telephone:  (203) 777-5501
Facsimile:  (203) 784-3199
Email:  arubin@carmodylaw.com
        afitzgerald@carmodylaw.com