IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| TIFD III-E INC., the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case Nos.: 3:01-CV-01839 (SRU) (lead case)<br>3:01-CV-01840 (SRU) |

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON REMAND REGARDING
SECTION 704(e) OF INTERNAL REVENUE CODE

I.   PROPOSED FINDINGS OF FACT

   A.   Aircraft leasing business of Castle Harbour-I Limited-Liability Company ("Castle Harbour" or the "Partnership")

1.   The operation of Castle Harbour involved a substantial investment in commercial aircraft. At formation, Castle Harbour owned 63 jet aircraft with a gross fair market value of $531,252,403 and a net fair market value of $294,903,437. **Joint Trial Memorandum, Stipulation (hereinafter, "Stip.") ¶ 15; JX 1 §§ 2.1 at 0101430,[1] 2.3 at 0101431-32,**

---

[1] "JX" refers to Joint Exhibits; "PX" refers to Plaintiff's Exhibits; "PDX" refers to Plaintiff's Demonstrative Exhibits; and "DX" refers to Defendant's Exhibits.

   **Exhibit F at 0101664-67; JX 17 at RABO 0241-43; PDX A; Tr. at 309:13 - 311:2 (7/22/04, Dull).**[2]

2.  Upon their agreement to participate in the Partnership, ING and Rabo (the "Banks") each invested $58.7 million in Castle Harbour. **PX 108-111; PDX C; Tr. at 322:6 - 323:5 (7/22/04, Dull).**

3.  Castle Harbour derived most of its income from its commercial aircraft portfolio. **JX 20 at 0008769; JX 24 at 0008809; JX 37 at 0016341; JX 49 at 0008963; JX 53 at 0009076; JX 61 at 0018000; JX 68 at 0027168; Tr. at 776:18 - 777:8 (7/27/04, Myers).**

4.  Throughout its existence, Castle Harbour actively engaged in the aircraft operating lease business. Its lessees included American Airlines, Delta Airlines, US Airways, Continental and SwissAir. **PX 383 at 1-4; Tr. at 508:5-7 (7/26/04, Hyde).**

5.  Castle Harbour derived its profits from capital, principally including: (i) profits generated from lease payments on its aircraft ("Operating Income"); (ii) profits realized when airplanes came off lease and were sold to third parties or distributed to Plaintiff at fair market value ("Disposition Gains"); and (iii) capital investments made by its subsidiary Castle Harbour Leasing Inc. ("CHLI"). **JX 20 at 0008769; JX 24 at 0008809; JX 37 at 0016341; JX 49 at 0008963; JX 53 at 0009076; JX 61 at 0018000; JX 68 at 0027168; Tr. at 532:22 - 533:3 (7/26/04, Hyde); Tr. at 776:18 - 777:8 (7/27/04, Myers).**

---

[2] Trial testimony is cited by the page and line references to the trial transcript, the date of the testimony and the last name of the witness.

6. During the 1993 through 1998 tax years, Plaintiff and TIFD III-M INC., a Delaware corporation ("TIFD III-M"), were members of Castle Harbour. **Stip. ¶ 11.**

7. For the 1993 through 1998 tax years, Castle Harbour was a partnership for federal income tax purposes. **Stip. ¶ 14.**

8. Capital was a material income-producing factor in the Castle Harbour partnership.

   **B.    The Banks' interests in Castle Harbour**

9. The Banks' interests in Castle Harbour entitled them to a payment out of the Partnership's assets upon their withdrawal from the Partnership or upon liquidation of the Partnership equal to the positive capital account balance, if any, in their respective capital accounts or, with their consent, a portion of the Partnership assets based upon these positive balances. **JX 1 §§ 10.8(b) at 0101487-90, 12.2(d) at 0101492; DX 61; Tr. at 334:25 - 335:6, 337:6-16 (7/22/04, Dull).**

10. Each Bank had an opening capital account balance of $58.7 million. **JX 24 at 0008812.**

11. The Banks' right to receive a payment or a distribution of assets in liquidation was subordinate to the claims of creditors. **JX 1 § 12.2(a)-(d) at 0101491-92; Tr. at 1057:2-18 (7/28/04, Lacey); Tr. at 797:24 - 798:16 (7/27/04, Myers); Mulders Depo. 107:25 - 108:5.**[3]

---

[3] The record citations for Messrs. Nagel and Mulders refer to their deposition transcripts, dated December 4, 2003 and December 9, 2003, respectively, portions of which were designated for trial and submitted to the Court on July 20, 2004.

