# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| TIFD III-E INC., the Tax Matters Partner of CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) |

Case Nos.:  3:01-CV-01839 (SRU) (lead case)
3:01-CV-01840 (SRU)

## PLAINTIFF'S BRIEF IN OPPOSITION TO GOVERNMENT'S
## INITIAL BRIEF ON REMAND REGARDING PENALTIES

MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C.  20036
Telephone:  (202) 775-1880


KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 572-3566


CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, Connecticut  06509-1950
Telephone:  (203) 777-5501


Attorneys for Plaintiff, TIFD III-E INC.

**TABLE OF CONTENTS**

Introduction ..........................................................................................................................1

Background Regarding TEFRA Proceedings ......................................................................2

Summary of Argument ........................................................................................................3

Argument ............................................................................................................................5

    I.     The Substantial Understatement Penalty Does Not Apply ......................................5

          A.     Overview of substantial understatement penalty. .........................................5

          B.     The treatment of the Banks as "partners" was supported by substantial authority. ....................................................................................................6

                  1.     The longstanding interpretation of *Culbertson* provides substantial authority for treating the Banks as partners. ......8

                  2.     Section 704(e)(1) requires treatment of the Banks as partners. ................................................................................9

                  3.     The authorities cited by the Government do not refute the Partnership's position. ...............................................9

                  4.     There is substantial authority for treating debt-like interests as equity. ...........................................................13

                    5.     Conclusion .....................................................................15

           C.     The Castle Harbour transaction is not a tax shelter within the meaning of the regulations. ............................................................................15

                  1.     Castle Harbour was not a "tax shelter" within the meaning of the section 6662 regulations because the disputed tax benefits were consistent with the Code and Congressional purpose ....................................................16

                  2.     Castle Harbour was not a tax shelter because the evidence in the record shows that its principal purpose was not the avoidance or evasion of tax. ...................................19

           D.     Conclusion. ................................................................................23

    II.     The Reasonable Belief Defense is a Partner-Level Defense That is Not Appropriate For Resolution in This Partnership-Level Proceeding ......................23

          A.     The TEFRA rules in effect for 1997 and 1998 distinguish between partnership-level and partner-level penalty issues. ...................................24

|   |   | 1. | Treatment of penalties in TEFRA proceedings. ................24 |
|   |   | 2. | The 1997 TEFRA amendments require consideration of partner-level defenses in a separate proceeding. ...........25 |

| | B. | The reasonable belief defense is a partner-level defense..........................28 |

III. There is No Basis for Assertion of a Negligence Penalty......................................30

A. Standard for negligence. .........................................................................30

B. A reasonable basis existed for the Partnership's treatment of the Banks as partners. ...................................................................................31

C. The Government's "too good to be true" argument provides no basis for its penalty assertion. ...................................................................31

D. Conclusion. ...........................................................................................33

IV. The Court Should Reject the Government's Effort to Obtain a Final Judgment on the Reasonable Cause Defense.......................................................34

V. The Court Should Determine that the Partnership Had Substantial Authority and a Reasonable Basis for its Tax Return Positions ...........................36

Appendices 1 and 2............................................................................................. Attached

## TABLE OF AUTHORITIES

### CASES

*Bobsee Corp. v. United States*, 411 F.2d 231 (5th Cir. 1969) ........................................22

*Brannen v. Commissioner*, 722 F.2d 695 (11th Cir. 1984)..............................................27

*Brown Group, Inc. v. Commissioner*, 77 F.3d 217 (8th Cir. 1996) ................................32

*Capri, Inc. v. Commissioner*, 65 T.C. 162 (1975) .........................................................21

*Coggin Automotive Corp. v. Commissioner*, 292 F.3d 1326 (11th Cir. 2002) ..............32

*Commissioner v. Meridian & Thirteenth Realty Co.*, 132 F.2d 182 (7th Cir. 1942) ......14

*Commissioner v. O.P.P. Holding Corp.*, 76 F.2d 11 (2d Cir. 1935).........................13, 14

*Culbertson v. Commissioner*, 337 U.S. 733 (1949) ..........................................................7

*Dyer v. Commissioner*, 211 F.2d 500 (2d Cir. 1954)........................................................8

*Estate of Kluener v. Commissioner*, 154 F.3d 630 (6th Cir. 1998)...................................6

*Gilbert v. Commissioner*, 248 F.2d 399 (2d Cir. 1957) ..................................................11

*Gitlitz v. Commissioner*, 531 U.S. 206 (2001)................................................................32

*Holmes v. United States*, 85 F.3d 956 (2d Cir. 1996) .....................................................37

*Jahn v. Pedrick*, 229 F.2d 71 (2d Cir. 1956)....................................................................8

*Jewel Tea Co., Inc. v. United States*, 90 F.2d 451 (2d Cir. 1937) ..................................13

*John Kelley Co. v. Commissioner*, 326 U.S. 521 (1946) .................................................11

*Katz v. Commissioner*, 335 F.3d 1121 (10th Cir. 2003) .................................................24

*Klamath Strategic Investment Fund, LLC v. United States*, 2007 U.S. Dist. LEXIS 6939
(E.D. Tex. Sept. 1, 2006) ...........................................................................................35, 36

*MCA INC. v. United States*, 685 F.2d 1099 (9th Cir. 1982) ...........................................32

*O'Hare v. Commissioner*, 641 F.2d 83 (2d Cir. 1981) .............................................10, 11

*Santa Monica Pictures, L.L.C v. Commissioner*, T.C.M. (CCH) 1157 (2005)..............36

*Singh v. United States Department of Justice*, 461 F.3d 290 (2d Cir. 2006) ...................................36

*Slifka v. Commissioner*, 182 F.2d 345 (2d Cir. 1950) ...............................................................8, 9

*Southern Dredging Corp. v. Commissioner*, 54 T.C. 705 (1970) .................................................21

*Tallal v. Commissioner*, 778 F.2d 275 (5th Cir. 1985) .............................................................27

*TIFD III-E INC. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004) .............................. *passim*

*TIFD III-E INC. v. United States*, 459 F.3d 220 (2d Cir. 2006) .........................................1, 12, 19

*U.S. Shelter Corp. v. United States*, 13 Cl. Ct. 606 (1987) .........................................................22

## STATUTES AND REGULATIONS

I.R.C. § 702(a) ........................................................................................................................2

I.R.C. § 6221 .....................................................................................................................2, 3, 24

I.R.C. § 6226(f) ..................................................................................................................3, 24

I.R.C. § 6230(a), (c) ...........................................................................24, 25, 27, 28, 34

I.R.C. § 6231(a) ........................................................................................................................24

I.R.C. § 6234 .....................................................................................................................2, 3, 24

I.R.C. § 6662(a), (d) .......................................................................................5, 6, 15, 23

I.R.C. § 6662(d)(2)(C) (1993) ..............................................................................6, 15

I.R.C. § 6664(c)(1) ...................................................................................................................34

American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 819, 118 Stat. 1418, 1584
(2004) .................................................................................................................................5

Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1238(a), 111 Stat. 788, 1026 (1997) ......3, 24

Uruguay Round Agreements Act, Pub. L. No. 103-465, §744, 108 Stat. 4809, 5011
(1994) ...............................................................................................................................15

Treas. Reg. § 1.704-1(c)(2)(i) (1956) .........................................................................18

Treas. Reg. § 1.704-3(b)(1)...................................................................................................19

Temp. Treas. Reg. § 301.6221-1T..............................................................................25, 26, 34

Treas. Reg. § 301.6221-1.............................................................................25, 26, 29, 34, 36

Treas. Reg. § 301.6231(a)(5).............................................................................................27, 34

Treas. Reg. § 1.6662-3(b)(3) (1997).....................................................................................30

Treas. Reg. § 1.6662-3...............................................................................................30, 31, 32

Treas. Reg. § 1.6662-4.......................................................................................................*passim*

Treas. Reg. § 1.6662-4(d)(2) (1997).....................................................................................30

## LEGISLATIVE MATERIALS

Staff of the Joint Committee on Taxation, 105th Cong., General Explanation of Tax
   Legislation Enacted in 1997, at 377-78 (Comm. Print 1997).................................24

H.R. Rep. No. 105-220, at 685 (1997) (Conf. Rep.)...........................................................25

S. Rep. No. 83-1622, at 381 (1954).....................................................................................18

S. Rep. No. 98-169, vol. 1, at 215 n.2 (1984)....................................................................19

## ADMINISTRATIVE MATERIALS

T.D. 8617, 1995-2 C.B. 274...................................................................................................31

T.D. 8808, 1999-1 C.B. 682...................................................................................................26

## MISCELLANEOUS

Donald Korb, What a Difference Two Years Makes, Remarks at the 2007 University of
   Southern California Tax Institute (Jan. 23, 2007), *in* Tax Notes Today, Jan. 24, 2007,
   LEXIS, 2007 TNT 16-65 ...........................................................................................12

Crystal Tandon, *Korb, Former IRS Officials Discuss Recent Shelter Cases, in* Tax Notes
   Today, Sept. 18, 2006, LEXIS, 2006 TNT 180-3 ....................................................12

*Corporation Income Tax Brackets and Rates, 1909-2002*, at Table 1, *at*
      http://www.irs.gov/pub/irs-soi/02corate.pdf ........................................................................33

*Personal Exemptions and Individual Income Tax Rates, 1913-2002*, at Table 1, *at*
      http://www.irs.gov/pub/irs-soi/02inpetr.pdf ........................................................................33

Reply for the United States Post-Trial Brief for Plaintiffs at 34-35, *Jade Trading, LLC v.*
      *United States*, No. 03-2164 (Fed. Cl. Dec. 2, 2005) .................................................................35

United States' First Motion in Limine at 5, *Klamath Strategic Investment Fund, LLC v.*
      *United States*, No. 5:04-CV-278-TJW, 2007 U.S. Dist. LEXIS 6939
      (E.D. Tex. Sept. 1, 2006) ........................................................................................................35

United States' Response to Plaintiffs' Motion to Compel Discovery, *Stobie Creek*
      *Investments, LLC v. United States*, No. 05-748 T (Fed. Cl. Dec. 29, 2006) ...........................35

Pursuant to the Court's November 15, 2006 Memorandum of Conference, Plaintiff TIFD III-E INC. files this opposition to the Government's Initial Brief on Remand seeking accuracy-related penalties for the years 1997 and 1998.

