20MAY08 TIFD

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

TIFD III-E INC., ET AL          :   No. 3:01CV-1839 (SRU)
                                :   915 Lafayette Boulevard
              vs.               :   Bridgeport, Connecticut
                                :
                                :   May 20, 2008
UNITED STATES OF AMERICA, ET AL :

- - - - - - - - - - - - - - - x

HEARING ON REMAND

B E F O R E:

      THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

      FOR THE PLAINTIFFS:

            MCKEE & NELSON
                  1919 M Street, NW, Suite 800
                  Washington DC  20036
            BY:  WILLIAM F. NELSON, ESQ.
                  DAVID J. CURTIN, ESQ.

      FOR THE DEFENDANTS:

            U. S. DEPARTMENT OF JUSTICE
                  901 E Street, NW
                  Washington DC
            BY:  ROBERT J. HIGGINS, ESQ.


                  Susan E. Catucci, RMR
                  Official Court Reporter
                  915 Lafayette Boulevard
            Bridgeport, Connecticut  06604
                  Tel: (917)703-0761

>                                                             2

1                    (2:05 O'CLOCK, P. M.)

2              THE COURT:  Good afternoon.  We're here in TIFD

3    III-E Inc. v. United States of America.  Could I have

4    appearances, please?

                    20MAY08 TIFD
5            MR. HIGGINS:  For the United States, Your Honor,
6    Robert Higgins.
7            THE COURT:  Mr. Higgins, you're out-numbered.
8            MR. HIGGINS:  Yes.
9            THE COURT:  All right.
10           MR. CURTIN:  I'm sure Mr. Higgins can deal with
11   it, Your Honor.  I'm David Curtin, Your Honor, for the
12   plaintiff in the case.
13           MR. NELSON:  Your Honor, Will Nelson.
14           MR. EIZEN:  Josh Eizen.
15           THE COURT:  Thank you.  All right.  We're here
16   for argument, trial on the record, however you want to
17   classify it, on remand.  There appear to be two principal
18   issues:  The 704(e) question and the penalties question.
19   I intend to hear from you on both of these issues and
20   probably decide both of those issues, regardless of the
21   outcome of the first issue, so that hopefully we can avoid
22   another trip back here after the Court of Appeals hears
23   about it.
24           MR. CURTIN:  Your Honor, may I address the
25   court?
>                                                          3

1            THE COURT:  Sure.
2            MR. CURTIN:  Your Honor, what we are prepared to
3    do is to argue unanswered questions and in that way, for
4    our side, Mr. Will Nelson will handle this matter and
5    argue it and answer questions.  And so he will proceed
6    whenever Your Honor is prepared.
7            THE COURT:  Very good.  Feel free.
8            MR. NELSON:  Your Honor, it seems to make sense
9    to deal with the 704 issue first.
10           THE COURT:  Yes, I agree.
                    Page 2

20MAY08 TIFD

11          MR. NELSON:  So, let's talk about that.  We have
12    put up on this little poster board here four things that
13    it seems to us maybe we ought to talk about this
14    afternoon.
15          The first one is what the court can decide.  And
16    the government says you can't decide anything, it was all
17    decided.  Notwithstanding that, I'd like to discuss that
18    subject, see if there's maybe a little daylight left.
19          And then the second thing is there is a mandate
20    that suggests that the court has to decide whether the
21    Section 704(e) applies on the merits, and I want to deal
22    with that one, too.
23          The third one is what about the record should be
24    clarified.  Now, I want to be clear at the outset, nothing
25    much needs, has to be clarified, as far as I'm concerned,

>                                                              4

 1    as far as we're concerned.  But this is an important case,
 2    it's going to be precedential, and to the extent that
 3    there are clear errors or other things that are just not
 4    correct in the record, we think that all parties, and
 5    especially my client, deserve to have a clean record.
 6    There are not many of those things, as I said, they are
 7    not necessary to the substantive decision, but we'd like
 8    to talk about those.
 9          And, finally, we may need to talk a little bit
10    about what the operative rules actually require you to do.
11    Your decision and judgment before was complete.  It
12    affirmed the termination of the partnership items to be
13    the same as those on the return.  That was a complete
14    decision.  The 2nd Circuit has rendered a decision that is
15    at best partial in the sense that it says, well, the

                            Page 3

20MAY08 TIFD

16  partnership items in question, the specific partnership

17  item in question, whether the banks were partners, is

18  answered under the Culbertson case.  What it doesn't say

19  is what that interest is.  And I'd like to talk about

20  what's necessary in its decision so that when the case is

21  over, one way or another, we can have a complete judgment

22  and something that we can move on from.

23        So, going to the merits, if the court doesn't

24  have a place to start --

25        THE COURT:  The merits are usually a good place.

> 5

1        MR. NELSON:  Okay.  Where we are.  Interesting

2  circumstance.  We have a case back on remand and you held

3  that the transaction wasn't a sham and had economic

4  substance.  Those decisions weren't appealed and they

5  weren't reversed.  You held that the transaction had

6  business purpose.  The 2nd Circuit actually said that

7  transaction had business purpose or, more specifically,

8  have said that the company had a business purpose for

9  raising money in exchange for issuing an interest that

10  would not be debt for nontax purposes.  So we're not

11  talking, I don't think, about sham.  I don't think we're

12  talking about economic substance, and I don't think we're

13  talking about business purpose as such.

14        The other thing that's a little bit surprising,

15  certainly was to me when I first read the case, read the

16  government's appeal, they didn't appeal the debt equity

17  holding that you rendered.  They said that the interest at

18  issue were not debt.  You said they were equity.  The

19  government did not appeal the debt holding.  And

20  notwithstanding the debt equity flavor of the 2nd

21  Circuit's opinion, it didn't reverse the debt holding

20MAY08 TIFD

22    either.  It used the debt equity cases to apply the
23    standard that it chose to apply.  Here --
24             THE COURT:  Well --
25             MR. NELSON:  Go ahead.

>                                                             6

1              THE COURT:  Hasn't the 2nd Circuit, as a
2    practical matter -- the decision does talk a lot about the
3    importance of practical reality and suggests that I missed
4    practical reality.  Well, isn't the practical reality that
5    they reversed the debt equity holding, notwithstanding the
6    fact it wasn't appealed?
7              MR. NELSON:  No, sir.  They say at the end the
8    Dutch banks' interest was in the nature of a secured loan
9    with an insignificant equity kicker.
10             THE COURT:  Now, am I able to, in light of that
11   statement, am I able to say that the Dutch bank's interest
12   was equitable?
13             MR. NELSON:  Yes.  And I will tell you why --
14             THE COURT:  Okay.
15             MR. NELSON:  -- since I assume that yes is not a
16   sufficient answer to that particular question.
17             First, out of the court's own mouth, as it were,
18   the court was very explicit that it was resourcing its
19   opinion to one Supreme Court case, actually two, the
20   Culbertson case and the Tower case.  And it held that
21   while you appropriately applied general debt equity
22   principles to the sham issue and things of that nature,
23   that you failed to apply Culbertson.  So it's drawing its
24   test from Culbertson.  And it says, in criticism really of
25   your decision, that "The Internal Revenue Service is on

>                                                             7

Page 5

20MAY08 TIFD

1    sound ground" -- this is line seven if you want it -- "in
2    rejecting the partnership's purported characterization of
3    the Dutch banks' interest as bona fide equity
4    participation."
5        "Our disposition makes it unnecessary for us to
6    consider whether the district court correctly determined
7    that the characterization of the banks' interest as equity
8    was not a sham."  And it repeated that thought elsewhere.
9        It also said that "The IRS is entitled to rely
10   on a test less favorable to the taxpayer, even when the
11   interest has economic substance.  The error was in failing
12   to test the banks' interest also under Culbertson after
13   finding that the taxpayer's characterization" -- that is,
14   as equity -- "survived the sham test."
15       So, they said -- I understand your point, they
16   said a lot of things, but what they said were not really,
17   were not really reversing you on the debt equity issue.
18       Now, there are a couple other things that make
19   that, I think, necessary as a conclusion.  First one, of
20   course, is the government doesn't appeal the issue, but
21   let's lay that aside.  There would be clear internal
22   inconsistency in the 2nd Circuit's opinion if it had
23   issued a blanket decision that the banks' interest was not
24   equity, and that blanket inconsistency is that if the 2nd
25   Circuit clearly stated that the debt equity question is a

>                                                          8

1    question that's common to partnerships and to
2    corporations.  And, indeed, it relied, exclusively really,
3    on corporate debt equity cases for its analysis.
4        The decision -- the test that it drew was from
5    the Culbertson case.  Culbertson is a partnership-only
6    case.  Culbertson draws its test, which I'll summarize in

20MAY08 TIFD

7    a second, from the common law and then the early

8    codification of the Uniform Partnership Act, which looks

9    to intent to decide who's a partnership and who's not.

10   Culbertson cannot apply in a corporate context.  It's

11   never been applied in a corporate context, and so just

12   generally there's a dichotomy.

13        The second -- third aspect actually, what they

14   said, the inconsistency between a broad statement and

15   analysis that looks to a single debt equity principle, set

16   of principles distinct to apply to both the corporations

17   and partnerships with the narrow focus of Culbertson,

18   which is limited to partnerships.

19        And the, the other thing -- and this is really

20   fascinating to me, is the court itself cited two 2nd

21   Circuit cases, O.P.P. Holding and Jewel Tea, which are

22   cases in the 2nd Circuit in which the 2nd Circuit decided

23   or considered whether preferred stock was debt and, in the

24   other case, whether subordinated debt was preferred stock.

25   And in both of those cases, the court acknowledged that

>                                                                9

1    there really isn't any substantive difference between a

2    preferred equity interest and debt.

3        And I think it's really worth -- if you'll do

4    slide three -- this is, this is the O.P.P. case -- this is

5    Jewel Tea.  This is Judge Hand.  And the issue in this

6    case is whether preferred stock is debt, similar issues to

7    the one you would be facing here if you chose to reopen

8    the debt equity question.

9        And the court said, "Thus it would be possible

10   to treat preferred shares like debts; that is, as

11   constituting merely a claim upon the company -- that is,

Page 7

20MAY08 TIFD

```
12    the common shareholders."  Next sentence is really key.
13    "Such a view would make the common shareholders alone the
14    company, since they alone share profits and manage the
15    enterprise.  It would have been an entirely logical and
16    reasonable theory and the law might well have insisted
17    upon it.  It has not; on the contrary, it has always
18    distinguished between creditors and preferred
19    shareholders, regarding the first as outside the corporate
20    aggregation and the second" -- even though they are not
21    participating -- "as embarked as owners along with the
22    common shareholders."
23           Now, we made a big deal about the preferred
24    stock analogy in our briefs, and right now I'm sticking
25    with the 2nd Circuit authority.  And the first one that I
```

> 10

```
1    cite to you is Jewel Tea.  Also cited by the 2nd Circuit
2    in this case, presumably the lead case, O.P.P. Holdings is
3    a case that is -- slide four -- that preceded Jewel Tea.
4    And, in fact, Learned Hand was actually on that panel, he
5    later decided Jewel Tea.  And the interesting thing about
6    that case, kind of the ironic thing, is that the
7    government -- there, the government was arguing
8    subordinated debt was, quote, "in the nature of preferred
9    stock."  Interesting turn of phrase.  And this is the case
10    that the 2nd Circuit actually cites for the proposition
11    that owners are coadventurers in the corporate business.
12           What the case, however, involved was whether
13    subordinated debt could be treated as preferred stock
14    because it was in the nature of preferred stock.  And
15    after making the corporate shareholders coadventurers
16    statement, the court dealt with an interesting problem,
17    and that is, it was faced with some prior decisions that
```

20MAY08 TIFD

18    it held that preferred stock was preferred stock,
19    notwithstanding the similarity to debt.  And it said "The
20    only substantial distinction between those certificates,"
21    meaning the other cases, "and the debenture bonds now
22    before the court is one of the nomenclature; the former
23    had been denominated preferred stock."
24          And then the 2nd Circuit went on to say that
25    "The petitioner" -- the petitioner in this case is the

>                                                                  11

1    government -- "urges that the name given to an instrument
2    is not controlling, but that its inherent characteristics
3    will determine the true nature and legal effect."
4          And then the court says this may be conceded but
5    it does not follow that the label is meaningless.
6          And then down a little further it says, "Though
7    both contain substantially similar provision" -- that is,
8    as the debt and the equity, the economic characteristics
9    are substantially similar, "and are silent as to the
10    source of the return," meaning the return may be out of
11    profits or out of capital, "it is not inconsistent to hold
12    that only in the case of certificates designated as bonds
13    were the holders intended to be creditors."
14          Now, I've already noted that the 2nd Circuit
15    agrees that GECC in this case had a business purpose, that
16    you found that it acknowledged to cause, to raise equity,
17    to raise funds in exchange for an interest that would not
18    be denominated as debt for nontax purposes.  So, if one
19    one were to set the law of the case aside, which we can
20    talk about but I don't really think that's the issue, I
21    think the no debt holding is the law of the case and
22    you're a district court judge and if you want to

Page 9

20MAY08 TIFD

23    reconsider that decision, it's within your power to do so.

24         So I don't think it's really necessary to talk

25    about the law of the case as such.  I think there's some

> 12

1    policy issues that would counsel against it, but, more

2    importantly, if you were to reopen the debt question, the

3    relevant cases would not be the cases in which the

4    government was arguing that debt was equity and the

5    comparison was debt versus common stock which

6    participates.  The relevant question would be the

7    comparison under the 2nd Circuit's authority in the other

8    circuits as well as revenue rulings and revenue procedures

9    that we have cited copiously that say that preferred stock

10    and preferred partnership interest are what they are.

11         Because of the labeled count, because labels

12    carry merits and substance and because preferred

13    stockholders and preferred partnership interest holders,

14    laying aside the participation that the banks had in this

15    case, assume they had none, which is effectively what the

16    2nd Circuit said, preferred stockholders don't want to

17    embark on a business venture with the common stockholders.

18    Their objective is not to share profits.  Their regular

19    objective is not to the share losses, and they almost

20    never vote, but they are still there.

