# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TIFD III-E INC., THE TAX MATTERS :
PARTNER OF CASTLE HARBOUR-I :
LIMITED LIABILITY COMPANY, :  CIVIL ACTION NOS.
  Plaintiff,       :  3:01cv1839 (SRU) (lead)
           :  3:01cv1840 (SRU)
  v.         :
           :
UNITED STATES OF AMERICA,  :
  Defendant.      :

## <u>AMENDED MEMORANDUM OF DECISION</u>

In 2001, TIFD III-E Inc. ("TIFD III-E") sued the United States of America to recover approximately $62 million that TIFD III-E deposited with the Internal Revenue Service ("I.R.S.") in satisfaction of an alleged tax liability. That tax liability arose from the I.R.S.'s determination that TIFD III-E had incorrectly calculated and reported the amount of income TIFD III-E earned as a partner in Castle Harbour-I Limited Liability Company ("Castle Harbour"). After an eight-day bench trial, I ruled that: (1) Castle Harbour's formation was not a sham transaction; (2) ING Bank N.V. and Rabo Merchant Bank N.V. (collectively, the "Dutch Banks" or the "Banks"), two foreign tax-neutral entities, were partners rather than lenders both in economic reality and for tax purposes, *see Commissioner v. Culbertson*, 337 U.S. 733 (1949); and (3) the entities' allocation of Castle Harbour's income did not violate the "overall tax effect" rule of section 704(b) of the Internal Revenue Code. Accordingly, I held that Castle Harbour properly allocated income among its partners and that the final partnership administrative adjustments ("FPAAs") issued by the I.R.S. were in error, and I ordered the I.R.S. to refund to TIFD III-E the total amount of TIFD III-E's jurisdictional deposit, plus any interest called for by 26 U.S.C. §§ 6226 and 6611. *TIFD III-E Inc. v. United States*, 342 F. Supp. 2d 94 (D. Conn. 2004) ("*Castle Harbour I*").

On appeal, the Second Circuit held that the Dutch Banks were not bona fide equity participants in the Castle Harbour partnership.[1] *TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006) ("*Castle Harbour II*").  The *Castle Harbour II* panel reversed my decision and remanded this matter for further proceedings, including consideration of "the taxpayer's argument that the partnership was a family partnership under the provisions of I.R.C. § 704(e)."

---

[1] The Second Circuit reversed my decision in *Castle Harbour I* for a variety of identified errors, notably my repeated acceptance of the "fictions projected by the partnership agreement, rather than . . . the practical realities" of the transaction.  *Castle Harbour II*, 459 F.3d at 234.  On those issues, the decisions speak for themselves.  I feel compelled, however, to address the repeated statement that I "recognized the existence of the [*Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949)] test, but did not conduct a *Culbertson* analysis of whether the banks' interest was a bona fide equity partnership participation."  *Id.* at 232 (internal citation omitted).  Respectfully, I did not identify the *Culbertson* test and then fail to apply it.  *Castle Harbour I* includes a comprehensive discussion of the totality of the circumstances and discusses the principal circuit court decisions applying *Culbertson*, including *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000), which the Second Circuit discussed in *Castle Harbour II*, and *Boca Investerings Partnership v. United States*, 314 F.3d 625, 632 (D.C. Cir. 2003), which it did not.

Although I did not discuss certain prior rulings discussed in *Castle Harbour II* that mention *Culbertson*, those prior decisions nowhere indicate that the proper test under *Culbertson* is whether the Banks' interest was bona fide equity participation.  *Estate of Kahn v. Commissioner*, 499 F.2d 1186, 1189 (2d Cir. 1974) (listing factors to consider, but not the question of "bona fide equity participation"); *Luna v. Commissioner*, 42 T.C. 1067, 1077-78 (1964) ("the essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise"); *Gilbert v. Commissioner*, 248 F.2d 399, 406 (2d Cir. 1957) ("We do not think that these cases [including *Culbertson*] hold that tax minimization is an improper objective of corporate management; they hold that transactions, even though real, may be disregarded if they are a sham or masquerade or if they take place between taxable entities which have no real existence.").

The phrase "bona fide equity participation" does not appear in any federal case law outside of *Castle Harbour II*, and only one opinion – which does not discuss *Culbertson* – considers whether a taxpayer had a "bona fide equity interest" for purposes of assessing tax liability.  *Weiss v. Commissioner*, T.C. Memo. 1999-17, 1999 WL 34813, *6 (T.C. Jan. 28, 1999).  *See also Serapion v. Martinez*, 119 F.3d 982, 991 (1st Cir. 1991) (considering whether plaintiff was "bona fide equity partner" in law firm in context of Title VII suit).  That said, I acknowledge the obvious fact that the Second Circuit reached a different conclusion following its *Culbertson* analysis than I reached following mine, and I accept that *Castle Harbour II* is law of the Circuit that I must apply in this decision.

*Castle Harbour II*, 459 F.3d at 241 n.19.  This opinion addresses that question.

## I.      Background

Because the Second Circuit "[i]n most respects . . . ha[d] no quarrel with the district

court's precise, thorough, and careful findings," *id.* at 224-25, and left undisturbed the majority

of findings of fact in *Castle Harbour I*, I repeat below the portion of those findings pertinent to

the present question.  In light of the *Castle Harbour II* decision and to the extent that certain facts

call for clarification or further explanation, both for the sake of accuracy and also so that the

factual record in this matter may adequately inform my application of I.R.C. § 704(e)(1) to the

Dutch Banks' participation in Castle Harbour, I amend certain prior findings and make further

findings of particular facts necessary to resolve the question presently before me.

TIFD III-E is a wholly-owned subsidiary of the General Electric Capital Corporation

("GECC"), a subsidiary of the General Electric Company ("GE").  Among other things, GECC[2]

is in the business of commercial aircraft leasing.  (July 21, O'Reilly, 48; July 21, Lewis, 134)[3]

Typically, airlines do not own aircraft, principally because airlines do not ordinarily produce

sufficient income to take advantage of the tax depreciation deductions generated by commercial

aircraft.  (July 21, Brickman, 204-05)  Instead, a company with greater taxable income, such as

GECC, will buy planes and lease them to airlines, thereby giving the airlines the use of the

aircraft and the lessor company the tax deductions.  (July 21, Brickman, 204-05)

_____

[2] GECC is the true party in interest and ultimate taxpayer in this case, though many of the actions relevant to this case were taken by GECC's wholly-owned subsidiaries.  I will frequently use the name "GECC" to refer interchangeably to both GECC itself and to its wholly-owned subsidiaries.

[3] Citations to trial testimony are given as follows: (month and day, last name of witness, page number).  All testimony was taken at the bench trial in 2004.

In the early 1990s, the airline industry experienced a number of setbacks, including several bankruptcies. (July 21, O'Reilly, 49; July 21, Lewis, 137; July 22, Dull, 299; July 22, Parke, 385-86; July 23, Nayden, 451)  Those events caused GECC concern for its own prospects in the aircraft leasing business.  (July 21, O'Reilly, 66-72; July 21, Lewis, 141-42; July 22, Parke, 386)  In 1992, at least partially in response to that concern, GECC executives began looking for ways to reduce GECC's risk in the aircraft leasing business.  (July 21, Lewis, 155-56)  To do so, GECC initiated what it referred to as a "sell-down" effort – an attempt, among other things, to raise immediate cash against GECC's aircraft assets.  (July 21, O'Reilly, 77-78; July 21, Lewis, 158-59; July 26, Nayden, 455-56)  In other words, rather than simply awaiting return in the form of the – now less certain – rental income, GECC wanted to lower its risk by raising immediate cash against that future stream of income.

Selling the aircraft or borrowing money against them, two straightforward ways of raising capital, were not options.  Sale was not a realistic option because, in general, the secondary market for aircraft was weak.  (July 21, O'Reilly, 70)  This was particularly true with respect to GECC's older aircraft – known as "Stage II" aircraft – which did not meet certain regulatory standards, including those for noise.  (July 21, O'Reilly, 50; July 22, Dull, 308)  Non-recourse debt was not an option for two reasons.  First, in order to maintain its AAA credit rating, GECC had entered into an agreement with credit rating agencies that prohibited GECC from borrowing more than eight times its common equity.  (July 21, O'Reilly, 95-96; July 22, Parke, 379)  In 1993, GECC's debt-to-common-equity ratio was 7.96 to 1, giving it little room to borrow.  (July 22, Parke, 381)  Second, a number of GECC's medium-term and long-term debt instruments contained a "negative pledge" – a covenant prohibiting GECC from using its assets to secure

4

debt other than purchase-money debt. (July 21, O'Reilly, 96; July 22, Parke, 384)

With the two most obvious options for raising money off the table, GECC sought outside advice concerning other possibilities.  In May 1992, GECC submitted Requests for Proposal ("RFPs") to seven investment banks.  (Pl.'s Exs. 141, 142, 143, 146; J. Exs. 8, 10)[4]  The RFPs sought proposals that would, in essence, allow GECC to solicit outside investment in at least part of its aircraft leasing business.  All of the investment banks submitted proposals; none of them met all of GECC's objectives.  (July 21, O'Reilly, 88-89)  Nevertheless, in March 1993, after some back and forth, the investment bank Babcock & Brown submitted a revised proposal that GECC found acceptable.  (July 21, O'Reilly, 90)  Babcock & Brown eventually received a $9 million fee for its work.  (July 21, Brickman, 225)

Babcock & Brown's final[5] proposal called for the creation of a separate entity to which GECC would contribute a number of aircraft.  (D.'s Ex. 22)  Investors would then be solicited to purchase ownership shares in the new entity.  (J. Ex. 17)  The result would be that GECC would trade some of the risks and returns of those aircraft to the outside investors in exchange for a cash contribution to the newly created entity.  The proposal also called for the investors to be foreign tax-neutral entities, an arrangement that would offer lucrative tax savings to GECC.

After GECC senior management approved the proposal, it was implemented in two stages.  First, on July 26, 1993, GECC formed a Nevada limited liability company known as GE Capital Summer Street-I Limited Liability Company ("Summer Street"), which was owned by

---

[4]  Throughout this opinion, "J. Ex." refers to joint exhibits that the parties introduced at the 2004 bench trial.

[5]  Before submitting the proposal ultimately adopted, Babcock & Brown submitted at least two other proposals to GECC, which were rejected.  (July 21, Brickman, 212-15)

three GECC subsidiaries: TIFD III-E, TIFD III-M, and General Electric Capital AG.  (Pl.'s Ex. 118; July 22, Dull, 315)  Through those subsidiaries, GECC contributed to Summer Street: (a) 63 "Stage II" aircraft worth $530 million, but subject to $258 million of non-recourse debt (a net value of $272 million);[6] (b) $22 million of rents receivable on the aircraft; (c) $296 million in cash; and (d) all the stock of GECC subsidiary TIFD VI, which had a value of $0.  (July 22, Dull, 314-15, 331)

Second, on October 6, 1993, the GECC subsidiaries sold $50 million of their interests in Summer Street, which included all of GE Capital AG's interest, to the Dutch Banks.  (July 22, Dull, 322-23)  The Dutch Banks also contributed an additional $67.5 million in cash, bringing their total investment to $117.5 million.  (July 22, Dull, 322-23)  Summer Street then changed its name to Castle Harbour-I Limited Liability Company (Pl.'s Exs. 118, 119), and TIFD VI changed its name to Castle Harbour Leasing, Inc. ("CHLI"). (July 22, Dull, 331)

A.    <u>Structure of Castle Harbour</u>

When the final stage of the Castle Harbour transaction was completed on October 6, 1993, the parties entered into an Amended and Restated Operating Agreement ("the Operating Agreement").  (J. Ex. 1)  The Operating Agreement dictated the way gains and losses were allocated between TIFD III-E, TIFD III-M (collectively the "GECC entities"), and the Dutch Banks.  Consequently, understanding the terms of the Operating Agreement is essential to understanding the tax consequences at issue in this litigation.