12. At the formation of Castle Harbour, the aircraft held by the Partnership were subject to nonrecourse debt in the amount of $257,987,600. **JX 1 §2.1 at 0101430; Tr. at 244:9-17 (7/22/04, Brickman);** *TIFD III-E*, **342 F. Supp. 2d at 97.**

13. The Castle Harbour transaction was presented to ING and Rabo as an equity investment in a partnership. **JX 17 at RABO 0241-47; Mulders Depo. at 75:11-14; Nagel Depo. at 85:10-19; Tr. at 221:3-22 (7/21/04, Brickman).**

14. In negotiating over their participation in Castle Harbour, ING and Rabo understood that they were acquiring equity interests in Castle Harbour and that their interests in Castle Harbour would be subordinate to the creditors of the Partnership. **Mulders Depo. at 16:8-18; Nagel Depo. at 85:10-19.**

15. In negotiating over their participation in Castle Harbour, ING and Rabo expressed concern over the legal and economic consequences (and potential liability) that could arise from a catastrophic accident involving Castle Harbour's airplanes, particularly an accident in a populated area that might lead to uninsured losses. **Mulders Depo. at 35:14 - 36:11, 98:13-20; Nagel Depo. at 77:2 - 78:14; Tr. at 257:1 - 258:11 (7/22/04, Brickman).**

16. The Banks' interests in Castle Harbour were reflected in their capital account balances. The balance in the Banks' capital accounts, and consequently the Banks' return of the capital they had invested in the Partnership, depended on the performance of the assets of the Partnership. **JX 58 at 0024116, 0024118-19; PX 380 at 0101222-24; PDX T; PDX V; DX 61; Tr. at 438:7-15 (7/22/04, Dull); Tr. at 527:13-19 (7/26/04, Hyde); Tr. at**

779:24 - 780:10, 810:2-23, 841:19 - 842:6 (7/27/04, Myers); Tr. at 1057:25 - 1058:4 (7/28/04, Lacey); **Mulders Depo. at 75:6-10, 103:20-24.**

17. The Banks received annual cash distributions from Castle Harbour. These distributions were referred to as "Exhibit E distributions." **JX 1 Exhibit E at 0101662-63; Tr. at 428:2-12 (7/22/04, Dull).**

18. Under the Operating Agreement, the Banks assumed the risk that they would be required to repay a portion of their Exhibit E distributions. Each Exhibit E distribution reduced the value of ING's and Rabo's capital accounts. The Exhibit E distributions assumed that Castle Harbour would earn a 9 percent return on its operations. Had the business earned less than a 9 percent return, the Banks' capital accounts would have shown a deficit that the Banks would have been obligated to repay upon liquidation of the Partnership. **JX 1 § 12.3 at 0101493; Tr. at 337:13 - 338:4, 338:10-21, 339:2 - 340:13 (7/22/04, Dull); Tr. at 906:3-20 (7/28/04, Myers); Mulders Depo. at 42:7-17.**

19. Rabo Bank established a reserve account equal to a portion of its Exhibit E distributions in order to cover any potential yearly losses allocated to its capital account and the possibility that at liquidation it would have a deficit capital account balance that it would be required to restore. **Mulders Depo. at 99:5-15.**

20. If Castle Harbour had earned larger profits, ING and Rabo would have had larger capital accounts and earned higher returns on their investments. **PDX T; PDX V; Tr. at 350:20 - 351:12, 356:19 - 357:13 (7/22/04, Dull); Tr. at 1057:25 - 1058:4 (7/28/04, Lacey).**