## Introduction

The Court previously determined that the formation of Castle Harbour-I Limited-Liability Company ("Castle Harbour" or the "Partnership") and the acquisition by ING and Rabo (collectively, the "Banks") of equity interests in the Partnership had business purpose and economic substance. The Court further held that Plaintiff's reporting of the transaction for federal income tax purposes was correct.

The Government did not appeal the Court's determinations that the Castle Harbour transaction had economic substance and that the Banks' interests were equity, but it did appeal the Court's determination that the Banks were partners. In addition, the Government sought remand for a determination of penalties. Appellant Br. at 83. The Second Circuit reversed and remanded the case for further proceedings in this Court, including consideration of whether the Banks were partners under section 704(e) of the Internal Revenue Code (the "Code"). *TIFD III-E INC. v. United States*, 459 F.3d 220, 241 n.19 (2d Cir. 2006). The Second Circuit's opinion did not mention penalties.

On remand, the Government resurrects its penalty claims and urges this Court to impose either a negligence penalty or a substantial understatement penalty. According to the Government, its penalty demands are justified by the Second Circuit's reversal of this Court's decision. But the law is clear that substantial understatement and negligence are not strict liability penalties. The Government's demands for imposition of penalties are inappropriate, particularly when one considers that this Court, after carefully considering the law and extensive

1

documentary and testimonial evidence, issued a thorough opinion sustaining Plaintiff's position on the merits.

The Court requested simultaneous briefing of section 704(e) and penalties. If the Court decides the section 704(e)(1) (statutory partner) issue in Plaintiff's favor, it need not address the Government's penalty claims. If, however, the Court does consider the penalty issues, an analysis of the relevant authorities demonstrates that there is no basis for imposition of any penalty.

## Background Regarding TEFRA Proceedings

Under the Code, partnerships generally are not subject to federal income tax at the entity level. Rather, partners must include their distributive shares of partnership income, gain, loss, deduction and credit in computing their separate tax liability. I.R.C. § 702(a). If the Internal Revenue Service ("IRS") adjusts an item reported on a partnership tax return (for example, if it disallows a deduction), any tax resulting from that adjustment is assessed at the partner level. Similarly, if the IRS decides to impose a penalty in respect of the adjustment, it assesses that penalty against the partners, not the partnership.

As discussed in detail below, the TEFRA provisions of the Code[1] provide for administrative and judicial proceedings at the partnership level to resolve issues common to all partners, and separate proceedings at the partner level to resolve partner-specific issues. *See* I.R.C. §§ 6221-6234. This case is a partnership-level proceeding. If the Court were to enter a judgment adjusting any of Castle Harbour's partnership items, the IRS would assess the tax resulting from those adjustments against Castle Harbour's partners.

---

[1] The identification of these provisions as the TEFRA rules is attributable to their original enactment as part of the Tax Equity and Fiscal Responsibility Act of 1982 (generally referred to as "TEFRA").

Prior to 1997, the TEFRA rules required that all penalty issues be determined in separate partner-level proceedings. In 1997, Congress amended the TEFRA provisions to provide for partnership-level determination of certain penalty-related issues. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1238(a), (b)(1), 111 Stat. 788, 1026 (1997) (codified at I.R.C. §§ 6221, 6226(f)). The 1997 amendment applies to taxable years ending after August 5, 1997. Thus, the only penalty-related issues properly before this Court are partnership-level determinations for the Partnership's taxable years ending December 31, 1997 and December 31, 1998. The parties agree that all penalty determinations relating to the 1993 through 1996 years must be resolved in separate partner-level proceedings. *See* United States' Initial Brief on Remand ("Gov't Penalty Br.") at 2. Furthermore, as discussed below, the Code and regulations continue to require that partner-specific defenses to penalties be asserted in separate partner-level proceedings.

## Summary of Argument

The only penalty-related issues that are properly before this Court are those determinations relating to 1997 and 1998 that do not involve partner-specific defenses. In this case, there are three such issues:

> (1) whether the Partnership's treatment of the Banks as partners was supported by "substantial authority";

> (2) whether the Partnership was a "tax shelter" for purposes of the substantial understatement penalty; and

> (3) whether there was a "reasonable basis" for the Partnership's classification of the Banks as partners.

Issues (1) and (2) relate to the substantial understatement penalty, while issue (3) relates to the negligence penalty.

3

A finding that the Partnership had substantial authority for its treatment of the Banks as partners would preclude imposition of the substantial understatement penalty, unless the Court determines that the Castle Harbour transaction was a "tax shelter," as defined in the applicable regulations. If the Court decides both the substantial authority and tax shelter issues in Plaintiff's favor, the penalty analysis ends and no penalty can be imposed by the IRS.

If, however, the Court decides that Castle Harbour was a tax shelter, the remaining issues necessary to determine whether the substantial understatement penalty applies—most importantly, whether the GECC partners reasonably believed that their tax position was more likely than not correct—would become relevant. These issues involve the application of partner-level defenses that, under the statute and regulations, must be addressed in a separate partner-level proceeding.

If the Court determines that the Partnership had a "reasonable basis" for its tax return position, the negligence penalty cannot apply. The reasonable basis standard is less stringent than the substantial authority standard. Therefore, a determination that there was substantial authority for the Partnership's tax return position would also resolve the reasonable basis issue and, accordingly, preclude imposition of the negligence penalty.

The prior opinion of this Court, as well as a fresh examination of all relevant authority, demonstrates that the Partnership's tax return position was supported by substantial authority and had a reasonable basis. Furthermore, an examination of the regulations and the evidence in the record leads directly to the conclusion that the Castle Harbour transaction was not a tax shelter within the meaning of the applicable statute and regulations. Therefore, neither the substantial understatement nor the negligence penalty applies with respect to the proposed adjustments to the Castle Harbour tax returns.

The Government's remaining penalty-related assertions—such as its claim that there was no "reasonable cause" for the GECC partners' tax return positions—involve partner-level defenses that, under the Code and regulations, must be addressed in a separate partner-level proceeding. The Government's effort to obtain a judgment on partner-level defenses in this partnership-level proceeding violates the applicable statute and regulations and contradicts the Government's litigating position in other pending cases. The Government's brief does not explain why it has changed its position on this issue in this case, nor does it explain why the rules it wrote implementing Congressional intent should be ignored in this case.

## ARGUMENT

### I.    The Substantial Understatement Penalty Does Not Apply

#### A.    Overview of substantial understatement penalty.

Section 6662 imposes a 20% penalty on the amount of any "substantial understatement" of tax. I.R.C. § 6662(a), (b)(2). For 1997 and 1998, the threshold understatement for imposition of the penalty against a corporation was the greater of $10,000 or 10% of the tax that should have been shown on the return. I.R.C. § 6662(d)(1)(A), (B) (1998). This 10% threshold applies in determining whether any understatement of tax by the GECC partners is subject to the substantial understatement penalty.[2]  As explained below, whether the threshold is satisfied is not before this Court. *See infra* pp. 26-27.

For purposes of applying the substantial understatement penalty, the taxpayer's understatement is reduced by the portion attributable to "the treatment of any item by the

---

[2]    In 2004, Congress amended the threshold to the lesser of $10,000,000 or 10% of the tax that should have been reported. I.R.C. § 6662(d)(1)(B). This amendment applies to taxable years ending after October 22, 2004 and thus does not apply to the Partnership's 1997 and 1998 years. American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 819, 118 Stat. 1418, 1584 (2004).

5

taxpayer if there is or was substantial authority for such treatment." I.R.C. § 6662(d)(2)(B).

Thus, if substantial authority existed for the taxpayer's treatment of the item on its tax return, the

amount of the item is excluded from the numerator of the fraction used to determine whether the

taxpayer's understatement exceeds 10% of the amount it should have reported.

As applicable to transactions entered into in 1993, section 6662 provides that, if an

understatement is attributable to a "tax shelter," the taxpayer must also show that it "reasonably

believed" that its tax return treatment was "more likely than not" the correct treatment. I.R.C. §

6662(d)(2)(C)(i)(II) (1993) (attached hereto as Appendix 2A).

### B.       The treatment of the Banks as "partners" was supported by substantial authority.

The regulations define "substantial authority" as an objective standard that "involv[es] an

analysis of the law and application of the law to the relevant facts." Treas. Reg. § 1.6662-

4(d)(2). Substantial authority exists for the tax treatment of an item if "the weight of authorities

supporting the treatment is substantial in relation to the weight of authorities supporting contrary

treatment." Treas. Reg. § 1.6662-4(d)(3); see Estate of Kluener v. Comm'r, 154 F.3d 630, 639

n.2 (6th Cir. 1998) (comparing substantial authority standard to the "substantial evidence"

standard applicable to judicial review of appeals from administrative bodies, i.e., whether the

degree of evidence could satisfy a reasonable factfinder). The regulations specify the types of

authorities that may be considered.[3] Substantial authority is analyzed as of the date on which the

---

[3]   The enumerated authorities include:

> Applicable provisions of the Internal Revenue Code and other statutory provisions;
> proposed, temporary and final regulations construing such statutes; revenue rulings and
> revenue procedures; . . . court cases; congressional intent as reflected in committee
> reports, joint explanatory statements of managers included in conference committee
> reports, and floor statements made prior to enactment by one of a bill's managers;
> General Explanations of tax legislation prepared by the Joint Committee on Taxation (the
> Blue Book); private letter rulings and technical advice memoranda issued after October

return containing the item is filed or the last day of the taxable year to which the return relates. Treas. Reg. § 1.6662-4(d)(3)(iv)(C).