21         So, my point at this point is that the 2nd

22    Circuit didn't say that these interests were not debt.  It

23    didn't say that they were not equity, as the government

24    argues.  And it couldn't have because if it had, it would

25    have been creating a precedent out of a partnership case

> 13

1    that applies to all preferred equity and it would be going

2    against its direct precedent.  So what it did -- so the

Page 10

20MAY08 TIFD

3      question then is what did it do.

4              Now, we got a series of notes here, which is

5      where I've led so far --

6              THE COURT:  Let me just note that I understand

7      why you say that couldn't be what they did, but that may

8      be what they unwittingly have done.

9              MR. NELSON:  Well, I hope, fortunately for us,

10     wittingly or unwittingly, that's not what they did but

11     we'll see.  What they did is they said even if it's not

12     debt and even if it is equity, it's not the special type

13     of equity that is required to satisfy the Culbertson test

14     for partnership.

15             THE COURT:  Bona fide effort.

16             MR. NELSON:  Bona fide or, more specifically,

17     the banks were not bona fide equity partners because their

18     interest was not a bona fide partnership equity

19     participation.  Okay?

20             And they did that because the government asked

21     them to.  That's what the, that's what the argument was by

22     the government to the 2nd Circuit, was we're not appealing

23     the economic substance issue.  We grudgingly accept it for

24     now.  We're not appealing the sham but we just don't think

25     that these banks, notwithstanding what they are generally

>                                                                    14

1      characterized as, their interest is characterized as, we

2      just don't think they participated enough in profits and

3      losses and management to be treated as coadventurers in

4      the enterprise.

5              The word, the term "bona fide partnership equity

6      participation" is the term that the court, the 2nd Circuit

7      consistently uses.  They did at one point say under

Page 11

20MAY08 TIFD

8   Culbertson, underline the "under Culbertson" part, the
9   banks were not bona fide equity partners, but everytime
10  they described the interest, they don't say it's not
11  equity.  They say it's not a bona fide partnership equity
12  participation.  The term "participation" and "participate"
13  is used I think 14 times in the opinion.  The word
14  "equity", fascinatingly, is almost always used as an
15  adjective.  Bona fide partnership, equity participation.
16  You've got to be both.  You got to be equity and you got
17  to participate.  And all of the cases, once we get past
18  the statement of the Culbertson test, the debt equity
19  cases are all binary cases.
20          The question is not -- the question is whether
21  an interest is debt or is it equity.  And in the direct
22  implicit or explicit holding in all of the cases cited
23  that are debt equity cases, either it's debt or it's
24  equity.  It doesn't fall into the twilight zone.  It's
25  debt or it's equity.

>                                                                15

1           The 2nd Circuit cites a few other cases.  They
2   are also binary.  The O'Hare case.  It's clear that
3   Mr. O'Hare was either a guarantor of the debt or he was a
4   partner.  The Luna case.  Mr. Luna was either an employee,
5   that is, an insurance salesman who's collecting
6   commissions, or he was a partner.  And where the
7   government's argument really confounds itself to me is
8   it's not debt, it's not equity, but there is no
9   Never-Neverland.  Well, in fact, that's what the 2nd
10  Circuit said under Culbertson.  It did say there's a
11  Never-Neverland.  It said if we read Culbertson, you've
12  got to want to be a partner.  You've got to want to share.
13  You've got to want to participate.  And a little's not
                        Page 12

20MAY08 TIFD

14      enough; it's got to be material.

15             So, what I see out of, out of the 2nd Circuit is

16      a very narrowly drawn identification of a subset of equity

17      trying to avoid a big precedent on debt equity.  Either

18      way, let's draw a narrow test from Culbertson.

19             Now --

20             THE COURT:  Aren't they really saying, isn't the

21      2nd Circuit really saying that, whether it's debt or

22      equity, and they keep talking about whether it's more akin

23      to debt or more akin to equity, isn't ultimately what they

24      are saying the point you just made about the banks are not

25      really partners?

>                                                              16

1              MR. NELSON:  That's absolutely what they are

2       saying but they are absolutely saying it under Culbertson.

3       The only source for their decision is Culbertson.  So if

4       we can work on Culbertson for a minute -- I'm not going to

5       try to argue they misread Culbertson; I want to make sure

6       what they read into Culbertson -- twelve.

7              This is the 2nd Circuit quoting Culbertson.

8       "The Supreme Court ruled that a partnership exists when,

9       considering all the facts" -- and they list a bunch of

10      facts -- "the parties in good faith and acting with a

11      business purpose intended to join together in the present

12      conduct of the enterprise.  This test turns on the fair,

13      objective characterization of the interest in question

14      upon consideration of all the circumstances."

15             Culbertson is a subjective test.  It is a search

16      for intent.  It is a search to which all circumstances are

17      relevant and no circumstance is going to be binding on a

18      fact finder under the Culbertson test, as we will get to

Page 13

20MAY08 TIFD

19    in a minute.  That was the problem with the Culbertson

20    test.

21        So, the reason that we don't see you bound in

22    any way is that the 2nd Circuit applied an

23    all-the-facts-and-circumstances test.  They then looked

24    around and said what circumstances are relevant.  What

25    objective circumstances do we see that Judge Underhill

>                                                                    17

1    didn't credit that rise to, that cause us not to be able

2    to infer that the banks intended to join together with

3    GECC in the present conduct of the enterprise.  And the

4    facts were that, the facts that showed that the banks

5    didn't intend to participate materially in the

6    entrepreneurial profits, the entrepreneurial losses and

7    the management of the enterprise, those are all the

8    circumstances that they culled out.

9        The question that faces you at this point is are

10    those circumstances relevant under Section 704(e).

11    Section 704(e) is an alternative test.  I want to get to

12    the legislative history but I do like to start with the

13    statute.  Give me slide 17.

14        It posed, it states affirmatively "A person

15    shall be recognized as a partner for purposes of this

16    subtitle if he, one, owns, two, a capital interest in a

17    partnership in which, three, capital is a material income

18    producing factor."  It focuses on three circumstances, not

19    all the circumstances, just three.  Is there ownership of

20    a capital interest in a partnership in which capital is a

21    material income producing factor.

22        Now, the -- when Congress was enacting this

23    provision, it was clearly reacting to Culbertson and I

24    actually direct you -- we cite a case in our brief, I

20MAY08 TIFD

25    can't remember the page cite -- it's on page 31 of the
>                                                                              18

1     main brief, 30 and 31, but it's the Smith case.  It's a
2     tax court case and it's a fascinating case, it seems at
3     least fascinating to me if I were you, because Smith
4     involves a partnership with no materially changed
5     circumstances that was litigated and determined to be not
6     a partnership under Culbertson and after 704(e)(1) was
7     enacted.  The same partnership goes back to the tax court
8     and says we've got a different test and the government
9     says collateral estoppel.  And the circuit case, the tax
10    court says no, not collateral estoppel, we have a
11    different test.  It looks at different circumstances and
12    it puts some of the circumstances that were looked at in
13    the prior case in a different light because they now have
14    different relevance, and it emphasized that 704(e)(1)
15    actually has an effective date.  It was intended to be a
16    change and it quotes the effective date, especially the
17    part that says 704(e)(1) won't apply to transactions that
18    are tested under prior law, that is, under Culbertson, but
19    will apply now and it goes the other way.
20            On page -- I believe, I think around page 23 and
21    30 of our main brief, we cite a number of other cases
22    besides Smith that say very clearly that Section 704(e)
23    changed the test.  The 7th Circuit in the Pflugradt case
24    says "The test is no longer whether the parties acted in
25    good faith with a business purpose in joining together to
>                                                                              19

1     conduct the enterprise."  And then it refers to the
2     committee report and then it says "The emphasis has
3     shifted from 'business purpose' to 'ownership of a capital

Page 15

20MAY08 TIFD

4    interest.'"  And that's at the 7th Circuit.

5            The 9th Circuit, Bateman.  "The drafters of

6    Section 704(e)(1) -- is intended to overrule Tower and

7    Culbertson."

8            Another, Forman, "The House and Senate Reports

9    concurred in finding such additional section was necessary

10   to curb the Tax Court in its erroneous interpretation,

11   since the Culbertson decision."

12           And then the Tax Court decision that says that

13   Culbertson is the law except to the extent limited by

14   Section 704(e).

15           Now, the legislative history itself says the

16   same thing.  It says that -- I'd better be correct -- but

17   it is very clear that it is -- "Section 704(e)(1) is

18   intended to harmonize the rules governing interests in the

19   so-called family partnership with those generally

20   applicable to other forms of property or business."

21           The concern that motivated Congress was that

22   there were being -- special rules, special requirements,

23   special intent requirements were being applied to interest

24   in partnerships that were not being applied to those

25   applicable to other forms of business.  That's what the

20

1    Congress said it was doing.  And it was not trying to

2    create a special rule for family partnerships.  It was

3    trying to conform the Culbertson case, which was a family

4    partnership case, even though it's cited for the general

5    proposition or the general definition of a partnership,

6    Culbertson was a family partnership case.  What Congress

7    is saying is we don't want any special rules.  Said it out

8    of its own mouth.

9            THE COURT:  Right.  But help me understand why

Page 16

20MAY08 TIFD

10    704(e) applies outside the family partnership context.  In
11    other words, I recognize the title of the chapter is not
12    controlling but you read this legislative history and it
13    seems that what they are doing is amending the statutes
14    that apply to family partnerships.
15           MR. NELSON:  No, there's an irony here.
16    Culbertson itself is a family partnership case --
17           THE COURT:  I know.
18           MR. NELSON:  -- and it is cited for -- this is
19    not a family partnership.  What the government relies on,
20    a family partnership case to say, well, this general
21    definition which was derived from family partnerships
22    applies generally, but the section that was enacted to be
23    sure that family partnerships are not treated differently
24    than general, other general forms of business, somehow,
25    somehow doesn't apply.

>                                                              21

1            I have, we have cited -- let me, the main
2     response to your question about limitation is right here.
3     "Congress intended to harmonize the rules governing
4     interests in the so-called family partnership with those
5     generally applicable to other forms of property or
6     business rules."  They weren't creating special rules for
7     family partnerships.
8            We've got one, two, three cases cited in the
9     briefs, there are no contrary cases, that very clearly
10    hold that 704(e) is by its terms not -- is not limited to
11    family partnerships.  We have also said the Evans case in
12    the 7th Circuit, the Bateman case in the Tax Court, and
13    Carrige Square in the Tax Court.
14           The government doesn't really argue that it's
Page 17

15    limited to family partnerships and sometimes in trying to

16    figure out the intent of something, maybe even lesser

17    authority is helpful.  The government itself in its own

18    internal guidance said the IRC, Section 704, entitled

19    Family Partnerships, but only one subsection applies to

20    family and family members, Subsection (e)(1), provides

21    "Any person who acquires an interest in a partnership from

22    any other person, from purchase or gift, a capital and

23    material income producing factor, then the person will be

24    considered a partner."  That's citing the tax code.  The

25    statements are just as clear in the cases but sometimes

> 22

1    when it comes out of the other side's mouth, it can be

2    more persuasive.

3         THE COURT:  Going back to Smith, is Smith the

4    only case authority that you've got, that either side has

5    frankly, that addresses the interplay between 704 and

6    Culbertson?  In other words, is there precedent where a

7    partnership has been held or an interest has been held not

8    to be a bona fide equity participation in a partnership

9    under Culbertson but, nevertheless, thereafter was found

10    to be an interest, capital interest within the meaning of

11    704?

12         MR. NELSON:  There has never been stated -- a

13    categorical absolute is dangerous -- I will hazard this

14    statement:  There is no statement anywhere in which

15    Culbertson has been applied in any way that remotely

16    resembles the positing of a test that requires material

17    partnership, equity participation.  That's the short

18    answer to the question.  Has the phrase ever been used?

19    Has something close to the phrase ever been used?  No.  In

20    fact, no one -- let me rephrase that.  Part of the problem

20MAY08 TIFD

21    with being a tax lawyer instead of a litigator is you
22    think you know the rules.
23            Speaking as a tax lawyer, it never occurred to
24    me in a million years that a legitimate substantial
25    investment in an entity that's not debt and is equity

>                                                          23

1    wouldn't be the partnership interest, any more than it
2    occurred to me that a substantial investment in a
3    corporation that's not debt and is denominated to
4    preferred stock won't be preferred stock.  This is new
5    stuff, but it is drawn from Culbertson which is old stuff.
6            And the broader answer to your question, which
7    is has anybody ever thought about this before, is yes.
8    The cases that I cited to you clearly say no, Culbertson's
9    not the issue anymore.  If the question is whether
10   capital, whether this -- whether the partner is a partner
11   because the partner owns a capital interest, then what
12   we're looking at is 704(e)(1) and that's Pflugradt,
13   Bateman, Forman and Morton.  Those are the cases.  And I
14   think -- I can't -- there are no other cases to the
15   contrary.  There's no other law to the contrary that I'm
16   aware of.
17           So, I think what you have is exactly what the
18   court faced in the Smith case.  Now, in the Smith case,
19   the question was whether trusts were partners, and the
20   Smith case drew from Culbertson an intent test, which
21   Culbertson was, a subjective test, and the conclusion was
22   that a trust created by a gift from a parent just didn't
23   intend to join together the conduct of the enterprise.
24   Those were the facts and circumstances that were relevant
25   to the pre-704(e)(1) Smith court.