1.    *Overview*

---

[6] Legal title to the aircraft in question was held in trust.  Consequently, it was the beneficial ownership in the aircraft that GECC transferred to Summer Street.  (July 22, Dull, 302)

Castle Harbour was a self-liquidating partnership.  Through its subsidiaries,[7] GECC contributed to Castle Harbour a net $246 million in cash[8] and, more importantly, approximately $294 million worth of leased aircraft.[9]  The Dutch Banks contributed approximately $117.5 million in cash.  Each partner received an allocation of the net income of the partnership.  The Dutch Banks were referred to as Class A partners, the GECC entities as Class B partners.  (J. Ex. 1 at Bates 101430-31)  Over eight years, the Dutch Banks' ownership interests were to be almost entirely bought out with the income of the partnership.  This self-liquidation mechanism can best be understood by considering an actual year in the partnership.

In 1994, Castle Harbour's first full year of operation was 1994.  At the beginning of 1994, each partner's ownership interest – recorded in a "capital account" entry on Castle Harbour's financial statements (J. Ex. 1 at Bates 101430-31) – was approximately the same as at the start of the partnership.  GECC's capital account was approximately $540 million.[10]  (J. Ex. 24 at Bates 8812)  The Dutch Banks' combined capital accounts were approximately $112 million.[11]  (Id.)

In 1994, Castle Harbour received approximately $100 million in gross income – mostly

---

[7] Those entities' compliance with the terms of the Operating Agreement was guaranteed by GECC.  (J. Ex. 3)

[8] $296 million initial contribution, minus $50 million interest sold to the Dutch Banks.

[9] $530 million in aircraft, minus $258 million non-recourse debt, plus $22 million in rent receivable.

[10] $294 million net aircraft value, plus $246 million cash investment, minus $12,000 income allocation.

[11] $117.5 million cash investment, plus $600,000 income allocation, minus $6 million distribution.

rent from aircraft leases.[12]  In accordance with the Operating Agreement, the net income for

1994, approximately $9.8 million, was distributed $9.6 million to the Dutch Banks and $0.2

million to GECC.  (J. Ex. 37 at Bates 16344)  (The mechanics of net income calculation and

allocation are discussed below.)  That income allocation increased the Dutch Banks' combined

capital accounts to approximately $122 million, and the GECC entities' capital accounts

increased negligibly, remaining at around $540 million.

The Dutch Banks' capital accounts, however, did not remain at the increased level

because part of the gross rent of $100 million was used to "buy-out" approximately $40 million

of the Banks' combined ownership interests.  (J. Ex. 37 at Bates 16344)  Thus, at the end of

1994, the Dutch Banks' capital accounts, originally at $112 million, had increased by $10 million

(allocation) but decreased by $40 million (buy-out), resulting in year-end combined 1994 capital

accounts of approximately $82 million.[13]

This general pattern was to be repeated for eight years.  Each year the Dutch Banks were

to have their capital accounts debited or credited, depending on whether the partnership had

received a gain or suffered a loss, and each year the Dutch Banks were to have a significant

portion of their ownership interests bought out by the partnership.  The amount of the annual

buy-out payment was set forth in the Operating Agreement at Exhibit E, giving rise to the name

---

[12] One aircraft was distributed back to GECC, an event that was treated essentially as a sale.  For simplicity, I ignore that transaction in this illustration.

[13] Principally because of the airplane distribution gain that this example ignores, the actual number was higher by about $3 million.  (J. Ex. 37 at Bates 16344)

"Exhibit E payments."[14]  (J. Ex. 1 at Bates 101662)  The Exhibit E payments were scheduled to

pay cash annually in amounts that would provide the Dutch Banks with an internal rate of

return[15] of 9.03587% over eight years.  At the end of eight years, if the Dutch Banks' capital

accounts had actually earned a rate of return of 9.03587%, the Dutch Banks' capital accounts,

i.e., ownership interests, would be decreased to near zero – in other words, Exhibit E payments

would have cancelled out the Dutch Banks' capital account increases and returned the Dutch

Banks' initial investments.  Similarly, if the Dutch Banks' capital accounts were credited with

partnership income at a rate less than 9.03587%, the capital accounts would be negative after

eight years; if the capital accounts were credited at a rate greater than 9.03587%, the capital

accounts would be positive.  Positive capital accounts would result in payments to the Banks

when the partnership wound up; negative accounts would mean the Banks owed money to the

partnership.  (Op. Agmt. §§ 12.2-12.3, J. Ex. 1 at Bates 101492-93)  If the Banks' interests were

not liquidated after eight years, the Banks would still have their capital accounts credited or

debited by allocations of income or loss in successive years.

        This arrangement provided the Dutch Banks, in return for their initial cash investment,

with: (a) an ownership interest in Castle Harbour that was increased or diminished by allocations

of income or loss, and (b) a stream of payments over eight years that would repay the Dutch

Banks' initial investments at an internal rate of return of 9.03587%.  Any discrepancies between

---

        [14] Technically, Exhibit E payments were discretionary on the part of GECC.
Nevertheless, because failure to make a scheduled Exhibit E payment gave the Dutch Banks the
right to force a liquidation of Castle Harbour, it was unlikely the payments would not be made.
(Op. Agmt. § 14.1(d), J. Ex. 1 at Bates 101499)

        [15] Internal rate of return is defined as the discount rate necessary to make the net present
value of a stream of future payments equal to zero.

these two items – the Dutch Banks' ownership shares and the total payments made to the Banks over the eight years – would be reconciled upon liquidation of the Banks' partnership interests.

The arrangement allowed GECC to reduce part of its interest in fixed assets to cash, i.e., it "monetized" or "securitized" part of the assets.  Before the formation of Castle Harbour, GECC – through its wholly owned subsidiaries – owned 100% of its net $272 million of aircraft, $22 million in associated rent receivables, and $240 million in cash.  After the formation of Castle Harbour, GECC owned approximately 82% of a partnership that itself owned the aircraft, receivables, GECC's cash, and an additional $117.5 million in cash.  In other words, pre-Castle Harbour, GECC owned 100% of $272 million in aircraft, 100% of $22 million in receivables, 100% of $240 million cash, and 0% of $117.5 million cash.  Post-Castle Harbour, GECC owned 82% of each asset, i.e., $223 million of aircraft, $18 million of receivables, and $290 million in cash.[16]  Over the first eight years, however, while the Dutch Banks' ownership interests were being bought out using Castle Harbour's income, GECC's interest was increasing inversely.  Consequently, at the end of the eight years (had the partnership lasted that long), GECC would have regained almost complete ownership of the aircraft.

In sum, through Castle Harbour, GECC received $117.5 million in cash from the Dutch Banks, in return for which the Banks received a self-liquidating (i.e., limited-term) ownership interest in aircraft and an allocation of the rental income from those aircraft.  Put another way, GECC sold the Dutch Banks what amounted to an eight-year investment in a commercial leasing partnership.

---

[16] On its consolidated financial statements, GECC did not actually record the transaction in this manner.  Instead, it simply kept the aircraft and $240 million on its books and recorded the Dutch Banks' investment as $117.5 million of "minority equity."  (July 22, Dull, 357-58)

###### 2.   Allocations

The general structure of Castle Harbour just described is fairly simple and perhaps not very different from that of a great many partnerships.  The complexity of the transaction, and the source of this litigation, comes principally from the way in which the partnership's income was allocated between the GECC entities and the Dutch Banks.

Crucial to its allocation scheme, the Operating Agreement defined two categories of income (or loss): Operating Income[17] and Disposition Gains/Losses.

###### a.   Operating Income

Operating Income was comprised of income less expenses.  Income was rent and interest on investments.  Expenses consisted of normal administrative expenses, interest owed on aircraft debt, depreciation of the aircraft, and guaranteed payments to GECC entities, also known as Class B Guaranteed Payments.  (J. Ex. 1 at Bates 101425-26)  Depreciation was calculated on a straight-line basis, starting with the fair-market value of the aircraft at the time of Castle Harbour's formation and assuming a useful life for each aircraft of the greater of seven years or 125% of the time remaining on the then-outstanding lease of the aircraft.  (J. Ex. 20 at Bates 8785)  The Class B Guaranteed Payments were made annually to the GECC entities in the amount of either $500,000 or $2 million and did not reduce the capital account of the receiving GECC entity.  (Op. Agmt. § 4.1, J. Ex. 1 at Bates 101447)  Notably, expenses did not include payment of principal on the airplane debt or Exhibit E payments to the Dutch Banks.

Once Operating Income had been calculated, it was allocated to the capital accounts as

---

[17] The Operating Agreement simply refers to this category as "Profit" and "Loss," but the parties adopted the more convenient designation of Operating Income.

follows.  If Operating Income was positive, i.e., an Operating Gain, it was allocated 98% to the Dutch Banks and 2% to the GECC entities.  (Op. Agmt. § 3.1, J. Ex. 1 at Bates 101435)  If Operating Income was negative, i.e., an Operating Loss, then it was: (a) first allocated in an amount sufficient to offset the cumulative Disposition Gains allocated to any of the partners in previous years, (b) the remainder was then allocated 98% to the Dutch Banks until they had been allocated, cumulatively, $3,854,493 of Operating Losses, and (c) the remainder was allocated 99% to the GECC entities and 1% to the Dutch Banks.[18]  (Op. Agmt. § 3.2, J. Ex. 1 at Bates 101435-36)

Operating Gain allocation was straightforward.  For example, in 1997 Castle Harbour's net Operating Income was $2,304,000, which was allocated $2,258,000 to the Dutch Banks and $46,000 to the GECC entities – a simple 98/2 split.  (J. Ex. 61 at Bates 18002)

Castle Harbour never experienced an Operating Loss, but a hypothetical situation will illustrate how one would have been allocated.  Assume that in 1994 Castle Harbour had an Operating Gain of $10 million and a Disposition Gain (described below) of $10 million.  The Operating Gain would have been allocated $9.8 million to the Dutch Banks and $200,000 to the GECC entities.  The Disposition Gain, assuming it was Castle Harbour's first ever, would have been allocated (for reasons explained later) approximately $3 million to the Dutch Banks and $7 million to GECC.  If in 1995 Castle Harbour had an Operating Loss of $15 million, it would have been allocated as follows.  First, $3 million would be allocated to the Dutch Banks and $7 million to the GECC entities to offset their prior Disposition Gains.  Second, the remaining $5

_____

[18] The Operating Agreement specified further Operating Loss allocations in the event losses exceeded $541 million.  Those allocations, which never did come into play, were highly unlikely to come into play.  (Op. Agmt. § 3.2(d)-(f), J. Ex. 1 at Bates 101436)

million would be allocated 90% to the Dutch Banks and 10% to the GECC entities until the Dutch Banks had been allocated $3,854,493 of cumulative Operating Losses.  Assuming the Dutch Banks in previous years had never been allocated an Operating Loss, this second step would mean that $4,282,770 would be allocated 90/10, resulting in $3,854,493 going to the Dutch Banks and $428,277 going to the GECC entities.  Third, the remaining approximately $717,000 would be allocated 99% to the GECC entities and 1% to the Dutch Banks.

> b.   Disposition Gain/Loss

A Disposition Gain or Loss was the result of the difference between the sale price of an asset, usually an aircraft, and its book value.  (Op. Agmt. § 3.3(h),(j), J. Ex. 1 at Bates 101438-39)  Alternatively, if an aircraft was distributed back to one of the GECC entities, the fair market value was deducted from the receiver's capital account and the difference between the aircraft's fair market value at the time of distribution and its book value was treated as a Disposition Gain or Loss.  (Op. Agmt. § 10.8(a)(i)(B), J. Ex. 1 at Bates 101488)  Similarly, if the GECC entities were to buy out entirely the Dutch Banks' interests in the partnership, the difference between the fair market value of all held assets and their book value was to be treated as a Disposition Gain or Loss.  (Op. Agmt. § 10.8(b)(i)(B), J. Ex. 1 at Bates 101488)

Disposition Gains and Losses were allocated much like Operating Losses:  (a) first, Disposition Gains were allocated to offset prior Disposition Losses and prior Operating Losses; Disposition Losses offset prior Disposition Gains,[19] (b) the remainder was then allocated 90% to

---

[19] The fact that Disposition Gains and Losses were allocated to first offset prior years' Disposition Gains or Losses meant that Disposition Gains and Losses were allocated cumulatively.  That is, if net Disposition Gains had been distributed only once, at the end of the partnership, the result would have been the same as if – as actually occurred – gains and losses were allocated annually in amounts sufficient to offset prior years' gains and losses.  The

the Dutch Banks until they had been allocated, $2,854,493 of either Disposition Gains or Losses,

(c) the remainder was allocated 99% to the GECC entities and 1% to the Dutch Banks.[20] (Op.