21. A 1997 dispute between Castle Harbour and Continental Airlines demonstrates how the variability in the performance of the Partnership's assets affected the Banks' return on investment. This dispute over the interpretation of the leveraged lease contract was resolved in Continental's favor and resulted in the loss of $2.29 million of lease payments otherwise payable to the Partnership. This shortfall, in turn, decreased operating profits. Had this dispute been resolved in favor of the Partnership, the additional operating profit would have benefited the Banks by increasing their overall rate of return from approximately 9.1% to 9.4%. **PDX T; Tr. at 831:13 - 832:12 (7/27/04, Myers); Tr. at 526:16-25 (7/06/04, Hyde).**

22. Under the loss allocation rules of the Operating Agreement, the Banks' return on investment was also subject to downside variability. Operating losses were allocated to the Banks as follows: 98% of the first $3.93 million of operating losses (net of disposition losses allocated under the corresponding disposition loss allocation tier) ("Tier 1 Operating Losses"), 1% of the next $547.97 million of losses (net of disposition losses allocated under the corresponding disposition loss allocation tier), and 100% of any additional losses until the Banks' capital accounts were reduced to zero. Disposition losses were allocated to the Banks as follows: 90% of the first $3.17 million of disposition losses (net of operating losses allocated under the corresponding operating loss allocation tier) ("Tier 1 Disposition Losses"), 1% of the next $547.97 million of losses (net of disposition losses allocated under the corresponding disposition loss allocation tier), and 100% of any additional losses until the Banks' capital accounts were reduced to zero. **JX 1 §§ 3.2-3.3 at 0101435-36; Tr. at 819:20 - 820:25, 841:3-18 (7/27/04, Myers).**

23. The Banks were entitled to receive a Class A Guaranteed Payment that was calculated as the excess, if any, of the Investment Account *Adjustments* (a notional return of either 8.53587% or 9.03587% *on* their Investment Accounts) over the actual allocations of net Operating Income and Disposition Gain to the Banks. Thus, the Class A Guaranteed Payment did not equal the difference between the Banks' Capital Account balances and their Investment Account balances. **JX 1 §§ 1.10 at 0101400, 0101405-07, 10.8 at 0101486-90, 12.7 at 0101494-95, 14.1 at 0101499-500, 14.3 at 0101501-05;** *TIFD III-E*, **342 F. Supp. 2d at 104.**

24. The Class A Guaranteed Payment guaranteed that the Banks would receive a percentage return *on* the amount invested in the Partnership (as adjusted for distributions to them), but did not guarantee a return *of* their capital investment. Any losses in excess of the Tier 1 Operating Losses and Tier 1 Disposition Losses allocated to the Banks were not protected by the Class A Guaranteed Payment, and these losses would be borne by the Banks themselves. In the unlikely event that the Partnership's losses exceeded approximately $551.5 million, the Banks would have been allocated 100% of such losses until their capital accounts were wiped out, and the Class A Guaranteed Payment would not have made the Banks whole for these losses. **JX 1 §§ 1.10 at 0101405-06, 3.2(c) at 0101435-36, 3.2(e) at 0101435-36, 3.3(j)(iv) at 0101439-40, 3.3(j)(v) at 0101439-41, 10.8 at 0101486-90, 12.7 at 0101494-95, 14.1 at 0101499-500, 14.3 at 0101501-05; PX 380 at 0101218; Tr. at 819:23 - 820:10 (7/27/04, Myers); Tr. at 1058:10 - 1059:7 (7/28/04, Lacey);** *TIFD III-E*, **342 F. Supp. 2d at 102 n.18.**

25. The Class A Guaranteed Payment was payable, if at all, out of the assets of the Partnership. The Class A Guaranteed Payment was subordinate to the claims of Castle

Harbour's creditors under the Operating Agreement.  **JX 1 §§ 1.10 at 0101405-06, 12.2(a)-(b) at 0101491-92.**

26. In the end, the Class A Guaranteed Payment was never made because the allocation of the income to the Banks provided them with a return that exceeded the applicable return used to determine the Class A Guaranteed Payment.  **PDX Q; Tr. at 833:10 - 835:19 (7/27/04, Myers); Tr. at 346:12-20, 365:18-21 (7/22/04, Dull).**