The regulations recognize that "[t]here may be substantial authority for more than one position with respect to the same item." Treas. Reg. § 1.6662-4(d)(3)(i). Thus, the substantial authority standard is less demanding than the "more likely than not" standard. Treas. Reg. § 1.6662-4(d)(2). In fact, substantial authority may exist even if a position is supported by nothing more than "a well-reasoned construction of the applicable statutory provision." Treas. Reg. § 1.6662-4(d)(3)(ii). Therefore, the taxpayer may satisfy the substantial authority standard even if its tax return position is ultimately held to be incorrect. All the taxpayer need show is that its position was supported by one or more authorities specified in the regulations or by a well-reasoned construction of the relevant statute. *See supra* note 3.

Plaintiff's trial brief identified two separate and independent lines of authority that support the treatment of the Banks as partners in Castle Harbour: (1) the common-law definition of partnership derived from *Culbertson v. Commissioner*, 337 U.S. 733 (1949); and (2) the statutory standard of section 704(e)(1). *See* Plaintiff's Trial Brief at 51-58. Standing alone, either of these lines of authority satisfies the substantial authority standard; taken together, they leave no room for doubt that Plaintiff has satisfied the substantial authority standard. This Court's thorough opinion confirms that there was substantial authority for the Partnership's tax return position.

---

31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin.

Treas. Reg. § 1.6662-4(d)(3)(iii).

7

1.     **The longstanding interpretation of _Culbertson_ provides substantial authority for treating the Banks as partners.** The Second Circuit based its decision on a novel interpretation of _Culbertson_. An examination of authorities in existence at the time the Partnership filed its 1997 and 1998 returns demonstrates that substantial authority existed for classifying the Banks as "partners" under the traditional reading of _Culbertson_.

In its opinion following trial, this Court noted that section 761 defines the term "partner" as "a member of a partnership" and held that because the Banks' investment in Castle Harbour had objective economic effect and was supported by a non-tax business purpose, the Banks satisfied the statutory definition of "partner." _TIFD III-E INC. v. United States_, 342 F. Supp. 2d 94, 115 (D. Conn. 2004); _see generally_ Plaintiff's Trial Brief at 51-58.

Prior case law in the Second Circuit is consistent with this Court's analysis and supports recognition of the Banks as partners under _Culbertson_. For example, in _Dyer v. Commissioner_, 211 F.2d 500, 506 (2d Cir. 1954), the Second Circuit construed _Culbertson_ to require "an explicit finding, as a fact, of lack of good faith intention before an apparently valid joint venture agreement could be ignored." In _Jahn v. Pedrick_, 229 F.2d 71, 73 (2d Cir. 1956) (per curiam), the Second Circuit held that a bona fide capital contribution may satisfy the requirement of _Culbertson_. In _Slifka v. Commissioner_, 182 F.2d 345 (2d Cir. 1950) (per curiam), the Second Circuit indicated that a non-tax business purpose satisfies _Culbertson_:

> The only question . . . is whether the partnerships . . . were within the statutory definition of that word. The Supreme Court has recently three times dealt with similar situations, and from these decisions we understand that they present instances of the general test laid down in _Gregory v. Helvering_: _i.e._, whether an association, or joint venture, which satisfies all formal requirements . . . has been created to promote the conduct of their business in any other way than by reducing taxes. That this makes motive a test of taxability is true enough; but it is equally true that it makes it so _only when the reducing of taxes is the sole motive._

182 F.2d at 345-46 (footnotes omitted) (emphasis added).

8

Thus, when the Partnership filed its 1997 and 1998 tax returns, the established case law in the Second Circuit provided that a taxpayer could satisfy *Culbertson* by showing the existence of a non-tax business purpose, a capital contribution, or other evidence of a good faith intention to form a joint venture. This Court's decision upholding the Partnership's treatment is entirely consistent with this prior Second Circuit case law and confirms that there was substantial authority for the Partnership's characterization of the Banks as partners under *Culbertson*'s intent-based standard.

2.    **Section 704(e)(1) requires treatment of the Banks as partners.**  Plaintiff has fully briefed why section 704(e)(1) requires recognition of the Banks as partners. *See* Plaintiff's Brief On Remand Regarding Section 704(e) of Internal Revenue Code ("Plaintiff's 704(e) Br."). As explained in that brief, section 704(e)(1) requires classification of the Banks as partners, regardless of the application of the Second Circuit's *Culbertson* test. *See id.* at 30-33. Accordingly, section 704(e)(1) also provides substantial authority for the Partnership's position, irrespective of the Second Circuit's *Culbertson* analysis.

3.    **The authorities cited by the Government do not refute the Partnership's position.**  As support for its contention that there was not substantial authority for the taxpayer's tax return treatment (or for this Court's prior decision), the Government asserts that (1) the Second Circuit cited longstanding case law that it said "compelled" its decision, and (2) there are "no contrary statutes, regulations, or rulings." Gov't Penalty Br. at 10. The Government's logic cannot be squared with the definition of "substantial authority," and its claim that no contrary authority exists is disingenuous and misleading.

The substantial understatement penalty is never placed in issue unless the IRS position has been upheld; thus, the mere fact that a court rules for the Government in a tax dispute (and,

in doing so, cites precedent that it believes supports its decision) cannot be sufficient to warrant imposition of the substantial understatement penalty. The Government's rationale would effectively convert the substantial understatement penalty into a strict liability penalty, subject only to the applicable dollar thresholds. That is not the law.

The Government asserts that penalties are appropriate because the Second Circuit relied on "well established law," *see* Gov't Penalty Br. at 3 n.4, citing four cases to support its argument. A review of these four cases demonstrates that they fall far short of negating the presence of substantial authority.

The first case identified by the Government is *Culbertson*. As the Government notes, *Culbertson* is 57 years old; however, out of more than 1,000 cases and IRS documents that have cited *Culbertson* over the last six decades, the Second Circuit's decision was the first to use the phrase "bona fide equity" or to characterize *Culbertson* as imposing that standard as a test for partner status. The Government has identified no prior case or IRS ruling relying on *Culbertson* to deny partner status to the owner of an equity interest in a tax partnership that had economic substance. Thus, the Second Circuit's 2006 interpretation of *Culbertson* fails to establish that there was not substantial authority for other interpretations of *Culbertson* in 1997 and 1998.

Similarly, the Government's new-found reliance on *O'Hare v. Commissioner*, 641 F.2d 83 (2d Cir. 1981), to support its penalty assertion is misplaced. Of all the briefs the Government has filed thus far in this case—including its pre-trial brief, its post-trial brief, and its two appellate briefs—its penalty brief on remand was the first to suggest that *O'Hare* has any relevance to the classification of the Banks as partners. A fair reading of *O'Hare* makes the Government's prior failure to rely on it understandable. In *O'Hare*, the taxpayer agreed to guarantee a loan. *Id.* at 84. Subsequently, he sought to recharacterize his guarantee as a

partnership interest so that he could convert ordinary income from a guarantee fee into capital gain from the "partnership." *Id.* The taxpayer's characterization of the arrangement as a partnership was inconsistent with the form of the transaction, and there was no evidence that the other parties intended to form a partnership with him. *Id.* at 85. The taxpayer did not have a capital interest in the alleged joint venture (and thus section 704(e)(1) could not have applied). *See id.* at 87. In short, the facts of *O'Hare* are not even remotely analogous to the facts surrounding the Banks' investment in Castle Harbour.[4]

In the third case cited by the Government, *John Kelley Co. v. Commissioner*, 326 U.S. 521 (1946), the Tax Court had upheld the taxpayer's characterization of an instrument as debt for tax purposes. The appellate court reversed. The Supreme Court reversed the appellate court and reinstated the Tax Court decision. In the same opinion, the Court resolved another case involving an unrelated taxpayer (Talbot Mills) by affirming a decision that had classified as equity an instrument that was substantially similar to the instrument classified as debt in *Kelley*. The Court devoted most of its opinion to a discussion of the amount of deference owed by the appellate courts to the Tax Court. *See id.* at 526-27. To the extent *Kelley* has any relevance to the classification of the Banks as partners, it shows that courts may reach different conclusions in debt/equity cases involving very similar instruments and thus supports Plaintiff's position on substantial authority.

The final case cited by the Government is *Gilbert v. Commissioner*, 248 F.2d 399 (2d Cir. 1957). Like *Kelley*, *Gilbert* involved an effort by the IRS to recharacterize debt as equity. In *Gilbert*, the court held that the instrument was equity, citing the lack of a "reasonable expectation of repayment." *Id.* at 406. The absence of a reasonable expectation of repayment may be highly

---

[4]  The Government may have thought *O'Hare* was irrelevant to the issue of partner status because the case does not refer to *Culbertson*, which was decided 32 years earlier.

11

relevant when the IRS is seeking to recharacterize nominal debt as equity; however, established

precedent respects preferred stock as equity even in cases where the holder has a high

expectation of repayment. *See infra* pp. 13-14; Plaintiff's 704(e) Br. at 40 n.42.[5]

The Government's reliance on *Kelley* and *Gilbert* to support the imposition of penalties

on remand is surprising. While the Second Circuit discussed these two debt/equity cases in its

opinion, it did not hold that the Banks were lenders. Moreover, since the issuance of the Second

Circuit's opinion in this case the IRS has tried to limit the implications of that opinion's

debt/equity discussion. On at least one occasion, the IRS Chief Counsel (the chief legal officer

of the IRS) reportedly referred to that discussion as a "mistake."[6] More recently, the Chief

Counsel has stated publicly:

> Although some have asserted that the Castle Harbour decision was a statement on
> the long standing debt/equity issue, the court was very careful in its statements.
> The court did not state that the interest was debt, but rather that the banks were more
> like secured creditors than equity partners. The difference is subtle but important,
> as it does not stand for any position on the debt/equity issue.[7]

Finally, the Government's assertion that "no contrary statutes, regulations, or rulings"

exist is misleading. By crafting its contention to refer only to statutes, regulations, and rulings,

the Government ignores the expansive list of authorities that must be considered in making the

determination. *See supra* note 3. Most notably, by excluding case law, the statement does not

address the numerous judicial decisions supporting Plaintiff's position. Moreover, the

---

[5]  The Second Circuit's opinion suggests that the "reasonable expectation of repayment"
standard should apply regardless of whether the form of the instrument is debt or equity, but
cites no authority for that position and fails to address the longstanding authorities that
respect highly secure preferred stock as equity. *See TIFD III-E*, 459 F.3d at 233.