>                                                          24
                        Page 19

1          Afterwards, focus shifts entirely to the
2    objective inquiry:  Is it a capital interest?  Is it a
3    capital material income producing factor?  And does the,
4    does the putitive partner actually own the interest that
5    the putitive partner purports to own?
6          704(e)(1), as I've said, poses three questions
7    and it doesn't directly define capital interest but it
8    does say we want interest in partnerships to be treated
9    just like interest in other forms of business.  That's
10   what the legislative history said.  The regulations come
11   along and they do define the capital interest.  What they
12   say is capital interest is an interest in the assets of
13   the partnership which is distributable to the owner of the
14   capital interest by withdrawal, upon withdrawal of the
15   partnership or upon liquidation of the partnership.
16   That's slide -- this one is actually worth putting up
17   here, 20.
18          Then there's a last sentence that's an
19   interesting counterpoint.  "The mere right to participate
20   in the earnings and profits of the partnership is not a
21   capital interest in the partnership."  You can look -- the
22   704(e) regulations are actually fairly long -- there was
23   nothing in the 704(e) regulations that indicates that a
24   capital interest has to be augmented with a particular
25   quality of profit or loss sharing.  The word "participate"

>                                                                    25

1    or "participation" shows up in those regulations in one
2    context and one context only, and that is it shows up
3    on -- the question is whether the putitive owner of
4    interest that's already a capital interest actually owns
5    the interest.  And one indicia that the putitive nominal

20MAY08 TIFD

6   owner of the interest really owns the interest is the
7   owner of the interest, the nominal owner actually
8   participates in the business.  But that's the only place
9   where you see the word "participate" or "participation" in
10  these regulations.  There is no suggestion at all that
11  any, any profit sharing or participation is necessary
12  under 704(e)(1).  It is under 704(e)(2) and (e)(3).
13          Let me back up one more second.  You said wasn't
14  Congress really trying to address a family partnership
15  situation.  What it was doing is it was trying to prevent
16  a family partnership situation from distorting the general
17  law, and it wrote what is now 704(e)(1).  When it was
18  written in 1951, it was put in the general definition of
19  the partnership.  That applies to everybody.  It wasn't
20  labeled, it wasn't headed Family Partnerships.  The '39
21  code, which was amended in '54, which is when the heading
22  changed simultaneously with what was in Section 3797, I
23  think (a) of the 39 code, there were two other subsections
24  that now are 704(e)(2) and (3).  704(e)(2) does address
25  profit participation, 704(e)(2).

>                                                           26

1           So, what we have is we have a situation where
2   the statute says if a partner owns a capital interest, if
3   a person owns a capital interest, that person is a
4   partner.  And, generally speaking, once a partner, you go
5   to Section 704(b), with which you have some familiarity,
6   to determine profit and loss sharing.  Section 704(e)(2)
7   says but if the interest was acquired by gift, not
8   mentioning family, just gift from anybody, then there are
9   limits on the amount of profits that you can allocate to
10  the donee partner.  You can't allocate more profits to the

Page 21

11    donee partner than the proportionate capital retained by

12    the donor.  So Congress understood that people were, in

13    fact, forming partnerships and would at that point shift

14    the taxable income from high bracket taxpayers to low

15    bracket taxpayers.  They say that's okay.  There was no

16    concern about not allocating enough.  There was a question

17    about allocating too much and that's 704(e)(2).

18         Now, you get to 704(e)(3) and you see the only

19    mention of family in this trilogy of provisions that were

20    enacted at the same time.  704(e)(3) says if the buyer --

21    if an interest is purchased and if the buyer and seller

22    are family members, then the transaction will be treated

23    as if the interest were acquired by gift, and then the

24    allocation, income allocation limitation of 704(e)(2) will

25    engage.  But nothing suggests that you worry about how

>                                                                27

1    income or loss is allocated in deciding whether a capital

2    interest is a capital interest.  Doesn't exist.

3         Now, as a sanity test matter, and I emphasize

4    sanity test here, we cited a number of authorities,

5    including, by the way, O.P.P. and Jewel Tea, that treat

6    debt like equity, as equity.  We've cited, in particular

7    we've cited two really seminal rulings.  Now, there are a

8    lot of them but Revenue Ruling 90-27 is a significant

9    ruling because it is the ruling that resolves the question

10    whether the government was going to attack highly

11    preferred rates like triple A rated adjustable rate

12    preferred stock and try to make it debt under a

13    characterization test.  And the government published

14    90-27, the corporate case, but it said very clearly that

15    Dutch auction rate preferred stock will be treated as

16    stock, and in the ruling itself the government describes

17    Dutch auction rate preferred stock as a, quote,

18    "investment alternative to commercial paper or short term

19    debt."

20          Now, I'm citing this as a sanity test.  Am I

21    saying something to you that you shouldn't believe?  And

22    the answer is the capital markets are flooded with

23    debt-like preferred stock.  We cite you another revenue

24    ruling which is actually somewhat closer to the facts, and

25    that's Revenue Ruling 78-142.  And the issue in 78-142 was

>                                                                  28

1     whether in a corporate reorganization, when a corporation

2     acquired the assets of another corporation in exchange for

3     preferred stock, whether that preferred stock provided a

4     sufficient "continuity of interest," a technical term, to

5     the preferred stockholder so that the transaction would

6     qualify as tax free.  78-142 is mandatorily redeemable

7     preferred stock under its -- it's nonvoting except when

8     somebody doesn't do what they are supposed to do with

9     respect to the preferred stock, at which point it gets to

10    be voting.  It requires that the company maintain a

11    minimum in current assets.  It requires that a subsidiary

12    of the company maintain a minimum level of cash.  It

13    prohibits the company from doing anything out of the

14    ordinary course of business, and it prohibits the company

15    from incurring any debt.  And the government says it's

16    preferred stock.  Not only is it preferred stock, it's

17    good enough to satisfy the continuity of interest

18    requirement.  So, those are sanity testing, I'm still in

19    sanity testing.

20          So, now we come to what's a partnership.  Some

21    people in this room may own interest in, they may have

20MAY08 TIFD

22    their checking account in a money market fund that pays,

23    quote, "tax exempt interest."  If they do, then they are

24    indirect owners of interest in a partnership that is

25    described in Revenue Procedure 2003-84.  That's slide 27.

>                                                                          29

1          Your Honor, the interesting thing about this

2    revenue procedure is that it describes an interest.  So

3    you go out and you get a pool of bonds and you divide the

4    profits and losses in those bonds in an interesting way.

5    You create variable rate interest that act like debt and

6    they are entitled to be paid out of all of the capital and

7    profits earned by this bond pool without any material up

8    side or down side.  And then there's the so-called inverse

9    interest, which is the equivalent of common stock, and it

10    gets all the profits that are left over, not necessary to

11    allocate to the variable interest, and its capital is at

12    first risk.  And the government goes on down, the IRS guys

13    go on down and it describes the variable interest as the

14    economic equivalent of a variable-rate tax-exempt bond.

15    There is no participation.  There is -- these things are

16    rated.

17          In fact, one of the problems in the market right

18    now is that the rating agencies are under fire and one of

19    the problems with this whole industry right now is that

20    the debt ratings that are applied to those partnership

21    interest are under question.  Every state and local

22    government in this country, let me say 99 percent because

23    I can't speak for all of them, finance themselves through

24    these interests.  Again, I'm not -- I'm sort of citing

25    this to you for authority but I'm not citing it to you

>                                                                          30

1    because I think you ought to be comfortable saying you

20MAY08 TIFD

2    don't have to participate to be a partner.  I know that's
3    true so maybe what Will Nelson is telling me about
4    704(e)(1) is not total smoke.
5              Okay.  Now, if one assumes that we're free to
6    apply 704(e)(1) the way it's written, then the question is
7    do the banks have to have a capital interest.  And let's
8    hit 26.
9              And the answer to this one I think is pretty
10   clear.  This is 12.2 of the partnership agreement.  It's
11   actually the operating agreement and a joint exhibit.  The
12   exhibit cite's down at the bottom.  But you'll see, if
13   Castle Harbour were liquidated, "The liquidator shall
14   cause the property or the proceeds from the sale of the
15   property to be applied in the following order:
16             "First, to creditors in satisfaction of all
17   debts and liabilities.
18             "Then to the banks in an amount equal to the
19   Class A guaranteed payment and indemnification premium."
20             Now, mind you, the Class A guaranteed payment
21   was income on the bank's capital and not the capital.
22   It's like accumulated or unpaid dividends on preferred
23   stock.  So, you've got preferred stock and you haven't got
24   your full accumulated dividends.  As the corporation is
25   liquidated, before anybody gets capital back, you're going

>                                                              31

1    to satisfy the accumulated unpaid dividends on the
2    preferred stock.  That's what we are talking about in B.
3              When we get to C, "Third, to the GECC partners
4    in an amount equal to their Class B guaranteed payments."
5    It gets its guaranteed payment.
6              And, finally, and most significantly, or only

20MAY08 TIFD

7      significantly for 704(e)(1) purposes, "The balance to the
8      interests holders," including the banks, "in accordance
9      with their positive capital accounts."  They just had a
10     capital interest.
11              THE COURT:  The 2nd Circuit seems to suggest
12     that because there was a guaranty, the banks didn't really
13     fall fourth in line.  What impact does that have on the
14     situation?
15              MR. NELSON:  Okay.  That's -- frankly I was
16     worried about that because I couldn't understand the
17     statement so I would imagine it would be troubling, so let
18     me try to run through it here.
19              It is explicable and I think it's important that
20     it be -- that you at least understand what the agreement
21     provided further up, number 38.  The 2nd Circuit said "The
22     banks did not need to rely on the assets of Castle Harbour
23     or the taxpayer for reimbursement.  They had the guaranty
24     of the taxpayer's far more solvent parent GECC.  Upon
25     consideration of all the facts and circumstances, it is

>                                                                32

1      clear that, far from being subordinate to the general
2      creditors, the Dutch banks were secured in such a manner
3      that they would be repaid in full with interest from a
4      source to which the general creditors had no access."
5              So, I read that and the first thing I did was go
6      searching for a copy of the guaranty agreement.  And when
7      I pulled out the guaranty agreement -- slide 39 -- what I
8      discovered is that in the guaranty agreement, GECC
9      guaranteed "The due and punctual performance and payment
10     by the GECC subsidiaries," which doesn't include the
11     partnership, "and the managers of all covenants,
12     obligations and indemnities to be performed or observed or
                              Page 26

20MAY08 TIFD

13    paid by them under all the transaction documents," which

14    includes specifically the partnership agreement, the

15    operating agreement.

16         So, I'm thinking, what did I miss here?  This is

17    a performance guaranty.  It doesn't create any rights.

18    It's a guaranty.  If the -- it's guaranteeing the banks

19    they will get what they were supposed to get.  It's

20    putting the banks in the same position, vis-a-vis GECC, as

21    if GECC were the partner, in which case all that

22    presumably would be direct to GECC but, because the

23    subsidiaries were the partners, we have this guaranty.

24         And you go back, go back and look at the

25    government briefs.  They describe these as the performance

>                                                           33

1    guaranty as well.  So I'm thinking, where does this come

2    from?  And then you look at the 2nd Circuit opinion.  Put

3    36 and 37 on.

4         And on 36 the 2nd Circuit says that "GECC gave

5    the banks its personal guaranty which effectively secured

6    the partnership's obligations to the banks."

7         And then on 37 it refers to "GECC's personal

8    guaranty of the obligations owed by the partnership to the

9    Dutch banks."

10         So, I don't think the 2nd Circuit misunderstood

11    the guaranty.  The guaranty is a performance guaranty.  It

12    doesn't, it doesn't -- it's not a hold harmless guaranty.

13    There's nothing in that guaranty that can possibly be read

14    to say if you lose money under the partnership agreement,

15    not to worry, we're going to hold you harmless.  It

16    doesn't exist and I don't think the 2nd Circuit read it

17    that way.

20MAY08 TIFD

18          What I think, therefore, and I think some of

19     this can be -- may have come from a couple statements in

20     your opinion that weren't exactly right, but what I think

21     the problem was is that the 2nd Circuit inferred one of

22     two things, either of which is wrong and cannot be and is

23     not an interpretation of the guaranty agreement as such.

24     Either the 2nd Circuit thought that the Class A guaranty

25     payment applied, applied to the return of the capital

>                                                                        34

1      investment as well as the income on the capital -- which

2      it clearly didn't and I think you clearly understood

3      that -- or misunderstood the loss allocations in the

4      partnership agreement.

5          We put an example in our main brief at page 11

6      and 12, but I want to use a real simple one here because I

7      think this is so important to understanding how the 2nd

8      Circuit might have gone astray, it's worth getting an

9      understanding.  So give me 40.

10         Now, this is real simple.  This is a kind of

11     accounting I can do.  Assume you have a partnership that

12     starts out with $300.  It borrows $100 and it got $100

13     capital contribution from GE and $100 capital contribution

14     from a limited partnership, so the balance sheet balance

15     is 300 to 300.  Now, let's assume that all losses were

16     allocated 99 percent to the general partnership and the GE

17     partner and 1 percent to the limited partnership.  If that

18     happened, then after losing the whole $300, losing all the

19     capital in the partnership, the GE partner would have a

20     deficit, a capital account of 197 bucks.  That's in the

21     agreement, under the partnership agreement, to put back in

22     that deficit capital account.  That's 12.3 of the

23     operating agreement.  The limited partner would have

20MAY08 TIFD

24    limited, a limited loss, three bucks.  The $197 would be
25    put back in, 100 of it would go to pay the creditors and
>                                                                    35

1    97 would go to pay the limited partner.
2            But let's suppose that the partner defaulted and
3    there were a guaranty of the GE obligation.  Well, in that
4    case there's this big unsatisfied positive capital account
5    on the part of the investor, 97 bucks, and under the
6    guaranty agreement, since the obligated partner has
7    defaulted, the investor would go to the guarantor and say
8    pay me the 97 bucks and the creditors wouldn't be able to
9    get their $100.  If that were the case, the 2nd Circuit's
10   statement would be something I could understand.  That's
11   not the case.
12           And that, for instance, may have come from a
13   statement in your opinion, because you said it both ways
14   in your opinion.  You said it right, and then in one place
15   when you were describing something, it seems to have
16   gotten a little off-track.  So, let me show you how it did
17   happen and then I'll point out the spot.
18           Same starting facts, same loss, $300.  What
19   happened in this deal is that GECC actually contributed
20   $541 million in net capital.  After a net $541 million of
21   net losses were allocated to GECC, all losses went to the
22   banks.  In other words, it was 99/1 until GECC's losses
23   equaled its contribution and then it's 100 percent to the
24   investors.  So, in this example here's how it works.
25   Everybody, still $100 contribution apiece.  The first tier
>                                                                    36

1    material loss is to 91, just like before, and since I'm
2    afraid of fractions, I'm assuming that's $100 to the

Page 29

20MAY08 TIFD

3  general partner and $100 to the investor.  Okay?