Agmt. § 3.3(h),(j), J. Ex. 1 at Bates 101438-41)

For example, in 1995 Castle Harbour disposed of a number of aircraft, some to TIFD III-

E and some to third parties.  The aircraft distributed to TIFD III-E had a fair market value of

approximately $27 million, and consequently TIFD III-E's capital account was reduced by that

amount.  (J. Ex. 49 at Bates 8969)  The aircraft sold to third parties were sold for approximately

$21 million.  (J. Ex. 49 at Bates 8969)  The book value of all the aircraft sold in 1995 was

approximately $74 million, causing Castle Harbour a total Disposition Loss of approximately

$26 million.[21]  (J. Ex. 49 at Bates 8969)  That loss was distributed as follows.  First, because in

prior years cumulative Disposition Gains of approximately $3 million had been allocated to the

Dutch Banks, and cumulative Disposition Gains of approximately $1.5 million had been

allocated to the GECC entities (J. Ex. 37 at Bates 16347), those amounts of loss were allocated to

each respectively.[22]  Second, the Dutch Banks were allocated 90% of the remaining losses and

GECC 10%, until the Dutch Banks had been allocated $2,854,493 in losses, and GECC had been

allocated about $0.3 million.  Third, the remainder was allocated 99% to GECC (approximately

─────────────────────

situation was not the same with Operating Gains and Losses because Operating Gains were not
allocated to offset prior Operating Losses and vice versa.

[20] As with Operating Losses, there were different allocations that would take place should
Disposition Losses exceed $541 million.  (Op. Agmt. § 3.3(j)(iv)-(vi), J. Ex. 1 at Bates 101440-
41)  Those allocations are not relevant to this case.

[21] $21 million, plus $27 million, minus $74 million.

[22] Note that prior years' Operating Gains were not offset.  If there had been a Disposition
Gain, however, it would have offset prior years' Operating Losses.

$18 million) and 1% to the Dutch Banks (approximately $0.1 million).  In total, therefore, the Dutch Banks were allocated approximately $6 million in Disposition Losses,[23] and the GECC entities, approximately $20 million.[24]  (J. Ex. 49 at Bates 8970)

> c.    Operating Income vs. Actual Income

Operating Income, as defined by the Operating Agreement, might at first glance look like a simple measure of the net cash received by Castle Harbour from its normal operations, i.e., gross non-disposition income less expenses.  That was not the case.  Operating Income in fact defined a category of income, primarily because it included as expenses items not ordinarily considered expenses, e.g., Class B Guaranteed Payments, and excluded items ordinarily treated as expenses, e.g., debt payments and Exhibit E payments.  It is worth pointing out some of the effects of this definition.

As noted above, the Class B Payments guaranteed to the GECC entities were treated as expenses and did not reduce the receiver's capital account.  Consequently, if one were to consider such payments as allocations – which would make sense given that they represented income going directly to GECC entities[25] – the income allocated to GECC would then be significantly more than 2%.  For example, in 1997, as discussed above, Operating Income was approximately $2.3 million, and was allocated 98% to the Dutch Banks and 2% to GECC.  If one

_____

[23] The $6 million in Disposition Losses is the sum of the $3 million Disposition Gain offset, plus $2.9 million allocated at 90%, plus $100,000 allocated at 1%.

[24] The $20 million in Disposition Losses is the sum of the $1.5 million Disposition Gain offset, plus $300,000 allocated at 10%, plus $18 million from the 99% allocation.

[25] Put another way, had the Class B payments been treated as allocations followed by distributions the effect on the capital account would have been the same.  The capital account would have been increased by the allocation, but then decreased by the distribution.

considers that GECC also received a Class B distribution of $2,000,000 prior to any allocation and not deducted from its capital account, it might make sense to consider its allocation to be $2,046,000, making the actual income split closer to 50/50.

The treatment of aircraft depreciation as an expense, and its consequent deduction from Operating Income, also had some interesting effects.  The depreciation schedule for the aircraft was fairly aggressive, usually coming out at 60 to 70 percent of the rental income for a given year.  The effect of this depreciation was that a large portion of the cash that came into Castle Harbour was not reflected in Operating Income.[26]  Of course, aggressive depreciations meant Castle Harbour would be more likely to realize a gain when the assets were sold (or the Dutch Banks were bought out), but such gain would be a Disposition Gain and therefore allocated more favorably to GECC.

### 3.  Other Provisions

The principal features of the Castle Harbour transaction have been described: it was a self-liquidating partnership with a complex scheme for allocating gains and losses.  There are several other features of the partnership relevant to this case.

#### a.  CHLI

Most of the cash invested in Castle Harbour was not held by Castle Harbour.  Instead it was transferred to Castle Harbour Leasing Inc. ("CHLI"), a domestic corporation and wholly-owned subsidiary of Castle Harbour.  (July 22, Dull, 322-23, 358; July 22, Parke, 394)  This arrangement allowed income from that cash to be recognized as a Disposition Gain rather than as

---

[26] The amount of cash offset by depreciation did not actually sit in Castle Harbour, but ended up being used to pay off the two significant expenses not included as Operating Income expenses – debt principal and Exhibit E payments.

Operating Income.  For example, interest earned on the re-investment of the approximately $360

million cash initially invested by the partners would have counted as Operating Income had it

remained with Castle Harbour.  Because the cash had been moved to CHLI, interest accumulated

there and was allocated to the partners as a Disposition Gain when the Dutch Banks were

ultimately bought out.  Similarly, CHLI purchased several aircraft during Castle Harbour's

existence.  (July 22, Dull, 325)  Rental income generated by those aircraft did not count towards

Operating Income, as it would have if the aircraft had been owned by Castle Harbour, and that

income was not allocated to the partners until the buyout of the Dutch Banks, when it was

allocated as a Disposition Gain.  (July 22, Dull, 370)

> b.      Investment Accounts

Under the Operating Agreement, Castle Harbour was required to maintain "Investment

Accounts" for the Dutch Banks.  (J. Ex. 1 at Bates 101405-06)  No cash was actually paid into

those accounts; they merely kept track of a hypothetical balance.  *Id.*  The opening balances of

the Investment Accounts was equal to the initial investments made by the Dutch Banks.  *Id.*

Those balances were to be recalculated at the time the Dutch Banks exited the partnership as if

every year the balances had been increased by a defined Applicable Rate but also reduced by the

Exhibit E payments.  *Id.*  The Applicable Rate was either 9.03587%[27] or 8.53587%, depending

on the reason for the Dutch Banks' exit.  *Id.*

At the time of the Dutch Banks' exit from Castle Harbour, their Investment Account

balances would be compared to the algebraic sum of the Dutch Banks' allocations of: (a)

---

[27] In the event that the Applicable Rate was 9.03587%, the Investment Accounts would be
close to zero at the end of the eight-year period, because, as noted above, the Exhibit E payments
provided an internal rate of return of 9.03587%.

Operating Gains, (b) Operating Losses that had been allocated at the 98% rate, which could not

exceed approximately $4 million, (c) Disposition Gains, and (d) Disposition Losses that had been

allocated at the 90% rate, which could not exceed approximately $3 million.  If that sum

exceeded the hypothetical balance in the Banks' Investment Accounts, that sum would be paid to

the Dutch Banks, instead of the amount in their capital accounts.  That payment, if made, would

be labeled a Class A Guaranteed Payment.  *Id.*

### c.      Core Financial Assets

As discussed above, Castle Harbour put most of its cash in its subsidiary, CHLI.  CHLI

was not free to dispose of that cash as it chose.  Under the Operating Agreement, CHLI was

required to keep high-grade commercial paper or cash, referred to as "Core Financial Assets," in

an amount equal to 110% of the current value of the Banks' Investment Accounts.  (J. Ex. 1 at

Bates 101408; Op. Agmt. § 5.8(b), J. Ex. 1 at Bates 101471-72)

As it turns out, CHLI ended up investing most of its $360 million cash in GECC

commercial paper.  (July 22, Dull, 324)  This benefitted GECC because, by having a GECC

subsidiary – Castle Harbour – purchasing GECC commercial paper, GECC was buying back or

"retiring" its debt, thereby decreasing its debt-to-equity ratio and freeing GECC to borrow more

money.  (July 22, Parke, 393)

### d.      Management Rights

Castle Harbour was managed primarily by the GECC entities, which elected the

partnership's managers.  The Dutch Banks' role was minimal.  They did not vote for managers[28]

---

[28] Apparently, because of Federal Aviation Administration ("FAA") restrictions, the
Dutch Banks could not have been given a right to elect the managers.  (July 22, Dull, 359)

and none of their employees worked for Castle Harbour.  They did participate in annual member meetings (July 22, Dull, 362), but, for the most part, the only control they had was negative. (July 22, Dull, 361)

The actual day-to-day operations of Castle Harbour, such as financing and accounting activities, were outsourced to other GE entities – first, GE Capital Advisory Services Ltd. and later General Electric Capital Aviation Services, Ltd. ("GECAS Ltd.").  (July 22, Dull, 412-13; July 26, Tewell, 646-47)

### 4.   Risks and Returns

Having explained Castle Harbour's structure, it is worth summarizing how this complex structure allocated the risks and returns of the Castle Harbour business.

The Dutch Banks received the lion's share of Operating Income, though this number was greatly reduced from gross rental income because depreciation was treated as an expense.  By contrast, the Dutch Banks were not likely to receive much upside from the disposition of assets. As a practical matter, their return on asset dispositions was capped at about $3 million.  Although they also received 1% of Disposition Gains above $3 million, that amount was insignificant compared to their overall investment.  For example, even if Castle Harbour had sold all its assets at approximately $303 million over book value, the Dutch Banks would only have recognized an additional $3 million of return.  By comparison, Castle Harbour actually disposed of the assets at a cumulative gain of $137 million, which netted the Dutch Banks only $1.3 million above their initial $3 million allocation.

Similarly, under the Operating Agreement, the Dutch Banks were exposed to little more than a $3 million risk of Disposition Losses and a $4 million risk of Operating Losses, i.e., a total

risk of just over $7 million. Again, that risk was capped because, for amounts above that range, the Dutch Banks were exposed, as a practical matter, to only 1% of the risk for each type of loss (Disposition or Operating). For example, if the aircraft had simply been given away (i.e., a Disposition Loss of roughly $530 million) in 1994, the Dutch Banks would only have been exposed to approximately $5.27 million dollars of loss above their initial $3 million allocation of Disposition Losses.

Accordingly, under the Operating Agreement, the Dutch Banks were entitled to almost all the Operating Income upside, but probably little more than approximately $3 million of any Disposition upside. On the other hand, they were not likely to be allocated much more than $7 million in losses, $4 million from Operating Losses and $3 million from Disposition Losses.

The Dutch Banks were actually protected against the possibility of even that $7 million in losses by their Investment Accounts. The Operating Agreement provided that, if the Dutch Banks' Investment Accounts exceeded the sum of their Operating Gains, Disposition Gains, Operating Losses up to $4 million, and Disposition Losses up to $3 million, then the Banks would be paid the difference. Thus, even if the Dutch Banks were allocated up to $4 million of Operating Losses and $3 million of Disposition Losses, they would still receive the full amount of their Investment Accounts. That is, the only negative effects of those losses would be to limit the Dutch Banks' payout to the return rate of their Investment Account (either 9.03587% or 8.53587%).

That is not to say that the Dutch Banks were guaranteed to receive at least their Investment Account amounts. Those amounts could be reduced by the allocation of Disposition Losses or Operating Losses, because such loss amounts were not included in the determination

20

whether a Class A Guaranteed Payment was required.

To illustrate the risks to the Dutch Banks, it is useful to start with what actually happened. When the Dutch Banks were actually bought out, their capital accounts were worth $31.1 million (J. Exs. 71, 72) and their Investment Accounts were worth approximately $29 million (using the applicable interest rate of 8.53587%) (July 22, Dull, 366). Because their allocated gains of $31.1 million exceeded their Investment Accounts, no Class A Guaranteed Payments were made; in other words, the Investment Accounts were irrelevant. (July 22, Dull, 365)

The situation would have been different if Castle Harbour had done worse. If, for example, Castle Harbour had suffered a cumulative Operating Loss of $1 million and no Disposition Gain or Loss, the Dutch Banks would have received a lower return. They would not, however, have received a negative return, that is, they would not have been required to pay more money into Castle Harbour. Castle Harbour would have suffered a loss, and that loss would have been allocated 98% to the Dutch Banks, bringing their capital account to negative $980,000. The result would have been that their Investment Accounts ($29 million) would have exceeded the sum of their Disposition Gains and Losses ($0) and their Operating Losses below $3 million ($980,000). Consequently, the Dutch Banks would have been bought out for only $29 million. Thus, though they would have received a lower return than if Castle Harbour had done better, their return would still have been positive.