27. In addition to the Class A Guaranteed Payment under the Operating Agreement, the Banks also received a separate performance guaranty from GECC ("GECC Guaranty"). **JX 3 at 0099399-429.**

28. The GECC Guaranty was a promise to the Banks that GECC's corporate subsidiaries (TIFD III-E and TIFD III-M) and the Managers of Castle Harbour would abide by the terms of Operating Agreement. GECC guaranteed "the due and punctual performance and payment by the GECC Subsidiaries (in their respective individual corporate capacities) and the Managers of all covenants, obligations and indemnities . . . to be performed or observed or paid by them" under the Operating Agreement and related documents.  **JX 3 § 2 at 0099405; Tr. at 246:24 - 247:21 (7/22/04, Dull); Tr. at 764:9-20 (7/27/04, Myers); Mulders Depo. at 50:3-15.**

29. The GECC Guaranty did not give the Banks any greater claim against GECC than they would have had against TIFD III-E and TIFD III-M and the Managers of Castle Harbour under the Operating Agreement. **JX 3 § 2 at 0099405; Mulders Depo. at 50:3-15.**

30. The GECC Guaranty did not change the economic reality that the Banks' return was tied to the performance of the assets in the Partnership and it did not provide the Banks with any guarantee as to the performance of those assets in the hands of the Partnership. **JX 3 § 2 at 0099405; Tr. at 246:24 - 247:21 (7/22/04, Dull); Tr. at 764:9-20 (7/27/04, Myers); Mulders Depo. at 50:3-15.**

31. The executives who negotiated the terms of the GECC Guaranty on behalf of the Banks understood that the GECC Guaranty did not guarantee the repayment of the Banks' capital investment. **Mulders Depo. at 50:15, 50:21 - 51:10, 52:11-13; Nagel Depo. at 81:24 - 82:8.**

32. Neither TIFD III-E nor TIFD III-M had any obligation to make the Banks whole for the loss of their investments, nor did GECC have any such direct or indirect obligation. **JX 1 §§ 3.2 at 0101435-36, 3.3 at 0101436-43; PDX E; Tr. at 781:15 - 782:1 (7/27/04, Myers).**

33. Pursuant to the terms of the Operating Agreement, on December 31, 1998, the Banks' interests in the Partnership were bought out and each Bank received $15,579,880, an amount equal to the positive balance in its capital account, plus an indemnification premium of $77,880. **JX 71 at 0024683-88; JX 72 at 0024677-82; Tr. at 779:24 - 780:10 (7/27/04, Myers).**

34. A transfer of aircraft by Castle Harbour to CHLI that would have disadvantaged the Banks was not a realistic possibility and never occurred. The aircraft contributed by TIFD III-E to Castle Harbour were encumbered by debt, and the by-laws of CHLI prohibited it from incurring or assuming debt without the consent of its shareholder,

Castle Harbour. Castle Harbour's Operating Agreement specifically prohibited the Managers from consenting to CHLI's incurring of indebtedness without the consent of the Banks. GECC could not amend CHLI's bylaws without the approval of the Banks. Upon the termination of a lease (which is typically when the debt would be repaid), section 5.5(h) of the Operating Agreement provided a list of actions the Managers were permitted to take. Any other option – including a contribution to CHLI – required the Banks' consent. **JX 1 §§ 1.10 at 0101408, 5.4(m) at 0101458, 5.5(h) at 0101462-63, 5.5(k) at 0101463, 9.1 at 0101480; JX 2 Exhibit L at 0102135-36; PX 258 at 0002792-97; PX 357 at 0025335-39.**

35. There were no side agreements between the parties to the Castle Harbour transaction that gave the Banks any rights in addition to those deriving from the transaction documents, including the Operating Agreement, as amended, and the GECC Guaranty. The Operating Agreement, its amendments and waiver agreements, and the various transaction documents relating to the formation and operation of Castle Harbour (including the GECC Guaranty) and the purchase of the Banks' interests in 1998 represented the entire agreement of the parties. **Nagel Depo. at 80:13-17; Tr. at 330:7 - 330:17 (7/22/04, Dull).**