[6]  Crystal Tandon, *Korb, Former IRS Officials Discuss Recent Shelter Cases, in* Tax Notes
Today, Sept, 18, 2006, LEXIS, 2006 TNT 180-3.

[7]  Donald Korb, What a Difference Two Years Makes, Remarks at the 2007 University of
Southern California Tax Institute (Jan. 23, 2007), *in* Tax Notes Today, Jan. 24, 2007, LEXIS,
2007 TNT 16-65.

Government's claim ignores numerous statutes, regulations, and rulings that support Plaintiff's position, including section 704(e)(1), the section 704(e)(1) regulations, and the numerous rulings that respect non-participating preferred interests as equity for tax purposes. *See generally* Plaintiff's 704(e) Brief.

> **4.    There is substantial authority for treating debt-like interests as equity.**  The

Government's assertion that "the nature of the Dutch banks' interest was akin to debt and not an equity interest," Gov't Penalty Br. at 19, does not support its position that the Partnership did not have substantial authority for treating the Banks as partners in 1997 and 1998. As explained in Plaintiff's 704(e) Brief, the Banks' interests were less debt-like than many preferred stock and preferred partnership instruments that the courts and the IRS have respected as bona fide equity for tax purposes. *See* Plaintiff's 704(e) Br. at 39-43.

In *Jewel Tea Co., Inc. v. United States*, 90 F.2d 451 (2d Cir. 1937), for example, Judge Learned Hand noted that preferred shareholders resemble lenders, because they, like lenders,

> are limited in their return, and any eventual profit goes to the common shares.
> Thus it would be possible to treat preferred shares like debts . . . . Such a view
> would make the common shareholders alone the company, since they alone share
> the profits and manage the enterprise . . . . It would have been an entirely logical
> and reasonable theory and the law might well have insisted upon it.  It has not; on
> the contrary it has always distinguished between creditors and preferred
> shareholders . . . .

*Id.* at 452.

Similarly, in *Commissioner v. O.P.P. Holding Corp.*, 76 F.2d 11 (2d Cir. 1935), the Second Circuit upheld a taxpayer's claim of an interest deduction on "debenture bonds." In doing so, it distinguished cases relied on by the IRS, stating:

> The only substantial distinction between those certificates [in the other cases] and
> the debenture bonds now before the court is one of nomenclature; the former had
> been denominated preferred stock. . . .  Though both contain substantially similar
> provisions and are silent as to the source of the return, it is not inconsistent to hold

that only in the case of certificates designated as bonds were the holders intended
to be creditors of the corporation . . . .

76 F.2d at 13.

The Second Circuit's longstanding recognition of preferred stock as equity that is "akin

to debt" is not unique. *See, e.g., Comm'r v. Meridian & Thirteenth Realty Co.*, 132 F.2d 182,

186 (7th Cir. 1942) ("It is often said that the essential difference between a creditor and a

stockholder is that the latter intends to make an investment and take the risks of the venture,

while the former seeks a definite obligation, payable in any event. But this variant in the

relationship—while sharp in the case of a common stockholder and a bondholder—is less wide

and distinct in the case of the preferred stockholder and the bondholder.").

These statements demonstrate that the courts have long understood that preferred stock is

"akin to debt" in many respects and, nevertheless, have respected preferred stock as equity.

Together with the authorities cited in Plaintiff's prior briefs, this precedent demonstrates that

substantial authority existed for the Partnership's treatment of the Banks' preferred interests as

equity interests in a partnership.

Finally, while the Government apparently has concluded that the Second Circuit's

opinion holds that one may have a capital investment in a partnership that is neither debt nor a

partnership interest, that "twilight zone" interpretation does not foreclose the existence of

substantial authority for the Partnership's position when it filed its returns. The Government has

cited no prior case for the proposition that one may transfer capital to a partnership and be

neither a partner nor a lender. Neither the FPAAs nor the Government's two trial briefs ever

advanced this theory, which the Government raised for the first time on appeal. *See* Plaintiff's

704(e) Br. at 43-46. Thus, while the Second Circuit's decision may support the Government's

14

position in future cases, it has no relevance to whether the Partnership had substantial authority

when it filed its 1997 and 1998 tax returns.

     5.    **Conclusion.**  There was substantial authority for the Partnership's treatment of

the Banks as partners on its 1997 and 1998 tax returns.

     C.    **The Castle Harbour transaction is not a tax shelter within the meaning of the regulations.**

     Under section 6662(d) as in effect at the time of the transaction, in the case of an

understatement resulting from a tax shelter, the taxpayer must show that it "reasonably believed

at the time the return was filed that the tax treatment . . . was more likely than not the proper

treatment." I.R.C. § 6662(d)(2)(C)(i) (1993) (attached hereto as Appendix 2A); Treas. Reg. §

1.6662-4(g)(1)(i)(B). The requirement that the taxpayer establish a "reasonable belief" defense

is in addition to the requirement that substantial authority exist for the taxpayer's position.[8]

     For purposes of triggering the reasonable belief requirement, the section 6662 regulations

generally define "tax shelter" as follows:

>      For purposes of section 6662(d), the term "tax shelter" means—(A) A
> partnership or other entity (such as a corporation or trust), (B) An investment plan
> or arrangement, or (C) Any other plan or arrangement, if the principal purpose of
> the entity, plan or arrangement, based on objective evidence, is to avoid or evade
> Federal income tax. The principal purpose of an entity, plan or arrangement is to
> avoid or evade Federal income tax if that purpose exceeds any other purpose.
> Typical of tax shelters are transactions structured with little or no motive for the
> realization of economic gain, and transactions that utilize the mismatching of
> income and deductions, overvalued assets or assets with values subject to
> substantial uncertainty, certain nonrecourse financing, financing techniques that

---

[8]   In 1994, Congress amended section 6662(d)(2) to provide that a corporation that has an
understatement attributable to a tax shelter may not avoid the substantial understatement
penalty by showing that it had substantial authority for its position. This amendment
rendered the reasonable belief defense irrelevant to such cases. As the Government
acknowledges, Gov't Penalty Br. at 9 n.8, that amendment applies to transactions entered
into on or after December 9, 1994 and thus does not apply to the Castle Harbour transaction.
*See* Uruguay Round Agreements Act, Pub. L. No. 103-465, §744, 108 Stat. 4809, 5011
(1994).

do not conform to standard commercial business practices, or the mischaracterization of the substance of the transaction.

Treas. Reg. § 1.6662-4(g)(2)(i).

There are two separate and independent reasons why Castle Harbour was not a "tax shelter" within the meaning of section 6662. First, because the disputed tax benefits at issue in this case are consistent with the statute and Congressional intent, they come within an exception to the definition of tax shelter, regardless of whether obtaining the benefits was the principal purpose of the transaction. Second, even if the disputed tax benefits do not satisfy this objective standard, the evidence in the record shows that the principal purpose of Castle Harbour was to achieve GECC's non-tax business objectives of attracting outside investors to raise equity capital and demonstrating liquidity in the aircraft leasing business without violating its negative pledge and debt-to-equity ratio requirements.

1.    **Castle Harbour was not a "tax shelter" within the meaning of the section 6662 regulations because the disputed tax benefits were consistent with the Code and Congressional purpose.** The section 6662 regulations provide that "the principal purpose" of an entity, plan or arrangement is not tax avoidance if the purpose is the claiming of a tax benefit "in a manner consistent with the statute and Congressional purpose." Treas. Reg. § 1.6662-4(g)(2)(ii). Thus, a transaction structured to claim a tax benefit that is consistent with the statute and Congressional purpose is not a tax shelter, even if obtaining that benefit was the principal purpose of the transaction.[9] Because this determination involves an objective, legal issue that

---

[9]   By definition, whether the tax benefit sought was "consistent with the statute and Congressional purpose" within the meaning of this regulation only becomes relevant if the taxpayer's effort to obtain the benefit has been unsuccessful. Accordingly, the fact a taxpayer has lost on the merits does not mean that its transaction cannot come within this exception.

16

does not depend on partner-specific facts, this Court may decide it in this partnership-level proceeding.

The tax benefits at issue in this case result from two positions: (1) the Banks were partners in Castle Harbour, and (2) the "ceiling rule" of section 704(c) required that taxable income be allocated to the Banks. As explained in our brief on section 704(e)(1), Congress has expressly provided that an owner of an interest in partnership capital shall be recognized as a partner, even if the sole purpose for its becoming a partner is tax avoidance. *See* Plaintiff's 704(e) Br. at 23-24.

Moreover, the parties' reliance on the ceiling rule did not constitute exploitation of an unanticipated "loophole" or "glitch" in the statute or regulations. To the contrary, the ceiling rule resulted from a conscious decision by Congress and the Treasury Department to require allocations of taxable income attributable to built-in gain on contributed property to the non-contributing partners. The possibility that the application of the ceiling rule could shift the tax burden associated with a contribution of built-in gain property is not an unintended or ancillary consequence of the ceiling rule: it is the logical result of applying the ceiling rule according to its terms.