4        Then we have a second tier of losses.  That goes

5  100 percent to the limited partner, to the investor --

6  until the investor gets $99 allocated to it which is the

7  positive balance in its capital account.  After that, the

8  last 100 goes back over to the general partner.  So that

9  at the end of the day, instead of having a $197 deficit

10  capital account, the GE partner has a $100 deficit capital

11  account which, if contributed, satisfies the creditors.

12        The banks, the limited partner here has a zero

13  capital account.  You go to the guaranty and you say,

14  okay, let's look at the guaranty and see what's owed.  The

15  answer is nothing, because the guaranty was that the

16  partnership would satisfy its obligation.  The partnership

17  has no obligation because the bank's capital account has

18  been reduced to zero.

19        Now, in one place in your opinion, I think it's

20  on page 106, you said you were looking at the situation

21  right at this end where the banks had a $28 million

22  capital account that was unrecovered, and you said for the

23  banks to lose all their capital there'd have to be

24  $2.8 billion of losses, which would suggest that in that

25  particular statement -- we'll get the exact cite.  Here it

>                                                              37

1  is right here, 106.

2        You said that with $28.8 million remaining

3  positive capital account, Castle Harbour would have to

4  experience $2.8 billion in disposition or operating losses

5  to zero out the bank's capital account, and that's not

6  right.  There's another place where you said it exactly

7  right.  You said after $541 million of aggregate losses

8  were allocated to GECC, it flips and then you said that's

20MAY08 TIFD

9      very unlikely which -- but you clearly, when you were --
10     you understood it, and then there's this statement here.
11     However -- this is the let-the-chips-fall-where-they-may
12     comment -- what I know is that the guaranty was a
13     performance guaranty.  What I know is that nothing
14     indemnified the banks for losses that were allocated to
15     their capital accounts, and I know that the last hearing
16     allocation was similar to what you see with preferred
17     stock and common stock.  What you see in common stock and
18     preferred stock is the corporation has losses.  Common
19     stock, it's for all of it, not 99.9 percent but all of it.
20     Once there's no capital left to satisfy the common
21     stockholders, all the losses go to the preferred
22     stockholders.  That's in round numbers what we have here,
23     except these investors took one percent of everything.
24     So, that is a possibility.
25              In any event, the guaranty, the operation of the

>                                                                    38

1      guaranty and its relation to the allocation provisions in
2      the capital account provisions, we really respectfully
3      request be clarified.
4              There's one more point regarding the guaranty,
5      if you'll give me a second.  And that is let's suppose
6      that you are applying Section 704(e)(1) and let's suppose
7      that GECC had given a hold harmless guaranty.  That's the
8      equivalent of a put.  So, think about what happens if a
9      shareholder buys a put from a creditor, a counter-party.
10     The shareholder now has the right to sell that stock for
11     the put price, even if the value of the stock goes down.
12     But the incremental put right doesn't deprive the
13     shareholder of the shareholder's claim on the assets of

20MAY08 TIFD

14    the corporation.  And if that were the case here, which I
15    emphasize it wasn't, the most that we would have here is a
16    put to a related entity to the partners.
17         That wouldn't -- to put it another way, let's
18    take it to its logical absurdity, and let's remember we're
19    in a crazy financial world, we did have an Enron.  Let's
20    suppose something happened to GECC and they had written
21    that kind of put guaranty.  GECC wouldn't be there.  The
22    guaranty would be worthless but the banks would still have
23    their claim on the assets of the partnership.  That's the
24    essence of a securitization.  That is, that you look to
25    the assets, not the general creditor or sponsor.

>                                                            39

1         In this case the business purpose of this
2    transaction was to get the banks to invest in an entity
3    that only held some assets, so that's what we have here.
4    So I would say to you that however the 2nd Circuit
5    misunderstood the guaranty, it clearly didn't -- the
6    documents themselves clearly don't give the banks a right
7    to be repaid a cent if their capital account has been
8    reduced by losses, and if there were something that was in
9    the nature of a put, it wouldn't change the essential
10    analysis of Section 704(e)(1) because they'd still have
11    the claim on the assets.  Now, to me that's a, that's an
12    argument, but it should be a helpful type of argument.
13         I don't think there's any question but what the
14    banks actually owned their interest, so I think that
15    second factor of 704(e) is clearly satisfied.  The
16    government makes an effort, I don't know how sincere, to
17    say that, well, capital's not a material income producing
18    factor in this partnership, which on its face is kind of
19    silly, but their argument is a little less silly than it

Page 32

20MAY08 TIFD

20    sounds and that is because it's clear that the banks --
21    that the partnership itself only had capital to produce
22    income.  What the government says is the partnership
23    didn't need the bank's capital to produce income.
24    Therefore, as to them, capital's not a material income
25    producing factor.

>                                                                40

1         That argument is wrong on the facts since the
2    whole business purpose of this transaction was to get
3    capital invested in this portfolio.
4              THE COURT:  Well -- help me understand maybe a
5    fundamental issue but is the distinction here between
6    capital and services as a practical matter?  In other
7    words, there are partnerships.  I think of law
8    partnerships where the idea of a capital interest may be
9    less apt because really what it is is it's a service.
10             MR. NELSON:  Inept would be better word.
11             THE COURT:  Right.  And so my initial
12   understanding of this question of capital being the source
13   of income producing, the income producing source for the
14   partnership, is simply is this in effect a partnership
15   that's going out and making and selling things or is it a
16   service-oriented --
17             MR. NELSON:  Yes, that is a difference.  And the
18   actual definition -- give me one second -- is in the
19   regulations.  Culbertson, by the way, still has full force
20   where capital's not a material income producing factor.
21   For example, if the question were am I an employee or a
22   partner of McKee Nelson, then Culbertson would be
23   applicable because the question is in what capacity am I
24   performing services.  Now, you'd still have a binary

Page 33

20MAY08 TIFD

25    choice.  It would still be I'm either an employee or a
>                                                                          41

1    partner.  I couldn't kind of come to the slot in the
2    middle and say I'm not -- I'm saying what you're not, I'm
3    going to tell you what you are.  But Culbertson applies
4    there.  Culbertson would apply in a situation, well, like
5    O'Hare, which the 2nd Circuit cites.  You could get a
6    partnership interest in exchange for a guaranty.  So, if
7    Mr. O'Hare had said, okay, I'll guarantee this
8    $200 million -- $200,000 debt that you want me to
9    guarantee, but in exchange for that I want ten percent of
10   the profits of the company, I think that probably would
11   have made Mr. O'Hare a partner because he would have
12   gotten profits and interest as a fee, even though he's not
13   investing any capital.
14           And so there's two questions really where
15   Culbertson -- two places where Culbertson still applies.
16   One is that capital's not a material income producing
17   factor at partnerships, a business that's -- it's a law
18   firm.  It's a medical firm.  It's an accounting firm.
19   It's a brokerage firm that doesn't use its own money to
20   make a book.
21           The other one is even if capital is a material
22   income producing factor, if I don't have any material
23   capital investment, then I've got to go -- I've still got
24   to ask the question am I an employee, an independent
25   contractor or a partner?  That's where Culbertson still
>                                                                          42

1    holds its sway.
2            THE COURT:  Right.  The government argues, as I
3    recall it, that the plaintiff here has not connected the
4    investment by the banks to the capital of the partnership,

Page 34

20MAY08 TIFD

```
 5    and I assume from your point of view it's not necessary to
 6    do that.  The question is whether -- what is the nature of
 7    the partnership as opposed to how is the capital used or
 8    how is the investment used within the partnership.
 9            MR. NELSON:  Yes.  Our view is that the question
10    is is capital a material income producing factor under the
11    partnership and does the putitive partner, the nominal
12    partner own a capital interest in those assets.  But
13    there's one thing I want to reiterate.  You and the 2nd
14    Circuit decided that there was a business purpose for this
15    partnership to accept money and issue an interest that
16    would not be treated as debt for nontax purposes, so I
17    don't want to -- I don't want to say there wasn't any
18    business purpose for doing what happened but, gee whiz,
19    we're stuck.
20            Even the 2nd Circuit, which did not look kindly
21    on some aspects of this transaction, acknowledged the bona
22    fides of trying to raise money in a securitization type
23    vehicle and issue an interest that is not debt for nontax
24    purposes, so there is a business purpose.
25            The guaranty is the first major -- really, we
```

> 43

```
 1    quibble with a lot of things but, you know, it doesn't
 2    matter, and in an under-all-the-facts-and-circumstances
 3    world, no factor really can count that much anyway.
 4            So, whatever, we've narrowed it down to the
 5    three factors and the guaranty is a factor that at least
 6    needs to be examined to explain why the three
 7    circumstances that 704(e) culls out aren't affected by the
 8    guaranty, and I'll give you two answers.  One is factually
 9    it doesn't apply and the other one is if it did, it should
```

Page 35

20MAY08 TIFD

10   be viewed like a put on stock and not change the

11   definitional relationship of the shareholder or the

12   partner to the property.

13           The second one I've already averted to.  This is

14   the second thing that I think ought to be clarified, and

15   that's the $2.8 billion point that we referred to before.

16   Just a clearer statement of the stacking order.  And here,

17   Your Honor, I am not arguing likelihood of loss.  This

18   stacking order exists whether this partnership owns

19   nothing but treasury bonds or nothing but junk bonds.

20           And the third one is on page 234, note 14 of the

21   government's -- of the 2nd Circuit.  Will you pop that up?

22   Do we have it?

23           And that's based on a statement that you made

24   that GECC could of its own volition and without any

25   problems strip the banks of their profit interest with the

                                                         44

>

1   expediency of moving the aircraft portfolio into CHLI.

2   And the 2nd Circuit picked up on that and it was really

3   derisive of the comment, and the 2nd Circuit talked a lot

4   about facts and circumstances and seemed to think that

5   this transaction was designed to give appearances that

6   weren't real and it really culled this one out and it's

7   really wrong.  And so clarification of this one would be

8   helpful.  You never know what really tilts something one

9   way or the other and makes someone say this is just really

10   what it's not supposed to be.

11           The reason that the portfolio couldn't be

12   contributed is that the operating agreement, there's

13   three -- the operating agreement required the partnership

14   to, quote, "maintain directly," close quote, the regional

15   released assets, so there was an affirmative obligation to

                          Page 36

20MAY08 TIFD

16    keep these assets or do with them what was permitted which
17    was release them, sell them or distribute them.
18          Secondly, the CHLI bylaws prohibited CHLI from
19    incurring debt.  That's in the record.  The airplanes were
20    all heavily encumbered.  These were leverage leased
21    airplanes.  The airplanes couldn't be contributed to CHLI,
22    the subsidiary, because they were encumbered, unless, of
23    course, GECC contributed however hundred million dollars
24    to pay off the debt.  And the bylaws couldn't be changed
25    without the bank's consent.  So there's a legal

>                                                                    45

1    prohibition, contractual prohibition, when applied to the
2    facts, that means you just couldn't do it.
3          And the third thing is that you will recall
4    these airplanes had zero basis.  They were encumbered by
5    big liabilities.  Under Section 357(c) of the Internal
6    Revenue Code, if you contributed an asset to the
7    partnership when the asset has liabilities in excess of
8    the basis, you trigger a gain.  You own the excess in
9    liability of the basis.
10          So there's three, at least three good legal
11    reasons as opposed to, well, we-just-wouldn't-have-done-it
12    kind of reasons, and we think that one could stand
13    clarification as well.  We certainly don't think it's
14    necessary.
15          Now, what TEFRA requirements -- I've worn you
16    out and I apologize, but I'm happy to keep going on the
17    substance --
18          THE COURT:  Well --
19          MR. NELSON:  -- if you don't have any further
20    questions.

20MAY08 TIFD

21          THE COURT:  No, I just just want to be sure

22   Mr. Higgins has a chance to have his turn.

23          MR. NELSON:  Absolutely.  So this is a bench

24   memorandum we prepared to deal with this point, and we

25   summarized the form.  The point is that TEFRA is a

>                                                                    46

1    proceeding to determine what partnership items are.  Part

2    of that is determining what they are not, part of it is

3    determining what they are.  It's a declaratory proceeding.

4    Once you classify, put a label, put a name on a

5    partnership item, then in a subsequent proceeding somebody

6    goes out and applies that declaratory characterization to

7    the partners.  And to make them compute income in this

8    case, the banks put on 117-plus million bucks and they got

9    back more.  That's income.  And we know, I think we know

10   that the banks' interest was income, wasn't debt.  We

11   think we knew at least that it wasn't equity.

12          But saying what it's not is not particularly

13   helpful and saying what it's not, thinking about what it

14   is as well as what it's not I think informs thinking, but

15   some determination of what the banks were and what their

16   return was, if it wasn't an allocation of profits, is a

17   necessary element of a judgment in a TEFRA case.

18   Otherwise we have nothing to go on other than knowing what

19   we have -- economically substantial income producing

20   partnership items without a label.  And that's what this

21   says.

22          If I can approach?  I will hand it to the Clerk.

23   Mr. Higgins will be duly served.  He has.

24          Mr. Higgins, I've taken more of your time than I

25   should, but I probably had more questions than you do.

>                                                                    47

Page 38

20MAY08 TIFD

1    So -- thank you, sir.

2              THE COURT:  Thank you.

3              MR. HIGGINS:  Thank you, Your Honor.  I'd be

4    happy to just to answer, respond to questions if you would

5    like.  I don't have slides to go over.  But I'll start

6    with the last point first.  That's what would TEFRA

7    require.  That's why, Your Honor, from the initial post

8    remand conference, we discussed the need for a judgment

9    and provided a sample judgment.  It's not somebody does

10   something after final judgment is arrived at, the IRS will

11   send out a bill, will bill the taxpayer.  Obviously the

12   Dutch banks, that's not relevant because the Dutch banks

13   are taxing different parties so it's not going to be the

14   Dutch banks who get a bill to pay the tax.  It's going to

15   be GECC.  That's why there was a $62 million payment

16   that's been made long ago.  So the process is not

17   particularly cumbersome in that regard.

18             There's a couple points.  One, the government

19   does not consider the court has leeway to make fact

20   findings.  The 2nd Circuit was quite clear in that regard.