The Dutch Banks would only have received less than the amount in their Investment Accounts if Castle Harbour had done badly enough to cause losses to be allocated to the Dutch Banks, i.e., losses exceeding approximately $4 million in Operating Losses or $3 million in Disposition Losses. Even then, the effect in most scenarios would be minimal because the Banks

21

would be allocated only 1% of losses until losses allocated to GECC exceeded $541.5 million, at which point the Banks would be allocated 100% of losses until their capital accounts were eliminated.  For example, the Dutch Banks would only have received a zero return, i.e., an allocation of $28.8 million in losses, if Castle Harbour experienced approximately $570 million in Disposition or Operating Losses, an unlikely scenario given that the combined assets of Castle Harbour never exceeded a value of $700 million.[29]

Although the *Castle Harbour II* opinion indicates that I previously "found the likelihood of loss to be so remote as to be irrelevant," 459 F.3d at 228 n.5, I never made such a finding. Instead, I found certain Operating Loss *allocations* specified in the Operating Agreement, which would have applied in the event losses exceeded $541 million, to be irrelevant because they "never came into play, [and] were highly unlikely to ever come into play."  *Castle Harbour I*, 342 F. Supp. 2d at 101 n.16.  I also pointed out that the Banks' exposure to downside risk was much less significant than the Banks' upside potential.  In other words, although the Dutch Banks were protected to a large extent from severe loss, the Banks maintained an interest in Castle Harbour's overall performance because there was significant opportunity for the Banks to maximize their returns.  My point was not that the likelihood of loss was so remote that it was irrelevant, but rather that the opportunity for gains above and beyond the Dutch Banks' minimum guaranteed return (as opposed to the Banks receiving a sum certain) was indicative of the Banks' interest in the overall economic performance of the Castle Harbour partnership.  Although, as it

---

[29] This scenario might have occurred had there been some catastrophic accident that exceeded insurance coverage, and if that accident were treated as an Operating Loss.  For that reason, the Dutch Banks, prior to entering Castle Harbour, bargained hard about the level of insurance coverage to be maintained by Castle Harbour and the degree to which such losses would come out of Operating Income.  (July 22, Dull, 354-55)

happened, the Banks' allocated gains exceeded the amounts in their Investment Accounts, that

outcome was not preordained; overall downside risk was minimal, but still possible, and

therefore not meaningless.

In *Castle Harbour II*, the Second Circuit wrote that a performance guaranty assured the

Banks they "would be repaid in full," *id.*, and "repayment of the banks was assured," 459 F.3d at

240.  Although the Banks were guaranteed a minimum return, they were not in fact guaranteed a

certain, fixed return on their investments.  As I found in *Castle Harbour I*:

> The Dutch Banks were not owed a sum certain.  They were to receive 98% of the net
> Operating Income, whatever that might be.  It is true that their potential downside was
> limited, but their upside was not.  Thus, although they were guaranteed a minimum
> return, *they were not guaranteed a maximum – or, more to the point, a certain – return*.
> The difference is significant.  An interest holder guaranteed a fixed return resembles a
> debtor because he has no interest in anything other than solvency of the entity obligated to
> pay him.  By contrast, even with security against downside risk, an investor with
> unlimited upside potential has a significant interest in the performance of the entity in
> question, because performance directly affects the amount of her return.

342 F. Supp. 2d at 116-17 (emphasis in original).[30]  The Banks were exposed to risk; a possibility

existed that the Banks' capital investment in Castle Harbour would not be fully repaid.

Additionally, in the event of liquidation, Castle Harbour's creditors had priority over the Dutch

---

[30] The Second Circuit disagreed with my prior determination that, due in part to the
Banks' upside potential under the formal partnership agreement, the Dutch Banks' interest in
Castle Harbour should be treated as equity for tax purposes.  *Castle Harbour II*, 459 F.3d at 233-
34.  Instead, the Second Circuit focused on the "practical reality" that the Banks' return would be
capped at or close to their Applicable Rate of return; "as a practical matter, the banks enjoyed
only a narrowly circumscribed ability to participate in profits in excess of their Applicable Rate
of return."  *Id.* at 234.  Accepting that as correct, the Second Circuit's conclusion regards the
Banks' potential gains, not their exposure to loss.  Accordingly, that conclusion does not now
compel a holding that the Banks were not potentially exposed to loss on their investment in
Castle Harbour.  Nor does it compel any particular answer to the question of the tax treatment of
the Banks' interests in Castle Harbour under section 704(e)(1).

Banks.  (J. Ex. 1 § 12.2(a)-(d))  Each Bank was entitled to the distribution of Castle Harbour's

assets equal to the Bank's capital account balance, *not* the Banks' actual capital investment.

    In short, the Castle Harbour Operating Agreement assigned to the Dutch Banks

principally the upside of the aircraft rentals in excess of their Investment Accounts.  The Dutch

Banks also received a small portion of any upside from the disposition of assets.  The Dutch

Banks bore some risk from Disposition and Operating Losses, but, for the reasons just given, the

risk was minimal.

### 5.    *Tax Consequences*

    The tax consequences of the Castle Harbour partnership allocations were significant.

They are also relatively simple to understand.  As described above, 98% of Operating Income

was allocated to the Dutch Banks.  Operating Income was reduced by expenses, including asset

depreciation, which in most years equaled close to 70% of gross rental income.  For tax purposes,

the same allocation was made; Operating Income was allocated 98% to the Dutch Banks.  Again,

Operating Income was reduced by expenses, including depreciation, but all the aircraft in Castle

Harbour had already been fully depreciated for tax purposes.  Consequently, although nominally

depreciation was an expense for tax purposes, it did not actually reduce taxable income.

Accordingly, the taxable income allocated to the Dutch Banks was greater than their book

allocation by the amount of book depreciation for that year.  The Dutch Banks, however, did not

pay United States income taxes.[31]  Thus, by allocating 98% of the income from fully tax-

---

[31] Moreover, were any U.S. taxes to be assessed against the Dutch Banks, GECC agreed to indemnify them.  (J. Exs. 4, 5)  In addition, the Dutch Banks were prohibited by the Operating Agreement from selling their interests, thus ensuring that the interests would not be transferred to a taxable entity.  (J. Ex. 1 at Bates 1482)

depreciated aircraft to the Dutch Banks, GECC avoided an enormous tax burden, while shifting very little book income.

Put another way, by allocating income less depreciation to tax-neutral parties, GECC was able, as a practical matter, to "re-depreciate" the assets for tax purposes.  The tax-neutrals absorbed the tax consequences of all the income allocated to them, but actually received only the income in excess of book depreciation.  Thus, the full amount of book depreciation was available, pre-tax, to Castle Harbour to use.[32]

B.      Operation of Castle Harbour

Having explained the structure and mechanics of Castle Harbour, I will now summarize the actual results of its five years of operation.

Castle Harbour operated from its formation on October 6, 1993 until December 31, 1998, when GECC liquidated the Dutch Banks' interest.[33]  Its principal place of business was in Bermuda.  For most of its period of operation, Castle Harbour's lease portfolio was managed by GECAS under the terms of an administrative services agreement.  (J. Exs. 26, 31, 32; July 22, Dull, 412-13; July 26, Tewell, 646-47)  GECAS also helped Castle Harbour place aircraft when existing aircraft leases expired.  (J. Ex. 32; July 26, Hyde, 534-35)

From 1993 to 1998, Castle Harbour's cumulative Operating Income was approximately

---

[32] Presumably GECC had to pay taxes on the amounts offset by depreciation when income was realized upon ultimate disposition of the assets.  The record contains no evidence on what tax rate was applied at that point.  At the very least, however, this arrangement allowed GECC to defer taxes on aircraft lease income.

[33] The Dutch Banks were bought out after a change in U.S. tax law made it possible that Castle Harbour would no longer be treated as a partnership, potentially implicating GECC's liability under the parties' tax indemnification agreement.  (July 22, Dull, 364-65)

$28.6 million.  (J. Exs. 20, 24, 37, 49, 53, 61, 68)  Approximately $28 million of that income was

allocated to the Dutch Banks.  *Id.*  During its period of operation, Castle Harbour disposed of a

number of aircraft at a cumulative loss of about $24 million.  *Id.*  When the Dutch Banks were

bought out, the value of all aircraft and of CHLI exceeded their respective book values by

approximately $161 million.  (J. Ex. 71 at Bates 24679)  Consequently, Castle Harbour had a

cumulative Disposition Gain of approximately $137 million.  Approximately $4 million of that

amount was allocated to the Dutch Banks.  Exhibit E payments were made through 1997 in an

amount totaling approximately $118.5 million.  At the time of the buyout, the Dutch Banks had a

positive balance in their Capital Accounts of approximately $31 million.  They were bought out

at that price.[34]  In total, the Dutch Banks received nearly $150 million ($118.5 million Exhibit E

payments, plus $31 million buyout) over five years for their $117.5 million investment.  Stated

more usefully, they received an internal rate of return of approximately 9.1%.  (July 27, Myers,

817)

The GECC entities were allocated approximately $600,000 of the $28.6 million of

Operating Income, and approximately $133 million of the $137 million Disposition Gains.  (J.

Exs. 20, 24, 37, 49, 53, 61, 68)  Over the period of Castle Harbour's operation, GECC received

$6 million in Class B payments, approximately $20 million in distributions from its Capital

Accounts, and distributions of aircraft worth about $41 million.  *Id.*  In 1998, after GECC bought

out the Dutch Banks for approximately $31 million, it became the sole owner of the assets of

Castle Harbour, worth approximately $692 million.  In total, GECC received nearly $728 million

---

[34] Actually, because of the circumstances of the buyout, the Dutch Banks received a slight
premium of approximately $150,000 for having their interests bought out early.  (July 22, Dull,
366-67).  The details of that premium payment are not relevant to this case.

26

($6 million Class B payments, plus $20 million distributions, plus $41 million aircraft, plus $692 assets, minus $31 million buyout) over five years for its initial investment of around $591 million.  These payments gave GECC a pre-tax internal rate of return of approximately 5.5%. (July 27, Myers, 762)

For the reasons given above, the Dutch Banks were allocated much more taxable income than book income.  Specifically, the Dutch Banks were allocated approximately $310 million in taxable income.  Had this income been allocated to GECC, GECC would have been required to pay approximately $62 million in taxes on that income.

## II.   Discussion of Internal Revenue Code Section 704(e)(1)

### A.   Whether the Dutch Banks were Partners Under Section 704(e)(1) of the Internal Revenue Code Remains an Open Question After *Castle Harbour II*

In *Castle Harbour II*, the Second Circuit held that, chiefly because "the Dutch banks' interest was overwhelmingly in the nature of a secured lender's interest," *id*. at 231, "the Dutch banks' interest was, for tax purposes, not a bona fide equity participation."  *Id*. at 241.  On remand, the government has argued in its briefs and at oral argument that the Second Circuit's holding in *Castle Harbour II* forecloses the possibility that the Dutch Banks were partners in Castle Harbour under I.R.C. § 704(e)(1).  In the government's words, "The Second Circuits' [sic] holding that the Dutch banks' interest was not bona fide equity precludes a holding, on the same factual record, that the Dutch banks own a capital interest."  Govt. § 704(e) Opp. Br. at 2-3.

As a preliminary matter, the Second Circuit did not consider "the taxpayer's argument that the partnership was a family partnership under the provisions of I.R.C. § 704(e)," and "[left] this question for consideration in the first instance by the district court."  *Castle Harbour II*, 459 F.3d

27

at 241 n.19.  I assume that, if the question of the Dutch Banks' status under section 704(e) were

closed, the Second Circuit would not have remanded this case with instructions to consider that

question.