36. Castle Harbour was not required to make Exhibit E distributions, even if adequate funds were available. If Castle Harbour failed to make an Exhibit E distribution to the Banks, the Banks' remedy was their right under the Operating Agreement to cause Castle Harbour to be liquidated. **JX 1 § 14.1(d) at 0101499-500; Tr. at 345:8-22 (7/22/04, Dull); Tr. at 649:4-13 (7/26/04, Tewell); Tr. at 1056:21 - 1057:1 (7/28/04, Lacey).**

37. The Banks held capital interests in the Castle Harbour partnership.

### C. Banks' ownership of and participation in Castle Harbour's leasing business

38. ING acquired its Class A member interest in Castle Harbour by:

    a. Payment of $25,424,649.50 to acquire part of the member interest in Castle Harbour that had been held by TIFD III-M; and

    b. A cash contribution of $33,712,079.50 to Castle Harbour.

    **JX 1 § 2.2 at 0101431; JX 2 § 2.1 at 0101699-700; PX 108; PX 109; PDX C; Tr. at 322:8 - 323:5 (7/22/04, Dull); *TIFD III-E*, 342 F. Supp. 2d at 97-98.**

39. Rabo acquired its Class A member interest in Castle Harbour by:

    a. Payment of $25,424,649.50 to acquire part of the member interest in Castle Harbour that had been held by TIFD III-M; and

    b. A cash contribution of $33,712,079.50 to Castle Harbour.

    **JX 1 § 2.2 at 0101431; JX 2 § 2.1 at 0101699; PX 110; PX 111; PDX C; Tr. at 322:8 - 323:5 (7/22/04, Dull); *TIFD III-E*, 342 F. Supp. 2d at 97-98.**

40. The formation of Castle Harbour and the transaction in which the Banks joined the Partnership had non-tax business purposes for GECC and its affiliates, including raising cash against GECC's aircraft portfolio, demonstrating the ability to attract equity investment in order to meet the industry's future demands, and reducing GECC's exposure to risk in the aircraft leasing business. **JX 8 at 0097297; JX 16 at 0076301; Tr. at 77:4 - 78:2, 92:20 - 93:25 (7/21/04, O'Reilly); Tr. at 154:7 - 157:10; 158:13 - 159:14; 167:18 - 169:23 (7/21/04, Lewis); Tr. at 390:1-20 (7/22/04, Parke); Tr. at 455:12 - 456:14, 457:6-20 (7/23/04, Nayden); Tr. at 302:13 - 302:20 (7/22/04, Dull); *TIFD III-E*, 342 F. Supp. 2d at 96-97, 111, 113.**

41. The Banks' agreement to participate in the Castle Harbour transaction came after three weeks of arduous negotiation over risk allocation and the manner in which the Partnership would be managed.  **Tr. 321:4-7, 327:13-24 (7/22/04, Dull); Tr. at 226:1-20 (7/21/04, Brickman); Nagel Depo. at 76:15-17; Mulders Depo. at 98:9-12.**

42. FAA regulations limited the ability of the members of the Partnership to structure Castle Harbour in a manner that would allow the Banks to participate directly in the operation, management, and control of the business.  In light of these restrictions, the Banks negotiated for and obtained a detailed set of negative controls in the Operating Agreement that limited the authority of the Castle Harbour managers to make certain business decisions without first obtaining approval from ING and Rabo.  **JX 1 at § 5.4 at 0101455-59; PX 43 at 046800; Tr. at 326:3-13, 359:8 - 360:7 (7/22/04, Dull); Tr. at 775:4 - 776:3 (7/27/04, Myers).**

43. The Banks frequently participated in Castle Harbour's annual meetings and managers meetings, either in person or by telephone.  **PX 213 at 0000364; PX 230; PX 249 at 0002719; PX 257 at 0041148; PX 300; PX 311 at 0002619; PX 336 at 0024212; PX 337 at 0024206; PX 355 at 0024174; PX 358 at 0024167; Tr. at 362:18-21 (7/22/04, Dull); Tr. at 501:14-16 (7/26/04, Hyde); Tr. at 644:13-34, 697:14 - 698:1 (7/26/04, Tewell); Mulders Depo. at 76:24 - 77:25.**