When Congress first enacted section 704(c) in 1954, the general rule (contained in section 704(c)(1)) required that all taxable income attributable to built-in gain be allocated among all partners in proportion to their interests in the partnership's economic income. Section 704(c)(2) was an exception to section 704(c)(1); it permitted partners to elect to allocate the tax burden attributable to the built-in gain to the contributing partner. The ceiling rule limited the effect of the section 704(c)(2) election.

17

The legislative history to the Internal Revenue Code of 1954 explicitly described the consequences of the ceiling rule and the Senate Committee Report includes an example that describes the application of the ceiling rule to depreciation. In the example, A and B form an equal partnership. A contributes property worth $1,000 with a basis of $400, while B contributes $1,000 cash. The property contributed by A was eligible for depreciation at an annual rate of 10%. The Committee Report states:

> Since B, who contributed $1,000 in cash, has, in effect, purchased an undivided half interest in the property for $500, and since the property depreciates at an annual rate of 10 percent, B should be entitled to a deduction of $50 per year. But since the partnership is allowed only $40 per year (10 percent of $400), no more than this amount may be allocated to B. Therefore the partners agree that the $40 deduction for depreciation is to be allocated $40 to B and $0 to A, the contributor.

S. Rep. No. 83-1622, at 381 (1954) (attached hereto as Appendix 2B). As this example demonstrates, the clear and well-understood effect of the ceiling rule is to overstate the taxable income of B, the noncontributing partner, compared to B's economic income, and to understate the taxable income of A, the contributing partner, compared to A's economic income.[10] *See also* Plaintiff's Trial Br. at 76-79.

Consistent with the legislative history, the regulations implementing the 1954 Code contained an example explicitly applying the ceiling rule to a depreciation deduction. Treas. Reg. § 1.704-1(c)(2)(i), Example 1 (1956) (attached hereto as Appendix 2C). This example shows that the ceiling rule shifted taxable income from the contributing partner to the noncontributing partner, causing the noncontributing partner's taxable income to exceed its

---

[10] Enactment of the Internal Revenue Code of 1954 came only three years after the Revenue Act of 1951, in which Congress had enacted legislation resolving the family partnership controversy. *See generally* Plaintiff's 704(e) Br. at 18-24. There can be no doubt that Congress was aware that the ceiling rule would, in many cases, shift taxable income attributable to built-in gain from high-bracket partners to low-bracket partners.

economic income. The Treasury Department promulgated this regulation in 1956, and the regulation remained unchanged until after the Castle Harbour transaction.

Congress eliminated the section 704(c)(1) rule in 1984 (thus making section 704(c)(2) mandatory rather than elective). At that time, it suggested that the IRS consider modifying the ceiling rule, but made clear that any revision should be prospective. S. Rep. No. 98-169, vol. 1, at 215 n.2 (1984) (attached hereto as Appendix 2D).[11]

Castle Harbour's application of the ceiling rule is consistent with the legislative history and the longstanding Treasury Regulations. Because the disputed tax benefit was claimed "in a manner consistent with the statute and Congressional intent," the Castle Harbour transaction was not a "tax shelter" for purposes of section 6662(d).

**2.     Castle Harbour was not a tax shelter because the evidence in the record shows that its principal purpose was not the avoidance or evasion of tax.** Even if the Court were to conclude that the application of the ceiling rule to the Partnership was not "consistent with the statute and Congressional purpose," the Castle Harbour transaction would not constitute a tax shelter unless the principal purpose of the Castle Harbour transaction was "to avoid or evade" tax.

While the Government cites the Second Circuit's characterization of the transaction as "largely" tax-motivated, Gov't Penalty Br. at 8, the Second Circuit did not purport to make a determination on that issue; in fact, it based its statement on its interpretation of this Court's opinion. *TIFD III-E*, 459 F.3d at 224. While this Court stated that "*one of* GECC's principal motivations*" for entering into the Castle Harbour transaction was tax savings, *TIFD III-E*, 342 F.

---

[11] The ceiling rule continues in the existing 704(c) regulations as part of the "traditional method." Treas. Reg. § 1.704-3(b)(1).

Supp. 2d at 121 (emphasis added), it made no finding that saving taxes was *the* principal purpose of the transaction. Accordingly, the Second Circuit's comment is not dispositive.

The uncontroverted evidence presented to this Court demonstrates that GECC's decision to enter into the Castle Harbour transaction was principally motivated by non-tax business objectives.[12] As the Court heard from a number of witnesses, when the airline industry encountered a number of setbacks in the early 1990s, GECC business people began to search for ways to minimize risk exposure in the industry.[13] In May 1992, GECC's aircraft leasing group sent requests for proposals to seven investment banks seeking their recommendations for how GECC could manage this exposure.[14] The requests for proposal show that GECC was interested in identifying outside equity investors that would provide immediate cash for an interest in future rental-income streams related to a portion of GECC's aircraft portfolio.[15] This monetization of assets would enable GECC to demonstrate in the marketplace that it could access liquidity in its aircraft portfolio even in an economic downturn.[16]

The evidence demonstrates that the Castle Harbour transaction originated with the business executives who were seeking to solve their non-tax business problems. In fact, the

---

[12]  Tr. at 451:25 - 452:10, 456:9-14 (7/23/04, Nayden); Tr. at 77:07 - 78:2 (7/21/04, O'Reilly).

[13]  JX 11 at 0097323; JX 7 at 0097222-31; PX 139; Tr. at 137:5 - 138:5, 154:12 - 157:10 (7/21/04, Lewis); Tr. at 451:7 - 452:10 (7/23/04, Nayden); Tr. at 49:1-20 (7/21/04, O'Reilly); Tr. at 385:17 - 386:14 (7/24/04, Parke); *TIFD III-E*, 342 F. Supp. 2d at 96. "JX" refers to Joint Exhibits; "PX" refers to Plaintiff's Exhibits; and "DX" refers to Defendant's Exhibits.

[14]  JX 8 at 0097471-83; JX 10 at 0097471-83; PX 141 at 0097234-51; PX 142 at 0097278-95; PX 143 at 0097252-77; PX 146 at 0097300-02; *TIFD III-E*, 342 F. Supp. 2d at 97.

[15]  JX 8 at 0097297; DX 10 at BB0669-72; Tr. at 152:1-7, 154:7 - 155:12, 159:3-14, 162:17 - 163:5 (7/21/04, Lewis); Tr. at 72:8-13, 77:13 - 78:2 (7/21/04, O'Reilly); Tr. at 452:23 - 453:16, 455:12-22 (7/23/04, Nayden); *TIFD III-E*, 342 F. Supp. 2d at 97.

[16]  JX 8 at 0097297; Tr. at 72:8-13, 93:17-21 (7/21/04, O'Reilly); Tr. at 193:13-21 (7/21/04, Lewis); Tr. at 455:23 - 456:2, 457:6-20 (7/23/04, Nayden); Tr. at 207:13-20 (7/21/04, Brickman); *TIFD III-E*, 342 F. Supp. 2d at 111.

Castle Harbour structure allowed GECC to monetize, in the amount of $117 million, a portion of its aircraft portfolio while (1) maintaining its debt-equity ratio as required by the credit rating agencies, and (2) complying with negative pledge covenants present in existing debt instruments.[17] While the Castle Harbour transaction also provided tax benefits, the undisputed testimony is clear that the transaction would not have occurred had it not satisfied GECC's non-tax business objectives.[18]

The conclusion that tax avoidance was not the principal purpose of the Castle Harbour transaction is consistent with case law under section 269(a) of the Code, which employs a similar "the principal purpose" test.[19] Decisions rendered under section 269(a) make clear that the testimony of the GECC executives is highly relevant. For example, in *Capri, Inc. v. Commissioner*, 65 T.C. 162, 179 (1975), the Tax Court observed that "[a]lthough the test is one of subjective intent, the inquiry is based upon objective facts which manifest the subjective intent. The testimony of the acquiring corporation's top management is of particular importance." In that case, the Tax Court held that section 269 did not apply, noting that the management testimony "reeks with business motives not tax motives." *Id.*; *see also Southern Dredging Corp. v. Comm'r*, 54 T.C. 705, 718 (1970).[20]

---

17  JX 8 at 0097297; JX 16 at 0076301; Tr. at 95:10 - 97:10 (7/21/04, O'Reilly); Tr. at 379:4 - 381:9 (7/22/04, Parke); *TIFD III-E*, 342 F. Supp. 2d at 97.

18  *See* Tr. at 105:15 - 107:2 (7/21/04, O'Reilly).

19  Section 269(a), first enacted in 1940, permits the IRS to disallow tax benefits arising from certain acquisitions by corporations if "the principal purpose" of the transaction is "evasion or avoidance of Federal income tax." Because the definition of "tax shelter" in section 6662(d) and the regulations thereunder employs similar language, the established interpretation of "the principal purpose" under section 269(a) provides guidance as to its interpretation for purposes of section 6662(d).

20  The evidence proves the existence of several non-tax business motives for the participation of the GECC entities in the transaction. The cases under section 269 indicate that these

21

While the Government seeks to dismiss the testimony of the GECC executives as "self serving," Gov't Penalty Br. at 6, as this Court observed other objective evidence in the record supported that testimony. *See TIFD III-E*, 342 F. Supp. 2d at 111. The Government had every opportunity to introduce evidence contradicting the business purpose evidence or showing that taxes dominated the transaction. It failed to do so. It did not even cross-examine the senior GECC business executive responsible for authorizing the Castle Harbour transaction. *See* Tr. at 459:8 (7/32/04, Nayden).[21]

The Government asserts that the GECC executives were motivated principally, if not solely, by their desire to obtain a tax benefit; however, its brief emphasizes that these same executives made little or no effort to determine the nature of the tax benefit or the likelihood that the benefit would be realized. *See* Gov't Penalty Br. at 6 (chief financial officer of GECC "could not explain at trial the tax implications of the transaction," and "plaintiff's witnesses did not claim tax expertise"). The very testimony cited by the Government further supports the conclusion that the executives were focused on, and motivated by, achieving their stated non-tax business purposes.