21   So the idea that what the court should clarify, it's our

22   position that the court is not authorized to clarify

23   anything outside the application of 704(e) and the penalty

24   which the court -- the appeals court didn't even mention

25   the penalties.  That was just left over from our initial

>                                                           48

1    briefings.

2              THE COURT:  Well, what gives you that sense?  In

3    other words, if I decide the 704(e) issue, isn't it likely

4    that I'm going to have to make some findings that are

5    different than the findings or in addition to the findings

                            Page 39

20MAY08 TIFD

6    that I made when deciding --

7              MR. HIGGINS:  No.

8              THE COURT:  Why not?

9              MR. HIGGINS:  Because the 2nd Circuit

10   reviewed -- first of all, the 2nd Circuit really didn't

11   dispute your factual findings but it went over all the

12   fact findings in detail, excruciating detail, and decided

13   explicitly there is no need for further fact finding.

14             THE COURT:  Well, they didn't say that with

15   respect to 704(e).  They didn't say that with respect to

16   penalties.  They didn't say that with respect to any issue

17   other than the question of debt equity, sham.

18             MR. HIGGINS:  Well, we read -- with all due

19   respect, Your Honor, we read the opinion differently.

20   Because as the 2nd Circuit came to the end of the opinion,

21   it first was going, well, do we just reverse for further

22   findings or do we have enough here to make a decision?

23   And its decision -- the opinion says, no, we're not going

24   to remand for further findings.  And then it's just in the

25   footnote that, the closing footnote that the court says

>                                                        49

1    the District Court needs to examine the 704(e) --

2              THE COURT:  Here's the 2nd Circuit.  Quote, "The

3    question remains whether we should remand for new findings

4    or undertake ourselves to answer in the first instance the

5    question of bona fide equity participation," unquote.  So

6    there's no need for additional fact findings with respect

7    to the question of bona fide equity participation.  Where

8    in the decision of the 2nd Circuit does it say the court

9    should not, need not, must not, cannot make further

10   factual findings on any other issue within the scope of

11   the remand?

Page 40

20MAY08 TIFD

12          MR. HIGGINS:  It doesn't.  It does not say it
13    any more specifically than the language the court just
14    quoted.  Does not, I agree.
15          THE COURT:  And that's one question.  If they
16    remanded on other questions, to not make a factual finding
17    under the 704 issue, they are going to remand again and
18    they are going to say why don't you make a factual finding
19    so we could resolve this issue.
20          MR. HIGGINS:  We think that would not happen
21    because I think the 2nd Circuit would expect that the
22    opinion would say based on, that there -- how can there be
23    a change of the fact finding, making a finding about the
24    nature of the transaction, because the underlying facts
25    and circumstances don't change.

>                                                              50

1          THE COURT:  No, but the factors that I have to
2    decide should change.  I didn't decide, I didn't decide
3    last time whether the banks had a capital interest.  Don't
4    I need to make some fact finding in connection with the
5    question --
6          MR. HIGGINS:  Well, we think that the fact
7    findings would be you don't need to because there's no
8    additional facts that need to be found to determine that
9    the banks did not have a capital interest, because all of
10    the facts that have been found so far in this case --
11    because the facts found are what was the nature of the
12    banks' interest and that question's been answered.
13          THE COURT:  I agree with you that I could issue
14    a ruling without making additional fact finding.  You said
15    I'm not entitled to or not permitted by the 2nd Circuit
16    decision to do so, and that's what I'm questioning.

20MAY08 TIFD

17        MR. HIGGINS:  Okay, well, our position comes

18    from the language Your Honor quoted, and I understand that

19    you disagree with us but that's where we're coming from.

20        THE COURT:  All right.

21        MR. HIGGINS:  Because we don't think that --

22        THE COURT:  Well, let me just ask you a more

23    general question.

24        MR. HIGGINS:  Sure.

25        THE COURT:  You obviously take the position that

>                                                                    51

1    the 2nd Circuit has already decided the 704(e) issue.

2        MR. HIGGINS:  The facts decided by the 2nd

3    Circuit have also decided the 704(e) issue, yes.

4        THE COURT:  Right.  And so why are we here?  If

5    the 2nd Circuit --

6        MR. HIGGINS:  Good question.

7        THE COURT:  If they already decided it, why did

8    they remand it?

9        MR. HIGGINS:  Oh, we've also considered that the

10    2nd Circuit's following the normal procedure that has let

11    the District Court make its ruling first on, on the legal

12    issue.  Not -- we're not going to presume that somehow we

13    don't know enough about the 704(e) to make that decision.

14    We want to hear from the District Court first.

15        THE COURT:  But why didn't they, as they often

16    do, remand for entry of judgment on this issue and the 704

17    issue?  In other words, it's a waste of everybody's time

18    and money to be here on this issue if it's already been

19    decided by the 2nd Circuit.  I can't believe that's what

20    they are saying in footnote 19.

21        MR. HIGGINS:  We certainly didn't think it's an

22    opposite that they think, oh, we're going -- clearly

Page 42

20MAY08 TIFD

23    704(e) applies and, therefore, we've wasted our time.  I'm

24    not just saying that 704(e) applies, so --

25            THE COURT:  No, of course not, but presumably

> 52

1     they don't think the issue is foreclosed and you're

2     treating it as foreclosed.  I don't understand why.

3             MR. HIGGINS:  Well, we're not treating it as

4     foreclosed because -- the why is because of procedure.

5     Simply that the district court didn't pronounce on the

6     issue and, therefore, the 2nd Circuit is deferring to the

7     district court.  That's all.  Is it a monumental waste of

8     time?  We don't think so, but, on the other hand, it

9     certainly is not -- it's difficult to read into the

10    opinion, as the plaintiff apparently does, that it's open

11    season and nothing that occurred before, the fictions that

12    the 2nd Circuit observed are no longer going to be

13    fictions under the 704(e) prism, because that's

14    essentially what the plaintiff is arguing in its briefs

15    and here today and we vigorously say that's not really a

16    possible conclusion.  Window dressing before is going to

17    be window dressing under 704(e) because the facts don't

18    change.  The underlying partnership agreement doesn't

19    change.  And whether it's Culbertson or 704(e), it

20    doesn't --

21            THE COURT:  Help me out, help me out.  The banks

22    owned an interest in the partnership, didn't they?

23            MR. HIGGINS:  For tax purposes.  The banks'

24    interest was not bona fide equity participation, and Mr.

25    --

> 53

1             THE COURT:  Well, that's not my question.

Page 43

20MAY08 TIFD

2   That's been decided by the 2nd Circuit and I'm not

3   getting --

4           MR. HIGGINS:  Well, it's a financial question.

5   We do not believe that the banks owned a capital interest.

6   The banks were lenders.  They have a secured loan with an

7   equity kicker.

8           THE COURT:  But your issue is whether it's

9   capital, a capital interest or not.  They owned an

10  interest.  They owned something.

11          MR. HIGGINS:  They made a loan to be paid so

12  they are creditors of the organization for tax purposes.

13  What their financial arrangement is under Delaware law

14  under some accounting principles, that's not the issue.

15  This is a tax dispute.

16          THE COURT:  So, for tax purposes this was debt.

17          MR. HIGGINS:  Yes.

18          THE COURT:  Absolutely.

19          MR. HIGGINS:  It's akin to debt, it's a

20  paradigm --

21          THE COURT:  Wait, wait --

22          MR. HIGGINS:  Okay.

23          THE COURT:  One at time.  Let's --

24          MR. HIGGINS:  You first.

25          THE COURT:  Thanks.  Is it akin to debt or is it

>                                                              54

1   debt?

2           MR. HIGGINS:  It's akin to debt.

3           THE COURT:  What's that mean?

4           MR. HIGGINS:  Well, the question, as the 2nd

5   Circuit pointed out in this case as well as in the Gilbert

6   case from 1957, the equity/debt question for tax purposes

7   is on a continuum and the only question is what's it

20MAY08 TIFD

8   closer to, debt or equity.  And if it's -- whatever, only
9   two boxes can be checked in the tax world.  The debt box
10  or the equity box.  So the analysis is is it akin to debt.
11  What is it closer to?  Your Honor said that in your
12  question.  Is it closer to debt or closer to equity?  And
13  that's how the decision is made for tax purposes.
14          THE COURT:  All right.  Just to be clear, the
15  government's position is for tax purposes the banks'
16  interest was debt.  Period.
17          MR. HIGGINS:  We can only use the term the 2nd
18  Circuit, akin to debt, because then we are not disputing
19  their --
20          THE COURT:  You just told me there's two boxes.
21          MR. HIGGINS:  Right.  It's debt.
22          THE COURT:  Which box --
23          MR. HIGGINS:  We check the debt box.
24          THE COURT:  You check the debt box.  This is
25  debt from your --

                                                            55

1           MR. HIGGINS:  For a tax case it is, because the
2   2nd Circuit reversing Your Honor says, your court says it
3   was closer to debt equity, check the equity box.  The 2nd
4   Circuit said no, it's closer to debt.  We checked the debt
5   box.
6           THE COURT:  I didn't say closer to.  I think I
7   said was.  I think I checked a box but I don't think the
8   2nd Circuit checked a box.
9           MR. HIGGINS:  Because -- well, the 2nd Circuit
10  effectively checked the box because it went toward -- it's
11  not close enough to equity, it's not akin to equity, and
12  it's closer to, akin to debt and that's our decision and

Page 45

20MAY08 TIFD

13    how that's how they ruled.  That's how tax issues are

14    resolved in this court.

15        THE COURT:  And what is it about the 2nd

16    Circuit's decision that is preclusive with respect to the

17    704(e) issues?  Did they find facts?  Did they make

18    conclusions?

19        MR. HIGGINS:  Everything that the 2nd Circuit

20    said about the nature of the partnership of the Dutch

21    banks' interest demonstrate in our view it's not a capital

22    interest under 704(e), but it's more -- it's easier to

23    backtrack.  What is 704(e), we disagree with --

24        THE COURT:  Well, help me understand.  As I

25    understand the statute, the definition of capital interest

>                                                                    56

1    has to do not with the things the 2nd Circuit looked at in

2    its decision but, rather, with the rights upon

3    liquidation.  Am I missing something?

4        MR. HIGGINS:  I don't, we don't agree with that,

5    Your Honor, because the regulations under 704(e) clearly

6    talk about all the facts and circumstances and dominion

7    and control.  And what the 2nd Circuit is saying is that

8    the Dutch banks under all the facts and circumstances of

9    the case, which are historical, what happened historical,

10    the Dutch banks didn't have dominion and control.  That's

11    the fiction, that they were full-fledged partners in this

12    business and they were there for the unlimited upside.

13    The 2nd Circuit says, no, that's not true.  And what

14    704(e)'s purpose is is not to overrule Culbertson or to

15    cut through a body of law.  The tax shelter regulations

16    can focus on the next round, the next decade.  It was to

17    put a donee, a donee of a partnership in interest on equal

18    standing with a purchaser of a partnership interest.

20MAY08 TIFD

19          A moment ago you asked what the, what were the
20    choices under 704(e), capital or service?  In the
21    legislative history and the case of -- and the Culbertson
22    decision itself, the original one, if there's a third
23    choice, it was nothing; that is, these family members who
24    were putitive partners like in the Smith case, their
25    interest was nothing.  They weren't supposed to do

>                                                              57

1    anything.  They didn't provide capital, they didn't bring
2    in dollars.  They weren't doing anything.  They weren't
3    providing services, so what they were actually doing was
4    nothing and that's why the IRS back in the 50s, late 40s
5    and 50s, saying these were not bona fide partnerships
6    because we're dealing with silent income profits.
7          THE COURT:  You talked about the regulations
8    generally talking about this and that.  I'm looking at
9    Treasury Reg 1.704-1(e)(1)(v), which is quoted at page
10   eight of your opponent's brief, and it says, "The
11   regulations under 704(e)(1) define the capital interest as
12   follows:  Quote, 'A capital interest in a partnership
13   means an interest in the assets of the partnership which
14   is distributable to the owner of the capital interest upon
15   his withdrawal from the partnership or upon liquidation of
16   the partnership,'" period.
17         Now, as I understand this transaction, the banks
18   were entitled to get their money back upon their
19   withdrawal from the partnership or upon liquidation of the
20   partnership.  Do you disagree with that understanding of
21   the transaction?
22         (Pause)
23         MR. HIGGINS:  That aspect of the partnership

Page 47

20MAY08 TIFD

24    agreement is part of the fiction that the 2nd Circuit was
25    addressing, in our view --

>                                                                    58

1        THE COURT:  Wait a minute.  Did the 2nd Circuit
2    say that upon liquidation of the partnership or the banks'
3    withdrawal from the partnership, that it was a fiction
4    that the banks would get their money back?
5        MR. HIGGINS:  It didn't say it directly because
6    it didn't have to because it, it's already saying that the
7    Dutch are going to get paid back at the applicable rate.
8    And actually, the pay out is calculated under, even using
9    the capital, capital accounts the tax accounting capital
10   accounts or -- even using that formula, it's going to get
11   them a return of their loan, plus the rate of interest.
12       So, to call it they got their capital account
13   refunded to them at the end is not, is not accurate
14   because it was just a repayment of the loan at the
15   guaranteed rate.  That's what we argued at trial and
16   that's what the 2nd Circuit in our view agreed with by
17   saying that, well, yeah, they've got this complex
18   arrangement but in reality, all it is is a pure loan with
19   an equity kicker.
20       THE COURT:  Is there a difference between an
21   interest that is distributable to the owner and an
22   interest that's payable to a creditor?
23       MR. HIGGINS:  Well, an owner is not a creditor;
24   a creditor is not an owner.
25       THE COURT:  Right.

>                                                                    59

1        MR. HIGGINS:  So, yes, there is a difference.
2    You have to be an owner to have an interest distributed to
3    you, and if you're a creditor, you're just getting paid
                              Page 48

20MAY08 TIFD

4      back.

5              THE COURT:  What did the partnership agreements

6      say?