Moreover, and more importantly, the Second Circuit's holding that the Dutch Banks'

interest in Castle Harbour was not "bona fide equity participation," and that "[t]he Dutch banks'

interest was in the nature of a secured loan, with an insignificant equity kicker," *id*. at 241, does

not necessarily distinguish the Banks' interests from other debt-like instruments that, despite

appearances, are not considered debt for tax purposes.  For example, the Second Circuit has long

and consistently held that, although preferred stock is debt-like in nature, it should be treated as

equity for tax purposes.

In *Jewel Tea Co. v. United States*, 90 F.2d 451 (2d Cir. 1937), the Second Circuit

addressed the question whether, because preferred shareholders do not share all profits or manage

the business to which they have contributed capital, they should be considered debtors for tax

purposes.  Judge Learned Hand wrote:

> If the shareholders also set up priorities between themselves, there results a hierarchy in
> which the lenders are merely the prior group; the preferred shareholders, like them, are
> limited in their return, and any eventual profit goes to the common shares.  Thus it would
> be possible to treat preferred shares like debts; that is, as constituting merely a claim upon
> the company – the common shareholders.  Such a view would make the common
> shareholders alone the company, since they alone share profits and manage the enterprise;
> it would treat all others as separate groups with whom they deal as third parties.  It would
> have been an entirely logical and reasonable theory and the law might well have insisted
> upon it.  It has not; on the contrary it has always distinguished between creditors and
> preferred shareholders, regarding the first as outside the corporate aggregation, and the
> second as embarked as owners along with the common shareholders.

90 F.2d at 452.  The Second Circuit's decision holding the Dutch Banks' interest to be debt-like

and in the nature of a secured loan was based on the Dutch Banks' limited participation in the

management and profits of the Castle Harbour partnership; that holding does not readily

distinguish the Castle Harbour partnership from any other company with preferred shareholders.

As the *Jewel Tea* Court indicated, although treating debt-like instruments as debt rather than

equity for tax purposes is neither illogical nor unreasonable, tax law has "always distinguished"

between creditors and preferred shareholders.  Accordingly, the fact that the Banks' interests

were debt-like is not dispositive and does not foreclose consideration of the question whether the

Banks held capital interests in the Castle Harbour partnership.

In *Commissioner v. O.P.P. Holding Corp.*, 76 F.2d 11 (2d Cir. 1935), the Second Circuit

considered whether certificates designated as stocks that were substantially similar to certificates

designated as bonds should be treated as debt or equity for tax purposes.  Noting that one of the

only differences between the two instruments was the name given to each, and that the "inherent

characteristics" of an instrument are determinative, rather than simply its name, the Court

nevertheless held that

> it does not follow that the name by which the certificates are designated is to be
> completely ignored. . . . [B]oth evidence a contract between their holders and the issuing
> corporation, and, in construing this contract, the language used . . . will be indicative of
> the intention of the parties.  Though both contain substantially similar provisions and are
> silent as to the source of the return, it is not inconsistent to hold that only in the case of
> certificates designated as bonds were the holders intended to be creditors of the
> corporation . . . .

76 F.2d at 13 (internal citation omitted).  Again, the debt-like nature of a party's interest in a

business organization does not definitively answer the question whether, for tax purposes, that

interest should be considered debt or equity.  The labels, rights and responsibilities set forth in a

partnership agreement or other corporate governance document may determine how the parties to

that agreement should be treated (for instance, as debtors or creditors), even (or especially) when

29

those labels and terms give shape to the parties' relationship and roles.  A partnership agreement may set forth both general partners who control and manage the partnership's business and limited partners who play little or no role in the control and management of the partnership; the general and limited partners' roles in control and management differ, but (provided the business relationship between the parties is not a sham) both are considered partners for tax purposes.

The *Culbertson* Court recognized that, to be treated as a partner for tax purposes, a person must contribute in some way to the partnership, because "income must be taxed to him who earns it."  *Culbertson*, 337 U.S. at 739-40.  "A partnership is, in other words, an organization for the production of income to which each partner contributes one or both of the ingredients of income – capital or services."  *Id*. at 740.  The Dutch Banks' primary contribution to Castle Harbour was capital, much like a limited partner to a partnership who contributes capital but does not play an active role in the management and control of that partnership.

Implicit in the *Culbertson* Court's recognition that income must be taxed to him who earns it is the understanding that, if a partner contributes to a partnership and the partnership earns income, the partner should be taxed accordingly.  The partners' contributions to the partnership are significant; the tax consequences of the partnership may be relevant to, but are not determinative of, whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."  *Id*. at 742.

The *Castle Harbour II* Court noted that:

It is true that the Court of Appeals in *ASA Investerings* noted that the Tax Court's decision "rejecting the bona fides of the partnership was the equivalent of a finding that it was, for tax purposes, a 'sham.'"  *ASA Investerings*, 201 F.3d at 512 (emphasis omitted).  We do not believe that this language should be interpreted as suggesting that the two underlying inquiries are identical.  While a classification that fails the sham test may be certain also

>to fail the *Culbertson* analysis, a classification that passes the sham test would not
>necessarily survive *Culbertson*.

459 F.3d at 232 n.13.  The Second Circuit pointed to no case in support of its suggestion that a

partnership, although not a sham, might nevertheless fail the *Culbertson* analysis, and it is

difficult to imagine one.  *Culbertson* nowhere uses the term "sham" but, as the *ASA Investerings*

Court's discussion indicates, "sham" may be read synonymously with "no business purpose."

*ASA Investerings*, 201 F.3d at 511-12 (calling "irrelevant" Tax Court's failure to use the word

"sham" and treating question whether partnership was a sham as equivalent to question whether

partnership had economic substance).

   Just as limited partners, although they may not control a partnership, are nonetheless

partners, the Internal Revenue Service has recognized that parties to a partnership whose interests

are "the economic equivalent of a variable-rate tax-exempt bond" may be partners for tax

purposes despite the lack of participation in the partnership's income or losses other than a

variable-rate return based on an external interest index.  Rev. Proc. 2003-84, 2003-2 C.B. 1159.

Put slightly differently, the I.R.S. and the Second Circuit have both recognized that equity

interests may differ significantly with respect to the level of participation in profits and losses, or

control of the organization, even with regard to a single business organization.  Still, those

differing interests may nonetheless be treated as equity for tax purposes.  There may be, for

instance, "two classes of equity interests: interests that are entitled to a preferred . . . return on

[their] capital . . . and interests that are entitled to all of the remaining income of the partnership .

. . ."  *Id*. at 1159.

   To be clear, I do not suggest that the Dutch Banks' participation in Castle Harbour was

preferred stock or that, because preferred shareholders' interests are treated as equity for tax

purposes, the Dutch Banks' interests in Castle Harbour should definitively be treated as such.

The case law and I.R.S. precedent do indicate, however, that the government is mistaken in its

assertion that, because the Second Circuit has held that the Dutch Banks' interests in Castle

Harbour are "debt-like," I must conclude those interests are also debt.  Where, as here, the Banks

could have been required to return certain distributions of income and were exposed to at least

one percent of all losses, the Dutch Banks' debt-like interests in Castle Harbour may still

constitute capital interests.  Under the longstanding precedent of the Second Circuit, even such

debt-like capital interests may be properly treated as equity for tax purposes.

      B.     Castle Harbour and Section 704(e)(1) of the Internal Revenue Code

Section 704(e)(1) of the Internal Revenue Code reads:

(e) **Family partnerships.**[35] –

> (1) **Recognition of interest created by purchase or gift.**– A person shall be
> recognized as a partner for purposes of this subtitle if he owns a capital interest in
> a partnership in which capital is a material income-producing factor, whether or
> not such interest was derived by purchase or gift from any other person.

Because I.R.C. § 704(e) is titled "Family partnerships," confusion may exist with regard

to the application of section 704(e)(1) to situations where, as here, the partnership in question is

---

[35] As I discuss at greater length below, although I.R.C. § 704(e) is titled "Family partnerships," the application of section 704(e)(1) is not limited to family partnerships, but instead applies to all partnerships in which capital is a material income-producing factor.  *See, e.g., Evans v. Commissioner*, 447 F.2d 547, 550 (7th Cir. 1971) ("We cannot agree that in making family partnerships subject to general partnership principles, Congress intended to limit § 704(e)(1) to family partnerships where the capital interest was frequently derived by gift rather than purchase. . . . § 704(e)(1) derives unchanged from § 3797(a)(2) of the 1939 Code which is a general definition applicable to all partnerships.").

neither between family members nor born out of a familial relationship.  Despite any appearance

to the contrary, however, section 704(e)(1) applies to any partnership in which capital is a

material income-producing factor, even non-family partnerships.

Both the Supreme Court of the United States and other courts have recognized that

"'[T]he title of a statute . . . cannot limit the plain meaning of the text.  For interpretive purposes,

[it is] of use only when [it] shed[s] light on some ambiguous word or phrase.'" *Pennsylvania*

*Department of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Trainmen v. Baltimore*

*& Ohio R. Co.*, 331 U.S. 519, 528-29 (1947)); *see also Collazos v. United States*, 368 F.3d 190,

196-97 (2d Cir. 2004) ("While a title may be a useful tool for the resolution of a doubt about the

meaning of a statute, title cannot limit the plain meaning of unambiguous text.") (internal

citations, punctuation and alterations omitted).

The plain language of section 704(e)(1) states that "[a] person shall be recognized as a

partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital

is a material income-producing factor, whether or not such interest was derived by purchase or

gift from any other person," and does not suggest that the section should only apply to natural

persons or to family partnerships.  Accordingly, I reach the same conclusion as other courts to

consider the issue:  Congress did not limit section 704(e)(1) to family partnerships.  *Evans*, 447

F.2d at 550 ("We cannot agree that . . . Congress intended to limit § 704(e)(1) to family

partnerships"), *affirming*, 54 T.C. 40, 51 (1970) (section 704(e) "is broad in its scope and covers

a situation such as the instant case which does not involve a family partnership") (internal

punctuation omitted); *Carriage Square, Inc. v. Commissioner*, 69 T.C. 119, 126 n.4 (1977)

(citing *Evans* for the proposition that "[a]lthough such section is primarily directed toward

'family partnership,' its language is sufficiently broad to cover the instant case which does not involve a 'family partnership' as defined in sec. 704(e)(3).").

Section 704(e)(1), then, sets forth an objective test for determining a putative partner's status: if a person (an individual or business organization) (1) owns (2) a capital interest in (3) a partnership in which capital is a material income-producing factor, then that person is a partner and is taxed as one. The terms used in section 704(e)(1) are defined in the Treasury regulations that govern application of the tax code.

       1.     *Did the Dutch Banks Own their Interests in Castle Harbour?*

Under section 1.704-1(e)(1)(iii) of the Treasury regulations,

> A donee or purchaser of a capital interest in a partnership is not recognized as a partner under the principles of section 704(e)(1) unless such interest is acquired in a bona fide transaction, not a mere sham for tax avoidance or evasion purposes, and the donee or purchaser is the real owner of such interest. To be recognized, a transfer must vest dominion and control of the partnership interest in the transferee.

In *Castle Harbour I*, I found that the transaction by which the Dutch Banks joined Castle Harbour was not a sham transaction entered into solely for tax avoidance or evasion purposes. 342 F. Supp. 2d at 109-14. Although the tax benefits of the transaction creating Castle Harbour are undisputed and substantial, there were legitimate non-tax business purposes underlying the relationship into which the Dutch Banks and other Castle Harbour partners entered.[36] The creation of a partnership was a legitimate way to raise capital against older aircraft that did not meet certain regulatory standards and were considered unsalable. *Id*. at 114. The Castle Harbour transaction allowed GECC to raise $117 million, and at the same time demonstrate its ability to

---

[36] The Second Circuit did not disturb my finding that the transaction creating the Castle Harbour partnership was not a sham transaction. *Castle Harbour II*, 459 F.3d at 231 n.11.

raise capital using its fleet of aging aircraft; the transaction also allowed GECC to retire debt, thereby improving its debt-to-equity ratio, increasing liquidity, and creating borrowing capacity. *Id.* at 111.