44. Outside the context of formal meetings, the Banks also were regularly kept abreast of and consulted on the operations of Castle Harbour.  **Tr. at 504:6-17, 627:6-12 (7/26/04, Hyde); Tr. at 645:18-25, 649:25 - 650:12 (7/26/04, Tewell) .**

45. Between March 8, 1994 and January 1, 1998, the Operating Agreement was amended seven times in order to accomplish business objectives of Castle Harbour that were otherwise limited by negative restrictions in the agreement. **JX 27 at 0029879; JX 30 at 0029890; JX 44 at 0070741; JX 46 at 0029907; JX 52 at 0029935; JX 63 0047915; JX 64 at 0024383.**

46. Each amendment to the Operating Agreement was considered and approved by the Banks. **JX 27 at 0029887-88; JX 30 at 0029695-96; JX 44 at 0070746-47; JX 46 at 0029916-17; JX 52 at 0029940-41; JX 63 at 0047920-21; JX 64 at 0024387-88.**

47. On six different occasions the Banks agreed to waive certain provisions of the Operating Agreement to allow the Partnership to accomplish business objectives that were otherwise limited by the negative restrictions in the Agreement, including Castle Harbour's sale of eight aircraft to Federal Express in 1995, Castle Harbour's sale of eight aircraft to American Airlines in 1995 and 1996, Castle Harbour's lease extension agreement with U.S. Airways, and Castle Harbour's lease extension agreement with Delta in 1995. **PX 258 at 002796-97; PX 260 at 0002828-29; PX 282 at 0057165-66; PX 350 at 0024420-21; PX 354 at 0024408-09; PX 357 at 0025338-39; Tr. at 361:4-21 (7/22/04, Dull); Tr. at 500:14-20 (7/26/04, Hyde); Mulders Depo. 77:23 - 80:20.**

48. The amount of the required depreciation on the Partnership's original aircraft was fixed at inception by Exhibit F to the Operating Agreement. Any revision of the depreciation schedule required the Banks' approval of an amendment to the Operating Agreement. **JX 1 §§ 1.10 at 0101408, 9.1(a) at 0101480, Exhibit F at 0101665.**

49. The Banks were the owners of their interests in Castle Harbour.

II.   CONCLUSION OF LAW UNDER SECTION 704(e)(1)

1.   ING and Rabo were partners, under section 704(e)(1), in the Castle Harbour partnership.

Respectfully submitted this 31st day of January 2007,

                    PLAINTIFF, TIFD III-E INC., the Tax Matters Partner of
                    CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY

                    */s/ Ann H. Rubin*
                    Ann H. Rubin, ct04486
                    Anthony M. Fitzgerald, ct04167
                    CARMODY & TORRANCE LLP
                    195 Church Street, P.O. Box 1950
                    New Haven, Connecticut 06509-1950
                    Telephone:   (203) 777-5501
                    Facsimile:   (203) 784-3199
                    Email:   arubin@carmodylaw.com
                            afitzgerald@carmodylaw.com

OF COUNSEL

| | |
|---|---|
| William F. Nelson, ct22883 | Suzanne Feese, ct23162 |
| David J. Curtin, ct22881 | KING & SPALDING |
| John A. Galotto, ct22882 | 1180 Peachtree Street |
| MCKEE NELSON LLP | Atlanta, Georgia 30309 |
| 1919 M Street, N.W., Suite 200 | Telephone:   (404) 572-3566 |
| Washington, D.C. 20036 | Facsimile:   (404) 572-5100 |
| Telephone:   (202) 775-1880 | Email: sfeese@kslaw.com |
| Facsimile:   (202) 775-8586 | |
| Email: wnelson@mckeenelson.com | |
|        dcurtin@mckeenelson.com | |
|        jgalotto@mckeenelson.com | |