Thus, the evidence in the record shows that the principal purpose that gave rise to the Castle Harbour transaction was the desire of GECC (and the GECC partners) to achieve non-tax business objectives. Furthermore, there is no question that the Banks' principal purpose in

---

multiple purposes should be aggregated for purposes of comparing them with the tax purpose. *See Bobsee Corp. v. United States*, 411 F.2d 231, 239 (5th Cir. 1969); *U.S. Shelter Corp. v. United States*, 13 Cl. Ct. 606, 620-21 (1987).

[21]  The Government makes several categorical assertions that the GECC witnesses were not familiar with the terms of the transaction. *See* Gov't Penalty Br. at 6, 12. Such assertions ignore the extensive testimony by Eric Dull, the GECC team leader for the Castle Harbour transaction, regarding the terms of the transaction documents. *See generally* Tr. at 304:15 - 371:20 (7/22/04, Dull).

investing in the Castle Harbour transaction was to make an economic profit. It follows, therefore, that Castle Harbour was not a "tax shelter."

### D.     Conclusion.

Based on the foregoing analysis, the Court should find that the Partnership's treatment of the Banks as partners was supported by substantial authority and that the Partnership was not a "tax shelter" within the meaning of section 6662. These determinations would resolve the substantial understatement penalty issue at the partnership level.

## II.     The Reasonable Belief Defense is a Partner-Level Defense That is Not Appropriate For Resolution in This Partnership-Level Proceeding

A determination by the Court that Castle Harbour was a "tax shelter" within the meaning of section 6662(d) would raise an additional issue: whether the GECC partners can show that they reasonably believed that the Partnership's tax return position was more likely than not correct. *See* I.R.C. § 6662(d)(2)(C)(i) (1993). The Government claims that the Partnership cannot make this showing because of the successful assertion of attorney-client privilege over the two tax opinions received in connection with the Castle Harbour transaction. Gov't Penalty Br. at 11-13. The Government's argument is incorrect.

The rules established under TEFRA for deciding whether penalties apply to partners distinguish between the penalty-related determinations that may be made in a partnership-level proceeding and those that may be made only in separate partner-level proceedings. Whether the actual taxpayer reasonably believed that its treatment of an item was "more likely than not correct" is a partner-level defense that may not be considered in this partnership-level proceeding. Because the Government's brief ignores these rules, responding to the Government's assertion requires an explanation of the rules for imposing penalties related to partnership items.

23

A.    **The TEFRA rules in effect for 1997 and 1998 distinguish between partnership-level and partner-level penalty issues.**

1.    **Treatment of penalties in TEFRA proceedings.** The TEFRA provisions of the Code provide for administrative and judicial determinations of the proper treatment of partnership items at the partnership level. *See* I.R.C. §§ 6221-6234. Section 6231(a)(3) defines "partnership item" as "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A," but only to the extent that, under regulations, "such item is more appropriately determined at the partnership level than at the partner level." *See generally Katz v. Comm'r*, 335 F.3d 1121, 1130 (10th Cir. 2003) ("[T]he hallmark of a partnership item is that it affects the distributive shares reported to other partners."). Because partnership items are limited to items taken into account under subtitle A, penalties are not partnership items.[22] Instead, penalties are "affected items," the tax treatment of which is determined at the partner level either by direct assessment of a computational adjustment or through the issuance of a statutory notice of deficiency. *See* I.R.C. §§ 6230(a)(2)(A)(i), 6231(a)(6).

Initially, the TEFRA rules did not authorize courts to consider any penalty-related issues at the partnership level. In 1997, Congress amended the TEFRA provisions to provide for partnership-level determination of certain penalty-related issues. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1238(a), (b)(1), 111 Stat. 788, 1026 (1997) (codified at I.R.C. §§ 6221, 6226(f)). Congress expanded the scope of partnership-level TEFRA proceedings because of concerns that "the relevant conduct [giving rise to the penalty] often occurs at the partnership level." Staff of the Joint Committee on Taxation, 105th Cong., General Explanation of Tax Legislation Enacted in 1997, at 377-78 (Comm. Print 1997) (attached hereto as Appendix 2E).

---

[22]  Subtitle A covers income taxes and includes sections 1 through 1563. The penalty provisions are found in subtitle F (procedure and administration).

2.    **The 1997 TEFRA amendments require consideration of partner-level**

**defenses in a separate proceeding.**  Even after 1997, the Code and regulations provide partners

with the right to assert partner-level defenses in separate, partner-level proceedings and preclude

those defenses from being adjudicated in the partnership-level proceeding.  Section

6230(c)(1)(C) of the Code provides that a partner may file a claim for refund to recover penalties

erroneously imposed against it.  Section 6230(c)(4) emphasizes that, notwithstanding any

partnership-level determination on penalties, a partner "shall be allowed to assert any partner

level defenses that may apply."  The regulations implementing the 1997 statutory amendments

make clear that partner-level defenses may be raised only in partner-level proceedings:

> Any penalty, addition to tax, or additional amount that relates to an
> adjustment to a partnership item shall be determined at the partnership level.
> *Partner level defenses to such items can only be asserted through refund actions*
> *following assessment and payment.*  Assessment of any penalty, addition to tax, or
> additional amount that relates to an adjustment to a partnership item shall be made
> based on partnership level determinations.  Partnership level determinations
> include all the legal and factual determinations that underlie the determination of
> any penalty, addition to tax, or additional amount, *other than partner level*
> *defenses* specified in paragraph (d) of this section.

Temp. Treas. Reg. § 301.6221-1T(c) (attached hereto as Appendix 2F) (emphasis added); *see*

Treas. Reg. § 301.6221-1(c).[23]  These regulations reflect the unambiguous intent of Congress.

*See* H.R. Rep. No. 105-220, at 685 (1997) (Conf. Rep.) (attached hereto as Appendix 2G)

("[T]he provision allows partners to raise any partner-level defenses in a refund forum.").

Subparagraph (d) states:

> Partner level defenses to any penalty, addition to tax, or additional amount
> that relates to an adjustment to a partnership item *may not be asserted in the*
> *partnership level proceeding*, but may be asserted through separate refund actions
> following assessment and payment.  See section 6230(c)(4).  Partner level

---

[23]  The temporary regulations were issued January 26, 1999 and were effective on the date of
issuance for taxable years ending after August 5, 1997.  The final regulations, which apply to
taxable years beginning on or after October 4, 2001, retain this language.

defenses are limited to those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level. *Examples* of these determinations are whether any applicable threshold underpayment of tax has been met with respect to the partner or whether the partner has met the criteria of section 6664(b) (penalties applicable only where return is filed), *or section 6664(c)(1) (reasonable cause exception)* subject to partnership level determinations as to the applicability of section 6664(c)(2).

Temp. Treas. Reg. § 301.6221-1T(d) (attached hereto as Appendix 2F) (emphasis added); *see*

Treas. Reg. § 301.6221-1(d).

The examples contained in subparagraph (d) of the regulations demonstrate that the term

"partner level defenses" includes threshold requirements for application of a particular penalty

(such as the amount of an underpayment or the filing of a return) as well as "defenses" that

become relevant only if those threshold requirements have been satisfied (such as the exception

for "reasonable cause"). The preamble to the temporary regulations explains that the difference

between the defenses that may be addressed at the partnership level and those that may be

addressed only at the partner level depends on whether the defense is "specific to a particular

partner" or "can be determined by reference to the activities of the partnership." T.D. 8808,

1999-1 C.B. 682.

For example, although the 10% determination is a threshold requirement for application

of the substantial understatement penalty, because it will vary from partner to partner it is a

partner-level defense. *See* Treas. Reg. § 301.6221-1T(d) (attached hereto as Appendix 2F)

(partner-level defenses include "whether any applicable threshold underpayment of tax has been

met"). Accordingly, whether the alleged understatements for 1997 and 1998 would cause a

substantial understatement on the General Electric Company's consolidated federal income tax return in either of those years is not at issue in this partnership-level proceeding.[24]

In contrast, determining whether there was substantial authority for treating the Banks as partners requires the application of an objective standard that does not depend on any partner-specific facts. *See supra* pp. 6-7. Accordingly, the existence of substantial authority may be determined in this partnership-level proceeding. Similarly, application of the principal purpose component of the tax shelter test may be addressed in this partnership-level proceeding.[25]

Thus, for penalties related to partnership items, the 1997 amendments establish a limited exception to the normal partner-level treatment of affected items.[26] Under this regime, a court makes determinations of all legal and factual issues (other than partner specific issues) that underlie the penalty in the partnership-level proceeding. Upon completion of the partnership proceeding, the IRS may make partner-level assessments of penalties to the extent these

---

[24] The Government asks the Court to "assume" that the 10% threshold amount is satisfied and issue a judgment that the substantial understatement penalty applies based on that assumption. *See* Gov't Penalty Br. at 8 n.7. Nothing in TEFRA contemplates the issuance of judgments based on factual assumptions. Instead, as described below the statute and regulations provide for partnership-level determinations of the legal and factual issues (other than partner-level defenses) that are relevant to the final determination of liability for penalties. If the partnership-level determinations do not bar imposition of the substantial understatement penalty, the IRS may then assess the penalty against any partner whose understatement of tax exceeds the 10% threshold, and the partner may then institute a refund suit and assert its partner-level defenses.

[25] As discussed above, the tax shelter definition refers to the principal purpose of the "entity, plan or arrangement," suggesting a partnership-level determination applicable to all partners. Furthermore, there is a significant overlap between the evidence considered in the partnership-level business purpose inquiry and that used in the principal purpose inquiry. The courts have held that whether a transaction has business purpose and economic substance generally is a partnership-level determination for TEFRA purposes. *See Brannen v. Comm'r*, 722 F.2d 695, 703-04 (11th Cir. 1984); *see also Tallal v. Comm'r*, 778 F.2d 275, 276 (5th Cir. 1985).