7              MR. HIGGINS:  Well, the partnership agreement

8      said they used the label that was self-serving for the tax

9      shelter.  They said it was, oh, this is equity.  Of course

10     they said it was equity.  The Dutch banks themselves

11     though categorized it as a loan and, yet -- so that was

12     not -- that's sort of, they were getting paid back their

13     loan.  The people at ING and Rabo who brought the money to

14     Castle Harbour, they worked in the loan department, the

15     credit department, so they wanted their loan paid back and

16     it didn't matter to them how GECC described the documents,

17     described the relationship in the documents, because

18     they're taxing different parties and that's, again, part

19     and parcel of a tax shelter because they are taxing

20     different parties, different parties.

21             THE COURT:  All right.  Isn't there a

22     distinction when somebody makes a loan and it's an eight

23     year loan and then in year three, they say you know what,

24     I really, I'm uncomfortable with your business approach, I

25     want my money back, pay me my money back, I'm withdrawing

>                                                                    60

1      from the loan.  Is that a pretty common commercial

2      relationship?

3              MR. HIGGINS:  I would doubt it.

4              THE COURT:  I would doubt it, too.  It seems to

5      me you've got an eight year loan, you've got an eight year

6      loan and I've got your money for eight years.  You can't

7      get out.

8              MR. HIGGINS:  Your Honor, there's nothing common

20MAY08 TIFD

9     about this arrangement.  As you said, I'm here by myself
10    and the plaintiffs are with a host.  That's a tiny part of
11    a host that creates that complex maze of elements of a tax
12    shelter.  That's why it's not a simple --
13              THE COURT:  Look, it doesn't help move the ball
14    to just keep calling it a tax shelter.  It's a
15    transaction.  It's a complex -- I understand it's complex.
16    I understand it was partly tax-motivated, but the point is
17    we have to sort out whether 704(e) applies or not.
18              MR. HIGGINS:  I know.
19              THE COURT:  And it doesn't help just to keep
20    talking about tax shelters.  I'm trying to understand why
21    this is more like, more like a loan.  If the bank makes me
22    a car loan, you know, as long as I'm paying it back they
23    can't call it early, they can't withdraw from the
24    agreement.  It's a loan.
25              MR. HIGGINS:  Loans, all loans depend on the

>                                                                    61

1     terms of the loan.  Yes, it's a contract and whatever the
2     contract provides or not, you get.  But this is not, we're
3     not buying a car here.  You know, when one buys a car, one
4     often doesn't solicit a car dealership from the
5     Netherlands to sell it to you because there's some reason
6     for that.  You go down the street and buy it.
7               THE COURT:  All right.  When the IRS looks at a
8     transaction, isn't it to a certain extent bound by the way
9     the parties treat the transaction?  If money, if
10    $117 million comes into a partnership and it's booked by
11    the partnership as a capital contribution --
12              MR. HIGGINS:  No, that would be form over
13    substance, Your Honor.  That's fundamental.  No, the IRS
14    isn't bound by the form, the label put on it by the
                              Page 50

20MAY08 TIFD

15    taxpayer.  That's Bedrock tax enforcement.  No, the label
16    doesn't control.  And that's enunciated, that principle is
17    in the 2nd Circuit opinion and all the tax cases of the
18    2nd Circuit that the 2nd Circuit relies upon.  That's a
19    classic form over substance.
20            THE COURT:  All right.  Let me try it this way.
21    Do you disagree with anything that your opponent said
22    about Section 704(e)?
23            MR. HIGGINS:  Yes.
24            THE COURT:  What it means and how it operates?
25            MR. HIGGINS:  Yes.  I think they misdescribed

 1    the history of 704(e) and why it was -- how it was put
 2    together by Congress and what its purpose was.  And we
 3    presented our legislative history in our response to their
 4    brief and we have it, we have a legislative history and we
 5    have copies of the original public laws.  And it's clear
 6    from the, both the -- if you reread the text of Culbertson
 7    trying to figure out where 704(e) comes from and read the
 8    legislative history, it's clear that Congress saw after
 9    Culbertson the IRS was continuing to take a very
10    aggressive view of disallowing partnerships, the origins
11    of which were from a donation, parent to child.  They are
12    saying, oh, it's a donee, they can't be a partnership.
13    And Congress reacted and said, no, that's not what
14    Culbertson said and we're not saying that's what
15    Culbertson said, that's not what the Supreme Court said,
16    but that seems to be the way the IRS is interpreting it
17    and, therefore, we're going to make it clear that family
18    partnerships and the original public law from 1951 was
19    entitled Family Partners and talks about all the Parts B

20    and C of today's 704(e)(1), (2) and (3).  Parts (2) and
21    (3) were about what a partnership could do in distributing
22    money or whatever.  That was focused on the owner, the
23    owner, the partner became an owner through a gift and
24    after 704(e) was passed, there is a statute that protected
25    a partner who became a partner through a gift and that was

>                                                                      63

1    supposed to level the playing field between the ordinary
2    partner who buys the share in partnership or who joins
3    together simultaneously by making a contribution of either
4    capital or a promise of services.  The intent was to
5    remove the stigma of the donee partner and I don't think
6    that's what the plaintiff's description portrayed.
7            THE COURT:  All right.  But you agreed that
8    704(e) applies to all partners, not just to so-called
9    family partners.
10            MR. HIGGINS:  The title of any section of the
11    Internal Revenue Code is generally not controlling but
12    informantive and here we think it's informative by
13    informing the legislative history.  And so to look at
14    unrelated parties under the prism of 704(e) to distinguish
15    other case law we think is a very rare if not unheard of
16    application which is being advanced now by those people,
17    by tax shelters.  We don't think out there in the public
18    there is a dispute.  There are disputes between the IRS
19    and family partnerships, fathers being -- fathers, parents
20    from children, farms being divided into partnerships, we
21    don't think there was a dispute about that.  So 704 has
22    pretty much laid low for decades.  So the purpose of
23    704(e), we differ on the original purpose of it.
24            THE COURT:  The original purpose, but how does
25    it apply?  Does it apply to all partners or not?

> 64

1          MR. HIGGINS:  It can be applied to all partners,
2     yes, Your Honor.
3          THE COURT:  The plaintiff has cited a number of
4     cases suggesting that 704(e) effectively overruled
5     Culbertson.
6          MR. HIGGINS:  Well, no court agrees with that,
7     including the 2nd Circuit.  Culbertson has been cited in
8     the very recent, the recent -- from this century forward.
9     2001, this case, many courts of appeals generally have
10    relied on Culbertson and --
11         THE COURT:  Well, the 7th Circuit came flat out
12    and said overruled, didn't it, in the Pflugradt case?
13         MR. HIGGINS:  I'm not familiar with that.  I
14    don't agree that, that in the 7th Circuit Culbertson is
15    not good law, Your Honor.  And to the extent that it --
16    certainly if it overruled Culbertson, maybe this would
17    have been a perfect vehicle to take this case to the
18    Supreme Court right away, but that didn't happen so I find
19    that a stretched view that Culbertson is not good law.
20    Certainly the 2nd Circuit is not out on its own upholding
21    Culbertson.
22         THE COURT:  Is the term "bona fide equity
23    participation" synonymous with the term "capital interest"
24    for purposes of 704(e)(1)?
25         MR. HIGGINS:  We don't see how a bona -- if you

> 65

1     were not a bona fide equity participant, how you could
2     have, own a capital interest in the same partnership, so
3     that we think is synonymous, yes.
4          THE COURT:  Okay.  Let me -- I want to turn to

20MAY08 TIFD

5      the question of penalties but quickly, before I do that, I
6      want to ask whether either of you want to discuss 704(b)
7      and what, if anything, I need to be returned about with
8      respect to 704(b).
9              MR. HIGGINS:  The fact that it was not, the
10     allocations were not directed in the agreement?
11             THE COURT:  Let's assume for a minute that I
12     rule in favor of the plaintiff on 704(e); what, if
13     anything, do I have to do under 704(b)?
14             MR. HIGGINS:  I don't think you have to do
15     anything, except note that the government has reserved its
16     argument on 704(b).  It has not been addressed by the 2nd
17     Circuit so as a formality we think that would preserve our
18     rights to take it back up to the 2nd Circuit.
19             THE COURT:  All right.  And if I rule in favor
20     of the government under 704(e), do I have to worry about
21     704(b) at all?
22             MR. HIGGINS:  No, no, Your Honor.  The
23     government only needs to prevail -- there are multiple
24     theories necessary; that the government only needs to
25     prevail on one.

>                                                              66

1              THE COURT:  Because it's their burden?
2              MR. HIGGINS:  Yes.
3              THE COURT:  Okay.
4              MR. HIGGINS:  And also, Your Honor, the
5      technicality of TEFRA, it's in the FPAA -- as long as
6      there's one ground in the FPAA that's sustained, then the
7      FPAA is sustained.
8              THE COURT:  All right.  Okay.  Do you want to --
9      unless there's any rebuttal, do you want to start on
10     penalties?
                            Page 54

20MAY08 TIFD

11          MR. HIGGINS:  I'll be happy to.

12          MR. NELSON:  Just one.  Put slide 17 up, please.

13    "A person shall be recognized as a partner for purposes,

14    whether or not such interest was derived by purpose" --

15    that should be "purchase," not "purpose -- "purchase or

16    gift from any other person."  It's not limited to

17    donations.

18          And I guess the other thing I'd say is you still

19    don't have an answer to whether this is debt or isn't

20    debt.  But O.P.P. Holdings and Jewel Tea and all the other

21    cases that I cited suggest that this would be a

22    fascinating ride if this interest turns out to be debt for

23    tax purposes.

24          THE COURT:  All right.  Mr. Higgins, why don't

25    you start on penalties, if you would.

>                                                                67

1          MR. HIGGINS:  Yes, Your Honor.

2          Okay.  As Your Honor's probably -- excuse me.

3    Penalties, the court has jurisdiction to determine if

4    penalties are applicable for the last two years at issue

5    in this case, 1997, 1998.  Because the statute changed,

6    the court doesn't have jurisdiction for previous years.

7    It was a partnership level determination at the first

8    instance.  If the court determines that penalties do not

9    apply, then a partner in a later proceeding would never,

10    it could not be assessed, they could not be assessed by

11    the IRS.  If the court determines that penalties are

12    applicable, the IRS would then assess penalties for the

13    amount of the underpayments to the partners for those two

14    years.  The years not before the court would be handled by

15    the IRS in the first instance administratively.  If the

Page 55

20MAY08 TIFD

16    taxpayer chose to challenge the penalties, they would have

17    to pay them and then bring a refund action.  This is the

18    way the statute is designed and is to be implemented.  Is

19    there any question about that, Your Honor?

20          THE COURT:  About what you just said or about

21    penalties?

22          MR. HIGGINS:  What I just said.

23          THE COURT:  No.

24          MR. HIGGINS:  Okay.  There's two penalties at

25    issue that, because they were described, determined they

>                                                                      68

1    were applicable, now the court's review of that action

2    would include, one, the substantial underpayment, and the

3    other is a negligence penalty.  The amounts are both

4    20 percent but let's do the underpayment of tax.  So the

5    maximum penalty is 20 percent of the underpayment due for

6    the particular infraction.  The government's position, in

7    the government's view there is a substantial underpayment

8    penalty first because the transaction is categorized in

9    our view as tax shelter and it's a two prong test.

10          They need substantial authority, they need to

11    demonstrate substantial authority for the position they

12    took on their returns, the original returns, 1997, 1998,

13    and demonstrate a reasonable belief that they -- that

14    their positions were valid, appropriate.

15          In our view, the plaintiff cannot establish the

16    reasonable belief because of its trial tactic of not

17    putting in any witnesses or documents which establish

18    their belief about the propriety of their return position.

19          THE COURT:  Is it too late to do that now?

20          MR. HIGGINS:  Yes, Your Honor.

21          THE COURT:  Why?

Page 56

20MAY08 TIFD

22        MR. HIGGINS:  Because the records are closed.
23        THE COURT:  We're here on remand; why is the
24   record closed?  It's for further proceedings consistent
25   with this opinion.

>                                                              69

1         MR. HIGGINS:  Well, the court could -- I guess
2    the court -- we don't believe the court is -- remand
3    provides, I guess we go back to the dispute about the
4    remand.  We have -- there's no, there's no indication in
5    the 2nd Circuit that the record should be reopened for
6    penalties.
7         THE COURT:  Or not.
8         MR. HIGGINS:  Or not.  But it sort of goes to
9    the underlying -- that's one way -- it would be rewarding
10   a taxpayer.  Let's see how we do and in the same
11   proceeding, if we lose, we won't put our opinion letter
12   in, tax shelters, or any taxpayer would say we're not
13   going to tell you how we came to this position because we
14   don't want the court to hear our internal quandaries about
15   it, we are not sure whether it was really good or not.
16        THE COURT:  My first analogy didn't work; let me
17   try another one.  In Section 1983 litigation or really any
18   litigation in which statutory attorney's fees are
19   available, it's typical to proceed to a determination of
20   the merits and then have a subsequent proceeding to
21   determine whether attorney's fees should be awarded and in
22   what amount.  Why?  Because you don't want to waste the
23   time at the initial proceeding with a lot of what is
24   potentially extraneous evidence about amounts of attorneys
25   fees, when they were incurred, whether they are

>                                                              70

20MAY08 TIFD

1   reasonable.  Why isn't that true here?

2         MR. HIGGINS:  In a tempered partnership

3   proceeding, the FPAA proceeding, and there's one

4   proceeding, I mean taxpayers have attempted to bifurcate

5   proceedings, meaning where it's clear from the beginning,

6   the trial, not the strategy, but the court rules they were

7   only going to hear testimony about it, we are not going to

8   have it here --

9         THE COURT:  But this is the same proceeding.

10  We're back on remand.  It's the same proceeding.

11        MR. HIGGINS:  Well, we would think that the, the

12  proceedings -- our view is the proceeding is limited to

13  the application of 704(e) and the penalties.  There's no

14  reopening of the record.  It just strikes us as

15  particularly odd we would now reopen the record for

16  additional evidence on penalties or even to clarify things

17  that the 2nd Circuit has already addressed.  It just

18  doesn't --

19        THE COURT:  Okay.  The case is remanded for

20  further proceedings consistent with this opinion.  It

21  would be consistent with the opinion to award penalties or

22  decide whether to award penalties.  Why isn't that a

23  subject, why isn't that a subject that has been remanded

24  to me for further proceedings?