Because the transaction that created the Castle Harbour partnership was not a sham, the relevant question under section 704(e)(1) is whether the Dutch Banks were the "real owners" of their interests in the partnership.  In other words, it is necessary for me to find whether the contribution of the Dutch Banks' capital to the partnership, as part of the creation of the Castle Harbour entity, and the concomitant interests the Banks acquired, vested dominion and control of the Banks' partnership interests in the Banks themselves.  In a meaningful sense, the question of real ownership arises only when the ownership interest has been gifted, not when it has been purchased in an arm's length transaction between unrelated entities for a significant sum of money, as were the Banks' interests here.  The question of domination and control arise with a gift, but generally not with a bona fide purchase for value.  The Treasury regulations focus on the status of the donee/donor relationship, indicating that "[t]he existence of such dominion and control in the donee is to be determined from all the facts and circumstances."  Treas. Reg. §§ 1.704-1(e)(1)(iii); 1.704(e)(2)(i) ("Whether an alleged partner who is a donee of a capital interest in a partnership is the real owner of such capital interest, and whether the donee has dominion and control over such interest, must be ascertained from all the facts and circumstances of the particular case.").  Although "[i]solated facts are not determinative," Treas. Reg. § 1.704-1(e)(2)(i), the regulations set forth a number of factors to consider.[37]  I will now address whether

---

[37] Those factors are: (1) retained controls (whether the donor may have retained such controls of the interest which he has purported to transfer to the donee that the donor should be treated as remaining the substantial owner of the interest), (2) indirect controls (whether controls

the pertinent factors enumerated in the Treasury regulations lead to a determination that the

Dutch Banks were the real owners of their interests in Castle Harbour.

As a general matter, I note that GECC did not control the Banks' interests in Castle

Harbour.  Just as general partners frequently control a partnership either wholly or nearly so,

while limited partners play a circumscribed role in the partnership's management, the Dutch

Banks did not play a large role in the management of Castle Harbour.  Here, the Dutch Banks had

the right to force liquidation of Castle Harbour if the partnership failed to make a scheduled

Exhibit E payment, consistent with the default rule that any partner can force a liquidation of the

partnership, i.e., force her investment to be returned to her (plus her gains or minus her losses).

*See* Revised Uniform Partnership Act § 801(1) (dissolution required upon notice of a "partner's

express will to withdraw as a partner").  Because the Banks had the right to force a liquidation,

GECC did not control the Banks' interests in Castle Harbour, even if GECC did primarily control

and manage the partnership.

First, the Dutch Banks participated in the management of the Castle Harbour entity.

Treas. Reg. § 1-704(e)(2)(iv).  The record evidence indicates that representatives of the Banks

participated in person at annual member meetings and by phone at quarterly manager meetings.[38]

---

inconsistent with ownership by the donee were exercised indirectly as well as directly), (3)
participation in management, (4) income distributions, (5) conduct of partnership business, (6)
trustees as partners (when a trustee may be recognized as a partner), (7) interests of minor
children (when a minor child will be recognized as a partner), (8) donees as limited partners
(when a donee's interest in a limited partnership will be recognized), and (9) motive.  Treas. Reg.
§§ 1-704.1(e)(2)(ii)-(x).

[38] As discussed above, the Dutch Banks' participation in the management of Castle
Harbour was minimal.  Nonetheless, the Banks did participate in the partnership's management.
Contrary to the Second Circuit's assertion that I "recogniz[ed] that the banks had no right to
participate in management," *Castle Harbour II*, 459 F.3d at 238, I found that the Banks had

(*See, e.g.*, July 26, Hyde, 501-03; *see also* J. Ex. 1 § 9.2 at 0101480-82)  Likewise, not only do the documents executed by the parties when forming Castle Harbour indicate that the Banks' consent was necessary for Castle Harbour to enter into certain transactions, but on at least some occasions, Castle Harbour did seek the Banks' consent before acting.  (J. Ex. 1 §§ 5.1(g) at 0101452, 5.4 at 0101455-59; July 22, Dull, 287; Pl's. Exs. 258 at 0002792-806, 82 at 0057159-76, 354 at 0024403-09, 357 at 0025335-39)   "Substantial participation by the donee in the control and management of the business . . . is strong evidence of a donee partner's exercise of dominion and control over his interest."  Treas. Reg. § 1-704(e)(2)(iv).  The record evidence supports a finding that the Dutch Banks actually participated in the control and management of Castle Harbour.  Although the Banks' participation was not "substantial," the participation was real.

Second, the Dutch Banks received distributions, for their sole use and benefit, of their distributive shares of Castle Harbour's income.  Treas. Reg. 1.704(e)(2)(v).  The Banks received those distributions regularly.  (*See, e.g.*, July 22, Dull, 342)

Third, the parties participating in Castle Harbour conducted partnership business consistently with their stated understanding that the Dutch Banks were partners.  Treas. Reg. § 1-704(e)(2)(vi); *see also Elrod v. Commissioner*, 87 T.C. 1046, 1072 (1986) ("We acknowledge that the filing of required tax returns is one of several significant factors to be considered.").  As discussed in the preceding paragraph, the Banks were entitled to, and in fact received,

---

rights to, and did, participate in the partnership's management.  *Castle Harbour I*, 342 F. Supp. 2d at 104.  Later in *Castle Harbour I*, I discussed the implications of the Dutch Banks' management rights, in the context of the general treatment of a party's interest in a partnership related to its management rights, but nowhere found or concluded that the Banks had no right to participate in Castle Harbour's management.

37

distributions of their shares of partnership profits; the Banks were also entitled to distributions of partnership property under the terms of the agreements that resulted in Castle Harbour's creation. Those written agreements set forth in great detail the rights and liabilities of Castle Harbour's putative partners to one another and to the partnership. Castle Harbour's tax returns are also consistent with the understanding that the Dutch Banks were the real owners of their interests in Castle Harbour. Indeed, if Castle Harbour and the Dutch Banks had not filed partnership tax returns that treated the Banks as partners in Castle Harbour, the present litigation would not have focused on the questions that it has.

The Banks were not guaranteed a return on their investments in Castle Harbour, they participated in the management of Castle Harbour, and received distributions of their distributive shares in Castle Harbour. Moreover, Castle Harbour's business was conducted consistently with an understanding that the Dutch Banks owned their interests in the business entity, and consistently with the Castle Harbour partnership agreement that allowed the Banks to force liquidation of the partnership. For these reasons, the Dutch Banks were the real owners of their interests in Castle Harbour for purposes of section 704(e).

> 2. *Were the Dutch Banks' Interests in Castle Harbour Capital Interests?*

Having addressed the question whether the Dutch Banks' owned their interests in Castle Harbour, I turn to the question whether those interests were capital interests. Treasury regulations define a "capital interest" as follows:

> For purposes of section 704(e), a capital interest in a partnership means an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his withdrawal from the partnership or upon liquidation of the partnership. The mere right to participate in the earnings and profits of a partnership is not a capital interest in the partnership.

As the Tax Court has held, a "capital interest" is distinguished from a "profits interest." "A capital interest is an interest that includes the right to share in the capital of a partnership upon liquidation.  A profits interest is a right to share in the profits and losses of a partnership, but not to share in its capital." *Johnston v. Commissioner*, 69 T.C.M. (CCH) 2283, 2296 n.5 (1995).  A capital interest holder may share in a partnership's profits and losses, but if a party does not have the right to share in a partnership's capital, he cannot be considered a capital interest holder. *Id.*

In determining whether a party to a partnership is a capital interest holder or instead holds a profits interest, courts have applied a "hypothetical liquidation" test to determine whether an interest is a capital interest. *See* W. McKee, W. Nelson & R. Whitmire, *Federal Taxation of Partnerships and Partners*, Vol. 1, ¶ 5.05[1], p. 5-22 ("[A] capital interest is defined as any interest which would entitle the holder to receive a share of partnership assets upon a hypothetical winding up and liquidation of the partnership immediately following acquisition of the interest . . . "), *quoted in Mark IV Pictures, Inc. v. Commissioner*, 60 T.C.M. (CCH) 1171, 1176 (1990)*, aff'd*, 969 F.2d 669, 674 (8th Cir. 1992).  Here, because GECC liquidated the Dutch Banks' interests in Castle Harbour on December 31, 1998, I not only look at the outcome of a hypothetical liquidation of the Banks' interests, but also the actual liquidation that occurred.

As discussed above, after changes in U.S. tax law provided that Castle Harbour would no longer be treated as a partnership, GECC liquidated the Dutch Banks' interests.  At that time, the Banks' capital accounts were liquidated.  At the time of the buyout, the Dutch Banks' capital accounts had a cumulative positive balance of approximately $31 million.  The Banks received that $31 million for their capital interests in the partnership.

Although the Banks' capital accounts reflected, to a large extent, the Banks' share of the

profits and losses of Castle Harbour, their initial capital investments in the partnership (and their share in the partnership's capital over the course of the partnership's existence) was also maintained in those capital accounts.  Each year the Dutch Banks had their capital accounts debited or credited, depending on whether the partnership received a gain or suffered a loss, and each year the Dutch Banks had a significant portion of their ownership interests bought out by the partnership in the form of Exhibit E payments.  Importantly, although the Exhibit E payments reduced the Banks' share of the partnership's capital, the possibility still existed that, as holders of capital interests in Castle Harbour, the capital accounts of the Dutch Banks would be negative upon dissolution.  In that case, the Banks would have owed money to the partnership.[39]  (Op. Agmt. §§ 12.2-12.3; J. Ex. 1 at Bates 101492-93)  Put differently, although upon liquidation the Banks' return on their investment in Castle Harbour depended in large part on Castle Harbour's gains and losses over the course of the partnership's existence, the Banks' ultimate payout – the amount in their capital accounts – was tied to their share of the partnership's capital.  Although the Banks' share of the partnership's capital was not static and decreased over time due to scheduled Exhibit E payments, the Banks' capital accounts reflected their capital stake in Castle Harbour.  That fact is evident in the Banks' receipt of $31 million from their capital accounts upon liquidation.  Although those capital accounts were in fact positive upon liquidation, that result was not pre-ordained, and the risk of negative capital accounts existed.  In any event, the

---

[39] In *Castle Harbour II*, the Second Circuit indicated that the Banks' investment accounts "kept track of the minimum balance that the Dutch banks would receive upon dissolution."  459 F.3d at 227.  However, as explained above, the Banks would receive payout of their *capital* accounts on liquidation, which reflected their capital stake in Castle Harbour, as opposed to payout of the *investment* accounts, which reflected the Banks' total stake in the partnership (including *inter alia* the Class A Guaranteed Payment in the event of certain Operating Losses).

Banks' capital accounts (which reflected their capital interests in Castle Harbour) – and any payments that the Banks would and did receive from those accounts upon liquidation – depended on the performance of Castle Harbour as a whole.

Despite their actual positive performance, the Banks incurred real risk that their capital accounts would run negative; the performance guarantee of GECC did not insulate the Dutch Banks against loss of their capital investment in the partnership.  The terms governing the Class A Guaranteed Payment guaranteed that TIFD III-E, TIFD III-M, and the managers of Castle Harbour would perform their obligations under the partnership agreement, but did not in any way insulate the Dutch Banks from the possibility of losses in excess of their capital investments.  (J. Ex. 1 § 1.10 at Bates 101405-07; J. Ex. 3 § 2 at 0099405)  To the extent that the Banks' losses would be covered through the Class A Guaranteed Payment, those losses could only be covered by partnership capital; accordingly, the Dutch Banks' return on their capital investment (and risk of loss) was tied to the availability of partnership capital.  *Id*.

Additionally, in the event that TIFD III-E and TIFD III-M were allocated $541.5 million or more in losses, the Castle Harbour Operating Agreement allocated to the Dutch Banks 100% of all losses until the Banks' capital accounts were reduced to zero.  *Castle Harbour I*, 342 F. Supp. 2d at 102 n.18.  At that point, when the Banks' stake in Castle Harbour's capital likewise would have been reduced to zero, the Banks would have received nothing upon liquidation.

Because, upon liquidation, the Dutch Banks were paid out of their capital accounts, which reflected their stake in Castle Harbour's capital, and were not instead limited to sharing in the profits and losses of the partnership, the Banks' interests in Castle Harbour were capital interests. Although in actuality, the Banks' capital accounts were positive upon liquidation and accounted

for $31 million in payments to the Banks, that amount would have fluctuated (and might have been negative) had Castle Harbour, as a whole, performed differently.