[26] Notably, even after the 1997 amendments the TEFRA rules do not classify penalties as "partnership items," but instead characterizes them as "affected items." *See* Treas. Reg. § 301.6231(a)(5)-1(c)(4).

assessments are not foreclosed by any partnership-level determinations. A partner that is assessed a penalty has the right to contest the penalty by paying the penalty and instituting a suit for refund. *See* I.R.C. § 6230(c)(1)(C), (c)(3). In that refund proceeding, a partner has the right to assert all relevant "partner level defenses," regardless of the resolution of the partnership-level determinations. I.R.C. § 6230(c)(4).

**B.     The reasonable belief defense is a partner-level defense.**

Belief is, by definition, personal and specific to each partner. Accordingly, the requirement that a taxpayer show that it "reasonably believed" that its tax return treatment was "more likely than not" correct is the quintessential partner-level defense that the TEFRA rules require be made and adjudicated at the partner level. Indeed, when Congress amended the TEFRA rules in 1997, the reasonable belief defense was no longer available to corporate partners. *See supra* note 8. The fact that the availability of this defense depended on whether a partner was an individual or corporation shows that it is the very type of partner-level defense that must be addressed in a later partner-level proceeding.

The section 6662 regulations make it clear that the reasonable belief defense is a partner-level defense when they describe how a taxpayer may establish the defense for tax shelter items resulting from its participation in a partnership:

> In the case of tax shelter items attributable to a pass-through entity, the actions described in paragraphs (g)(4)(i)(A) and (B) of this section, if taken by the entity, are deemed to have been taken by the taxpayer and are considered in determining whether the taxpayer reasonably believed that the tax treatment of an item was more likely than not the proper tax treatment.

Treas. Reg. § 1.6662-4(g)(5).[27]  As this passage demonstrates, in the case of a penalty resulting from an adjustment to a partnership item, the taxpayer required to establish the reasonable belief defense is the partner—not the partnership.  The regulation permits the attribution of partnership-level activities to the partner in determining whether the partner had a reasonable belief; it says nothing about the examination of partner-level actions at the partnership level.  Thus, the section 6662 regulations explicitly contemplate the application of the reasonable belief defense at the partner level.

Likewise, the TEFRA rules require classification of reasonable belief as a partner-level defense.  The TEFRA regulations explicitly identify the section 6664(c) "reasonable cause" defense as one example of a partner-level defense.  Treas. Reg. § 301.6221-1(d).  The reasonable belief defense under section 6662 is virtually identical to the section 6664 reasonable cause defense; indeed, the reasonable belief defense incorporates many of the elements of the reasonable cause defense.  *See, e.g.*, Treas. Reg. § 1.6662-4(g)(4)(ii) (to satisfy the reliance component of the reasonable belief defense a taxpayer must meet the requirements of section 1.6664-4(c)(1) (pertaining to the reasonable cause defense)).  The substantial overlap between the reasonable belief analysis and the reasonable cause analysis removes any doubt that adjudication of the reasonable belief defense must occur at the partner level.

The privilege log attached to the Government's brief refers to two legal opinions.  Neither opinion is addressed to the Partnership or to either of the Banks.  Rather, the addressees are Plaintiff (in its individual capacity rather than its capacity as tax matters partner) and GECC (the corporate parent of Plaintiff and TIFD III-M).  Reliance on these opinions is a defense that is

---

[27]  The cross-references to sections 1.6662-4(g)(4)(i)(A) and (B) refer, respectively, to analysis undertaken by the taxpayer and to the taxpayer's reliance on an opinion of a professional tax advisor.

available only to two partners, and thus the defense is properly determined at the partner level. The only apparent reason for the Government's current effort to litigate the defense at the partnership level is that, with the record now closed, the Government believes it can obtain a tactical advantage by denying the partners their right to introduce all the evidence material to their partner-level defenses.

**III.    There is No Basis for Assertion of a Negligence Penalty**

   **A.    Standard for negligence.**

   Section 6662(b)(1) includes, as a separate ground for imposition of the accuracy-related penalty, "negligence or disregard of rules or regulations." The Government's brief makes no claim that the Partnership disregarded any rules or regulations. It does, however, allege that the Partnership's treatment of the Banks as partners was "negligent."

   According to the regulations, the negligence penalty may apply if the taxpayer "failed to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b). Although the regulations describe negligence by reference to conduct by a specific taxpayer, they contain an objective safe harbor that allows a taxpayer to refute negligence without regard to specific conduct. This safe harbor provides that a "return position with a reasonable basis as defined in paragraph (b)(3) of this section is not attributable to negligence." Treas. Reg. § 1.6662-3(b).

   The regulations describes "reasonable basis" as an objective standard that is less stringent than substantial authority but "significantly higher than not frivolous or not patently improper." Treas. Reg. § 1.6662-3(b)(3); *see* Treas. Reg. §§ 1.6662-3(b)(3)(ii) (1997) (attached hereto as Appendix 2H), 1.6662-4(d)(2) (1997) (attached hereto as Appendix 2I). A return position that is "reasonably based on one or more of the authorities set forth in [the substantial authority

regulations will] . . . generally satisfy the reasonable basis standard." *Id.*[28] Because reasonable

basis is an objective standard that does not depend on any partner-specific conduct, application

of the standard is appropriate in this partnership-level proceeding.

**B.     A reasonable basis existed for the Partnership's treatment of the Banks as partners.**

Castle Harbour's tax return positions had a reasonable basis and therefore are not

negligent. As already explained in connection with the Government's assertion of the substantial

understatement penalty, the Partnership's treatment of the Banks as partners was reasonably

based on numerous authorities described in Treas. Reg. § 1.6662-4(d)(3)(iii). Because the

regulations state that substantial authority is a more stringent standard than reasonable basis, the

same analysis that establishes that substantial authority existed also proves that there was a

reasonable basis for the Partnership's tax return positions. This Court's prior opinion on the

merits further refutes any suggestion of negligence.

**C.     The Government's "too good to be true" argument provides no basis for its penalty assertion.**

In support of its negligence penalty assumption, the Government states that "[t]he

regulations provide that negligence 'is strongly indicated where . . . a deduction, credit or

exclusion on a return which would seem to a reasonable and prudent person to be "too good to be

true" under the circumstances.'" Gov't. Penalty Br. at 14-15 (quoting Treas. Reg. § 1.6662-

3(b)(1), (b)(1)(ii)). The Government's quotation, however, contains a crucial deletion: in its

entirety, the provision refers to a case in which "[a] taxpayer fails to make a reasonable attempt

---

28  The cross-reference to the substantial authority regulations was added to the regulations in
1998 as "additional guidance" on the meaning of reasonable basis. *See* T.D. 8617, 1995-2
C.B. 274. Although this amendment applies to returns due after December 2, 1998 (in this
case, the Partnership's 1998 tax return), it merely provides further detail to the definition of
terms that already existed in the regulations. Therefore, the standard should apply to the
1997 year as well.

to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.6662-3(b)(1)(ii). As the omitted language makes clear, "too good to be true" is not a substantive standard; the indication of negligence arises only if the taxpayer fails to make a "reasonable attempt" to ascertain whether the "too good to be true" position is correct. *Id.* Thus, the Government's "too good to be true" argument is completely irrelevant to the objective reasonable basis standard.

Indeed, in numerous cases the courts have made it clear that the taxpayer may, in fact, be entitled to a result that the IRS claims is "too good to be true." *See, e.g., Gitlitz v. Comm'r*, 531 U.S. 206, 220 (2001) (rejecting IRS argument that the taxpayer's position would result in a "double windfall," stating that "[b]ecause the Code's plain text permits the taxpayers to receive these benefits, we need not address this policy concern") (footnote omitted); *Coggin Auto. Corp. v. Comm'r*, 292 F.3d 1326, 1333-34 (11th Cir. 2002) ("Relying upon the plain meaning of the statute, in a legitimate business transaction, a taxpayer deserves the right to be able to predict in advance what the tax consequences of such transaction will be with reasonable certainty. Here the statute just does not do what the litigation position of the Commissioner would have it do . . . . Any potential windfall . . . must be cured by Congress, not the judiciary."); *Brown Group, Inc. v. Comm'r*, 77 F.3d 217, 222 (8th Cir. 1996) ("Although our holding may result in a tax windfall . . . , such a tax loophole is not ours to close but must rather be closed or cured by Congress.") (citation omitted); *MCA INC. v. United States*, 685 F.2d 1099, 1105 (9th Cir. 1982) ("If the omission of income received from controlled partnerships has indeed created an unjustified loophole in the tax laws, the remedy lies in new legislation, not judicial improvisation.") (citation omitted).

In all these cases, the taxpayer obtained a tax result that, according to the IRS, was "too good to be true." Nevertheless, in each case the court ruled in favor of the taxpayer on the merits. The fact that the Government believes the disputed tax results were "too good to be true" is irrelevant to whether the Partnership's return position satisfies the objective reasonable basis standard.

This point is particularly relevant to the ceiling rule. The legislative history to the Internal Revenue Code of 1954 recognized that the ceiling rule would shift the incidence of taxation on income from one partner to another. Indeed, that shift was the principal consequence of the rule. Sometimes that shift benefited taxpayers; sometimes it hurt. But it was always the rule.[29]

### D.    Conclusion.

Because the Partnership had a reasonable basis for its tax return positions, none of the FPAA adjustments proposed by the IRS are attributable to negligence. Therefore, the negligence penalty does not apply to any adjustment to the Partnership's "partnership items." The Court need not address any of the Government's other assertions regarding the negligence penalty because those assertions are relevant only to partner-level defenses that are not before this Court.