25        MR. HIGGINS:  But what's -- there's no direction

71

1   to reopen the record because there's no -- it's not like

2   the taxpayers didn't have the opportunity to present

3   evidence about their belief or their belief about their

4   formation of their legal position, and really it impacted

5   the government's case during the original proceeding.  I

6   mean -- well --

                    Page 58

20MAY08 TIFD

7          THE COURT:  Okay.  You seem to be arguing that I
8     cannot hear additional evidence and that's the -- I don't
9     know, I have no idea whether the plaintiff wants to put on
10    evidence or not.
11         MR. HIGGINS:  I understand that.  It's
12    hypothetical.  But I've never heard of a tempered
13    proceeding where a case is decided by the court, goes up
14    on appeal, gets reversed and remanded, and the record is
15    reopened.  So we're now facing a more likely, in their
16    judgment, view of penalties because now the court, you're
17    inviting them to now put on your evidence because you
18    won't have presented your argument about things that were
19    decided or not.  I mean --
20         THE COURT:  All right, I understand your
21    position.
22         MR. HIGGINS:  So --
23         THE COURT:  Whether or not we have evidence, why
24    are penalties appropriate in a case such as this where I
25    heard eight days of evidence and ruled in favor of the
>                                                              72

1     plaintiff?
2          MR. HIGGINS:  Because the 2nd Circuit reversed
3     the decision and said, no, the plaintiffs are not entitled
4     to --
5          THE COURT:  All that means is they got it wrong.
6     In any penalty situation, they got it wrong.
7          MR. HIGGINS:  Right.
8          THE COURT:  The question is is it reasonable for
9     them to have thought that they were doing the right thing?
10         MR. HIGGINS:  The record is absent on that.  It
11    has to, has to be a reasonable belief, have a factual

Page 59

20MAY08 TIFD

12    component to it, Your Honor, that they have to have

13    demonstrated on the record why did you believe it.  I

14    asked people on cross examination, you recall --

15         THE COURT:  Of course, but am I permitted in

16    making this determination to draw inferences from the

17    facts that I inferred or not?

18         MR. HIGGINS:  Of course.

19         THE COURT:  So, after eight days of evidence and

20    having ruled in favor of the plaintiff, why would I not

21    reach inferences that it was reasonable for them to do

22    what I found they legally did?

23         MR. HIGGINS:  Because we would argue and we

24    argue that it was not reasonable and that decision would

25    not be reasonable on your part.

>                                                              73

1         THE COURT:  No, it was incorrect --

2         MR. HIGGINS:  Right.

3         THE COURT:  But it certainly was reasonable,

4    wasn't it?

5         MR. HIGGINS:  No, we don't agree that it was

6    reasonable and we don't really have to argue, we don't

7    have to argue about what they did to determine whether

8    they were following the tax law was reasonable because

9    they wouldn't ask -- they wouldn't answer that question.

10    They wouldn't allow us to ask that question.  And,

11    therefore, the only reason, the only real inference from

12    the absence of the record is you should draw a negative

13    inference because what they kept out of the record at

14    trial would have suggested, in our view, that they were

15    being unreasonable and they were playing the audit

16    lottery.  They played the audit lottery, they got caught.

17    We had a trial, they prevailed at trial but they got

20MAY08 TIFD

18    reversed by the 2nd Circuit.

19        This is a long process but it comes down to

20    where is the deterrent value if, if the penalty -- well,

21    if you come close, you don't get a penalty.  There's no

22    deterrence there.  And then --

23        THE COURT:  But you don't impose penalties when

24    somebody mistakenly takes a reasonable position.  You

25    impose penalties to deter unlawful conduct.

>                                                              74

1         MR. HIGGINS:  Yes.

2         THE COURT:  And what I'm suggesting to you is,

3    having heard eight days of testimony and found that this

4    was lawful, it's going to take something to convince me

5    that I got snookered.  I'm not saying what the law is.

6    The 2nd Circuit's clearly said I was wrong.  That's not

7    the issue here.  That's the starting point for penalties,

8    was the taxpayer wrong.  So, we got that.  Now, the

9    question is was the taxpayer reasonable.  Help me out

10   here.  What was unreasonable about this position?

11        MR. HIGGINS:  Well, what's unreasonable about

12   the position is they went to, they went to tax indifferent

13   Dutch banks to obtain the capital.  It was unreasonable to

14   believe that GECC had -- well, and Your Honor, that they

15   had to go overseas to get -- this is the tax shelter

16   world --

17        THE COURT:  They didn't have to but they legally

18   could do it.  That's what the law permitted at the time.

19   There was nothing --

20        MR. HIGGINS:  No, our argument would be that the

21   law, the law never permitted them to do what they did.

22   And if they thought the law permitted them to do what they

Page 61

20MAY08 TIFD

23    did, they could have applied for a private ruling before

24    they did it to make sure.  If they did that, then clearly

25    there's no penalty, but they did not.

> 75

1        THE COURT:  But they are not obligated to do

2    that either and there's nothing -- why wouldn't a person

3    or an entity acting in its economic best interest go to a

4    tax indifferent party when that's available to them

5    legally?  There's no -- you can't, you can't sanction, I

6    mean you can't sanction that conduct in the sense of

7    penalizing that conduct.

8        MR. HIGGINS:  That's one, that's one aspect of

9    the tax shelter.  Another aspect of the tax shelter is

10    it's taking, they take fully depreciated assets which they

11    know are fully depreciated for tax purposes and

12    effectively get to redepreciate them under their

13    transaction that was devised so the law says no, the law

14    now says you couldn't have done that and we argue that you

15    should have known you couldn't have done that because you

16    got depreciation once, you shouldn't get it again.  We

17    understand that it's profitable to get into a tax shelter

18    and pass -- either not be audited or not be caught or even

19    be caught and you make more money at the time because the

20    government's only going to charge you interest at a

21    relatively low rate compared to the rate you can make

22    through your own business.  So, it's a constant activity

23    and the penalties established by Congress are to deter,

24    punish illegal activity, and if they are not applied when

25    they are found out to be wrong, there has to be a

> 76

1    reasonable basis for it.

2        And inferences drawn, I would just argue, should

20MAY08 TIFD

3    not be drawn lightly because this is not a minor matter.

4    Tax shelters are not a minor matter.

5         THE COURT:  But, you know, you're making a

6    policy speech.

7         MR. HIGGINS:  Yes.

8         THE COURT:  You're not helping me in this case.

9    I'm a judge and I have to decide this case, so I need help

10   in this case.

11        MR. HIGGINS:  I'm trying to, I'm trying to argue

12   that the policy is important and, therefore, to ask the

13   court to reflect in my -- by letting them, by not

14   assessing, recommending a policy, penalty against them, is

15   that contrary to public policy?  Because the law, the 2nd

16   Circuit says they were very, very, very wrong.  It wasn't

17   a close case in the 2nd Circuit's view.  I understand the

18   court had a different view.

19        THE COURT:  Right.

20        MR. HIGGINS:  But that's why, that's why we

21   don't just, oh, forget the penalties, we'll never get them

22   from the district court that got reversed, but it's

23   important to make the case, to make the case to, have GECC

24   get assessed the penalty.  It may be more important than

25   100 other companies getting assessed the penalty because

>                                                              77


1    they should have known better.  They did know better.

2    They did it anyway because it was so profitable, but it

3    wasn't legal.

4         THE COURT:  Okay.

5         MR. HIGGINS:  So that's the -- and the same, the

6    lesser standard is the negligence penalty.  Substantial

7    underpayment penalty is a two prong, substantial authority

20MAY08 TIFD

 8    and reasonable --

 9         THE COURT:  But there's no evidence of

10    negligence in this case.  Where's the negligence?  This

11    was, this was clearly an intentional act.  They had

12    investment bankers.  They had lawyers.  They had business

13    people.  This was a huge transaction.  This was not

14    something that anybody did by accident.

15         MR. HIGGINS:  Well, negligence doesn't mean

16    mistake in this context.  Reasonable attempt to comply

17    with the Internal Revenue laws.  And here they made, in

18    our view, a clear decision to not comply with the revenue

19    rules.

20         THE COURT:  Doesn't the negligence apply

21    principally where somebody looks the other way and tries

22    to avoid knowing what the laws are as opposed to knowing

23    very, very well what the laws are and looking for ways to

24    fit within those laws?

25         MR. HIGGINS:  Not, not -- I must disagree with

>                                                                78

 1    the court.  I think in the 2nd Circuit case of Nicole

 2    Rose, the 2nd Circuit made clear that a blatant scheme,

 3    you know, no matter how well staffed you are, to see, you

 4    know, what is the tax law and how close can we get to

 5    minimize our taxes, that doesn't excuse the penalties.  It

 6    doesn't excuse the negligence penalty because they should

 7    have known better.  That should apply to people who have

 8    the most resources.  Someone who's an unsophisticated

 9    businessman who gets involved in a shelter program, I have

10    cases like that where there's a program, they buy it from

11    one entity and it's a one-off-deal to try to avoid capital

12    gains taxes.  Well, that person is a heck of a lot less

13    sophisticated than GECC was.  Yet they are still

20MAY08 TIFD

14    potentially liable for the negligence penalty and they
15    have to demonstrate, well, who did you check this out
16    with.
17              THE COURT:  That's my point.
18              MR. HIGGINS:  Okay.  And we don't know because
19    they wouldn't tell us in the record, Your Honor.  That's
20    the problem.  They wouldn't tell us, all right, what was
21    this process.  We have redacted documents and when we say
22    why did you do this?  Well, we listened to our lawyers.
23    What did they say?  We can't tell you that.
24              THE COURT:  Well, what we do know is they went
25    to Kings Spaulding and they got lots of legal advice

> 79

1     because I had to look at scads and scads of documents of
2     legal advice, so we do know they checked it out.
3              MR. HIGGINS:  But the public doesn't know and
4     the government doesn't know what those opinions said.
5     These are in camera reviews or privilege claims.
6              THE COURT:  But that's not negligence.  They
7     sought to figure out whether they were doing something
8     illegal or not.
9              MR. HIGGINS:  Unless we saw those opinion
10    letters, and there's more cases where, for example, one
11    long term capital case, the opinion letters from King &
12    Spaulding, Sherman & Sterling, high level, competent tax
13    firms, the penalties are assessed, the opinions come into
14    the record and they are examined by the court and through
15    cross examination and it's determined that, oh yeah, they
16    got them from these places, these big law firms, but the
17    penalties still apply because they should have known
18    better and that advice, maybe they were warned in the

Page 65

20MAY08 TIFD

19  letter, oh yeah, well, the chances are, you know, 50-50,
20  49-51, you know.  The public doesn't know and we don't
21  know and the government doesn't know what the opinion
22  letter says, so there's a public policy of saying, well, I
23  know they got an opinion letter.  We didn't see it.  Well,
24  good, then the regulations are even more entitled in the
25  future years to say, well, that's definitely not good

>
                                                                  80

1   enough.
2              THE COURT:  Okay.
3              MR. HIGGINS:  Thank you, Your Honor.
4              THE COURT:  Thank you.  Any response?
5              MR. NELSON:  The reason the company didn't put
6   in evidence on reasonable basis, which is a reasonable
7   basis for the tax position, is that we think under the
8   regulations the reasonable basis for the decision is not a
9   partnership level decision at all.  With the court's
10  permission I'd like to come back to that table that I
11  think is what, is within the court's jurisdiction in this
12  case and then we should talk about reasonable basis.
13             The penalty regime really has three questions.
14  Two questions and two sub-questions at the partnership
15  level.  They are not only fair game but if you decided you
16  wanted to deal with them, even if you found for us, it
17  would be appropriate to deal with them.
18             One is the substantial authority question.
19  That's an objective test, decidable and required to be
20  decided at this level.  Was there, without regard to
21  whether GECC knew about it, didn't know about it or
22  whatever else, under the partnership, was there
23  substantial authority.  That's not -- more likely than
24  not, that's substantial authority, and I'm not going to
                              Page 66

20MAY08 TIFD

25    belabor that.  The fact is that you held, and it wasn't
>                                                                          81

1    reversed, the case is not a sham.  It had economic
2    substance.  It has business purpose.  It isn't debt.  The
3    court has not yet held it was debt, and the 2nd Circuit
4    took a case called Culbertson that's been cited more than
5    1,000 times and it has never been read for the proposition
6    that in order to be a bona fide partner you've got to have
7    a bona fide participation.  May be right, may be right in
8    this circuit.  Never so read.
9            Plus we've got 704(e).  And, in fact, just for
10   what it's worth, the only case I will cite to you that is
11   not cited is we finally did find a case that was decided
12   under Culbertson where there was a partner, a wife who
13   made an investment in her husband's investment bank, bore
14   no losses, got a fixed return with a nominal 2 percent
15   participation, and it was still held to be a valid
16   partnership interest under Culbertson.
17           So, even under Culbertson -- and I didn't have
18   this case before.  It's like looking for a needle in a
19   haystack; we finally got through all the straw and found
20   one case.  But it is one case which, if I can approach,
21   I'll hand it to your clerk.
22           That having been said, I don't want to talk
23   about substantial authority because I honestly don't see
24   the issue.
25           THE COURT:  Just for the record, that's Morris
>                                                                          82

1    v. Commissioner.
2            MR. NELSON:  I'm sorry.
3            THE COURT:  13 Tax Court 1020.  Thank you.
                              Page 67

20MAY08 TIFD

4          MR. NELSON:  What does need to be decided at
5     this level, at least if you find against us, is whether
6     this transaction was a tax shelter, because substantial
7     authority does not absolve the taxpayer from penalties in
8     and of itself if the transaction is a tax shelter.
9          There are two pieces of tax shelter before you
10    get to reasonable basis.  The first one is whether the
11    principal purpose of the transaction was avoidance or
12    evasion of income tax.  And the second one was whether, if
13    there was a principal, such a principal purpose, whether
14    the purpose of the tax savings was consistent with the
15    statute and congressional purpose.
16         I want to go with the principal purpose question
17    for a minute.  I mean I stood here and heard this
18    transaction referred to as a tax shelter a lot.  And at
19    the end of your opinion you said there were business
20    purposes and it was undoubtedly tax purposes, and the 2nd
21    Circuit said, well, you essentially had conceded, I think
22    is the word they said -- which was a strange way to say
23    it -- that the transaction was largely tax motivated.  I
24    want to answer that question for the record and I want to
25    answer it two ways.