>    3.    *Was capital a material income-producing factor in Castle Harbour?*

Under the Treasury Regulations,

>    Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business conducted by the partnership.  In general, capital is not a material income-producing factor where the income of the business consists principally of fees, commissions, or other compensation for personal services performed by members or employees of the partnership.  On the other hand, capital is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or a substantial investment in plant, machinery, or other equipment.

Treas. Reg. § 1.704-1(e)(1)(iv).  As the record evidence indicates, not only was capital *a* material income-producing factor in Castle Harbour, capital was the *only* material income-producing factor.  Castle Harbour, when formed, owned 63 aircraft; in addition, the Dutch Banks and other parties to Castle Harbour contributed approximately $364 million in capital.  J. Ex. 1 §§ 2.1-2.3 at 010430-32.  Castle Harbour did not generate fees or commissions; instead, Castle Harbour generated income through leasing commercial aircraft.

The government argues that, although capital was a material income-producing factor for the partnership, the Dutch Banks' capital contributions were not income-producing.  Instead, the government argues that the Banks' capital participation in Castle Harbour handicapped the partnership's ability to produce income due to the requirement that CHLI protect an amount equal to 110% of the Banks' partnership contribution.

The government's argument fails for two main reasons.  First, the only authority that the

42

government cites in support of its contention that the Dutch Banks were not partners under

section 704(e) because the Banks' capital contributions did not help Castle Harbour produce

income is *Poggetto v. United States*, 306 F.2d 76, 79 (9th Cir. 1972).  *Poggetto* considered a

partnership that principally generated revenue through sales commissions.  After operating with

minimal capital for several years, the taxpayers' daughter contributed capital in exchange for an

interest in the partnership.  The Ninth Circuit in that case ruled against the taxpayers, holding that

the daughter was not a partner for tax purposes because her capital investment served no non-tax

business purpose in her parents' partnership.  "Her capital contribution was not made to meet the

needs of or to benefit the Sales Division, but was merely a part of appellants' efforts to have

Marian considered a member of the partnership for income tax purposes."  *Id*.

　　　　The partnership at interest in *Poggetto* was non-capital intensive and primarily generated

income through sales commissions.  The Treasury regulation expressly excludes such

partnerships.  Treas. Reg. § 1.704-1(e)(1)(iv) ("In general, capital is not a material

income-producing factor where the income of the business consists principally of fees,

commissions, or other compensation for personal services performed by members or employees

of the partnership.").  The partnership in *Poggetto* operated for several years on $500 worth of

capital prior to the daughter's $5,000 capital contribution that precipitated the *Poggetto* litigation.

　　　　In the case of Castle Harbour, capital was used to purchase commercial jets for leasing;

the partnership generated revenue by employing its captial, rather than through sales

commissions or any other non-capital intensive methods, as in *Poggetto*.  Moreover, where the

*Poggetto* daughter sought tax advantages ostensibly warranted by her capital contribution, the

Dutch Banks are not taxed and therefore did not seek any tax benefit that derived from

43

contributing capital to Castle Harbour.  Although the partnership's tax liability was greatly

reduced by the Banks' participation in the partnership, the Banks were not taxed prior to their

capital contribution; their tax status remained unchanged.

Second, it is undisputed that "a substantial portion of the gross income of [Castle

Harbour] [wa]s attributable to the employment of capital in the business conducted by the

partnership." Treas. Reg. § 1.704-1(e)(1)(iv).  Accordingly, the third prong of the section

704(e)(1) test is satisfied by agreement of the parties.  The Treasury regulation looks to whether

the gross income of the business, rather than a particular participating partner's capital

contribution, is income-producing.  The government's argument relies upon a new "test"

inconsistent with the Treasury regulation and unsupported by any case law.[40]  I decline to adopt

it, and instead find that capital was a material income-producing factor for Castle Harbour.

     C.     The Relationship Between Section 704(e)(1) and *Culberston*

In *Castle Harbour II*, the Second Circuit held that the Dutch Banks were not bona fide

equity participants in the Castle Harbour partnership under the totality-of-the-circumstances test

set forth in *Culbertson*.  The parties dispute the extent to which Congress abrogated or limited

*Culbertson* when it enacted section 704(e)(1), and accordingly whether "*Culbertson* is still good

law." *Atlas v. United States*, 555 F. Supp. 110, 114 (N.D. Ill. 1982).

Case law discussing the relationship between section 704(e)(1) and *Culbertson,* including

---

[40] Put differently, it does not matter whether the Banks' capital *contributions* were
income-producing.  The test is whether capital is "*a material income-producing factor*" of the
*partnership*.  I.R.C. § 704(e)(1) (emphasis added); *see* Treas. Reg. § 1.704-1(e)(1)(iv) ("a
substantial portion of the gross income of the business" is attributable to capital).  Neither the
statute nor the regulations require that every capital contribution eventually produce income in
order for section 704(e)(1) to apply.

*Atlas*, suggests that section 704(e)(1) may have abrogated *Culbertson* and replaced its totality-of-the-circumstances test.  Even if it did not, the case law indicates that section 704(e)(1) provides an alternative test that parties to a partnership in which capital is a material income-producing factor may use to determine treatment of their partnership interests for tax purposes.  In other words, even if section 704(e)(1) did not abrogate *Culbertson*, it is nevertheless possible for an entity not to qualify as a partner under *Culbertson* and still to qualify as a partner in a partnership under section 704(e)(1).[41]

In *Pflugradt v. United States*, 310 F.2d 412 (7th Cir. 1962), the Seventh Circuit held that four infant children were not owners of capital interests in a partnership based on a variety of factors including the lack of a fiduciary being appointed to manage interests for the sole benefit of the minors and the invasion of the children's funds by their parents to pay items of support. The *Pflugradt* Court came to its conclusion after applying the section 704(e)(1) test, described above, rather than *Culbertson*, stating that "[Section 704(e)(1)] commands that these minor children are to be recognized as partners if they own a capital interest in the partnership.  The test is no longer whether the parties acted in good faith with a business purpose in joining together to conduct the partnership business.  This was the test set forth in *Commissioner v. Culbertson*, which was decided before present § 704(e)(1) was a part of the Code."  310 F.2d at 415 (internal citation omitted).

Similarly, the Seventh Circuit later re-affirmed in *Evans v. Commissioner*, 447 F.2d 547,

---

[41] In *Castle Harbour II*, the Second Circuit held that under *Culbertson* the Banks were not bona fide equity participants in Castle Harbour, and left open the question whether the Banks were partners in Castle Harbour under section 704(e).  459 F.3d at 241 n.9.  I do not understand the Second Circuit to have held that, if any test is unfavorable to the taxpayer, all alternative tests are irrelevant.  If that were the case, remand would have been unnecessary.

550 (7th Cir. 1973), that:

> Under I.R.C. § 704(e)(1) the corporation as owner of a capital interest in a partnership in which capital is a material income-producing factor is recognized for federal tax purposes as a partner . . . . [A] person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person. . . . If the corporation's ownership is real then the subjective intent of the parties is not a determinative test.

*Id*.  In the Seventh Circuit, the section 704(e)(1) test has replaced *Culbertson*; "[t]he test is no longer whether the parties acted in good faith with a business purpose in joining together to conduct a partnership business."  *Id*. (quoting *Pflugradt*, 310 F.2d at 415).  Others have reached the same conclusion.  *Bateman v. United States*, 490 F.2d 549, 555 (9th Cir. 1973) (Wright, J., dissenting) (indicating that section 704(e)(1) overruled *Culbertson*); *Carriage Square, Inc. v. Commissioner*, 69 T.C. 119 (1977) (after first considering whether capital was a material income-producing factor in partnership, the Tax Court decided that it was not and section 704(e)(1) therefore did not apply; only then did the Tax Court apply *Culbertson*).

Even *Atlas*, which the government cites for the proposition that *Culbertson* still applies in this case, suggests that section 704(e)(1) provides, at least, an alternative test.  In *Atlas*, the district court applied section 704(e)(1).  After determining that *Culbertson* is still good law, the *Atlas* court clarified that "the Code's present section 704(e)(1) replaced [*Culbertson*'s] 'good-faith/business purpose' test in force in 1949 with the 'ownership of a capital interest' test." *Atlas*, 555 F. Supp. at 114.  The government has cited to no authority, and I am not aware of any, suggesting that either: (1) where capital is a material income-producing factor in a partnership, *Culbertson*'s totality-of-the-circumstances test should apply instead of section 704(e)(1), or (2) if a party is not a partner in a partnership under *Culbertson*, then section 704(e)(1) cannot apply and

the party cannot be treated as a partner for tax purposes under that section.

      D.    <u>Conclusion</u>

The Second Circuit's *Castle Harbour II* decision left open the question whether, although the Dutch Banks were not partners in Castle Harbour under *Culbertson*, the Banks "shall be recognized as [partners] for purposes of [section 704(e)]" because they owned "a capital interest in a partnership in which capital is a material income-producing factor."  I.R.C. § 704(e)(1).  The Dutch Banks satisfy both the plain language of the statute and the standards set forth in the Treasury regulations relating to section 704(e).  For the reasons discussed above, the Banks were owners of capital interests in Castle Harbour, a partnership in which capital was a material income-producing factor.  Accordingly, the Dutch Banks were partners in Castle Harbour, and their interests in Castle Harbour should be treated as partnership interests for tax purposes.

## III.    Discussion of Penalties

Because I hold in the taxpayer's favor on the section 704(e)(1) question, I do not need to address the government's arguments concerning penalties to impose upon the taxpayer; the disputed tax liability is not due, therefore no penalties on that amount can accrue.  However, in the interest of avoiding another remand in the event the Second Circuit disagrees, I address the penalty issue now.

The government argues that, should the Dutch Banks' interest in Castle Harbour ultimately be treated as debt for tax purposes, and should the GECC subsidiaries ultimately bear tax liability, a negligence penalty or a substantial understatement penalty should lie against the taxpayer.

As an initial matter, the parties here agree that any penalty determinations relating to the

years 1993 through 1996 are properly resolved at separate partner-level proceedings (that is,

proceedings concerning each partner's tax liability), and that the only penalty questions before

me relate to the tax years 1997 and 1998.  At the time of Castle Harbour's formation, Section

6662 of the Internal Revenue Code, titled "Imposition of accuracy-related penalty on

underpayments," provided in relevant part that:[42]

> (a) Imposition of penalty.--If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

> (b) Portion of underpayment to which section applies.--This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

>> (1) Negligence or disregard of rules or regulations.

>> (2) Any substantial understatement of income tax. . . .

> (c) Negligence.--For purposes of this section, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard.

> (d) Substantial understatement of income tax.--

>> (1) Substantial understatement. . . .

>> (2) Understatement. . . .

>>> (B) Reduction for understatement due to position of taxpayer or disclosed item.--The amount of the understatement . . . shall be reduced by that portion of the understatement which is attributable to--

>>>> (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

---

[42] Amendments to the Internal Revenue Code in 1994 changed certain language in this section, including removal of the "reasonable belief" defense in cases involving tax shelters.  The government has acknowledged that the 1994 amendments apply to transactions entered into on or after December 9, 1994, and therefore those amendments do not apply to the Castle Harbour transaction.  Govt. Br. on Penalties at 9 n.8.

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

(C) Special rules in cases involving tax shelters.--

(i) In general.--In the case of any item attributable to a tax shelter--

(I) subparagraph (B)(ii) shall not apply, and

(II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.

(ii) Tax shelter.--For purposes of clause (i), the term "tax shelter" means--

(I) a partnership or other entity,

(II) any investment plan or arrangement, or

(III) any other plan or arrangement,

if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.

I.R.C. § 6662, *codified at* 26 U.S.C. § 6662 (1993).  Accordingly, with regard to the tax years at issue, I must determine: (1) whether a substantial understatement penalty should apply due to a lack of substantial authority for treating the Banks as partners, (2) whether a substantial understatement penalty should apply because Castle Harbour was a tax shelter, and (3) whether the negligence penalty should apply due to a lack of a reasonable basis for Castle Harbour's decision to treat the Banks as partners.