---

[29]  Nor is there anything about the application of the ceiling rule to foreign taxpayers that makes it "too good to be true." When the ceiling rule was adopted in 1954, the difference between the highest marginal tax rate and the lowest was 71% (based on a maximum rate of 91% and a minimum rate of 20%). *See Personal Exemptions and Individual Income Tax Rates, 1913-2002*, at Table 1, *at* http://www.irs.gov/pub/irs-soi/02inpetr.pdf (attached hereto as Appendix 2J). The maximum rate of tax applicable to Castle Harbour's income was 39%. *See Corporation Income Tax Brackets and Rates, 1909-2002*, at Table 1, *at* http://www.irs.gov/pub/irs-soi/02corate.pdf (attached hereto as Appendix 2K).

IV.   **The Court Should Reject the Government's Effort to Obtain a Final Judgment on the Reasonable Cause Defense**

Section 6664(c)(1) provides that "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Thus, a taxpayer that would otherwise be subject to the substantial understatement or negligence penalty (for example, because its tax return position did not have substantial authority) may avoid imposition of the penalty if it proves that it had "reasonable cause."

The Government's brief asserts that, because of the Partnership's valid assertion of attorney-client privilege over the legal opinions received by its partners, the Partnership cannot establish that it had "reasonable cause" for its tax return positions. Gov't Penalty Br. at 17-18. Accordingly, the Government affirmatively asks the Court to render a judgment that "Castle Harbour-I, [sic] Limited Liability Company has not established reasonable cause or good faith under section 6664(c)." Gov't Penalty Br. at Appendix B28 (Proposed Judgment).

The Government's position and its proposed judgment are inappropriate. The reasonable cause exception applies only to an "underpayment" of tax. I.R.C. § 6664(c)(1). Since partnerships do not pay income tax, the reasonable cause exception simply cannot apply at the partnership level. Moreover, the Code explicitly provides for refund procedures in which "the partner shall be allowed to assert any partner level defenses that may apply" to the applicability of any penalty. I.R.C. § 6230(c)(1), (4). As the Government knows well, the TEFRA regulations identify the section 6664(c) reasonable cause defense as a partner-level defense that "may not be asserted in the partnership-level proceeding." Treas. Reg. § 301.6221-1(d); Temp. Treas. Reg. § 301.6221-1T(d) (attached hereto as Appendix 2F); *see* Treas. Reg. § 301.6231(a)(5)-1(e)(4), Example 1 (applying the negligence test at the partner level).

34

In addition to violating its own regulations, the Government's request for a partnership-level adjudication of reasonable cause is inconsistent with its litigating position in other cases. In three recent cases, the Government has sought to prevent the consideration of partner-specific reasonable cause evidence in the partnership-level proceeding. *See* United States' First Motion in Limine at 5, *Klamath Strategic Investment Fund, LLC v. United States*, No. 5:04-CV-278-TJW, 2007 U.S. Dist. LEXIS 6939 (E.D. Tex. Sept. 1, 2006) (attached hereto as Appendix 2L); Reply for the United States to Post-Trial Brief for Plaintiffs at 34-35, *Jade Trading, LLC v. United States*, No. 03-2164 T (Fed. Cl. Dec. 2, 2005) (attached hereto as Appendix 2M); United States' Response to Plaintiffs' Motion to Compel Discovery, *Stobie Creek Investments, LLC v. United States*, No. 05-748 T (Fed. Cl. Dec. 29, 2006) (attached hereto as Appendix 2N).

In *Klamath*, for example, the plaintiff sought partnership-level consideration of partner-specific reasonable cause evidence in the form of tax opinions obtained by individual partners. *Klamath*, 2007 U.S. Dist. LEXIS 6939, at *50-52. The Government strenuously objected to admission of that evidence because the TEFRA rules prohibit any consideration of reasonable cause at the partnership level. *Id.* at *50-51.

In this case, the Government does an about-face and faults the taxpayer for not introducing partner-specific evidence of reasonable cause in the partnership-level proceeding. Gov't Penalty Br. at 17. Seeking to take advantage of a closed record, the Government now claims that Plaintiff's failure to introduce partner-specific evidence of reasonable cause justifies a partnership-level finding against Plaintiff on that issue even though the Court has no jurisdiction to make such a finding in this proceeding.

In *Klamath*, the court permitted the plaintiff to introduce partner-specific evidence of reasonable cause. That decision, however, does not support the Government's position in this

case. The court did not explain how its ruling squared with the TEFRA rules.[30]  *Klamath*, 2007

U.S. Dist. LEXIS 6939, at *47-53.  In any event, nothing in *Klamath* suggests that a partner who

fails to offer reasonable-cause evidence in the partnership-level proceeding forfeits the right to

assert partner-level defenses in a separate proceeding.  Moreover, while *Klamath* held that the

plaintiff was not bound by the Government's regulation, the decision does not support permitting

the Government to decide, on a case-by-case basis, whether it will adhere to its own regulations.

*See, e.g., Singh v. United States Dep't of Justice*, 461 F.3d 290, 296 (2d Cir. 2006).  The

Government may have the right to change its litigation tactics from one case to another;

however, it does not have the right to ignore its regulations simply because they happen to be

inconvenient to its litigation strategy in a particular case.

## V.  The Court Should Determine that the Partnership Had Substantial Authority and a Reasonable Basis for its Tax Return Positions

There is no plausible argument that the Partnership's tax return positions were not

supported by substantial authority or that the positions did not have a reasonable basis.  Because

Castle Harbour was not a tax shelter within the meaning of section 6662(d) and the regulations

thereunder, the determination that the Partnership had substantial authority will resolve all

penalty issues in Plaintiff's favor in this proceeding.[31]

---

[30]  The *Klamath* court reasoned that the TEFRA regulations only "suggest" that reasonable cause is a partner-level defense.  *Klamath*, 2007 U.S. Dist. LEXIS 6939, at *52.  Relying on a nonprecedential memorandum opinion from the Tax Court in *Santa Monica Pictures, L.L.C v. Commissioner*, T.C.M. (CCH) 1157 (2005), the *Klamath* court concluded that the reasonable cause defense could be considered at the partnership level "if it involves actions by the managing member partner."  *Klamath*, 2007 U.S. Dist. LEXIS 6939, at *52.  Neither *Klamath* nor *Santa Monica Pictures* reconciles this position with the clear expression of Congressional intent or the plain language of Treas. Reg. § 301.6221-1(d) that "partner level defenses . . . *may not* be asserted in the partnership-level proceeding" (emphasis added).

[31]  The Government's proposed judgment asks the Court to reallocate Partnership income from the Banks to the GECC partners in accordance with the FPAA theory that the Castle Harbour transaction was a sham.  This Court's decision explicitly rejecting that theory was left

In seeking penalties, the Government is attempting to convert the fault-based penalty regime of the Code to a strict liability regime that punishes taxpayers for taking positions with which the Government disagrees. The Second Circuit has rejected similar efforts by the Government in the past:

> One may disagree, as we did, with the taxpayer . . . , but the government's bald claim that the taxpayer did not exercise due care in making his argument is little short of reprehensible. And its persistence in asserting the negligence claim even after it lost below is mind boggling. Both bespeak of bullying tactics employed against someone who did no more than exercise his right to question the government's chosen reading of the tax laws. We therefore not only reject the claim of negligence in this case, but caution the government against making like claims in similar situations where the law is, at best, uncertain.

*Holmes v. United States*, 85 F.3d 956, 963 n.7 (2d Cir. 1996) (Calabresi, J.). The Government clearly has overreached, both in its failure to take seriously the standards for imposition of penalties on taxpayers and in its disregard of its own rules for distinguishing between partnership-level and partner-level determinations.

---

undisturbed on appeal. The Government's proposal would inappropriately tax the GECC partners on the economic income actually received by the Banks.

Respectfully submitted this 2nd day of March 2007,

PLAINTIFF, TIFD III-E INC., the Tax Matters Partner of
CASTLE HARBOUR-I LIMITED-LIABILITY COMPANY

_signature_

Ann H. Rubin, ct04486
Anthony M. Fitzgerald, ct04167
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, Connecticut 06509-1950
Telephone:    (203) 777-5501
Facsimile:    (203) 784-3199
Email:   arubin@carmodylaw.com
           afitzgerald@carmodylaw.com

OF COUNSEL

William F. Nelson, ct22883
David J. Curtin, ct22881
John A. Galotto, ct22882
MCKEE NELSON LLP
1919 M Street, N.W., Suite 200
Washington, D.C. 20036
Telephone:    (202) 775-1880
Facsimile:    (202) 775-8586
Email: wnelson@mckeenelson.com
         dcurtin@mckeenelson.com
         jgalotto@mckeenelson.com

Suzanne Feese, ct23162
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone:    (404) 572-3566
Facsimile:    (404) 572-5100
Email: sfeese@kslaw.com

## CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing: (1) Plaintiff's Brief in Opposition to

Government's Initial Brief on Remand Regarding Penalties (inclusive of all appendices); and (2)

Plaintiff's Proposed Findings of Fact and Conclusions of Law on Remand Regarding Penalties,

has been made today, March 2, 2007, by sending true and correct copies thereof via overnight

delivery to the following:

> Robert J. Higgins
> Trial Attorney, Tax Division
> U.S. Department of Justice
> 555 4th Street, N.W., Rm. 8816
> Ben Franklin Station
> Washington, D.C. 20001

and by regular mail, postage prepaid to:

> John B. Hughes
> Assistant U.S. Attorney
> Chief, Civil Division
> 157 Church Street
> New Haven, CT 06508

Ann H. Rubin, ct04486
Anthony M. Fitzgerald, ct04167
CARMODY & TORRANCE LLP
195 Church Street, P.O. Box 1950
New Haven, Connecticut 06509-1950
Telephone:     (203) 777-5501
Facsimile:     (203) 784-3199
Email:   arubin@carmodylaw.com
         afitzgerald@carmodylaw.com