>                                                          83

1          One way is I want to review the evidence of what
2     the principal purpose was and the second thing I'd like to
3     do is I'd like to posit with if Mr. Higgins is right,
4     let's suppose there was no business purpose and I'd like
5     to ask the question whether on this record, this
6     transaction, it's rational to think that a taxpayer could
7     have done, would have done this transaction for the tax,
8     the net tax benefit that it might have derived.  Two
9     questions.

20MAY08 TIFD

10         Can they -- because the government's position is
11   $62 million is real.  You've got $117 million.  That
12   couldn't be -- the use of $117 million on a declining
13   balance can't be worth 62.  Case closed.  That's the way
14   they argue the case.  And, frankly, some of the -- I won't
15   even call them -- but some of the press have picked that
16   up.  And it sounds so QED, of course it's a tax shelter.
17   All right.  What you heard --
18         THE COURT:  I remember the evidence on business
19   purpose.
20         MR. NELSON:  Okay, that's fine.  I want to make
21   three simple points since you heard the evidence.  One is
22   the evidence said that this was a demonstration project.
23         THE COURT:  Right.
24         MR. NELSON:  It said that they wanted to get new
25   money from new investors.  It explained why new investors

>                                                            84

1    were not likely to be found in the United States because
2    the United States was washing in airplanes on the ground.
3    That's in the record.  It's repeatedly in the record.  And
4    they did go for a demonstration project and the fact of
5    the matter is anybody who read their Wall Street Journal
6    in the past six months understands that the problem in the
7    capital markets is that there's a bunch of assets that
8    nobody can value and, therefore, there are no buyers for
9    those assets, and all the metrics don't work.  And so
10   everyone is out trying to figure out how they can do
11   something little to prime the pump, and that's what that
12   record said to you.
13         And I see no -- one other thing from your
14   opinion that I think is significant, you said, and you

Page 69

15    were correct, that if you had a purpose of trying to

16    induce somebody to put money into a, into the portfolio,

17    and it was a $6.5 billion portfolio, of which 62 -- of

18    which 500, roughly 580 intent would the deal be any help

19    on.  That portfolio is a big portfolio, 6.5 billion is a

20    lot of money, but what you said is not only was it

21    reasonable but there's probably no other way since GECC

22    couldn't sell the airplanes.  If they could have, they

23    certainly would have.  And they couldn't borrow money

24    because of the negative pledge and the debt equity

25    restrictions.  So what you said is the only thing they

> 85

1    could logically do is form an entity.  I don't care

2    whether it's called a partnership or a corporation or, you

3    know, a widget.  Whatever you call that thing, put those

4    assets in that partnership and cause that thing, that

5    entity to issue, to raise money by issuing something to

6    the contributor or transfer more of the money that's not

7    characterized as debt for nontax purposes.

8         So this structure, whether it was foreign

9    investors or domestic investors or investors from Mars,

10   required the structure that was here, that you saw, and

11   it's ridiculous to think that GECC tried to get the banks

12   to take a small interest.  They wanted to get the banks to

13   get as big a participation as they could.  And you'd think

14   from reading the 2nd Circuit's opinion that the whole

15   purpose of this was somehow to create a thin partnership

16   interest.  It was as thick as they could get.  Okay.

17        Now, let me talk about what happens if we say,

18   well, let's say the principal purpose of this transaction

19   was taxable interest.  Okay.  One thing we know is that

20   the dollars are $62 million.  That's the gross tax number.

20MAY08 TIFD

21    The government loves to point out that the company paid
22    $9 million to Babcock & Brown.  That takes it from
23    $62 million to $51 million.  The government also --
24              THE COURT:  53.
25              MR. NELSON:  $53 million.  My math is not good,

86

1    particularly in subtraction.  I got addition down.
2              In addition to that, the government loves to
3    point out that the banks' return was greater than the
4    company's CP, commercial paper rate, by a spread that was
5    between 3- and 500 basis points.  And so while the debt
6    equity always cost more than debt, if one assumed that the
7    purpose of this transaction was just to get a tax benefit,
8    then the spread's not being sought for the legitimate
9    purpose of meeting equity as cost.  So that's going to
10    give you another, depending on how you do the math, 10,
11    12, 13, $15 million.
12              This transaction, you will recall Eric Dull
13    testifying that there was a two week and then a three week
14    period in Bermuda of intense negotiations with the full
15    deal team.  The three week period included two banks,
16    Babcock & Brown, a dealer from GECC and three law firms.
17    That's in the record.  I think the legal bills are in the
18    record too.  I don't care whether the debt cost was
19    $5 million or $10 million or $15 million.  It's a big
20    number that's pulling that $62 million down.
21              In addition to that, in order to achieve this
22    tax shelter, we're going to go to the Bank of America
23    where we don't have an office.  We're going to open an
24    office and because we're stupid enough to put a real fleet
25    of assets out there, we're going to cause ourselves to

87

20MAY08 TIFD

1   take three times, three sequential employees, move them
2   lock, stock and barrel, family and all, to the Island of
3   Bermuda so they can maintain my tax shelter.
4          Then, on top of that, while you said, correctly,
5   that the banks didn't have a vote, the company put those
6   airplanes, which were the most troubled airplanes in its
7   fleet, and put itself in a position where the, where it
8   couldn't deal with those airplanes outside the ordinary
9   course.
10          So, now here's a company with a $6.5 billion
11  fleet.  Jack Welch and Gary Wendt have said go, do
12  something about this.  To get $62 million, I'm going to
13  pay $9 million in fees, $10 or $15 million of contract
14  interest.  I'm going to incur the cost of putting, of
15  opening an office in Bermuda and I'm going to run some
16  risk that the transaction will terminate early, which it
17  did, in which case, you know, it happens -- fortunately
18  for the company, it terminated late enough that most of
19  the benefit was already in as far as the tax motivation.
20          But if there's any tax risk in a transaction, I
21  mean I've got to be assuming I'm going to be 100 percent
22  successful if I'm going to end up with positive money in
23  this transaction.  So, where we are -- and by the way, I
24  mean in the audit lottery point, some of the agents that
25  currently audit the company and audited the company are

>                                                             88

1   back there.  This company is under constant examination.
2   There is no chance the audit lottery applied to this
3   transaction.  That absolutely couldn't possibly happen.
4          So, where we are is a situation, if the benefit
5   was $600 million, you might see a company taking this kind

20MAY08 TIFD

6    of, incurring this kind of cost.  That way, if you have to
7    settle the case, so what?  I've covered my costs and I
8    still made money.  I'm not telling you, because I haven't
9    done the math and I don't know that I can do that math on
10   the record, but I can tell you the record shows that
11   $62 million means the costs are -- it's silly to think
12   that Bob Lewis and Bob O'Reilly and Denis Nayden were
13   going to go back to Jack Welch and Gary Wendt and say, I
14   know you told us to do something with the airplanes, we
15   couldn't really do anything for the airplanes so we got
16   you a tax shelter.  And it may net us a 10- or $15 million
17   one-time benefit but, then again, if it's challenged, we
18   may have to give that up and sell them.  I think that's a
19   preposterous notion and I just don't think it withstands
20   logic.
21           So, what I'm trying to do here is put the
22   reality -- everybody wants to tax the real deal.  The real
23   deal makes no sense as a tax shelter.
24           Now, the tax benefits clearly help.  If there
25   are any, they will have mitigated some of these costs.  In
                                                              89

1    fact, hopefully they would have covered those costs with
2    all this litigation, maybe not, but it's not a tax
3    shelter.
4           The other thing that is to my mind almost QED
5    under the circumstances of this case is that to the extent
6    a tax shelter benefit was sought, it was not, admittedly a
7    tax partner who was not a real partner.  It was sought to
8    get that 704(c) benefit.  That 704(c) benefit, you held,
9    was consistent with the statute of congressional purpose,
10   and we got some stuff in our briefs and some material in

Page 73

20MAY08 TIFD
11    the brief that explain that it's not a loophole.  It's a
12    fact.
13          So, what we think is at this level, you can
14    decide substantial authority, can and should.  We think
15    you can and ought to embellish on, think about what I've
16    said about principal purpose and try to think about
17    whether the principal purpose of this transaction, based
18    on the evidence you heard and based on just thinking about
19    the rest of the stuff in the record, whether you can
20    really get to the conclusion that the principal purpose
21    was really tax avoidance in this context.  And then I
22    think that it's still not a tax shelter because it's
23    consistent with the statute of congressional purpose.
24          On the issue, the issue that Mr. Higgins
25    commented on of reasonable basis, I repeat, the reason we

>                                                                      90

1    didn't argue reasonable basis is because reasonable basis
2    and reasonable cause are belief.  They are two sides of
3    the same coin and the regulations, many, many written by
4    the government is who is making this argument right now,
5    make a taxpayer's legal analysis cause and diligence on
6    the tax a partner level item.
7          One of the things that is the most amazing to me
8    about where we are in this case is that the government,
9    having written a regulation that says reasonable cause is
10   a partner level item, you can't even put the evidence on.
11   The regulation says you can't even put the evidence on in
12   a partnership proceeding.  The government is now coming
13   back in and saying, somehow having not done it, we're
14   precluded from doing it.  Well, I don't think, as we said
15   in our briefs, reasonable basis and reasonable cause are
16   not fair game in this proceeding.  They are partner level

20MAY08 TIFD

17    items, partner level defenses.  Examples of partner level
18    defenses that can't be asserted into the partnership level
19    proceeding are reasonable cause, 6664(c)(1).  By the way,
20    6664(c)(4) references this regulation.
21          Now, click up so there is a -- we weren't trying
22    to bamboozle anybody and frankly I think it's a little
23    bit -- the government doesn't like to give up its
24    privilege when it wants to make a -- take the position
25    that a taxpayer's wrong and give up evidence that says,

>                                                              91

1    well, maybe they are right, and I don't think in the
2    spirit of litigation and fair play people ought to waive
3    their privilege which, by the way, is a subject matter
4    waiver which waives all the other privilege, vis-a-vis the
5    government and everybody else, in order to carry their
6    burden.  But that's what we're trying to get here.  We're
7    trying to get a situation where the rule as it was
8    written, as it's still written, says do it at the
9    partnership level.
10          And in this case, by the way, in 1993, there was
11    no partnership level penalty question at all.  And the
12    opinions that were received were not received by the
13    partnership, they were addressed to GECC partners only.
14    So there's no partnership opinion to deliver.  The only
15    opinions to deliver are the opinions that were given to
16    the partners that directed them to things that the
17    partners sought advice on.
18          So, I don't think reasonable basis is even fair
19    game here.  I think it's substantial authority.  I think
20    it's a tax shelter question.  I think the tax shelter
21    question is two questions.  Its principal purpose and is

Page 75

20MAY08 TIFD
22    it consistent with the statute and congressional purpose
23    on the 704(c) question.
24         THE COURT:  All right, thank you.  Anything
25    further?

>                                                          92

1         MR. HIGGINS:  Just a minute.  I'd just like to
2    point out for the record, Your Honor, that attached to our
3    Appendix B to the United States' initial brief on remand,
4    we have Exhibit 2 which is also Joint Exhibit 16 which
5    runs through the costs and benefits of, certainly the
6    benefits of Castle Harbour to GECC with initial M 1993
7    book income benefit of 50- to $55 million.  So --
8         THE COURT:  I'm sorry, where was that again?
9         MR. HIGGINS:  I'm sorry, it's in Appendix B to
10    our initial brief on remand.
11         THE COURT:  Okay.
12         MR. HIGGINS:  And Exhibit 2 on page B-17, on
13    Exhibit two in this document was also Joint Trial Exhibit
14    16, so that lays out some of the economics.  That is a
15    pitch document, P-I-T-C-H.
16         And with respect to the last point about what's
17    on the table here, the regulation points to examples of
18    reasonable cause, an example the partner on -- the
19    partners, the reasonable cause, reasonable belief defense,
20    that can be both a partnership level defense and a partner
21    level defense.  And, here, if the tax opinions were
22    delivered to TIFD III-E, the tax matters partner
23    controlled by GECC and also controlled the partnership;
24    that is, that deliverance of the tax opinion as delivered
25    to the partnership.  Otherwise, it's not -- you'd have an

>                                                          93

1    individual, an individual designated to receive partner
                         Page 76

20MAY08 TIFD

2   level opinion, it's whomever controls in the partnership,

3   that entity or entities, and controls the opinion.  It's a

4   partnership level issue.  It can also be raised again at

5   the partner level.  Here, it would be unusual because they

6   are one and the same but in other tax shelter cases, of

7   course, it does matter.  Thank you, Your Honor.

8           THE COURT:  Okay.  All right.

9           MR. NELSON:  Your Honor, that's an estoppel

10  argument.  The argument is here.  You're here.  The

11  taxpayer can raise it again but if you hear it here, even

12  though the partnership wasn't required to form a

13  reasonable belief, then whatever you say will be estoppel

14  when the partnership, when the partner level proceeding

15  comes up.  This is a classic effort at gotcha.  If it

16  happens, you should just understand where it's going.

17          THE COURT:  All right.  Thank you all.  I'm

18  obviously going to reserve decision and get something to

19  you as quickly as I can.  I have no idea how long that

20  will take.  Thank you.

21          MR. HIGGINS:  Your Honor, may the government

22  respond to the bench memo?

23          THE COURT:  Respond to the bench memo?

24          MR. HIGGINS:  The bench memo.

25          THE COURT:  That was handed up on the issue --

>                                                              94

1           MR. HIGGINS:  The one that was handed up today?

2           THE COURT:  Yes, sure.

3           MR. HIGGINS:  Thank you, Your Honor.

4           THE COURT:  All right.

5           (Whereupon the above matter was adjourned at 4:30

6   o'clock, p. m.)

                              Page 77

20MAY08 TIFD

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
>

95

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.
                         Page 78

20MAY08 TIFD

---

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761

>