A.    <u>Did Substantial Authority Support Castle Harbour's Treatment of the Dutch Banks as Partners?</u>

49

If substantial authority supported the tax treatment of the Dutch Banks as partners in Castle Harbour, the substantial understatement penalty would not apply unless Castle Harbour was a tax shelter within the meaning of section 6662.  Under the Treasury Regulations, "[t]he substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts.  The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard . . . ."  Treas. Reg. § 1.6662-4(d)(2).  "There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. . . . There may be substantial authority for more than one position with respect to the same item. . . ."  *Id*. at § 1.6662-4(d)(3).  Under the regulations, then, a taxpayer may demonstrate substantial authority underlying a tax position even if that position is ultimately held to be wrong.  Ostensibly, substantial authority could have supported Castle Harbour's tax treatment of the Dutch Banks' interest as equity while, at the same time, substantial authority would have also supported Castle Harbour's tax treatment of the Banks' interest as debt.  *See Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 201 (D. Conn. 2004) (discussing "substantial authority" standard under the Treasury Regulations).

To a large extent, my holding in *Castle Harbour I* in favor of the taxpayer demonstrates the substantial authority for the partnership's tax treatment of the Dutch Banks, as does my discussion above of the Dutch Banks' interest in Castle Harbour under section 704(e)(1).  In addition, the government's arguments against the substantial authority defense are unavailing.

50

Since *Culbertson*, courts in the Second Circuit have consistently held that, if a partnership has economic substance or a valid business purpose, parties to that partnership are partners and should be treated as having equity interests for tax purposes.  For instance, in *Slifka v. Commissioner*, 182 F.2d 345 (2d Cir. 1950), the Second Circuit affirmed the Tax Court's holding that joint venturers had not formed a partnership and framed the *Culbertson* test as "whether an association, or joint venture, which satisfies all formal requirements and may be valid as between the parties, has been created to promote the conduct of their business in any other way than by reducing taxes.  That this makes motive a test of taxability is true enough; but it is equally true that it makes it so only when the reduction of taxes is the sole motive.  That does not mean that 'business' may not be so conducted as best to keep down taxes . . . ."  182 F.2d at 346.  Four years later, in *Dyer v. Commissioner*, 211 F.2d 500 (2d Cir. 1954), the Second Circuit reversed a Tax Court ruling that had held certain assignments of interests in a partnership to be ineffective.  In doing so, the *Dyer* court held *Culbertson* to require "an explicit finding, as a fact, of lack of good faith intention before an apparently valid joint venture agreement could be ignored."  211 F.2d at 506.

The government argues that *Culbertson* and Second Circuit cases like *Slifka* and *Dyer* that interpreted *Culbertson* cannot provide substantial authority for the partnership's tax position because the Second Circuit held in *Castle Harbour II* that the Dutch Banks were not partners under *Culbertson*.  The government, however, has not pointed to any Second Circuit case or other authority, prior to 1997 and 1998 when the Castle Harbour partners took the tax positions at issue, where the parties' good faith intention or valid business purpose in forming a partnership was not sufficient to support a conclusion of partnership status for tax purposes.  As

51

the regulations cited above make clear, the Second Circuit's ruling against the taxpayer in *Castle Harbour II* does not compel a conclusion that no substantial authority supported the taxpayer's prior position; substantial authority did support a finding that the Dutch Banks' interests should be treated as debt for tax purposes under *Culbertson* or as equity.  The *Castle Harbour II* Court's holding that the Banks' interest was not "bona fide equity participation," a phrase that exists nowhere in the case law prior to *Castle Harbour II*, did not include a conclusion that the Dutch Banks' interest was not equity and was in fact debt (only that it was substantially debt-like in nature).

The Second Circuit's holding that the IRS "is entitled in rejecting a taxpayer's characterization of an interest to rely on a test less favorable to the taxpayer, even when the interest has economic substance," *Castle Harbour II*, 459 F.3d at 231, states a novel proposition of law.  The Second Circuit is certainly entitled to establish as the law of this Circuit a holding that a partnership that meets the formal definition of a partnership, passes the "sham transaction" test, and passes the "sham entity" test, *cf. Culbertson*, 337 U.S. at 741 (whether a partnership "is real for income-tax purposes depends upon whether the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both"), can still be rejected as a partnership interest by the IRS.  The relevant point for present purposes is that the holding of *Castle Harbour II* was not the established law of this Circuit prior to 1998, and that *Slifka* and *Dyer* are long-standing rulings that are still good law and support treatment of the Banks as partners under *Culbertson*.

The government has pointed to no case where joint venturers were held not to be partners despite a valid business purpose or good faith intention, and none of the cases the government

52

cites to would support such a holding.  First, *Culbertson* stated plainly that "[t]he question is . . . whether . . . the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."  *Culbertson*, 337 U.S. at 742.  Here, the Second Circuit did not disturb my factual finding that the transactions resulting in the formation of Castle Harbour were not sham transactions; neither did the Second Circuit disturb my factual findings that valid business purposes, such as improving GECC's debt-to-equity ratio, factored into the relationships that the various Castle Harbour entities entered into.

Second, in *O'Hare v. Commissioner*, 641 F.2d 83 (2d Cir. 1981), the Second Circuit upheld the Tax Court's determination that a title holder to property, who faced some financial exposure but who never intended to buy or own the property in question in his own right, could not convert his role as guarantor of a loan to that of joint venturer for tax purposes (thereby converting his fees as guarantor into capital gains from the sale of the property).  There is no suggestion in *O'Hare* that the taxpayer's attempt to convert his status into that of a joint venturer was done for any purpose other than the tax benefits to the taxpayer.  In contrast, Castle Harbour's business organization presented a creative solution to GECC's problems borrowing money and raising capital that were posed by ownership of an aging fleet of commercial aircraft. Here, where the Castle Harbour partnership arrangement served valid business purposes, the parties dispute whether the Dutch Banks acted more like lenders or equity holders in meeting those valid business purposes.

Third, and fourth, the government relies on *John Kelley Co. v. Commissioner*, 326 U.S. 521 (1946), and *Gilbert v. Commissioner*, 248 F.2d 399 (2d Cir. 1957), two cases that the Second Circuit discussed in support of its conclusion that the Dutch Banks' interest in Castle Harbour

53

was akin to debt rather than to equity.  Neither case suggests that parties who entered into business relationships ostensibly as partners with valid business purposes or good faith intentions should be treated as creditors for tax purposes.

To the extent that *O'Hare*, *Kelley*, and *Gilbert* address the question when a party's interest should be treated as debt rather than equity for tax purposes, none leads to a conclusion that no substantial authority supported the treatment of the Dutch Banks' interests in Castle Harbour as partnership interests under section 704(e)(1).  As discussed in more detail above, the debt-like nature of the Banks' interests in no way precludes a holding that, like holders of preferred stock, the Dutch Banks held partnership interests in a business organization, albeit in the form of debt-like instruments.  *See, e.g., Jewel Tea*, 90 F.2d at 452 ("it would be possible to treat preferred shares like debts. . . . [T]he law might well have insisted upon it.  It has not; on the contrary it has always distinguished between creditors and preferred shareholders . . . ."); *O.P.P. Holding Corp.*, 76 F.2d at 13 ("Though both [preferred stock certificates and debenture bonds] contain substantially similar provisions . . . it is not inconsistent to hold that only in the case of certificates designated as bonds were the holders intended to be creditors of the corporation . . . .").

Again, the question before me concerning penalties is whether substantial authority supported treating the Dutch Banks as partners in Castle Harbour.  As *Jewel Tea* and *O.P.P. Holding Corp.* demonstrate, courts have historically treated debt-like interests, in the form of preferred stock, as equity for tax purposes.  Any argument that, in light of the *Castle Harbour II* conclusion that the Banks' interests were akin to debt, there was no substantial authority to believe they were nevertheless partners, is unavailing.  The government has cited no decision

54

from any court holding that an entity that purchased an interest in a purported partnership for substantial consideration did not qualify as a partner under section 704(e)(1).  For the reasons discussed earlier in this opinion, I conclude the Dutch Banks were partners under section 704(e)(1) of the Internal Revenue Code.  Without repeating that entire discussion here, even if the Second Circuit were to find my legal conclusion above in error and the question of penalties were to arise, substantial authority supports treating the Dutch Banks as partners in Castle Harbour, and the substantial underpayment penalty should not be assessed.

      B.     <u>Was the Castle Harbour Transaction a Tax Shelter?</u>

A "substantial authority" defense is not available to the taxpayer if Castle Harbour was a tax shelter under I.R.C. § 6662 and the governing Treasury regulations.  Those regulations define a "tax shelter" as any partnership or other entity, investment plan or arrangement, or any other plan or arrangement,

> if the principal purpose of the entity, plan or arrangement, based on objective evidence, is to avoid or evade Federal income tax.  The principal purpose of an entity, plan or arrangement is to avoid or evade Federal income tax if that purpose exceeds any other purpose.  Typical of tax shelters are transactions structured with little or no motive for the realization of economic gain, and transactions that utilize the mismatching of income and deductions, overvalued assets or assets with values subject to substantial uncertainty, certain nonrecourse financing, financing techniques that do not conform to standard commercial business practices, or the mischaracterization of the substance of the transaction.  The existence of economic substance does not of itself establish that a transaction is not a tax shelter if the transaction includes other characteristics that indicate it is a tax shelter.

Treas. Reg. § 1.6662-4(g)(2)(i).  The regulations go on to define "principal purpose."  "The principal purpose of an entity, plan or arrangement is not to avoid or evade Federal income tax if the entity, plan or arrangement has as its purpose the claiming of exclusions from income, accelerated deductions or other tax benefits in a manner consistent with the statute and

Congressional purpose. . . ." *Id.* at § 1.6662-4(g)(2)(ii).

The Second Circuit, in *Castle Harbour II*, did not disturb my factual findings that, despite Castle Harbour effectively sheltering significant income from taxes, the partnership had "bona fide purposes" and "some genuine economic effect." *Castle Harbour II*, 459 F.3d at 224. Nowhere in *Castle Harbour I* or *Castle Harbour II* is there a factual finding or legal conclusion that tax savings were the principal purpose of the Castle Harbour transaction.  Along with the testimony of five GECC executives that "demonstrating liquidity" and "monetizing" Stage II aircraft were important motivations underlying the formation of Castle Harbour, the objective economic reality of the Castle Harbour transaction supports a conclusion that the partnership was not principally tax-motivated.  It is undisputed that GECC raised $117 million and increased its liquidity by retiring debt through Castle Harbour's formation and functioning.  Moreover, Castle Harbour claimed tax benefits in a manner consistent with the statutes then in effect. Accordingly, the partnership was not a tax shelter under section 6662 and its governing regulations, and a substantial understatement penalty is not warranted.  Because the partnership was not a tax shelter, I do not reach the question of whether a "reasonable belief" defense shields the Castle Harbour partners from tax shelter liability.

        C.      <u>Did Castle Harbour Have a Reasonable Basis for Treating the Dutch Banks as Partners?</u>

Under I.R.C. § 6662(b)(1), penalties may be imposed against the taxpayer if underpayment of taxes occurred as a result of "negligence or disregard of rules or regulations." The governing regulations state that "[a] return position that has a reasonable basis . . . is not attributable to negligence."  Treas. Reg. § 1.6662-3(b)(1).  The "reasonable basis" standard is a

less stringent standard than "substantial authority" standard.  *Id.* at §§ 1.6662-3(b)(3), 1.6662-4(d)(2).  Because, as discussed above, substantial authority supported treating the Dutch Banks as partners in Castle Harbour, a reasonable basis for that tax treatment necessarily existed as well. Accordingly, a negligence penalty does not apply.

## IV.   Conclusion

For the reasons discussed above, the Banks were owners of a capital interest in Capital Harbour, a partnership in which capital was a material income-producing factor.  Accordingly, the Dutch Banks were partners in Castle Harbour, and their interests in that partnership should be treated as such under section 704(e).

Even if the Dutch Banks are later held not to have been partners in Castle Harbour, the partnership's tax position treating the Banks as partners was supported by substantial authority and a reasonable basis.  Accordingly, penalties against the taxpayer are unwarranted.

Castle Harbour properly allocated income among its partners and the final partnership administrative adjustments issued by the I.R.S. were in error.  The I.R.S. is hereby ordered to refund to TIFD III-E the total amount of TIFD III-E's jurisdictional deposit, plus any interest called for by 26 U.S.C. §§ 6226 and 6611.

The clerk shall enter judgment in favor of the plaintiff and shall close this file.

It is so ordered.

Dated at Bridgeport, Connecticut this 23rd day of October 2009.

/s/ Stefan R. Underhill
        Stefan R. Underhill
        United States District Judge

57